## ARGUMENT

### I. THE DISCOVERY TO DATE HAS PROVIDED FULL AND COMPLETE DISCLOSURE REGARDING THE REINSURANCE AGREEMENT.

Plaintiff first sought discovery from Educators regarding the reinsurance agreement on December 6, 2002, in her Interrogatories and Requests for Production.[2] Educators produced numerous documents responsive to these requests.

On April 15, 2003, Plaintiff noticed the deposition of Educators' corporate representative with knowledge of the "negotiation and execution of the reinsurance agreement signed in July, 1999 between the defendants, including the selection of claimants subject to the agreement."[3] Educators designated two corporate representatives to testify regarding these topics. On May 13, 2003, Plaintiff deposed Kimberly Rankin, a vice president and corporate secretary for Educators, and Kenneth Wasnock, the life and disability claim manager for Educators.

Mr. Wasnock testified regarding Educator's transfer of the physical claim files and responsibility for the administration of the claims subject to the reinsurance agreement to Hartford.[4] He also testified that Educators advised Plaintiff and other claimants subject to the reinsurance agreement that Hartford would be responsible for the administration of their claims after August 1999.[5] He further testified that Educators had no communications with Hartford regarding Plaintiff's specific claim.[6]

Ms. Rankin testified that by executing the reinsurance agreement Educators ceded 100 percent of the liability for and the administration of the block of claims subject to the agreement

---

[2] A true and correct copy of Plaintiff's Interrogatories and Requests for Production are attached as Exhibit B.

[3] A true and correct copy of the April 15, 2003 Notice of Deposition is attached as Exhibit C.

[4] True and correct copies of excerpts from Kenneth Wasnock's deposition, taken on May 13, 2003, at 45:16-23, 69:7-70:4, is attached as Exhibit D.

[5] *Id.* at 69:24- 72:8.

[6] *Id.* at 74:9-23.

to Hartford.[7] She also testified that Plaintiff's claim was not specifically chosen to be part of the reinsurance agreement; instead, Educators sold all of its professional association claims to Hartford, regardless of the size of the claims.[8]

On May 24, 2003, Plaintiff served Hartford with a Notice of Deposition for Hartford's Corporate Representative.[9] In the deposition notice, Plaintiff requested that Hartford designate a person to testify to "due diligence review and actuarial review and claim review of the Educators Mutual files which were subject to the bid submitted by the plaintiff, including all actions taken after August 1999" and "the relationship with Educators Mutual and the preparation of the bid to enter into the "Reinsurance Agreement" of July, 1999, as well as "any communications with insureds about the relationship after July 1999." Hartford designated Pamela Mormino, who gave her deposition on July 28, 2003. At that deposition, Ms. Mormino testified that under the reinsurance agreement Hartford had 100 percent of the liability and the risk on the claims subject to the agreement and that Educators had zero liability for the claims.[10] Ms. Mormino also testified that Hartford informed the claimants subject to the reinsurance agreement that Hartford was administering claims on behalf of Educators because the claims were still on Educators' paper—i.e., subject to Educators' disability policy.[11]

On September 13, 2003, Plaintiff served Educators with Requests for Admissions seeking admissions regarding topics relating to the reinsurance agreement.[12] Educators responded to the requests on October 13, 2003.[13]

---

[7] True and correct copies of excerpts of Kimberly Rankin's deposition, taken on May 13, 2003, at 13:17-14:7, 19:3-11, 50:2-51:22, are attached as Exhibit E..

[8] *Id.* at 33:22-35:3.

[9] A copy of the Amended Notice of Deposition is attached as Exhibit F.

[10] True and correct copies of excerpts from Pamela Mormino's July 28, 2003 deposition, at 98:23-100:12, are attached as Exhibit G.

[11] *Id.* at 99:5-100:12.

[12] A true and correct copy of Plaintiff's Request for Admissions is attached as Exhibit H.

