**Page 1**

```
IN THE UNITED STATES DISTRICT COURT
      DISTRICT OF CONNECTICUT
         CIVIL ACTION - LAW

CANDI MCCULLOCH        :
       Plaintiff       :
                       :
       v.              :
                       :
HARTFORD LIFE and ACCIDENT INSURANCE : No. 3:01CV1115 (AHN)
COMPANY and EDUCATORS MUTUAL LIFE    :
INSURANCE COMPANY                    :
                       :
       Defendants      :
```

The deposition of **KIMBERLY A. RANKIN**, held at the Law Offices of Barley Snyder Senft & Cohen, 126 East King Street, Lancaster, Pennsylvania 17602-2893, on Tuesday, May 13, 2003 beginning at 1:55 p.m., before DEBRA ROSE KEENAN, Professional Court Reporter and Notary Public.

APPEARANCES:

ELIOT B. GERSTEN, ESQUIRE
GERSTEN & CLIFFORD
214 Main Street
Hartford, Connecticut 06106-1881
  Appearing on behalf of the Plaintiff

JESSICA TAYLOR, ESQUIRE
AKIN GUMP
300 Convent Street, Suite 1500
San Antonio, Texas 78205
  Appearing on behalf of the Defendants

- - - - -

KEENAN REPORTING SERVICE
DEBRA ROSE KEENAN
87 South Grant Street
Manheim, Pennsylvania 17545

**Page 2**

CONTENTS

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Kimberly Rankin | 3 | - | - | - |

INDEX

| EXHIBIT | MARKED |
|---|---|
| No. 10 (Re-insurance Agreement) | 16 |

**Page 3**

STIPULATIONS

It is hereby stipulated between the counsel for the parties that the reading, signing and certification of the transcript is hereby waived.

It is further stipulated between the parties that all objections, except to the form of the question, are reserved until the time of trial.

**KIMBERLY RANKIN**, called as a witness, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. GERSTEN:

Q. Great. What is your position with the company, ma'am?

A. Vice president, and corporate secretary.

Q. And what do you do in that job?

A. I'm responsible for oversight of our legal work. I'm corporate spokesperson, government relations, liaison to the board, and corporate compliance issues.

Q. I take it, are you trained as an attorney?

A. No, we do not have internal general counsel.

Q. Okay. What sort of background did you have before taking this job?

A. I've been with Educators 22 years. So I basically went to them about six months out of high school;

**Page 4**

went back to college in the evenings as I worked full time at Educators.

Q. And do you have a degree?

A. Yes.

Q. And what is it in?

A. Accounting and finance.

Q. And where is it from?

A. Lebanon Valley College.

Q. And when did you get your degree?

A. 1995.

Q. And during the time period of 1994 through the year 2000, what was your job, or jobs, as the case may be?

A. I first became an officer as corporate secretary in February of 1995. Prior to that I was assistant secretary, and immediately prior to that I was manager of product development.

Q. And you are here today pursuant to the notice of deposition, Exhibit 1; am I correct?

A. Yes.

Q. Okay. And what topics have you been designated to speak about?

A. The negotiation and execution of the re-insurance agreement, advertising or marketing procedures


EXHIBIT E

13

1  Q. And I'm presuming outside counsel was Barley
2  Snyder?
3  A. No, the outside counsel used in this was
4  Morgan Lewis and Bockius, out of Philadelphia.
5  Q. And who was it there?
6  A. David Harbaugh. H-A-R-B-A-U-G-H.
7  Q. Okay. What was the reason for a re-insurance
8  agreement being entered into, as opposed to a sale of the
9  business?
10 A. There was no business. There were no
11 policies. The policies had terminated. There were open
12 claims that we were still paying. So we reinsured the
13 liability of those claims.
14 Q. Those are terms of art, so forgive me if I'm
15 going to act like I'm stupid. I don't think I am, but I
16 don't know what I'm talking about, so please forgive me.
17    What do you mean by re-insurance, the
18 liability for those claims?
19 A. The business was, the block of claims was 100
20 percent ceded to The Hartford, meaning that they took full
21 responsibility for the liability of those claims.
22 Q. Okay. And then you paid them?
23 A. There was, as part of the agreement, there
24 was a transfer of, or an amount representing the reserves

