Page 1

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
 2                     (BRIDGEPORT)
 3
 4
                                    )
 5   CANDI McCULLOCH,               )
            Plaintiff               )
 6                                  )   Civil Action No:
     Vs.                            )   301CV1115 (AHN)
 7                                  )
     HARTFORD LIFE AND ACCIDENT     )
 8   INSURANCE COMPANY and          )
     EDUCATORS MUTUAL LIFE          )
 9   INSURANCE COMPANY,             )
            Defendant               )
10                                  )
11
12
            Deposition of PAMELA M. MORMINO, taken
13   before Judith L. Kline, Certified Shorthand
     Reporter/Notary Public in and for the State of
14   Connecticut, pursuant to notice, at the law offices of
     Gersten & Clifford, 214 Main Street, Hartford,
15   Connecticut, on July 28, 2003 at approximately 9:05
     a.m.
16
17   APPEARANCES:
18   FOR THE PLAINTIFF:
            ELIOT B. GERSTEN, ESQUIRE
19          GERSTEN & CLIFFORD
            214 Main Street
20          Hartford, CT 06106
21   FOR THE DEFENDANTS:
            ROBERTA JILL SHARP, ESQUIRE
22          AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
            300 Convent Street
23          Suite 1500
            San Antonio, TX 78205
24
     ALSO PRESENT:
25          Jeffery Apuzzo, Esquire
            Candi McCulloch
```

Page 6

1  Q  Just gave your deposition?
2  A  Yes.
3  Q  Okay. Great. And prior to this morning, did
4  you have an opportunity to review any documents, in
5  connection with your testimony today?
6  A  I reviewed my file. I reviewed the file that
7  was performed on the Educator's due diligence visit
8  prior to purchasing it. And I reviewed two
9  depositions.
10  Q  Okay. And which depositions did you review?
11  A  Kim Gabrielsen and Sue Wilk.
12  Q  Did you make any notes?
13  A  No.
14  Q  Okay. And when you say you reviewed your file,
15  what does your file look like?
16  A  Just had some extraneous papers in it, around
17  the buy out itself, when we bought out Educator's
18  Mutual.
19  Q  Okay. So you have a file that dealt with the
20  buy out of Educator's?
21  A  Dealt with the claim part of the buy out, yes.
22  Q  Okay. Let me show you documents that were
23  produced last Wednesday, numbers 11720 through 11916.
24  And I'm going to have them marked as Exhibit 108.
25

Page 7

1       (Plaintiff's Exhibit No. 108-- Documents
   Bates Stamped H11720-H11916, marked for
2  identification.)
3
4  Q  (By Mr. Gersten)  And I'll ask if you can
5  identify these documents as the documents you just
6  made reference to, or any other format. I'll indicate
7  to you -- what page number is that?
8  A  H 11730.
9  Q  And the yellow highlight, you see there, I did
10  that by mistake myself. So I don't want you to think
11  that the yellow highlight came on it.
12  A  Okay.
13       MS. SHARP:  Eliot, while she's doing that,
14  I think I need to redact the Social Security numbers
15  off the other reports, as well. I redacted the names,
16  but I think we also need to redact Social Security
17  numbers, to protect privacy.
18       MR. GERSTEN:  Okay.
19       MS. SHARP:  So when it comes back, I'll do
20  that real quickly.
21       MR. GERSTEN:  Okay.
22       THE WITNESS:  Those are in the two files.
23  Q  (By Mr. Gersten) Great. Now, is there a
24  particular division of documents in there, between
25  what came from what you call the Educator's buy out,

Page 8

1  and your file, or are they all mixed up together and
2  there's no particular order to them?
3  A  I don't understand the question.
4  Q  Okay. You indicated previously in your
5  testimony that you had two sets of files, if I
6  understood it correctly. One was the Educator's buy
7  out file and you indicated your personal file?
8  A  That Educator's file was my personal file.
9  Q  Okay. Now, looking at these documents in
10  Exhibit 108, is there any particular order to the way
11  they were maintained in your file?
12  A  Probably not.
13  Q  Okay. When you say probably not, I'm asking
14  this because it was difficult to figure out, when I
15  looked at it, what went with what.
16  A  Part of this is the second file that I referred
17  to as our due diligence file.
18  Q  That's what I thought. I'm sorry if my
19  question wasn't clear. That's what I was trying to
20  find out.
21       Could you tell us, by reference to the
22  numbers at the bottom of the page, what portion of the
23  file is relating to what you -- your personal file,
24  and what part related to the Educator's buy out file?
25  A  I'm starting with -- where is the page

Page 9

1  number -- H 11857 would be the separation. However,
2  there are many copies of this, so I'm really not sure.
3  Q  Go slow for a second. H 11857?
4  A  Right.
5  Q  And does it end at some page?
6  A  11916.
7  Q  Okay. 11916.
8  A  That's the due diligence file.
9  Q  That's the due diligence file. Okay. And the
10  other portion of the file --
11  A  Would be my file.
12  Q  That would be H 11720 --
13  A  To 856, I'm assuming.
14  Q  You know, I've learned in this case I don't
15  assume. 11856?
16  A  Yes.
17  Q  Great. And that's what you're calling your
18  file?
19  A  Yes.
20  Q  And can you tell me where these records were
21  maintained as of -- I just got them Wednesday. So I'm
22  trying to understand where they were before then?
23  A  This was in the -- the auditor that did the due
24  diligence, it was on his desk.
25  Q  That would be the part of the Exhibit 108 that

Page 10

1  starts at 11857?
2  A  Yes.
3  Q  Okay. Go ahead.
4  A  And the other was in my files.
5  Q  Okay. And what was the name of the auditor
6  that you're referring to?
7  A  Don Loveland.
8  Q  Okay. Does he still work with the company?
9  A  Yes, he does.
10 Q  Does he have a title?
11 A  He's a quality assurance analyst.
12 Q  And what does a quality assurance analyst do?
13 A  He reviews the claims in the office, to see
14 that we're maintaining the proper quality, according
15 to The Hartford's standards.
16 Q  And when you say proper quality according to
17 The Hartford's standards, what is the quality you're
18 looking for?
19 A  We have statistical -- excuse me, we don't have
20 statistical. We have sections broken up into the
21 investigation of a claim, proper payment of a claim,
22 timeliness of a claim. And the claim is audited, or
23 looked at, for those particular attributes.
24 Q  Okay.
25 A  And then a report is given back to the

Page 11

1  examiner, on whatever claims are audited.
2  Q  And what is that report called?
3  A  QA report -- quality assurance report, but it's
4  called QA.
5  Q  How often is a quality assurance report
6  generated?
7  A  They're on an ongoing basis of four claims, per
8  examiner, per month.
9  Q  Okay. So using a name like Susan Wilk, that's
10 an examiner that's involved in this particular case;
11 correct?
12 A  Yes.
13 Q  And so four of the files that are assigned
14 to her, are subject to some sort of audit a month?
