```
                                                                    Page 1
 1                 UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT
 2                        (BRIDGEPORT)
 3
 4
                                    )
 5    CANDI McCULLOCH,              )
             Plaintiff              )
 6                                  )   Civil Action No:
      Vs.                           )   301CV1115 (AHN)
 7                                  )
      HARTFORD LIFE AND ACCIDENT    )
 8    INSURANCE COMPANY and         )
      EDUCATORS MUTUAL LIFE         )
 9    INSURANCE COMPANY,            )
             Defendant              )
10                                  )
11
12            Deposition of JOHN A. McGOLDRICK, taken
      before Judith L. Kline, Certified Shorthand
13    Reporter/Notary Public in and for the State of
      Connecticut, pursuant to notice, at the law offices of
14    Gersten & Clifford, 214 Main Street, Hartford,
      Connecticut, on July 10, 2003 at approximately 1:20
15    p.m.
16
      APPEARANCES:
17
      FOR THE PLAINTIFF:
18         ELIOT B. GERSTEN, ESQUIRE
           GERSTEN & CLIFFORD
19         214 Main Street
           Hartford, CT 06106
20
      FOR THE DEFENDANTS:
21         ROBERTA JILL SHARP, ESQUIRE
           AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
22         300 Convent Street
           Suite 1500
23         San Antonio, TX 78205
24    ALSO PRESENT:
           Candi McCulloch
25
```

Page 126

1    For example, if all of a sudden the
2  investigation number was consistent, and the number of
3  impacts had dropped off, that would indicate to me a
4  probable training issue, where we weren't conducting
5  the proper investigations.
6    Q  Okay. Now then, is there any compilation with
7  respect to the impact on the DLR, based upon your
8  department's work?
9    A  Oh, I don't know.
10   Q  Okay. Well, for example, in the Candi
11 McCulloch case, didn't you indicate to someone to get
12 the DLR released, you've made a determination?
13   A  What typically happens is when the claim is
14 terminated, that would release the result.
15   Q  And are you involved in making the decision to
16 release the DLR?
17   A  No.
18   Q  Who is?
19   A  The claims people.
20   Q  When you say claims people, is there any
21 particular people that you know of?
22   A  It would be the claims staff.
23   Q  Okay.
24   A  In this case it was the group reinsurance plus
25 office.

Page 127

1    Q  Okay. I'm glad you reminded me of that. So in
2  your 79/21 (sic) figure, does it -- you're able to
3  tell the total number of claims then, in arriving at
4  this number?
5    A  It's 71/29.
6    Q  I'm sorry.
7    A  We look at the total number of investigations
8  that we have conducted.
9    Q  Okay. Do you take a look at the total number
10 of investigations, and the amount of potential
11 liability to the company?
12   A  We track that, yes.
13   Q  You do?
14   A  Yes.
15   Q  Is that contained in the same report that
16 you're talking about, that says this 79/21 (sic)?
17   A  No.
18   Q  What report is that contained in?
19   A  We track that right in the database -- the
20 Lotus Notes database or the HITS database.
21   Q  So that you can pull up, on any given day then,
22 the potential liability to the company that you've
23 referred to; correct?
24   A  We keep track of the liability associated with
25 a claim that we're investigating. Does that answer

Page 128

1  your question?
2    Q  Sure. Well, my question to you is also, in
3  terms of -- you run this department; am I correct?
4    A  Yes.
5    Q  Do you ever take a look and say, hey, we've got
6  ten million dollars worth of claims that we're
7  investigating, or ten million dollars of exposure to
8  the company in liability that we're investigating?
9    A  That's there. I don't look at it.
10   Q  When you say that's there, what do you mean
11 that's there?
12   A  The information is in our system.
13   Q  So there's information in your system that can
14 actually tell you, on a regular basis, the liabilities
15 of the claims you are examining?
16      MS. SHARP:  Object to form.
17      THE WITNESS:  I'm not real clear on what
18 you're asking. There's no -- I can't press something
19 and see how much liability is associated with claims
20 we have under investigation.
21      I do know that we track, every month or every
22 day, the number of claims that are accepted for
23 investigation, where investigations have begun. And
24 the liability associated with those claims is also in
25 our system.

