UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CANDI McCULLOCH                  §     CIVIL ACTION NO.:
    Plaintiff,                   §     301CV1115(AHN)
                                 §
vs.                              §
                                 §
HARTFORD LIFE AND ACCIDENT       §
INSURANCE COMPANY AND            §
EDUCATORS MUTUAL LIFE            §
INSURANCE COMPANY                §
    Defendants.                  §     November 6, 2003

---

## MEMORANDUM IN SUPPORT OF HARTFORD LIFE & ACCIDENT INSURANCE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

      Plaintiff is an internist and former director of a women's clinic. She is insured under a group disability policy underwritten by Hartford. Plaintiff claims to be totally disabled due to chronic pain as well as cognitive impairment from the medications she takes for pain. In the course of gathering routine information to update Plaintiff's claim file a few years after her initial claim was accepted, Hartford encountered "red flags" raising questions as to the nature and extent of Plaintiff's disability. Hartford sought additional information from Plaintiff, gathered and reviewed records from her treating physicians, sought input from an independent medical examiner as well as an on-staff physician, and obtained video surveillance of Plaintiff conducting activities dramatically inconsistent with her claimed limitations. On the basis of all the information, Hartford determined she was not eligible for disability benefits under the Policy.

      Rather than address the compelling evidence supporting Hartford's decision, Plaintiff argues Hartford was not entitled to investigate her continuing eligibility for benefits in the first place. Hartford's right to investigate is recognized by common law, by statute, and by the policy itself. Plaintiff's disagreement with the resulting decision falls far short of the heavy burden she bears in proving "bad faith," and Hartford is entitled to judgment as a matter of law.

063670.0229 WEST 5392120 v2                    1

## MATERIAL UNDISPUTED FACTS

*Hartford Assumed Responsibility For Administration Of Claims And Any Benefits Due
Under Plaintiff's Policy By The Terms Of A July 1999 Reinsurance Agreement.*

In 1969, Educators Mutual Life Insurance Company ("Educators") contracted with Group
Insurance Administrators ("GIA") to underwrite and administer a group long-term disability plan
for the American College of Physicians ("ACP").[2]  Plaintiff Candi McCulloch applied for
disability benefits through ACP in September 1994.[3]  Her disability coverage became effective
on September 24, 1994.[4]  Educators is a co-defendant in this suit and has separately moved for
summary judgment.

On April 15, 1997, GIA and ACP terminated their relationship with Educators and moved
their long-term disability plan to another insurance company.[5]  After April 1997, Educators was
no longer writing professional association policies or accepting premiums; its only involvement
was the administration of open disability claims such as Plaintiff's.[6]  This prompted Educators to
begin negotiations with Hartford to sell all of its open professional association disability claims.[7]
On July 1, 1999, Educators and Hartford executed a reinsurance agreement by which Educators
ceded 100 percent of its liability for and the administration of its open professional association
claims, including Plaintiff's, to Hartford.[8]

Educators informed Plaintiff and other claimants whose claims were subject to the
Reinsurance Agreement that Hartford would be responsible for the administration of their claims

---

[2] Hartford's Rule 56(a)(1) Statement, ¶ 10.

[3] *Id.*

[4] Plaintiff also had disability insurance through her employer and UNUM.

[5] *Id.* ¶ 16.

[6] *Id.* ¶ 17.

[7] *Id.* ¶ 19.

