eligibility for benefits. *See, e.g., Zakeosian v. Provident Life & Accident Ins. Co.,* 1999 U.S. Dist. LEXIS 6292, at *4-5 (E.D. Pa. April 26, 1999) ("it is axiomatic that when an insured makes a claim for disability benefits, the insurer is entitled to all relevant medical records, not only in order to evaluate the claim initially, but to verify the continuation of the alleged disability. To hold otherwise would be an open invitation to fraud");[84] *Tucker v. American Employers' Ins. Co.,* 171 So. 2d 437, 438 (Fla. Dist. Ct. App. 1965) ("because of the public interest in exposing fraudulent claims, a plaintiff must expect that a reasonable investigation will be made subsequent to the filing of a claim").

In fact, Hartford is required by the laws of 39 states to investigate possible insurance fraud.[85] For example, the Connecticut Health Insurance Fraud Act requires that insurers who have reason to suspect insurance fraud notify the Insurance Commissioner and provide any supporting information or evidence to the Commissioner. *See* Conn. Gen. Stat. § 53-445. Similarly, in Massachusetts, insurance company personnel who have reason to believe an insurance transaction is fraudulent are required to report fraud to the Insurance Fraud Bureau of Massachusetts ("IFB"). The IFB requests that fraud reports be supported by documentation such as IMEs, surveillance for more than one day, recorded statements, and SIU or private investigator reports.[86] Hartford established its SIU unit in part to comply with the insurance laws of these states.[87]

Hartford's internal claim procedures carry out these policies by mandating periodic review and evaluation of claims to determine whether an insured continues to be eligible for

---

[84] Attached as Exhibit D to the Rule 56(a)(1) Statement.
[85] McGoldrick Aff.¶ 4.
[86] *Id.*
[87] *Id.*

benefits. Claim examiners are to perform an annual review of a claim every twelve to eighteen months. Claim examiners are taught to be alert to "red flags" that may indicate fraud by an insured, and if red flags are noted, refer the file to SIU. Upon referral, an SIU investigative analyst independently reviews the basis for referral and determines whether there is sufficient basis to investigate the claim.

Hartford's right to investigate Plaintiff's claim for continuing disability is expressly recognized in the Policy. The Policy does not vest in Plaintiff a right to perpetual payment of benefits merely because Educators made an initial determination that she was disabled under the Policy. Rather, the clear language of the Policy provides for benefit payments only so long as Plaintiff continues to meet the definition of Total Disability. Benefits are payable "for each complete month of disability,"[88] for the period that disability continues beyond the Disability Waiting Period."[89] The Policy requires a claimant to provide "later proofs of the continuance of [her] disability" at such intervals as Hartford reasonably requires. Moreover, the Policy gives Hartford the right to examine Plaintiff at its own expense "when and as often as it may reasonably require while a claim is pending."[90]

Plaintiff's claim that Hartford acted in bad faith by investigating her claim cannot support a cause of action and should be dismissed as a matter of law.

---

[88] Rule 56(a)(1) Statement, ¶ 2.

[89] *Id.* ¶ 5.

[90] *Id.* ¶ 7. Plaintiff contends the phrase "claim is pending" means that Hartford was limited to examining Plaintiff when she first made her claim for benefits under the policy, citing Hartford's claims manual for the definition of "pending." Plaintiff offers no authority for the proposition that Hartford's internal claim manual alters the terms of the contract. The Policy, which was written and issued by Educators, not Hartford, contains a merger provision providing "the master policy, the copy of the application of the policyholder attached to it and the applications submitted by members constitute the entire contract between the parties."

**B.    Hartford Thoroughly Investigated Plaintiff's Claim and Considered
       All The Information Obtained Before Reaching Its Decision.**

Hartford is entitled to summary judgment on Plaintiff's bad faith claim because Hartford

conducted a thorough investigation of her claim and had a good faith basis to terminate her

benefits.  In order to recover for bad faith, Plaintiff must present evidence that Hartford neglected

or refused to fulfill a contractual obligation under her policy that was not prompted by an honest

mistake as to its rights or duties.  *Martin v. American Equity, Ins. Co.,* 185 F. Supp. 2d 162, 164

(D. Conn. 2002) (*citing Buckman v. People Express, Inc.,* 530 A.2d 596, 599 (Conn. 1987)).

