UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT    **FILED**

| | | |
|---|---|---|
| CANDI McCULLOCH | § | CIVIL ACTION NO.: |
| **Plaintiff,** | § | 301CV1115(AHN) |
| | § | 2003 NOV P 2: 01 |
| vs. | § | |
| | § | US DISTRICT COURT |
| HARTFORD LIFE AND ACCIDENT | § | BRIDGEPORT CT |
| INSURANCE COMPANY AND | § | |
| EDUCATORS MUTUAL LIFE | § | |
| INSURANCE COMPANY | § | |
| **Defendants.** | § | November 6, 2003 |

---

## DEFENDANT HARTFORD LIFE & ACCIDENT INSURANCE COMPANY'S LOCAL RULE 56(a)(1) STATEMENT

---

Defendant Hartford Life & Accident Insurance Company ("Hartford") requests the Court

consider the following undisputed material facts in support of Hartford's Motion for Partial

Summary Judgment.

1.     The Policy upon which Plaintiff's claims are based includes the following definition of

"disability" or "total disability:"[1]

   a.     As a direct result of injury or sickness the member is unable to perform the
material and substantial duties of the member's occupation as it existed at
the time disability began; and

   b.     The member is not working in any gainful occupation; and

   c.     The disability began while this insurance was in force; and

   d.     The member is under the regular and direct care of a licensed physician
other than a person in the member's family.  Tab 2, at 5.

---

[1] A true and correct copy of Plaintiff's application for participation in the American College of Physicians
Insurance Trust Group Long Term Disability Program is attached as Tab 2 to the Affidavit of Deborah Laughran,
which is attached as Exhibit A.  A true and correct copy of the group long term disability policy is attached as Tab 3
to the Laughran Aff.

2.      The policy provides that "([i])n the event of the members total disability, we will pay the
Monthly Benefit Amount for each complete month of disability.  For any partial month of
disability, payment will be made on a pro rata basis.  Coverage for this benefit and the
amount of this benefit shall be determined from the Schedule of Benefits." *Id.* at 6.

3.      Payment under the Policy is subject to all of the following conditions:

   1.      Disability must begin while the member is covered under this benefit provision;

   2.      During any period of disability, the member must be under the regular and direct
   care of a physician;

   3.      Benefits will be paid for the period that disability continues beyond the Disability
   Waiting Period shown in the Schedule of Benefits;

   4.      Benefits will not be paid for any period of disability beyond the Maximum
   Benefit Period shown in the Schedule of Benefits;

   5.      On the policy anniversary on or next following the member's 65 birthday, the
   Monthly Benefit Amount will be reduced to $1,000.00, if it is greater than
   $1,000.00.  *Id.* at 6.

4.      The Maximum Benefit Period under the Policy for injury is the member's lifetime and for
sickness is to age 65.  *Id.* at 3.

5.      The Policy requires the insured to provide timely written notice and proof of loss to the
insurer.  The policy gives the insurer the right to require "[l]ater proofs of the continuance
of [the] disability…at such intervals as we may reasonably require." *Id.* at 10.

6.      The Policy reserves to the insurer the right to examine a person whose injury or sickness
is the basis of a claim under the Policy at its own expense.  *Id.* at 11.

7.      The Policy allows the insurer to examine the insured "when and as often as it may
reasonably require while a claim is pending." *Id.* at 11.

8.    The Policy states that "[t]he master policy, the copy of the application of the policyholder

attached to it and the applications submitted by members constitute the entire contract

between the parties." *Id.* at 10.

9.    The Policy further states it may be changed at any time and "no consent of any person

insured hereunder is needed for such a change."

10.    In 1969, Educators Mutual Life Insurance Company ("Educators") contracted with Group

Insurance Administrators ("GIA") to underwrite and administer a group long-term

disability plan for the American College of Physicians ("ACP").[2]

11.    The Policy was issued by Educators Life Insurance Company ("Educators") to the

American College of Physicians ("ACP") in September 1994. It is a group policy; ACP

is the policyholder.[3]

12.    Candi McCulloch applied for disability benefits through ACP in September 1994, and her

coverage became effective on September 24, 1994.[4]

13.    In June 1994, Plaintiff was hired by JFK Medical Center in Atlantis, Florida.[5] Plaintiff's

employment was governed by two written employment agreements. Under the first

contract, she was employed by H.C.M.S., Inc. ("H.C.M.S."), a primary group practice

affiliated with JFK, pursuant to which she was to work sixteen hours per week

performing patient care duties.[6] Under the second contract she was employed by JFK as

---

[2]    True and correct copies of excerpts from Kimberly Rankin's May 13, 2003 deposition, at 5:4-7:19, are attached as Tab 1 to the Declaration of Jessica Spangler Taylor ("Taylor Dec.") which is attached as Exhibit B.

