# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| CANDI McCULLOCH | : CIVIL ACTION NO. 301CV1115(AHN) |
| Plaintiff, | : |
| | : |
| vs. | : |
| | : |
| HARTFORD LIFE AND ACCIDENT | : |
| INSURANCE COMPANY AND EDUCATORS | : |
| MUTUAL LIFE INSURANCE COMPANY | : |
| Defendants. | : November 28, 2003 |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO EDUCATORS' MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

The Court should deny defendant Educators Mutual Life Insurance Company's ("Educators") spurious Motion for Summary Judgment. Among other things:

A. Educators represents that it executed a reinsurance agreement (the "Agreement") with defendant Hartford Life and Accident Insurance Company ("Hartford") that not only created a contractual relationship between Hartford and plaintiff, but which rendered Hartford solely and exclusively liable to plaintiff in Educators' stead. Nothing could be further from the truth. The Agreement states that it "shall not create any right or legal relation between the Reinsurer [Hartford] and the Claimant [e.g. plaintiff] . . . and the Company [Educators] shall be and remain solely liable to the Claimant [e.g. plaintiff] on the Reinsured Claim."

B. Educators represents that "Educators ceded all responsibility and liability for Plaintiff's claim to Hartford in July 1999, and so informed her by letter in August 1999." The August 1999 letter stated that Educators had contracted with Hartford "to administer your disability claim. This in no way affects your rights under your Certificate of Insurance."

1

C. Educators argues that the policy required plaintiff to <u>amend</u> her complaint to assert her claims related to the Agreement within three years of Educators' execution of the <u>Agreement</u>. The policy provided that no "<u>action</u> shall be <u>brought</u> after three years from the end of the period within which <u>proof of loss is required</u> by the policy." Moreover, defendants refused to disclose and produce the Agreement in response to plaintiff's October 2001 discovery request, notwithstanding a court order, until September 2002, two months <u>after</u> they claim the limitation period expired.

D. Educators represents that the last act of which plaintiff complains in her proposed CUTPA count occurred in September 2000. The complaint, from the inception of this action, alleged that Hartford wrongfully terminated plaintiff's benefits, purportedly on Educators' behalf, on November 18, 2000. The CUTPA count incorporates this allegation and further alleges that the representation that Hartford was acting solely on Educators' behalf was false.

E. Educators claims that it was not engaged in trade or commerce in Connecticut. Since 1999, Educators has been administering its disability claims, including plaintiff's claim, from Connecticut, by and through Hartford, a Connecticut corporation.

As a matter of undisputed fact, Educators did not assign plaintiff's insurance policy to Hartford. As a matter of law, Educators cannot avoid liability for breach of contract and bad faith simply by delegating the administration of its claims to a third party. Plaintiff's amended claims are not time barred. Whether plaintiff will be entitled to punitive damages is a question of fact that is not properly resolved on Educators' motion for summary judgment. Finally, plaintiff has asserted a valid claim under the Connecticut Unfair Trade Practices Act ("CUTPA.")

## II.    COUNTER STATEMENT OF FACTS

Beginning on or about September 24, 1994, plaintiff obtained disability insurance with Educators through a group disability policy issued by Educators.  Educators provided plaintiff with a copy of her policy and a certificate of insurance.  (Def. Ex. C(2)).  On October 11, 1995, plaintiff submitted a claim for long term disability benefits to Educators, which accepted her claim and paid her disability benefits.   (Def. Stmt., ¶ 8.)  In August 1999, Educators and Hartford executed a contract entitled "Reinsurance Agreement."  (Id., ¶ 11; Pl. Ex. 1.)  Hartford terminated plaintiff's benefits in November 2000. (Pl. Exhibit 2.)

In this action, plaintiff challenges the termination of her benefits and also alleges that, after entering the Agreement, Educators abdicated its responsibility to plaintiff in breach of its contractual and legal obligations and in violation of the statutes governing the insurance industry.  First Amended Complaint; Proposed Second Amended Complaint.  Educators freely admits that it abdicated all responsibility to plaintiff, but asserts that the Agreement constituted a legally permissible "assignment," after which it had no contractual obligation to plaintiff, no obligation of good faith, and no liability for Hartford's bad faith.  These claims are without merit.

### A.    INSURANCE INDUSTRY BACKGROUND

A general understanding of three insurance industry practices, including indemnity reinsurance, assumption agreements and third party administration,  assists in resolving Educators' motion.

#### 1.    Indemnity Reinsurance

Indemnity reinsurance "is a contract by which one insurance company agrees to indemnify another in whole or in part against loss or liability which the latter has incurred under a separate

contract as insurer of a third party. It is neither double insurance nor coinsurance since the reinsurer is not co-liable to the original insured, nor liable to the original insured in the same degree." 1-2 Holmes' Appleman on Insurance 2d § 2.15 (hereinafter "Appleman.") "The liability of the reinsurer is solely to the reinsured, which is the ceding company. <u>The ceding company retains all contractual relationship with the original insured.</u>" <u>Id</u>. (emphasis added.) "A reinsurance contract is an indemnity contract that operates to shift part of the risk of loss under an insurance policy from the original insurer to the reinsurer; the original insurer remains in privity with the insured." <u>Id</u>.[1]

An insurance company obtains indemnity reinsurance to: (1) diversify the risk of loss, thereby preventing a catastrophic loss from falling on a single insurer, and (2) reduce reserve requirements which allows the ceding insurer more capital to invest or use to insure more risks. <u>Id</u>. Public policy favors indemnity reinsurance because it provides an added level of protection to insureds in the event that the original insurer is financially unable to satisfy its liabilities, particularly in the case of insolvency. <u>Id</u>.; <u>Bluewater Insurance Limited v. Balzano</u>, 823 P.2d 1365, 1367-1368 (Colo. 1992); <u>Reid v. Ruffin</u>, 469 A.2d 1030 (Pa. 1983) (same).

