Connecticut Trial Ct. Unpublished Decisions

DIESEL> INJ. SERV. v. <JACOBS> VEHICLE EQ., No. CV-98-0582400-S (Dec. 4, 1998)

<DIESEL> INJECTION SERVICE vs. <JACOBS> VEHICLE EQUIPMENT

1998 Ct. Sup. 15591, 23 CLR 621

CT Page 15592

No. CV-98-0582400-S

Superior Court

Judicial District of Hartford at Hartford

December 4, 1998

## MEMORANDUM OF DECISION MOTION TO STRIKE

PECK, J.

This action was commenced by service of process on August 18, 1998. The complaint is in two counts. The first count alleges the violation of state franchise laws, including both the Connecticut Franchise Act, General Statutes § 42-1 33e et seq., and the franchise laws of the states of Arkansas, California, Delaware, Hawaii, Indiana, Illinois, New Jersey and Virginia.[fn1] (¶ 23) The second count alleges the violation of the Connecticut Unfair Trade Practices Act ["CUTPA"], General Statutes § 42-110a et seq. (¶ 65)

As alleged in the complaint, the defendant, <Jacobs> Vehicle Equipment ["<Jacobs>"], is a manufacturer and seller of <diesel> truck parts and accessories. (¶ 1) The plaintiffs are several long-term franchisees of the defendant — collectively referred to as the <Jacobs> Warehouse Distributors, or "JWDs," in both parties' memoranda — who distribute <diesel> engine brake products manufactured by the defendant; (¶ 2)

The franchise agreements[fn2] that govern the relationships

between the parties are form contracts prepared by the defendant. These agreements provide that either party may terminate the relationship upon thirty days written notice. The contracts also contain a choice-of-law provision that states: "The construction, validity, enforceability and enforcement of this Agreement and of each clause thereof and all documents relating thereto and the rights and relations of the parties shall be governed by and construed in accordance with the laws of the State and decided by the courts of Connecticut where the Manufacturer is located."

When the defendant sought to terminate its relationships with the plaintiffs, the plaintiffs brought this action. In count one, the plaintiffs allege that notwithstanding the termination provision of the contract, the defendant violated the franchise statutes of Connecticut and other states in which certain plaintiffs do business by terminating the agreements without cause. (Complaint ¶ 23) In count two, the plaintiffs allege
CT Page 15593
that the defendant violated the Connecticut Unfair Trade Practices Act by terminating the franchise relationships without cause in violation of the Connecticut Franchise Act and by making false representations, which the plaintiffs relied upon, concerning the plaintiffs' future role as distributors for the defendant. (¶¶ 67-70)

On October 5, 1998, the defendant filed a motion to strike the plaintiffs' entire complaint. The defendant asserts in its motion that none of the statutes cited by the plaintiffs provides a basis for recovery. Several memoranda have been filed by each party, and oral argument was heard on the matter on October 19, 1998.

## DISCUSSION

A motion to strike may be used "to contest . . . the legal sufficiency of any complaints . . . to state a claim upon which relief can be granted." Peter-Michael Inc. v. Sea Shell Associates, 244 Conn. 269, 270, 709 A.2d 558 (1998). In considering a motion to strike, "all well pleaded facts and those facts necessarily implied from the allegations are taken as admitted." (Emphasis in original; internal quotation marks omitted.) Parsons v. United Technologies Corp., 243 Conn. 66, 100, 700 A.2d 655 (1997). In reviewing a motion to strike, the court must construe the facts in a manner most favorable to the party opposing the motion. See Pamela B. v. Ment, 244 Conn. 296,

308, 710 A.2d 688 (1998).

A complaint includes all exhibits referenced therein. See Practice Book § 10-29, formerly § 141; see also Hossan v. Hudiakoff, 178 Conn. 381, 382, 423 A.2d 108 (1979). When a copy of a contract is incorporated into the complaint, the court can consider the contract as part of the complaint in ruling on a motion to strike. See H. Pearce Real Estate Co. v. Kaiser, 176 Conn. 442, 444, 408 A.2d 230 (1979); Redmond v. Matthies, 149 Conn. 423, 425-26, 180 A.2d 639 (1962).

### COUNT ONE: CONNECTICUT FRANCHISE ACT

The Connecticut Franchise Act, General Statutes § 42-133e et seq., provides a variety of protections to franchisees. One such protection is that a franchise relationship may not be terminated by a franchisor "except for good cause." General Statutes § 42-133f (a). However, under § 42-133h, the act
CT Page 15594
"shall apply only to franchise agreements entered into, renewed or amended on or after [October 1, 1972], the performance of which contemplates or requires the franchisee to establish or maintain a place of business in this state."

In support of its motion to strike, the defendant argues that none of the plaintiffs have stated a cause of action under the Connecticut Franchise Act. The act, it claims, does not apply to out-of-state franchisees, and none of the plaintiffs allege that they do any business in Connecticut. The plaintiffs concede that the act, by its terms, only applies to in-state franchisees. However, they argue that the contractual choice-of-law provision designating Connecticut law as governing creates a cause of action under the act notwithstanding the territorial limitations contained therein.

With respect to the validity of choice-of-law provisions, Connecticut has adopted the analysis set forth in 1 Restatement (Second), conflict of Laws § 187, p. 561 (1971). See Elgar v. Elgar, 238 Conn. 839, 850, 679 A.2d 937 (1996). Under the Restatement analysis, the parties' contractual choice of law will normally be upheld.[fn3] In this case, however, the issue is not whether Connecticut law applies generally, but whether portions of Connecticut laws which limit their territorial scope apply when the parties have designated Connecticut law as applicable. Ultimately, this issue turns on the language of the choice-of-law

provision contained in each of the agreements between the parties.

