the faculty for their comments. President Giamatti wrote that "[a]s I receive comments, I will share them with you and the members of the committee. Sometime early in the next semester, having taken into account the advice of the faculty, I will take, with the Provost, the report to the [Yale] Corporation. My intention is to ask the Corporation to approve as university policy those relevant portions of the report." Subsequently, President Giamatti circulated the Markert Committee Report to faculty and research scientists. Dr. Fenn received a copy of the Markert Report.

On February 29, 1984, Dr. Fenn wrote to President Giamatti concerning the Committee's Report. Dr. Fenn wrote: "In the covering letter that accompanied the draft copy of the Report of the Committee on Cooperative Research, Patents and Licensing (CCRPL), Chairman Markert indicated that the views set forth comprised a consensus of the committee membership. Lest you harbor the illusion that this consensus was unanimous I write to record one member's dissent with respect to some of those views." Dr. Fenn's letter set forth his objections to the Markert Report, particularly taking exception to the Committee's recommendation to reduce the inventor's share of royalty income through licensing.

On March 10, 1984, the Yale Corporation[9] "[v]oted, to accept in principle 'the Report of the Committee on Cooperative Research, Patent, and Licenses [the Markert Report].'" On March 23, 1984, President Giamatti responded to Dr. Fenn's February 29, 1984 letter in which he had objected to the Markert Report. In his letter, President Giamatti specifically told Dr. Fenn that "[t]he final draft

---

[9]The Yale Corporation is the senior policy-making body for Yale University. It has nineteen members: the President of the University; ten Successor Trustees, who elect their own successors to up to two six-year terms; six Alumni Fellows, who are elected by the alumni for staggered six-year terms; and the Governor and Lieutenant Governor of the State of Connecticut, ex officio.

has been approved by the Corporation in principle. The Report was modified in a few places, specifically with regard to copyright issues, in response to faculty comment." The draft patent policy dated March 6, 1984 became Yale's patent policy on March 10, 1984 through the approval of the Markert Report.[10] As mentioned, that policy provided inventors with 30% of net royalty income achieved through licensing up to $200,000 and 20% of net royalty income in excess of $200,000. The policy also required that inventions be "reported promptly" to Yale and that Yale may release its interest to the inventor should it decide it does not wish and has no legal obligation to participate in the patenting or licensing of the invention. The 1984 policy, like the 1975 patent policy, specifically provided that it was "subject to revocation or amendment by the [Yale] corporation at any time."

In 1986, Yale prepared a revised edition of its Faculty Handbook which contained a section titled "Policy on Patents, Copyrights, and Licensing." The section indicated that a "full statement of the University policies on patent, copyrights, and licensing is available from the Office of the Provost, the Office of Cooperative Research, or the Office of Grant and Contract Administration." The section indicated that licensing royalties would be divided "in accord with the University patent policy," and reiterated that the patent policy required faculty to disclose "[a]ny potentially patentable invention or any potentially licensable computer program" to the Committee on Cooperative Research, Patent, and Licenses through the Office of the Director of Cooperative Research.

In June 1988, the Yale Corporation adopted a patent policy developed by the Committee on

---

[10]The Court finds such despite the absence of an effective date in the March 6, 1984 policy and in spite of a recently-admitted July 17, 1984 letter by Arthur L. Palmer, Jr., of Phillip Morris, Inc., to Dr. Bickerton referring to the March 6, 1984 policy as a "patent policy draft." The letter appears to be a response to Dr. Bickerton's inquiry to Palmer seeking an opinion on the 1984 patent policy.

7

Cooperative Research, Patent, and Licenses and published the text of that policy in the October 10-17, 1988 Yale Weekly Bulletin and Calendar. The policy, consistent with the prior policies, stated that "all inventions . . . shall be reported promptly in writing to the provost through the director of the Office of Cooperative Research" and that "[i]f the University decides that it does not wish and has no legal obligation to participate in the patenting or licensing of an invention, the University may release to the inventor the University's interest in the invention, and the inventor shall then be free to dispose of the invention as he or she wishes." The 1988 policy continued the royalty sharing provisions set forth by the 1984 policy, providing 30% of net royalty income up to $200,000 to the inventor and 20% of net royalty income in excess of $200,000 to the inventor. The policy provided that it was effective as to "all inventions/discoveries made on or after June, 1988." It also provided that it was "subject to revocation or amendment by the [Yale] Corporation."

