Connecticut larceny statute. As a result, the Court makes no findings of law at this time as to the conversion and civil theft counts.

B. **Fenn's Defenses to Yale's Counterclaims**

Fenn raises several defenses to Yale's counterclaims. As indicated below, the Court concludes that these defenses lack merit.

1. **Waiver**

Dr. Fenn argues that Yale abandoned, released and/or waived its rights to the '538 invention because Yale did not apply for a patent by the statutory deadline. "Waiver" is defined as the "voluntary" and "intentional abandonment of a known right . . . It involves the idea of assent, and assent is an act of understanding." Soares v. Max Services, Inc., 42 Conn. App. 147, 175, 679 A.2d 37, 52 (citations and internal quotations omitted), cert. denied 239 Conn. 915, 682 A.2d 1005 (1996); see also McHugh v. McHugh, 181 Conn. 482, 486-87, 436 A.2d 8, 11 (1980) (holding that waiver of statutory or common-law rights must be voluntary and knowing). Similarly, "abandonment" is "the intentional relinquishment of a known right . . . To constitute abandonment there must be an intention to abandon or relinquish accompanied by some act or omission to act by which such intention is manifested . . . when [ ] possession is voluntarily forsaken by the owner." Sharkiewicz v. Lepone, 139 Conn. 706, 707-08, 96 A.2d 796, 797 (1953) (citations and internal quotations omitted).

The evidence shows that Yale did not knowingly and intentionally relinquish title to the '538 invention or knowingly and wilfully decide in 1989 not to seek a patent for the invention. Where parties have been fraudulently induced to action or inaction, courts have refused to find that such parties have waived, released or otherwise abandoned their rights, including property rights. See Pacelli Brothers

26

Transportation, Inc. v. Pacelli, 189 Conn. 401, 407-09, 456 A.2d 325, 328-29 (1983) (holding that general release could not shield defendant from liability where defendant failed to disclose a misappropriation of corporate funds in breach of fiduciary duty)); Banatoski v. Sheridan, 1999 WL 545369, *1 (Conn. Super. Ct. 1999) ("The general principle that fraud vitiates every transaction and all contracts applies to releases.") (citations and internal quotations omitted).

As the Court found above, Dr. Fenn failed to promptly disclose the '538 invention and fully inform Yale as to its import. Relying on Dr. Fenn's false and misleading information and unaware that he was in the process of pursuing his own patent, Yale determined that it should not file a patent application. Accordingly, the evidence does not establish that Yale knowingly or voluntarily waived or abandoned its rights, interests, or property.

### 2. Estoppel

There are two essential elements to an estoppel claim: "the party [against whom estoppel is claimed] must do or say something which is intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief; and the other party, influenced thereby, must actually change his position or do something to his injury which he otherwise would not have done. Estoppel rests on the misleading conduct of one party to the prejudice of the other. In the absence of prejudice, estoppel does not exist." W v. W, 248 Conn. 487, 496-97, 728 A.2d 1076, 1082 (1999). The Connecticut courts have declared that "[n]o one is ever estopped from asserting what would otherwise be his right, unless to allow its assertion would enable him to do a wrong." W v. W, 248 Conn. at 496, 728 A.2d at 1082 (citations and internal quotations omitted).

The Court concludes that the evidence does not support Dr. Fenn's claim of estoppel against

27

Yale. Yale's failure to seek a patent for the '538 invention was the result of Dr. Fenn's failure to promptly disclose the '538 invention and fully inform Yale as to its import. Relying on Dr. Fenn's information and unaware that he was in the process of pursuing his own patent, Yale determined that it should not file a patent application. Thus, though Yale originally declined to seek to patent the '538 invention, Yale's assertion of its rights now does not enable Yale to do a wrong, but rather, serves to correct the wrong that was done to it by Dr. Fenn. Accordingly, Yale should not be estopped from asserting its claims.

### 3.     Unclean Hands

"The doctrine of unclean hands expresses the principle that where a plaintiff seeks equitable relief, he must show that his conduct has been fair, equitable and honest as to the particular controversy in issue." Thompson v. Orcutt, 59 Conn. App. 201, 205, 756 A.2d 332, 334 (2000) (citations and internal quotations omitted), rev'd on other grounds, 257 Conn. 301, 2001 WL 850150 (August 7, 2001). Alternatively, the party seeking to invoke the clean hands doctrine to bar equitable relief must show that "his opponent engaged in willful misconduct with regard to the matter in litigation . . . The trial court enjoys broad discretion in determining whether the promotion of public policy and the preservation of the courts' integrity dictate that the clean hands doctrine is invoked." Id. (citations and internal quotations omitted).

