# REINSURANCE AGREEMENT

**THIS REINSURANCE AGREEMENT** ("Agreement") is made and entered into as of July 1, 1999 by and between **EDUCATORS MUTUAL LIFE INSURANCE COMPANY**, a Pennsylvania mutual life insurance corporation ("Company"), and **HARTFORD LIFE & ACCIDENT INSURANCE COMPANY**, a Connecticut stock life insurance corporation ("Reinsurer").

## *Recitals*

Subject to the terms, conditions and limitations set forth herein, the Company desires to cede, assign and transfer to the Reinsurer all of the Company's liabilities on the Reinsured Claims as of the Effective Date. In consideration of the Company's payment of the Reinsurance Premium, the Reinsurer is willing to reinsure and assume the Company's liabilities on the Reinsured Claims as of the Effective Date, subject to the terms, conditions and limitations set forth herein. The parties intend that the reinsurance transaction described in this Agreement shall operate as indemnity reinsurance under which the Reinsurer shall coinsure (on a 100% quota share basis) the Reinsured Claims as of the Effective Date.

## *Agreement*

**NOW, THEREFORE**, in consideration of the mutual covenants and promises contained herein and other good and valuable consideration, the sufficiency and receipt of which are acknowledged, and intending to be bound hereby, the parties agree as follows:

## ARTICLE I:  Definitions

The following capitalized terms used and not otherwise defined herein shall have the meanings given below:

1.1.  Accrual Rate.  The term "Accrual Rate" means an interest rate of 5.7345% per annum.

1.2.  Additional Claim.  The term "Additional Claim" means a claim under an Association Policy that (i) was not identified as a Reinsured Claim in *Schedule 1.20* to this Agreement, and (ii) is submitted to the Reinsurer under an Additional Claim Proposal in accordance with Section 2.9.

1.3.  Additional Claim Proposal.  The term "Additional Claim Proposal" has the meaning given in Section 2.9.

I:\HOME\HARB5751\EMLIC\DISSALE\REINSK.006

EXHIBIT
#10

Plaintiffs
5/13/03  DRC

EDUC 0126

2

1.4.  <u>Association Policies</u>.  The term "Association Policies" means the group long-term disability insurance policies issued by the Company that are listed at *Schedule 1.4.*

1.5.  <u>Books and Records</u>.  The term "Books and Records" means and includes copies of all files and records of the Company necessary for the Reinsurer's performance of its obligations hereunder and relating to the Reinsured Claims, including but not limited to, contract files, claim files and underwriting files for the Related Policies and the Reinsured Claims covering the period up to and including the Effective Date.

1.6.  <u>Claimant</u>.  The term "Claimant" means the claimant on a Reinsured Claim.

1.7.  <u>Closing and Closing Date</u>.  The terms "Closing" and "Closing Date" shall have the meanings given in Section 4.1.

1.8.  <u>Effective Date</u>.  The term "Effective Date" means 12:01 A.M., eastern time, on July 1, 1999.

1.9.  <u>Estimated Settlement Amount</u>.  The term "Estimated Settlement Amount" has the meaning given in Section 4.2.

1.10.  <u>Excluded Liabilities</u>.  The term "Excluded Liabilities" means any liability on or in connection with the Reinsured Claims or the Related Policies (a) for benefit amounts due in the Pre-Effective Date Period, or (b) involving bad faith, punitive or other extra-contractual claims arising out of actions or omissions of the Company, provided that such acts or omissions do not involve, or were not undertaken at the direction or with the written approval of, the Reinsurer.

1.11.  <u>Extension Period</u>.  The term "Extension Period" means the period commencing on the date of this Agreement and ending six months following the Effective Date.

1.12.  <u>Final Settlement Amount</u>.  The term "Final Settlement Amount" shall have the meaning given in Section 4.3.

1.13.  <u>Final Settlement Amount Report</u>.  The term "Final Settlement Amount Report" shall have the meaning given in Section 4.3.

1.14.  <u>Instruction Expenses</u>.  The term "Instruction Expenses" has the meaning given in Section 2.6.

1.15.  <u>Liquidator</u>.  The term "Liquidator" has the meaning given in Section 12.4.

