
Hartford Life

November 17, 2000

Candi McCulloch M.D.
63 Grove Ave.
Leeds, MA 01053

Policy Holder:    The American College Of Physicians Insurance Trust
Claimant:         Candi Mcculloch M.D.
SSN:              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
Policy Number:    GLT401500

Dear Ms. McCulloch:

We are writing to you regarding your claim for Long Term Disability "LTD" income benefits under the above-captioned Group Insurance Policy ("Policy").

We have completed our review of your claim for benefits and have determined that the evidence submitted in support of your claim does not establish that you continue to meet the policy's definition of Total Disability on or after 8/14/00. Accordingly, LTD benefits are no longer payable to you under the terms of the Policy and your claim has been terminated as of 8/14/00.

Because benefits were paid after 8/14/00, an overpayment has occurred. An explanation of how this overpayment occurred follows in the body of this letter.

Hartford Life and Accident Insurance Company assumed the administration of Educators Mutual Life Insurance Company 11/1/99. The Hartford is adjudicating your claim based on the Educators Mutual Life Insurance Company Long Term Disability policy.

Your Policy contains the following Definitions, please refer to Page 5 of your LTD Policy Booklet, which defines Total Disability as follows:

1. "Disability" or "Total Disability" means that:
    (a) As a direct result of injury or sickness the member is unable to perform the material and substantial duties of the member's occupation as it existed at the time disability began; and
    (b) The member is not working in any gainful occupation; and
    (c) The disability began while this insurance was in force; and
    (d) The member is under the regular and direct care of a licensed physician other than a person in the members family.

Hartford Life Insurance Companies
Simsbury Disability Claim Office
200 Great Pond Drive
Windsor, CT 06095
Facsimile (860) 843-5997

HL 001

Mailing Address: P.O. Box 2999

11/17/00
Page 2
Candi McCulloch M.D.

Next please refer to Page 6 of your LTD Policy Booklet, which defines "LONG TERM DISABILITY BENEFIT" as:

" In the event of a member's total disability, we will pay the Monthly Benefit Amount for each complete month of disability. For any partial month of disability, payment will be made on a pro rata basis. Coverage for this benefit and the amount of this benefit shall be determined from the Schedule of Benefits.

Payment is subject to all of the following conditions:

1. Disability must begin while the member is covered under this benefit provision; and
2. During any period of disability, the member must be under the regular and direct care of a physician; and
3. Benefits will be paid for the period that disability continues beyond the Disability Waiting Period shown in the Schedule of Benefits; and
4. Benefits will not be paid for any period of disability beyond the Maximum Benefit Period shown in the Schedule of Benefits; and
5. On the policy anniversary on or next following the member's 65th birthday, the Monthly Benefit Amount will be reduced to $1000.00, if it is greater than $1000.00."

We have based our decision to terminate your claim for LTD benefits upon Policy language and all documents contained in your claim file, viewed in its entirety, including the following specific information:

1. The Claimant Questionnaire you completed on 4/20/00.
2. Medical records from Carine Porfiri M.D. dated from 11/18/99 to 4/20/00.
3. Our letter dated 10/13/00 to Carine Porfiri M.D.
4. Medical records from Rollin M. Johnson M.D., dated 4/15/00.
5. Our letter dated 10/13/00 to Rollin M. Johnson M.D.
6. Medical records from Beverly Walters M.D. from 9/21/98 to 4/25/00.
7. Medical records from Bruce Coulombe D.C., from 7/12/99 to 6/05/00.
8. Medical records from Richard Norris M.D., dated from 6/1/00 to 6/19/00, including an undated note received in our office on 11/13/00.
9. Our letter dated 10/13/00 to Richard Norris M.D.
10. Medical records from Andrew Salvin, D.D.S. from 7/5/00 to 7/10/00.
11. Medical record from Jordon Grabel, M.D. dated 7/7/00.
12. Medical records from Ignacio Magana, M.D., from 7/11/00 to 10/31/00.
13. Our letter dated 10/13/00 to Ignacio Magana, M.D.
14. Medical record from Christine Baker, M.D. dated 9/5/00.
15. Our telephone call to Christine Baker, M.D. dated 10/31/00.