On October 16, 2003, Plaintiff noticed yet another deposition of a corporate representative of Educators with knowledge of the basis for Educators' denials to Plaintiff's Requests for Admissions.[14] Plaintiff's requests seek admissions regarding the nature of the reinsurance agreement, the transfer of files from Educators to Hartford, and communications between Educators and Plaintiff or Educators and Hartford, all topics upon which Mr. Wasnock and Ms. Rankin were previously designated to testify or for which they have already given testimony. Plaintiff had the opportunity to obtain testimony from these individuals regarding these topics; she is not entitled to a second bite at the apple.

## II. GOOD CAUSE EXISTS FOR PREVENTING PLAINTIFF FROM CONDUCTING A SECOND DEPOSITION OF EDUCATORS.

Good cause exists for a protective order preventing Plaintiff from conducting a second deposition of Educators because the deposition will be duplicative of discovery previously taken and the burden and expense of the deposition outweighs any benefit Plaintiff may. FED. R. CIV. P. 26(c); FED. R. CIV. P. 26(b)(2).

Educators and Hartford have produced all the documents relevant to the reinsurance agreement in their possession; both defendants responded to written discovery about the reinsurance agreement; both defendants designated witnesses who testified regarding the reinsurance agreement.

Plaintiff seeks to depose Educators a second time regarding denials made in response to her Requests for Admissions, which encompass topics relevant to the reinsurance agreement. These are the same topics Educators' corporate representatives have already testified about or about which they were designated by Educators to testify. Plaintiff is not entitled to take

---

[13] A true and correct copy of Educators' Answers and Objections to Plaintiff's Request for Admission is attached as Exhibit I.

[14] See Exhibit A.

cumulative and duplicative depositions merely because she did not avail herself of the opportunity to fully question these witnesses in their depositions.[15]

Ms. Rankin and Mr. Wasnock testified for an entire day on Educator's behalf on May 24, 2003. Now Plaintiff seeks to depose Educators on topics that were covered, or could have been covered, in the first depositions. Plaintiff has offered no justification for requiring defendants to bear the burden or expense of discovery Plaintiff could have taken but did not. Permitting Plaintiff to re-depose Educators under these circumstances would set a precedent permitting any party to redepose a witness on the thin ground that he or she wants to ask more questions. The Federal Rules do not permit a party to shift the burden of its own oversight to another party.

### III.   THE DEPOSITION NOTICE SHOULD BE QUASHED BECAUSE PLAINTIFF DID NOT SEEK LEAVE TO RE-DEPOSE EDUCATORS.

Plaintiff did not seek leave from the Court to re-depose Educator's corporate representatives. FED. R. CIV. P. 30(a)(2)(B). Rule 30(a)(2)(B) provides: "a party must obtain leave of Court . . . if, without written stipulation of the parties . . . (B) the person to be examined already has been deposed in the case."

On May 24, 2003, Educators presented two witnesses to testify on its behalf in response to Plaintiff's 30(b)(6) deposition notice. On October 16, 2003, Plaintiff noticed Educators' deposition yet again, on topics upon which Educators had already designated its corporate representatives to testify in the previous deposition. Plaintiff failed to seek leave of court before noticing the second deposition, and therefore, the notice should be quashed. *Ameristar Jet*

---

[15] Plaintiff's counsel asserts he is seeking a deposition regarding the admission responses because Educators objected to responding to his Fourth Set of Interrogatories. A true and correct copy of the October 16, 2003 letter is attached as Exhibit J. Educators objected, in part, to responding to Plaintiff's Fourth Set of Interrogatories, which sought information regarding Educators' denials to Plaintiff's Request for Admissions, because Plaintiff had already served Educators with 44 Interrogatories prior to her Fourth Set. This number far exceeds the 25 interrogatories allowed by Rule 33 of the Federal Rules of Civil Procedure. Further, Plaintiff never sought leave from the Court to serve interrogatories upon Educators in excess of the number allowed by the rules. In any event, Plaintiff could have questioned Educator's corporate representatives in their depositions regarding the question on which she now seeks discovery.

*Charter, Inc. v. Signal Composites, Inc.*, 244 F.3d 189, 192-93 (1st Cir. 2001) (upholding district court's order quashing second deposition notice issued to corporate defendant because plaintiff failed to seek leave of court); *Innomed Labs, LLC v. Alza Corp.*, 211 F.R.D. 237, 240-41 (S.D.N.Y. 2002) (quashing deposition notice issued to corporate defendant for failure to seek leave).