14

1  of those claims.
2  Q. Okay. So was there a payment to The Hartford
3  for taking over this responsibility?
4  A. Yes.
5  Q. Okay. And how much did you pay The Hartford?
6  A. I don't remember the exact amount, but I
7  believe it was approximately $27 million.
8  Q. Okay. And that was based upon a formula,
9  that was based upon some sort of formula?
10 A. Yes.
11 Q. Which was in turn based upon the reserves for
12 the claims?
13 A. Yes.
14 Q. How many meetings did you have with The
15 Hartford prior to closing?
16 A. I never met directly with The Hartford.
17 Q. Okay. Did anyone from Educators meet
18 directly with The Hartford?
19 A. I believe most of the negotiations were done
20 by telephone. The only time I'm aware of that they
21 actually came in, and I'm not even sure that it was someone
22 from Hartford, was when they did due diligence and reviewed
23 files.
24 Q. Okay. Did they come in for more than one

15

1  afternoon, one day? Can you tell me a little bit about
2  what you observed?
3  A. I don't recall.
4  Q. Okay. What do you know about what due
5  diligence The Hartford did?
6  A. I'm aware that all of the claim files were
7  pulled together and put into a conference room and a group
8  of individuals came in. Whether it was specifically
9  Hartford or representatives of Hartford, I'm not sure. And
10 they reviewed the files.
11 Q. Okay. And do you know if they reviewed all
12 the files or just selected ones?
13 A. It is my understanding that they did a random
14 sampling.
15 Q. And what is your understanding based on?
16 A. I believe that was the process. We made all
17 of them available, but I don't believe that they looked at
18 every single file.
19 Q. Okay. I guess I will have this copy of the
20 -- oh, I had it right in front of me when you were talking
21 about -- what number pages do you have there?
22 A. EDUC-1054 and 0155.
23 Q. I didn't bring it because I didn't know what
24 I was doing. I'm all the way up to 152. Do you have extra

16

1  pages of, I guess, I just want to be able to introduce a
2  complete document, ma'am, so either your document or we can
3  add pages into what I brought with me, not really knowing
4  what the whole deal was. Is it easier to just use your
5  copy?
6     MS. TAYLOR: That's fine.
7     THE WITNESS: You are talking about the
8  entire copy of the re-insurance agreement?
9     MR. GERSTEN: Correct. Pages 126 through 155
10 as the document and I am going to ask the witness just to
11 authenticate for us. And mark that as Exhibit Number 10.
12    (Plaintiff's Deposition Exhibit Number 10 was
13     produced and marked for identification.)
14 BY MR. GERSTEN:
15 Q. Okay. Can you identify this, ma'am, this
16 document?
17 A. Yes. This is the re-insurance agreement
18 between Educators Mutual Life and The Hartford.
19 Q. Okay. Now one thing I'd like you to do is
20 turn to page 148.
21 A. Yes.
22 Q. And if I understand you correctly, these are
23 all the claims that, what you have called the active
24 claims, that you have transferred to The Hartford pursuant

**Page 17**

1 to this agreement; am I correct?
2   A.   Yes.
3   Q.   And just so that I can understand how this
4 all works, the policy number on the left there, that would
5 be the group number?
6   A.   And that refers back to that same chart we
7 just looked at.
8   Q.   That's why I asked. Where you see five
9 columns in, it says incurred?
10   A.   Yes.
11   Q.   What would that mean?
12   A.   That would be the date the claim incurred,
13 the date the claim began.
14   Q.   Does that mean you started making payments on
15 that date, or when the Claimant came in seeking acceptance?
16   A.   I can tell you what I think it is. I can't
17 tell you with certainty.
18   Q.   Okay. Tell me what you think it is?
19   A.   I believe it is the date of disability. So
20 it would not necessarily be the date that payment was first
21 made, depending on when they made the claim. But I believe
22 it is the date that benefits started.
23   Q.   The next benefit period refers to what?
24   A.   I believe that's, for example, the first item