15 A  Yes.
16 Q  And is there some sort of report that's
17 generated and given to you?
18 A  No.
19 Q  Do you ever see the results of the quality
20 assurance report?
21 A  Yes.
22 Q  And what do you -- what is it that's given to
23 you?
24 A  A roll up of the figures, so that I have an
25 overall picture of what's going on in the office.

Page 12

1  Q  What are you referring to, a role up?
2  A  Of all the examiners -- all of the results
3  rolled up into one figure.
4  Q  Okay. So you get some sort of summary of what
5  happens on each of the four reports that are -- four
6  claims per examiner each month?
7  A  Yes.
8  Q  What other kind of information is contained in
9  that roll up?
10 A  Nothing else. The turnaround time, the quality
11 of the claims.
12 Q  What does a quality of claim mean?
13 A  Would you rephrase that?
14 Q  Sure. You just used the term quality of
15 claims.
16 A  Uh-huh.
17 Q  What does that mean?
18 A  We ask our examiners to achieve a certain level
19 of quality, in order to be fulfilling their
20 obligations as an examiner, and that would be --
21    (Knock on door.)
22 Q  (By Mr. Gersten) Hang on just a second.
23    (Off the record.)
24 Q  (By Mr. Gersten) I'm sorry. You were giving
25 your answer.

Page 13

1      MR. GERSTEN: Can I have the answer read
2  back, please?
3
4      (The court reporter read back the last
5  answer as follows: A. We ask our examiners to
   achieve a certain level of quality, in order to be
   fulfilling their obligations as an examiner, and that
   would be --)
6
7      THE COURT REPORTER: And then there was a
8  knock on the door.
9      THE WITNESS: And that would be at 90
10 percent.
11 Q  (By Mr. Gersten) Okay. I'm not sure I
12 understand the 90 percent figure. What does that
13 mean?
14 A  Different areas, as they're audited, are given
15 assigned points, as to whether they met the criteria
16 in that particular area or not.
17 Q  Okay. And when you say different areas, what
18 are their areas -- what are the names of the areas
19 that you're referring to?
20 A  Investigative areas. Communications, which
21 would be letter writing and phone calls. Use of our
22 ancillary services in the office, such as our medical
23 department, our rehab department and Social Security.
24    The turnaround time on the claim; whether it
25

Page 66

1  of claims that were subject to the transfer?
2    A  The actuaries would have had such a list.
3    Q  Okay. Do you know if there is such a list?
4    A  Do I know for sure? No.
5    Q  Okay. Who would be the actuary who would have
6  such a list?
7    A  At this point I would go to Jason Lichtman, not
8  to the actuary department; to our accountant.
9    Q  Well, you indicated the actuaries would have
10 the list?
11   A  Right. He's up in the same department, but
12 just works on accountant things. But he would know if
13 such a list existed.
14      At one point such a list would have had to
15 have existed --
16   Q  I would think so. That's why I'm asking.
17   A  -- for the actual true-up. When we buy a book
18 of business, because of the changes -- where someone
19 will die, or somebody goes off of claim for the
20 benefit period expiring, or for whatever reason -- as
21 we input claims, they would then check against the
22 list of claims that actually were input, and see if
23 there are any discrepancies with the price that they
24 determined for the actual buy out.
25      And sometimes the price then would be

Page 67

1  adjusted downward. If someone died, or you're not
2  taking over the liability of that claim, the price
3  would be adjusted downward.
4    Q  Okay. Do you know if there is such a -- you
5  called it a chew-up; what does that mean?
6    A  It's a true-up, where it's a look at the data,
7  to make sure that everything you were given, that you
8  got the claims on, is actually correct.
9    Q  Did a chew-up take place in this particular
10 situation?
11   A  Yes.
12   Q  When did the chew-up take place?
13   A  It usually takes place within 90 to 180 days
14 after the buy out. In this particular instance, I do
15 not know the exact date.
16   Q  Okay. What is the document that evidences this
17 chew-up entitled?
18      MS. SHARP: Object to form.
19      THE WITNESS: There is no document that I
20 know of, so I wouldn't know any name.
21   Q  (By Mr. Gersten) Okay. Who did the chew-up
22 here in this particular transaction?
23   A  Our actuarial department.
24   Q  And do you know who in the actuarial
25 department?

Page 68

1    A  Peter Heinrichs was in charge of the actuarial
2  department at that time.
3    Q  Why did he leave the company?
4    A  For other opportunities.
5    Q  You still work with him; correct?
6      MS. SHARP: Object to form.
7      THE WITNESS: No.
8    Q  (By Mr. Gersten) No? So as you sit here
9  today, you don't know if a chew-up was done?
10   A  A true-up was done. I don't know if there's
11 any such report to reflect that.
12   Q  How would you know, if there's no report to
13 reflect that, that a chew-up was done?
14   A  It is not the claim department's responsibility
15 to be involved in the true-up, except to supply the
16 correct data. The correct data is supplied in our
17 claims system.
18   Q  And where, amongst the documents you've
19 produced today, does it reflect the correct data as of
20 the time of the chew-up?
21   A  Each claim is then put in individually into our
22 claim system, and the data can be pulled out of the
23 claim system. It's not in any of these documents.
24   Q  And as you sit here today, you're not aware
25 whether there was a document evidencing this so-called

Page 69

1  chew-up that was done?
2    A  Yes.
3    Q  And does the chew-up reflect the DLR for each
4  of the claims?
5    A  That's supplied by the claim department. No.
6    Q  How does one at The Hartford -- what's the
7  information called on The Hartford, in terms of the --
8  strike that.
9       Who supplies the DLR, as it relates to each
10 of the claims that were the subject of the transfer
11 from Educator's?
12   A  The actuarial department determines what the
13 DLR will be.
14   Q  And you didn't bring any of those documents
15 with you today?
16   A  No.
17   Q  Do you know what those documents are called?
18   A  No.
19   Q  Is that a part of the due diligence work?
20   A  No.
21   Q  Okay. What is that part, that the actuarial
22 people do, called? If it's not part of the due
23 diligence part of the transaction, what is that
24 called?
25   A  I guess I'm confused about the question.

Page 70

1  Q  Okay. Do the auditors that you just made
2  reference to -- Mr. Heinrichs?
3  A  Actuary.
4  Q  Actuary, okay. Does the actuarial department
5  get involved with the due diligence that's done?
6  A  The due diligence report is supplied to the
7  actuarial staff.
8  Q  Do you know why?
9  A  To make sure that a claim has been valued
10 correctly. Just a for instance; if somebody is on the
11 sheet from Educator's, and they have an age down as
12 25, and he has benefits through age 65, and actually
13 should have been he was 55 years old, not 25 years
14 old, the money that any company would have to set
15 aside, to reserve for that claim, would be
16 significantly reduced by the incorrect birthday.