Page 129

1    Q  (By Mr. Gersten) Okay. Is either one of those
2  numbers ever put together, in some sort of summary
3  fashion, at any given time?
4    A  Yes. We have a monthly performance review that
5  we do on the investigative analysts. We track the
6  work that they're investigating -- the number of
7  claims that they have under investigation. I don't
8  know if that has a liability listed in that report or
9  not. It may.
10   Q  Okay. Well, where do you get your information
11 in liability -- you said, yes. If it's not in that
12 report, where else would it be?
13   A  We could get it out of there. We could run a
14 report -- design a report to get it out.
15   Q  You could? And what would you -- you're not
16 the computer guy, I presume; correct?
17   A  No, I'm not.
18   Q  What would you do, to try to get a report like
19 that?
20   A  I would ask James Ruotolo to do it for me.
21   Q  Okay. And you would say to him, I want to know
22 the number of claims we're handling at any given time?
23   A  I could ask him that. Our system would show me
24 that. I wouldn't need to ask him to run a report on
25 that, because we do track that.

Page 130

1  Q  Okay. Average size -- you could find out the
2  total number of -- the aggregate of the liability of
3  the claims that you're looking at?
4  A  I could ask him to do that, yes.
5  Q  And you would be able to probably conduct an
6  average, in terms of the aggregate liability versus
7  the number of claims; am I correct?
8  A  Yes.
9  Q  Okay. The length of time it takes to conduct
10 an investigation; is that in this report, too?
11 A  We do do that, yes. We have reports that do
12 that, if you're referring to the MPR, monthly
13 performance review that I had mentioned. And if
14 you're referring -- go ahead.
15 Q  No, I not referring. I'm trying to learn how
16 it's all tracked. I'm not referring to anything.
17    Are you able to obtain information that
18 indicates whether a claim is a -- for example, are you
19 aware whether Candi McCulloch was an Educator's Mutual
20 claim, that came over to The Hartford, or a Hartford
21 original claim?
22 A  I know it was an Educator's Mutual -- whatever
23 it is.
24 Q  Does this system that you said you could ask
25 James to do, does that pull out which ones of the

Page 131

1  claims are Educator's versus Hartford?
2     MS. SHARP:  Object to form.
3     THE WITNESS:  I know that now. I don't
4  know that I knew it back when we were doing the
5  investigation. So let me clarify that.
6     Could it do that? We could do that. We
7  could run a report to identify by policyholder, yes.
8  Q  (By Mr. Gersten) Would it take a lot of time?
9  A  I don't think it would.
10 Q  And in terms of your percentages of 71 and 29,
11 that's something that would be available to you over
12 the past three or four years?
13 A  Yes.
14 Q  Okay. Do you know if there's any particular
15 size of claim that's attributable to either being put
16 into the 71 category versus the 29 category?
17    MS. SHARP:  Object to form.
18    THE WITNESS:  I'm not sure I understand
19 your question.
20 Q  (By Mr. Gersten) Okay. You're aware the DLR
21 in this case exceeds a million dollars?
22 A  Yes.
23 Q  And in your universe of claims, is that a small
24 claim, a medium claim, a large claim?
25 A  That's a large claim.

Page 132

1  Q  That's a large claim? Thank you. How many
2  claims that large have you been involved with in the
3  past five years?
4     MS. SHARP:  Object to form.
5     THE WITNESS:  I'm not real sure I
6  understand the question. By "you," do you mean my
7  unit?
8  Q  (By Mr. Gersten) Yes, sir.
9  A  Then I don't know.
10 Q  Does the system that you've referred to, have
11 that kind of information available to it?
12    MS. SHARP:  Object to form.
13    THE WITNESS:  Yes.
14 Q  (By Mr. Gersten) And what would you have to
15 do; ask James can you get me -- how would you ask
16 James to get you that kind of information?
17 A  I would ask him -- the information what?
18 Q  In terms of the size of the claims, and things
19 like that?
20 A  I could ask him to do a print out of all the
21 claims by reserve listed.
22 Q  Reserve list?
23 A  The reserve listed, I said.
24 Q  Oh, the reserve listed. Okay. Now, I have to
25 revert back to another question for a moment. What