[8] *Id.* ¶ 18.

after August 1999.[9]  In an August 26, 1999 letter to Plaintiff, Educators explained it had contracted with Hartford to administer her benefits and that Educators would continue her benefits through October 31, 1999 to accommodate the transfer of her claim.  Thereafter, she would receive her benefit payments from Hartford.  Educators advised Plaintiff to contact Hartford directly if she had any questions regarding her claim.[10]

***The Policy Provides for Continuing Annual Review Of Claims.***

Under the Policy, an insured is Totally Disabled when she is "unable to perform the material and substantial duties of [her] occupation as it existed at the time [her] disability began."[11]  Payment of benefits is subject to a number of terms contemplating that benefits are payable only for such period as disability continues.  For example, in the event of Total Disability, the monthly benefit amount will be paid "for each complete month of disability," and "benefits will be paid *for the period that disability continues* beyond the Disability Waiting Period shown in the Schedule of Benefits."[12]  (Emphasis added.)  The "Maximum Benefit Period" for injury is the insured's lifetime and for sickness is age 65.[13]

The Policy provides that Hartford may review an insured's right to continuing disability payments at reasonable intervals.  For example, the insured must provide timely written notice and written proof of loss to the insurer, and must provide "[l]ater proofs of the continuance of [her] disability…at such intervals as [the insurer] reasonably require."[14]  The Policy also reserves

---

[9] *Id.* ¶ 21.
[10] *Id.* ¶ 22.
[11] *Id.* ¶ 1.
[12] *Id.* ¶ 2.
[13] *Id.* ¶ 4.
[14] *Id.* ¶ 5.

to Hartford the right to examine the insured "when and as often as it may reasonably require while a claim is pending."[15]

The Policy may be changed at any time and "no consent of any person insured hereunder is needed for such a change."[16]  Finally, the Policy contained the following merger clause:  "the master policy, the copy of the application of the policyholder attached to it and the applications submitted by members constitute the entire contract between the parties."[17]

***Hartford's Investigation Of Plaintiff's Disability Claim Began With A Routine Annual Review.***

Plaintiff first submitted a claim for disability benefits under the Policy on October 11, 1995.[18]  According to the letter notifying Educators of her claim, Plaintiff claimed she fell while skiing in February 1995, and as of October 3, 1995, was disabled due to back and neck pain.[19]

At the time of her initial claim, Plaintiff was employed by Primary Care Medical Associates ("PCMA") pursuant to two written employment contracts.[20]  These agreements called for her to work 16 hours per week as an internal medicine physician and 30 hours per week performing administrative duties as medical director of the Phyllis Rothman Women's Center.  In support of her claim for benefits, Plaintiff provided Educators an employer statement outlining her job duties, and an Attending Physician Statement ("APS") completed by Dr. Charles Theofilos, indicating she had a "severe limitation of functional capacity."[21]  Educators began

---

[15] *Id.* ¶ 7.

[16] *Id.* ¶ 9.

[17] *Id.* ¶ 8.

[18] *Id.* ¶ 14.

[19] *Id.* ¶ 14.

[20] *Id.* ¶ 13.

[21] A true and correct copy of the APS signed by Dr. Theofilos is attached as Tab 31 to the Laughran Aff., which is attached as Exhibit A to the Rule 56(a)(1) Statement.

paying Plaintiff benefits on March 22, 1996.[22]  In February 1996, Plaintiff submitted an

Application for Continuation of Disability Benefits, in which Dr. R. Eric Santos opined that

Plaintiff was had a "moderate limitation of functional capacity" and "was "capable of

clerical/administrative (sedentary) activity."[23]

Shortly after Hartford's assumption of responsibility for the ACP open claims pursuant to

the Reinsurance Agreement, Hartford claim examiner Susan Wilk undertook a routine annual

review of Plaintiff's claim.[24]  On December 15, 1999, in accordance with Hartford's claim

procedures, Wilk requested Plaintiff provide an up-to-date APS, a claimant questionnaire, a

person profile evaluation ("PPE"), and an authorization to obtain information from Plaintiff's

medical providers.[25]  Wilk received the authorization and claimant questionnaire from Plaintiff

on January 19, 2000, but did not receive the APS or PPE.[26]

In the claimant questionnaire, Plaintiff described her current condition as "chronic pain

from cervical neck pathology . . . herniation at C5-C6."  She stated the "pain affects every aspect

of my life . . . makes me unable to perform the duties of my specialty of internal medicine . . .