"Bad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of

a wrong because of dishonest purpose or moral obliquity...it contemplates a state of mind

affirmatively operating with furtive design or ill will."  *Id.*   (a bad faith claim "must be alleged

in terms of wanton and malicious injury, evil motive and violence").

Hartford thoroughly investigated Plaintiff's continuing eligibility for disability benefits

(and paid her benefits) for approximately one year before determining she did not meet the

definition of Total Disability under the Policy.  Ten employees and consulting staff from two

different departments at Hartford were involved in investigating her claim and reaching the

decision to terminate her benefits.[91]  Hartford's thorough investigation of Plaintiff's claim and

consideration of the totality of the evidence gathered in the course of this investigation is the

antithesis of "bad faith."  *Compare Uberti v. Lincoln Nat'l Life Ins. Co.,* 144 F. Supp. 2d. 90, 104

(D. Conn. 2001) (An insurer conducts an unreasonable investigation when it "cut[s] off benefits

on the basis of unsupported determinations resulting from its arbitrary failure or refusal to

properly perform the claims function.")

---

[91] Susan Wilk, Diane Favreau, Kim Huber, Deborah Laughran, Dr. Joseph Amato, Joseph Sterle, R.N. and Marsha Esson, R.N. were involved in the administration of the claim from the claims perspective, and Kim Gabrielsen, Jack McGoldrick and William Mortyo were involved from the special investigations perspective.

As set forth in detail in Hartford's statement of undisputed facts, Hartford (1) obtained medical records from all of the physicians Plaintiff identified to Hartford, and continued to obtain additional records each time Plaintiff identified additional doctors; (2) Hartford properly obtained video surveillance on four dates, documenting Plaintiff's activities and functionality in everyday settings; (3) Hartford canvassed pharmacies and obtained prescription drug records from all pharmacies identified by Plaintiff in her statements to Hartford; (4) Hartford provided Plaintiff's physicians as well as Plaintiff herself an opportunity to comment and provide additional information regarding Plaintiff's disability and the video surveillance;[92] (5) Hartford sought input from an IME doctor as well as review by consulting medical staff; (6) finally, at each step along the way, the handling and investigation of Plaintiff's claim was reviewed by supervisors to insure compliance with procedures.

When Hartford reached its decision and notified Plaintiff, Hartford again asked for any additional information that would shed light on Plaintiff's claims. Plaintiff did not offer additional information. Plaintiff did not attempt to explain the dramatic inconsistency between her documented physical activities and her self-reported limitations. Plaintiff did not offer an attending physician's statement to support her claim of cognitive impairment. Plaintiff asserts Hartford made the wrong decision, notwithstanding the efforts to make the right one. Even if Plaintiff establishes at trial that Hartford made the wrong decision, her "bad faith" claim must fail.

---

[92] Plaintiff complains that Hartford represented to her the Moryto was a "field representative" rather than a field investigator for SIU. Hartford's decision to describe one of its representatives working in the field as just that does not amount to conscious deception by Hartford to mislead Plaintiff. *1049 Asylum Limited Partnership v. Kinney Pike Ins., Inc.*, 2003 Conn. Super. LEXIS 1740, at *9 (Conn. Super. May 30, 2003) (simply alleging a misrepresentation occurred does not amount to conscious deception). Attached as Exhibit E to the Rule 56(a)(1) Statement.

**C.      Hartford Reasonably Concluded Plaintiff No Longer Met The
Definition Of Totally Disabled Under The Policy.**

Plaintiff represented to Hartford in her claimant questionnaire, her PPE, and her written

statement that pain in her neck and back severely limited her ability to engage in any physical

activity. Video surveillance strongly contradicted these statements. To the extent Plaintiff's

medical records lent support to Plaintiff's description of her limitations, these were based

primarily on Plaintiff's self-reporting. For example, Dr. Johnson noted that Plaintiff reported

"persisting problems … [with] pain in the right gluteal region … She noted a burning sensation

and numbness. Her symptoms are aggravated by flexion of the back." However, upon

examination, he noted "[s]he is remarkably flexible," "[w]e did not reproduce symptoms in the

office today," "manual motor examination in both extremities is entirely normal," and "sensory

exam is normal to sharp."