[3]    *Id.* at 9:15-21; 11:10-12:13.

[4]    Laughran Aff., Tab 2.

[5]    True and correct copies of excerpts from Candi McCulloch's July 11, 2003 deposition (Vol. I) ("McCulloch depo."), at 44:11-46:1, are attached as Tab 2, to the Taylor Dec.

[6]    The H.C.M.S. Agreement is attached as Exhibit 83 to the McCulloch depo., which is Tab 3 to the Taylor Dec.

the director of the Phyllis Rothman Women's Center, and was to work thirty hours per week in that capacity.[7]

14. Plaintiff's attorney submitted a disability claim on behalf of Plaintiff to Educators on October 11, 1995, describing neck and back pain as a result of a fall she claimed she suffered while skiing eight months earlier.[8]  She requested a leave of absence on October 3, 1995.[9]

15. Educators initially determined that Plaintiff met the definition of total disability under the Policy and began paying Plaintiff disability benefits on March 22, 1996.[10]

16. On April 15, 1997, GIA and ACP terminated their relationship with Educators and moved their long-term disability plan to New York Life Insurance Company.[11]

17. After April 1997, Educators was no longer writing professional association policies or accepting premiums; its only involvement was the administration of open disability claims such as Plaintiff's.[12]  This prompted Educators to begin negotiations with Hartford to sell all of its open professional association disability claims.[13]

18. On July 1, 1999, Educators and Hartford executed a reinsurance agreement by which Educators ceded 100 percent of its liability for and the administration of its open professional association claims, including Plaintiff's, to Hartford.[14]

---

[7] The JFK Agreement is attached as Exhibit 61 to the McCulloch depo., which is Tab 4 to the Taylor Dec.

[8] A true and correct copy of the October 11, 1995 letter is attached as Tab 4 to the Laughran Aff.

[9] *Id.*

[10] True and correct copies of excerpts from Kenneth Wasnock's May 13, 2003 deposition ("Wasnock depo."), at 35:10-24, are attached as Tab 5 to the Taylor Dec.

[11] Rankin depo. at 9:17-21.

[12] Rankin depo. at 9:15-21; 11:10-12:13.

[13] *Id.* at 11:19-12:13.

[14] *Id.* at 13:7-14:4. A true and correct copy of the Reinsurance Agreement is attached as Exhibit 10 to the Rankin depo.

19.   As part of the negotiation of the agreement, Hartford conducted due diligence of Educators' claim files to determine pricing.[15]  Hartford reviewed 11 of approximately 80 professional associations claims; Plaintiff's claim was not selected for review as part of the due diligence.[16]

20.   Educators had no communication with Hartford regarding Plaintiff's particular claim prior to or after the execution of the Reinsurance Agreement.[17]

21.   Educators informed Plaintiff, and other claimants whose claims were subject to the Reinsurance Agreement that Hartford would be responsible for the administration of their claims after August 1999.[18]

22.   Educators sent a letter to Plaintiff on August 26, 1999, which explained it had contracted with Hartford to administer her benefits and that it was paying her benefits through October 31, 1999 to accommodate the transfer of her claim.  It also explained she would thereafter receive her benefits from Hartford and that she should contact Hartford directly regarding her claim.[19]

23.   Hartford assigned Plaintiff's claim to examiner Susan Wilk, who undertook a routine annual review of Plaintiff's claim.[20]  Upon reviewing the claim file, Wilk noted the most recent medicals records for Plaintiff were from November 1998.[21]

---

[15] True and correct copies of excerpts from Pamela Mormino's July 28, 2003 deposition ("Mormino depo."), at 137:18-139:18, are attached as Tab 6 to the Taylor Dec.

[16] *Id.* at 73:15-73:23.  Those reviewed were selected based on apparent discrepancies between the diagnosis, the length of disability, or the age of the claimant. *Id* at 139:8-12.

[17] Wasnock depo. at 74:9-23.

[18] Wasnock depo. at 69-12-71:12.