Because the insured is not a party to the reinsurance contract, and the reinsurance contract has no effect on the original insured's contractual relationship with her insurer, the original insured is usually not even aware of the existence of reinsurance, and there is no requirement that the original

---

[1] <u>See</u> <u>also</u> 14-105 Appleman § 105.4; 14-106 Appleman § 106.7 ("As an initial matter, <u>a ceding insurer remains liable to its insured for the full amount of the insured risk</u> even though it obtains reinsurance . . . , the reinsurance contract is totally distinct from, and unconnected with, the original insurance policy."); <u>Fontenot v. Marquette Casualty Co.</u>, 247 So.2d 572 (La. 1971), <u>quoting</u>, 19 *Couch on Insurance* 2d § 80.2.("<u>Of course the original insurer which issues a policy remains liable to its insured for the full amount of the insured risks</u>. But as between that insurer and the reinsurers the final loss on the maturity of the risk will fall upon the reinsurers to the extent their contracts stipulate.") (emphasis added.)

insurer notify the insured of the agreement.  Appleman, § 2.15.

### 2.    Assumption Agreements

By contrast to indemnity reinsurance, in an assumption agreement (also known as "substitute insurance" and "bulk reinsurance")  the reinsurer "assumes" the original insurer's policies and becomes directly liable to the insureds.  14-109 Appleman § 109.1.  However, even after the execution of an assumption agreement, "the original insurer remains liable to the original insured, in the absence of a novation; that is, an original insurer cannot, without the knowledge or consent of the insured, enter into any contract of reinsurance with another company which abrogates or alters the rights of the insured as against it, the insurer.  An insurer may not transfer its liability to another company and compel its policyholders to accept the new company as their insurer.  When another insurance company assumes the insurer's obligations, the original insurer is not relieved of its liability to the insured without the consent of the insured to substitute another insurer."  Id.[2]

Because assumption agreements dramatically affect insureds, almost every state requires insurance companies to submit such agreements to the Insurance Commissioner for approval, to obtain the written consent of the insureds to the transfer, and to provide notice of the transfer to insureds on a form approved by the Commissioner.  See 14-109 Appleman § 109.3 & fns. 20.  The Insurance Commissioner is to consider, among other things, the fairness to policyholders, the plans

---

[2]  See also 14-109 Appleman § 109.2, quoting Restatement (Second) Contracts § 318 ("Unless the obligee agrees otherwise, neither delegation of performance nor a contract to assume the duty made with the obligor by the person delegated discharges any duty or liability of the delegating obligor."), and § 280, comment d ("(A) mere promise by a third party to assume the obligor's duty, not offered in substitution for that duty, does not result in a novation, and the new duty that the third party may owe to the obligee as an intended beneficiary is in addition to and not in substitution for the obligor's original duty. For a novation to take place, the obligee must assent to the discharge of the obligor's duty in consideration for the promise of the third party to undertake that duty."); See also  14-109 Appleman § 109.8

of the assuming insurer in administering the claims, and whether the notice intended to be provided to the insureds is fair, adequate and not misleading. Id.; See also, C.G.S. § 38a-66(b)(1)-(3); 18 Del. Code § 4944(b)(1)-(3); 31 Pa. Code § 90i.1(a), 90i.2, 90i.3.

The policyholders may reject the transfer and keep their policy with the original insurer. 14-109 Appleman § 109.3 & fn. 20. If the policyholders accept the transfer, the original insurer or assuming insurer must provide the policyholders and insureds with a new certificate of insurance, in a form approved by the Insurance Commissioner, that informs the insured that the assuming insurer has assumed all obligations and liabilities to the original insured. See e.g., 31 Pa. Code § 90i.1(a), 90i.2, 90i.3; C.G.S. 38a-66; 18 Del. Code § 4944.

These onerous obligations do not apply to indemnity reinsurance agreements, wherein the original insurer remains directly liable to the insured. See 14-109 Appleman § 109.3.

### 3.    Third Party Administration

Insurance companies may, and often do, hire another party, known as a "third party administrator" or "TPA" to administer claims under their policies. The insured does not have a contractual relationship with the TPA, which is an agent of the insurer and is "normally clothed with either actual or apparent authority to deal with matters involving the administration." 4-18 Appleman § 18.4.

### B.    THE AGREEMENT IN THIS CASE

The Agreement in this case states that it "shall operate as indemnity reinsurance." (Pl. Ex. 1, Recitals & § 2.2 (the Agreement "provides for indemnity reinsurance solely . . .")[3] The

---

[3] "A contract cannot be both assumption reinsurance and indemnity reinsurance." 14-109 Appleman § 109.1.

Agreement also requires Hartford to administer Educators' disability claims, but Educators reserves the "right to require that a Reinsured Claim be paid on a basis determined by" Educators. (Id., § 2.1.4.). The Agreement authorized Hartford, in its capacity as administrator, to issue payments directly to the claimants "in the Reinsurer's name" and to correspond directly with the claimants "provided the Reinsurer [Hartford] discloses that it is acting as agent for the Company [Educators]." (Id., § 2.1.2)

The Agreement specifically provided that <u>"the Company [Educators] shall be and remain solely liable to the Claimant [e.g. plaintiff] on the Reinsured Claim."</u> (Id. § 2.2.) (emphasis added.) In recognition of Educators' continuing liability for the claims, and Educators' responsibility for Hartford's conduct as administrator, the Agreement required Hartford to indemnify Educators for any damages incurred by Educators (including punitive, exemplary, and other forms of extra-contractual damages) as a result of Hartford's claims adjustment actions and determinations. (Id., § 2.1.3.).

On August 26, 1999, Educators informed plaintiff that "[e]ffective July 1, 1999, Educators Mutual Life Insurance Company has contracted with Group Reinsurance Plus (GRP), a service provider segment of Hartford Life and Accident Insurance Company, <u>to administer</u> your disability claim. <u>This in no way affects your rights under your Certificate of Insurance</u>." (Pl. Ex. 3.) (emphasis added.) Hartford's subsequent correspondence to plaintiff included a stamp that stated "Administered by Hartford on Behalf of Educators Mutual Life Co." (Pl. Ex. 4.) When Hartford terminated plaintiff's benefits, it claimed that it was doing so as administrator for Educators. (Pl. Ex. 2.)

On June 15, 2001, plaintiff filed her initial complaint (the "Complaint") in this action. The

Complaint alleged that plaintiff was insured by Educators, which accepted her claim for disabilty benefits in 1995. (Complaint, ¶¶ 5-7.) The Complaint further alleged that Hartford, on Educator's behalf, terminated plaintiff's benefits on November 17, 2000. Id., ¶19. The Complaint contained one count, which alleged that the termination constituted a breach of plaintiff's insurance contract. (Id., Count One.)