"The rules of construction are applied only if the language of the contract is ambiguous, uncertain or susceptible of more than one construction." Levine v. Advest, Inc., 244 Conn. 732, 746, 714 A.2d 649 (1998). "It is a general rule of construction that whenever two possible interpretations of a contract seem equally possible, the language will be construed against the party responsible for its inclusion." Mongillo v. Commissioner, 214 Conn, 225, 231, 571 A.2d 112 (1990). In this case, the interpretations of the choice-of-law provision advanced by each party are equally plausible. Thus, the choice-of-law provision is ambiguous, and the rules of construction are applicable. Examining the representative contract attached to the complaint, it is evident that it was drafted by the defendant. Accordingly, the court must favor the construction advanced by the plaintiffs that the choice-of-law provision was meant to make all of the substantive provisions of Connecticut's laws applicable
CT Page 15595
notwithstanding any territorial limitations in those laws which otherwise would render them inapplicable.

No court in Connecticut has yet considered the precise issue of whether a contractual choice-of-law provision overrides territorial limitations in the chosen state's laws. However, there are a number of decisions in other jurisdictions that have considered this issue. A majority of the cases hold that a state franchise statute's territorial limitations preclude a cause of action by out-of-state franchisees even if the parties have contractually agreed to be governed by the law of the state in question. See, e.g., JRT, Inc. v. TCBY Systems, Inc., 52 F.3d 734, 736, 739-40 (8th Cir. 1995) (non-Arkansas plaintiff has no cause of action under Arkansas franchise statute notwithstanding parties' choice-of-law provision selecting Arkansas law); Highway Equipment Co. v. Caterpillar, Inc., 908 F.2d 60, 62-64 (6th Cir. 1990) (same, Illinois choice-of-law); Peugeot Motors of America, Inc. v. Eastern Auto Distributors, Inc., 892 F.2d 355, 358 (4th Cir. 1989) (same, New York choice-of-law); Bimel-Walroth Co. v. Raytheon Co., 796 F.2d 840, 842-43 (6th Cir. 1986) (same, Wisconsin choice-of-law); Carlock v. Pillsbury Co., 719 F. Sup. 791, 810 (D.Minn. 1989) (same, New York choice-of-law provision); In re Montgomery Ward Catalog Sales Litigation, 680 F. Sup. 182, 186 (E.D. Pa. 1987) (same, Illinois choice-of-law provision); Premier Wine & Spirits of South Dakota, Inc. v. E. & J. Gallo

Winery, 644 F. Sup. 1431, 1439 (E.D. Cal. 1986) (same, California choice-of-law provision); Gilchrist Machinery Co. v. Komatsu America Corp., 601 F. Sup. 1192, 1201 (S.D. Miss. 1984) (same, California choice-of-law provision); McDonald's Corp. v. C.B. Management Co., United States District Court, Docket No. 97C6176, 1998 WL 164865, * 10 (N.D. Ill. 1998) (same, Illinois choice-of-law provision); Winer Motors, Inc. v. Jaguar Rover Triumph Inc., 208 N.J. Super. 666, 506 A.2d 817, 820 (N.J. Super. A.D. 1986) (same, New Jersey choice-of-law provision); see also Burger King Corp. v. Austin, 805 F. Sup. 1007, 1023 n. 24 (if Florida franchise statute included territorial limitation, statute would not protect non-Florida plaintiff notwithstanding choice of Florida law in contract); Bunch v. Artec International Corp., 559 F. Sup. 961, 968 n. 14 (S.D.N.Y. 1983) (California franchise statute would not afford non-California plaintiff protection notwithstanding choice of California law in contract).

Most of these decisions do not discuss the reasons for so holding and simply conclude that because the state legislatures intended for the relevant acts only to apply to in-state CT Page 15596 franchisees, no cause of action lies. See, e.g., Highway Equipment Co. v. Caterpillar, Inc., supra, 908 F.2d 62-64; Peugeot Motors of America, Inc. v. Eastern Auto Distributors, Inc., supra, 892 F.2d 358; Bimel-Walroth Co. v. Raytheon Co., supra, 796 F.2d 843; Premier Wine & Spirits of South Dakota Inc. v. E. & J. Gallo Winery, supra, 644 F. Sup. 1439. Thus, these decisions focus on the language of the statutes rather than the language of the contractual provisions. In support of the position adopted by these courts, one commentator has suggested: "Theoretically, parties might specifically contemplate that a franchise relationship law will apply in states other than that in which the law was enacted. Such a case is so unlikely in a franchise context, however, that it may never rise above the level of theory. Franchise contracts are drafted by franchisors, and it is not in their interest to expand the application of franchise relationships laws. Accordingly, it is reasonable to start from the presumption that the contract did not contemplate that such would apply beyond the territory in which it was enacted."[fn4] T. Pitegoff, "Choice of Law in Franchise Relationships: Staying Within Bounds," 14 Franchise L. J. 89, 117 (1995).