In October 1989, Yale published another patent policy which it indicated applied retroactively to "all inventions/discoveries made on or after June 1988." Like the policy set forth in the October 1988 bulletin, this policy stated that "all inventions . . .shall be reported promptly in writing to the Provost through the Director of the Office of Cooperative Research" and that "[i]f the University decides that it does not wish and has no legal obligation to participate in the patenting or licensing of an invention, the University may release to the inventor the University's interest in the invention, and the inventor shall then be free to dispose of the invention as he or she wishes." The 1989 policy changed the royalty sharing as follows: for the first $100,000, 50% to the inventor; for amounts between $100,000 and $200,000, 40% to the inventor; and for amounts exceeding $200,000, 30% to the inventor. Like all the policies since 1975, it provided that it was "subject to revocation or amendment

8

by the [Yale] Corporation."

### C. The Invention and Licensing of the '538 Patent

Prior to June 1988, Dr. Fenn, together with Matthias Mann and Chin-Kai Meng, Yale graduate students working with Dr. Fenn at Yale,[11] invented a method for determining the molecular weight of particles through the use of multiply charged ions, which relates to the field of mass spectrometry. The research that led to that invention was conducted under Yale's auspices, on the Yale campus, and was funded by grants from the National Institutes of Health ("NIH") awarded to Yale.

Dr. Fenn first publicly disclosed this invention in San Francisco at the Annual Conference of the American Society for Mass Spectrometry ("ASMS") in June 1988. The paper he presented to the ASMS met the ASMS's novelty requirements because it demonstrated for the first time that the electrospray ionization process could produce ions from large molecules.

Fenn and others recognized the importance of the invention in medical diagnosis and treatment at the 1988 conference because it solved a "longstanding scientific problem" and was believed to "revolutionize the way that one could analyze peptides and proteins." Dr. Mann, Dr. Fenn's co-inventor, believed in 1988 that the invention was "revolutionary" and a "scientific breakthrough."

Dr. Fenn did not disclose the invention to Yale's Office of Cooperative Research ("OCR") in 1988. It was not until April 6, 1989 that Dr. Fenn submitted a completed invention disclosure form to the OCR regarding the invention.[12] However, at least by the end of 1988, Dr. Fenn knew of the great

---

[11]Messrs. Mann and Meng assigned all of their interests in the invention and patent to Dr. Fenn in August 1990 and they are not parties to this action.

[12]In March 1989, Dr. Fenn had requested that Yale assign him and the other inventors title to two previous mass spectrometry inventions with which he was involved that were patented in Yale's

9

importance of the invention and its commercial value. In his invention disclosure–which only generally and briefly summarized the invention–Dr. Fenn indicated that any patent application would have to be filed by June 1, 1989–within one year of the patent's public disclosure at the San Francisco conference. He also noted that co-inventor Mann would be out of the country until May 15, 1989.

After the Yale OCR received Dr. Fenn's invention disclosure, Dr. Robert Bickerton ("Dr. Bickerton"), the head of the OCR, telephoned Dr. Fenn to find out more about the invention. Dr. Bickerton specifically inquired as to the potential commercial value of the invention. Dr. Fenn stated to Dr. Bickerton that he did not believe the invention had the potential for much commercial value because any patent issued on it would be a "use" patent as opposed to an "apparatus" patent and, as such, it would difficult to protect against its infringement.[13] Dr. Fenn did not disclose that Pfizer Corporation, colleagues at the Yale Medical School and others had previously expressed a strong interest in the commercial viability of the invention. Dr. Fenn also did not disclose his own view, and the view of others, that the invention was in fact "revolutionary" or "important" and that it would likely have substantial commercial value.

Dr. Bickerton asked Dr. Fenn if Analytica of Branford, Inc. ("Analytica"), a company founded in 1987 to pursue electrospray technology by Dr. Fenn and Craig Whitehouse, one of Dr. Fenn's

---

name in 1985. On April 6, 1989, Yale refused Dr. Fenn's request.