It is well-settled that for the doctrine to apply "[t]he wrong must be done to the defendant himself." Thompson, 59 Conn.App. at 206, 756 A.2d at 334 (citations and internal quotations omitted); see also Cohen, 182 Conn. at 206, 438 A.2d at 61-62. The clean hands doctrine "is applied not for the protection of the parties but for the protection of the court . . . It is applied . . . for the

28

advancement of right and justice." Thompson, 59 Conn. App. at 205, 756 A.2d at 334 (citations and internal quotations omitted); see also Kulmacz v. New York Life Ins. Co., 39 Conn. Supp. 470, 476-77, 466 A.2d 808, 812 (1983) (citations and internal quotations omitted).

Here, the evidence does not show that Yale has "unclean hands." Again, though Yale initially disclaimed its interest in the '538 invention, it did so because of Dr. Fenn's failure to fully inform Yale as to the invention's import and his actively discouraging Yale to apply for the patent. That Yale pursued its counterclaims after learning the truth about the '538 invention and patent is not unfair, inequitable, or dishonest. Nor did the evidence at trial suggest that Yale engaged in willful misconduct with regard to the matter in litigation. Accordingly, Dr. Fenn's unclean hands defense must fail.

   **4. Negligence**

Dr. Fenn alleges that Yale was negligent in pursuing a patent application for the '538 invention, and thus is precluded by its own negligence from claiming any interest in the invention. The evidence also does not support this defense.

Dr. Bickerton assessed the feasibility of pursuing a patent on the '538 invention in consultation with Dr. Fenn and Dr. Skinner, then Chairman of the Committee on Cooperative Research, Patents, and Licensing. Relying on the information provided by Dr. Fenn, Yale reasonably and justifiably determined that it could not and should not file a patent application. Yale arrived at its decision not to file a patent application in a sensible manner consistent with the patent policy and consistent with the facts it knew then and could reasonably have known. The 1989 patent policy provides that "[t]he Director [of the OCR], with the advice of the Committee on Cooperative Research, Patents, and Licensing, shall conduct an initial screening followed, when indicated by a detailed evaluation of the

29

invention. This may be done through an internal review." Yale's conduct was appropriate and reasonable in the circumstances.

### 5.     Statutes of Limitations

Dr. Fenn claims that the applicable statutes of limitations bar Yale's fraud, negligent misrepresentation, conversion, and civil theft counterclaims.[20]

C.G.S.A. § 52-577 provides that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of." Yale's claim of fraud is subject to this three-year limitations period. See In re Colonial Ltd. Partnership Litigation, 854 F. Supp. 64, 90 (D. Conn. 1994) (fraud).

C.G.S.A. § 52-577 is an "occurrence" statute so that the three-year period within which a party must assert its tort claims begins to run the moment the act, injury and/or omission complained of occurs. See Collum v. Chapin, 40 Conn.App. 449, 451-52, 671 A.2d 1329, 1331 (1996); In re Colonial Ltd. Partnership Litigation, 854 F. Supp. at 90 (holding, in securities fraud case, that "act or omission complained of" for C.G.S.A. § 52-577 limitations purposes occurs when false and misleading information is received). Nevertheless, the limitations period must be tolled when defendants like Dr. Fenn have fraudulently concealed the existence of a cause of action and/or have breached their ongoing fiduciary duties of disclosure. See In re Colonial Ltd. Partnership Litigation, 854 F. Supp. at 90 (holding that limitations period for common-law tort claims, including claims for fraud, negligent

---

[20] As the Court has rejected Yale's negligent misrepresentation claim and declined to reach its conversion and civil theft claims in this opinion, it need only reach Dr. Fenn's statute of limitations argument as to Yale's claim of fraud. Also, Dr. Fenn does not raise a statute of limitations argument as to Yale's breach of contract or breach of fiduciary duty counterclaims.

30

misrepresentation and breach of fiduciary duty may be tolled by fraudulent concealment); Gibbons, 983 F. Supp. at 315-16.