1.16.  <u>Loss</u>.  The term "Loss" means and includes all costs and expenses (including

I:\HOME\HARB5751\EMLIC\DISSALE\REINSK.006

EDUC 0127

3

interest, penalties, reasonable attorneys' fees, necessary accountants' and actuaries' fees, and any other costs and expenses incident to any suit, action or proceeding), damages, charges, losses, deficiencies, liabilities, obligations, claims and judgments sustained or incurred by a party with respect to a matter for which indemnity is due hereunder.

1.17.  Post-Effective Date Period.  The term "Post-Effective Date Period" means the period commencing on and continuing after the Effective Date.

1.18.  Pre-Effective Date Period.  The term "Pre-Effective Date Period" means the period prior to the Effective Date.

1.19.  Reinsurance Premium.  The term "Reinsurance Premium" shall have the meaning given in Section 4.2.

1.20.  Reinsured Claims.  The term "Reinsured Claims" means the disability insurance claims listed by Claimant and Related Policy number at *Schedule 1.20.*

1.21.  Related Policy.  The term "Related Policy" means a policy issued by the Company under which a Reinsured Claim is made.

1.22.  Reinsurance Percentage.  The term "Reinsurance Percentage" means 93.3%.

1.23.  Services.  The term "Services" has the meaning given in Section 2.1.2.

1.24.  Settlement Amount.  The term "Settlement Amount" means an amount equal to the Settlement Reserves for the Reinsured Claims as of the Effective Date.

1.25.  Settlement Reserves.  The term "Settlement Reserves" means the reserves for the Reinsured Claims calculated in accordance with the actual means, methodologies, principles, practices, procedures and policies used by the Company in calculating reserve and claim liabilities for the Reinsured Claims and the Related Policies for purposes of the Company's year-end 1998 statutory financial statements as disclosed by the Company to the Reinsurer prior to the date of this Agreement (including, but not limited to, the fact that the Company has calculated reserves for the Reinsured Claims using the 1964 CDT table at 3% for disabilities incurred prior to 1993 and the 1987 CGDT table at 5% for disabilities incurred after 1992).

1.26.  Statutory Accounting Rules.  The term "Statutory Accounting Rules" means the accounting rules, methodologies, principles, practices, procedures and policies prescribed or permitted by Pennsylvania law and regulation for the calculation of insurance reserve and claim liabilities by Pennsylvania-domiciled insurance companies writing disability insurance business.

I:\HOME\HARB5751\EMLIC\DISSALE\REINSK.006

EDUC 0128

4

1.27.  Statutory Reserves.  The term "Statutory Reserves" means the reserves for the Reinsured Claims which are required to be held by the Company as of a particular point in time, calculated in accordance with the Statutory Accounting Rules.

## ARTICLE II:  Coinsurance of the Reinsured Claims

2.1.  Coinsurance.  Subject to the terms and conditions of this Agreement, including payment of the Reinsurance Premium, the Company will cede to the Reinsurer and the Reinsurer will accept reinsurance on a coinsurance basis of one hundred percent (100%) of the Company's liability (other than the Excluded Liabilities) on the Reinsured Claims as of the Effective Date. As of such date, the Reinsurer agrees to be responsible for one hundred percent (100%) of the Statutory Reserves and liabilities associated with the Reinsured Claims (other than the Excluded Liabilities).

2.1.1.  On and after the Effective Date, the Reinsurer shall pay, and shall reimburse the Company for all payments it makes, of liabilities (other than Excluded Liabilities) with respect to the Reinsured Claims.

2.1.2.  From and after the Effective Date, the Reinsurer shall be responsible for the administration and management of the Reinsured Claims including, without limitation, claims management, processing and payment; settlement of disputed Reinsured Claims; lump-sum settlements and commutations of Reinsured Claims (except as provided at Section 2.1.4); litigation involving Reinsured Claims; and rehabilitation and loss management services provided in respect of the Reinsured Claims (collectively, the "Services").  The Reinsurer will provide the Services under and in accordance with the terms and conditions of the Related Policies and all applicable legal requirements and restrictions.  In providing the Services and paying the Reinsured Claims, the Reinsurer shall be authorized to correspond with Claimants and issue payments directly to the Claimants in the Reinsurer's name, provided the Reinsurer discloses that it is acting as agent for the Company in the performance of such functions.

2.1.3.  Except as provided in Section 2.1.4, the Reinsurer shall have sole authority to administer and adjudicate the Reinsured Claims, provided that the Reinsurer shall indemnify, defend and hold the Company harmless in connection with any Loss (including punitive, exemplary and other forms of extra-contractual damages, fines, penalties and defense costs) incurred by the Company as a result of the Reinsurer's claims adjustment actions and determinations.