HL 002

11/17/00
Page 3
Candi McCulloch M.D.

16. A consultation report of the 10/5/00 Discography procedure performed by R. Hicks M.D. at Baystate Medical Center.
17. Surveillance records from our representative vendor, Security Services of Connecticut, Inc. (DBA Fact Finder Investigations) on 5/22/00, 5/23/00, 6/20/00 and 6/21/00.
18. Your interview and statements to Hartford Life Investigators William Moryto and Edward T. Golden on 9/8/00.
19. Records of prescription services rendered to you from CVS Pharmacy, 90 North Main, Northampton, MA.
20. Reports of a pharmacy canvass performed on 9/21/00, 10/17/00, and 11/10/00 by our representative vendor, Master Sleuth Investigations.
21. Independent Medical Examination (IME) and Functional Capacity Evaluation (FCE) reports for services performed by Asha Garg, M.D. on 8/14/00.
22. Job description as Director of Women's Health Center Services, contained in the Educators Mutual Life Insurance Company's claim file, labeled exhibit A.
23. Job Description as Internal Medicine Physician contained in the Educators Mutual Life Insurance Company's claim file, labeled exhibit A.
24. Hartford Life's Medical Department's review dated 11/09/00.

Your claim file reflects you stopped working on 10/3/95 as a result of a disability caused by chronic shoulder and neck pain after a fall while skiing in March 1995. At that time you were working approximately 30 hours per week as a Director of Phyllis Rothman Women's Health Center and as an Internal Medicine Physician approximately 16 hours per week. Accordingly, pursuant to the Policy's definition of Totally Disabled, you became entitled to LTD benefits as the evidence submitted showed that you were unable to perform the material and substantial duties of your occupation.

When Hartford Life assumed the management of your claim, we contacted you for information regarding your current treatment and attending physicians. Subsequently we learned, on 2/28/00, you were involved in a motor vehicle accident, which according to medical records collected for this review, caused pain in the lower to mid back with intermittent pain and numbness in the right gluteal region and upper thigh.

We received your completed forms on 1/19/00. In your Claimant Questionnaire you provided the names of 6 physicians that were currently treating you, (Carine Porfiri M.D., Beverly Walters M.D., Bruce Coulombe D.C., Susan Glover M.D., Lorraine Bello, M.D. and Susan Silverstein, M.D.).

In January 2000, we received an Attending Physicians Statement dated 11/18/99 from Carine Porfiri M.D.. In her statement, Dr. Porfiri relayed that your diagnosis was "...Chronic Pain, Herniated Cervical Disk, TMJ, Migraines...", and that your subjective symptoms include pain in your neck, upper back, right shoulder, jaw pain, severe head pain and migraines. Your medications include Ultram, and Vicodin or Percocet, vitamins, calcium, Glucosamine, Chondroitin Sulfate and

HL 003

11/17/00
Page 4
Candi McCulloch M.D.

herbal remedies. She further comments that "...the chronic condition of pt's (patient's) cervical neck pathology likely to worsen, rather than improve over time...". The last entries in the records we were provided are three phone calls, on 2/29/00, 3/30/00 and 4/20/00. In these calls, information was relayed to Dr. Porfiri regarding your motor vehicle accident on 2/28/00 and the medical treatment rendered concerning that accident. Included in Dr Porfiri's notes was a record of a consultation with Rollin M. Johnson, M.D. dated 4/15/00.

In the consultation report from Dr. Johnson, your subjective symptoms were noted as "...low back pain of about two months duration...following a motor vehicle accident on 2/28/00...". "She reports that ever since, she has persisting problems...are described as pain in the right gluteal region radiating to the lower glutei and to the groin on the right and to the thigh anteriorly and medially. She notes a burning sensation and numbness. Her symptoms are aggravated by flexion of the back...". You told Dr. Johnson that you had a C6-7 fusion and a C5-6 herniation, that you receive chiropractic care on a regular basis two to three times per week.