## IV.    CERTIFICATE OF COMPLIANCE

In accordance with Local Rule 37(a)(2), counsel for Educators attempted to confer with Plaintiff's counsel in connection with the subject matter of this motion.[16] The parties could not reach an agreement as to the subject matter of this motion.

## CONCLUSION

Educators requests the Court enter an order quashing the deposition and a protective order preventing Plaintiff from re-deposing Educator's corporate representative. Educators also requests any further relief to which it may be entitled.

---

[16] Educators' counsel discussed this motion with Plaintiff's counsel in person on October 22, 2003, and by letter dated October 23, 2003. A true and correct copy of the letter is attached as Exhibit K.

By: *Roberta J. Sharp*

Barry A. Chasnoff (ct11162)
Roberta J. Sharp (ct24407)
Jessica S. Taylor (ct24408)
AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.
300 Convent Street, Suite 1500
San Antonio, Texas 78205
Telephone: (210) 281-7000
Telecopier: (210) 224-2035

AND

Donald E. Frechette (ct 08930)
Edwards & Angell, LLP
90 State House Square
Hartford, CT 06103
Phone: (860) 525-5065
Facsimile: (860) 527-4198

ATTORNEYS FOR DEFENDANT
HARTFORD LIFE & ACCIDENT
INSURANCE COMPANY

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was sent via facsimile and certified mail, return receipt requested to the following attorney on the __27th__ day of October, 2003:

Eliot B. Gersten
Gersten & Clifford
214 Main Street
Hartford, CT 06106
Phone (860) 527-7044
Facsimile (860) 527-4968

ROBERTA J. SHARP
JESSICA S. TAYLOR

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
(BRIDGEPORT)

| | |
|---|---|
| CANDI McCULLOCH<br>Plaintiff, | CIVIL ACTION NO. 301CV1115(AHN) |
| vs. | |
| HARTFORD LIFE AND ACCIDENT<br>INSURANCE COMPANY, and EDUCATORS<br>MUTUAL LIFE INSURANCE COMPANY<br>Defendants. | APRIL 15, 2003 |

## NOTICE OF DEPOSITION

**PLEASE TAKE NOTICE THAT**, pursuant to Rule 30 (b) (6) of the Federal Rules of Civil Procedure, the Plaintiff will take the deposition, upon oral examination, of the **corporate representative(s) of the defendant Educators Mutual Life Insurance Company**, designated by the defendant as the individual(s) most knowledgeable to testify in the above-referenced matter on its behalf, on **Tuesday, May 13, 2003** at **10:00 a.m.** at the law offices of Gersten & Clifford, or such other place that the parties can agree on, before a court reporter or other authority competent to administer an oath. This deposition is being taken for the purpose of discovery or for use at trial (or both), or for such purposes as are permitted under the Federal Rules of Civil Procedure. The corporate representative(s) should be someone knowledgeable with respect to:

1) the defendant's disability insurance file and records of plaintiff Candi McCulloch;

2) the negotiation and execution of the reinsurance agreement signed in July, 1999 between the defendants, including the selection of claimants subject to the agreement;

3) claims handling procedures in effect between 1994 to 2000;



EXHIBIT C

4) approval of the plaintiff's claim between 1994 through 2000, and any investigation of the plaintiff's claim;

5) advertising or marketing procedures concerning the policy purchased by plaintiff;

6) procedures in place during the time period of 1992 to 1996 for advertising, promoting or otherwise selling the policy purchased by the plaintiff; and

7) the relationship between this defendant and the American College of Physicians.

The deponent should bring with him/her/them any documents in possession or control of the defendant relating to any of the above topics.

You are invited to attend and cross-examine.