**Page 18**

1 on that list is A-75. I believe that means to age 75. So
2 it tells you the duration of benefits if the maximum
3 benefit is paid under the policy.
4   Q.   Elimination period? Is that what that stands
5 for, ELIM?
6   A.   That would be the waiting period that you
7 discussed this morning.
8   Q.   Just to correct the record, I asked questions
9 about it, I wasn't discussing it. But when you heard the
10 answers, was anything you disagreed with?
11   A.   Not that I recall, no.
12   Q.   So when the prior witness was here talking
13 about the waiting period you thought he was testifying
14 accurately?
15   A.   Yes.
16   Q.   Was there any other portion of his testimony
17 that you thought he was wrong about?
18   A.   Not necessarily wrong, but there were things
19 about what we are discussing now with regard to this
20 transaction that I probably would have explained a little
21 differently.
22   Q.   Okay. Can you give me an example?
23   A.   Yes. The business was not sold. The
24 business lapsed. It moved to New York Life. And then we

**Page 19**

1 reinsured the claim liability. So we did not sell the
2 business.
3   Q.   Okay. You will have to again excuse me.
4 What does reinsured the claim liability mean?
5   A.   We ceded the liability for the open claims to
6 The Hartford.
7   Q.   Again, you are using a term of art, the
8 ceding thing.
9   A.   The liability was transferred from Educators
10 to The Hartford. So we no longer had any liability for
11 those claims. It was 100 percent ceded to The Hartford.
12   Q.   Okay. Is that what the term ceding means as
13 you understand it?
14   A.   Yes. And the other item was a discussion
15 about paying benefits with a reservation of rights. That
16 is not a common occurrence for the company. We have done
17 it twice that I know of. And it was on advice of counsel
18 because of two particular claims that were contentious and
19 probably headed to litigation.
20   Q.   Did they, in fact, go to litigation?
21   A.   I don't recall.
22   Q.   Okay. Can you go back on the chart here,
23 cost type?
24   A.   I don't know that.

**Page 20**

1   Q.   Unfortunately, you are here on behalf of
2 Educators so I have to ask you this question for the
3 record. Does Educators know what cost type means in the
4 chart that it is providing to me here?
5   A.   Yes. I'm sure that there is an explanation
6 for what they are. Again, I can guess that S is sickness,
7 and A is accident, but I'm not certain.
8   Q.   Okay. Monthly benefit would be the payout
9 each month due on the policy?
10   A.   Yes. That would be my understanding.
11   Q.   Okay. What does the COLA portion mean?
12   A.   Cost of living increase.
13   Q.   Okay. That is considered separate and
14 distinct from the monthly --
15   A.   It is calculated differently.
16   Q.   Okay. 699 something, what does this mean?
17   A.   It is disability duration.
18   Q.   What does that mean?
19   A.   At the time this report was run, again, using
20 the first line as an example, that claim has been in
21 duration for seven years.
22   Q.   Okay. So as we go down here there is one for
23 20 years, for example. That is what that 20 means?
24   A.   Yes.

33

1  A.  We worked through a third entity who brokers
2  transactions.
3  Q.  And what is the name of that entity?
4  A.  I don't remember what their name was off the
5  top of my head. But I believe there is correspondence with
6  their name on it.
7  Q.  Is that the California outfit?
8  A.  Yes.
9  Q.  Okay. So were they a broker representing
10 you?
11 A.  Yes.
12 Q.  And when was the decision made by Educators
13 to contact that person and try to transfer the liabilities?
14 A.  I don't remember a specific date, but it
15 would have been shortly after we were completely out of
16 writing any new business under the professional
17 association.
18 Q.  Oh, I see. So after the transfer to New York
19 Life, the handwriting was on the wall that, what do we need
20 this stuff for, we should get out of it?
21 A.  Right. Right.
22 Q.  Okay. Was there any discussion with Hartford
23 regarding the terms and conditions of the various policies
24 that were subject to this ceding agreement?

34

1  A.  Not that I'm aware of. And the block that
2  was transferred is not only American College of Physicans.
3  There are claims in there from some of the other
4  professional association groups as well. And it was an all
5  or nothing transaction for us. So there was no selection
6  of, well, we only want this block or these certain
7  policies. It was take it all or nothing.
8  Q.  Tell me how that works.
9  A.  We had the block of policies that you see
10 listed, or the block of claims that you see listed on the
11 other documents that we were looking at earlier. We wanted
12 nothing to do with that area of the business anymore. So
13 the transaction for us that we put out for bid, was you
14 take it all or you take nothing.
15 Q.  So basically the buyer assumed a risk there?
16 Some of them were good, some of them were bad?
17 A.  Well, a claim is a claim.
18 Q.  Right. Gotcha. Was that done in writing
19 somewhere? This so-called take it all or take nothing?
20 A.  I don't recall the language in the -- I don't
21 know what the broker went out with as part of the
22 transaction.
23 Q.  Okay.
24 A.  I know for us it was an all or nothing.