17     So what the claim department will do is go
18 through, and look to see, on the claims they actually
19 review -- they don't review every claim, but the ones
20 they do -- to see whether the data elements that were
21 supplied, like diagnosis, age, whether there was a
22 COLA benefit, whether there's a residual benefit being
23 paid, to see whether all those data elements are
24 correct, so they know whether the actual reserve
25 amount has been correct.

Page 71

1      And they will have to do it on percentages;
2  that you go and you review 50 claims, and ten of them
3  are wrong, there's a 20 percent margin for error. So
4  the actuaries would take that into consideration when
5  they actually do the valuation.
6  Q  Okay. Are any of the documents that -- are
7  there documents that reflect any of this consideration
8  that you just described?
9  A  The document that we gave actuarial, reflecting
10 the due diligence, I believe is in the file.
11 Q  Okay. Could you point that out to me?
12 A  Okay. It's in two places. It's H 11867 and
13 868, I think.
14 Q  Okay. And you said it's in two places; where
15 is the other place?
16 A  There's also a copy in our file.
17 Q  And can you just point out which document it is
18 that you're referring to in your file, please?
19 A  11854 and 11855.
20 Q  Okay. Is 854 and 855 -- are those the same
21 contents as 67 and 68?
22 A  Yes. Just printed differently.
23 Q  Okay. My first question to you on 67 and 68 --
24 I didn't see it in the others, were there redactions
25 made on both?

Page 72

1  A  It says on the second page --
2  Q  I'm just trying to find out --
3  A  The redaction is the same.
4  Q  The redaction is the same. Do you know what it
5  is that was redacted, in general?
6  A  Claimant name. Claimant name, I believe.
7  Q  Okay. I'm just asking because mine has a few
8  entries of redaction, and yours only seems to have
9  one. So I'm trying to --
10 A  Because of the way it was printed, all the
11 redactions are on this page.
12 Q  Okay. So it's just because of the way it was
13 printed out, that this page has redacted on it more
14 often than your version?
15 A  I think so.
16 Q  Okay. Fair enough. This e-mail -- the
17 document I'm looking at seems to indicate that it's
18 sent by a Dan Loveland?
19 A  Don.
20 Q  Sorry. Don Loveland. What's his job?
21 A  He's the quality assurance analyst that we
22 talked about previously.
23 Q  All right. And it looks like he's the one that
24 actually did the due diligence work?
25 A  Yes.

Page 73

1  Q  Okay. I'll get back to this in just a minute.
2  I'm just trying to get a handle on some other
3  documents. Look at --
4      MS. SHARP: I'm going to just state, to
5  keep things clear, I hope, that obviously we would not
6  have redacted Dr. McCulloch's name, had that been the
7  name in any of these documents.
8      This was in order to protect the privacy of
9  the individuals names; not to keep you from knowing if
10 Dr. McCulloch was the subject of any of this due
11 diligence.
12     So I just want you to know we would not have
13 redacted her name from any document.
14     MR. GERSTEN: I think I understand. Okay.
15 Q  (By Mr. Gersten) Do you know if Dr.
16 McCulloch's claim was the subject matter of any due
17 diligence work?
18 A  It was not.
19 Q  Is there a particular reason why it was not?
20 A  It was not one of the claims selected for the
21 due diligence.
22 Q  Okay. Do you know why?
23 A  No.
24 Q  Now, looking at documents -- if you would be
25 kind enough to look at documents number 11857. Wait a

19 (Pages 70 to 73)

Page 86

1  with, that describes each of those two types of
2  variations of the transactions?
3    A  No.
4    Q  Where one is done, where you're accepting
5  liability and the paper, versus just accepting
6  liability?
7    A  The only terms that I know of -- I don't know
8  if they're legal terms, but one is a hundred percent
9  co-insurance arrangement, and one is an assumption.
10   Q  Right. And the Educator's deal is a
11 co-insurance agreement?
12   A  Yes.
13   Q  How many buy outs do you do a year, since
14 you've been involved with --
15   A  It varies from zero to six or eight a year,
16 depending on -- it's an opportunistic type of
17 arrangement. You can't buy anything unless there's
18 something for sale. So you just have to wait for the
19 right opportunity to come.
20   Q  Sure. And were you involved in any of this
21 process to buy out the Educator's claim?
22   A  Was I, personally? No.
23   Q  You weren't involved at all?
24   A  No.
25   Q  Okay. Do you know what sort of -- you call it

Page 87

1  opportunistic -- strike that. Do you know what sort
2  of opportunistic -- strike that. I don't like that
3  question.
4        Now, going to page 11847.
5    A  (Witness complies.)
6    Q  Can you tell me whose handwriting this is?
7    A  This is mine.
8    Q  Do you know why you made it up?
9    A  There was a conference call. The parties to
10 the conference call are listed at the top of the page.
11 And it was to actually figure out who was going to do
12 what, when for the actual transfer of the files on the
13 claims.
14   Q  So this is post agreement; correct?
15   A  Yes. It was on August 3, 1999.
16   Q  Is this -- when I asked you if you were
17 involved at all, and you indicated no, it looks like
18 you were involved. Am I misunderstanding?
19   A  I was involved in the transfer of the claims.
20 I was not involved with the buy out.
21   Q  Okay. Who was involved in the buy out?
22   A  It would have been Peter Heinrichs. And I
23 don't know who else with him.
24   Q  And what was Mr. Heinrichs' job?
25   A  He was an actuary. He did the pricing of the

Page 88

1  buy out.
2    Q  And did he maintain files, in connection with
3  his pricing of the buy out?
4    A  I don't know.
5    Q  Do you -- was Mr. Heinrichs involved in any of
6  the due diligence work?
7    A  Just in getting it set up.
8    Q  So did he help coordinate the due diligence?
9    A  Yes, he did.
10   Q  Do you know if he maintained files, in
11 connection with his involvement?
12   A  I don't know.
13   Q  Who would know that?
14   A  Peter Heinrichs.
15   Q  And he's no longer with the company?
16   A  Right.
17   Q  Did he have a secretary?
18   A  No.
19   Q  When did he leave the company?
20   A  Four to six months ago.
21   Q  And if I recall correctly, you said he left for
22 a different business opportunity?
23   A  Yes.
24   Q  Looking at your 8-3-99 handwriting here, the
25 entry here of "no tax," what does that mean?

Page 89

1    A  They are not taxable benefits.
2    Q  Okay. And I can't -- although I'll commend you
3  for most of your handwriting, I can't read all of it.
4  What's the claim --
5    A  Auto load.
6    Q  What does that mean?
7    A  If we can get data in some sort of data file
8  transferred to us, we can actually load claim data
9  from that file. And it saves our examiners a lot of
10 key strokes, not to have to input every single piece
11 of data.
12       Then we go in and add anything that they
13 couldn't give us. So at this particular point, we
14 were investigating whether they could actually supply
15 us with that kind of data.