Page 133

1  were the representations that Candi McCulloch made,
2  that you thought were false, in looking at the video?
3     MS. SHARP:  Object to form.
4     MR. GERSTEN:  What's wrong?
5     MS. SHARP:  I don't think that's what
6  he said.
7  Q  (By Mr. Gersten) Did I misunderstand your
8  testimony earlier, sir? Certainly, I'm not trying to
9  put words in your mouth.
10 A  I'm going to refer to a document.
11 Q  Go right ahead.
12 A  The misrepresentations that I believe she made,
13 that caused me to come to that conclusion after
14 reviewing the video.
15 Q  You're reading that from a document now, aren't
16 you?
17 A  I am.
18 Q  Which document are you reading from?
19 A  This is -- and I'm going to read more here in a
20 minute. This is one dated 4-23-00, claimant
21 questionnaire.
22 Q  Okay. Give me a second, please?
23    MS. SHARP:  I believe it was tab four from
24 that list. It was the one that didn't have a sticker.
25    MR. GERSTEN:  Thanks.

### Page 142

1  testimony, which is why I think we had a
2  miscommunication, that you observed the videotape and
3  had some reaction to it.
4      If I misunderstood you -- and I remember I
5  interrupted your answer and Attorney Sharp said you
6  were trying to answer that -- I thought you were
7  talking about when you saw the videotape, during the
8  time your investigation was taking place.
9      If you were talking about the videotape
10 currently, I apologize. So that was my fault.
11     I'm going to take you back to the time period
12 now, when this investigation was taking place and ask
13 you if you made any observations when you saw the
14 videotape?
15  A  Yes.
16  Q  Okay. Did you express any of those
17 observations?
18  A  I recall being at a meeting where it was
19 generally discussed. I don't recall whether or not I
20 did or not. If I did, I very well might have.
21     If I didn't, I was certainly in agreement
22 with the consensus that what we were seeing on the
23 videotape was very contrary to the information that we
24 had acquired prior to the surveillance.
25  Q  Okay. Now, as you sit here today then,

### Page 143

1  you have no recollection of uttering any reaction
2  relating to your observations of what was seen by you
3  on the videotape; is that your testimony?
4   A  My testimony is that I don't recall if I said
5  something or not.
6   Q  Thank you.
7   A  That's correct.
8   Q  That's what I wanted to know.
9   A  Yes, sir.
10  Q  And do you recall a decision to send the
11 videotapes to the IME?
12  A  I don't recall.
13  Q  Is that standard operation in your office?
14  A  Yes.
15  Q  Okay. Why would you send a videotape to an
16 IME?
17  A  The reason that that's done, as I understand
18 it, is to allow the IME physician to view the evidence
19 that we have acquired, to help them with their medical
20 evaluation.
21  Q  Okay. And that's done by -- when you say as
22 far as I understand it, that's something that SIU
23 does?
24  A  Kim Gabrielsen might have done it in this case,
25 or it might have been the claims staff. I don't know.

### Page 144

1   Q  And when we talk about Kim, she's working at
2  the SIU section. She's not a claim person, is she?
3   A  She is assigned to the office. She works in
4  the claim office. She has a distinct responsibility,
5  and works for SIU. But she supports the claim office
6  where she is assigned.
7   Q  And she supports the claim office for purposes
8  of conducting her -- what you have called the fraud
9  investigation; am I correct?
10  A  Yes.
11  Q  And she's not there as an expert in processing
12 the claim, is she?
13  A  No, she's not.
14  Q  Now, do you get bonuses in your job?
15  A  Yes.
16  Q  And how do bonuses get awarded?
17  A  How do bonuses get awarded. In my case, do you
18 mean?
19  Q  Yes, sir.
20  A  According to how well I execute my job, in my
21 unit.
22  Q  And are there any sort of objective criteria
23 used, in determining the answer to that question?
24  A  Yes. I have the guidelines I'm supposed to
25 operate under, how well I execute the budget, how well

### Page 145

1  I manage my staff, the promptness in reports sent to
2  management. General criteria.
3   Q  What kind of reports are sent to management?
4   A  I send monthly management -- MML's they're
5  called. I think monthly management letter it stands
6  for. It has to do with our results.
7      I send reports on -- we have a report on head
8  count -- you know, the number of people within the
9  unit. I keep organizational charts, or cause
10 organizational charts to be maintained. I'm
11 responsible for recruiting and hiring people into the
12 unit, interviewing.
13     Performance management is part of my
14 responsibility. Supervision of the employees within
15 the unit are my responsibility. Establishing best
16 practices, and making sure they get established around
17 SIU activities, is part of my responsibility.
18     Interaction -- effective, positive
19 interaction with the claim office staff is my
20 responsibility.
21  Q  Now, how often are bonuses awarded to you,
22 personally?
23  A  Typically, bonuses are awarded in a paycheck
24 normally about March 15th, I believe.
25  Q  March 15th of every year?