[and] restricts me in all activities."  She provided a list of the physicians she had consulted in the

last 18 months including Dr. Carine Porfiri, her primary care physician, Dr. Beverly Walters, a

neurosurgeon, and Bruce Coulombe, D.C., a chiropractor.[27]

---

[22] Although Educators paid Plaintiff disability benefits, it continually gathered information to determine whether Plaintiff still met the definition of total disability under the Policy.  In 1997, Educators suspended benefit payments for approximately 3 months due to questions about whether Plaintiff still met the definition of disability.

[23] A true and correct copy of the Application for Continuation of Disability Benefits is attached as Tab 32 to the Laughran Aff., which is attached as Exhibit A to the Rule 56(a)(1) Statement.

[24] Rule 56(a)(1) Statement, ¶ 23.  Hartford's claim manual provides that claims should be reviewed every twelve to eighteen months.  *Id.* ¶ 24.

[25] *Id.* ¶ 24.

[26] *Id.* ¶ 26.

[27] *Id.* ¶ 27-28.

On January 28, 2000, Wilk requested by telephone that Plaintiff provide a copy of her driver's license for purposes of age verification.[28]  Wilk requested this information because she noticed that Plaintiff's of birth year was sometimes noted in her file as 1958, and sometimes as 1957.[29]  Wilk requested Plaintiff's driver's license again on February 1, 2000 and February 4, 2000, without response from Plaintiff.[30]

On or about February 2, 2000, Wilk received an APS from Dr. Porfiri, a family practitioner in Florida and Plaintiff's former co-worker at PCMA.[31]  Dr. Porfiri stated Plaintiff's diagnoses were "chronic pain, herniated cervical disc, TMJ and migraines," and Plaintiff had decreased range of motion and muscle spasms in her neck.  She concluded Plaintiff was "unable to perform the material duties of her profession."[32]

Dr. Porfiri's APS indicated she had last seen Plaintiff in her office on November 18, 1999.[33]  However, when Wilk called Dr. Porfiri's office in late January 2000 to check on the status of the APS, she was informed that Plaintiff had not visited Dr. Porfiri's office since 1997.[34]  Dr. Porfiri's Attending Physician Statement was the only one Plaintiff ever submitted to Hartford.  Dr. Porfiri did not state that Plaintiff was unable to work because the pain medication she was taking impaired her cognitive abilities, as Plaintiff now asserts.[35]

---

[28] *Id.* ¶ 30.

[29] *Id.*  Hartford's claim procedures require that when a discrepancy exists regarding a claimant's birth date, age verification is required to ensure the maximum benefit period is applied.

[30] *Id.* ¶ 32.

[31] *Id.* ¶ 33.

[32] *Id.* ¶ 34.

[33] *Id.* ¶ 35.

[34] *Id.*  Dr. Porfiri has since admitted in her deposition that her records did not reflect an office visit by Plaintiff in November 1999 and that the date on the APS was likely an error. Porfiri Depo. at 145:13-25.

[35] Laughran Aff., Tab 5; Porfiri depo. at 153:13-18.

On April 4, 2000, Wilk requested by letter a brief, narrative report describing Plaintiff's current condition and a complete copy of office records from October 1, 1998 to the present from Drs. Porfiri, Walters, Coulombe, Glover (a urologist), Bello and Silverstein (both gynecologists). These were all the physicians Plaintiff disclosed on her claimant questionnaire.[36]

### Hartford Investigated Plaintiff's Claims Further As A Result Of "Red Flags."

By this time, Wilk had noted a number of "red flags" regarding Plaintiff's claim: Plaintiff's failure to provide a copy of her drivers license despite repeated requests; the fact that Plaintiff's APS was submitted by a physician in Florida, though Plaintiff lived in Massachusetts; and the report by Dr. Porfiri's assistant that Plaintiff had not been seen by the doctor in her office since 1997.[37]  Hartford's claim procedures require claim examiners to be alert to red flags, and if any red flags are noted, to refer the file to Hartford's Special Investigations Unit (SIU).[38] Hartford Investigative Analyst Kim Gabrielson reviewed the claim and found a sufficient basis to conduct further investigation, based in part on the fact that Plaintiff resided in Massachusetts but submitted an APS from a Florida doctor.[39]