At Hartford's request, Plaintiff was examined on August 14, 2000 by Dr. Garg, a

physiatrist. Based on her examination, a review of Plaintiff's medical records, and her review of

the surveillance, Dr. Garg concluded that Plaintiff should be able to work as an internist for 16

hours a week and as a director of a women's clinic for 30 hours a week.[93]

Dr. Magana, a neurosurgeon selected by Plaintiff, opined that the evidence indicated

Plaintiff should be able to work.[94] Dr. Norris, a physiatrist who examined Plaintiff the day

before the June 20 surveillance, was arguably in the best position to explain how Plaintiff's

---

[93] Plaintiff criticizes Dr. Garg and Hartford because Dr. Garg did not conduct a FCE as Hartford requested.
Plaintiff does not suggest how a functional capacities test would have changed the outcome, particularly in light of
the normal examinations reflected in her medical records and the functionality documented in the videos. "A
thorough investigation is not necessarily a perfect investigation; and the mere fact that in hindsight there may be
other areas that could have been investigated does not always establish bad faith." *Fontaine v. Provident Mut. Life
Ins. Co.,* 2001 WL 275078, at *2 (9th Cir. 2001). Attached as Exhibit F to the Rule 56(a)(1) Statement.

[94] Plaintiff attempts to discredit Dr. Magana because Hartford paid Dr. Magana his customary hourly rate
for the review performed Physicians expect to be compensated for their time, and it is Hartford's routine practice to
pay a physician's customary hourly rate for medical review. Laughran Aff. ¶5. Dr. Norris also requested payment,
but after Hartford sent him the video and IME report, he refused to comment.

stated limitations could be reconciled with the activities documented in the video. However, after initially suggesting he would review the materials provided, Dr. Norris stated that he preferred not to comment because his "involvement in her treatment was limited and he had not seen her in a long time." Drs. Porfiri and Johnson failed to respond at all.

Perhaps most telling, the medical records Hartford gathered from twelve physicians involved in Plaintiff's treatment were virtually devoid of any indication of the "cognitive" impairments Plaintiff now claims prevent her from working as an internist and director. In fact, Plaintiff's expert retained for litigation has testified that all her previous physicians "missed" the proper diagnosis.[95] In light of this testimony, Hartford's conclusion that the medical records, video surveillance, and other data did not support the limitations Plaintiff claimed is entirely reasonable and cannot form the basis for a "bad faith" claim.

At best, Plaintiff's complaint sets forth a coverage dispute. A mere coverage dispute does not demonstrate bad faith. *Uberti,* 144 F. Supp. 2d at 104; *see also McCauley Enters. v. New Hampshire Ins. Co.,* 716 F. Supp. 718, 721 (D. Conn. 1989) (summary judgment granted for insurer in the absence of evidence insurer failed to act in good faith or failed to handle Plaintiff's claims fairly). When a good faith controversy exists, an insurer's withholding of policy benefits cannot be found in bad faith, even if the insurer's position is ultimately found to be erroneous. *McCauley,* 716 F. Supp. at 723.

The depositions of ten Hartford employees and staff to date have produced no evidence to suggest an evil motive or ill will towards Plaintiff, or that her benefits were terminated arbitrarily. Plaintiff's disagreement with the decision or even the manner in which her claim was handled do not support a claim for bad faith. *See e.g., Alexander v. Provident Life & Accident*

---

[95] A true and correct copies of excerpts from Dr. Philip Arnold's October 15, 2003 deposition, at 203:2-24, are attached as Tab 11 to the Taylor Dec.

*Ins. Co.,* 2003 U.S. Dist. LEXIS 4498, at \*12-14 (M.D. Pa. January 2, 2003) (granting summary

judgment in favor of insurer on bad faith claim because insurer's decision to deny disability

benefits was reasonably based on an IME report and compelling videotape surveillance);[96]

*compare Uberti,* 144 F. Supp. 2d at 104-05 (upholding judgment in favor of insured on bad faith

claim because insurer's claim examiner, who had no medical training, conducted no investigation

whatsoever of cause of disability other than her own reading of insured's medical file).

## II.    PLAINTIFF CANNOT MEET THE HEAVY BURDEN NECESSARY TO RECOVER PUNITIVE DAMAGES.

To establish "bad faith," Plaintiff must first establish that Hartford breached the Policy in

terminating her benefits, then must establish that Hartford lacked a good faith basis for having

done so.  To recover punitive damages, Plaintiffs bears an even heavier burden:  Plaintiff must

prove Hartford's conduct was malicious, outrageous, with bad motive, or in reckless disregard of

Plaintiff's rights.  *Uberti* at 107.  Malice requires an intent or design to cause harm.  *Sharkey v.*

*Skilton,* 77 A. 950, 951 (Conn. 1910).  Outrageous conduct is conduct that is "so extreme in

degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and

utterly intolerable in a civilized community." *Bombalicki v. Pastore,* 804 A.2d 856, 859 (Conn.