[19] A true and correct copy of the August 26, 1999 letter is attached as Tab 38 to the Laughran Aff.

[20] A true and correct copy of excerpts from Sue Wilk's June 24, 2003 deposition ("Wilk depo.") is attached as Tab 7 to the Taylor Dec.

[21] A true and correct copy of the K-6 comments for Plaintiff's claim, at 25, is attached as Tab 5 to the Laughran Aff.

24.    Hartford's claims manual provides that at a minimum, a review of a claim is performed
       every 12 to 18 months. The annual review shall include providing the claimant with the
       following forms to be completed by the claimant and his or her doctor: an attending
       physicians statement of continued disability ("APS"), a claimant questionnaire, and an
       updated authorization to obtain and release information.[22]

25.    On December 15, 1999, Wilk requested that Plaintiff complete an authorization to obtain
       and release information, a claimant questionnaire, and an APS in December 1999.[23]

26.    Plaintiff submitted the completed claimant questionnaire and authorization on January 19,
       2000, but not the APS.[24]

27.    In the claimant questionnaire, Plaintiff described her condition as "chronic pain from
       cervical disc pathology … herniation at C5-C6." She also stated the "pain affects every
       aspect of my life, … makes me unable to perform the duties of my specialty of internal
       medicine, … [and] restricts me in all activities."[25]

28.    On her claimant questionnaire Plaintiff also provided Hartford with a list of the
       physicians she had consulted in the last 18 months, including Dr. Carine Porfiri, her
       primary care physician, Dr. Beverly Walters, a neurosurgeon, Bruce Coulombe, a
       chiropractor, Dr. Susan Glover, a urologist, and Drs. Lorraine Bello and Susan
       Silverstein, both gynecologists.[26]

---

[22] True and correct copies of excerpts from Hartford's long-term disability claim procedures are attached as Tab 1 to the Laughran Aff.

[23] Sue Wilk's December 15, 1999 letter to Plaintiff is attached as Tab 6 to the Laughran Aff.

[24] Plaintiff's completed claimant questionnaire is attached as Tab 7 to the Laughran Aff.

[25] *Id.*

[26] *Id.*

29.   Hartford's claim manual requires that a claim examiner obtain the claimant's correct date
      of birth so that Hartford can ensure the maximum benefit duration is applied to the claim.
      If during the course of claim administration the examiner encounters conflicting
      information regarding birth date, Hartford's procedures call for the examiner to obtain
      documentation to verify the date of birth.[27]

30.   Wilk noticed that Plaintiff's date of birth was sometimes noted in her file as 1958, and
      sometimes as 1957.[28]  On January 28, 2000, Wilk requested by telephone that Plaintiff
      provide a copy of her driver's license for purposes of age verification.[29]

31.   Plaintiff did not respond to Wilk's January 28th request.[30]

32.   Wilk requested copies of Plaintiff's driver's license again on February 1, 2000 and
      February 4, 2000.  Plaintiff did not respond these requests.[31]

33.   On or about February 2, 2000, Wilk received the APS from Dr. Porfiri, a physician
      practicing in Florida.[32]  Dr. Porfiri was Plaintiff's co-worker at PCMA.[33]

34.   In the APS, Dr. Porfiri stated that Plaintiff's diagnosis was chronic pain, herniated
      cervical disc, TMJ and migraines, "and that Plaintiff had decreased range of motion and
      muscle spasm in her neck.  She concluded that Plaintiff was "unable to perform the
      material duties of her profession."[34]

---

[27] Laughran Aff., Tab 1.

[28] Wilk depo. at 99:1-23.

[29] Laughran Aff., Tab 5, at 19, 23-24.

[30] Id.; Wilk depo at 98:23-25.

[31] Laughran Aff., Tab 5, at 19, 21-23.

[32] Id., at 23.

[33] True and correct copies of excerpts from Dr. Carine Porfiri's September 8, 2003 deposition, at 113:17-114:2, are attached as Tab 8 to the Taylor Dec.

[34] A true and correct copy of the APS is attached as Tab 8 to the Laughran Aff.