On November 26, 2001, plaintiff requested that Hartford identify and produce all documents that reflected the relationship between defendants, including any indemnities. (See, Order dated July 2002, p.2.) Hartford sought numerous extensions of time to respond to plaintiff's discovery requests, and ultimately refused to respond to these requests on the ground that this information was irrelevant and confidential. (Id.) In April 2002, plaintiff also requested that Educators produce all communications, including documents and contracts, relating to Hartford's assumption of the function of "administrator" for Educator's claimants. (See Pl. Ex. 5.) In July, 2002, plaintiff finally obtained a court order requiring Hartford to comply with her November 2001 discovery requests. (Order, dated July 2002. ) Hartford waited for two months, until September 2002, before it disclosed, for the first time, the existence of the Agreement. (Pl. Ex. 6, No. 21.)[4]

A review of the Agreement revealed that, although designated as indemnity reinsurance, the Agreement was the converse. In an indemnity reinsurance agreement, the reinsurer agrees to

---

[4] Hartford did not seek an extension of time for compliance as otherwise required by local rules, but consistently sought and obtained consent from plaintiff for this delay which finally resulted in several filings of "supplemental compliance." Significantly, on August 9, 2002, Hartford served an "Unexecuted Better Answers" in which it responded to the interrogatory that requested Hartford to identify any documents that described the relationship between the defendants by stating "The answer will be provided shortly." (Pl. Ex. 9, No. 21.) As of August 9, 2002, Hartford clearly knew that the Agreement was responsive to plaintiff's discovery request because it had argued to the court a few months earlier that the responsive document was confidential. (Order dated July 2002, pp.2, 4.)

reimburse the original insurer if the insurer becomes obligated to pay a claim, which allows the reinsured insurer to release the reserves associated with the policies for its own use. 14-105 Appleman § 105.4 ("true reinsurance is a contract of indemnity . . .The reinsurer is obligated only to pay for a loss when the ceding insurer was required to pay.") In this case, Educators transferred the reserves allocated to pay its claimants into the future, to Hartford, and further entitled Hartford to keep those funds even in the event that plaintiff's benefits were terminated. (Pl. Ex. 1, § 2.3, 4.2; Def. Ex. B(1) at pp.13:22-14:13.) The Agreement not only gave Hartford a significant financial incentive to terminate plaintiff's benefits, but delegated it the power to do so without requiring Hartford to assume primary liability for such a decision. (Pl. Ex. 1, § 2.1.2, 2.2.)

Soon after discovering this information, plaintiff amended her complaint (the "First Amended Complaint") to include allegations related to the Agreement and Hartford's financial incentive to terminate plaintiff's benefits.  (First Amended Complaint, ¶¶ 11-12; Count Two.)  During depositions this past summer, Educators disclosed, for the first time, that notwithstanding (a) Educators' representations to plaintiff that it had merely contracted with Hartford to provide administrative services, (b) Hartford's representations to plaintiff that it was investigating her claim, and terminating it, on Educators' behalf, (c) the Agreement, which stated that Educators would remain solely liable to its claimants, and that Hartford would be administering the claims as Educators' agent, and (d) Educators' statutory financial statements, which represent that the claims belong to Educators but are reinsured by Hartford,[5] Educators had treated the Agreement as a sale of its claims after which it had no responsibility or liability to the claimants. (See Def. Ex. B(1), at

---

[5] Educators has apparently represented in statutory filings since 1999 that the claims were the subject of reinsurance. (Pl. Ex. 1, §§ 2.4-2.8.)

9

pp.11:19-22, 13:17-21, Def. Ex. B(2), at p.71:4-24; Pl. Exs. 7 & 1, §§ 2.4-2.8.)  Following the

Agreement, Educators had ceased to act as plaintiff's insurer in any capacity and was not even aware

that Hartford had terminated plaintiff's benefits until she filed the above-captioned action.  (Educ.

Br., pp.1, 5, & fn.14;  Def. Ex. B(1), at pp.11:19-22, 13:17-21, Def. Ex. B(2), at p.71:4-24, Def. Ex.

B(3); Pl. Ex. 8, Nos.1-4, 7, 9-12.)

Hartford's Regional Vice President of Group Reinsurance Plus has acknowledged that

Hartford did not buy the claims, that Hartford did not assume Educators' policies, that Educators

remained ultimately responsible for the claims, and that the parties did not fulfill the review and

consent requirements of an assumption agreement or novation.  (Pl. Ex. 7, Pl. Ex. 1, §§ 8.4, 9.4.)[6]

Yet, Educators argues that the Court should relieve it of any liability because it acted as if the

Agreement was an assumption and novation of its obligations. (Educ. Br., pp.1, 2, 4-7.)  To deprive

plaintiff and other claimants of their right to reject the substitution of Hartford for Educators, and

to avoid review of the Agreement by the Insurance Commissioners, defendants mislabled the

Agreement as "Reinsurance," characterized the Agreement as one for "indemnity reinsurance," but

structured it financially as an assumption, and provided that the reinsurer, Hartford, would also

administer the claims directly. (Pl. Ex. 1, Recitals and §§ 2.1.2, 2.2, 2.4-2.8, 4.2.) On October 22,

2003, plaintiff filed a proposed Second Amended Complaint to allege these facts and to add a breach

of contract, bad faith, and CUTPA claim based on this information, all of which defendants

---

[6]    To the contrary, in 1999 Educators represented to the claimants that the contract for claims administration "in no way affects your rights under your Certificate of Insurance." (Pl. Exhibit 3.) Educators has acknowledged that the August 26, 1999 letter only informed the claimants that Hartford would be processing plaintiff's claim - it did not inform them that Educators had "sold" their claim to Hartford. (Def. Ex. B(2), at p.71:4-24.) Educators did not believe that information would be "pertinent to the claimant." (Id.)

previously knew.

## III.    ARGUMENT

### A.    STANDARD FOR GRANTING MOTION FOR SUMMARY JUDGMENT

A party moving for summary judgment must establish that there are no genuine

issues of material fact in dispute and that it is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d

202 (1986). Summary judgment may be granted only if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that reasonable

minds could not differ as to the material facts. Miner v. City of Glens Falls, 999 F.2d 655, 661

(2d Cir. 1993.)  In determining whether a genuine issue has been raised, all ambiguities must be

resolved and all reasonable inferences be drawn against the moving party. United States v.

Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam); Quinn v.

Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980).

### B.    EDUCATORS IS NOT ENTITLED TO JUDGMENT ON PLAINTIFF'S BREACH OF CONTRACT AND BAD FAITH CLAIMS

Educators claims that it is entitled to judgment on plaintiff's breach of contract and bad

faith claims because (1) it assigned the policy, and all of its obligations to Hartford and (2)

plaintiff failed to bring her action within three years of the assignment.  Educ. Br., pp.3-5. These

arguments are specious.

#### 1.    EDUCATORS DID NOT ASSIGN THE POLICY OR EFFECT A NOVATION

##### a.    Hartford Did Not Assume Educators' Policies

As a matter of undisputed fact, Hartford did not assume Educators' policies. The

11

Agreement expressly "provides for indemnity reinsurance solely," that Educators "shall be and remain solely liable to the Claimant [e.g. plaintiff]," and that Hartford will be "acting as agent for" Educators. (Pl. Ex. 1, §§ 2.1.2, 2.2)  Hartford has acknowledged that it did not assume Educators' policies. (Pl. Ex. 7.)

As a matter of well-established law, the indemnity reinsurance agreement between defendants is an allocation of liability as between them, alone, which did not substitute Hartford as plaintiff's insurer.  See Bluewater Insurance Limited v. Balzano, 823 P.2d 1365, 1367-1368 (Colo. 1992); Fontenot v. Marquette Casualty Co., 247 So.2d 572 (La. 1971); Reid v. Ruffin, 469 A.2d 1030 (Pa. 1983) (same).[7]  Defendants are well-aware of this fact.  (Pl. Ex. 1, § 2.2; Pl. Exhibit 7.)

Further, even if the Agreement were an assumption, it would be void.  An insurance company's duty to its insureds is not "freely assignable," as Educators' claims.  As a matter of common law and statutory law, defendant could not validly assign its claims without the knowledge and consent of the Insurance Commissioner, and without, at minimum, informing the insureds of the assignment and providing the insureds with a new certificate of insurance, none of which it did.  See e.g., 31 Pa. Code § 90i.1(a), 90i.2, 90i.3; C.G.S. 38a-66; (See also Pl. Ex. 1, §§ 8.4, 9.4; Pl. Exs. 3, 7.)[8]

---

[7]  The obligations of an insurer and reinsurer in a reinsurance agreement are determined by the law of their domicile. 14-105 Appleman § 105.4. Educators is domiciled in Pennsylvania and Hartford is domiciled in Connecticut. (First Amended Answer, ¶¶ 2, 3.) The jurisdiction applicable to the underlying insurance policy, Delaware, has requirements that are identical to Connecticut. See 18 Del. C. § 4944.

[8]  In Rumbin v. Utica Mut. Ins. Co., 254 Conn. 259, 757 A.2d 526 (2000), upon which defendant relies, the Court held that an insured, and others, could assign a right to future payments. Id., at 268. The Court did not address, much less overrule, the well-established principle that a party cannot assign an obligation without the knowledge and consent of the obligee, and certainly did not purport to override

**b.    Educators Is Liable to Plaintiff Even if Hartford Assumed Educators' Policies**

Educators is liable to plaintiff even if it did enter an assumption agreement, because it failed to effect a novation. See 14-109 Appleman § 109.1 ("An obligor is discharged by substitution of a new obligor only if the contract so provides or if the obligee makes a binding manifestation of assent to the substitution, forming a novation. Otherwise, the obligee retains his original right against the obligor, even if the obligor intends to substitute another obligor in its place and the obligor purports to assume the duty. "); Ruwet-Sibley Equip. Corp. v. Stebbins, 15 Conn.App. 21, 26, 642 A.2d 1171 (1988) (same); Gateway Co. v. DiNoia, 232 Conn. 223, 233, 654 A.2d 342 (1995) (same); Berg v. Liberty Fed. Sav. & Loan Ass'n., 428 A.2d 347, 349-50 (Del. 1981) (proponent of novation bears the burden to prove a novation and even a creditor's knowledge of a debt assumptor and acceptance of payments from the assumptor is not sufficient to effect a novation or release of the original debtor without the creditor's express consent.)

The contract provision that authorizes Educators to "change" the policy without the consent of the insureds, on which Educators relies, does not purport to authorize Educators to assign the policy or effect a novation without the consent of the insureds.  See e.g. Gateway Co., supra (novation requires proof of specific intent by the obligee to release the obligor.)[9]  At the time of the Agreement, Educators apparently acknowledged that the policy change provision did not apply to the Agreement, when it represented that the Agreement did _not_ change any provision

---

the statutory prerequisites to assignment by insurers.

[9] Educators seems to attach some significance to the fact that plaintiff was an "insured," rather than a policyholder.  Where, as here, the insurer issues a certificate of insurance to the insureds under a group policy, the insureds have a direct contract with the insurer. Holt v. American Progressive Life Ins., 731 S.W.2d 923 (Tenn.App. 1987).

of the policy. (Pl. Ex. 3.) Further, by its terms, the policy required Educators to obtain the consent of the "policyholder" prior to any change. Educators bears the burden to prove that it obtained the consent of the policyholder and has not produced <u>any</u> evidence that it did so. <u>Id</u>. Finally, the contract provision did not, and could not, exempt Educators from obtaining the consent of the Insurance Commissioners, which it also did not do. (Pl. Exs. 7 & 1, §§ 8.4, 9.4.)