A few courts have held that where a contractual choice-of-law provision designates a state's laws as governing, an out-of-state

plaintiff may maintain a cause of action under the designated
state's franchise statute notwithstanding a territorial
limitation contained in the operative act. See Boatland, Inc. v.
Brunswick Corp., 558 F.2d 818, 822 (6th Cir. 1977) (non-Wisconsin
plaintiff has claim under Wisconsin franchise statute in light of
contractual choice of Wisconsin law as governing); C. A. May
Marine Supply Co. v. Brunswick Corp., 557 F.2d 1163, 1166-67 (5th
Cir. 1977) (same); Mon-Shore Management, Inc. v. Family Media,
Inc., 584 F. Sup. 186, 193 (same, New York choice-of-law
provision); Department of Motor Vehicles v. Mercedes-Benz of
North America, Inc., 408 So.2d 627, 630 (Fla. App. 1981) (same,
New Jersey choice-of-law provision); see also Infomax Office
Systems, Inc. v. MBO Binder & Co. of America, 976 F. Sup. 1247,
1254 (S.D. Iowa 1997) (choice-of-law provision designating
Illinois law creates cause of action under Illinois statute for
non-Illinois plaintiff only to extent that statute does not
conflict with terms of contract); Peugeot Motors of America, Inc.
v. Eastern Auto Distributors, Inc., supra, 892 F. Sup. 360-62
(Hall, J., concurring in part and dissenting in part). The
plaintiffs suggest that the reasoning set forth in the C. A. May
decision is persuasive. The defendant in C. A. May argued that
CT Page 15597
the statute in question, the Wisconsin Fair Dealership Law
["WFDL"], Wisc. Stat. § 153.02 et seq., was not meant to
apply to out-of-state dealers and was thus inapplicable to the
out-of-state plaintiff notwithstanding the existence of a
choice-of-law provision in the parties' contract selecting
Wisconsin law. C.A. May Marine Supply Co. v. Brunswick Corp.,
supra, 557 F.2d 1166. The court, however, held that the plaintiff
was protected by the WFDL: "Obviously, the legislature passed the
law to protect Wisconsin dealers, and had no concern for
protecting the termination rights of dealers such as plaintiff.
But that does not mean that parties, one or both of which have
some reasonable contact with the State of Wisconsin, may not
agree to clothe themselves with the rights and duties of citizens
of that state when determining their respective rights under
their contract." Id.; see also Peugeot Motors of America, Inc. v.
Eastern Auto Distributors, Inc., supra, 892 F.2d 362 (Hall, J.,
concurring in part and dissenting in part) (choice of New York
law operates to incorporate substantive provisions of New York
statutory and common law into the contract itself). Similarly,
one commentator suggests: "Although a state's franchisee
protection law may apply, by its terms, only to franchisees
within that state, when the franchisor agrees to be bound by the
whole body of that state's law, it agrees that such protective

legislation will apply to the subject relationship. Having chosen
the law, the franchisor is bound by both that which is favorable,
and that which is unfavorable." G. Carpinello, "Testing the
Limits of Choice of Law Clauses: Franchise Contracts as a Case
Study," 74 Marq.L.Rev. 57, 79 (1990); but see Pitegoff, supra,
14 Franchise L.J. 117 (asserting that parties in this situation
intend for territorial limitations in a chosen state's laws to
operate to limit applicable law).

The defendant correctly points out that subsequent to C.A.
May, the WFDL was amended to include a provision limiting its
application to Wisconsin dealerships, and that this amendment was
likely a result of the C.A. May and Boatland decisions. See,
e.g., Bimel-Walroth Co. v. Raytheon Co., supra, 796 F.2d 842.
While this is true, the court's decision in C.A. May did not
turn on whether the statute at that time was intended to have
such a limitation. See Peugeot Motors of America, Inc. v. Eastern
Auto Distributors, Inc., supra, 892 F.2d 362 (Hall, J.,
concurring in part and dissenting in part). In fact, the court
conceded that the Wisconsin act would not normally apply to an
out-of-state franchisee in the absence of a choice-of-law
provision stating that Wisconsin law governs the parties'
CT Page 15598
agreement. See C.A. May Marine Supply Co. v. Brunswick Corp.,
supra, 557 F.2d 1166. The determinative factor in C.A. May,
rather, was the existence of the parties' choice-of-law
provision, which rendered the Wisconsin act's substantive
provisions applicable to the parties irrespective of the act's
possible geographical restrictions. See id.

Although there is sound reasoning supporting each side of
this argument that can be extracted from these decisions, the
reasoning set forth in C.A. May is more persuasive in light of
the ambiguous nature of the choice-of-law provision in the
present action. The decisions which do not allow a cause of
action to lie do not address the fact that the choice-of-law
provisions in those cases could be construed in the manner
suggested by the plaintiffs in the present action. In the context
of a motion to strike, the ambiguous choice-of-law provision must
be construed in favor of the plaintiffs. Thus, for the purpose of
this motion, the provision must be read such that the parties
have agreed to clothe themselves with the rights and duties of
similarly situated Connecticut citizens. Furthermore, it seems
counterintuitive that when the parties to an agreement stipulate
that Connecticut law is to govern their rights and relationships,

they do not intend for the substantive provisions of the
Connecticut statute most relevant to their relationship to be
part of the governing law. In the present action, the parties
entered into franchise agreements and designated that Connecticut
law should govern the agreements and the rights and relations of
parties. It is logical that Connecticut franchise statute was
meant to be part of the governing body of law chosen. Given that
the Connecticut Franchise Act was enacted to protect franchisees,
it would not be consistent with the purpose of the act to permit
the defendant to use it as a shield against its application to
the franchise relationships at issue in the present action.

What the parties intended with respect to the choice-of-law
provision is a question of fact that must be explored at least
during discovery and perhaps at trial. For the purpose of a
motion to strike, however, all unsettled facts must be
interpreted in the manner most favorable to the party opposing
the motion. Construing the facts in a manner most favorable to
the plaintiffs, they have alleged a legally sufficient cause of
action under the Connecticut Franchise Act[fn5] Accordingly, the
motion to strike is denied with respect to count one of the
complaint.
CT Page 15599

## COUNT TWO: CUTPA

The defendant argues that count two of the plaintiffs'
complaint, alleging a violation of the Connecticut Unfair Trade
Practices Act ["CUTPA"], General Statutes § 42-110a et seq.,
should be stricken as CUTPA does not apply to the plaintiffs
because they are all out-of-state businesses. The defendant also
contends that even if CUTPA is applicable to the plaintiffs, the
defendant's actions do not as a matter of law constitute "unfair
acts or practices." The plaintiffs argue in their reply and
surreply that CUTPA is applicable because of the parties'
choice-of-law provision designating Connecticut law as governing,
and because they have alleged the requisite nexus with
Connecticut. The plaintiffs also claim that the defendant's conduct
as alleged constitutes a CUTPA violation.