[13] A patent claim for a "use," or "method," is infringed when a business entity or person, without the patent owner's authority, uses the patented method in the United States or sells, offers to sell or uses within the United States or imports into the United States, a product that is made by the patented method. 35 U.S.C. § 271. A patent claim for a product or apparatus is infringed when a business entity or person, without the patent owner's authority, makes, uses, sells, or offers to sell a patented product or apparatus in the United States, or imports a patented product or apparatus into the United States. Id.

10

former graduate students, would be willing to pay for a patent application in return for Yale's commitment to license the invention to Analytica. As mentioned, Analytica was founded for the purpose of exploiting Dr. Fenn's two previous mass spectrometry inventions, which were owned by Yale, and Dr. Fenn was a 49% shareholder of Analytica. Though Dr. Fenn had already discussed the '538 invention with Mr. Whitehouse, also a 49% shareholder-owner of Analytica, he stated to Dr. Bickerton that he did not know if Analytica would be interested. Contrary to Dr. Fenn's representation to Dr. Bickerton, Dr. Fenn knew that Analytica was very much interested in the invention and its potential for commercial success.

On May 5, 1989, Dr. Bickerton called Dr. Fenn to discuss the invention again. When Dr. Bickerton noted that any patent application would have to be filed within a month, Dr. Fenn replied that he would be "up to his ears" preparing for several upcoming scientific conferences and that, beginning on May 20, 1989, he would be absent from the Yale campus for several weeks in Miami and Europe attending those conferences. Dr. Fenn stated that he was not scheduled to return from Europe until the end of June 1989, after the statutory deadline for filing a patent application had passed. Dr. Fenn did not tell Dr. Bickerton that co-inventor Meng was on the Yale campus during that same period of time and would be available to assist Yale with a patent application.

Dr. Fenn knew at that time that it would be difficult for Yale to prepare a patent application without his assistance in the limited time remaining. He also understood that he would have to assist Yale in preparing a patent application because information far beyond the inventors' disclosure document he gave the OCR would be needed for a proper patent application.

Yale did not file a patent application before the statutory deadline of June 1, 1989.[14] In making this decision, Yale relied on Dr. Fenn's representations about the importance of the invention. Recognizing that Dr. Fenn was an expert in the technology, Yale accepted Dr. Fenn's statement that the invention and any resulting patent would have little commercial value. Dr. Fenn's representation that the invention was of limited value was very significant to the OCR staff and signaled that it should not expend its resources on a patent application.

In his own name and without Yale's knowledge, however, Dr. Fenn filed a patent application for the invention on May 19, 1989, which was financed by Analytica. In an October 19, 1989 letter to Provost Turner regarding the invention, Dr. Fenn continued to conceal from Yale that he had filed the patent application. Dr. Fenn testified that he did so in order to "let[] the scheme play out so the incompetence of [the OCR] would emerge." Dr. Fenn stated at trial:

> I ha[d] made a number of complaints to Yale, the fact that I thought that [OCR] was incompetent. And here was a case which I had filed a patent application, it had nothing further, and I thought we'll let it go because if it culminates in a patent this will be first rate evidence that I've been trying to convince Yale of for a long time that these guys over there weren't doing their job. . . And I knew that if I, from Bickerton's previous behavior, confirmed by subsequent behavior, that if I had told him that I had filed a patent application at that time he would have immediately said, well, that belongs to Yale. And there would have been a confrontation. And if no patent issued, the confrontation would have been pointless but, moreover, if the patent didn't issue, then he'd be off the hook in a sense because he could say, well, I knew it wasn't going to result in a patent. So I was essentially making my case.

---

[14] 35 U.S.C. § 102 provides, in relevant part: "A person shall be entitled to a patent unless— . . . (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States. . . ."

12

Dr. Fenn stated that he "was trying to show up how [the OCR] handled its business which in my view was incompetent."