Conn. Gen. Stat. § 52-595 provides the basis for such tolling.[21] Section 52-595 provides that "[i]f any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence." Although the fraudulent concealment tolling statute generally requires an affirmative act of concealment beyond mere silence, non-disclosures are sufficient where, as here, the defendant is under a fiduciary duty to disclose material facts. See Martinelli, 989 F. Supp. at 115-116 (holding that requirement of affirmative act of concealment for purposes of tolling limitations period not applicable when defendant under affirmative fiduciary duty to disclose); In re Colonial Partnership Litigation, 854 F. Supp. at 90. The evidence in this case shows that Dr. Fenn engaged in affirmative acts that were designed to and did conceal his wrongful conduct from Yale.

Fraudulent concealment for purposes of tolling the statute of limitations must not be presumed, but must be "strictly proven with clear, precise and unequivocal evidence." Gibbons, 983 F. Supp. at 316 (citations and internal quotations omitted); Puro v. Henry, 188 Conn. 301, 308-09, 449 A.2d 176, 189 (1982). Nonetheless, a reasonable inference that a defendant's acts of concealment were aimed at delaying or preventing legal action is a recognized basis upon which to toll the statute of limitations. See

---

[21]The Connecticut Supreme Court has held that "the exception contained in section 52-595 constitutes a clear and unambiguous general exception to any statute of limitations that does not specifically preclude its application." Connell v. Colwell, 214 Conn. 242, 246 n.4, 571 A.2d 116 (1990). Section 52-577 does not specifically preclude the application of the tolling statute.

31

Martinelli, 989 F. Supp. at 115; Puro, 188 Conn. at 310, 449 A.2d at 180 (holding that fraud may be presumed by circumstantial evidence; the "test of the sufficiency of proof by circumstantial evidence is whether rational minds could reasonably and logically draw the inference").

Here, the three year limitations period is tolled pursuant to C.G.S.A. § 52-595 because the evidence establishes: (i) Dr. Fenn's actual awareness of the facts necessary to establish Yale's causes of action; (ii) his intentional concealment of these facts from Yale; and (iii) his concealment of the facts was done to mislead Yale into inaction. See Gibbons, 983 F. Supp. at 31; Zimmerer v. General Elec. Co., 126 F. Supp. 690, 693 (D. Conn. 1954) (holding that to establish fraudulent concealment plaintiff must show that he was ignorant of existence of right of action and that defendant intended that plaintiff be kept in ignorance).

As detailed earlier, Dr. Fenn, in violation of his fiduciary duties to Yale, deceived Yale about the fact that, in violation of Yale's patent policy and federal law (his responsibilities under the NIH grants), he had patented and licensed the invention in his own name. He also actively misled Yale about whether the invention should be patented. Dr. Fenn fraudulently concealed the truth with the specific intent of preventing Yale from asserting its rights. For example, Dr. Fenn testified:

> I knew . . . from Bickerton's previous behavior, confirmed by subsequent behavior, that if I had told him that I had filed a patent application at that time he would have immediately said, well, that belongs to Yale. And there would have been a confrontation.

As a result of Dr. Fenn's ongoing fraudulent concealment, Yale did not discover, and could not reasonably have discovered, that it had suffered actionable harm until January 20, 1993 when Aldo Test, an attorney for the Finnegan Corporation, wrote a letter to Dr. Bickerton asking for a sub-license

32

to the '538 patent. Dr. Fenn's own testimony confirms that prior to this time "neither NIH nor Yale recognized the invention and the substance of it."[22]

Accordingly, pursuant to C.G.S.A. § 52-595, Yale's claim of fraud accrued on or about January 20, 1993 for statute of limitations purposes. See Goldwasser, 817 F. Supp. at 270-72.

Because of the special relationship between Dr. Fenn and Yale, Dr. Fenn had a continuing duty to keep Yale fully informed. His "continuing course of conduct" in failing to do so provides an alternative and independent ground for tolling the statute of limitations. To support a finding of a "continuing course of conduct" sufficient to toll the applicable statute of limitations, "there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to the commencement of the period allowed for bringing an action for such a wrong, and it may be found where there is a special relationship between the parties giving rise to a continuing duty, or later wrongful conduct by the defendant related to the prior wrongful act." In re Kellogg, 166 B.R. 504, 507-508 (Bankr. D. Conn. 1994) (citations omitted); see also Fichera v. Mine Hill Corp., 207 Conn. 204, 209-10, 541 A.2d 472, 474-75 (1988).