2.1.4.  The Company shall have the reserved right to require that a Reinsured Claim be paid on a basis determined by the Company if, in the Company's reasonable

I:\HOME\HARB5751\EMLIC\DISSALE\REINSK.006

EDUC 0129

5

and good faith judgment, it would be exposed to material adverse regulatory action as a result of the Claim determination made by the Reinsurer. In such event, the Company will pay the Reinsurer the additional cost incurred as a result of the Company's determination and the Reinsurer shall not be required to indemnify, defend or hold the Company harmless in connection with any Loss that is incurred as a result of the Company's determination.

2.1.5. The Company shall comply with any reasonable written instructions of the Reinsurer on all matters affecting the Reinsurer's obligations with respect to the Reinsured Claims; provided that Reinsurer shall indemnify and defend Company in connection therewith pursuant to Section 10.2.

2.2. <u>Parties to Coinsurance</u>. This Article II provides for indemnity reinsurance solely between the Company and the Reinsurer. The acceptance of reinsurance under this Article II shall not create any right or legal relation between the Reinsurer and the Claimant on a Reinsured Claim, and the Company shall be and remain solely liable to the Claimant on the Reinsured Claim.

2.3. <u>Termination of Coinsurance</u>. Coinsurance will continue hereunder as to any Reinsured Claim until settlement or payment in full of the Reinsured Claim. The Company shall have no right to recapture the Reinsured Claims.

2.4. <u>Maintenance of Statutory Reserves</u>. The Reinsurer shall maintain Statutory Reserves with respect to the Reinsured Claims as required by the Statutory Accounting Rules. All such Statutory Reserves will be accounted for by the Company as ceded reinsurance and by the Reinsurer as assumed reinsurance.

2.5. <u>Reserve Credit and Ratings Changes</u>. If, following closing of the coinsurance transaction contemplated by this Agreement, either (i) the Reinsurer's rating under the Standard and Poor's rating system falls below the major rating category of "A" ("Qualifying Ratings Change"), or (ii) the Company is unable for any reason to take reserve credit for the reinsurance of the Reinsured Claims without the reinsurance facility being secured, then the Reinsurer, at the Company's written request, will either (a) furnish and thereafter maintain in force a letter of credit for the Company's benefit in a face amount equal to no less than 103% of the then current Statutory Reserves associated with the Reinsured Claims ("Required Security Balance"); or (b) fund and thereafter maintain a trust for the benefit of the Company with cash or cash equivalent assets having a market value equal to no less than the Required Security Balance; or (c) take such other equivalent action ("Alternate Action") as may be necessary to cure the Qualifying Ratings Change or, as applicable, enable the Company to take reserve credit for reinsurance of the Reinsured Claims. Any security for the Reinsurer's performance hereunder that is provided by letter of credit, trust, or Alternate Action shall be maintained in force and effect for so long as (1)

I:\HOME\HARB5751\EMLIC\DISSALE\REINSK.006

EDUC 0130

6

the Reinsurer remains subject to a Qualifying Ratings Change, or (2) as applicable, the Company is unable to take reserve credit for reinsurance of the Reinsured Claims.  The Reinsurer may select from the alternatives provided in clauses (a) through (c) of this Section 2.5 in its sole discretion.

2.6.  Certain Reimbursements.  If the Reinsurer provides the Company with written instructions to undertake actions or incur expenses with respect to the Reinsured Claims (and such actions or expenses do not arise out of Excluded Liabilities but instead relate to the liabilities reinsured hereunder), the Reinsurer shall reimburse the Company on a calendar-quarter basis in an amount equal to the sum of such expenses incurred in the period ("Instruction Expenses").  Instruction Expenses shall consist of reasonable out-of-pocket costs incurred by the Company in complying with the Reinsurer's written instructions provided such expenses are approved in writing in advance by the Reinsurer, but specifically shall exclude any allowance for the Company's internal costs, salaries, wages, taxes, overheads or other allocated costs of the Company's general operations.