Upon examination, Dr. Johnson relays in part that; "...She is remarkably flexible despite that fact that she is in pain and has had to reduce her flexibility in both flexion, extension, lateral bend, and rotation." Further, Dr. Johnson relays that symptoms were not reproduced in the examination, that while straight leg raise was positive on the right and produced gluteal pain on the right, the femoral stretch was negative, reflexes were brisk and equal in both lower extremities, and that manual motor and sensory exams were normal. He commented that you had sensitivity on flexion and internal rotation during a range of motion exam of the right hip. Dr. Johnson commented that he suspected you had a "...L4-5 disc on the right with irritation of the L5 nerve root."

We received information from Dr. B. Walters. These records reflect that you were first treated on 9/21/98 for complaints of pain in your neck and upper back. Surgical treatment was suggested in the form of anterior cervical decompression and fusion. Your next office visit was on 6/10/99, after relaying to Dr. Walters you had been in two motor vehicle accidents. Surgery was once again discussed, however not pursued by you. Dr. Walters informed us that you were last treated on 6/10/99, however you did phone her office on 3/15/00 and 4/13/00 to relate that you had been in a car accident on 2/28/00. You were referred for a cervical and lumbar MRI and refused an appointment for 6/29/00, stating you would go to a different physician, because you did not want to wait.

We received information from Everest Chiropractic. B. Coulombe D.C. relays that your subjective and objective restrictions/limitations are essentially the same as you relayed to Drs. Porfiri, Johnson and Walters. The records reflect that you are treated on several occasions between 7/12/99 and 6/05/00 (the last record of treatment we have).

Dr. Johnson referred you to Dr. Norris for treatment. We received information from Dr. Richard Norris. His records reflect that you were seen for a consultation on 6/01/00. Upon examination, Dr.

HL 004

11/17/00
Page 5
Candi McCulloch M.D.

Norris relays that your subjective and objective restrictions/limitations regarding your lower back pain and neck & right shoulder pain are essentially the same as you relayed to Drs. Porfiri, Johnson, Walters and B. Coulombe D.C. Dr. Norris opines that his diagnostic impression was that you had "...a right sided L4 radiculitis..." and possibly "...some component from the L5 both from the disc bulge and the central stenosis..." Dr. Norris further opined that "...factor in some mild right sided sacroliliac pain...". His notes reflect that his plan was to start physical therapy and to perform a right L4-5 transforaminal epidural steroid injection under fluoroscopic guidance. This injection was performed on 6/9/00.

On 6/19/00, Dr Norris saw you in follow-up to the 6/9/00 injection. At that time you relayed that the injection had afforded you 100% relief of pain for approximately 2 days, (approximately 6/11/00). After two days, your pain symptoms returned in your lower back. Dr. Norris opined that an additional epidural or selective nerve root block could confirm the response she had to the prior injection. Further, he opined that if the same clinical response was obtained that a surgical reduction could be considered.

On 6/19/00, Dr. Norris examined your neck and right shoulder. Upon examination Dr. Norris relays that your subjective and objective restrictions/limitations are essentially the same were relayed to Drs. Porfiri, Johnson, Walters and B. Coulombe D.C. It is not clear, based on the notes we were provided, if the additional epidural or selective nerve root block treatments recommended by Dr. Norris took place. In addition, it is also not clear if his recommendation regarding treatment with Neurontin or the alternative topical Capsaicin for your neck and right shoulder pain, and/or gradually increased amounts of Amitriptyline for insomnia, took place.

In July and August of 2000, we contacted you relative to scheduling independent medical examinations and functional capacity evaluations. During the scheduling process, you provided us with the names and addresses of additional treating physicians. We subsequently obtained records of treatment from Drs. A. Slavin, J. Grabel and I. Magana.