> PLAINTIFF,
> CANDI McCULLOCH

By  *[signature]*

Eliot B. Gersten, Esq.
Fed. Bar No. ct05213
GERSTEN & CLIFFORD
214 Main Street
Hartford, CT 06106
(860) 527-7044
Her Attorney

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Notice of Deposition was mailed, **via certified mail, return receipt requested,** on April 15, 2003, 2002 to all counsel and pro se parties of record, as follows:

Roberta J. Sharp, Esq.
Barry A. Chasnoff, Esq.
Jessica Spangler Taylor, Esq.
Akin Gump Strauss Hauer & Feld, LLP
300 Convent Street, Suite 1500
San Antonio, TX 78205
*Tel: 210-281-7146*
*Fax: 210-224-2035*


*Via first class mail only:*

Donald E. Frechette, Esq
Joshua L. Milrad, Esq.
Charles F. Gfeller, Esq.
Edwards & Angell, LLP
90 State House Square
Hartford, CT 06103
*Tel: (860) 525-5065*
*Fax: (860) 527-4198*

_____
Eliot B. Gersten

**Page 1**

```
IN THE UNITED STATES DISTRICT COURT
        DISTRICT OF CONNECTICUT
           CIVIL ACTION - LAW

CANDI MCCULLOCH

      Plaintiff

      v.

HARTFORD LIFE and ACCIDENT INSURANCE   :  No. 3:01CV1115 (AHN)
COMPANY and EDUCATORS MUTUAL LIFE
INSURANCE COMPANY

      Defendants
```

The deposition of KENNETH WASNOCK, held at the Law Offices of Barley Snyder Senft & Cohen, 126 East King Street, Lancaster, Pennsylvania 17602-2893, on Tuesday, May 13, 2003 beginning at 10:00 p.m., before DEBRA ROSE KEENAN, Professional Court Reporter and Notary Public.

APPEARANCES:

ELIOT B. GERSTEN, ESQUIRE
GERSTEIN & CLIFFORD
214 Main Street
Hartford, Connecticut 06106-1881
   Appearing on behalf of the Plaintiff

JESSICA TAYLOR, ESQUIRE
AKIN GUMP STRAUSS HAUER & FELD, LLP
300 Convent Street, Suite 1500
San Antonio, Texas 78205
   Appearing on behalf of the Defendants

Also present:  Kimberly Rankin

KEENAN REPORTING SERVICE
DEBRA ROSE KEENAN
87 South Grant Street
Manheim, Pennsylvania 17545

**Page 2**

                           CONTENTS

WITNESS:              DIRECT   CROSS   REDIRECT   RECROSS
Kenneth Wasnock          3

                            INDEX

EXHIBIT                                                  MARKED
No. 1 (Notice of Deposition)                                3
No. 2 (Written objection)                                   4
No. 3 (Disability Guideline, LD-3)                          5
No. 4 (Disability Guideline, LD-4)                          5
No. 5 (Claim Activity Records)                             10
No. 5-A (Application for LTD Benefits forms 119 & 120)     11
No. 5-B (Claims Disability Record, Pgs. 2009-2023)         11
No. 5-C (LTD Claim Jacket)                                 12
No. 5-D (Medical File Documentation)                       14
No. 6 (Bates Stamp Nos. 2024, 1999 & 2000)                 18
No. 7 (Policy, Bates Stamp Nos. 2320-2335)                 20
No. 8 (Policy, Bates Stamp Nos. 2336-2390)                 20
No. 9 (COLA Calculation, Bates Stamp No. 2015)             57

**Page 3**

                         STIPULATIONS

It is hereby stipulated between the counsel for the parties that the reading, signing and certification of the transcript is hereby waived.

It is further stipulated between the parties that all objections, except to the form of the question, are reserved until the time of trial.

KENNETH WASNOCK, called as a witness, having been duly sworn, was examined and testified as follows:

BY MR. GERSTEN:

Q.   Sir, my name is Eliot Gersten, as I introduced myself to you a moment ago. You are aware you are here pursuant to a notice of deposition?

A.   Yes.

Q.   Okay. And I am going to have, if the court reporter be kind enough, to have this marked as an Exhibit 1 and then I will have her show it to you, if that is okay, and see if you can identify it.

A.   Okay.

(Plaintiff's Deposition Exhibit Number 1 was produced and marked for identification.)

THE WITNESS: No, I have not seen that before.