35

1  There was no partial bidding or, can we only take a portion
2  of this. It was, this is it for us. You take it all or
3  you take nothing.
4  Q.  So they weren't just taking over the
5  administration of the policies, were they?
6  A.  There were no policies.
7  Q.  Excuse me, you're right.
8  A.  It was claims.
9  Q.  They weren't just taking over administration
10 of the claims, you were ceding the entire liability to
11 them?
12 A.  Correct.
13 Q.  So that a customer of your's, Candi
14 McCulloch, was formally a customer of your's; correct?
15 A.  Yes.
16 Q.  And fundamentally, you were selling her, for
17 lack of a better word, to The Hartford?
18     MS. TAYLOR: Objection. Vague.
19 BY MR. GERSTEN:
20 Q.  Okay. I will restate it another way. So
21 Candi McCulloch, the customer, was being transferred to The
22 Hartford?
23     MS. TAYLOR: Objection, vague.
24 BY MR. GERSTEN:

36

1  Q.  Can you answer that question?
2  A.  The claim liability associated with the
3  then-current claim of Candi McCulloch was transferred to
4  The Hartford as part of the re-insurance agreement.
5  Q.  Well, who did she buy the policy from?
6  A.  She would have applied, as a member of the
7  American College of Physicians, through Group Insurance
8  Administrators. Educators would have underwritten that
9  policy, approved it, and then a certificate would have been
10 issued to her through Group Insurance Administrators.
11 Q.  And then the check that she cut to pay for
12 that, the premium went to whom?
13 A.  I don't recall whether the checks were made
14 out to Group Insurance Administrators or whether they were
15 made out to Educators Mutual Life, because there was some
16 shared billing responsibilities there.
17 Q.  Right.
18 A.  But eventually the premium would have ended
19 up with Educators.
20 Q.  And that is who issued the policy that she
21 purchased, was Educators, in doing its so-called
22 underwriting with GIA; right?
23 A.  During this time period, yes.
24 Q.  And when you say during this time period,

49

1   Q.   Okay.
2   A.   So doing anything they want, to me, is
3  whatever their policies and procedures were for managing
4  claims, as long as they fell within the provisions of the
5  policy.
6   Q.   So if they are doing whatever they want with
7  respect to management of the claims, affected the
8  determination of disability benefits, was that something
9  that you expected them to do or didn't expect them to do?
10  A.   I would think that would be on a claim by
11 claim basis, based on their management of that claim.
12  Q.   Okay.  What part of the Educators policy that
13 you had with Ms. McCulloch permitted the assignment of the
14 liability of the claim from Educators to Hartford?
15  A.   I don't know.
16  Q.   What is your knowledge of the claim
17 department of Hartford?
18  A.   I'm not sure I understand your question.
19  Q.   Do you know anything about the Hartford?
20  A.   I know that they are a very large insurer.
21  Q.   Okay.
22  A.   Based in Hartford.
23  Q.   Okay.  Do you know anything about their
24 disability management program?

50

1   A.   No.
2   Q.   What is the difference between the ceding of
3  liability of claims and transferring administration of the
4  disability claim?
5   A.   I'm not sure I understand your question.
6   Q.   Okay.  Is it your testimony that ceding
7  liability for the claim is the equivalent of administering
8  the claim?
9   A.   In this particular case, yes.
10  Q.   Okay.  Tell me why.
11  A.   Again, our transfer with the Hartford was an
12 all or nothing transaction, so they assumed 100 percent
13 liability for all the claims in that closed block, and that
14 included the administration of those claims.
15  Q.   But it had something to do more than just
16 simply administration of those closed claims, didn't it?
17 It was administration plus?
18  A.   I'm not sure what you are getting at.
19  Q.   All right.  I'm sorry, I'm not being clear.
20 Hartford didn't just take over administration of the
21 disability claim, did it?  They took over liability as
22 well?
23  A.   Yes.
24  Q.   Okay.  And when Educators managed its claim