16   Q  Okay. And were they able to?
17   A  I don't know. I don't remember.
18   Q  Okay. And it says here payments from
19 Educator's will reimburse them on true-up?
20   A  Uh-huh.
21   Q  What's a true-up?
22   A  We discussed the true-up before, with matching
23 their data file with the actuality. And it would be a
24 transfer of money.
25       So it was decided that the payments that

Page 106

1  Q  And as you recall today, it could have been
2  that Pete was still on board in portions of 2003?
3  A  Yes.
4  Q  What does it mean they want to use HIG check
5  stock, GRP is not silent on this arrangement?
6  A  There are times, even if they do a buy out -- a
7  financial buy out, as this is, that they don't want it
8  to be "administered on behalf of" -- the checks to
9  read that -- they don't want The Hartford checks to be
10 used.
11      They want their own checks to be used. So
12 they would give us a bank account, and we would
13 administer those checks off of their own check stock.
14 Q  All right. What does GRP refer to?
15 A  Group reinsurance plus.
16 Q  And what does it mean it is not silent?
17 A  That we can tell people we're Hartford.
18 Q  I see. This letter refers to a letter that's
19 attached -- 1148 refers to a letter that's attached?
20 A  Where do you see that?
21 Q  It says here, I sat in on a call with --
22 A  Oh, okay.
23 Q  My first question to you is, do you see the
24 reference?
25 A  Yes, I do.

Page 107

1  Q  Do you know what letter is attached?
2  A  It's the following pages. The July 1st letter
3  -- 11849 to 11852.
4  Q  And is that the same, ma'am? I just want to
5  make sure; is that the same as 11830 through 11833?
6  A  Yes.
7  Q  Great. Now, looking at the document 11853,
8  which appears to be an e-mail from you, could you
9  confirm that for me?
10 A  Yes.
11 Q  Who did Joann work for, by the way?
12 A  Joann worked for Ken Hallden.
13 Q  And what department is that?
14 A  In group reinsurance plus operations area.
15 Q  Okay. So that this e-mail reflects the fact
16 that people from group re were involved, but no one
17 from claims was involved in the conference call?
18 A  In that particular conference call, no.
19 Q  And is Ken Hallden still with the company?
20 A  Yes.
21 Q  And if I could take you to, it looks like,
22 11854, please.
23 A  (Witness complies.) Okay.
24 Q  You received this e-mail; correct?
25 A  Yes.

Page 108

1  Q  What's the term -- you see the paragraph that
2  deals with case management. It looks like five
3  paragraphs down?
4  A  The files were documented and managed?
5  Q  Yes, ma'am.
6  A  Yes.
7  Q  It says the term is case management, in capital
8  letters there; do you see that?
9  A  Yes.
10 Q  Do you know what that term means?
11 A  It means that either their nurse or their rehab
12 consultant was actively working with the claimant on
13 the file.
14 Q  And there's a reference to ICD-9 code?
15 A  Yes.
16 Q  What does ICD-9 mean?
17 A  I'm not really sure what the initials stand
18 for, but it's a diagnosis code that is used in the
19 medical profession to -- if you have a heart
20 condition, you would have a different diagnosis code
21 than if you have a broken leg, or arthritis, or
22 whatever.
23 Q  So that where you see page -- if you go to the
24 next page, 11356, I guess my first question, before I
25 get there is who's Rita Boulay?

Page 109

1  A  Rita Boulay is an actuary that worked with
2  Peter Heinrichs.
3  Q  Is she still with the company?
4  A  I don't know.
5  Q  Okay. She's describing the 95 claimants that
6  are in the list -- the database as of 12-31-98; am I
7  correct?
8  A  I believe so.
9  Q  Great. There's an attachment, it looks like,
10 underneath Rita's name, because she's sending you
11 data; do you see where I'm referring to?
12 A  Uh-huh.
13 Q  Do you know what the data was?
14 A  No.
15 Q  Did you bring the attachment with you today?
16 A  I don't know. If it was not in that file, then
17 I didn't copy it.
18 Q  Do you know what the attachment was?
19 A  I'm assuming, again, that it has something to
20 do with the ICD-9 code, but I don't know exactly what
21 it was.
22 Q  Is there any reference to the ICD-9 codes, in
23 the document we've looked at today as the 12-31-98
24 list of claimants?
25 A  The list of codes.

Page 110

1   Q   All right. That's what I wanted. So each one
2   of those numbers reflects some reference to a medical
3   condition?
4   A   Yes.
5   Q   And she's indicating here that she was doing
6   this to run reserves; can you tell me what that means?
7   A   All the data elements that are on that sheet
8   are important, in order to come up with the correct
9   reserve.
10      The diagnosis is one of those elements. So
11  if your diagnosis was a broken leg, you would have a
12  different reserve assumption than you would if you had
13  diabetes with complications.
14  Q   Okay. Just so that it's clear for me, looking
15  at 11869, which is a handwritten form, which was one
16  of the documents that was -- go ahead; you can tell
17  me, I'm sorry.
18  A   (Witness complies.)
19  Q   What I would like you to do is take a look at
20  11869 through 78.
21  A   (Witness complies.)
22  Q   I know I don't have them. This one time I know
23  I don't have them.
24  A   But this should have been in the other file.
25  Those aren't in this 108. It should have been in 109.

Page 111

1       MS. SHARP:   What number are you looking
2   for?
3       MR. GERSTEN:   69 through 78.
4       THE WITNESS:   Here we go.
5   Q   (By Mr. Gersten) By the way, when we refer to
6   Don, who are we referring to?
7   A   Don Loveland.
8   Q   And these are the documents you indicated were
9   filled out as part of the due diligence review?
10  A   That's correct.
11  Q   And is it the same handwriting on each of
12  these?
13  A   Yes.
14  Q   And that would all be by Ms. Laughran?
15  A   Don Loveland.
16  Q   Oh, Loveland. Oh. I thought you said
17  Laughran.
18  A   Donald Loveland.
19  Q   Okay. So I understood it as Deb Laughran, and
20  you were saying Don Loveland?
21  A   Don Loveland.
22  Q   Okay. I'm glad I double checked. And he's
23  still with the company; correct?
24  A   Yes.
25  Q   Great. So these are the notes that were used

Page 112

1   by Don Loveland, that are incorporated in the report
2   you received of due diligence section; correct?
3   A   Correct. Yes.
4   Q   And looking at document 11880?
5   A   (Witness complies.)
6   Q   Could you tell me whose handwriting is at the
7   top of the page?
8   A   No.
9   Q   Okay. And looking at the next series of
10  documents, 11882 through 85.
11  A   (Witness complies.)
12  Q   Can you tell me what this set of documents are?
13  A   This is the master contract for the Educator's
14  American College of Physicians.
15  Q   What's a master contract?
16  A   It's a contract where you -- whenever there are
17  parentheses, if you look down at the bottom on the
18  first page on 882?
19  Q   Okay.
20  A   Wherever there's parentheses, those are
21  variables that you can select. So that the American
22  College of Physicians could select perhaps one benefit
23  for one group, and then another benefit for a
24  different group.