Page 146

1  A  Yes. That's when the company awards bonuses.
2  Q  Okay. And when you say the company awards
3  bonuses, I'm talking about Mr. McGoldrick, personally?
4  A  Well, I get it the same time the rest of the
5  company gets it.
6  Q  And are you involved in giving bonuses to
7  people like -- or making the decision to give bonuses
8  to people like Kim Gabrielsen?
9  A  Yes.
10 Q  Okay. Do you know if Kim Gabrielsen got a
11 bonus in -- what's the fiscal year, January to
12 December?
13 A  Yes.
14 Q  Okay. So do you know if Kim Gabrielsen got a
15 bonus in the year 2001, covering the fiscal year
16 before?
17 A  I looked that up, thinking you would probably
18 ask this question, and found that she did not.
19 Q  Excuse me?
20 A  She did not.
21 Q  Why would you think I would ask that question?
22 A  If I were you, I would. And you did, so... .
23 Q  When did you look it up?
24 A  Pardon?
25 Q  When did you look that up?

Page 148

1  assign a percentage bonus to all qualifying employees.
2  And, basically, qualifying employees would be those
3  that have been there, and were not being performance
4  managed during the year.
5  Q  Performance what, sir?
6  A  Performance managed. In other words, you're
7  not under some performance plan -- discipline --
8  potential discipline. So all employees would get
9  that. I'm assuming that we had that in 2001, so Kim
10 Gabrielsen would have gotten that.
11 Q  So she did get a bonus?
12 A  Almost all employees would have gotten that.
13 Q  Okay.
14 A  There's also something called the individual
15 performance award. And that would have to do,
16 obviously, with individual performance. Kim
17 Gabrielsen did not get one in that time period. I
18 think I probably did, although I didn't look at my
19 records.
20 Q  There is some term called GEMS?
21 A  Yes.
22 Q  Is that a bonus, too?
23 A  Not really a bonus. It would be a -- I forget
24 what the acronym stands for, but they're called GEM
25 awards. And those would be $50 savings bonds, that

Page 147

1  A  This morning.
2  Q  Okay. So was that one of the documents you
3  looked at, for purposes of preparing yourself for the
4  deposition?
5  A  I looked at that on-line.
6  Q  Okay. What else did you look at, in preparing
7  for the deposition today, that you haven't mentioned
8  so far?
9  A  I don't recall any others. There may have been
10 some. I don't recall any others.
11 Q  Okay. Do you know if you received a bonus in
12 the year 2001, covering the time period 2000?
13 A  I would think I did. I don't recall for sure.
14 Q  That wasn't a question you expected me to ask,
15 so you didn't look it up?
16 A  I didn't look it up. I could have. I didn't.
17 And there's several kinds of bonuses. I should make
18 sure you understand that.
19     We have something called a business
20 performance award. This is -- has to do with the
21 profitability of the company in general, Hartford
22 Life, the specific division of The Hartford. And
23 there's other factors. Customer satisfaction plays
24 into it. There's several different factors.
25     And they have a rating system, by which they

Page 149

1  are given to individual employees. I guess it would
2  be a bonus, yes.
3  Q  And is there some sort of tracking system that
4  you could look up, and see if anybody had a GEM award?
5  A  There must be. I wouldn't know where to find
6  it.
7  Q  Did you look to see if Kim Gabrielsen got a GEM
8  award in any year?
9  A  No, I didn't.
10 Q  So there's more than one kind of bonus,
11 apparently, that can be awarded?
12 A  Yes. There's also something called special
13 achievement awards. They're usually around projects
14 above and beyond what you're supposed to do in your
15 job. I don't have a record that she got one of those
16 that year either.
17 Q  Okay. But you didn't look for that?
18 A  No. It should have been in the system. It was
19 not.
20 Q  Okay. And what about Mr. Moryto; did he get
21 anything?
22 A  I didn't look him up. I don't know the answer
23 to that.
24 Q  Okay. Let me show you another document that --
25 we're up to 73 -- and ask if you remember this

38 (Pages 146 to 149)