By April 11, 2000, Wilk had yet to receive verification of Plaintiff's date of birth and sent Plaintiff a letter again requesting she provide a copy of her driver's license or passport and complete a PPE.[40]  Wilk also continued her efforts to gather information from Plaintiff's medical

---

[36] *Id.* ¶ 36.

[37] *Id.* ¶ 38. Red flags include the "[c]laimant hid[ing] or alter[ing] other identifying documents (Driver's License, Passport, etc.)," "[t]he Attending Physician (s) are not in the same geographic area as the claimant," and "knowledge, experience, instinct and intuition tell you that something is not right." *Id.* ¶ 37.

[38] *Id.* ¶ 37.

[39] Gabrielsen depo. at 72:15-73:15. Upon referral to SIU, an SIU investigative analyst reviews the basis for referral and determines whether there is sufficient basis to investigate the claim. SIU accepts only 50% of claims referred. McGoldrick Aff. ¶ 5.

[40] *Id.* ¶ 40.

providers, and requested that PCMA, Plaintiff's former employer, complete a Physical Demands Analysis as it applied to Plaintiff's former position as an Internist.

On April 25, 2000, Wilk received a copy of Plaintiff's passport and a completed PPE. [41] In her PPE, Plaintiff stated she "had chronic pain from cervical disc herniation, TMJ, and low back pain requiring pain medication and constant care which make working as an internist impossible." She further stated she had "constant neck, interscapular, and low back pain which limit and restrict all [her] ordinary physical activities."[42]

On May 2, 2000, Wilk received medical records from Dr. Walters that indicated Plaintiff had been seen by Dr. Walters only twice, once on September 21, 1998 and again on June 10, 1999, complaining of pain in the neck, upper back and shoulder blades.[43] Dr. Walters stated that she advised Plaintiff to have surgery, but Plaintiff "had no interest in pursuing it."[44]

On May 17, 2000, Kim Gabrielson arranged for video surveillance to be taken of Plaintiff. Surveillance was initially conducted on May 22, 2000 and May 23, 2000.[45] On those dates, Plaintiff was observed turning her head and shoulders to see behind her while driving in reverse drinking coffee, talking on a cell phone while driving, bending into the back of her vehicle (Exhibit 14A), and entering her vehicle with no obvious discomfort (Exhibit 14B). Based on the activities observed, Gabrielsen scheduled more surveillance, which was conducted on June 20, 2000. On that date, Plaintiff was observed carrying a large plant from her Porsche to her son's school (Exhibit 14C), dancing at a party at her son's school, (including stooping and

---

[41] *Id.* ¶ 41.

[42] *Id.* ¶ 42.

[43] *Id.* ¶ 43.

[44] *Id.*

[45] The videos are attached as Tab 14 to the Laughran Aff. and may be viewed on CD ROM. Exhibits 14A through 14H are still shots excerpted from the video surveillance.

bending) (Exhibits 14 D, E and F), sitting and standing, and departing the party by car with no

apparent difficulty getting in the vehicle or with driving maneuvers (Exhibits 14G and H).  In all,

the videotaped surveillance spanned several hours, during which Plaintiff exhibited no "pain

behaviors."[46]

### On The Basis Of All The Information, Hartford Concluded Plaintiff No Longer Met The Definition Of Totally Disabled Under The Policy.

On July 11, 2000, Joseph Sterle, a disability case manager for Hartford, requested

Plaintiff undergo an Independent Medical Examination ("IME") and Functional Capacities

Evaluation ("FCE").[47]  When contacted by Sterle, Plaintiff provided the names of three more

physicians from whom she had sought treatment: Dr. Ignacio Magana, a neurosurgeon, Dr.