App. Ct. 2002).  Finally, "conduct in reckless disregard of the rights of others is improper or

wrongful conduct, and constitutes wanton misconduct, evincing a reckless indifference to

consequences to the life, or limb, or health, or reputation or property rights of another."

*Bordonaro v. Zenk,* 147 A. 136, 137 (Conn. 1929).

Plaintiff's mere conjecture that Hartford intentionally set out on a campaign to terminate

her benefits will not support a claim for punitive damages, especially after exhaustive discovery

has produced no evidence to support this wild claim.  After combining the entire claim file and

---

[96] Attached as Exhibit G to the Rule 56(a)(1) Statement.

deposing every individual involved even tangentially in the adjudication or investigation of Plaintiff's claim Plaintiff has found no evidence that Hartford bore her malice, engaged in outrageous conduct, or acted in reckless disregard of her rights.

The culpability necessary for punitive damages is unlikely to be found even when an insurer breaches its duty of good faith. *See Uberti*, 144 F. Supp. 2d at 107. In *Uberti*, the insured sought disability benefits after a knee injury. *Id.* at 91. The insurer terminated his benefits on the ground that the disability was an aggravation of a preexisting condition from a childhood car accident, not the more recent knee injury, and thus was a "sickness" for which benefits were limited to five years. *Id.* at 91-94. The examiner based this conclusion on the files already in the insurer's possession and did not seek any further medical information on the question of causation, even after an in-house medical consultant recommended obtaining more detailed records in order to make a definitive evaluation. *Id.* at 95-96. The Court found that the claims examiner "medically change[d]" the insured's accident from accident to sickness, despite company policy to the contrary. *Id.* at 104-05. The Court found the examiner's failure to investigate was sufficiently unreasonable to support a claim for bad faith, but declined to find "sufficient indicia of bad motive, wantonness, or outrageousness to warrant imposition of punitive damages." *Id.* at 107.

If the facts in *Uberti*, where an insurer shirked its obligation to make *any* investigation of the insured's claim, did not meet the standard for the recovery of punitive damages, this case clearly does not. Unlike the insurer in *Uberti*, Hartford conducted a thorough investigation of Plaintiff's claim. Hartford did not merely rely on minimal medical records on hand, it gathered records from the physicians and pharmacies Plaintiff disclosed, considered the opinions of Plaintiff's doctors and independent doctors, reviewed the voluminous medical records gathered,

and considered the video surveillance of Plaintiff. Given the totality of evidence at the time of

its decision, Hartford's actions in no way can be characterized as "atrocious" or "utterly

intolerable in a civilized society," nor can they reasonably be said to show an intent to cause her

harm. In the absence of evidence of bad motive, wantonness, or outrageousness, Plaintiff's

claim for punitive damages must fail as a matter of law.

## III.    HARTFORD IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS AND EXPECTATIONS CLAIM

### D.    Hartford Cannot Interfere With Its Own Contract

Hartford could not tortiously interfere with its own contract. In order to establish a claim

for tortious interference with contractual relations, Plaintiff must present evidence of (1)

existence of a contractual or beneficial relationship; (2) Hartford's knowledge of that

relationship; (3) Hartford's intent to interfere with that relationship, (4) a tortious interference,

and (5) actual loss suffered by her as a consequence of Hartford's interference. *Brown v.*

*Northeast Nuclear Energy Co.,* 118 F. Supp. 2d 217, 221 (D. Conn. 2000) (*citing Collum v.*

*Chapin,* 40 Conn. App. 449, 452 (1996)); *Powell v. Feroleto Steel Co.,* 659 F. Supp. 303, 307 (D.

Conn. 1986).