35.    The APS stated that Dr. Porfiri had last seen Plaintiff in her office on November 18, 1999.

       However, when Wilk called Dr. Porfiri's office in late January, she was informed that

       Plaintiff had not been seen since 1997.[35]

36.    On April 4, 2000, Wilk requested by letter a brief, narrative report describing Plaintiff's

       current condition and a complete copy of office records from October 1, 1998 to the

       present from Drs. Porfiri, Coulombe, Glover, Bello, Silverstein, and Walters, the

       physicians Plaintiff disclosed in her claimant questionnaire.[36]

37.    Hartford's claim manual defines "red flags" to include "[c]laimant hid[ing] or alter[ing]

       other identifying documents (Drivers License, Passport, etc.), "the Attending Physician

       (s) are not in the same geographic area as claimant, " and "knowledge, experience,

       instinct and intuition tell you that something is not right." Hartford's claim procedures

       require a claim examiner to be alert to red flags when reviewing a claim, and if any red

       flags are noted, the file is to be immediately referred to an investigative analyst.[37]

38.    As of this time, Wilk's administration of Plaintiff's claim had raised three "red flags":

       apparent reluctance by Plaintiff to provide Hartford with her drivers license or birth

       certificate to verify her birth date, the submission of an APS by an out-of-state physician

       and information provided by the attending physician's office staff that was inconsistent

       with the APS.[38]

---

[35]   *Id.*

[36]   True and correct copies of the April 4, 2000 letters to Drs. Coulombe, Porfiri, Glover, Walters, Bello and Silverstein are attached as Tab 9 to the Laughran Aff.

[37]   A true and correct copy of the SIU manual is attached as Tab 1 to the Declaration of John McGoldrick, which is attached as Exhibit C.

[38]   A true and correct copy of the EBD Special Investigations Form, dated April 4, 2000 is attached as Tab 10 to the Laughran Aff.

39.    Wilk referred the claim to SIU on or about April 4, 2000.[39] SIU assigned Plaintiff's claim

to Kim Gabrielson, an investigative analyst. [40]

40.    On or about April 11, 2000, Wilk sent Plaintiff a letter requesting she provide a copy of

her driver's license or passport and complete a PPE.[41]

41.    On April 25, 2000, Wilk received a copy of Plaintiff's passport and a completed PPE.[42]

42.    Plaintiff stated in her PPE that her current condition made working as an internist

impossible because "she had chronic pain from cervical herniation, TMJ, and low back

pain requiring pain medication and constant care." Plaintiff also stated she had neck,

interscapular, and low back pain which limited and restricted all of her ordinary physical

activities. She stated she had to be careful in every activity she performed so that she

would not worsen the constant pain.[43]

43.    On May 2, 2000, Wilk received medical records from Dr. Walters that indicated Plaintiff

had been seen by Dr. Walters only twice, once on September 21, 1998 and again on June

10, 1999, complaining of pain in the neck, upper back and shoulder blades.  Dr. Walters

stated that she advised Plaintiff to have surgery, but Plaintiff "had no interest in pursuing

it."[44]

44.    On May 17, 2000, Kim Gabrielson arranged for video surveillance to be taken of

Plaintiff.  Surveillance was initially conducted on May 22, 2000 and May 23, 2000.  On

---

[39] *Id.*

[40] Laughran Aff., Tab 5, at 21.

[41] A true and correct copy of the April 11, 2000 letter to Plaintiff is attached as Tab 11 to the Laughran Aff.

[42] Laughran Aff., Tab 5, at 19.

[43] A true and correct copy of Plaintiff's complete PPE is attached as Tab 12 to the Laughran Aff.

[44] A true and correct copy of Dr. Walters' April 25, 2000 letter and attached medical records are attached as Tab 13 to the Laughran Aff.

those dates, Plaintiff was observed turning her head and shoulders to see behind her while driving in reverse drinking coffee, talking on a cell phone while driving, bending into the back of her vehicle (Exhibit 14A), and entering her Porsche with no obvious discomfort (Exhibit 14B).[45]

45.     Based on the activities observed on May 22-23, Gabrielsen scheduled more surveillance, which was conducted on June 20, 2000.  On that date, Plaintiff was observed carrying a large plant from her Porsche to her son's school (Exhibit 14C), dancing at a party at her son's school, (including stooping and bending) (Exhibits 14 D, E and F), sitting and standing, and departing the party by car with no apparent difficulty getting in the vehicle or with driving maneuvers (Exhibits 14 G and H).