## 2.     <u>EDUCATORS IS LIABLE FOR HARTFORD'S CONDUCT</u>

The Court should also reject Educators' argument that it "is entitled to summary judgment on Plaintiff's claim for bad faith because it owed her no contractual duties and was not involved in the termination of her benefits." Educ. Br., p.6. First, as plaintiff's insurer, Educators did owe plaintiff both "contractual duties" and the duty of good faith and fair dealing. <u>See</u> Section B(1), <u>supra</u>; <u>Clausen v. Nat'l Grange Mut. Ins. Co.</u>, 730 A.2d 133, 140-141 (Del.Super. 1997). Second, Educators did not, and could not, escape its duties by delegating the administration of plaintiff's claim to Hartford. <u>Gateway Co. v. DiNoia</u>, 232 Conn. 223, 233, 654 A.2d 342 (1995) ("When a duty is delegated. . . the delegating party (delegant) continues to remain liable. . . . [Delegation] does not free the obligor-delegant from his duty to see to it that performance is rendered, unless there is a novation.")[10]

---

[10] <u>See also</u> <u>Natividad v. Alexsis, Inc.</u>, 875 S.W.2d 695, 698 (Tex. 1994) ("When the insurance carrier has contracted with agents or contractors for the performance of claims handling services, the carrier remains liable for actions by those agents or contractors that breach the duty of good faith and fair dealing owed to the insured by the carrier."); <u>Cary v. United of Omaha Life Ins. Co.</u>, 68 P.3d 462 (Colo. 2003) (insurers cannot escape their duty of good faith and fair dealing by delegating tasks to third parties."); <u>Majorowicz v. Allied Mut. Ins. Co.</u>, 569 N.W.2d 472 (Wis.App. 1997) ("An insurer's duty to act in good faith in its dealings with its insured is non-delegable. An insurer cannot escape liability for bad faith by delegating its responsibilities to attorneys or other agents."); <u>Walter v. Simmons</u>, 818 P.2d 214 (Az.App. 1991), <u>citing</u>, Restatement (Second) of Agency § 214 (1958) ("an insurer who owes the legally imposed duty of good faith to its insureds cannot escape liability for a breach of that duty by delegating it to another, regardless of how the relationship of that third party is characterized."); <u>Cooper v. Nat'l Union Fire Ins. Co.</u>, 21 P.2d 1297, 1300 (Ok.App. 1996) ("an insurer cannot avoid liability for

At all relevant times, Educators and Hartford represented that Hartford was acting as Educators' agent in administering plaintiff's claim. (Pl. Exs. 2-4.) Indeed, the Agreement required Hartford to inform plaintiff that it was acting as Educators' agent in the performance of its claims administration. (Pl. Ex. 1, § 2.1.2.)[11] As a matter of well-established law, Educators is liable for the conduct of its agent, Hartford. Gateway Co., at 240-241 (principal is liable for the acts of its agent.); Walter v. Simmons, 818 P.2d 214 (Az.App. 1991), citing, Restatement (Second) of Agency § 214 (1958) ("an insurer who owes the legally imposed duty of good faith to its insureds cannot escape liability for a breach of that duty by delegating it to another, regardless of how the relationship of that third party is characterized.")

### 3.   EDUCATORS IS LIABLE FOR ITS OWN BREACH OF CONTRACT AND BAD FAITH

Educators is also liable for abdicating its contract and abandoning its responsibilities to plaintiff.

> [A]n insured receives more for its premium than just the possibility its claim will be covered when appropriate. In the relationship between the insured and insurer, the insurer receives both the premium and control over the arrangement. In first party situations, the insurer establishes the conditions for making and paying claims. The insurer evaluates the claim, determines coverage, and assesses the monetary value of the coverage. Thus, the insurance contract brings the insured a certain peace of mind that the insurer will deal with it fairly and justly when a claim is made. Conduct by the insurer which erodes the security purchased by the insured breaches the insurer's duty to act in good faith.

Coventry v. American States Ins. Co., 961 P.2d 933 (Wash. 1998), quoting, William M. Shernoff

---

'bad faith' failure to pay simply because it was due to the act of an independent contractor adjuster, given the non-delegable nature of the duty to deal fairly and in good faith.")

[11]   Educators' current representation that it had no "control" over the administration of plaintiff's claim is false. Educ. Br., p.5. Educators reserved the right to direct Hartford to pay any of the claims on a basis determined by Educators. (Pl. Exhibit 1, § 2.1.4.)

et al., Insurance Bad Faith Litigation § 3.04[5], at 3-26 (1991) (emphasis added.)

As plaintiff's insurer, Educators had a contractual obligation to ensure that plaintiff received benefits to which she was properly entitled, and to ensure that plaintiff's claim was properly administered. See Gateway Co., at 233; Coventry v. American States Ins. Co., 961 P.2d 933 (Wash. 1998) (in addition to the obligation to pay benefits, in insurer has a contractual and statutory duty to ensure that the claims are administered properly and in good faith.) Educators currently asserts that after executing the Agreement, it "owed no contractual duty to plaintiff," and thus "no longer had any knowledge of, control over, or involvement in the administration, investigation, or termination of Plaintiff's benefits" - that it "ceded all responsibility . . . for plaintiff's claim." Educ. Br., pp.3-5; Pl. Exhibit 8. Educators has thus admitted that it failed to perform any of its obligations as plaintiff's insurer since 1999. This is a breach of contract.

Further, Educators' conduct was in bad faith. Educators plainly knew that the Agreement it signed expressly provided that Hartford would not assume Educators' liability to plaintiff. (Pl. Ex. 1, §§ 2.1.2, 2.2.) Indeed, by these provisions, Educators avoided the regulatory oversight designed to protect the rights of the insureds, and deprived plaintiff and others of the opportunity to reject the substitution. By abdicating its responsibilities to plaintiff pursuant to an agreement that provided that Hartford would not assume Educator's liability, Educators effectively left plaintiff with no insurer and simply delegated the disposition of plaintiff's claims to a third party who was not subject to regulation as plaintiff's direct insurer, had no contract with plaintiff, and who had a substantial financial incentive to terminate her benefits, which it did.

Moreover, if, as Educators claims, it did substitute Hartford as plaintiff's insurer and effect a novation, notwithstanding the plain terms of the Agreement, than Educators deceived the

Insurance Commissioner, failed to comply with the statutes governing assumption agreements, and knowingly misrepresented to plaintiff (and required Hartford to misrepresent to plaintiff) that Hartford was acting as a third party administrator on Educators' behalf and that this "in no way affects your rights under your Certificate of Insurance." (Pl. Ex. 3 & Pl. Ex. 1, § 2.2, 2.4.)