CUTPA declares that "[n]o person shall engage in unfair
methods of competition and unfair or deceptive acts or practices
in the conduct of any trade or commerce." General Statutes §
42-110b (a). "Trade" and "commerce" are defined as "the
advertising, the sale or rent or lease, the offering for sale or

rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." (Emphasis provided.) General Statutes § 42-110a (4). The meaning of the geographical limit contained in this definition is unclear and has not been clarified by an appellate court in this state.

CUTPA "is remedial in character . . . and must be liberally construed in favor of those whom the legislature intended to benefit." (Citations omitted.) Willow Springs Condominium Assn., Inc. v. Seventh BRT Development Corp., 245 Conn. 1, (1998).

One court has held that CUTPA may be applied to conduct that occurs outside the state where choice of law principles indicate the applicability of Connecticut law. See USGI, Inc. v. Michele Limited Partnership, United States District Court, Civil No. B-88-229 (D. Conn. January 29, 1990) (16 CLT No. 11, 24). The USGI decision, however, is not clear as to whether there was a contractual choice of law. Id. Regardless of whether the existence of a contractual choice-of-law provision selecting Connecticut law as governing renders CUTPA applicable in this case, the court finds that the plaintiffs have alleged a CT Page 15600 sufficient nexus with Connecticut to withstand the defendant's motion to strike.

Few decisions discuss the geographical scope of CUTPA. However, consistent with the notion that CUTPA is to be liberally construed, it has been held that "CUTPA does not necessarily require that the violation occur within the state, only that it be tied to a form of trade or commerce intimately associated with Connecticut." H & D Wireless Limited Partnership v. Sunspot, United States District Court, Civil No. H-86-1026 (February 24, 1987) (13 CLT No. 17, 22). Other courts have followed the reasoning in H & D Wireless in holding that CUTPA applies as long the alleged conduct is tied to trade or commerce intimately associated with Connecticut. See Titan Sports, Inc. v. Turner Broadcasting Systems, Inc., 981 F. Sup. 65, 71 (D. Conn. 1997); Uniroyal Chemical Co. v. Drexel Chemical Co., 931 F. Sup. 132, 140 (D. Conn. 1996); Richmond Fredericksburg & Potomac Railroad Corp. v. Aetna Casualty & Surety Co., United States District Court, Docket No. 3:96CV1054 (D. Conn. April 11, 1997).

Interestingly, one court has considered whether CUTPA was applicable in an action between a non-Connecticut company and Jacobs, the defendant in the present action. See Jacobs Manufacturing Co. v. Sam Brown Co., United States District Court, Docket No. 84-0887-CV-W-9 (W.D. Mo. June 30, 1986) (1986 WL 7815). That court held that the plaintiffs had stated a claim under CUTPA based on the allegations indicating "a course of conduct emanating out of Connecticut which constituted unfair methods of competition and unfair and deceptive practices in the conduct of trade or commerce." Id.

The defendant in the present action argues that in contrast to Sam Brown, the plaintiffs here have not alleged any course of conduct emanating out of Connecticut. However, the existence of such a course of conduct may be reasonably inferred from the allegations of the complaint. The plaintiffs allege that the defendant has its principal place of business in Connecticut. It is logical to infer that where non-Connecticut franchisees have an agreement to distribute products created and manufactured by a company with its principal place of business in Connecticut, the defendant's conduct is tied to trade or commerce intimately associated with Connecticut. While there may remain an issue of fact as to the nature of the nexus between the alleged misconduct and this state, it cannot be resolved in the context of a motion to strike.
CT Page 15601

The defendant also argues that the conduct alleged by the plaintiffs does not, as a matter of law, amount to a violation of CUTPA. The test for whether conduct violates CUTPA consists of three parts: "(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)]." (Alterations in original; internal quotation marks omitted.) Willow Springs Condominium Assn., Inc. v. Seventh BRT Development Corp., supra, 245 Conn. 43; see also Thames River Recycling, Inc. v. Gallo, 50 Conn. App. 767, 785-86, (1998). "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three . . . Thus a violation of CUTPA may be established by

showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy . . . Furthermore, a party need not prove an intent to deceive to prevail under CUTPA." (Citations omitted; internal quotation marks omitted.) Cheshire Mortgage Service, Inc. v. Montes, 223 Conn. 80, 105-06, 612 A.2d 1130 (1992); see also Thames River Recycling, Inc. v. Gallo, supra, 50 Conn. App. 786.

The plaintiffs have sufficiently alleged a violation of public policy. In particular, the plaintiffs allege that the defendant violated the terrorization provision of the Connecticut Franchise Act by terminating its relationship with the plaintiffs without cause. The act reflects a public policy in favor of protecting franchisees from unjustified and unfair terminations. See General Statutes § 42-133e et seq. The plaintiffs, in addition to having stated a claim under the Connecticut Franchise Act, have alleged that the public policy behind the act has been violated. It has been held that a violation of the Connecticut Franchise Act amounts to a violation of public policy. See Chem-Tek, Inc., General Motors Corp., 816 F. Sup. 123, 130-31 (D. Conn. 1993); Hartford Electric Supply Co. v. Allen-Bradley Co., Superior Court, judicial district of Hartford, Docket No. 562061 (May 28, 1997) (Satter, J.) (19 CONN. L. RPTR. 363, 370-71); but see Grand Light & Supply Co, v. Honeywell Inc., 771 F.2d 672, 680 (1985) ("a violation of the [Connecticut] Franchise Act would not necessarily implicate the interests protected by CUTPA").
CT Page 15602
Accordingly, the plaintiffs' complaint satisfies the first prong of the three-part CUTPA test.