Also in the fall of 1989, Dr. Henry Lowendorf of the Yale OCR, not knowing of Dr. Fenn's pending patent application, wrote to the NIH that "Yale is reporting an invention which was disclosed to NIH on 17 May 1989 to be unpatentable . . . The invention is not patentable because enabling information on this invention was published in an abstract, enclosed, at a conference in June of 1988 and Yale did not file a patent application between the time the invention was disclosed to this Office, 6 April 1989, and the one year anniversary of disclosure." Dr. Fenn received a copy of Dr. Lowendorf's letter to NIH. Dr. Fenn knew that this letter was untrue, but he did nothing to correct Dr. Lowendorf's unintentional misrepresentation to the NIH that no patent application had been filed.

Without telling Yale, Dr. Fenn licensed the invention to Analytica on July 31, 1991. On July 14, 1992, United States Patent No. 5,130,538 ("the '538 patent") issued to Dr. Fenn for the "Method of Producing Multiply Charged Ions and for Determining Molecular Weights of Molecules By Use of the Multiply Charged Ions of Molecules." Dr. Fenn also failed to let Yale known of the issuance of the patent.

Yale first learned about the '538 patent when Aldo Test, an attorney for the Finnigan Corporation, wrote to Dr. Bickerton on January 20, 1993 inquiring about the possibility of licensing the '538 patent. Mr. Test explained in his letter that he had tracked the patent to Yale through its NIH grant number. Mr. Test also indicated that the patent had issued to Dr. Fenn, that Analytica claimed control over the licensing of the patent through its assignment from Dr. Fenn, and that Analytica had

13

refused to sub-license the invention to Finnigan. Dr. Fenn received a copy of Mr. Test's letter.

Upon receiving Mr. Test's letter, Dr. Bickerton spoke with Dr. Fenn and forwarded to him a form asking him to assign the patent to Yale pursuant to the patent policy. The form was attached to a letter dated March 2, 1993, in which Dr. Bickerton wrote:

> As we discussed last month, the University recently became aware that you had filed a patent application, and obtained one or more patents, on an invention disclosed by you to my office in 1989. The invention was made by you and your students in the course of research at Yale funded by NIH . . . We have looked into the matter and concluded that Yale's patent policy requires that the invention and the patents be assigned to the University. Enclosed is a standard assignment agreement for your signature.

Yale's Committee on Cooperative Research, Patents and Licensing had determined that Yale was the rightful owner of the invention and '553 patent, and that Dr. Fenn should assign the patent to Yale. Dr. Fenn, nevertheless, refused to assign the patent to Yale.

Concerned with its ability to pursue infringers of the '538 patent because of the question whether its assignment from Dr. Fenn was valid, Analytica then asked Dr. Fenn to also assign the patent to Yale so that Yale could then license the patent to Analytica. Although Dr. Fenn "thought Analytica had a legitimate concern," he refused to assign the patent to Yale. Analytica then asked Yale for a license to any rights Yale possessed. In a meeting with Dr. Bickerton, Mr. Whitehouse "emphasized the critical nature of the invention to his company and indicated that it was imperative that they have a license." In September 1993, Yale entered into a licensing agreement with Analytica granting Analytica a "worldwide exclusive license in and to any and all interest Yale has or may have in the licensed patents [i.e. '538 patent]."

14

Since January 30, 1997, Analytica has been paying into escrow amounts calculated pursuant to the royalty provisions of the Fenn-Analytica agreement to which Dr. Fenn would otherwise be entitled. Before Analytica began to deposit the royalties into the escrow accounts, it had paid out $302,435.16 in royalties to Dr. Fenn and his designees in accordance with the Fenn-Analytica license agreement. At the time of trial, the escrowed amounts through the third quarter of 2000 totaled $2,108,820.90. Analytica has been depositing in escrow only amounts calculated pursuant to the terms of the Fenn-Analytica agreement and has not also deposited additional amounts calculated pursuant to the Yale-Analytica agreement. Amounts calculated pursuant to the Yale-Analytica agreement total $1,717,975.92 of the $2,108,820.90 in escrow through the third quarter of 2000. Beginning in the first quarter of 1995, Analytica ceased making royalty payments to Yale. Up until that time, Analytica had paid Yale $43,011.30 pursuant to the Yale-Analytica license agreement. At the time of trial, the earned, but unpaid, royalties due Yale under the Yale-Analytica license amounted to $1,760,987.22.