---

[22]The Court disagrees with Dr. Fenn's claim that Yale should have been alerted in February 1992 that Dr. Fenn had filed an application for the '538 patent because of (1) a conversation that Dr. Howard Jenerick of the NIH had with Dr. Bickerton about Attorney Aldo Test's letter to the NIH dated January 16, 1992 (Pl. Ex. 77); and (2) Dr. Lowendorf's May 21, 1992 memo to Dr. Bickerton about his conversation with Attorney Robert Green (Pl. Ex. 85). In each of those documents, the parties writing to Dr. Bickerton referenced a patent that issued in May 1989 regarding the electrospray technology. The Court concludes that it was reasonable for Dr. Bickerton to believe that Mr. Test and Mr. Green were referring to an earlier Fenn invention that had been patented, not the invention which led to the '538 patent.

33

As Yale's fiduciary, Dr. Fenn had an ongoing and continuing duty to act in Yale's interest, to disclose the facts, and to rectify his prior deceptions. See In re Kellogg, 166 B.R. at 509; Fichera, 207 Conn. at 209-10, 541 A.2d at 474-75. Dr. Fenn, however, intentionally set upon a "continuing course of conduct" in dereliction of his fiduciary duties of candor, undivided loyalty and good faith. In these circumstances, the applicable three-year statute of limitations did not begin to run until January 1993, when Yale learned the truth. See, e.g., City of West Haven v. Commercial Union Ins. Co., 894 F.2d 540, 546 (2d Cir. (Conn.) 1990) (holding that insurer's continuing duty to defend its insured created a "special relationship" between the parties sufficient to toll CUTPA's statute of limitations).

Yale was not required to bring its claims by January 1996 – three years after it learned of Dr. Fenn's wrongdoing -- because Dr. Fenn and Yale entered into statutes of limitations tolling agreements dated March 17, 1995, and December 1, 1995, which exclude the one year and eight month period of time between March 17, 1995, and December 17, 1996, from the calculation of the three year statute of limitations period. Accordingly, Yale had until September 1997 to file the claims it filed in this action in November 1996.

Accordingly, the fraud counterclaim is not barred by the statute of limitations.

C.   **Fenn's Claims**

The Court concludes that Dr. Fenn has failed to prove his claims against Yale. Dr. Fenn maintains that in giving Analytica a "quit claim" license to any rights it might have in the '538 invention, Yale wrongfully assumed ownership and control over the patent and converted it (first count), stole the patent under C.G.S.A. § 52-564 (second count) and tortiously interfered with Dr. Fenn's business relationship with Analytica (third count). Dr. Fenn also claims that Yale's actions constituted CUTPA

34

violations (fourth count). The record shows, however, that Yale, and not Dr. Fenn, is the rightful owner of the '538 invention and patent. Accordingly, Fenn's conversion and theft claims fail.

Moreover, there is nothing in the Yale-Analytica license agreement that would interfere with Dr. Fenn's rights even if he had been the rightful owner of the '538 invention and patent because the agreement simply grants Analytica a license to any rights that Yale might have in the '538 invention and patent. Yale made no representation in the agreement that it had any rights, and nothing in the agreement interferes in any way with Dr. Fenn's agreement with Analytica.

The classic elements of tortious interference are "the existence of a contractual or beneficial relationship, defendant's knowledge of that relationship, the intent to interfere with it, and the consequent actual loss suffered by the plaintiff." Hart, Nininger and Campbell Assoc., Inc. v. Rogers, 16 Conn. App. 619, 629, 548 A.2d 758, 764 (1988). In addition, the plaintiff must "plead and prove at least some improper motive or improper means . . . A claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself." Blake v. Levy, 191 Conn. 257, 262, 464 A.2d 52, 55 (1983) (citations and internal quotations omitted); see Robert S. Weiss and Assoc., Inc. v. Wiederlight, 208 Conn. 525, 536, 546 A.2d 216, 223 (1988) (citing to Blake); Golembeski v. Metichewan Grange No. 190, 20 Conn. App. 699, 702-03, 569 A.2d 1157, 1159-60, cert. denied, 214 Conn. 809, 573 A.2d 320 (1990). This element of "improper motive or improper means" may be satisfied by proof that "the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously." Blake, 191 Conn. at 261, 464 A.2d at 54 (citations omitted); see Robert S. Weiss and Assoc., Inc., 208 Conn. at 536, 546 A.2d at 223 (citing to Blake); Golembeski, 20 Conn.App. at 702-03, 569 A.2d at 159-60

35

(citing to Blake). "Not every act that disturbs a contract or business expectancy is actionable." Blake, 191 Conn. at 260, 464 A.2d at 54; see Robert S. Weiss and Assoc., Inc., 208 Conn. at 535-536, 546 A.2d at 223 (citing to Blake); Golembeski, 20 Conn.App. at 702, 569 A.2d at 1159-60.