2.7.  Calculation of Statutory Reserves.  Not later than thirty (30) days following the close of each calendar quarter during which any of the Reinsured Claims remains outstanding, the Reinsurer shall calculate and report to the Company Statutory Reserves for the Reinsured Claims as of the quarter-end or year-end closing date, as applicable ("Reserve Report").  The Reserve Report shall be in such form and content as will enable the Company to reflect the reinsurance of the Reinsured Claims in the Company's quarterly and annual statutory financial statements.  Annually, the Reinsurer will provide the Company a written statement from the Reinsurer's appointed actuary attesting to the sufficiency of such Statutory Reserves.

2.8.  Calculation of GAAP Reserves.  Not later than thirty (30) days following the close of each calendar quarter during which any of the Reinsured Claims remain outstanding, the Reinsurer shall calculate and report to the Company GAAP Reserves for the Reinsured Claims as of the quarter-end or year-end closing date, as applicable ("GAAP Reserve Report").  The GAAP Reserve Report shall be in such form and content as will enable the Company to reflect the reinsurance of the Reinsured Claims in the Company's quarterly and annual GAAP financial statements.  The basis for the GAAP Reserves will be the Reinsurer's current GAAP reserving basis.

2.9.  Additional Claims.  From time to time in the Extension Period, the Company may identify and submit to the Reinsurer in writing Additional Claims for inclusion as Reinsured Claims under this Agreement ("Additional Claim Proposal").  An Additional Claim Proposal shall include a proposed price for the Reinsurer to assume the Company's liability on the Additional Claim(s) and a proposed effective date for the assumption.  An Additional Claim Proposal shall otherwise be deemed to incorporate, and shall be subject to, all the terms and conditions of this Agreement.  The Reinsurer shall respond in writing to the Additional Claim

I:\HOME\HARB5751\EMLIC\DISSALE\REINSK.006

EDUC 0131

7

Proposal within five (5) business days of receipt by either (i) accepting the Additional Claim Proposal or (ii) rejecting the Additional Claim Proposal and proposing a counter-offer on the price and effective date at which the Additional Claim(s) will be assumed ("Counter-Offer"). The Company shall have five (5) business days from receipt within which to accept a Counter-Offer by written notice to the Reinsurer. If the Company does not so notify the Reinsurer of its acceptance, the Counter-Offer shall be deemed rejected. If the Counter-Offer is rejected or deemed rejected, the Reinsurer shall have no liability on the Additional Claim.

### ARTICLE III: Transition Provisions

3.1. <u>Books and Records</u>. Within 60 days following the Effective Date, the Company will deliver copies or, subject to the Reinsurer's reasonable request, originals of the Books and Records to the Reinsurer. The Company may retain copies of any original Books and Records delivered to the Reinsurer under this Section 3.1. On written request from the Company, the Reinsurer will give the Company as soon as reasonably practicable (but in no event later than three business days following the request) access to, and the Company shall have the continuing right to use, any originals of the Books and Records that are delivered to the Reinsurer, if and to the extent use of such originals is necessary for the Company's reasonable business purposes and operations. Such access shall be provided during Reinsurer's normal business hours.

3.2. <u>Reinsurer Records</u>. The Reinsurer agrees that it will maintain true and accurate records of all reinsurance hereunder, including all such records as may be required by law. On written request from the Company, the Reinsurer shall make available for inspection and copying by the Company as soon as reasonably practicable (but in no event later than three business days following the request) any records pertaining to the Reinsured Claims that may be required by the Company for any reasonable business purpose. Such access shall be provided during Reinsurer's normal business hours.

3.3. <u>Privacy</u>. The Reinsurer recognizes that, in the course of its performance under this Agreement, it will obtain from the Company and other sources personal or privileged information about individuals collected or received in connection with insurance transactions. The Reinsurer agrees to maintain the confidentiality of such information in accordance with applicable law and not to redisclose such information further without the individual's written authorization, unless such disclosure is otherwise permitted by law.

3.4. <u>Forwarding of Claims and Inquiries</u>. After the Effective Date, the Company shall refer to the Reinsurer all inquiries involving the Reinsured Claims.

I:\HOME\HARB5751\EMLIC\DISSALE\REINSK.006

EDUC 0132

8

## ARTICLE IV: <u>Closing Date and Reinsurance Premium Payment</u>

4.1.  <u>Closing and Closing Date</u>.  Closing of the transactions contemplated by this Agreement ("Closing") shall occur as of July 29, 1999 or such other date as may be mutually agreed by the parties  ("Closing Date").  Closing shall be held at the offices of Morgan, Lewis & Bockius LLP, 1701 Market Street, Philadelphia, Pennsylvania 19103, or at such other location as may be agreed by the parties; provided however, that Closing may be accomplished by mail, facsimile, wire transfer or such other means as may be agreed by the parties.