Dr. Slavin treated you for bilateral jaw joint facial discomfort. He notes that this is a re-injury to the temporomandibular joint as a result of the motor vehicle accident of 2/28/00. You were treated with bilateral joint lavage and corticosteroid injection on 7/06/00. There is no indication of any functional limitation that would preclude you from performing your own occupation as a Director of Women's Health Center Service and as a Internal Medicine Physician.

On 7/7/00 you saw Dr J. Grabel in consultation for your chronic lumbar and cervical pain conditions. Dr. Grabel opined that additional cervical surgery would not be helpful and further that another opinion should be sought regarding a surgical approach to your lumbar spine.

On 7/11/00, you were seen in consultation by I. Magana M.D. Dr. Magana relays that it is his impression that you have chronic mechanical cervical pain and radiculopathy, in addition to

HL 005

11/17/00
Page 6
Candi McCulloch M.D.

spondylitic changes and a protruding disc at C5-6 along with some mechanical low back pain. His recommendations included a continuation of conservative measures, epidural steroid injections, or surgery. He suggested "...cervical flexion-extension x-rays and lumbar Discography at L3-4, L4-5, and L5-S1. She will consider her options."

We contacted C. Baker M.D. for medical records. We received Dr. Baker's treatment notes for 9/5/00. There is no indication of any functional limitation that would preclude you from performing your own occupation as a Director of Women's Health Center Service and as a Internal Medicine Physician.

Dr. Baker's notes contained a consultation report of the 10/05/00 Discography procedure performed by R. Hicks M.D. at Baystate Medical Center. Dr. Hicks opined that there was a L4-5 right anterolateral annular tear which when tested, produced a significant pain response.

On 5/22 and 5/23/00, 6/20 and 6/21/00 our representative surveillance vendor, Security Services of Connecticut, Inc. (DBA Fact Finder Investigations) observed you.

During this period you were observed driving children from your residence to the Hilltown Cooperative Charter School in Williamsburg Massachusetts over local roads. You drove two vehicles, a 1999 Subaru Forrester SW, Massachusetts plate #RT76BK and a late model Porsche 911 Massachusetts Plate #RW89TU. We note that the Porsche is a manual transmission vehicle, requiring (specifically) the use of your left leg and right arm used in concert to maximize the efficiency of this vehicle's operation. We note that during the time we observed you driving this vehicle, the operation appeared to be smooth and non-eventful. In addition, we note that during this period you are seen pivoting out of the vehicles without assistance or hand support.

While driving the Subaru, you were observed to pull the driver's side seatbelt down and engage it in the lock with your right arm/hand, move your neck, shoulders and arms in an unrestricted manner. While backing up all vehicles, you turned and used your neck/head to look in all directions for oncoming traffic or obstructions.

On 5/22 on two occasions, you used both arms to reach above your head to pull the Subaru hatchback closed. On 5/22 and 5/23 you were observed to open and close your car door and a door to the school multiple times.

On 6/20 you were observed driving the Porsche to Hilltown Cooperative Charter School. You carried what appeared to be a paper grocery sack and an artificial plant while walking from your vehicle into the school. These items appeared to be awkward to hold as, while walking, you held the items first with both arm, then balanced the items on your left hip and held them with your left arm. You walked to your vehicle. While backing up the vehicle, you used your neck and head to look in all directions for oncoming traffic or obstructions.

HL 006



11/17/00
Page 7
Candi McCulloch M.D.

Later that same evening you were observed at what appeared to be a party for the school. During this time from 7:18 PM to 8:53 PM you were observed to:

1. Demonstrate the ability to stand and walk for an extended period of time.
2. Show the ability to move your head, neck, arms, upper and lower torso and extremities freely and independently.
3. Demonstrate the ability to twist your upper torso at the waist, lift your left leg and spin on your right heel to complete a 360-degree turn. These movements were performed on multiple occasions during the evening.
4. Between 7:18 PM and 8:53 PM, you sat for approximately 5 minutes. During this approximately 5 minute period you leaned forward, sometimes with your arms resting on your thighs. You conversed with people located on either side of you. You kept your shoulders in a static position, while utilizing your neck to turn your head in the direction of the person you were speaking to.
5. Demonstrate the ability to dance and use all parts of your body. While dancing, you were seen to bend and twist at the waist, squat and immediately return to a standing position, hop, move your hips from side to side, lift your arms to shoulder and above head level, swing your arms, extend your legs and point your toes, flex your neck and back, move your head and neck in a bouncing motion, and bend at the waist to almost 180 degrees to pick an item off the ground.
6. Carrying flowers in your left hand and a paper grocery sack in your right hand to your car.
7. Driving your Porsche from the parking lot to the party location. You got out of the vehicle and before getting back into the driver's compartment, you moved the drivers seat forward, bent at the waist, placed your head and shoulders inside the rear passenger compartment and retrieved an item from the rear passenger seat. Prior to getting into the driver's seat you repeated these movements to place the item back in the rear passenger compartment. Once seated in the driver's seat you twisted at the waist to adjust the front passenger's seat, closed the driver's side door and drove away.

On 6/21 between the hours of 9:56 AM and 10:34 AM, you were observed driving the Porsche and a red Volkswagen Jetta, entering several businesses in the town of Leeds/Northampton, MA and walking through the downtown area of town. During this period, you demonstrate the ability to stand, walk briskly, and swing your arms, drive, move your shoulders, head, neck and arms independently and without visible restrictions.

On 9/8/00, Hartford Life Investigators, William Moryto and Edward T. Golden interviewed you at the law offices of Valerie Botter, 16 Center Street, Northampton MA. Ms. Botter was not present and it is our understanding that you are not represented by counsel for this claim.

During the interview, you were positively identified as the person depicted in the video surveillance discussed earlier in this letter. At this time, you were asked to detail the limitations to your daily activities caused by your disability, how those limitations restrict your ability to perform your

HL 007

11/17/00
Page 8
Candi McCulloch M.D.

occupation and to provide information regarding your medical treatment. Your responses to the investigator's questions were put into statements, which you were given the opportunity to read, correct and sign.

In your signed statement you relayed the following, in part:

" I have been asked to describe my limitations relative to my disability. The only thing I can tell you is that when I get up in the morning I am in pain. If I bend over, it ends up increasing the pain. A couple of hours into the day, I try not to bend and pick up anything. It will just make it worse. I look at something before I decide to pick it up. If I do it, I will pay for it dearly. I will be in more pain and have to take more medication. Sometimes I don't bother bending to pick up anything because of what the additional pain will do to me. My limitation is pain. I go to sleep with it and get up with it. I can't stay in one position for very long. It is a risk benefit ratio to whatever I do.

I have been asked what I do on an average day. I don't sleep well through the night. An average night is not sleeping well. I don't remember the last night I sleep well. I get up in the morning. I need to get my kids to school. I take a hot shower or hot tub either before or after getting the kids off to school. I get them cereal or something quick for breakfast. I drive them the two miles to their school.

Once a week I go to the massage therapist, the chiropractor, doctor's appointment and a knitting class. I will write letters. I read books. I read a lot. I pay bills. I walk the dog for ten or fifteen minutes.

I pick up the kids after school. I bring them home for a snack, then drive them to soccer. During the season it is six days a week. I also take them for other activities.

I make dinner. If I have to do errands and have to carry anything, I usually bring the kids with me. My son will carry things for me.

I don't do any heavy cleaning. The only cleaning I do is laundry. I presently have someone come in once a week to clean. It is not enough. I am considering having someone come in five or more days a week. I need a housekeeper. I had a housekeeper six days a week until this summer. I don't do any yard work. I have a herb garden and will spend a few minutes weeding it.

On Monday nights I go to yoga. I am there from about 6:30 for a sauna, then the yoga until about 8:45PM. The knitting is a two-hour class in Northampton.

There is a lot of live music and concerts in Northampton. I might go two to three times a month. The music is played at local places and outside during the summer months. I don't do any dancing. I wish I could."

HL 008

11/17/00
Page 9
Candi McCulloch M.D.