BY MR. GERSTEN:

**Page 4**

Q.   Could you take a look at it then for a moment?

A.   Sure.

Q.   Great.

(Pause.)

Q.   And just for the purposes of the record, I will note that this is the notice of deposition that has been issued. And other than changing the location to Lancaster, it is the document that we issued having Educators designate somebody to testify. Do you understand that?

A.   I understand that.

Q.   Great. And what topics are you here to testify about as outlined in the notice?

A.   Claims handling.

MR. GERSTEN: Okay. And I guess what I'd like to do is get this just-delivered objection noted as an exhibit. I'm not sure you had anything to do with it, but it corresponds to the notice of deposition.

(Plaintiff's Deposition Exhibit Number 2 was produced and marked for identification.)

BY MR. GERSTEN:

Q.   I'm not sure if you have seen this document before, sir, but I will represent to you it is what was

**Page 45**

1 the page you had in your left hand, that is the page were
2 you looking at a moment ago?
3   A.   That is correct.
4   Q.   All right.
5   A.   There are two maximum benefit periods for
6 disability commencing prior to 8/16 which is, in the case
7 of Dr. McCulloch, it would be the case, for injury it is
8 lifetime benefits. For sickness, it is to age 65.
9   Q.   Okay. And you are looking from the same
10 2259?
11   A.   Yes.
12   Q.   Okay. Looking back at 5-B for a moment. It
13 appears that your claim management then continued through
14 November 1998?
15   A.   I don't understand the question.
16   Q.   Am I reading this correctly that the claim
17 management continued through November 1998?
18   A.   Claim management would have continued until
19 we put the claim in a box and shipped it to Hartford.
20   Q.   Okay. And looking at this document, this set
21 of documents then, when did you put the claim in a box and
22 ship it to Hartford?
23   A.   On or about August 26, 1999.
24   Q.   Okay. Can you tell me what you are reading

**Page 46**

1 there?
2   A.   Check to the employee with cover letter, paid
3 to 10/31/99.
4   Q.   And whose handwriting is that?
5   A.   John Eisenberg.
6   Q.   And why was it transferred to Hartford?
7   A.   My understanding is that they bought that
8 block of claims from us.
9   Q.   Now, do you have any kind of classifications
10 in terms of your claim management, in terms of more active
11 claim management versus less active claim management?
12   A.   Yes.
13   Q.   How do you classify it?
14   A.   Typically; acute, chronic, long term and
15 permanent and total.
16   Q.   Acute, chronic, permanent?
17   A.   Long term and total.
18   Q.   And what does acute means?
19   A.   Acute means onset of a condition that you do
20 expect a defined recovery process.
21   Q.   And what is chronic?
22   A.   It means an ongoing medical condition that
23 may or may not be treatable.
24   Q.   And what is long term?

**Page 47**

1   A.   Long term could be recovery from a medical
2 condition such as a broken femur that takes 12 to 18 months
3 to fully heal before a person could return to heavy work.
4   Q.   And what is permanent and total?
5   A.   It would be a classification where we believe
6 that there is, a person has achieved maximum medical
7 improvement. There is zero chance of recovery to return to
8 gainful employment, or to their occupation, or any
9 occupation.
10   Q.   Are there guidelines that are written up,
11 like you have these guidelines, describing each of these
12 categories?
13   A.   Not specifically.
14   Q.   Okay. Do you have them generically?
15   A.   No.
16   Q.   You hesitated for a moment, so I'm trying to
17 find out?
18   A.   I have a claims manual that was written after
19 these claims were transferred that generally speaks of
20 managing claims.
21   Q.   All right. So that claims manual was not in
22 effect while Candi McCulloch was being managed?
23   A.   The written document was not, no.
24   Q.   Okay. When you say the written document was

**Page 48**

1 not, was there a claims manual in effect?
2   A.   There were claim procedures in effect based
3 upon the knowledge of myself and my staff.
4   Q.   Okay. And the claims procedures, were they
5 in writing?
6   A.   No.
7   Q.   And what was the reason you changed from
8 having them not be in writing to having them in writing?
9   A.   We did not change, it was a work in progress
10 that we began to commit them to paper.
11   Q.   Okay. It sounds like you have had a lot of
12 turnover within the staff, am I correct, between the time
13 period Candi McCulloch's claim was subject to review and
14 today?
15   A.   It depends on how you define turnover.
16   Q.   Then I will ask it a different way. I'm
17 sorry. How many people were in your staff as of 1995?
18   A.   Five.
19   Q.   How many people were on your staff as of
20 1996?
21   A.   Five.
22   Q.   How many people were on your staff as of
23 1997?
24   A.   Five.