51

1  program, it administered its own claim program, didn't it?
2   A.   Yes.
3   Q.   Okay.  And isn't it correct to say that there
4  is a difference between simply administering a claim
5  program and becoming liable for the claim?
6   A.   There could be.
7   Q.   Okay.  When you say there could be, my
8  question is, is there a difference between simply
9  administering a disability claim and accepting liability
10 for it?
11  A.   Yes.
12  Q.   And what is the difference?
13  A.   In one instance, such as a third party
14 relationship, you could have someone administering claims,
15 but retain liability.
16  Q.   Okay.  And what happened here was that you
17 had a service provider taking over administration of the
18 claim together with accepting liability for those claims;
19 correct?
20  A.   You can describe it that way.  I mean, it was
21 a true re-insurance deal, where the claims were ceded, 100
22 percent.  So that encompasses everything.
23  Q.   Okay.  Is there a reason why Candi McCulloch
24 wasn't told that you had ceded everything, as opposed to

52

1  telling her you had simply contracted with a service
2  provider to administer the disability claim?
3   A.   Not that I'm aware of.
4   Q.   Okay.  Let me show you a document, 032, which
5  was one of the post re-insurance agreement correspondences.
6  Is that one of the ones you were talking about that was
7  subject to continued adjustment?
8   A.   I believe this refers to the two claims in
9  the other letter that you showed me that were added to the
10 transaction.
11  Q.   Okay, great.  Does Educators advertise at
12 all, or use a slogan?  Strike that.  Does Educators use a
13 slogan as part of its advertising about the way it will
14 treat its customers?
15  A.   Are you talking specifically about with the
16 American College of Physicians, or are you talking about in
17 general?
18  Q.   In general, first of all.
19  A.   In general, we really don't do advertising,
20 per se.  Our business is all marketed, today, through
21 independent brokers.
22       So we print brochures and things like that
23 used by the broker, but we don't direct advertise to the
24 public.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
(BRIDGEPORT)

| | |
|---|---|
| CANDI McCULLOCH<br>Plaintiff, | CIVIL ACTION NO. 301CV1115(AHN) |
| vs. | |
| HARTFORD LIFE AND ACCIDENT<br>INSURANCE COMPANY, and EDUCATORS<br>MUTUAL LIFE INSURANCE COMPANY<br>Defendants. | MAY 24, 2003 |

## AMENDED NOTICE OF DEPOSITION

**PLEASE TAKE NOTICE THAT**, pursuant to Rule 30 of the Federal Rules of Civil Procedure, the Plaintiff will take the deposition, upon oral examination, of the **CORPORATE REPRESENTATIVE(S) of the defendant Hartford Life and Accident Insurance Company**, designated by the defendant as the individual(s) most knowledgeable to testify in the above-referenced matter on its behalf, on **Friday, June 13, 2003** at **10 a.m. at the law offices of Gersten & Clifford, 214 Main Street, Hartford, Connecticut** before a court reporter or other authority competent to administer an oath. This deposition is being taken for the purpose of discovery or for use at trial (or both), or for such purposes as are permitted under the Federal Rules of Civil Procedure and laws of the State of Connecticut. The testimony of the corporate representative will cover the following topics:

1. Management of the claim submitted by the plaintiff, including all actions taken after August 1999;

2. Due diligence review and actuarial review and claim review of the Educators Mutual files which were subject to the bid submitted by the Hartford prior to entering into the so-called



EXHIBIT F

"Reinsurance Agreement" of July, 1999, as well as the any current claim review and current actuarial review of the claims since November, 2000, which were subject to the transfer

3. The "database" used to keep track of the cases referred to in testimony provided by William Moryto on May 13, 2003, indicating the system or practice of tracking of disability claims including the database that each investigator or claims representative is able to access and can find out the status of their own work product, or the number of cases in progress and/or being worked on and completed and closed, or otherwise used to track the progress of claims subject to management by BMS and/or the Special Investigations Unit, including the following: disability claims subject to management, the disability claims included in the transfer of claims from Educators Mutual and subject to the "Reinsurance Agreement" of July 1999, and referral to criminal or regulators' authorities.