25      If they insured their doctors and their --

Page 113

1   maybe the office people differently, that's possible.
2   They also are masters in that the variables --
3   wherever there's a parentheses there can be a
4   variable.
5   Q   Okay. Now, is this the complete master
6   contract?
7   A   That's what we were given.
8   Q   By whom?
9   A   By Educator's.
10  Q   Have you seen a complete copy of the master
11  contract?
12  A   This is what I've seen.
13  Q   Okay. And what does this document tell you?
14  A   This me the basic provisions of the policy.
15  Q   Okay. And looking at page 11883.
16  A   (Witness complies.)
17  Q   This is what's incorporated in the particular
18  contract with Ms. McCulloch?
19  A   Yes.
20  Q   And do you see the provision one, disability or
21  total disability?
22  A   Yes.
23  Q   Good. This is an own occupation definition,
24  isn't it?
25  A   Yes, it is.

Page 130

1  adjudication going on, because the adjudication
2  process is a continual process.
3  Q  (By Mr. Gersten) And that's The Hartford's
4  policy?
5  A  I believe so.
6  Q  Do you know if it was the Educator's policy?
7  A  I don't know.
8  Q  Okay. Are you aware whether Dr. McCulloch had
9  to be a licensed physician, in order to perform her
10 occupation as you've used it in applying the
11 definition under the policy?
12 A  I don't know.
13 Q  Okay. Just going back to some of the documents
14 you brought with you today, looking at number 11887.
15 A  (Witness complies.)
16 Q  I was wondering if you can identify the
17 handwriting on these documents?
18 A  That's Don Loveland.
19 Q  That's his handwriting?
20 A  Yes.
21 Q  Okay. And looking at 11888, can you tell me
22 whose handwriting this is?
23 A  Don Loveland's.
24 Q  So he's the one who actually performed the due
25 diligence work?

Page 131

1  A  Yes.
2  Q  And page 11889 is whose handwriting?
3  A  That's Don's.
4  Q  And looking at page 11890; is that his
5  handwriting?
6  A  Yes.
7  Q  Do you see the circled portion?
8  A  Yes.
9  Q  Can you read his handwriting?
10 A  It says, "disabled from own specialty versus
11 own occupation. Doesn't state own specialty."
12 Q  Do you know what he's referring to?
13 A  The definition of disability.
14 Q  And is there any particular significance
15 attached to that?
16 A  He was reviewing the policy, as well as the
17 claims. So it was a clarification, I would imagine.
18 Again, this is my interpretation; he would be just
19 looking at the policy, to know what he's reviewing;
20 whether he was reviewing own specialty, own
21 occupation, own job.
22 Q  And is one definition broader than the other?
23 A  Own occupation is broader than own specialty.
24 Q  Is there one, in particular, that -- I'll
25 restate my question.

Page 132

1  Why is it broader than own specialty?
2  MS. SHARP:  Object to form.
3  THE WITNESS:  Own specialty, as a
4  physician, or even as an attorney -- or most
5  professionals will have their degree in one area, and
6  then have a specialization.
7  For instance, an attorney would be an
8  occupation. A trial attorney would be your specialty.
9  So it's a little bit more defining.
10 Q  (By Mr. Gersten) Okay. So one could still be
11 an attorney, even though they couldn't be a trial
12 attorney?
13 A  Yes.
14 Q  Okay. Looking at the next paragraph, the next
15 page is 11891 and 11897, it looks like. It goes all
16 the way up 899; correct?
17 A  No. 900.
18 Q  Oh, 900. Okay. Whose handwriting is this?
19 A  Don Loveland's.
20 Q  And do you know what he's doing, when he's
21 writing down this?
22 A  He was not sure if he was going to be allowed
23 to take the policy with him. He couldn't find a copy
24 machine, and he actually wrote it all down, so he
25 would have the policy provisions there when he was

Page 133

1  reviewing the claims, and also afterwards when he was
2  doing his report.
3  Q  Does he incorporate these notes somewhere in a
4  report?
5  A  No. These are the policy provisions. I think
6  the last pages of it are notes about the claims
7  themselves. The file review starts on 898.
8  Q  All right. So if I understand it correctly,
9  your understanding as to why these notes are here,
10 from the guy who did the due diligence, is that this
11 is his writing of the provisions of the policy?
12 A  Yes.
13 Q  And, in particular --
14 A  Excuse me.
15 Q  Yes.
16 A  It also helps to write it out, when you're
17 doing a due diligence, so that it's very fresh in your
18 mind as to what the policy provisions are, since they
19 vary so much.
20 Q  Looking at page 897 for just a moment.
21 A  (Witness complies.)
22 Q  See the portion that starred at the top there?
23 A  Yes. "Unable to perform the material and
24 substantial duties of your own occupation, as it
25 exists at the time disability began."

Page 134

1  Q  Okay. And it looks like he starred it?
2  A  Uh-huh. Yes.
3  Q  Do you know why it's starred?
4  A  No.
5  Q  And on the file review at 898, this reflects
6  what?
7  A  This is more of an administrative review of the
8  procedures. He interviewed the claim manager, as well
9  the overall view of the files -- his overall
10  impressions of the files.
11  Q  In the middle of the page it says something
12  about medical records reviewed; do you see that?
13  A  Done by outside vendor. For example, Seymour
14  Diamond -- maybe -- M.D., of Diamond Headache Clinic,
15  as requested by vendor.
16  Q  Okay. The fella who did this due diligence,
17  this is the accountant guy that you said is still
18  employed?
19  A  It was my quality assurance person.
20  Q  Quality assurance person?
21  A  Yes.
22  Q  Then the next page here at 11899, what's it say
23  here -- what are ABC's?
24  A  Yeah. There was a reference to ABC's.
25  Q  What's an ABC?

Page 135

1  A  Current APS on file. Action followed. I don't
2  know what that is. File reviewed by an MD if medical
3  is in question.
4      So it's the ABC's of Educator's. And that's
5  the only reference that I have to it. So whatever's
6  there is all I know.
7  Q  Okay. And then there's the next portion that's
8  starred; do you see that?
9  A  Uh-huh.
10  Q  And what does that say?
11  A  Policy states -- MB is monthly benefit amount.
12  XX, which is a cover amount, or the lesser amount, as
13  agreed by the insured member and by us.
14      And I don't know what that's in reference to
15  exactly.
16  Q  At the bottom of the page it says something
17  about settling?
18  A  Yes. He asked about settlements, and they said
19  they were very conservative. They were just starting
20  to look into that.
21  Q  What does that mean?
22  A  A lot of companies don't offer lump sum
23  settlements to claimants. And it is a more
24  conservative approach not to do that.
25  Q  So when it says here "too conservative", what

Page 136

1  does that mean?
2  A  Again, I don't know exactly. I don't know if
3  it's a result of the conversation, or whether it's a
4  value judgment.