Jordan Grabel, a neurosurgeon, and Dr. Andrew Slavin, an oral surgeon. [48] Sterle requested

medical records from these physicians.[49]

Sterle scheduled an IME/FCE for Plaintiff at the Sunnyview Hospital and Rehabilitation

Center, in Schenectady, New York, on August 2, 2000.[50]  Plaintiff objected to attending the

IME/FCE, citing the distance of the center from her home.[51]  After Plaintiff objected, Sterle

searched for a physiatrist closer to Plaintiff's home and ultimately arranged for Plaintiff to

undergo an IME by Dr. Asha Garg in Worchester, Massachusetts on August 14, 2000.[52]  Sterle

sent Dr. Garg copies of Plaintiff's medical records.[53]  Kim Gabrielsen sent Dr. Garg the video

surveillance and asked her to review the video to determine if the functionality shown by

---

[46] Amato depo. at 154:19-155:5.

[47] Rule 56(a)(1) Statement, ¶46.

[48] Id. ¶ 47.

[49] Id.

[50] Id. ¶ 48.

[51] Id. ¶ 49.

[52] Id. ¶ 50.

[53] Id.

Plaintiff corresponded to the way she presented for examination and whether it changed her initial opinion of Plaintiff's functionality.[54]

Hartford's procedures require, in every instance in which video surveillance appears to contradict the claimant's stated disability, that a Hartford field representative conduct an in-person interview to confirm the person on the video is the claimant and allow the claimant an opportunity to explain the activities on the video.[55] On August 15, 2000, Wilk wrote to McCulloch to arrange an in-person interview with William Moryto, a field investigator for Hartford's SIU department.[56] Plaintiff objected to the interview in a number of letters and phone calls, but eventually agreed to meet with Moryto on September 8, 2000.[57]

During the interview, Plaintiff told Moryto she was in constant, chronic pain and signed a statement stating "if I bend over, it ends up increasing the pain…I have constant pain in my neck. It is between my shoulder blades and my neck. The neurological pain is in my shoulder. It is a very deep pain. The pain in my neck and scapula is always there." She specifically denied being able to dance and said "I wish I could dance." Plaintiff also provided Moryto for the first time the names of yet more doctors who had treated her, including Dr. Baker, a new primary care doctor, Dr. Roland Johnson, an orthopedist, and Dr. Richard Norris, a physiatrist. She also advised Moryto that she filled prescriptions for Ultram and Vicodin at "CVS 90 Main St. Northampton, MA" and she thought she had filled her prescription for Percocet at "Eckerd's on Australian Ave in West Palm Beach."[58] After Plaintiff signed her statement, Moryto described the activities she was observed performing when video surveillance was conducted. Upon

---

[54] *Id.* ¶ 51.
[55] *Id.* ¶ 52.
[56] *Id.* ¶ 53.
[57] *Id.*
[58] *Id.* ¶ 54-55.

learning that she was observed dancing, she responded that she was drinking and taking medications that day, but she refused to sign a statement to that effect and would not watch the video.[59]

Dr. Garg issued a preliminary IME report on September 8, 2000. In her report, she stated Plaintiff "ambulated well, there was no limp," her "range of motion was normal" but slightly painful in her cervical spine and lumbosacral region, and that she did not show any signs of being in pain during her interview of Plaintiff.[60] In regard to the video surveillance, Dr. Garg stated that the functionality Plaintiff showed in the video did not correspond with the way she presented for examination, and the "video change[d] my opinion somewhat in terms that she's able to function pretty well in her routine activities but I still do not think she will be able to do heavy work." Dr. Garg concluded that based on her review of the detailed medical information, the history provided by Plaintiff her examination, and her review of the videos, her opinion was that Plaintiff should be able to perform the duties of her occupation as an internist for 16 hours a week and as administrator of a women's clinic for 30 hours a week.[61]