The reinsurance agreement involved the assignment of 100 percent of Educators' liability

for and its responsibility for administration of its open professional association claims, of which

Plaintiff's claim was just one of approximately 80 claims. Hartford did not have any knowledge

of Plaintiff's claim prior to the execution of the reinsurance agreement; it did not review

Plaintiff's claim as part of its due diligence nor did it have any discussions with Educators

regarding her claim. Indeed, Plaintiff does not contend Hartford engaged in any tortious acts by entering into the reinsurance agreement with Educators.[97]

After the reinsurance agreement was executed on July 1, 1999, Hartford owed contractual duties to Plaintiff. It could not tortiously interfere with Plaintiff's policy *"following the execution of the Reinsurance Agreement,"*[98] because Hartford could not interfere with its own contract. *Powell,* 659 F. Supp. at 306-07. In *Powell,* the Plaintiff brought a tortious interference with contract claim against the new president of the corporation for which the Plaintiff worked. The Plaintiff claimed the new president, who was the son of the former president with whom he had an employment contract, had tortiously interfered with his employment contract by firing him. *Id.* at 307. The court held that Plaintiff's claim failed as a matter of law because the new president had assumed his father's presidential duties, and therefore, he was a party to the employment contract when he fired Plaintiff. *Id.* Similarly, Hartford became a party to Plaintiff's disability policy and could not, as a matter of law, tortiously interfere with it.

### E.     Plaintiff's Claim is Barred by Limitations.

Plaintiff's claim for tortious interference with contractual relations and expectations is barred by the three-year statute of limitations set forth in Conn. Gen. Stat. § 52-577. *Collum v. Chapin,* 671 A.2d 1329, 1331 (Conn. App. Ct. 1995) (Section 52-577 is applicable to tortiuos interference with contract claim). Section 52-577 provides "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of." The three-year statute of limitations begins with the date of the act or omission complained of, not the date the plaintiff first discovers an injury. *Id.*

---

[97] Plaintiff's Second Amended Complaint, ¶¶ 39-41.
[98] *Id.* ¶ 40.

More than three years elapsed between the execution of the reinsurance agreement and the filing of her Second Amended Complaint, in which she asserted her tortious interference with contract claim for the first time. The reinsurance agreement was executed on July 1, 1999. Plaintiff did not seek leave to file her Second Amended Complaint until October 22, 2003, more than four years after the time the act or omission could have occurred.[99] Hartford is entitled to summary judgment.

## IV.   HARTFORD IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CUTPA CLAIM AS A MATTER OF LAW.

### A.   Plaintiff's CUTPA Claim is Barred by the Statute of Limitations.

Plaintiff's claims for violations of the Connecticut Unfair Trade Practices Act are barred by the three-year statute of limitations contained in Conn. Gen. Stat. § 42-110g(f). Section 42-110g(f) provides that an action "may not be brought more than three years after the occurrence of a violation of this chapter." A CUTPA violation occurs when an alleged misrepresentation is made and the statute of limitations commences running the moment the act or omission complained of occurs. *Timmons v. City of Hartford*, 2003 WL 22228989, at *6 (D. Conn. Sept. 16, 2003) (dismissing CUTPA claim because claim barred by statute of limitations).[100] The limitations period is not "tolled" until such time as the complaining party learns of the alleged misrepresentation or injury. *Fichera v. Mine Hill Corp.*, 207 Conn. 204, 216-217 (1988) (the Connecticut legislature did not intend for the statute of limitations for CUTPA violations to begin running after the discovery of the violation).

---

[99] Plaintiff only alleges Hartford engaged in tortious acts after the execution of the reinsurance agreement. *Second Amend. Compl.* ¶ 40. Even if this stated a claim for tortious interference, the last wrongful act alleged by Plaintiff occurred in September, 2000, still more than three years before she asserted her claim. *Id.*

[100] Attached as Exhibit H to the Rule 56(a)(1) Statement.

More than three years elapsed between the wrongful conduct alleged by Plaintiff and the filing of her Second Amended Complaint, in which she asserted her CUTPA claim for the first time. Plaintiff's CUTPA claims are based on alleged misrepresentations and omissions by Hartford regarding the nature of the Reinsurance Agreement.[101] Plaintiff alleges Hartford informed her by letter that it was administering claims on behalf of Educators, and therefore misrepresented and failed to disclose that Educators had ceded all of its liability for her claim to Hartford. Even assuming this entirely proper statement could form the basis for a CUTPA violation, the last time Hartford represented to Plaintiff that it was administering claims on behalf of Hartford was September 25, 2000. Plaintiff did not seek leave to file her Second Amended Complaint until October 22, 2003, more three years from the date of this alleged misrepresentation. Plaintiff's CUTPA claim fails as a matter of law.