46.     On July 12, 2000 Joseph Sterle, a disability case manager for Hartford, requested Plaintiff undergo an Independent Medical Examination ("IME") and Functional Capacity Evaluation ("FCE").[46]

47.     When contacted by Sterle, Plaintiff provided the names of three more physicians from whom she had sought treatment:  Dr. Ignacio Magana, a neurosurgeon, Dr. Jordan Grabel, a neurosurgeon, and Dr. Andrew Slavin, an oral surgeon.[47]  On or about August 2, 2000, Sterle requested medical records from these physicians.[48]

---

[45] The surveillance videos are attached as Tabs 14 to the Laughran Aff. and may be viewed on CD ROM. Tabs 14 A through 14 H are still shots excerpted from the video surveillance.

[46] A true and correct copy of Sterle's July 12, 2000 letter to Plaintiff is attached as Tab 15 to the Laughran Aff.

[47] A true and correct copy of Plaintiff's July 31, 2000 letter to Sterle is attached as Tab 16 to the Laughran Aff.

[48] Laughran Aff., Tab 5, at 14.

48.   Sterle scheduled an IME/FCE for Plaintiff at the Sunnyview Hospital and Rehabilitation Center, in Schenectady, New York, on August 2, 2000.[49]  Sterle chose this facility because he wanted a physiatrist who would not only examine the patient but either be present or perform the FCE as well.[50]

49.   Plaintiff objected to attending the IME/FCE, citing the distance of the center from her home.[51]  After Plaintiff objected, Sterle searched for a physiatrist closer to Plaintiff's home.[52]

50.   Sterle arranged for Plaintiff to have an IME by Dr. Asha Garg in Worchester, Massachusetts on August 14, 2000.[53]  Sterle sent Dr. Garg copies of Plaintiff's medical records.[54]

51.   On September 1, 2000, Kim Gabrielsen sent Dr. Garg the video surveillance and asked her to review the video to determine if the functionality shown by Plaintiff corresponded to the way she presented for examination and whether it changed her initial opinion of Plaintiff's functionality.[55]

52.   Hartford's procedures require, in every instance in which video surveillance appears to contradict the claimant's stated disability, that a Hartford field representative conduct an

---

[49] Laughran Aff., Tab 15.

[50] A true and correct copy of Joseph Sterle's August 15, 2003 deposition ("Sterle depo."), at 48:22-49:4 is attached as Tab 9 to the Taylor Dec.

[51] Laughran Aff., Tab 16.

[52] Laughran Aff., Tab 5, at 13-14.

[53] A true and correct copy of Sterle's August 2, 2000 letter to Plaintiff is attached as Tab 17 to the Laughran Aff.

[54] Sterle depo. at 61:3-20.

[55] A true and correct copy of Gabrielsen's September 1, 2000 letter to Dr. Garg is attached as Tab 18 to the Laughran Aff.

in-person interview to confirm the person on the video is the claimant and allow the

claimant an opportunity to explain the activities on the video.[56]

53.   On August 15, 2000, Wilk wrote to McCulloch to arrange an in-person interview with

William Moryto, a field investigator for Hartford's SIU department.[57]  Plaintiff objected

to the interview in a number of letters and phone calls, but eventually agreed to meet with

Moryto on September 8, 2000.[58]

54.   During the interview, Plaintiff told Moryto she was in constant, chronic pain and signed a

statement stating  "if I bend over, it ends up increasing the pain…I have constant pain in

my neck.  It is between my shoulder blades and my neck.  The neurological pain is in my

shoulder.  It is a very deep pain.  The pain in my neck and scapula is always there."  She

specifically denied being able to dance and said "I wish I could dance."[59]

55.   Plaintiff also provided Moryto for the first time the names of yet more doctors who had

treated her, including Dr. Baker, a new primary care doctor, Dr. Roland Johnson, an

orthopedist, and Dr. Richard Norris, a physiatrist.  She also advised Moryto that she filled

prescriptions for Ultram and Vicodin at "CVS 90 Main St. Northampton, MA" and she

thought she had filled her prescription for Percocet at "Eckerd's on Australian Ave in

West Palm Beach."[60]

56.   After Plaintiff signed her statement, Moryto described the activities she was observed

performing when video surveillance was conducted.  Upon learning she was observed

---

[56]  McGoldrick Aff. ¶7.

[57]  A true and correct copy of Wilk's August 15, 2000 letter to Plaintiff is attached as Tab 19 to the
Laughran Aff.

[58]  Laughran Aff., Tab 5, at 12.