In sum, Educators is liable for breach of contract and bad faith because: (i) if it assigned plaintiff's policy to Hartford and effected a novation, it did so improperly, without plaintiff's knowledge and consent, and in violation of the applicable statutes while (and by) misrepresenting that Hartford was acting as Educators' agent and that the Agreement would "in no way affect[] your rights," and (ii) if it did not assign plaintiff's policy to Hartford and effect a novation, its had no basis to terminate its performance as plaintiff's insurer. In either event, Educators eroded the security purchased by plaintiff and plaintiff is entitled to damages. See e.g. Rumbin, at 274 (a party who improperly assigns a contract without following the prerequisites to assignment may be held liable for damages caused by the improper assignment.) (and citations); Coventry, supra.[12]

### 4.   THE POLICY DOES NOT BAR PLAINTIFF'S CONTRACT CLAIM

The disability policy provides that "no . . . action [to recover on the policy] shall be brought after three years from the end of the period within which proof of loss is required by the

---

[12] Because Educators was, and at all times has remained, plaintiff's disability insurer, the case of Janicki v. Paul Revere Life Ins. Co., 2001 U.S.Dist.LEXIS 22308 (D.Conn. December 6, 2001), has no bearing on this case. In that case, the court held that a third party to the insurance contract, which had no role in handling the plaintiff's claim, could not be held liable for the termination of the plaintiff's benefits. The case of Janicki does not support Educators' circular claim that an insurer may evade liability for improperly abdicating its responsibilities to its insured based on the improper abdication itself.

policy." (Def. Ex. C(2), at p.11.) Educators does not dispute that plaintiff brought her action to recover on the policy within the contractual limitation period. Educators' argument, that this provision precludes plaintiff's October 2003 <u>amendment</u> of her complaint, to include a breach of contract count related specifically to Educators' conduct in executing the Agreement and following its execution, is without any merit. Educ. Br., p.3.

First, by its terms, the policy provision merely requires an insured to <u>bring</u> her action within three years; the provision does not purport to establish a limitation period for amendments to the complaint to assert additional theories of recovery. Second, plaintiff's amended complaint relates back to her previous pleading, because it arises "out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." F.R.C.P. 15(c); <u>Travelers Ins. Co. v. Third Assoc.</u>, 14 F.3d 114, 125 (2nd Cir. 1994); <u>Franc v. Bethel Holding Co.</u>, 73 Conn.App. 114, 136, 807 A.2d 519 (2002); First Amended Complaint (alleging facts related to the reinsurance agreement, Hartford's financial interest in terminating plaintiff's benefits, and wrongful termination.)

Third, pursuant to defendants' own interpretation of the policy, the claim would be timely even if it did not relate back. Defendants claim that the policy's "proof of loss" provision required plaintiff to submit proof of loss continually, up to and including November 17, 2000, when they terminated her benefits. <u>See</u> Hartford's Memorandum of Law in Support of Motion for Summary Judgment, p.17 & fn.90. Thus, according to the plain terms of the policy and defendants' own interpretation of the policy, plaintiff's October 2003 amendment was timely. At minimum, the question of whether plaintiff asserted her second breach of contract count within three years of the "period within which proof of loss is required," is a question of fact. <u>See</u>

18

United Technologies v. American Home Assur., 989 F.Supp. 128, 158-159 (D.Conn. 1997)

(denying summary judgment where there were genuine issues of fact as to when statute of

limitations began to run.)

Finally, Educators' misrepresentations, omissions, and obstructions, which prevented

plaintiff from learning of the facts, estop Educators from enforcing the limitation period.   Prior

to this action, defendants represented to plaintiff that Hartford was acting as an administrator on

its behalf, and that the contract for administration "in no way affects your rights under your

Certificate of Insurance."  (Pl. Exs. 3, 4; Def. Ex. B(2), at p.71:4-24.)   In this action, Educators

delayed disclosing the Agreement in response to plaintiff's October 2001 discovery requests, and

in violation of a court order, until September 2002, two months after it asserts plaintiff's claims

accrued.[13]   Even then, Educators did not reveal until depositions this summer that, contrary to its

pre-litigation representations to plaintiff and contrary to the express terms of the Agreement, it

had abdicated all responsibility as plaintiff's insurer since 1999.   The court should not allow

Educators to avoid liability and profit from misleading plaintiff and delaying plaintiff's discovery

of the facts upon which the amendment is based.  See e.g. Cerbone v. Int'l. Ladies' Garment

Workers' Union, 768 F.2d 45 (2nd Cir. 1985) (the federal doctrine of equitable tolling applies

where "the defendant engaged in conduct, often itself fraudulent, that concealed from the

---

[13]   Educators claims that it did not disclose the Agreement to plaintiff prior to this litigation
because it was not "pertinent" to plaintiff, and attempted to prevent plaintiff from discovering the
Agreement during litigation on the ground that it was irrelevant and confidential.  (Def. Exhibit B(2),  at
p.71:4-24; Order dated July 2002, pp.3-4.)  Notably, this "irrelevant" agreement is the primary basis for
Educators' motion for summary judgment, and Educators has submitted the Agreement in a public filing
to the court without any confidentiality designation.

plaintiff the existence of the cause of action.")[14]

## C.    EDUCATORS IS NOT ENTITLED TO JUDGMENT ON PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES[15]

To prevail on summary judgment, Educators must establish that no reasonable jury could conclude that Educators acted in reckless disregard of, or indifference to, plaintiff's property rights. Cf. Uberti v.Lincoln Nat'l Life Ins. Co., 144 F.Supp.2d 90 (D.Conn. 2001.)  Educators has failed to meet that burden.  Educators (1) completely abdicated its responsibilities as plaintiff's insurer; (2) granted a third party, Hartford, a substantial financial incentive to terminate plaintiff's only source of income, and carte blanche to do so; (3) mischaracterized the Agreement as one for indemnity reinsurance and third party administration, thereby circumventing the oversight by the Insurance Commissioner that is intended to protect the rights of insureds, including plaintiff, from precisely the situation described, above; and (4) misrepresented to plaintiff, and required Hartford to misrepresent to plaintiff, that, pursuant to the Agreement, Hartford was merely acting as an administrator on Educators' behalf, and that "this in no way affects your rights under your Certificate of Insurance," thereby depriving plaintiff of the opportunity to object to Educators' arrangement with Hartford.  Plaintiff has plainly submitted evidence from which a reasonable jury could conclude that Educators acted in

---

[14]    See also Maher v. Conn. Ins. Placement Facility, 40 Conn.Sup. 299, 303-305, 494 A.2d 631 (1985) (summary judgment based on contractual limitation period inappropriate where there were disputed issues as to whether the insurer's non-disclosure evidenced bad faith and estopped it from enforcing the limitation period.); Kilburn v. Keenan, 27 Conn.Sup. 394, 397, 240 A.2d 213 (1967) ("An estoppel may prevail over the statute [of limitations] where the defendant's conduct is directed to the very point of obtaining the delay of which he afterwards seeks to take advantage by pleading the statute.")