The plaintiffs' complaint also satisfies the second part of the test. The complaint alleges that the defendant made a series of false representations to the plaintiffs concerning the life of the partnership between the parties. The defendant argues that the statements referenced in the complaint do not amount to unethical or unscrupulous conduct as they were not false. However, the truth of the alleged representations is a question of fact which for the purposes of this motion to strike, must be construed in favor of the plaintiffs. The defendant also contends that the complaint fails to allege that the statements were untrue at the time they were made and that the defendant knew of their falsity when it made the statements. Intent to deceive, however, is not a required element for a CUTPA violation. Construing the facts in the complaint in a manner favorable to sustaining its legal sufficiency, the court finds that the

plaintiffs have alleged conduct that is immoral, unethical, oppressive, or unscrupulous, thus satisfying the second prong of the three-part analysis for CUTPA violations.

The plaintiffs have also satisfied the final prong of the test. Based on the allegations of the complaint, it can be inferred that the plaintiffs will suffer substantial economic harm, based largely on the investments they have made in connection with their relationships with the defendant, should the defendant be allowed to terminate the franchise relationships. See Hartford Electric Supply Co. v. Allen-Bradley Co., supra, 19 CONN. L. RPTR. 371 (finding that termination of franchise agreement would cause substantial injury to franchisee). As the complaint satisfies each part of the three-part test for a CUTPA violation, the plaintiffs have sufficiently alleged a violation of CUTPA. The defendant's motion to strike is therefore denied with respect to the second count of the plaintiffs' complaint.

Accordingly, the defendant's motion to strike the complaint is denied in its entirety.

Peck, J.

[fn1] Arkansas Franchise Protection Act, Ark. Code Ann. § 4-72-201 et seq. (Michie 1996); California Franchise Relations Act, Cal. Bus. & Prof. Code § 20000 et seq. (Deering 1992); CT Page 15603
Delaware Franchise Security Law, Del. Code Ann. tit. 6, § 2551 et seq. (1993); Hawaii Franchise Investment Law, Haw. Rev. Stat. § 482E-1 et seq. (1993); Illinois Franchise Disclosure Act, 815 Ill. Comp. Stat. 705/19 et seq. (West 1993); Indiana Deceptive Franchise Practices Act, Ind. Code § 53-2-2.7-1 et seq. (Michie 1995); New Jersey Franchise Practices Act, N.J. Stat. Ann. § 56:10-1 et seq. (West 1989); Virginia Retail Franchising Act, Va. Code Ann. § 13.1-557 et seq. (Michie 1993)

[fn2] A copy of a representative agreement is attached as an exhibit to one of the affidavits referenced in the complaint. (Complaint ¶ 26)

[fn3] The Restatement provides, in relevant part: "The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one

which the parties could not have resolved by an explicit
provision in their agreement directed to that issue, unless
either (a) the chosen state has no substantial relationship to
the parties or the transaction and there is no other reasonable
basis for the parties' choice, or (b) application of the law of
the chosen state would be contrary to a fundamental policy of a
state which has a materially greater interest than the chosen
state in the determination of the particular issue and which,
under the rule of § 188 [dealing with choice-of-law in the
absence of a contractual provision], would be the state of the
applicable law in the absence of an effective choice of law by
the parties." 1 Restatement (Second), conflict of Laws § 187
(2), p. 561 (1971).

[fn4] While Pitegoff may be right in his assertion that
franchisors generally do not intend to expand the application of
franchise relationship laws, this does not preclude the
possibility that the express language of a choice-of-law
provision in a franchise agreement is ambiguous and thus subject
to the rules of construction which operate in favor of the
non-drafting party.

[fn5] The defendant also claims that the plaintiffs have failed
to allege a legally sufficient cause of action under the
franchise statutes of Arkansas, California, Delaware, Hawaii,
Indiana, Illinois, New Jersey and Virginia. However, the
complaint alleges violations of these statutes in the same count
as the claim under the Connecticut Franchise Act. A single
CT Page 15604
paragraph of a count of a pleading is only subject to a motion to
strike where the paragraph itself states a cause of action. See,
e.g., Zavo v. Montanaro, Superior Court, judicial
district of Fairfield at Bridgeport, Docket No. 313902 (January
25, 1995) (Cocco, J.); see also Pixel. Inc. v. Forensic
Technologies International, Superior Court, judicial
district of Fairfield at Bridgeport, Docket No. 340702 (May 8,
1998) (Mottolese, J.). As the paragraph alleging the
violation of these other state franchise statutes does not
purport to set forth a cause of action, the motion to strike
must be denied with respect to count one in its entirety.

Copyright © 2003 Loislaw.com, Inc. All Rights Reserved

Connecticut Trial Ct. Unpublished Decisions

DIESEL> INJECTION v. <JACOBS> VEHICLE, No. X04 CV 980120289S (Apr. 16, 2002)

<DIESEL> INJECTION SERVICE CO., INC., et al. v. JACOBS VEHICLE

EQUIPMENT COMPANY, et al.

2002 Ct. Sup. 4395, 31 CLR 741

No. X04 CV 98 0120289S

Superior Court

Judicial District of New London at Norwich

Complex Litigation Docket.

April 16, 2002

MEMORANDUM OF DECISION
ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CT Page 4396

McLACHLAN, JUDGE.