15

II.   **Conclusions of Law**

Dr. Fenn's complaint raises claims of conversion, theft, tortious interference with business relationship, and violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, et seq. Yale's counterclaims seek an accounting and assignment of the '538 patent, as well as damages for breach of contract and fiduciary duty, fraud, negligent misrepresentation, conversion, theft, and unjust enrichment. Dr. Fenn has asserted special defenses to Yale's counterclaims, including waiver, abandonment and release, estoppel, unclean hands, negligence, and statutes of limitations bars. As the Court generally finds for Yale on all these issues, it will address Yale's counterclaims first.[15]

A.   **Yale's Counterclaims**

1.   **Breach of Contract**

a.   **Dr. Fenn Was Bound by Yale's Patent Policy**

University patent policies such as Yale's have long been recognized as a valid and enforceable part of the contract of employment. See Chou v. University of Chicago, 254 F.3d 1347, 1356-57 (Fed. Cir. 2001); University of West Virginia Bd. of Trustees v. VanVoorhies, 84 F. Supp.2d 759, 769-71 (N.D.W. Va. 2000) (holding that inventor was bound by university's patent policy, of which he was aware, and with which he had complied on several occasions). This Court has held that "employment agreements [pursuant to which an employee agrees to assign to her employer inventions she developed during the course of employment] are valid and enforceable and [ ] do not violate public

---

[15]The parties do not dispute that Connecticut law applies to their claims.

16

policy." Goldwasser v. Smith Corona Corp., 817 F. Supp. 263, 274 (D. Conn. 1993), aff'd 26 F.3d 137 (Fed. Cir. 1994).

In Chou v. University of Chicago, the United States Court of Appeals for the Federal Circuit held that a research assistant was obligated to assign her inventions to the university, based on the university's patent policies. The court noted that "[a]lthough it is true that Chou never signed a contract with the University specifically obligating her to assign her inventions to the University, she accepted her academic appointment subject to the administrative policies of the University." Chou, 254 F.3d at 1356-57. Those administrative policies, the court noted, included the university's patent policies, which were set forth in the faculty handbook and included the obligation to assign inventions to the university. The court also noted that the research assistant had previously assigned other inventions to the university without disputing her obligation to do so. See Chou, 254 F.3d at 1357.

Here, Dr. Fenn, like Chou, was bound by Yale's administrative policies, including its patent policy. Indeed, as noted above, Dr. Fenn concedes that he was contractually bound by the 1975 patent policy. Dr. Fenn argues, however, that he did not assent to any subsequent patent policies, and thus, that he was not contractually bound by them. He cites Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc., 234 Conn. 1 (1995), as support for his argument. In Torosyan, the plaintiff, a chemist, was encouraged by the defendant corporation to move from California to Connecticut to work for it. The plaintiff was orally promised "long term" employment and given an employee handbook that limited the defendant's right to discharge employees, i.e., provided for discharge only "for cause." After the plaintiff was hired and moved to Connecticut, the defendant amended its employee manual to delete the limiting "for cause" language in the employee handbook section dealing with the defendant's

17

right to discharge employees. Thereafter, the plaintiff was fired and the defendant claimed it was not bound by the for cause provision of the earlier employment manual. Affirming the trial court's finding for the plaintiff on its breach of contract claim, the Connecticut Supreme Court held that when an employer issues an employment manual after the employee starts work that substantially interferes with the employee's legitimate expectations about the terms of employment, the employee's continued work after notice of those terms is not conclusive evidence of the employee's consent to those terms.

The instant circumstances differ from those in Torosyan. As noted above, Dr. Fenn concedes that he was bound by and consented to Yale's 1975 patent policy. Unlike the employee handbook in Torosyan, Yale's 1975 patent policy explicitly provided that Yale could revoke or amend that policy at any time. Yale did amend its patent policy in 1984, 1988, and 1989, each time reserving its right to further amend the policy. Thus, unlike in Torosyan, Dr. Fenn has not shown that Yale's amended patent policies in 1984, 1988, and 1989 "substantially interfered" with his legitimate expectations about the terms of employment. Rather, he assented that Yale could amend those policies. Additionally, there was no evidence that he limited his assent to certain provisions of the 1975 patent policy or expressed his refusal to assent to its right to amend provision. Moreover, his continuation of work and compliance with the patent policy for two prior inventions are evidence that he agreed to the changes. Accordingly, the Court does not accept Dr. Fenn's position that only the 1975 patent policy applied to him, but rather, finds that it and the subsequent patent policies applied.