Dr. Fenn testified that he "saw no harm in [the Yale-Analytica license agreement." Indeed, as Dr. Fenn admitted at trial, the Yale-Analytica "quitclaim" agreement was in fact beneficial to him as an owner of Analytica because it allowed Analytica to defeat Finnegan's claim that Analytica lacked standing to maintain its patent infringement action.

The Court also concludes that Dr. Fenn's CUTPA claims fail. CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen.Stat. § 42-110b(a). Trade or commerce under CUTPA is defined as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and real property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Conn. Gen.Stat. § 42-110a(4). "However, 'although an employer may engage employees for the purpose of promoting trade or commerce, the actual employment relationship is not itself trade or commerce for the purpose of CUTPA.'" Drybrough v. Acxiom Corp., 172 F. Supp. 2d 366, 369 (D. Conn. 2001) (quoting Quimby v. Kimberly Clark Corp., 28 Conn.App. 660, 613 A.2d 838, 844 (1992)). When an employment relationship exists between two parties, actions taken outside the confines of that relationship may constitute violations of CUTPA. See Larsen Chelsey Realty Co. v. Larsen, 232 Conn. 480, 656 A.2d 1009, 1018 (1995) (quotations and citations omitted). To determine whether certain actions fall within or outside the employment relationship, the defendant's conduct-not the employment relationship-is dispositive. See

36

Fink v. Golenbock, 238 Conn. 183, 680 A.2d 1243, 1260 (1996); Larsen Chelsey, 656 A.2d at 1017.

Here, even assuming without deciding that CUTPA applies to Yale's actions, the Court concludes that nothing in the record indicates that Yale engaged in any unfair or deceptive conduct or otherwise committed a violation of CUTPA. As noted above, Yale's actions in declining to file a patent application and subsequently seeking a quitclaim from Analytica after learning of the patent's existence and value (and after Dr. Fenn's refusal to assign the patent to Yale) were reasonable and justifiable under the circumstances. Yale's actions were also consistent with its patent policy, to which Dr. Fenn assented. Accordingly, the Court finds no CUTPA violation.

## III. Conclusion

Dr. Fenn's contributions to the science of mass spectrometry, including the invention that led to the '538 patent, are significant and beneficial to many. As evidenced by his receipt of the 2002 Nobel Prize for Chemistry, the invention that led to the '538 patent is one of far-reaching import and magnitude. Indeed, the Nobel Foundation stated that the invention has "revolutionised the development of new pharmaceuticals" and that "[p]romising applications are also being reported in other areas, for example foodstuff control and early diagnosis of breast cancer and prostate cancer." The Nobel Foundation, Press Release: The Nobel Prize in Chemistry 2002, at http://www.nobel.se/chemistry/laureates/2002/press.html.

However, Dr. Fenn failed to promptly disclose the '538 invention to Yale, misrepresented its importance and commercial viability, and actively discouraged Yale from preparing and filing a patent application by the statutory deadline. At the same time, Dr. Fenn secretly prepared a patent application

37

in his own name and licensed the '538 invention to Analytica without notifying Yale and the NIH. Those actions not only violated Dr. Fenn's obligations to Yale, but also violated Connecticut state law. Moreover, his actions were intentional and without justification.

Accordingly, the Court finds for the defendant and counter-plaintiff, Yale University, as indicated above. However, in order to fashion a judgment consistent with this memorandum of decision, the Court directs the parties to file supplemental papers.

Specifically, the Court hereby orders the parties to file proposed findings of fact with factual support and proposed orders concerning the relief requested by Yale. The parties shall address: (1) Yale's request for an accounting/assignment of the patent; (2) the amount of damages under the 1989 patent policy and how they should be awarded; and (3) whether punitive damages should be awarded and their amount, including proof as to reasonable attorney's fees.[23] Those proposed findings and orders are due within thirty days of the date of this order. Both parties are also ordered to file memoranda regarding Yale's theft and conversion claims within thirty days.[24]

SO ORDERED this _____ day of August 2003, at Hartford, Connecticut.

---

**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**

---

[23] In the Court's Final Pretrial Order, at paragraph 4, the Court, in accordance with the parties' stipulation, bifurcated the issue of the amount of attorney's fees to be awarded.

[24] The parties are also to indicate whether an additional factual hearing is necessary.

38