4.2.  <u>Reinsurance Premium</u>.  In consideration of Reinsurer's reinsurance and assumption of the Reinsured Claims as provided herein, the Company shall pay Reinsurer an amount equal to (i) the product of (a) the Settlement Amount and (b) the Reinsurance Percentage, *plus* (ii) an allowance for interest accruing on item (i) at the Accrual Rate from the Effective Date through the Closing Date (collectively, the "Reinsurance Premium"), *less* (iii) claims payments made by the Company that are allocable to the Post-Effective Date Period, *less* (iv) an allowance for interest accruing on the payments comprising item (iii) at the Accrual Rate from the date of each such payment through the Closing Date.  The Reinsurance Premium shall be calculated and paid to Reinsurer as follows:

4.2.1.  The Settlement Amount will be calculated by the Company on an estimated basis for purposes of the Closing ("Estimated Settlement Amount").  At the Closing, the Company shall deliver to the Reinsurer a written calculation of the Estimated Settlement Amount and the Reinsurance Premium, certified by an executive officer and the appointed actuary of the Company to be true and correct to the best of such officers' then current knowledge, information and belief ("Closing Date Statement").  The Estimated Settlement Amount will be based on the reserves for the Reinsured Claims that were included in the Company's statutory financial statements as of June 30, 1999.

4.2.2.  The Reinsurance Premium will be paid in cash, by wire transfer of immediately available funds to an account designated by the Reinsurer.

4.2.3.  The Company shall provide the Reinsurer with such information as Reinsurer may reasonably request regarding the calculation of the Estimated Settlement Amount under this Section 4.2.  The Estimated Settlement Amount will be subject to the post-closing accounting and certification described at Section 4.3.

4.3.  <u>Post-Closing Accounting and Reserve Certification</u>.  Within 30 days following the Closing Date, the Company shall cause its appointed actuary to recalculate and certify to the Reinsurer in writing ("Final Settlement Amount Report") the Statutory Reserves for the Reinsured Claims as of the Effective Date ("Final Settlement Amount").

I:\HOME\HARB5751\EMLIC\DISSALE\REINSK.006

EDUC 0133

9

4.3.1.  The Reinsurer shall have one-hundred-thirty-five (135) days from the date of receipt of the Final Settlement Amount Report to review and approve, or object to, the basis and methodology used in, and the results of, the calculation. In the course of such review, the Reinsurer may audit the Reinsured Claims, verify the data provided by the Company with respect to the Reinsured Claims, and may verify the data with respect to the Reinsured Claims that was used in the calculation of the Final Settlement Amount and the Reinsurance Premium.

4.3.2.  If errors in the data or in the calculation of the Final Settlement Amount or the Reinsurance Premium are discovered, the Reinsurance Premium will be adjusted accordingly.  If the parties cannot agree on the Final Settlement Amount, the matter shall be submitted to arbitration.

4.3.3.  If the Final Settlement Amount exceeds the Estimated Settlement Amount shown in the Closing Date Statement, the Company shall pay the Reinsurer an amount equal to the excess.  If the Final Settlement Amount is less than the Estimated Settlement Amount shown in the Closing Date Statement, the Reinsurer shall refund to the Company an amount equal to the difference.  In either instance the payment shall be made within ten (10) days following the date on which the Final Settlement Amount is finally determined, with interest at the Accrual Rate from the Effective Date to the date of payment.

4.3.4.  The audit and verification process under Section 4.3.1 will be limited to verification of objective, verifiable data points and calculation errors.  The process will not be used to seek adjustment of the Reinsurance Premium for judgmental claims adjustment or judgmental reserving determinations or judgmental assumptions, unless the claims adjustment or reserving determinations or assumptions used by the Company in calculating the Reinsurance Premium are inconsistent with those previously disclosed to the Reinsurer.

**ARTICLE V:  Covenants and Undertakings**

5.1.  Fees and Expenses.  Except as otherwise provided herein, each party shall pay all costs incurred by it for legal, actuarial and other services used in connection with the preparation of, and in closing under, this Agreement.