" I have been asked to describe a good day. A good day is a day with less pain. On a good cycle, I will take less pain medication. A good day is being able to have a pain level that will let me enjoy just sitting reading with my children, or just braiding my daughter's hair. A good day is a day of not thinking of the pain constantly.

I have been asked to describe a bad day. On a real bad day, I can't do anything, but I do it anyway. I cry. I do the same things I have to do. I take more medication. Right now everyday, is a bad day. If I am in a good cycle, I might have two bad days a week. In a good cycle of pain, I am still in pain.

I have been asked what prevents me from returning to work. It is the pain. Pain is a very subjective. I have constant pain in my neck. It is between my shoulder blades and my neck. The neurological pain is in my shoulder. It is a very deep pain. The pain in my neck and scapula is always there. It is a burning pain.

My jaw is sometimes good and sometimes bad. I wear a mouthpiece at night. My jaw pain is a dull ache. When my muscles tense, my jaw hurts more.

Now I have a lower back pain. It is deep in my lower spine. It goes into my lower right hip. Sometimes it goes into my thigh.

I can't live with my neck and back the way it is. I have to do something to get it better. I have tried acupuncture with four or five different people, acupressure, feldenkreis, Alexander technique, hands on healing, Reiki, herbal therapies such as Chinese herbal medicines, aroma therapies and essential oils, antidepressants, and membrane stabilizers during the past four to five years.

I have been asked what duties and activities relative to my profession I unable to perform. It is all of them. I believe it is unethical and immoral to be on narcotics and practice medicine. My limitation is pain. I can't think and examine people while I am in pain and on narcotics. "

During the interview, you were told of the surveillance. You gave a second statement, but you refused to sign it. In that statement, you provided the following information in part:

" I have been informed a surveillance had been performed on my activities. I am told I am shown dancing outside of my children's school. I remember the day. I was drinking and taking medications that day.

I would love to dance more. If I could ever get to the point where I could do it without taking booze and lots of drugs, I would do it.

HL 009

11/17/00
Page 10
Candi McCulloch M.D.

I am told I am not shown displaying any impairments or wincing from pain while walking, moving about or driving. I limp a lot. I don't limp all of the time. Once I get moving, I don't limp as much, but it still hurts."

We obtained records from CVS Pharmacy in Northampton MA for prescription service rendered from 3/25/00 to 9/13/00. These prescriptions include 5 services of 100 pills (500 total) of Ultram and 2 services of 50 pills (100 total) of Hydrocodone/APAP. Ultram, a non-narcotic and Hydrocodone a narcotic, are used for the treatment of pain. Dr. Porfiri prescribed these services.

We also canvassed 44 pharmacies, (8 Eckerd's and 36 other pharmacies) in the West Palm Beach, FL area for information regarding prescription services rendered to you from 11/01/99 to present. Of the 44 pharmacies, we found only 2 prescriptions, at the Walgreen Drug Store located at 1255 Palm Beach Lakes Blvd in West Palm Beach FL. The prescriptions were for 100 tablets of Roxicet, a narcotic, on 2/28/00 and 100 tablets of Hydrocodone on 11/9/00. Dr. Porfiri prescribed both of these services.

On 8/14/00, an Independent Medical Examination and Functional Capacity Evaluation was performed by A. Garg M.D. at Vernon Medical Center, Worcester MA. In addition to Dr. Garg's comments regarding the examinations, we requested Dr. Garg's comments on the video surveillance. Dr. Garg identified you in the video as the person she examined on 8/14/00.

Dr. Garg opines (in part), in her report dated 9/8/00, as follows, "...The functionality shown by Ms. McCulloch in the video does not correspond to the way she presented for the examination...The functionality shown in the video changes my opinion some what in terms that she's able to function pretty well in her routine activities...After reviewing detailed medical information, obtaining history from the patient, and examination, as well as reviewing the videos this is my opinion that she should be able to work as an internist 16 hours a week and administrator work in the Women's clinic 30 hours a week..."