69

1  A.  I couldn't fathom a guess.
2  Q.  Okay. Mr. Craft's note, I think, or Mr.
3  Eisenberg's, I'm sorry, indicated it was transferred to
4  Hartford at one point in time?
5  A.  August 26, 1998 is the date that he sent the
6  last benefit payment.
7  Q.  Okay. Were you involved in any way when
8  Hartford came in to conduct a due diligence of the claims
9  in terms of it being sold or purchased or transferred?
10 A.  I was involved in different aspects of the
11 process, simply making the claims available to them.
12 Q.  Okay. Can you just tell me what you did to
13 make the claims available to them?
14 A.  I seem to recall that some folks came in and
15 they wanted to review some files. We made the file
16 available to them. When they were done, we put them back
17 in our file drawers.
18     Subsequently a decision was made to sell the
19 business to Hartford. I was involved in the tail end of
20 it. How we were going to get the claims packaged up to
21 them. What to do about the benefit period to give them
22 time to get the files and go through them and start their
23 own claim management process.
24     There was a cover letter that was jointly

70

1  written to the claimant advising them of the change and the
2  fact that they were going to be paid, I think, a two or
3  three month benefit, and that the following benefit would
4  come from Hartford, that type of thing.
5  Q.  Okay. Is that letter included in the claim
6  file?
7  A.  I don't recall. I think it is.
8  Q.  Could you look for it? I would like to ask
9  you some questions about it.
10 A.  (Pause.)
11 Q.  If not, I have it, I think.
12 A.  That would make it a lot easier. Oh, here it
13 is.
14 Q.  Great. Go slowly for a second. What part of
15 the claim file is that in?
16 A.  5-C.
17 Q.  Okay. And you are referring to document
18 2027?
19 A.  Correct.
20 Q.  And what is the date of that?
21 A.  The date of the letter is August 26, 1999.
22 Q.  Now this indicates that, this letter
23 indicates that this is the form letter that you said you
24 helped prepare?

71

1  A.  Yes.
2  Q.  Who else prepared it?
3  A.  I have no recollection.
4  Q.  This indicates that you contracted with Group
5  Reinsurance Plus, GRP. Am I reading that correctly?
6  A.  That is what it says.
7  Q.  To administer your disability claim.
8  A.  That's correct.
9  Q.  What does, to administer your disability
10 claim mean?
11 A.  It means that they will commence claim
12 processing.
13 Q.  Is there a particular reason -- you indicated
14 earlier that you were selling this block of business?
15 A.  That was my understanding, yes.
16 Q.  Okay. If that was your understanding, is
17 there a reason why you didn't indicate that you have sold
18 this block of business?
19 A.  I don't think that it's pertinent to the
20 claimant.
21 Q.  Okay. You will agree with me you didn't
22 indicate that you actually sold the block of business?
23 A.  You read the letter, yes.
24 Q.  Correct.

72

1  A.  That's correct.
2  Q.  And is there a reason why you indicated that
3  you had contracted to The Hartford to administer the
4  disability claim but didn't mention that the insurance
5  policy had been sold?
6  A.  Is there a reason?
7  Q.  Yes.
8  A.  I can recall none.
9  Q.  Is it correct, sir, that you did more than
10 simply contract with The Hartford to administer the
11 disability claim?
12 A.  That I don't know.
13 Q.  All right. Well, you indicated earlier that
14 you had sold the whole book of business?
15 A.  That was my belief, yes, that was my
16 impression.
17 Q.  Would you agree, if your impression is
18 correct, you did more than simply contract with the
19 Hartford to administer the disability claim?
20 A.  I think is subject to interpretation.
21 Q.  Okay. Could you explain what the similarity
22 is between administering the disability claim and selling
23 the book of business?
24 A.  We contracted with them to take over the