4. Any financial incentives or bonuses provided to individuals employed by the BMS division of the defendant between 1999 and 2002, and the basis for such an award.

5. The relationship with Educators Mutual and the preparation of the bid to enter into the "Reinsurance Agreement" of July, 1999, as well as any communications with insureds about the relationship after July 1999;

6. The performance of the claims handling department and tracking the performance as referenced int eh testimony of William Moryto.

**ALSO TAKE NOTICE THAT** the deponents are requested to bring with them any documents relating to any of the topics, such as, but not limited to, claims due diligence reports, actuarial reports, current claim review and current actuarial review, and the database referred to by William Moryto, excepting those which have previously been subject to production by either of the

-2-

defendants; and documents reflecting the performance of the claims operation on a weekly, monthly and quarterly basis, for the time period of 1999 to 2002 including, but not limited to:

1. The total number on claim reserves at the beginning of each month.

2. The amount of reserve closure each month/quarter compared to the reserve at the beginning of the month.

3. The Actual to Expected loss ratio of claims during the year before, year of and year after the closure of this claim.

4. The liability acceptance rate of the claim block for this same time period.

5. The closure rate by duration of claims for the following durations: 0 to 6 months; 6 to 12 months; 12 to 18 months; 18 to 24 months; 24 to 36 months; and greater than 36 months for the same time period as described above.

6. The breakdown of closure codes for the same time period; e.g.:

    a. Return to work

    b. Not totally disabled, Own OCC

    c. Not totally disabled Any OCC

    d. Not eligible due to pre-existing

    e. Didn't satisfy the elimination period.

You are invited to attend and cross-examine.

PLAINTIFF,
CANDI McCULLOCH

By _____
Eliot B. Gersten, Esq.
Fed. Bar No. ct05213
GERSTEN & CLIFFORD
214 Main Street
Hartford, CT 06106
(860) 527-7044
Her Attorney

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Notice of Deposition was faxed and mailed on May 24, 2003 to all counsel and pro se parties of record, as follows:

Roberta J. Sharp, Esq.- via email as well
Barry A. Chasnoff, Esq.
Jessica Spangler Taylor, Esq.
Akin Gump Strauss Hauer & Feld, LLP
300 Convent Street, Suite 1500
San Antonio, TX 78205
*Tel: 210-281-7146*
**Fax: 210-224-2035**

*Via first class mail only:*

Donald E. Frechette, Esq
Joshua L. Milrad, Esq.
Charles F. Gfeller, Esq.
Edwards & Angell, LLP
90 State House Square
Hartford, CT 06103
*Tel: (860) 525-5065*
**Fax: (860) 527-4198**

_____
Eliot B. Gersten

```
                                                              Page 1
 1           UNITED STATES DISTRICT COURT
                DISTRICT OF CONNECTICUT
 2                   (BRIDGEPORT)
 3
 4
                                    )
 5   CANDI McCULLOCH,               )
            Plaintiff               )
 6                                  )   Civil Action No:
     Vs.                            )   301CV1115 (AHN)
 7                                  )
     HARTFORD LIFE AND ACCIDENT     )
 8   INSURANCE COMPANY and          )
     EDUCATORS MUTUAL LIFE          )
 9   INSURANCE COMPANY,             )
            Defendant               )
10                                  )
11
12
             Deposition of PAMELA M. MORMINO, taken
13   before Judith L. Kline, Certified Shorthand
     Reporter/Notary Public in and for the State of
14   Connecticut, pursuant to notice, at the law offices of
     Gersten & Clifford, 214 Main Street, Hartford,
15   Connecticut, on July 28, 2003 at approximately 9:05
     a.m.
16
17   APPEARANCES:
18   FOR THE PLAINTIFF:
          ELIOT B. GERSTEN, ESQUIRE
19        GERSTEN & CLIFFORD
          214 Main Street
20        Hartford, CT 06106
21   FOR THE DEFENDANTS:
          ROBERTA JILL SHARP, ESQUIRE
22        AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
          300 Convent Street
23        Suite 1500
          San Antonio, TX 78205
24
     ALSO PRESENT:
25        Jeffery Apuzzo, Esquire
          Candi McCulloch
```