5  Q  Okay. Do you have a label that you view The
6  Hartford as having, when you use the label
7  conservative?
8  A  The Hartford started doing lump sum settlements
9  fairly recently also. It's an evolving program. We
10  have put guidelines out; so when is it appropriate to
11  do a settlement.
12      And I would say we probably are -- we're not
13  aggressive, but we are accommodating to settlements,
14  but they have to meet strict guidelines.
15  Q  Okay. And when did these guidelines go into
16  effect?
17  A  Probably around 1995 or so.
18  Q  Okay. Looking at page 11901, can you tell me
19  whose handwriting that is?
20  A  That's Don Loveland's.
21  Q  And do you know what it's referring to?
22  A  It's referring to claims that he reviewed, when
23  he was looking at those ICD-9 codes, that we discussed
24  previously. And if there were any discrepancies --
25  it looks like there were on a couple of files.

Page 137

1  Q  Okay. I'm looking at page 902; can you tell me
2  who's handwriting this is?
3  A  Don Loveland's.
4  Q  And I'm looking at page 903. Can you tell me
5  whose handwriting this is?
6  A  That's Don's also.
7  Q  It says something here about discussion -- if
8  I'm reading his handwriting correctly, it says
9  something about discussions with Pam Mormino; do you
10  see that?
11  A  Uh-huh.
12  Q  What is he talking about there?
13  A  The files that were in arbitration. And we had
14  a discussion. It was my recommendation not to include
15  them in the buy out, if they were already in a
16  litigation status, or present us with a high potential
17  for litigation.
18  Q  Now, when I asked you earlier about your
19  involvement with due diligence, you said you didn't
20  have any; is that correct?
21  A  Yes, I did.
22  Q  It appears as though you --
23  A  It appears that I did answer that question.
24  Q  Okay. Now, pages 904 and 905 seem to be typed
25  up?

Page 18

1  Q  Fair enough.
2  A  So I don't necessarily have a barrage of
3  reports at my desk.
4  Q  Fair enough. What kind of reports do your
5  staff review?
6  A  They review pending claim reports, to make sure
7  that we don't have claims pending in pending status
8  too long. Make sure that we're taking care, again, of
9  the customers turnaround time needs.
10     They would look at -- we have ERISA reports.
11  We have some business that's ERISA. And to make sure
12  we're meeting ERISA guidelines, we have ERISA reports
13  that will tell us when any delay letters need to be
14  sent, if we haven't made a decision.
15     We try to review -- we have some new reports,
16  so I'm not sure how they're being used yet. But one
17  of them is about test change reports, when you change
18  from own occupation to any occupation, to make sure
19  those are on a timely basis.
20     Most of the reports reviewed, again, are
21  about timeliness.
22  Q  Okay. Do you have any reports that indicate to
23  you how many claims are subject the referral to SIU?
24  A  Yes.
25  Q  Okay. And what are those reports called?

Page 19

1  A  From the SIU department.
2  Q  Okay. So you get the reports from SIU?
3  A  Yes.
4  Q  Great. And do you have any reports that
5  indicate to you the amount of reserves that are
6  affected in some way?
7  A  In the SIU report?
8  Q  In general, in this overall review that your
9  staff does?
10  A  Uh, no.
11  Q  And what are the reports that are --
12  A  Can I just correct that?
13  Q  Sure.
14  A  At the end of every month I give a report to my
15  boss, that tells him how many claims -- how many
16  positive outcomes we have had.
17     And by positive outcome is return to work,
18  return to wellness, obtained Social Security for
19  somebody, recovered overpayments, claim settlements.
20     All of this is on a report that I give to my
21  boss. And on there we do put what dollar reserve that
22  affects.
23  Q  And I'm presuming you put some notation about
24  termination of benefits in that report; am I correct?
25  A  No.

Page 20

1  Q  Oh. That's not included on this claim
2  settlement?
3  A  (Shakes head.)
4  Q  Do you give any indication to your boss about
5  termination of claims?
6  A  No.
7  Q  Do you track how many claims have been
8  terminated, in your office, at all?
9  A  I, personally, do not.
10  Q  Does anybody do that tracking for you?
11  A  No.
12  Q  And who's your boss?
13  A  James Casey.
14  Q  What is his title?
15  A  He's vice-president of claims.
16  Q  Now, when you said you have people who report
17  to you on a regular basis, can you identify their
18  title? Do these people have a title that are directly
19  under you?
20  A  Yes.
21  Q  And what's their title?
22  A  I have -- do you want the names with them?
23  Q  Sure. If that's easier for you.
24  A  You were going to ask me anyway. I might as
25  well do it all at once.

Page 21

1  Q  Okay.
2  A  Deborah Laughran, she's director of LTD and STD
3  -- long term and short term disability. Peggy
4  Dembicer, D-E-M-B-I-C-E-R. She's assistant director
5  of operations and life.
6  Q  Okay.
7  A  Life claims. Those are my two direct reports.
8  Q  Are there -- is there a difference between
9  direct reports and some other kind of report?
10  A  Well, people who direct report to these people,
11  I also am in contact with fairly regularly. One would
12  be Sharon Swanson, who's a best practices manager.
13  Q  Okay. Anybody else?
14  A  Then our team leaders. There would be various
15  team leaders.
16  Q  Okay. Like Gloria Manente?
17  A  She doesn't work for us anymore.
18  Q  Okay. Do you know where she works?
19  A  Where she does now? Yes.
20  Q  Where does she work now?
21  A  She works for IDR.
22  Q  What's IDR?
23  A  I'm not sure.
24  Q  Is that in Connecticut?
25  A  Yes.

6. (Pages 18 to 21)

Page 222

1  Q  Okay. Just so I understand correctly, on
2  Exhibit 109, at page four of the one that talks about
3  disability claims for the College of Physicians,
4  there's a terminated death of claimant entry there;
5  correct?
6  A  Yes.
7  Q  Upon the death of the claimant, is the reserve
8  released?
9  A  Yes.
10  Q  And on page five of the Philadelphia Bar
11  portion of this, it says terminated, lack of EE
12  information; what does that mean?
13  A  We ask for claims forms and --
14     MS. SHARP: If you don't mind, if I take a
15  call real quick; it's my daughter.
16     MR. GERSTEN: Not at all.
17     MS. SHARP: Off the record, please.
18     (Off the record.)
19     MR. GERSTEN: What was my last question,
20  Judie?
21
       (The court reporter read back the last
22  question as follows: Q  And on page five of the
   Philadelphia Bar portion of this, it says terminated,
23  lack of EE information; what does that mean?)
24
25     THE WITNESS: What it means is that we

Page 223

1  attempted to redocument the claim. And we asked for
2  information that was not received.
3     We usually ask at least three times, and give
4  people notice that the claim will be terminated if we
5  don't get any response. And if we don't get any
6  response, the claim is terminated.