Upon receiving Dr. Garg's initial report, Sterle called Dr. Garg to request further explanation regarding her conclusions and that she provide the results of the FCE.[62] In Garg's final report of September 21, 2000, the only change was deletion of the comment that Plaintiff should avoid heavy work.[63] In response to Sterle's request for details of the FCE, Garg provided a summary statement that Plaintiff "should be able to do light duty work without any problems"

---

[59] *Id.* ¶ 56.
[60] *Id.* ¶ 58.
[61] *Id.* ¶¶ 59-60.
[62] *Id.* ¶ 61.
[63] *Id.* ¶ 63.

if she avoided heavy lifting, frequent bending, stooping, twisting and kneeling, and staying in one position for more than an hour.[64]

On or about September 13, 2000, Kim Gabrielsen took steps to obtain medical records from the physicians identified by Plaintiff in her September 8, 2000, statement, including Dr. Christine Baker, Dr. Roland Johnson, and Dr. Richard Norris.[65] She also requested pharmacy records from the Eckerd pharmacy in West Palm Beach and the CVS pharmacy on 90 Main Street in Northampton, the pharmacies McCulloch disclosed in her September 8, 2000 statement.[66] Gabrielsen was unable to find any record of prescriptions filled for Plaintiff at an Eckerd pharmacy in West Palm Beach.

On October 13, 2000, in accordance with Hartford's claim procedures, Wilk sent Drs. Porfiri, Johnson, Norris, Baker and Magana letters enclosing the IME report, Plaintiff's September 8 statement, and the surveillance videos, requesting they review the materials and comment.[67] Dr. Baker responded it was not her practice to review video surveillance or IME results.[68] Dr. Norris responded that his involvement in Plaintiff's care was rather limited and he preferred not to comment on the video despite the fact he had seen Plaintiff in his office just the day before one of the videotaped surveillances.[69] Drs. Porfiri and Johnson declined to respond at all.[70]

---

[64] *Id.* ¶ 63. Marsha Esson, the nurse disability case manager who took over for Sterle, reviewed the revised version of the IME/FCE report of September 28, 2000. She called Dr. Garg's office to inquire whether formal testing had been done and learned it had not. Laughran Aff., Tab 5 at 10.

[65] *Id.* ¶ 64.

[66] *Id.*

[67] *Id.* ¶ 67.

[68] *Id.* ¶ 70.

[69] *Id.* ¶ 69.

[70] *Id.* ¶ 68.

Dr. Ignacio Magana was the only one of Plaintiff's treating physicians to comment. Dr. Magana agreed with Dr. Garg that the level of Plaintiff's "complaints is different from what she describes than what we see in the video." He wrote:

> It is my opinion that this patient is capable of working in the following manner: She should be allowed to change her position every hour, she should avoid lifting more than 20 pounds, occasionally or 10 pounds repetitively. *Within these restrictions, she would seem capable of working a full eight hour day. She would, in my opinion be capable of practicing medicine two days a week as she was doing prior to her injury.* (Emphasis added.)[71]

On or about November 9, 2000, Wilk requested a review of the records by Dr. Joseph Amato.[72] Dr. Amato is an internal medicine physician and an independent contractor retained by Hartford to provide consulting reviews as requested.[73] Dr. Amato reviewed Plaintiff's medical records, the IME report, and the surveillance videos.[74] Based on his review Dr. Amato agreed with Dr. Garg and Dr. Magana that Plaintiff should be able to perform 16 hours of patient care as an internist and 30 hours of light work as a medical director for a total of 46 hours per week.[75]

***Hartford Notified Plaintiff Of Its Decision On November 17, 2000, And Requested Any Additional Information.***

On November 10, 2000, based on all the information gathered in connection with Plaintiff's claim, Kim Gabrielsen prepared a termination letter.[76] Kim Huber, a claim specialist, conducted a final review and agreed that procedures had been followed and that the termination