**B.    Plaintiff Has Not Suffered an Ascertainable Loss Proximately Caused by the Alleged CUTPA Violations.**

Connecticut General Statutes § 42-110g(1) provides "[a]ny person who suffers any *ascertainable loss* of money or property... *as a result of* the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action in the judicial district in which the plaintiff or defendant ... to recover actual damages." (Emphasis Added.) The language "as a result of" requires a showing that the alleged prohibited act was the proximate cause in addition to the actual but-for cause of harm to Plaintiff. *Abrahams v. Young & Rubicam, Inc.*, 240 Conn. 300, 306 (1997). The "question to be asked in ascertaining whether proximate cause exists is whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's act." *Id.* at 306-07.

---

[101] *Id.* ¶ 44.

Plaintiff's claimed damages—loss of disability benefits—were not proximately caused by any purported failure by Hartford to disclose that Educators ceded all of its responsibility regarding the professional association claims to Hartford. Hartford stamped its letters to Plaintiff and other insureds who were part of the Educators block of claims with a notice that the claims were "Administered by Hartford Life on behalf of Educators Mutual Life Co" regardless of whether it had determined that a particular insured was or was not entitled to continuing disability benefits, and it is not foreseeable that a stamp on a letter would cause Plaintiff to lose her disability benefits, particularly since Hartford would have made the same representations if it had continued to pay her benefits.

Plaintiff has no ascertainable loss caused by any statement by Hartford regarding its agreement by Educators. An "ascertainable loss is a deprivation, detriment or injury that is capable of being discovered, observed or established." Plaintiff has no evidence that she suffered a deprivation, detriment or injury proximately caused by any alleged misrepresentation or omission by Hartford. Hartford is entitled to summary judgment.

## V.    PLAINTIFF'S CUIPA CLAIM FAIL TO STATE A CLAIM AGAINST HARTFORD.

No private right of action exists for a violation of CUIPA. *Martin v. Am. Equity Ins. Co.*, 185 F. Supp 2d. 162, 166 (D. Conn. 2002). Therefore, Hartford is entitled to judgment as a matter of law on Plaintiff's CUIPA claims.

### CONCLUSION

Hartford requests that the Court enter summary judgment in Hartford's favor on Plaintiff's claims for bad faith, punitive damages, tortious interference, CUIPA, and CUTPA.

By:_____

Barry A. Chasnoff (ct 1162)
Roberta J. Sharp (ct 24407)
Jessica S. Taylor (ct24408)
AKIN GUMP STRAUSS HAUER & FELD L.L.P.
300 Convent Street, Suite 1500
San Antonio, Texas  78205
Telephone:  (210) 281-7000
Telecopier: (210) 224-2035

AND

Donald E. Frechette (ct 08930)
Edwards & Angell, LLP
90 State House Square
Hartford, CT 06103
Phone:  (860) 525-5065
Facsimile: (860) 527-4198

ATTORNEYS FOR DEFENDANT
HARTFORD LIFE & ACCIDENT
INSURANCE COMPANY

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was sent via certified mail, return receipt requested to the following attorney on the _____ day of November, 2003:

Eliot B. Gersten
Gersten & Clifford
214 Main Street
Hartford, CT 06106
Phone (860) 527-7044
Facsimile (860) 527-4968

_____
ROBERTA J. SHARP
JESSICA S. TAYLOR

## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **CANDI McCULLOCH** | § | **CIVIL ACTION NO.:** |
| **Plaintiff,** | § | **301CV1115(AHN)** |
| | § | |
| **vs.** | § | |
| | § | |
| **HARTFORD LIFE AND ACCIDENT** | § | |
| **INSURANCE COMPANY AND** | § | |
| **EDUCATORS MUTUAL LIFE** | § | |
| **INSURANCE COMPANY** | § | |
| **Defendants.** | § | **November 6, 2003** |

### ORDER GRANTING DEFENDANT'S
### MOTION FOR PARTIAL SUMMARY JUDGMENT

On this date, the Court considered Defendant's Motion for Partial Summary Judgment.

After considering Defendant's Motion for Partial Summary Judgment, the response, and all other

evidence on file, the court finds there are no genuine issues of material fact. Therefore, the Court

GRANTS the motion.

SIGNED on _____, 2003.


_____
UNITED STATES DISTRICT JUDGE