[59]  A true and correct copy of Plaintiff's signed September 8, 2000 statement is attached as Tab 20 to the
Laughran Aff.

[60]  *Id.*

dancing, she responded she was drinking and taking medications that day, but she refused to sign a statement to that effect and would not watch the video.[61]

57.    Dr. Garg issued her preliminary IME report on September 8, 2000.[62]

58.    Dr. Garg reported that Plaintiff "ambulated well, there was no limp," "her range of motion was normal" but slightly in her cervical spine and lumbar sacral region, and that she did not show any signs of being in pain during her interview of Plaintiff.[63]

59.    Dr. Garg commented that the functionality shown by Plaintiff in the video did not correspond with the way she presented for examination, and that the video revealed she could function pretty well in her routine activities.[64]

60.    Dr. Garg concluded that Plaintiff "should be able to work as an internist 16 hours a week and administrator work in the Woman's clinic thirty hours a week."[65]

61.    Sterle contacted Dr. Garg on September 14, 2000, to request that she correct typographical errors and provide the results of the FCE.[66]

62.    On September 21, 2000, Dr. Garg provided Hartford with her revised report.[67]

63.    In her revised report, Dr. Garg deleted the statement that Plaintiff should avoid "heavy" work and provided a short summary of the FCE, in which she stated that Plaintiff "should be able to do light duty work without any problems" if she avoided heavy lifting, frequent

---

[61] A true and correct copy of Plaintiff's unsigned statement regarding the surveillance is attached as Tab 21 to the Laughran Aff.

[62] A true and correct copy of Dr. Garg's initial IME report is attached as Tab 22 to the Laughran Aff.

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] Laughran Aff., Tab 5, at 11.

[67] A true and correct copy of Dr. Garg's revised IME report is attached as Tab 23 to the Laughran Aff.

bending, stooping, twisting and kneeling, and staying in one position for more than an hour.[68]

64. On or about September 13, 2000, Ken Gabrielson retained vendors to obtain medical records from the physicians listed by Plaintiff in her September 8, 2000 statement, including Dr. Christine Baker, Dr. Roland Johnson, and Dr. Richard Norris. She also requested that they obtain pharmacy records from the Eckerd pharmacy from West Palm Beach and the CVS pharmacy on 90 Main Street in Northampton.[69]

65. Hartford's written claim procedures require that an examiner send a copy of an IME report that contradicts the opinions of a claimant's primary care physician to the primary care physician for review and comments.[70]

66. On October 16, 2000, Wilk sent the IME report and surveillance videos to several treating physicians previously identified by Plaintiff in her statements to Hartford: Dr. Rollin Johnson (orthopedics), Dr. Carine Porfiri (primary care physician), Dr. Ignacio Magana (neurosurgery), and Dr. Richard Norris (orthopedics). Wilk later requested that Dr. Christine Baker (primary care physician) review the materials.[71]

67. Drs. Johnson and Porfiri did not respond at all. [72]

68. Dr. Norris responded that he would not comment because he had not seen Plaintiff for a long time and his involvement in her care had been limited.[73] Dr. Norris had seen

---

[68] *Id.*

[69] A true and correct copy of the September 13, 2000 vendor assignment is attached as Tab 24 to the Laughran Aff. True and correct copies of Gabrielsen's September 14, 2000 letters to Drs. Baker, Johnson and Norris and to Eckerd and CVS pharmacies are attached as Tab 25 to the Laughran Aff.

[70] Laughran Aff. ¶4.

[71] Wilk's October 16, 2000 letters to Dr. Johnson, Porfiri, Magana and Norris are attached as Tab 26 to the Laughran Aff; Laughran Aff., Tab 5, at 4.

[72] Laughran Aff. ¶6.

[73] Laughran Aff., Tab 5, at 1, 3.