[15]    Educators has also moved for summary judgment on plaintiff's tortious interference claim. However, plaintiff has asserted this claim against Hartford, alone.  Accordingly, no response to Educators' arguments is warranted.

reckless disregard of, or indifference to, her property rights.

**D.    EDUCATORS IS NOT ENTITLED TO JUDGMENT ON PLAINTIFF'S CUTPA CLAIM**

      1.    <u>The CUTPA Claim Is Not Barred By The Statute of Limitations</u>

Plaintiff's CUTPA claim is not barred by the statute of limitations. First, the claim relates back to the previous pleadings because it arises out of the same conduct and transaction - the Reinsurance Agreement and subsequent termination of plaintiff's benefits purportedly on Educators' behalf. <u>See</u> <u>e.g.</u> First Amended Complaint, ¶¶ 11, 13, 22, 31; Proposed Second Amended Complaint, ¶ 44 . Second, the October 2003 proposed second amended complaint is within the three year statute of limitations. According to defendant's own authority, the CUTPA claim did not accrue until <u>at least</u> November 2000, when Hartford terminated plaintiff's benefits. <u>Timmons v. City of Hartford</u>, 2003 WL 22228989 at *6 (D.Conn.) (Sept. 16, 2003) (Thompson, J.) (CUTPA claim accrued when the last act occurred - that being the date when defendant told plaintiff it would not be paid.) (attached to defendant's motion.) In this case, however, Educators' obligation to the insureds to disclose its alleged ceding of responsibility and substitution of Hartford as their insurer, is ongoing. Proposed Second Amended Complaint, ¶ 44. This on-going obligation, as well as Educators' misrepresentations and concealment of facts described in the Fact Section and Section B(4), <u>supra</u>, tolled CUTPA's statute of limitation until plaintiff's discovery of the facts late this summer. See <u>Fenn v. Yale University</u>, CV 3:96-CV-1647 at pp.31-34 (August 19, 2003) (Droney, J.) (concealment and continuing duty both toll statute of limitations) (attached), <u>citing</u>, <u>City of West Haven v. Commercial Union Ins. Co.</u>, 894 F.2d 540 (2nd Cir. (Conn.) 1990) (insurer's continuing duty to its insured was sufficient to toll

CUTPA statute of limitations.)

### 2. Educators Was Engaged in Trade or Commerce in Connecticut

CUTPA is "remedial in character . . . and must be liberally construed." Titan Sports v. Turner Broadcasting System, Inc., 981 F.Supp. 65, 71 (D.Conn. 1997) (Dorsey, J.) Consistent with this principal, "[a] CUTPA violation . . . need not necessarily occur in Connecticut, but instead, the violation must 'be tied to a form of trade or commerce intimately associated with Connecticut.'" Id., at 72; See also Uniroyal Chem. Co. v. Drexel Chem. Co., 931 F.Supp. 132, 140 (D.Conn. 1994). CUTPA applies to "a course of conduct emanating out of Connecticut." Diesel Inj. Serv. v. Jacobs Vehicle Eq., 23 C.L.R. 621 (December 14, 1998).

Plaintiff's CUTPA claim is tied to a form of trade or commerce intimately associated with Connecticut - Hartford's "reinsurance" and assumption of administration of Educators' disability claims from Connecticut. (Pl. Exs. 1, 3.) Further, plaintiff's CUTPA claim asserts a course of conduct that emanated out of Connecticut - Hartford's misrepresentations to the insureds that it was administering the insured's claims solely on Educators' behalf, which representations were made while Hartford was acting as Educators' agent and pursuant to the defendants' Agreement. (Pl. Ex. 1, § 2.1.2; Pl. Exs. 2, 4.) Accordingly, CUTPA applies.

### 3. Plaintiff's Claims Arise Out of Educators' Trade or Commerce

The conduct of Educators' business includes ensuring that its claims are properly adjudicated and paid, and that it complies with the statutory requirements of its business. (Def. Exhibit B(1), at p.5:10-12. p.5:21-24; Def. Ex. B(2), p.35; Def. Ex. C(1)-(4).). Plaintiff's CUTPA claim alleges that Educators abdicated this contractual obligation to over thirty of its disability claimants after it executed the Agreement (Pl. Ex. 3); delegated authority and financial

interest to a third party to administer its disability claims without complying with the statutory requirements (Pl. Ex. 1); and perpetuated its improper conduct by misrepresenting, and by causing Hartford to misrepresent, that Hartford was acting solely on Educators' behalf in performing claims administration.  (Pl. Ex. 1, § 2.1.2, Pl. Exs. 2-4; See also Proposed Second Amended Complaint, ¶¶ 43-46.)  These actions were not "incidental to Educators' trade or commerce," as Educators claims, they are an integral part of Educators' trade and commerce. See Coventry, supra (an insurer "establishes the conditions for making and paying claims. The insurer evaluates the claim, determines coverage, and assesses the monetary value of the coverage.")

### 4.    Plaintiff Has Suffered Ascertainable Loss

The Court should also reject Educators' argument that plaintiff cannot establish ascertainable loss.  CUTPA's requirement of "ascertainable loss" is not synonymous with actual damages.  Hinchcliffe v. American Motors Corp., 184 Conn. 607, 612-619, 440 A.2d 810 (1981) Bristol Technologies v. Microsoft Corp., 114 F.Supp.2d 59, 78 (D.Conn. 2000) (Hall, J.) (not only may a plaintiff who fails to prove any actual damages resulting from a violation of CUTPA prevail on the claim, but the court may award him attorney fees and punitive damages.) "Whenever a consumer has received something other than what he bargained for, he has suffered a loss of money or property" even where the loss does not consist of a diminution in value.  Id.