In their two-count Complaint, the plaintiffs who are engaged in the
sale and, in some cases, installation of truck equipment, allege that the
defendants, <Jacobs> Vehicle Equipment Company and <Jacobs> Vehicle Systems,
Inc. ("<Jacobs>"), a manufacturer and seller of <diesel truck parts and
accessories, violated various state franchise laws including the
Connecticut Franchise Act (CFA), Connecticut General Statutes § 42-133
(e) et seq., and the franchise laws of various states including
Arkansas, California, Delaware, Hawaii, Indiana, Illinois, New Jersey and
Virginia (First Count). In their Second Count, plaintiffs allege that the
termination of the agreements plaintiffs had with the defendants was a
violation of CUTPA because of the CFA franchise violation and because of
the misrepresentations made by the defendants. Plaintiffs, who had
long-term agreements with Jacobs for the distribution of its parts, were
referred to in the agreements as the Jacobs Warehouse Distributors or
"JWDs".

Jacobs asserts in its motion for summary judgment that the provisions of the CFA do not apply so that the First Count fails and that the CUTPA claim in the Second Count also fails because the alleged misconduct occurred outside the permitted period of the statute of limitations.

This is not the first time the defendants have raised these issues and in fact there have been two previous motions for summary judgment with respect to the CFA claim, as well as a motion to dismiss and a motion to strike both of which were denied. Plaintiffs' claim that the statute of limitations issue precludes the CUTPA claim has previously been raised and rejected.

Discussion

Before dealing with the legal issues raised by the motion itself, the court must first address plaintiffs' claim that the motion should be denied under the law of the case doctrine. Our Supreme Court recently considered this issue.

This claim is without merit. `A judge is not bound to follow the decisions of another judge made at an earlier stage of the proceedings, and if the same point is again raised he has the right to reconsider the question as if he had himself made the reasonable decision . . . [O]ne judge may, in a proper case, vacate, modify, or depart from an interlocutory order or ruling of another judge in the same case, upon
CT Page 4397
questions of law.'

Wagner v. Clark Equipment Co., 259 Conn. 114, 130-31 (2002), citing Breen v. Phelps, 186 Conn. 86, 98-99 (1982). In the present case, in her memorandum on the motion to dismiss, Judge Peck did not make an absolute finding as to the applicability of the CFA to this case based upon the choice of law provisions of the contract. Rather, she stated that the parties' intention "with respect to the choice of law provision is a question of fact that must be explored at least during discovery and perhaps at trial." Mem., Motion to Strike, December 4, 1998, P11.

Thus, the court is not obligated to follow the previous orders entered herein and believes that the issue may again be addressed now that discovery is concluded. Mac's Car City, Inc. v. America National Bank, 205 Conn. 255, 262 (1987). At this stage of the proceedings, with discovery completed and the case prepared for trial, the plaintiffs have been unable to provide any credible evidence that the parties intended to

be bound by the provisions of the CFA excluding the territorial
restriction in that Act which limited the right to recovery to
franchisees operating in the State of Connecticut or intending to operate
a franchise in the State of Connecticut. Gen. Stat. § 42-133h.

A motion for summary judgment is designed to eliminate the delay and
expense of litigating an issue where there was no real issue to be
tried. Wilson v. New Haven, 213 Conn. 277, 279 (1989). The judgment
sought on such a motion shall be rendered if the pleadings, affidavits
and other proof show that there is no genuine issue as to any material
fact and that the moving party is entitled to judgment as a matter of
law. Connecticut Practice Book § 17-49. In this case it is undisputed
that none of the plaintiffs operated their businesses within the State of
Connecticut. The only question is whether the parties intended that only
the substantive provisions of CFA be incorporated into their agreement or
whether the territorial exclusions contained in CFA at § 42-133h
would also apply. The plaintiffs have been unable to show any evidence
that the parties intended to adopt the substantive provisions of
Connecticut law particularly with respect to CFA excluding the
territorial restrictions. Nor could a trier of fact reasonably conclude
that they so intended in light of the language in the most recent
agreement between the plaintiffs and the defendants which expressly
acknowledged that the JWDs were not franchisees of Jacobs. While this
characterization may not be binding for the purpose of applying the
franchise acts of various states, it certainly is inconsistent with the
plaintiffs' claim that they intended that the protective provisions of the
CFA should apply under the agreement.

Moreover, the identical argument made by plaintiffs in this case was
CT Page 4398
rejected by Judge Nevas in the United States District Court in the case
of Forbes v. Joint Medical Products Corp., 976 F. Sup. 124 (D.Conn.
1997). In Forbes, the defendants moved for summary judgment as to claims
made pursuant to the CFA on the ground that the CFA was not applicable to
the plaintiff because he did not maintain a place of business in the
State of Connecticut. The court agreed.

The Act prohibits franchisors from, inter alia,
canceling or failing to renew a franchise agreement
without good cause. See Conn. Gen. Stat. Sec. 42-133f
(a). However, the Act only applies to a franchise
agreement, "the performance of which contemplates or
requires the franchisee to establish or maintain a
place of business in this state." Conn. Gen. Stat.
Ann. Sec. 42-133h (West 1992).

Forbes argues that the provision in the Distributor
Agreement which states that Connecticut law shall
apply to any disputes arising from the agreement
affords him the protection of the Act. He claims that
the parties included a clause stating that Connecticut
law applied to potential future disputes because they
specifically contemplated that the Act would apply to
their franchise agreement. However, without deciding
whether Forbes was actually a "franchisee" as defined
by the Act, a fair reading of both the Act itself and
the case law interpreting it lead the court to
conclude that only franchisees who have established or
maintained a place of business in Connecticut are
covered by the Act.