### b. The 1989 Patent Policy Applies to the Invention Here

The Court also concludes that Yale's 1989 patent policy applied to the '538 invention. The patent policy published in the October 9-16, 1989 Yale Weekly Bulletin and Calendar, became Yale's

18

official patent policy for "all inventions/discoveries made on or after June 1988." Although Dr. Fenn argues that the '538 invention in fact was "discovered" prior to June 1988 (the effective date of the 1989 policy), the meaning of "inventions/discoveries made on or after June 1988" in the 1989 patent policy is not clear from the face of the policy. A court may admit extrinsic evidence to interpret ambiguous language of a contract. See HLO Land Ownership Assocs. Ltd. P'Ship. v. City of Hartford, 727 A.2d 1260, 1265 (Conn. 1999) (citing Jay Realty, Inc. v. Ahearn Dev. Corp., 453 A.2d 771, 773 (Conn. 1983)). Accordingly, the Court employs extrinsic evidence to determine the meaning of the language "inventions/discoveries made on or after June 1988" contained in the 1989 patent policy. Dr. Lowendorf of the Yale OCR testified that Yale considers the date that the faculty member/inventor discloses the invention to Yale to be the date the invention is "discovered" for purposes of determining which patent policy applies because the patent policy requires that all inventions be promptly reported to the OCR. Yale's position on this issue is likely informed by the principle of patent law that the date by which a patent application must be filed is one year from the *public disclosure* of that invention, rather than the discovery date. Accordingly, the Court interprets the language "inventions/discoveries made on or after June 1988" to mean inventions or discoveries *disclosed to Yale on or after June 1988.*

Here, the '538 invention was disclosed to Yale in April 1989. Accordingly, the "invention/discovery" date under the policy is April 1989, and the 1989 patent policy applies.[16] As

---

[16] Additionally, even assuming that the '538 invention was "invented/discovered" prior to June 1988, the 1984 patent policy would apply. Though Dr. Fenn argues that the 1984 patent policy was not properly adopted and never became Yale's patent policy, the Court finds that the policy dated March 6, 1984 became Yale's official patent policy on March 10, 1984 through the adoption of the

19

noted above, although there was a 1988 patent policy, effective June 1, 1988, continuing the 80-20 division of licensing royalties of the 1984 policy, the 1989 policy changed that division to 70-30 and was made retroactive to June 1, 1988, thereby superseding the 1988 policy and its 80-20 division. Accordingly, the 1989 patent policy and its licensing royalty provisions apply as follows: for the first $100,000, 50% to the inventor; for amounts between $100,000 and $200,000, 40% to the inventor; and for amounts exceeding $200,000, 30% to the inventor.[17]

### c. Dr. Fenn Breached Yale's 1989 Patent Policy

The 1989 patent policy requires that "all inventions . . . shall be reported promptly in writing to the Provost through the Director of the Office of Cooperative Research" and that "[i]f the University decides that it does not wish and has no legal obligation to participate in the patenting or licensing of an invention, the University may release to the inventor the University's interest in the invention, and the inventor shall then be free to dispose of the invention as he or she wishes."

---

Markert Report by the Yale Corporation. The Court notes, however, that it is Yale's position that the 70-30 split contained in the 1989 policy, rather than the 80-20 split contained in the 1984 and 1988 policies, applies to the '538 invention, notwithstanding that this split is less favorable for Yale.

[17] The 1989 patent policy (like the others before it) provides that the divisions are calculated on the "net" royalty income:
> Royalties, including license fees or other forms of advance payments, resulting from licensing an invention shall be used first to offset direct expenses incurred by the University in applying for, obtaining and defending a patent . . . Expenses for this purpose will include fees paid to outside legal, consulting, and licensing organizations and any out-of-pocket costs incurred by the
> University . . . After recovery of expenses by the University, the remaining royalties will be designated net income . . . The royalty net income as defined above shall be divided between the inventor and the University . . . .