5.2.  Subrogation Recoveries.  From and after the Closing Date, if the Company receives a subrogation recovery in respect of a Reinsured Claim liability, the Company shall pay the Reinsurer an amount equal to the net recovery proceeds within thirty days of receipt.

I:\HOME\HARB5751\EMLIC\DISSALE\REINSK.006

EDUC 0134

10

5.3. <u>Company Proprietary Information</u>. During the course of performance under this Agreement, the Reinsurer and its agents, employees and representatives may obtain or have access to certain proprietary information of the Company ("Company Proprietary Information"). The Reinsurer covenants as follows with respect to the Company Proprietary Information:

5.3.1. The Reinsurer will, and will cause its agents, employees and representatives to, (i) keep the Company Proprietary Information strictly confidential; (ii) use the Company Proprietary Information only as necessary to carry out the terms and conditions of this Agreement; and (iii) not disclose such information to others without the prior consent of the Company, except as may be required by law.

5.3.2. The Reinsurer will permit disclosure of Company Proprietary Information only to those agents, employees and representatives of the Reinsurer who require such for purposes of this Agreement and who have been advised of, and have agreed to be bound by, the terms of this Section 5.3.

5.3.3. In the event that the Reinsurer or anyone to whom the Reinsurer discloses the Company Proprietary Information as permitted by this Agreement becomes legally compelled to disclose any of the Company Proprietary Information, the Reinsurer will provide the Company with prompt written notice (within 24 hours) so that it may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement. In the event that a protective order or other remedy is not obtained or that the Company waives compliance with the provisions of this Agreement, the Reinsurer will disclose only that portion of the Company Proprietary Information which is legally required, and the Reinsurer will make reasonable efforts to obtain assurances that confidential treatment will be accorded the Company Proprietary Information.

5.3.4. The restrictions of this section shall not apply to the Company Proprietary Information if and to the extent that such has entered the public domain or is available to the Reinsurer from a third-party that is not, to the Reinsurer's knowledge, bound by a confidentiality obligation with respect to such information.

5.4. <u>Reinsurer Proprietary Information</u>. During the course of performance under this Agreement, the Company and its agents, employees and representatives may obtain or have access to certain proprietary information of the Reinsurer ("Reinsurer Proprietary Information"). The Company covenants as follows with respect to the Reinsurer Proprietary Information:

5.4.1. The Company will, and will cause its agents, employees and representatives to, (i) keep the Reinsurer Proprietary Information strictly confidential; (ii) use the Reinsurer Proprietary Information only as necessary to carry out the terms and condition of this Agreement; and (iii) not disclose such information to others without the

I:\HOME\HARB5751\EMLIC\DISSALE\REINSK.006

EDUC 0135

11

prior consent of the Reinsurer, except as may be required by law.

.5.4.2.  The Company will permit disclosure of the Reinsurer Proprietary Information only those agents, employees and representatives of the Company who require such for purposes of this Agreement and who have been advised of, and have agreed to be bound by, the terms of this Section 5.4.

5.4.3.  In the event that the Company or anyone to whom the Company discloses the Reinsurer Proprietary Information as permitted by this Agreement becomes legally compelled to disclose any of the Reinsurer Proprietary Information, the Company will provide the Reinsurer with prompt written notice (within 24 hours) so that it may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement. In the event that a protective order or other remedy is not obtained or that the Reinsurer waives compliance with the provisions of this Agreement, the Company will disclose only that portion of the Reinsurer Proprietary Information which is legally required, and the Company will exercise reasonable efforts to obtain assurance that confidential treatment will be accorded the Reinsurer Proprietary Information.

.5.4.4.  The restrictions of this section shall not apply to the Reinsurer Proprietary Information if and to the extent that such has entered the public domain or is available to the Company from a third-party that is not, to the Company's knowledge, bound by a confidentiality obligation with respect to such information.

5.5.  Claim Reimbursements.  If the Company pays a Claim that is allocable, in whole or in part, to the Post-Effective Date period, the Reinsurer shall reimburse the Company for the allocable portion of the Claim plus interest thereon at the Accrual Rate.  If the Reinsurer pays a Claim that is allocable, in whole or in part, to the Pre-Effective Date period, the Company shall reimburse the Reinsurer for the allocable portion of the Claim plus interest thereon at the Accrual Rate.