In the FCE report, Dr. Garg relays, quoted here, in part, "...Restrictions & Limitations...Avoidance of heavy lifting, more than 10 lbs.....Frequent bending, stooping, twisting, and kneeling should be avoided...Avoidance of one continuance constant positioning for more than one hour...she should be able to do light duty work without any problems with the above limitations."

On 10/13/00, we contacted to Drs. C. Porfiri, R. Norris, R. Johnson, and I. Magana and requested that they provide their comments on the IME/FCE, surveillance and interview. On 10/31/00, we contacted Dr. C. Baker for her comments on these items, also. We asked that responses are received by 11/03/00, and if responses were not received, we would assume that they were in agreement with Dr. Garg's assessment. As of the date of this letter Drs. Porfiri and Johnson have not responded. On 10/31/00 Dr. Baker indicated that it was not her practice to review video or IME results. In an undated note received in our office on 11/13/00, Dr. Norris stated, in part, "...I have

HL 010

11/17/00
Page 11
Candi McCulloch M.D.

no response to this – my involvement in Dr. McCulloch's care was rather limited...I prefer to not comment on this...".

On 10/31/00, Dr. Magana provided the following, quoted here in part, "...I agree with Dr. Gargs that the patient in the video tape would seem capable of doing what would seem independent in her activities of daily living...It is my opinion that this patient is capable of working in the following manner: She should be allowed to change her position every hour, she should avoid lifting more than 20 pounds, occasionally or 10 pounds repetitively. Within these restrictions, she would seem capable of working a full eight hour day. She would, in my opinion, be capable of practicing medicine two days per week as she was doing prior to her injury."

Our Medical Department reviewed your file including medical data, videos and your interview/statement. The weight of the evidence contained in your file does not support your inability to perform the duties of your occupation as it existed at the time of your leave from work on or after 8/14/00. Consequently, it is our determination that you no longer meet the Policy's definition of Totally Disability as of 8/14/00, and as such your claim has been terminated.

Because benefits have been paid beyond 8/14/00, an overpayment of $19,655.53 has occurred. This overpayment occurred as follows:

| | |
|---|---|
| Benefits paid 8/14/00 to 8/31/00 | $7658.00 |
| Should have paid | $3318.47 |
| Overpaid | $4339.53 |
| | |
| Benefits paid 9/1/00 to 10/31/00 | $15,316.00 |
| Should have paid | $0.00 |
| Overpaid | $15,316.00 |
| | |
| Total Overpayment | $19,655.53 |

Please submit your check for $19,655.53 made payable to Hartford Life and Accident Insurance Company.

If you have any additional information, not previously submitted, which you believe will assist us in evaluating your claim for LTD benefits, please forward that to us for our consideration within sixty (60) days from the date of your receipt of this letter. In particular, as medical information from any attending physicians including restrictions/limitations placed on your activities, prescription records, hospitalization records, office notes, narrative reports, testing and laboratory results that may assist us in further evaluating your claim for benefits. The Hartford will review any additional information, along with previously submitted information, and notify you of the results of our review.

HL 011

11/17/00
Page 12
Candi McCulloch M.D.

If you do not have additional information, but you disagree with our denial decision, you have the right to appeal our decision and review pertinent documents in your claim file. If you do not agree with the reason why your claim was denied, in whole or in part, and you wish to appeal our decision, you must write to us within sixty (60) days of the date of this letter. Your letter, which must be signed and dated by you or your legal representative, should clearly outline your position and any issues or comments you have in connection with your claim and our decision to deny your request for benefits under the Policy.

Once we receive your appeal, we will again review your claim, based upon your statements and the documents and notes contained in your claim file. Upon completion of this review, we will advise you of our further determination.

We reserve all rights and defenses available to us in making our determination

If you have any questions, please feel free to contact our office at (800) 359-8391. Our office hours are 8:15 AM to 4:15 PM EST, Monday through Friday.

Sincerely,

Kim L. Gabrielsen, Senior Investigative Analyst
Special Investigations Unit, Group Benefits Division
Hartford Life and Accident Insurance Company