**73**

1  claims, and that they would be administering and
2  adjudicating them. To me, it says the same thing.
3       Q.    Do you have any idea of the terms and
4  conditions --
5       A.    No.
6       Q.    -- of the sale?
7       A.    No.
8       Q.    Were you aware that your company actually
9  paid money to The Hartford to purchase the business?
10      A.    No.
11      Q.    Were you aware that your company gave The
12 Hartford the opportunity to keep, by way of example, a
13 portion of what was paid, was $1 million, to The Hartford,
14 attributable for the McCulloch claim and The Hartford would
15 have the right to administer and adjudicate, to use your
16 word, and keep the balance of the money if it chose to
17 terminate the claim? Were you aware of that?
18           MS. TAYLOR: Objection, assumes facts not in
19 evidence.
20           THE WITNESS: No.
21 BY MR. GERFIN:
22      Q.    Your letter indicates that this in no way
23 affects your rights under your certificate of insurance.
24 Are you talking about the insurance policy that we saw

**74**

1  today?
2       A.    That is correct.
3       Q.    Okay. And that would be which exhibit? That
4  would be Exhibit 7? I'm flying it around, and I apologize.
5       A.    Yes.
6       Q.    Did anyone from The Hartford participate in
7  helping to create this August 26, 1999 letter?
8       A.    I don't recall.
9       Q.    Did you have conversations with anyone from
10 The Hartford in connection with this file?
11      A.    This file specifically?
12      Q.    Yes.
13      A.    No, sir.
14      Q.    Do you know if anyone from Educators had
15 discussions with Hartford in connection with this file?
16      A.    Not to my knowledge.
17      Q.    If there were discussions with anyone from
18 The Hartford, is that something that would be directed to
19 you?
20      A.    Yes.
21      Q.    And no one from The Hartford contacted you to
22 find out what you knew about the file?
23      A.    No.
24      Q.    Are you familiar with something called the

**75**

1  re-insurance agreement?
2       A.    No.
3       Q.    Are you familiar with the term re-insurance?
4       A.    Yes.
5       Q.    And what does re-insurance mean to you?
6  Strike that.
7            What does the term re-insurance mean to you?
8       A.    It means that two insurers are sharing the
9  risk. Two or more insurers are sharing the risk.
10      Q.    Okay. Is that the same as contracting for
11 the administration of a policy?
12      A.    I don't know.
13      Q.    I will restate my question, I'm sorry. Is a
14 re-insurance agreement or arrangement where two insurers
15 are sharing the risk, the same as contracting to administer
16 a disability claim?
17      A.    It could be interpreted as such, I guess.
18 That is not how this letter was written.
19      Q.    When you say, that is not how this letter was
20 written, that is not what you intended to mean?
21      A.    That is not what I was conveying.
22      Q.    What were you conveying?
23      A.    That Hartford had contracted to take over the
24 claim and administer and adjudicate the claim.

**76**

1       Q.    Is that the same as a re-insurance, as you
2  understand it?
3            MS. TAYLOR: Objection. Asked and answered.
4            THE WITNESS: I guess that would be subject
5  to interpretation.
6  BY MR. GERSTEN:
7       Q.    And that is what I'm asking. You indicated
8  it was not what you were implying, what you were trying to
9  say. So I'm trying to get at and understand what it was
10 that you are drawing the distinction on in your letter?
11      A.    I was told that business was going to
12 Hartford. So myself and maybe others crafted this letter
13 to let them know.
14      Q.    Okay.
15      A.    The specific terms of any transfer of claims
16 is really, really has no effect on the insured and I don't
17 think it would have been relevant to convey those specifics
18 to the insured and so we spoke in terms of, we have
19 contracted, and they will administer.
20      Q.    All right. So if The Hartford was coming in
21 to share the risk on the claim was something that you
22 didn't really have, that wasn't something that you were
23 trying to indicate in your letter?
24      A.    I would not be aware of any such arrangement.