Brandon Smith Reporting Service

ca337c4d-8692-4f4f-ba9f-42c749d62989

**Page 98**

1  Q  So that this particular transaction is a
2  co-insurance transaction?
3  A  Yes.
4  Q  And is that reflected -- you have the
5  reinsurance agreement, that you see in the pile of
6  papers you brought me today?
7  A  Yes.
8  Q  Can you show me what portions of that agreement
9  deal with the so-called co-insurance provision?
10 A  Could you clarify what you mean by that?
11 Q  Sure.  How do you know whether it's an
12 assumption or a co-insurance?
13 A  Well, that was stated up front.  That was a
14 verbal knowledge of knowing up front.  But in the
15 actual reinsurance agreement, I believe it states that
16 we would -- all checks will say "administered on
17 behalf of."
18 Q  Okay.
19 A  Article 2, 11752 talks about the co-insured of
20 the reinsured claims.
21 Q  What page are you looking at?
22 A  11752, 53, 54 through part of 55.
23 Q  Okay.  And as you understand it, what portion
24 of the risk was retained by Educator's?
25 A  Zero.  It was a hundred percent co-insurance.

**Page 99**

1  Q  And what does that mean, a hundred percent
2  co-insurance?
3  A  We have a hundred percent of the liability and
4  the risk on the claims.
5  Q  Okay.  And that sounds like it's the same as
6  the way you described the assumption agreement?
7  A  No.  There's no transfer of paper.  In a
8  co-insurance arrangement, it stays on Educator's
9  paper.
10     Thus, we have to put on the claim -- on the
11 checks or any correspondence that we are administering
12 on their behalf, because it is still their paper.
13 Q  Okay.  But they've given up all risk on the
14 deal; correct?
15 A  Yes.  We hold them harmless.
16 Q  You hold them harmless; correct.  Now, how
17 would a -- we're going to use the word customer to
18 mean claimant in this particular circumstance; okay?
19 A  Uh-huh.
20 Q  If I understand correctly, when you do an
21 assumption agreement -- an assumption buy out versus a
22 co-insurance buy out, you inform the customer of the
23 change of the companies; correct?
24 A  Yes.  Because they have to be issued a new cert
25 page -- something to let them know that they now have

**Page 100**

1  Hartford paper, instead of Educator's paper, if that
2  was the case.
3  Q  Sure.  How would a customer know that The
4  Hartford has assumed a hundred percent of the risk, in
5  a co-insurance agreement of this type?
6  A  I don't know that they would.  Reinsurance is
7  -- almost every company, they reinsurance claims.
8  Sometimes all of the liability, sometimes part of the
9  liability.  That's why reinsurance companies are
10 available.  I don't believe that anybody then tells
11 their customers -- their claimants -- who the
12 reinsurers are.
13 Q  Okay.  Would you agree with me, under the
14 circumstances you just described, where there's a
15 reinsurance, the initial insurer remains responsible?
16 A  Yes.
17 Q  Correct?
18 A  Uh-huh.  Yes.
19 Q  In this scenario, if I understand the way
20 you've described it, Educator's is no longer
21 responsible.
22     MS. SHARP:  Object to form.
23     THE WITNESS:  I don't know the
24 responsibility of Educator's.
25 Q  (By Mr. Gersten) Okay.  As you understood the

**Page 101**

1  responsibility --
2  A  As I understand it, we assume -- we assume the
3  liability and we hold them harmless of our decisions.
4  Yet, since it is still their paper, if you were to
5  approach Educator's about anything, you probably would
6  go to Educator's first, and then they would defer to
7  us.
8  Q  Okay.  Now, if I understood it correctly,
9  Educator's has basically had no risk since entering
10 into this agreement; is that correct?
11 A  Right.  That's correct.
12 Q  And, in fact, you're familiar with the hold
13 harmless provision, as well; correct?
14 A  Yes, I am.
15 Q  What is the difference between the arrangement
16 you've just described, and the assumption arrangement
17 you've just described, other than the formal transfer
18 of paper?
19 A  As I would understand it?
20 Q  Yes, ma'am.
21 A  The process is different.  One takes time to go
22 through the courts, and the other one can be a fairly
23 simple transaction.  Those are two differences -- or
24 one difference.
25     The fact that it's now backed by The

26 (Pages 98 to 101)