7  Q  (By Mr. Gersten) Okay. And that caused a
8  release of the DLR in that case; correct?
9  A  Yes.
10  Q  How are the DLR for all of these claims -- how
11  is that calculated?
12  A  Based on all the data that actuaries use. I
13  don't know how they do that. But they do base it all
14  on all the demographics and the age of the claimant
15  and stuff.
16  Q  I'll ask my question another way then. As I
17  understand it, The Hartford was paid approximately 30
18  million dollars to take over these claims; correct?
19     MS. SHARP: Object to form.
20  Q  (By Mr. Gersten) Correct?
21     MR. SHARP: Object to form.
22     THE WITNESS: Yes.
23  Q  (By Mr. Gersten) Now, that 30 million dollars
24  appears to be a figure taken from the reserves that
25  Educator's had on file; is that correct?

Page 224

1  A  No.
2  Q  Where does that 30 million dollars come from?
3  A  The Hartford would have recalculated the
4  reserves, based on our own reserve base.
5  Q  You have to explain it to me. I think we had a
6  miscommunication. I apologize.
7     The 30 million dollars appears to be what the
8  totals -- the aggregate of the reserves that are set
9  forth on this schedule in Exhibit 108; is the right?
10  A  Right.
11     MS. SHARP: Wait. I need to object to
12  form, but I didn't know if he was done with the
13  question.
14  Q  (By Mr. Gersten) Is that correct?
15     MS. SHARP: Object to form.
16     THE WITNESS: Yes.
17  Q  (By Mr. Gersten) All right. So, are you
18  indicating that there's actually a whole other reserve
19  calculation done by The Hartford, after receipt of the
20  30 million dollar payment?
21     MS. SHARP: Object to form.
22     THE WITNESS: All right. Before the 30
23  million dollar payment. We don't -- they don't send
24  us a list and say "there's 30 million," and we send
25  them 30 million.

Page 225

1     They send us the list and we do a due
2  diligence. We verify what the fields are. The
3  actuaries then will run all these claims through our
4  own reserving bases, and match the two up.
5  Q  (By Mr. Gersten) Okay.
6  A  And make their offer for the claims, based on
7  The Hartford's calculation; not necessarily based on
8  what they've supplied to us.
9  Q  Okay. So The Hartford's calculation could be
10  that we may only have to reserve 25 million, for the
11  same claims that Educator's is reserving 30 million
12  for; correct?
13  A  Absolutely.
14     MS. SHARP: Object to form. You need to
15  wait until he's done, just so I can get my objections
16  in; okay?
17     THE WITNESS: Okay.
18  Q  (By Mr. Gersten) And then The Hartford would
19  get to keep five -- under my hypothetical, The
20  Hartford would keep five million dollars, that it
21  wouldn't have to put into reserves for the initial
22  payment; is that correct?
23     MS. SHARP: Object to form.
24     THE WITNESS: I don't really know,
25  firsthand, how any of that works.

Page 226

1  Q  (By Mr. Gersten) Okay. Who does, as it
2  relates to the Educator's deal?
3  A  Peter Heinrichs would know.
4  Q  Okay. And he's the fella who left the company
5  somewhere between four and six months ago?
6  A  Yes.
7  Q  Anyone else?
8  A  I don't know if there are any other actuaries
9  that would know exactly how this was done.
10 Q  Are there any records of any of these
11 actuaries, that reflect how this was done?
12 A  I don't have them, no. If they exist, I don't
13 have them.
14 Q  Okay. Are they kept in a particular -- did the
15 actuarial department exist?
16 A  Yes.
17 Q  Okay. Where did it exist, physically?
18 A  In Windsor.
19 Q  Okay. What's the department called?
20 A  Group reinsurance plus actuarial area.
21 Q  And who is in charge of that actuarial area
22 today?
23 A  Right now it is directly reporting to the head
24 of group reinsurance plus, until we get an actuarial
25 replacement in for Pete.

Page 227

1  Q  Okay. And who is that fellow?
2  A  Jay Haryseko.
3  Q  One more time?
4  A  Jay Haryseko.
5  Q  Does Jay have a title?
6  A  Assistant vice-president.
7  Q  Does SIU report to Mr. Haryseko?
8  A  No.
9  Q  Does SIU report to -- I'm sorry, I have another
10 question for you. I apologize. I'm going to withdraw
11 that question and move to a different topic.
12    Showing you Exhibit 64-1-d, for just a
13 moment, do you see any reference there to your role as
14 administrator for Educator's?
15 A  This is the same one you showed me before, and
16 I said no.
17 Q  Actually, this is a different letter.
18 A  It is?
19 Q  Yes.
20 A  It looks like the same one.
21 Q  Same thing missing from it; right?
22    MS. SHARP: Object to form.
23    THE WITNESS: Yes.
24 Q  (By Mr. Gersten) Is Mr. Moryto someone who
25 works for you?

Page 228

1  A  No.
2  Q  Who does he -- as of August 2000, he was a
3  member of SIU, wasn't he?
4  A  Yes.
5  Q  So would you consider him a member of your
6  department?
7  A  No.
8  Q  Okay. So would you describe him as a field
9  representative of the claims department?
10 A  Yes.
11 Q  You would?
12 A  He works for the claim -- the home office claim
13 department; not for any particular claim office.
14 Q  I thought he works for the SIU?
15 A  SIU reports through the claim department.
16 Q  I'm just going to talk to my client. I don't
17 think I have much more for you, but I'm going to take
18 a minute.
19 A  Okay.
20    (Off the record.)
21 Q  (By Mr. Gersten) We're all done. Thank you.
22    (Deposition concluded at 4:12 p.m.)
23              *****
24
25

Page 229

1
   I, PAMELA M. MORMINO, do hereby certify that the
2  foregoing testimony given by me on July 28, 2003 is
   true and accurate to the best of my knowledge and
3  belief.
4
5
   Date            PAMELA M. MORMINO
6
7
8
9  At            in said county of
   this    day of   , 2003, personally appeared,
10 and she made oath to the truth of the foregoing
   answers by her subscribed.
11
12
13
14 Before me,            , Notary Public.
15
16
17
18
19
20
21 My Commission Expires:
22
23
24
25

58 (Pages 226 to 229)

**Page 14**

1  was satisfactory or not, to satisfy the customer. And
2  the dollar accuracy.
3      Q   And the what?
4      A   The dollar accuracy.
5      Q   What does that mean?
6      A   Of the payments.
7      Q   And when you say the turnaround time in order
8  to satisfy the customer, who is the customer?
9      A   The customer is the claimant.
10     Q   Okay. And what are these roll up reports
11 called, if I was going to ask you, Mrs. Mormino, to
12 produce them?
13     A   I'm not sure of the title.
14     Q   Okay. If I refer to them, and I said, Mrs.
15 Mormino, could you produce the roll up record for the
16 time period of 1999 to 2000, would you know what I'm
17 referring to?