---

[71] *Id.* ¶ 71.
[72] *Id.* ¶ 72-73.
[73] *Id.* ¶ 73.
[74] *Id.* ¶ 74.
[75] *Id.*
[76] *Id.* ¶ 75.

was supported.[77]  On November 17, 2000, Kim Gabrielson signed the termination letter and sent it to Plaintiff.[78]

Throughout the investigation of Plaintiff's claim, Wilk and Gabrielson sought advice from, and Plaintiff's claim was reviewed by, others in the claim and investigative units.  These individuals included Diane Favreau and Kim Huber, both claim specialists, SIU Director, Jack McGoldrick, William Moryto, a field investigator, Joseph Sterle and Marsha Esson, both nurse disability case managers, Dr. Joseph Amato, a physician, and Deborah Laughran, the director of long-term disability claims.  The decision to terminate Plaintiff's claim was the result of a consensus developed through this team approach.

Gabrielsen's November 17 letter identified the information Hartford relied upon in reaching its decision to terminate benefits, including the medical records obtained from the physicians Plaintiff disclosed to Hartford, the video surveillance, Plaintiff's September 8, 2000, statement, the pharmacy records for the pharmacies disclosed by Plaintiff, Dr. Garg's report, and the conclusion by Hartford's medical reviewer that the weight of the evidence contained in Plaintiff's file did not support her claimed inability to perform the duties of her occupation.  The termination letter expressly invited Plaintiff to provide any additional information she wished Hartford to consider.

On November 30, 2000, Plaintiff's attorney wrote Gabrielsen to request a copy of her claim file.[79]  On December 1, 2000, Gabrielsen inquired whether Plaintiff intended to appeal the

---

[77] *Id.* ¶ 76.

[78] *Id.* ¶ 77.

[79] A true and correct copy of the November 30, 2000 letter is attached as Tab 33 to the Laughran Aff.

claims decision.[80]  Plaintiff's attorney responded that he was seeking the claim file in order to

determine whether Plaintiff should appeal.[81]  Gabrielsen sent him the claim file in response.[82]

On January 8, 2001, Plaintiff's attorney advised Gabrielsen by letter that he needed more

time to pursue an appeal because he was trying to assemble his own records to support Plaintiff's

disability claim.  He stated he was "currently obtaining records from out of state druggists to

show that your decision relied on incomplete 'surveys' of the record of prescriptions written for

my client."[83]  Gabrielsen provided Plaintiff with an extension of time to appeal her claim, but

Plaintiff did not provide any additional information.

Rather than appeal Hartford's decision or provide additional information to support her

claim, Plaintiff filed this lawsuit on June 15, 2001.

## ARGUMENT AND AUTHORITY

I.   **PLAINTIFF'S DISAGREEMENT WITH HARTFORD'S DECISION DOES NOT CONVERT AN ALLEGED BREACH OF CONTRACT INTO "BAD FAITH."**

    A.   **Hartford's Right to Investigate Claims is Well Founded in Law and in the Policy.**

Hartford's right to investigate Plaintiff's continuing eligibility for disability benefits is

grounded in common law, and statute, reflected in Hartford's internal claim procedures, and is

incorporated in the language of Plaintiff's policy.

An insurer's right and duty to investigate and administer claims does not end, as Plaintiff

claims, with proof of loss and initial acceptance of liability under the Policy.  An insurer such as

Hartford has a duty and a right to investigate claims to determine an insured's continuing

---

[80] A true and correct copy of the December 1, 2000 letter is attached as Tab 34 to the Laughran Aff.

[81] A true and correct copy of the responsive letter is attached as Tab 35 to the Laughran Aff.

[82] A true and correct copy of Gabrielsen's December 7, 2000 letter is attached as Tab 36 to the Laughran Aff.

[83] A true and correct copy of the January 8, 2001 letter is attached as Tab 37 to the Laughran Aff.