Plaintiff in his office on June 19, 2000, the day before the video surveillance of Plaintiff in which she was seen dancing.[74]

69.   Dr. Baker's office responded that she "does not review IME's/videos for comment and not to bother sending anything."[75]

70.   Dr. Magana reviewed the video and IME report and sent a written report to Hartford indicating his opinion that Plaintiff should be capable of working a full eight hour day, including practicing medicine two days per week as she was prior to her injury, with some light restrictions (avoid lifting more than 20 pounds occasionally or 10 pounds repetitively).[76]

71.   On or about November 3, 2000, Wilk requested Hartford's medical department review Plaintiff's claim.[77]

72.   Dr. Joseph Amato, is an internal medicine physician and an independent contractor who provides consulting reviews as requested by Hartford.[78]

73.   Dr. Amato review Plaintiff's medical records, the IME report, and the surveillance videos. Based on his review Dr. Amato agreed with Dr. Garg and Dr. Magana that Plaintiff should be able to perform the duties of an internist for 16 hours per week and administrative functions for 30 hours per week. Dr. Amato reviewed Plaintiff's medical records and concluded Dr. Garg's reports supported the conclusion Plaintiff could perform light work. Dr. Amato noted the surveillance videos showed Plaintiff was able to

---

[74] A true and correct copy of Dr. Norris' June 19, 2000 progress note is attached as Tab 27 to the Laughran Aff.

[75] Laughran Aff., Tab 5, at 1, 4.

[76] A true and correct copy of Dr. Magana's October 31, 2000 letter to Wilk is attached as Tab 28 to the Laughran Aff.

[77] Laughran Aff., Tab 5, at 3.

[78] True and correct copies of excerpts from Dr. Joseph Amato's deposition ("Amato. depo"), at 59:1-4, are attached as Tab 10 to the Taylor Dec.

stand for more than four hours, twist, dance, squat, bend and move her neck for an entire day without signs of fatigue or pain.

74. On November 10, 2000, based on all the information gathered in connection with Plaintiff's claim, Kim Gabrielson recommended that Plaintiff's disability benefits be terminated.[79]

75. Kim Huber, a claim specialist, reviewed the draft termination letter and the claim file on or about November 17, 2000.[80]  Huber agreed with the recommendation to terminate benefits.[81]

76. Hartford terminated Plaintiff's benefits by letter dated November 17, 2000, effective August 14, 2000.[82]

77. Hartford also claimed an overpayment of $19,655.53.[83]

78. Plaintiff did not appeal Hartford's decision to terminate her benefits and did not provide additional information to support her claim after November 17, 2000.[84]

---

[79] A true and correct copy of Request for Medical Review is attached as Tab 29 to the Laughran Aff.

[80] *Id.*

[81] Laughran Aff., Tab 5, at 1.

[82] A true and correct copy of the November 17, 2000 termination letter is attached as Tab 30 to the Laughran Aff.

[83] *Id.*

[84] Laughran Aff. ¶7.

By: _____

Barry A. Chasnoff (ct11162)
Roberta J. Sharp (ct24407)
Jessica S. Taylor (ct24408)
AKIN GUMP STRAUSS HAUER & FELD L.L.P.
300 Convent Street, Suite 1500
San Antonio, Texas 78205
Telephone: (210) 281-7000
Telecopier: (210) 224-2035

AND

Donald E. Frechette (ct 08930)
Edwards & Angell, LLP
90 State House Square
Hartford, CT 06103
Phone: (860) 525-5065
Facsimile: (860) 527-4198

ATTORNEYS FOR DEFENDANT
HARTFORD LIFE & ACCIDENT
INSURANCE COMPANY

## **CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing document was sent via certified mail, return receipt

requested to the following attorney on the _____ day of November, 2003:

| Eliot B. Gersten | |
| Gersten & Clifford | |
| 214 Main Street | |
| Hartford, CT 06106 | |
| Phone (860) 527-7044 | |
| Facsimile (860) 527-4968 | |

ROBERTA J. SHARP
JESSICA S. TAYLOR

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **CANDI McCULLOCH**<br>        **Plaintiff,** | § <br> § | **CIVIL ACTION NO.:**<br>     **301CV1115(AHN)** |
| | § | |
| **vs.** | § | |
| | § | |
| **HARTFORD LIFE AND ACCIDENT**<br>     **INSURANCE COMPANY AND**<br>     **EDUCATORS MUTUAL LIFE**<br>     **INSURANCE COMPANY**<br>     **Defendants.** | §<br>§<br>§<br>§<br>§ | <br><br><br><br>**November 6, 2003** |

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

On this date, the Court considered Defendant's Motion for Partial Summary Judgment.

After considering Defendant's Motion for Partial Summary Judgment, the response, and all other

evidence on file, the court finds there are no genuine issues of material fact.  Therefore, the Court

GRANTS the motion.

SIGNED on _____, 2003.


_____
UNITED STATES DISTRICT JUDGE