As set forth in detail above, as of 1999, upon Hartford's entrance into the relationship with the goal of terminating benefits, plaintiff received insurance services that far different from those that Educators represented that plaintiff would, and was, receiving.  (See Pl. Exs. 1, 3; Def. Ex. B(2), at p.71:4-24.)  Further, Educators deprived plaintiff of the protection of the oversight

of the Insurance Commissioner to which she was entitled, and subjected her to Hartford's self-interested, bad faith, claim investigation. All of this damaged the plaintiff. See e.g. Coventry, at 279, 282.(conduct that "damages the very protection or security which the insured sought to gain by buying insurance" causes the insured injury even where the denial of coverage is ultimately determined to be correct.); Josey v. Filene's, Inc., 187 F.Supp.2d 9, 15 (D.Conn. 2002) (Hall, J.) (denying motion for summary judgment because deprivation of personal property for 45 minutes could constitute ascertainable loss under CUTPA.)

The Court should reject Educators' argument that plaintiff did not suffer "ascertainable loss" because she "did not change her position as a result of this" misinformation and Educators' disregard of the statutory requirements designed to protect insureds such as plaintiff. Educ. Br., pp.11-12. Plaintiff need not prove that she acted in reliance on any act by defendants to establish her CUTPA claim. Hinchcliffe, at 617. Moreover, had Educators informed plaintiff that it was abdicating its role as plaintiff's insurer and substituting Hartford as plaintiff's direct insurer, plaintiff could have sought the appropriate regulatory oversight and refused to consent to the alleged novation.

Finally, whether plaintiff's benefits would have been terminated if Educators had not engaged in the misconduct alleged is not relevant to whether plaintiff has suffered "ascertainable loss." See e.g. Coventry, supra. Because the loss in a consumer protection claim can arise solely from receiving something *different from*, rather than *less than*, what was represented to the plaintiff, the contingency of the alleged loss is not a barrier to stating a claim. In re Bridgestone/Firestone Tires Prod. Liab. Litig, 155 F.Supp.2d 1069, 1098 (S.D.Ind. 2001) (emphasis in original.) (holding plaintiffs alleged ascertainable loss where tires were different

24

from what was represented, and that they need not show that but for the difference, they would have received a higher price when selling or trading in their cars or that the tread separated from their tires), citing, Hinchcliffe, supra; Peck v. Public Service Mut. Ins. Co., 114 F.Supp.2d 51, 58 (D.Conn. 2000) (Goettel, J.) (plaintiff, subrogee of insured under direct action statute, alleged "ascertainable damages" where she had an unpaid judgment for which the defendant insurer may or may not be liable.)

Moreover, whether plaintiff's benefits would have been terminated absent the misconduct alleged is a question of fact for the jury. As Educators points out, it had accepted and paid plaintiff's claim for benefits since March 1996 and during the entire period it handled plaintiff's claim. (Educ. Br., p.5.)  Educators' last few reviews of plaintiff's claim before it abdicated all of its responsibilities, concluded that "the case has been exhaustively reviewed with determinations in regards to attempts to corroborate appropriate findings from the subjective and objective concerns . . . Documentation for the clinical symptomology is correlated well by several physicians in regards to the objective findings" (Pl. Ex. 10, at H2047) and that "[i]n review of your file, it is clearly documented that you have sustained functional limitations which prevent you from performing the substantial requirements of your job." (Pl. Ex. 10, at H 2080.)

Plaintiff's benefits were only terminated after Hartford assumed "administration," investigated her claim based on a different standard for assessing disability (Pl. Exhibit 7, p.205), and with the incentive of keeping the substantial reserves that Educators allocated to pay her claim if it terminated her claim.  The inference that must be drawn in plaintiff's favor on defendant's motion for summary judgment is that (a) Hartford would never have been adjudicating plaintiff's claim in the first place if defendants' Agreement had complied with the

statutory requirements[16]; and (b) plaintiff would still be receiving her benefits today had her claim remained, at least under the supervision of Educators, and subject to the same standards under which Educators had accepted plaintiff's claim since 1996.

## CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that the Court deny Educators' Motion for Summary Judgment. Plaintiff also requests that the Court issue an order pursuant to Federal Rule of Civil Procedure 56(d) specifying the facts that appear without substantial controversy.

PLAINTIFF

CANDI McCULLOCH

By_____

Eliot B. Gersten, Esq.
Fed. Bar No. ct05213
GERSTEN & CLIFFORD
214 Main Street
Hartford, CT 06106
(860) 527-7044
Her Attorney

---

[16] The Insurance Commissioner would not have approved of the Agreement, which allowed Hartford to terminate plaintiff's benefits, because it was directly contrary to the statutory requirements. The Agreement gave Hartford a financial incentive to terminated plaintiff's benefits by transferring all of the reserves for the claims to Hartford, without protecting plaintiff by requiring Hartford to assume Educators' obligations as plaintiff's insurer and issue her a certificate of insurance evidencing this alleged assumption of liability, as required by statute. C.G.S. § 38a-66; 31 Pa. Code 90i.1 to 90i.3. (To the contrary, the Agreement required Hartford to misrepresent that it was administering plaintiff's claim solely on Educators' behalf. Pl. Ex. 1, § 2.1.2.)

PLAINTIFF

CANDI McCULLOCH

By_____
    Eliot B. Gersten, Esq.
    Fed. Bar No. ct05213
    GERSTEN & CLIFFORD
    214 Main Street
    Hartford, CT 06106
    (860) 527-7044
    Her Attorney

11

### CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of November, 2003, a copy of the foregoing was mailed, postage prepaid to the following counsel of record via U.S. mail:

Roberta J. Sharp, Esq.
Barry A. Chasnoff, Esq.
Jessica Spangler Taylor, Esq.
Akin Gump Strauss Hauer & Feld, LLP
300 Covent Street, Suite 1500
San Antonio, TX 78205
Tel: (210) 281-7146
Fax: (210) 224-2035

Donald E. Frechette, Esq. (ct 08930)
Joshua L. Milrad, Esq. (ct 19321)
Charles F. Gfeller, Esq.
Edwards & Angell, LLP
90 State House Square
Hartford, CT 06103
Phone (860) 525-5065
Facsimile (860) 527-4198

Eliot B. Gersten