. . . The provision of the agreement which states that
Connecticut law applies to future disputes merely
governs which State's laws applies to such disputes,
not whether the jurisdictional prerequisites of a
specific statute have been satisfied.

Id., 126.

Accordingly, the court grants the motion for summary judgment with
respect to the First Count to the extent only of determining that the
provisions of the CFA are not applicable in this action and the plaintiffs
are not entitled to the protection of its provisions.

Next, the court turns its attention to the Second Count.
CT Page 4399

Notwithstanding the fact that the plaintiffs are not entitled to the
protection of CFA, conduct of the defendants may still violate CUTPA where
the defendants' actions violate the public policy of this state as
expressed "within at least the penumbra of some common law, statutory, or
other established concept of unfairness." (Emphasis added.) Willow
Springs Condominium Association, Inc. v. Seventh BRT Development Corp.,
245 Conn. 1, 43 (1998). Tallmadge Bros., Inc. v. Iroquois Gas
Transmission System, L.P., 252 Conn. 479, 505 (2000).

The defendants argue that plaintiffs' CUTPA claim must fail because it
is based upon the public policy embodied in the CFA. They claim that a
CUTPA claim based on CFA cannot stand because the plaintiffs are
geographically excluded from the applicability of CFA. The cases cited by
the defendants in support of this position are not directly in point,

however, because the plaintiffs in those cases failed to satisfy substantive requirements rather than the geographical requirements of CFA. Moreover, the plaintiffs in this case are not relying solely upon the CFA as the basis for their CUTPA claim. Paragraph 67 of the Second Count of the Complaint alleges that "Jacobs' termination of the JWDs' distributorships offends, inter alia Connecticut's public policy of protecting franchisees from unjustified terminations as expressed in the Connecticut Franchise Act." There are also allegations in paragraph 69 of the Second Count that "Jacobs made false representations to the JWDs concerning the JWDs' future roles as Jacobs distributors."

Our Supreme Court has held that whether a party made fraudulent misrepresentations or engaged in unfair or deceptive practices is a question of fact. Tallmadge Bros., supra. Thus, the conduct alleged by the plaintiffs which is supported by the affidavits submitted is sufficient to show a triable issue of fact with respect to the alleged misrepresentations. As to the claim that the misrepresentations occurred in 1989 and any claim is thus barred by the statute of limitations, the plaintiffs maintain that Jacobs persisted in republishing the false and misleading statements of Jacobs with respect to their intentions of maintaining the JWDs.

While summary judgment may be granted where a claim is barred by the statute of limitations, Doty v. Mucci, 238 Conn. 800, 806 (1996), summary judgment is not appropriate where there is a dispute as to the material facts concerning the statute of limitations. Burns v. Hartford Hospital, 192 Conn. 451, 452 (1984). Accordingly, the Court denies Jacobs' motion for summary judgment with respect to the Second Count of the Complaint.

---

McLachlan, J.
CT Page 4400

Copyright © 2003 Loislaw.com, Inc. All Rights Reserved

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JOHN B. FENN, | : | |
| Plaintiff, | : | |
| | : | |
| | : | CIVIL ACTION NO. |
| | : | 3:96-CV-1647 (CFD) |
| YALE UNIVERSITY, | : | |
| Defendant. | : | |

**MEMORANDUM OF DECISION**

The plaintiff, John B. Fenn, brought this action against the defendant, Yale University, alleging

conversion, theft, tortious interference with business relationship, and violations of the Connecticut

Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, et seq., regarding an invention

and patent for that invention, which issued to him as United States Patent No. 5,130,538 ("'538

patent") on July 14, 1992.[1]  Yale has asserted counterclaims against Fenn, seeking an accounting and

assignment of the '538 patent, as well as damages for breach of contract and fiduciary duty, fraud,

negligent misrepresentation, conversion, theft, unjust enrichment, and CUTPA violations.[2]

The following are the findings of fact and conclusions of law determined by the Court following

the bench trial:

**I.      Findings of Fact**

      **A.      Introduction**

---

[1]Jurisdiction is based upon diversity of the parties and an amount in controversy exceeding $75,000, pursuant to 28 U.S.C. § 1332(a)(1).  Personal and subject matter jurisdiction are uncontested.

[2]Yale withdrew its CUTPA claim following the trial.  See Yale University's Proposed Findings of Fact and Conclusions of Law at 3 n.2.

1

John B. Fenn ("Dr. Fenn") is a leading scientific expert in the field of mass spectrometry, which determines the masses of atoms and molecules. Mass spectrometry has important uses in the development of medicines and the mapping of genes.[3] In 1967, Dr. Fenn joined the faculty of Yale University ("Yale") as a tenured full professor. In 1987, as required by Yale's then-mandatory retirement policy, Dr. Fenn retired from his position as a full professor, but continued his work at Yale for another seven years as a "Professor Emeritus" and "Senior Research Scientist." In 1994, Dr. Fenn left Yale and became a research professor at Virginia Commonwealth University.

This case concerns a dispute between Yale and Dr. Fenn over an invention in the field of mass spectrometry which he developed while at Yale. In the following findings of fact, the Court will first address the various Yale policies that concern the inventions of its faculty members such as Dr. Fenn, then the particular policy that applied to him for this invention, then the particular invention here.

**B.      Yale's Patent Policy**

From before Dr. Fenn joined its faculty, Yale's administrative policies have provided that patentable inventions resulting from a faculty member's research conducted at Yale belong to Yale and not the faculty member unless Yale expressly releases its interest in such inventions.[4] These policies have also provided, though, that licensing royalties resulting from such inventions would be shared by Yale and the faculty member/inventor. After Dr. Fenn came to Yale in 1967, Yale made changes to its patent policy in 1975, 1984, 1988, and 1989, but these changes dealt primarily with the division of net

---

[3]Dr. Fenn recently won the Nobel Prize for Chemistry for the mass spectrometry invention which is the subject of the instant action.