20

As to Yale's counterclaim of breach of contract, the Court concludes that Dr. Fenn violated the 1989 patent policy and committed a material breach of that policy when:

(i) he failed to "promptly" disclose the '538 invention to Yale and, rather, waited nearly a year after the '538 invention's public disclosure and approximately two months prior to the statutory deadline for filing a patent application before notifying Yale that he had discovered the invention;

(ii) he misrepresented the importance and commercial viability of the invention;

(iii) he actively discouraged Yale from preparing and filing a patent application by the statutory deadline while at the same time he was secretly preparing a patent application in his own name;

(iv) he filed a patent application in his own name without notifying Yale and the NIH;

(v) he licensed the '538 invention to Analytica without notifying Yale and the NIH;

(vi) he did not share the resulting licensing income with Yale; and

(vii) he refused to assign the '538 patent to Yale when Yale discovered what he had done and repeatedly asked that he do so.

Accordingly, Yale prevails on its breach of contract claim.[18]

### 2. Breach of Fiduciary Duty

Under Connecticut law, "[a] fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." Dunham v. Dunham, 204 Conn.

---

[18] As a result, Yale's unjust enrichment claim, plead in the alternative, fails.

21

303, 322, 528 A.2d 1123, 1133 (1987), overruled in part on other grounds, Santopietro v. New Haven, 239 Conn. 207, 213, fn. 8, 682 A.2d 106 (1996). It follows that a fiduciary "'must act in scrupulous good faith and candor . . . and with the finest and undivided loyalty to the trust.'" Martinelli v. Bridgeport Roman Catholic Diocesan Corp., 989 F. Supp. 110, 117 (D. Conn. 1997) (quoting Konover Development Corp. v. Zeller, 228 Conn. 206, 220, 635 A.2d 798, 805 (1994)). The Supreme Court of Connecticut has "specifically refused to define a fiduciary relationship in precise detail and in such a manner as to exclude new situations, choosing instead to leave the bars down for situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other." Alaimo v. Royer, 188 Conn. 36, 41, 448 A.2d 207, 209 (1982) (citations and internal quotations omitted); see also Johnson v. Schmitz, 119 F. Supp. 2d 90, 97 (D. Conn. 2000) (recognizing the Connecticut Supreme Court's disinclination to confine the scope of the fiduciary duty doctrine by precise definition and its willingness to allow for case-by-case analysis in new situations); Dunham, 204 Conn. at 320-21, 528 A.2d at 1133.

Dr. Fenn and Yale had a special relationship of trust and confidence that was different from the usual employer-employee relationship. Yale supported Dr. Fenn's research in the form of facilities, funding, and staff and entrusted Dr. Fenn with the proper management of its NIH grants in the reasonable expectation that Dr. Fenn would use his superior knowledge, skill and expertise to act in good faith and with complete candor and undivided loyalty in connection with the University's research funds and intellectual property, including the '538 invention and related NIH grants.

With respect to Dr. Fenn's work, there was a "justifiable trust confided on [Yale's] side and a resulting superiority and influence on [Dr. Fenn's side]." Alaimo, 188 Conn. at 41, 448 A.2d at 209;

22

see also Dunham, 204 Conn. at 320-22, 538 A.2d at 1133. Dr. Fenn knew more about the value and patentability of inventions he developed than anyone else, and Yale necessarily sought out and reasonably relied on his expertise in evaluating such inventions. Similarly, Yale was entirely dependent on Dr. Fenn, the inventor, to provide truthful and forthright information regarding the progress and outcome of his federally funded research so that Yale could fulfill its reporting obligations to the NIH pursuant to the Bayh-Dole Act.