## ARTICLE VI: The Reinsurer's Conditions Precedent

The obligation of the Reinsurer to coinsure the Reinsured Claims hereunder is subject to the satisfaction or waiver at the Reinsurer's option, on or prior to the Closing Date, of the following conditions.

6.1.  Representations, Warranties and Covenants.  The representations and warranties of the Company contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of such date, except that any such representations and warranties that are given as of a particular date and

I:\HOME\HARB5751\EMLIC\DISSALE\REINSK.006

EDUC 0136

12

relate solely to a particular date or period shall be true and correct in all material respects as of such date or period. The Company shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by the Company on or prior to the Closing Date.

6.2. <u>Closing Deadline</u>. Closing must occur no later than August 16, 1999.

6.3. <u>Litigation</u>. No action, suit or proceeding shall have been instituted and be continuing or be threatened by any governmental or regulatory body or any other person or entity to restrain, modify or prevent the carrying out of the transactions contemplated hereby, or to seek damages in connection with such transactions, that has or is reasonably likely to have a material adverse effect on the Reinsured Claims or the business, property, prospects, results of operations or financial condition of the Reinsurer.

## ARTICLE VII: <u>The Company's Conditions Precedent</u>

The obligation of the Company to cede the Reinsured Claims is subject to the satisfaction or waiver at the Company's option, on or prior to the Closing Date, of the following conditions.

7.1. <u>Representations, Warranties and Covenants</u>. The representations and warranties of the Reinsurer contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of such date, except that any such representations and warranties that are given as of a particular date and relate solely to a particular date or period shall be true and correct in all material respects as of such date or period. The Reinsurer shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by the Reinsurer on or prior to the Closing Date.

7.2. <u>Closing Deadline</u>. Closing must occur no later than August 16, 1999.

7.3. <u>Litigation</u>. No action, suit or proceeding shall have been instituted and be continuing or be threatened by any governmental or regulatory body or any other person or entity to restrain, modify or prevent the carrying out of the transactions contemplated hereby, or to seek damages in connection with such transactions, that has or is reasonably likely to have a material adverse effect on the Reinsured Claims or the business, property, prospects, results of operations or financial condition of the Company or the Reinsurer.

I:\HOME\HARB5751\EMLIC\DISSALE\REINSK.006

EDUC 0137

13

## ARTICLE VIII: Representations and Warranties of the Company

The Company hereby represents and warrants to the Reinsurer as follows:

8.1. <u>Organization and Standing of the Company</u>. The Company is a corporation validly existing and in good standing under the laws of the Commonwealth of Pennsylvania and has all requisite power and authority to carry on the business and operations of the Company as now being and as heretofore conducted.

8.2. <u>Authorization</u>. The Company has all requisite corporate power and authority to enter into this Agreement, and to perform its obligations hereunder. The execution and delivery by the Company of this Agreement and the performance by the Company of its obligations hereunder have been duly authorized and are valid and binding obligations of the Company, enforceable against it in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting creditors' rights generally or by the principles governing the availability of equitable remedies.

8.3. <u>No Conflict or Violation</u>. The execution, delivery and performance of this Agreement, will not (a) violate any provision of the Articles or Certificate of Incorporation, By-laws or other organizational document of the Company; (b) violate, conflict with or result in the breach of any of the terms of, result in any modification of, give any counterparty the right to terminate, or constitute a default under, any material contract or other material agreement to which the Company is a party; (c) violate any order, judgment, injunction, award or decree of, or any agreement with or condition imposed by, any court, arbitrator or governmental or regulatory body against, binding upon or applicable to the Company, the Reinsured Claims or the Related Policies; or (d) violate any statute, law or regulation of any jurisdiction.

8.4. <u>Consents and Approvals</u>. To the best of the Company's current knowledge, the execution, delivery and performance of this Agreement do not require the Company to obtain any approval from, to make any filing with or to give any notice to, any person.

8.5. <u>Brokers and Finders</u>. The Company has not employed any broker or finder or incurred any liability for any brokerage fees, commissions or finders' fees in connection with the transactions contemplated by this Agreement.

## ARTICLE IX: Representations and Warranties of Reinsurer

Reinsurer hereby represents and warrants to the Company as follows:

9.1. <u>Organization and Standing of the Reinsurer</u>. The Reinsurer is a corporation validly

I:\HOME\HARB5751\EMLIC\DISSALE\REINSK.006

EDUC 0138