18     A   Yes.
19     Q   Are they producible?
20     A   I don't know if we still have them back that
21 far.
22     Q   How far back are the records normally kept?
23     A   For quality assurance, probably a year or two.
24 But I don't know whether the report is actually still
25 available back that far.

**Page 15**

1      Q   Is the report a computer generated piece of
2  paper?
3      A   I believe it's an Excel spreadsheet.
4      Q   And who do you have to ask, to find out if they
5  could produce these roll up reports?
6      A   I'd go back to the quality assurance analyst.
7      Q   Okay. And that would be Mr. Loveland?
8      A   Yes.
9      Q   So am I correct this roll up would indicate --
10 how many people are subject to inclusion in this roll
11 up report?
12     A   That would vary.
13     Q   Okay. What are the variations?
14     A   It would vary as to how many examiners you have
15 at the time, subject to audit.
16     Q   I see. Now, you mentioned something about
17 investigators. Is that a service -- is that somebody
18 that's included in the roll up, as well?
19     A   I didn't say investigators.
20     Q   You mentioned something about investigator?
21     A   The investigative part of the claim is one of
22 the areas that is looked into. The investigative part
23 would be made up of getting the medical records,
24 getting your attending physician's statement; having
25 the proper documentation, so that you can get the

**Page 16**

1  medical records, you get your authorization form.
2          The investigative part, to look into any
3  irregularities that would be on the claim.
4      Q   Does that include involvement of the SIU unit?
5      A   If what they saw was something that might
6  indicate the necessity of referral to SIU, yes.
7      Q   And so does this roll up report indicate to you
8  how many matters were subject to some sort of
9  involvement by the SIU, during this quality assurance
10 period?
11     A   No.
12     Q   Okay. Do you get these roll ups delivered to
13 you on a regular basis?
14     A   On a monthly basis.
15     Q   Okay. And do they analyze things solely on a
16 month by month review, or is there some sort of a
17 comparison to a quarter or to a year?
18     A   Just month by month.
19     Q   Okay. Is there any other similar report that
20 puts something together in a more aggregate form, as
21 opposed to a month by month roll up?
22     A   I have a quarterly report, that gives me what
23 the percentage of accuracy is, in the office, on a
24 quarterly basis.
25     Q   Okay. And, again, percentage of accuracy means

**Page 17**

1  what, when you use it like that?
2      A   How many points that the examiners achieved on
3  an average at one hundred.
4      Q   Any other reports you receive on a regular
5  basis?
6      A   About what?
7      Q   About --
8      A   That's awfully broad.
9      Q   Okay. Any time I'm awfully broad, and you
10 don't understand, let me know; okay?
11     A   Okay.
12     Q   What other kinds of reports do you review on a
13 regular basis?
14     A   That I review on a regular basis. We -- let's
15 see. From a claim area. Most of the reports are
16 reviewed by the people under me, that have to do with
17 the claim adjudication process.
18         Or, as with this, with the quality offices.
19 Most of them are reviewed below me, and then are
20 rolled up to me. So it's very difficult for me to say
21 exactly which reports.
22         I would probably get input from the staff
23 below me, that would be telling me about a report.
24 And if I felt I needed to see it in more detail, I
25 would.

Page 18

1  Q  Fair enough.
2  A  So I don't necessarily have a barrage of
3  reports at my desk.
4  Q  Fair enough. What kind of reports do your
5  staff review?
6  A  They review pending claim reports, to make sure
7  that we don't have claims pending in pending status
8  too long. Make sure that we're taking care, again, of
9  the customers turnaround time needs.
10    They would look at -- we have ERISA reports.
11  We have some business that's ERISA. And to make sure
12  we're meeting ERISA guidelines, we have ERISA reports
13  that will tell us when any delay letters need to be
14  sent, if we haven't made a decision.
15    We try to review -- we have some new reports,
16  so I'm not sure how they're being used yet. But one
17  of them is about test change reports, when you change
18  from own occupation to any occupation, to make sure
19  those are on a timely basis.
20    Most of the reports reviewed, again, are
21  about timeliness.
22  Q  Okay. Do you have any reports that indicate to
23  you how many claims are subject the referral to SIU?
24  A  Yes.
25  Q  Okay. And what are those reports called?

Page 19

1  A  From the SIU department.
2  Q  Okay. So you get the reports from SIU?
3  A  Yes.
4  Q  Great. And do you have any reports that
5  indicate to you the amount of reserves that are
6  affected in some way?
7  A  In the SIU report?
8  Q  In general, in this overall review that your
9  staff does?
10  A  Uh, no.
11  Q  And what are the reports that are --
12  A  Can I just correct that?
13  Q  Sure.
14  A  At the end of every month I give a report to my
15  boss, that tells him how many claims -- how many
16  positive outcomes we have had.
17    And by positive outcome is return to work,
18  return to wellness, obtained Social Security for
19  somebody, recovered overpayments, claim settlements.
20    All of this is on a report that I give to my
21  boss. And on there we do put what dollar reserve that
22  affects.
23  Q  And I'm presuming you put some notation about
24  termination of benefits in that report; am I correct?
25  A  No.

Page 20

1  Q  Oh. That's not included on this claim
2  settlement?
3  A  (Shakes head.)
4  Q  Do you give any indication to your boss about
5  termination of claims?
6  A  No.
7  Q  Do you track how many claims have been
8  terminated, in your office, at all?
9  A  I, personally, do not.
10  Q  Does anybody do that tracking for you?
11  A  No.
12  Q  And who's your boss?
13  A  James Casey.
14  Q  What is his title?
15  A  He's vice-president of claims.
16  Q  Now, when you said you have people who report
17  to you on a regular basis, can you identify their
18  title? Do these people have a title that are directly
19  under you?
20  A  Yes.
21  Q  And what's their title?
22  A  I have -- do you want the names with them?
23  Q  Sure. If that's easier for you.
24  A  You were going to ask me anyway. I might as
25  well do it all at once.

Page 21

1  Q  Okay.
2  A  Deborah Laughran, she's director of LTD and STD
3  -- long term and short term disability. Peggy
4  Dembicer, D-E-M-B-I-C-E-R. She's assistant director
5  of operations and life.
6  Q  Okay.
7  A  Life claims. Those are my two direct reports.
8  Q  Are there -- is there a difference between
9  direct reports and some other kind of report?
10  A  Well, people who direct report to these people,
11  I also am in contact with fairly regularly. One would
12  be Sharon Swanson, who's a best practices manager.
13  Q  Okay. Anybody else?
14  A  Then our team leaders. There would be various
15  team leaders.
16  Q  Okay. Like Gloria Manente?
17  A  She doesn't work for us anymore.
18  Q  Okay. Do you know where she works?
19  A  Where she does now? Yes.
20  Q  Where does she work now?
21  A  She works for IDR.
22  Q  What's IDR?
23  A  I'm not sure.
24  Q  Is that in Connecticut?
25  A  Yes.