[4]These administrative policies concerning patentable inventions are referred to here as the "patent policy."

licensing royalties between Yale and the inventor. The policy that inventions belong to Yale and not the inventor remained unchanged throughout Dr. Fenn's employment at Yale.

In 1967, when Dr. Fenn began his employment at Yale, the Faculty Handbook, dated July 1, 1966, contained provisions about Yale's patent policy with regard to inventions by its faculty members (the "1966 policy"). Pursuant to that policy, a faculty member was required to report to the university any invention resulting from "research conducted under University auspices or with the use of facilities under its control" and Yale owned the invention. The patent policy further stated that Yale did not typically keep title to patents resulting from those inventions; Yale arranged with the "Research Corporation"[5] to carry out the patenting and commercializing of the inventions and to retain title to the subject patents. The policy also indicated that an inventor's share of any net royalty income from such inventions was "usually" 15%. The policy further stated that the University could abandon its interest in an invention and that in such circumstances, "the inventor is free to handle or dispose of his invention as he wishes." Dr. Fenn does not dispute that this patent policy applied to him.

On July 1, 1970, Yale prepared and distributed an updated Faculty Handbook with a section setting forth a patent policy identical to the 1966 policy. Subsequently, Dr. Fenn wrote a letter to

---

[5]The Research Corporation is a non-profit foundation which distributes its total income as grants-in-aid of research to colleges, universities, and scientific institutions. It assists colleges, universities, and scientific institutions in exploiting their employees' inventions by overseeing the patenting and commercializing of those inventions. To that end, the Research Corporation typically holds title to those inventions and divides the net income from the inventions between the inventor and the schools and other institutions. At some point, Yale established its internal Committee on Cooperative Research, Patents and Licensing and Office of Cooperative Research ("OCR") to assist in those functions and supervise inventions by the Yale faculty. The Yale OCR eventually took over most of the functions previously performed by the Research Corporation.

Yale's Provost expressing his opinion that the inventor's share of royalty income provided by that

patent policy was inadequate.

In 1974, the Yale Provost appointed a committee of faculty and administrators, including Dr.

Fenn, to review the patent policy. The committee's work resulted in the 1975 patent policy, which

increased the faculty member/inventor's share of net licensing royalties from 15% to 50%. The policy

reiterated that all discoveries and inventions which result from "teaching, research, and other intellectual

activity performed under University auspices" must be reported to Yale and provided that:

> [t]he [Yale] Treasurer shall refer inventions to Research Corporation or make other
> arrangements for evaluation of them in accordance with this policy. . . . In addition, the
> inventor may propose, even though the invention is one in the patenting or licensing of
> which the University wishes to participate, that the patenting of the invention or the
> licensing of the patent shall be arranged by the inventor at the inventor's expense, and if
> his proposal is accepted by the University, he shall proceed in accordance with an
> agreement to be made between the inventor and the University providing for such
> patenting or licensing by the inventor. Finally, if the University decides that although
> patenting or licensing of an invention is not contrary to University policy or the
> University does not wish to participate in the patenting or licensing, the University shall
> release to the inventor the University's interest in the invention, and the inventor shall be
> free to dispose of the invention as he wishes.

The 1975 patent policy also provided that it was "subject to revocation or amendment by the [Yale]

corporation at any time." Dr. Fenn concedes that he was contractually bound by this 1975 patent

policy.

In the early 1980s, a committee headed by Yale Professor Clement L. Markert ("the Markert

Committee") was convened and charged with the task of reviewing the 1975 patent policy, faculty

research sponsored by private entities, and commercial activities of faculty members. The Committee

also recognized a need to re-examine the patent policy in light of the Bayh-Dole Act's changes in

federal law and a shift in responsibilities from the Research Corporation to the Yale Office of

Cooperative Research.[6]  Dr. Fenn served on the Markert Committee.

The Markert Committee produced a "Report of the Committee on Cooperative Research,

Patents, and Licensing" ("the Markert Report"), setting forth specific recommendations, including

changes to Yale's 1975 patent policy.  The report's recommendations were embodied in a revised

draft of the Faculty Handbook and a revised draft patent policy.[7]  Among other things, the Markert

Report recommended reducing the share of licensing royalties for faculty members set forth in its 1975

patent policy.  In particular, the Markert Report provided that inventors should receive 30% of net

royalty income up to $200,000 and 20% of net royalty income in excess of $200,000.[8]

Professor Markert presented Yale's then-president, A. Bartlett Giamatti ("President Giamatti"),

with a draft of the Markert Report by letter dated November 18, 1983.  In that letter, Professor

Markert indicated that the report "represents a consensus of diverse views held by members of the

committee."  In a reply letter dated November 28, 1983, President Giamatti thanked Professor

Markert for the Committee's work and informed him that the Markert Report would be circulated to

_____

[6]The Bayh-Dole Act, Act of Dec. 12, 1980, Pub. L. 96-517, § 6(a), 94 Stat. 3019, codified at 35 U.S.C. § 200 et seq., grants non-profit organizations exclusive title to inventions developed through federal funding, and allows them to freely license such inventions for profit so long as such profit is used to fund additional scientific research.

[7]Several draft patent policies were prepared while the Markert Report was under consideration.  Patent policies were drafted on November 9, 1983, February 14, 1984, and March 6, 1984.

[8]The stated goal in the Markert Report was to devise a new formula which was "roughly consistent" with the royalty split set forth in the 1975 patent policy after the shift from the Research Corporation to the Yale Office of Cooperative Research.