By virtue of Dr. Fenn's special relationship with Yale and the trust Yale necessarily had to place in Dr. Fenn, Dr. Fenn owed Yale the duties of a fiduciary, including the duties to make full disclosures and maintain an undivided loyalty. Dr. Fenn breached that duty when he failed to promptly disclose the '538 invention to Yale, actively discouraged Yale from preparing and filing a patent application by the statutory deadline while at the same time he was preparing a patent application in his own name, filed a patent application in his own name without notifying Yale, and licensed the '538 invention to Analytica without notifying Yale. Accordingly, Yale also succeeds on its breach of fiduciary duty claim.

### 3. Fraud

The Court concludes that the evidence at trial was sufficient to establish that Dr. Fenn engaged in fraudulent misrepresentation and fraudulent nondisclosure. "The essential elements of an action in common law fraud ... are that: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." Barbara Weisman, Trustee v. Kaspar, 233 Conn. 531, 539, 661 A.2d 530 (1995). "Fraud by nondisclosure,

23

which expands on the first three of [the] four elements, involves the failure to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak . . . ." Gelinas v. Gelinas, 10 Conn.App. 167, 173, 522 A.2d 295, cert. denied, 204 Conn. 802, 525 A.2d 965 (1987); Pacelli Bros. Transportation, Inc. v. Pacelli, 189 Conn. 401, 407-08, 456 A.2d 325, 328-29 (1983) (intentional withholding of information for purpose of inducing action equivalent to fraudulent misrepresentation); D. Wright, J. Fitzgerald & W. Ackerman, Connecticut Law of Torts, § 139 (3d Ed. 1991 rev.).

First, the Court does not credit Dr. Fenn's testimony that he accurately represented to Yale his then belief in the limited commercial viability of the patent because of its nature as a "use patent." It was certainly clear to him by April 1989 that the invention was an important one, likely to be patented, and would likely be of significant commercial value. Yet he failed to be straightforward with Yale about that. In addition, Dr. Fenn misrepresented to Yale Analytica's interest in the invention when Dr. Bickerton inquired about that topic. Though Dr. Fenn had already discussed the '538 invention with Mr. Whitehouse, a 49% shareholder-owner of Analytica, he stated to Dr. Bickerton that he did not know if Analytica would be interested. Contrary to Dr. Fenn's representation to Dr. Bickerton, Dr. Fenn knew that Analytica was very much interested in the invention and in fact was funding the secret patent application.

Additionally, as found above, Dr. Fenn had a contractual duty to promptly disclose the '538 invention to Yale and fiduciary duties to keep Yale adequately informed about patentable inventions. Also, as found above, he breached those duties in failing to promptly disclose the invention or provide adequate and accurate information about the invention or its value and actively discouraging Yale from

24

preparing and filing a patent application by the statutory deadline while he was preparing a patent application in his own name. Dr. Fenn also failed to disclose to Yale his view, and the view of others, that the invention was "revolutionary" or "important." He also filed the patent application in his own name without notifying Yale and licensed the '538 invention to Analytica without notifying Yale. Dr. Fenn acted purposefully and although he maintains it was only to show the "incompetence" of the Yale OCR office, his conduct was also motivated by his personal financial interests.

The Court finds that Dr. Fenn made these misrepresentations and omissions in order to induce Yale not to file a patent application and that Yale relied on Dr. Fenn's actions and information to its detriment in failing to pursue a patent or otherwise follow up with Dr. Fenn on the invention. Dr. Fenn knew that his representations and omissions did not accurately represent the facts concerning the invention and its commercial value. Accordingly, those misrepresentations and omissions constitute fraudulent misrepresentation and fraudulent nondisclosure, and Yale succeeds on its fraud claim.[19]

### 4. Conversion and Civil Theft

As significant issues remain regarding Yale's claims of conversion and civil theft, the Court concludes that further briefing by the parties is necessary. Accordingly, the Court hereby orders the parties to submit within thirty days memoranda addressing: (1) which definition of civil theft (i.e., larceny under Conn. Gen. Stat. § 53a-119) Yale pursued at trial, i.e., whether Yale argued that Dr. Fenn intended to deprive Yale of its property permanently or intended to dispose of the property for his own benefit; and (2) whether Dr. Fenn's conduct meets any of the definitions of larceny under the

---

[19] In light of its findings as to fraud, the Court finds it unnecessary to reach Yale's negligent misrepresentation claim, plead in the alternative.

25