7/28/2003

Pamela M. Mormino

Page 1

```
 1                  UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT
 2                        (BRIDGEPORT)
 3
 4
                                      )
 5    CANDI McCULLOCH,                 )
                 Plaintiff            )
 6                                     )    Civil Action No:
      Vs.                             )    301CV1115 (AHN)
 7                                     )
      HARTFORD LIFE AND ACCIDENT      )
 8    INSURANCE COMPANY and           )
      EDUCATORS MUTUAL LIFE           )
 9    INSURANCE COMPANY,              )
                 Defendant            )
10                                     )
11
12
                  Deposition of PAMELA M. MORMINO, taken
13    before Judith L. Kline, Certified Shorthand
      Reporter/Notary Public in and for the State of
14    Connecticut, pursuant to notice, at the law offices of
      Gersten & Clifford, 214 Main Street, Hartford,
15    Connecticut, on July 28, 2003 at approximately 9:05
      a.m.
16
17    APPEARANCES:
18    FOR THE PLAINTIFF:
              ELIOT B. GERSTEN, ESQUIRE
19            GERSTEN & CLIFFORD
              214 Main Street
20            Hartford, CT 06106
21    FOR THE DEFENDANTS:
              ROBERTA JILL SHARP, ESQUIRE
22            AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
              300 Convent Street
23            Suite 1500
              San Antonio, TX 78205
24
      ALSO PRESENT:
25        Jeffery Apuzzo, Esquire
          Candi McCulloch
```

Brandon Smith Reporting Service

ca337c4d-8692-4f4f-ba9f-42c749d62989

McCulloch vs Hartford Life

7/28/2003

Pamela M. Mormino

Page 22

1   Q  What does a best practices manager do?
2   A  She looks at some of these reports that we
3  referred to, and looks at the overall function in the
4  office, to see whether there's consistency in how we
5  do things, and whether we're doing things most
6  efficiently.
7       If she sees that team A is working very
8  efficiently on pending claims, she'll look to see how
9  they're doing it, so that she can apply it to all the
10 other teams.
11      And try to make sure that we're keeping well
12 within our turnaround time, and our promise to our
13 customers.
14  Q  When you say our promise to our customers, what
15 do you mean?  Who is the customer?
16  A  The claimant.
17  Q  And what's the promise to our customers, that
18 you're referring to?
19  A  Our promise is to adjudicate claims as quickly
20 as possible, and try to help them through whatever
21 situation they're going through with our rehab
22 department or our medical department, if possible.
23      But it's more meeting the turnaround time,
24 that would satisfy our customers.
25  Q  And you just used the term adjudicate claims;

Page 23

1  could you tell me what you're referring to?
2   A  Adjudicate claims would be the claim process
3  that the examiner engages in, when they receive the
4  first notice of claim -- how they would proceed from
5  there.
6       Going through the process of investigating
7  the claim, making sure eligibility is correct, making
8  sure that they have the proper payment and this person
9  is entitled to benefits.
10      And paying the claim when they are, and
11 denying the claim if they are not.  And it's all ruled
12 and governed by the policy provisions.
13  Q  I didn't ask you this, and I apologize.  Can
14 you tell me a little bit about yourself?
15  A  I've been with Hartford for 19 years.  I'm the
16 regional vice-president for claims for our group
17 reinsurance plus operation.
18  Q  When you say regional vice-president, is there
19 more than one region?
20  A  No.  I'm the region.
21  Q  Okay.
22  A  Our other offices, that are not a reinsurance
23 and a private label office, as we are -- the regular
24 direct offices of The Hartford are regional throughout
25 the region, so I am their equivalent.  I have a

Page 24

1  regional vice-president title.
2   Q  And when you say regional -- when you say
3  reinsurance and private label, those are terms that
4  you may be familiar with, but I'm not sure I am.
5       Can you tell me what you mean by those terms?
6   A  Our office was started to be able to handle
7  claims for other insurance companies, who wanted to,
8  in essence, call it private labeling.
9       They want another company to do their claims
10 for them, or select whatever services they want.  They
11 may select underwriting services.  They may select
12 claim services.  They come to group reinsurance plus,
13 and we take risk on those claims also.  So that's the
14 reinsurance piece.
15      So we'll handle the claims on their behalf.
16 We will be them, for them.  So if we're working for
17 XYZ Insurance Company, we would answer the phone as
18 XYZ Insurance Company.
19      And, in essence, be their TPA, for want of
20 another word; would be somebody who does their claim
21 processing.  But we also take risk; that's the
22 difference.  That's one of the things that we do at
23 group reinsurance plus.
24  Q  Okay.  What's a TPA?
25  A  Third party administrator.

Page 25

1   Q  Great.  I'm sorry.  I have to make sure that
2  you and I -- strike that.  I have to understand what
3  you're saying, in order to ask you questions that you
4  will understand from me.
5   A  Absolutely.
6   Q  Okay.  Thanks.  And when you say take risk,
7  what are you referring to?
8   A  That a certain part of the claim we would
9  reinsure, so that we would get -- for instance, most
10 of our business, let's say, is 80 percent our risk, 20
11 percent the other company.
12      We actually take the lion's share of the risk
13 when we do the claims.  So the liability -- the lion's
14 share of the liability is ours.  If it's an 80/20,
15 take 80 percent of the liability.  We also take 80
16 percent of the premium.
17  Q  Okay.  And that's the so-called reinsurance?
18  A  That's the private label and the reinsurance
19 piece, yes.
20  Q  And that's how the risk gets spread between the
21 two companies?
22  A  Right.
23  Q  Okay.  And before you received the title of
24 regional vice-president, what did you do?
25  A  I've been in this capacity since the end of

7 (Pages 22 to 25)

ca337c4d-8692-4f4f-ba9f-42c749d62989

Page 82

1    Q   It says here that they have 14 claimants on
2   partial payments; do you see that?
3    A   Uh-huh.
4    Q   Do you know what that means?
5    A   There are also people that were on partial,
6   that -- there were some of them that they would hold
7   and they would just do a quarterly payment, instead of
8   paying them every month.  And those, again, we had to
9   put them back on our monthly cycle.
10   Q   Going to page 11837.
11   A   (Witness complies.)  Yes.
12   Q   Do you see the handwriting at the top of the
13  page, first of all?
14   A   Yes.
15   Q   Whose handwriting is that?
16   A   I believe that's Joann Alleano.
17   Q   Excuse me?
18   A   Joann Alleano.
19   Q   Okay.  What does she do?
20   A   She was the account manager, in our operations
21  area, for the buy out.
22   Q   Okay.  What does an account manager and your
23  operations manager do?
24   A   Well, the account manager will make sure that
25  all of our new business is set up properly.  And they

Page 83

1   will handle the account as their representative.
2        And it's within -- it takes care of all
3   disciplines, to make sure the claims is doing what
4   they need to do.  If it's a new private label
5   arrangement, make sure underwriting is doing what
6   they're supposed to do.  Make sure that we meet all
7   the timeliness -- again, to give the best customer
8   service we can.
9    Q   Let me ask you a question; you used that
10  phrase, and I forgot to get it defined.  What's a
11  private label?
12   A   Private label is when we process claims on
13  behalf of other insurance companies in their name.
14   Q   Do you disclose to a claimant that's what
15  you're doing?
16   A   Not with a private label arrangement, no.
17   Q   What do you disclose to a claimant, about your
18  involvement, when it's a private label?
19   A   When it's private label if we're working for
20  XYZ Insurance Company, we pick up the phone and we say
21  that we're from XYZ Insurance Company, because we are
22  their third party administrator.
23        As I indicated before, we pay the claim on
24  their behalf.  Part of the arrangement and part of our
25  agreement is to remain in the background, and to be

Page 84

1   transparent to the customer.
2    Q   Okay.  What's the purpose in that?
3    A   From a standpoint of the other insurance
4   company, it shows that they have the capability to do
5   claims, where they -- perhaps they want to use those
6   resources for something else, and they have us as
7   their extension.
8        From our standpoint -- probably is the only
9   thing that I can talk to -- is there are no advantages
10  to us, as far as that goes.  If you talk about
11  advantage, you would have to go each one of our
12  client companies, and find out why they want a private
13  label arrangement.
14        But from our standpoint, it's a service we
15  provide.  And confidentiality is one of the most
16  important things that they are looking for, to keep
17  the confidentiality.  And The Hartford is a company of
18  integrity.  And they know they can come to us, and
19  that we will respect that.
20   Q   And that's different than when you take over a
21  book of business that's not private label?
22   A   Right.  When we do a buy out.
23   Q   When you do a buy out?
24   A   When we do a buy out, it can be done two
25  different ways.  You can buy out the financial

Page 85

1   liability, as we did with Educator's, but it remains
2   on their paper -- it still is an Educator's policy.
3   It doesn't transfer onto Hartford paper.  That's what
4   we call it.
5        Or it can actually be an assumption
6   agreement, where it has to actually go through all the
7   states.  And that's -- in the assumption buy out, you
8   assume their paper onto your paper, as well take over
9   the liability.  So there are two different kinds.
10   Q   And do you know why this was done as a buy out
11  that was not an assumption of their paper?
12   A   No.
13   Q   Okay.  When you assumed their paper, you said
14  you have to go to all of the states; is that for
15  permission to transfer the paper?
16   A   You have to go to the states for permission,
17  and then you have to go to each claimant for
18  permission, in most of the states.
19   Q   All right.  And that wasn't done here?
20   A   No.
21   Q   Okay.  So what was done here is the first
22  example you gave me of a buy out?
23   A   A buy out of the claim liability; not of the
24  paper.
25   Q   Okay.  Is there a legal term you're familiar

22 (Pages 82 to 85)

Page 86

1  with, that describes each of those two types of
2  variations of the transactions?
3     A  No.
4     Q  Where one is done, where you're accepting
5  liability and the paper, versus just accepting
6  liability?
7     A  The only terms that I know of -- I don't know
8  if they're legal terms, but one is a hundred percent
9  co-insurance arrangement, and one is an assumption.
10    Q  Right.  And the Educator's deal is a
11 co-insurance agreement?
12    A  Yes.
13    Q  How many buy outs do you do a year, since
14 you've been involved with --
15    A  It varies from zero to six or eight a year,
16 depending on -- it's an opportunistic type of
17 arrangement.  You can't buy anything unless there's
18 something for sale.  So you just have to wait for the
19 right opportunity to come.
20    Q  Sure.  And were you involved in any of this
21 process to buy out the Educator's claim?
22    A  Was I, personally?  No.
23    Q  You weren't involved at all?
24    A  No.
25    Q  Okay.  Do you know what sort of -- you call it

Page 87

1  opportunistic -- strike that.  Do you know what sort
2  of opportunistic -- strike that.  I don't like that
3  question.
4        Now, going to page 11847.
5     A  (Witness complies.)
6     Q  Can you tell me whose handwriting this is?
7     A  This is mine.
8     Q  Do you know why you made it up?
9     A  There was a conference call.  The parties to
10 the conference call are listed at the top of the page.
11 And it was to actually figure out who was going to do
12 what, when for the actual transfer of the files on the
13 claims.
14    Q  So this is post agreement; correct?
15    A  Yes.  It was on August 3, 1999.
16    Q  Is this -- when I asked you if you were
17 involved at all, and you indicated no, it looks like
18 you were involved.  Am I misunderstanding?
19    A  I was involved in the transfer of the claims.
20 I was not involved with the buy out.
21    Q  Okay.  Who was involved in the buy out?
22    A  It would have been Peter Heinrichs.  And I
23 don't know who else with him.
24    Q  And what was Mr. Heinrichs' job?
25    A  He was an actuary.  He did the pricing of the

Page 88

1  buy out.
2     Q  And did he maintain files, in connection with
3  his pricing of the buy out?
4     A  I don't know.
5     Q  Do you -- was Mr. Heinrichs involved in any of
6  the due diligence work?
7     A  Just in getting it set up.
8     Q  So did he help coordinate the due diligence?
9     A  Yes, he did.
10    Q  Do you know if he maintained files, in
11 connection with his involvement?
12    A  I don't know.
13    Q  Who would know that?
14    A  Peter Heinrichs.
15    Q  And he's no longer with the company?
16    A  Right.
17    Q  Did he have a secretary?
18    A  No.
19    Q  When did he leave the company?
20    A  Four to six months ago.
21    Q  And if I recall correctly, you said he left for
22 a different business opportunity?
23    A  Yes.
24    Q  Looking at your 8-3-99 handwriting here, the
25 entry here of "no tax," what does that mean?

Page 89

1     A  They are not taxable benefits.
2     Q  Okay.  And I can't -- although I'll commend you
3  for most of your handwriting, I can't read all of it.
4  What's the claim --
5     A  Auto load.
6     Q  What does that mean?
7     A  If we can get data in some sort of data file
8  transferred to us, we can actually load claim data
9  from that file.  And it saves our examiners a lot of
10 key strokes, not to have to input every single piece
11 of data.
12        Then we go in and add anything that they
13 couldn't give us.  So at this particular point, we
14 were investigating whether they could actually supply
15 us with that kind of data.
16    Q  Okay.  And were they able to?
17    A  I don't know.  I don't remember.
18    Q  Okay.  And it says here payments from
19 Educator's will reimburse them on true-up?
20    A  Uh-huh.
21    Q  What's a true-up?
22    A  We discussed the true-up before, with matching
23 their data file with the actuality.  And it would be a
24 transfer of money.
25        So it was decided that the payments that

23 (Pages 86 to 89)

ca337c4d-8692-4f4f-ba9f-42c749d62989

Page 94

1 can sort of -- I want to get things put to the side if
2 I can.
3       MR. GERSTEN: What time is it?
4       MS. SHARP: It's 11:30.
5       MR. GERSTEN: Okay. Can we take a moment?
6 And I know, Roberta, that you usually like to take a
7 lunch and we'll figure out when we'll do that.
8       (Off the record.)
9       (Short recess.)
10 Q   (By Mr. Gersten) Back on the record.
11 A   Before we start anything, I just need to
12 clarify one thing.
13       MS. SHARP: Well, we are back on the
14 record.
15       THE WITNESS: We're back on the record?
16 Okay. When I referred to we settled this claim, it was
17 an arbitration settlement, not a lump sum settlement,
18 as would be reflected on that report that we looked
19 at.
20       In arbitration the settlement was to reopen
21 the claim. We had actually looked at the claim, and
22 we felt that it should not have been a denied claim;
23 that it really should have been a continued claim. So
24 we were very willing to open liability on the claim.
25 Q   (By Mr. Gersten) All right.

Page 95

1 A   And, no, I just know from, perhaps,
2 conversations with Deb Laughran, that that's what
3 happened. I did not find any paperwork.
4 Q   Okay. So when you've termed it a settled
5 claim, what do you mean?
6 A   On this particular claim?
7 Q   Yeah.
8 A   I meant that we came to an agreement to reopen
9 the claim.
10 Q   Although it was in arbitration?
11 A   It was in arbitration, and then the individual
12 did file suit.
13 Q   Okay. And where did he file suit?
14 A   I don't know.
15 Q   How do you know he filed suit?
16 A   That is in the document.
17 Q   All right. Where is that in the document?
18 A   Okay. (Witness looking through documents.)
19 Q   Let me ask you something, and maybe that will
20 help you; is that the scuba diving case?
21 A   Yes.
22 Q   Okay. Got it. I know what you're talking
23 about.
24 A   It's in here somewhere.
25 Q   Okay. At least I know what you're talking

Page 96

1 about. The problem I have is that there appears to be
2 two scuba cases. One took place in Hawaii?
3 A   Yes.
4 Q   And the other one is the one that filed suit in
5 New York, against the scuba equipment manufacturer.
6 A   Yes. But he was diving in Hawaii, I believe,
7 or the Bahamas -- excuse me -- he was diving in the
8 Bahamas.
9 Q   Right. So one was in the Bahamas and the other
10 one was in Hawaii; does that refresh your recollection
11 at all?
12 A   Yes.
13 Q   Okay. Great. Which one was the one that was
14 -- so the lawsuit was filed in New York. Okay. Got
15 it. Am I correct?
16 A   Correct.
17 Q   Okay. If you could look at document 11848 for
18 a moment.
19 A   (Witness complies.)
20 Q   Can you tell me whose handwriting is it on this
21 document?
22 A   That's mine.
23 Q   And what is it -- this one the copy didn't come
24 out as clear, so I'm not going to critique your
25 handwriting, but could you tell me what you wrote?

Page 97

1 A   They do letter -- parting letter -- and we do
2 welcome letter. Check says administered by dot, dot,
3 dot.
4 Q   What does that mean?
5 A   Whenever we take over, and enter into any
6 agreement where we buy out claims, we make sure that
7 the company we're buying it from tells everybody that
8 they are changing administration of their claim.
9       If it's on a buy out, they tell them they're
10 changing administration to Hartford Life. And they
11 tell them their policy is still in force, and the
12 address and the phone number for the future contacts.
13       And they tell them the date it will
14 transpire. And we do the same thing. When we get our
15 claims in, we give them a welcome letter. So it's a
16 transition type of letter. And our letter pretty much
17 states what their letter says.
18 Q   Okay. And in this particular case, this goes
19 back to your differentiation that you were talking
20 about, between a paper and non-paper; am I correct?
21 A   Assumption or co-insurance buy out.
22 Q   Okay. And as you're writing this note, "checks
23 say administered by," does that go to an assumption
24 or to a co-insurance?
25 A   To a co-insurance.

25 (Pages 94 to 97)

ca337c4d-8692-4f4f-ba9f-42c749d62989

McCulloch vs Hartford Life

7/28/2003                                                                 Pamela M. Mormino

---

Page 98

1    Q   So that this particular transaction is a
2   co-insurance transaction?
3    A   Yes.
4    Q   And is that reflected -- you have the
5   reinsurance agreement, that you see in the pile of
6   papers you brought me today?
7    A   Yes.
8    Q   Can you show me what portions of that agreement
9   deal with the so-called co-insurance provision?
10    A   Could you clarify what you mean by that?
11    Q   Sure.  How do you know whether it's an
12   assumption or a co-insurance?
13    A   Well, that was stated up front.  That was a
14   verbal knowledge of knowing up front.  But in the
15   actual reinsurance agreement, I believe it states that
16   we would -- all checks will say "administered on
17   behalf of."
18    Q   Okay.
19    A   Article 2, 11752 talks about the co-insured of
20   the reinsured claims.
21    Q   What page are you looking at?
22    A   11752, 53, 54 through part of 55.
23    Q   Okay.  And as you understand it, what portion
24   of the risk was retained by Educator's?
25    A   Zero.  It was a hundred percent co-insurance.

---

Page 99

1    Q   And what does that mean, a hundred percent
2   co-insurance?
3    A   We have a hundred percent of the liability and
4   the risk on the claims.
5    Q   Okay.  And that sounds like it's the same as
6   the way you described the assumption agreement?
7    A   No.  There's no transfer of paper.  In a
8   co-insurance arrangement, it stays on Educator's
9   paper.
10    Thus, we have to put on the claim -- on the
11   checks or any correspondence that we are administering
12   on their behalf, because it is still their paper.
13    Q   Okay.  But they've given up all risk on the
14   deal; correct?
15    A   Yes.  We hold them harmless.
16    Q   You hold them harmless; correct.  Now, how
17   would a -- we're going to use the word customer to
18   mean claimant in this particular circumstance; okay?
19    A   Uh-huh.
20    Q   If I understand correctly, when you do an
21   assumption agreement -- an assumption buy out versus a
22   co-insurance buy out, you inform the customer of the
23   change of the companies; correct?
24    A   Yes.  Because they have to be issued a new cert
25   page -- something to let them know that they now have

---

Page 100

1   Hartford paper, instead of Educator's paper, if that
2   was the case.
3    Q   Sure.  How would a customer know that The
4   Hartford has assumed a hundred percent of the risk, in
5   a co-insurance agreement of this type?
6    A   I don't know that they would.  Reinsurance is
7   -- almost every company, they reinsurance claims.
8   Sometimes all of the liability, sometimes part of the
9   liability.  That's why reinsurance companies are
10   available.  I don't believe that anybody then tells
11   their customers -- their claimants -- who the
12   reinsurers are.
13    Q   Okay.  Would you agree with me, under the
14   circumstances you just described, where there's a
15   reinsurance, the initial insurer remains responsible?
16    A   Yes.
17    Q   Correct?
18    A   Uh-huh.  Yes.
19    Q   In this scenario, if I understand the way
20   you've described it, Educator's is no longer
21   responsible.
22    MS. SHARP:  Object to form.
23    THE WITNESS: I don't know the
24   responsibility of Educator's.
25    Q   (By Mr. Gersten)  Okay.  As you understood the

---

Page 101

1   responsibility --
2    A   As I understand it, we assume -- we assume
3   liability and we hold them harmless of our decisions.
4   Yet, since it is still their paper, if you were to
5   approach Educator's about anything, you probably would
6   go to Educator's first, and then they would defer to
7   us.
8    Q   Okay.  Now, if I understood it correctly,
9   Educator's has basically had no risk since entering
10   into this agreement; is that correct?
11    A   Right.  That's correct.
12    Q   And, in fact, you're familiar with the hold
13   harmless provision, as well; correct?
14    A   Yes, I am.
15    Q   What is the difference between the arrangement
16   you've just described, and the assumption arrangement
17   you've just described, other than the formal transfer
18   of paper?
19    A   As I would understand it?
20    Q   Yes, ma'am.
21    A   The process is different.  One takes time to go
22   through the courts, and the other one can be a fairly
23   simple transaction.  Those are two differences -- or
24   one difference.
25    The fact that it's now backed by The

---

26 (Pages 98 to 101)

ca337c4d-8692-4f4f-ba9f-42c749d62989

Page 102

1    Hartford, instead of XYZ Company, would be something
2    that, again, it has to be agreed to in the courts and
3    agreed to by the claimant. In a co-insurance
4    arrangement that doesn't exist. So it is not really
5    the same thing.
6        Q   Okay. I understand that they're not really the
7    same thing. But in terms of the role that's assumed
8    by The Hartford in both scenarios, is there any
9    difference?
10       A   One you have to have a treaty, stating those
11   type of provisions.
12       Q   Correct.
13       A   The provisions of this treaty could very well
14   have said Educator's wants to remain part of any
15   litigation. It would be designed how the two parties
16   want it to look.
17           If you go through the courts, there's only
18   one way to design it; you assume it onto your paper
19   and it now becomes Hartford liability. You don't have
20   any arrangement with the prior company, other than the
21   transfer of money and data.
22           This can be designed any way the two
23   companies want it to be designed.
24       Q   So when it says that you are administering this
25   on behalf of Educator's --

Page 103

1        A   Uh-huh.
2        Q   -- that's referring to the fact that the paper,
3    itself, hasn't been transferred?
4        A   Yes.
5        Q   In all other form and substance is there any
6    difference between an assumption agreement, as you've
7    described it, based upon your understanding, and a
8    co-insurance agreement as you understand it?
9        A   I guess I don't understand the question.
10       Q   Okay. Fair enough. Other than the -- what
11   we've just discussed as the paper staying with
12   Educator's, do you know what other -- let me restate
13   my question.
14           You've indicated that this reinsurance
15   agreement between Educator's and Hartford, was easier
16   to do than a process that involved the court?
17       A   Less time consuming.
18       Q   Less time consuming. Other than the time
19   constraints, and the need to transfer the paper
20   formally -- and what I mean by that is from Educator's
21   to Hartford -- is there any other difference in
22   substance between the assume agreement, as you
23   understand it, and the Educator's/Hartford agreement
24   as you understand it?
25       A   As I understand it, no. However, there are

Page 104

1    probably other departments that would have more data.
2    That's the actuaries and the operations area, that
3    actually draw up the contracts, and draw up the
4    agreements, and make these agreements. They would
5    probably know if there were others, but I do not.
6        Q   Okay. Great. Now, going again to 1148, that
7    has your handwriting on it?
8        A   Yes.
9        Q   It says here that -- well, you're being
10   informed by Joann -- I'll never get this name right.
11       A   Alleano.
12       Q   Alleano; right?
13       A   Right. Just pronounce all the vowels.
14       Q   Okay. How about if I just refer to her as
15   Joann?
16       A   Okay.
17           MS. SHARP:  You have to pronounce those
18   vowels, too.
19           MR. GERSTEN:  Everybody get your shots in.
20   That's okay.
21       Q   (By Mr. Gersten) Joann is indicating to you
22   that there's no reporting requirements from us, other
23   than quarterly reserves?
24       A   Yes.
25       Q   Okay. What does that mean?

Page 105

1        A   They're not requesting anything as to open
2    claim listings, or overpayment reports, or any data
3    from us. The only data that they need is that
4    quarterly financial report.
5        Q   Okay. And do you give them quarterly financial
6    reports?
7        A   The claim area? No.
8        Q   Okay. Who gives quarterly reserve reports?
9        A   The actuarial area.
10       Q   Has Educator's received quarterly reserve
11   reports?
12       A   I don't know.
13       Q   Who would be the person in the actuarial
14   department, who would know the answer to that
15   question?
16       A   At this time I would refer most of those
17   questions to Jason Lichtman. Pete is no longer with
18   us, so he could only talk to as long as he was there.
19       Q   Right. And, I'm sorry, when did you say Pete
20   left?
21       A   I don't know. It was four to six months ago.
22       Q   Okay. So would that be in the year 2003?
23       A   Yes. I don't remember exactly when.
24       Q   Okay. So he was around all of 2002?
25       A   Yes.

27 (Pages 102 to 105)

ca337c4d-8692-4f4f-ba9f-42c749d62989

McCulloch vs Hartford Life

7/28/2003

Pamela M. Mormino

---

Page 202

1  A  I'm sorry.  You hesitated.  I thought you were
2  done.
3  Q  That's okay.  What was the IME's opinion that
4  was different than the attending physicians?
5  A  The IME physician said that she thought that
6  Dr. McCulloch was capable of working in her
7  occupation.
8  Q  Okay.  And which one of the attending
9  physicians gave a different opinion?
10  A  I believe her four physicians -- or four of her
11  physicians that stated she -- they said she was
12  disabled, that's where we sent the -- so we had
13  dissenting opinions.  We have the attending physician
14  and we have our opinion.
15      We also -- again, it was reviewed in-house.
16  We wanted to -- if you have an IME that's different
17  from the attending, we require some kind of input from
18  the attending physicians, or we are required to send
19  for some kind of info.  We don't always get it.
20      And if we get dissenting opinions again, then
21  we would do the actual paper review -- it would be a
22  third opinion.  In this particular instance, the only
23  physician that did write back, said perhaps Dr.
24  McCulloch could have enough function to work.  We did
25  not feel it necessary, at that point, to actually do

---

Page 203

1  the paper review.
2  Q  And it says here, in Deb Laughran's e-mail to
3  Mr. McGoldrick, you have reason to believe that her
4  Florida DR will not agree.  Is DR Florida doctor?
5  A  I believe so.  I don't know that for sure, but
6  that's what my understanding was when I read it.
7  Q  Okay.  Did you have any response at all to Mr.
8  McGoldrick's e-mail, yourself?
9  A  I don't even remember the e-mail, so I don't
10  remember the response.
11  Q  So where Mr. McGoldrick indicated sending you
12  the message that, "I understand the desire to close
13  every possible loop" -- particularly because this is a
14  serious matter, terminating; right?
15  A  Absolutely.
16  Q  But he had serious misgivings about having this
17  done.  You don't recall responding to this in any way,
18  indicating that it's a serious decision that we're
19  making, and we should close every loop?
20  A  I think Deb Laughran answered it sufficiently.
21  Q  Okay.  So what work -- if your indicating that
22  -- Deb Laughran indicates we still have some work to
23  do before we can make our decision on this; do you see
24  that?
25  A  Yes.

---

Page 204

1  Q  What work was done, before she made her
2  decision -- or we?
3  A  We were waiting for the responses from her
4  attending physician.  And then, depending on what
5  those responses were, that we might possibly have to
6  have the paper review.
7      So at that particular point she didn't know
8  just how much more we would have to do.  But we
9  definitely had to wait for the responses from the
10  attending physicians.
11  Q  Okay.
12      MS. SHARP:  Is this a good time for a
13  break?
14      MR. GERSTEN:  It's a perfect time for a
15  break.
16      (Off the record.)
17      (Short recess.)
18  Q  (By Mr. Gersten)  Back on.  Did you form an
19  opinion, as to whether handling by claims management
20  by Educator's, of this particular claim, was done
21  appropriately?
22      MS. SHARP:  Object to form.
23      THE WITNESS:  I think it was done within
24  the procedures of the Educator's book of business.
25  Q  (By Mr. Gersten)  And what do you mean by that?

---

Page 205

1  A  Most of their claim files were documented every
2  year with medical.  They had case managers and rehab
3  people working where they thought it was appropriate.
4  They had well-documented files, within the realm of
5  how they did their claims.  They did an average job.
6  Q  Okay.  Would you consider what they did as an
7  average job, to be the same as what The Hartford
8  procedures were?
9  A  No.  I think we do an above average job.
10  Q  Okay.  What makes yours different?
11  A  I think we look more towards getting more data
12  in our files.  We look very much towards the
13  functionality versus the diagnosis.  What is limiting
14  this person from doing this job -- this occupation.
15      And in doing that, I think you build a more
16  solid claim file.
17  Q  Okay.  You read my mind.  What was it about the
18  functionality of Dr. McCulloch, that led you to
19  believe she could perform the substantial and material
20  duties of her occupation?
21      MS. SHARP:  Object to form.
22      THE WITNESS:  I didn't review the claim
23  file, so I really wouldn't be able to give you a good
24  answer to that.
25  Q  (By Mr. Gersten)  Okay.  Notwithstanding your

---

52 (Pages 202 to 205)

ca337c4d-8692-4f4f-ba9f-42c749d62989

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CANDI MCCULLOCH,                          :
                                         :        CIVIL ACTION NO.
          Plaintiff,                     :        3:01CV1115 (AHN)
v.                                       :
                                         :
HARTFORD LIFE AND ACCIDENT               :
INSURANCE COMPANY and                    :
EDUCATORS MUTUAL LIFE                    :
INSURANCE COMPANY,                       :
                                         :        October 13, 2003
          Defendants.                    :

---

## DEFENDANT EDUCATORS MUTUAL LIFE INSURANCE COMPANY'S ANSWERS AND OBJECTIONS TO PLAINTIFF'S REQUESTS FOR ADMISSIONS

---

Defendant Educators Mutual Life Insurance Company ("Educators") provides the

following objections and responses to Plaintiff's Request for Admissions.

## REQUESTS FOR ADMISSIONS

### REQUEST FOR ADMISSION NO. 1:

Admit that after November 30, 1999, Educators Mutual did not keep or maintain records relating to the plaintiff within its possession or control.

### RESPONSE:

Educators objects to this request on grounds that it is vague and ambiguous. Subject to the foregoing objection, Educators admits that it did not keep or maintain Plaintiff's claim file within its possession or control after November 30, 1999. However, Educators Mutual denies that it did not keep or maintain surveillance videos of Plaintiff after that date. To the extent this request seeks the admission of anything further, denied.

### REQUEST FOR ADMISSION NO. 2:

Admit that during the period of July, 1999 to November, 1999, Educators transferred all of its files to Hartford relating to the plaintiff.

**RESPONSE:**

Educators objects to this request on grounds that it is vague and ambiguous. Subject to the foregoing objection, Educators admits it sent Plaintiff's original claim file to Hartford. To the extent this request seeks the admission of anything further, denied.

**REQUEST FOR ADMISSION NO. 3:**

Admit that between November, 1999 and February, 2001, Educators had no contact with the plaintiff.

**RESPONSE:**

Educators admits that it did not have any direct contact with the Plaintiff after November 1999. To the extent this request seeks the admission of anything further, denied.

**REQUEST FOR ADMISSION NO. 4:**

Admit that between November, 1999 and February, 2001 Educators did not request that plaintiff supply proof of a continued disability.

**RESPONSE:**

Educators admits that after November 1999, Educators did not request that Plaintiff supply proof of continued disability directly to Educators. To the extent this request seeks the admission of anything further, denied.

**REQUEST FOR ADMISSION NO. 5:**

Admit that Educators did not receive a written agreement from the policy owner to change any terms of the policy.

**RESPONSE:**

Educators objects to this request on the grounds that is vague, ambiguous, and does not adequately define the information sought. Educators further objects that this request is overly broad in time. Subject to the foregoing objections, denied.

**REQUEST FOR ADMISSION NO. 6:**

Admit that between June, 1999 to February 2001, Educators did not obtain a consent of any policy holder to change the policy or terms of the policy.

**RESPONSE:**

Educators objects to this request on grounds that it is vague, ambiguous, and does not adequately define the information sought. Subject to the foregoing objections, denied.

**REQUEST FOR ADMISSION NO. 7:**

Admit that after November, 1999, Educators did not participate in the review of the claim submitted by plaintiff.

**RESPONSE:**

Educators objects to this request on grounds that it is vague and ambiguous. Subject to the foregoing objections, Educators admits that Educators did not participate in Hartford's handling of Plaintiff's disability claim after November 1999. To the extent this request seeks the admission of anything further, denied.

**REQUEST FOR ADMISSION NO. 8:**

Admit that the attached Exhibit 1 is a true and correct copy of the letter terminating benefits to Candi McCulloch.

**RESPONSE:**

After making a reasonable inquiry, Educators states that the information known or readily obtainable by it is insufficient to enable it to admit or deny this request.

**REQUEST FOR ADMISSION NO. 9:**

Admit that after November, 1999 to September, 2001, Educators had no contact with the Hartford regarding Candi McCulloch.

**RESPONSE:**

Admit.

**REQUEST FOR ADMISSION NO. 10:**

Admit that after November, 1999 to September, 2001, Educators was not aware that the Hartford issued a termination of benefits letter (Exhibit 1) to Candi McCulloch.

**RESPONSE:**

Educators admits that it was not aware that Hartford terminated Plaintiff's benefits until this lawsuit was filed. To the extent this request seeks the admission of anything further, denied.

**REQUEST FOR ADMISSION NO. 11:**

Admit that after November, 1999, Educators had no participation in any processing of the claim of Candi McCulloch.

**RESPONSE:**

Educators objects to this request on grounds that it is vague and ambiguous. Subject to the foregoing objections, Educators admits that Educators did not participate in Hartford's handling of Plaintiff's disability claim after November 1999.

**REQUEST FOR ADMISSION NO. 12:**

Admit that after November, 1999 to September, 2001, Educators had no communication with Hartford regarding Candi McCulloch.

**RESPONSE:**

Admit.

**REQUEST FOR ADMISSION NO. 13:**

Admit that after July 30, 1999, Educators surrendered to Hartford all of its responsibilities it owed to plaintiff under the insurance policy.

**RESPONSE:**

Educators objects to this request on grounds that this request is vague, ambiguous, and does not adequately define the information sought. Subject to the foregoing objection, Educators admits that it ceded 100 percent of the liability for and administration of the open claims subject to the Reinsurance Agreement to Hartford. To the extent that this request seeks the admission of anything further, denied.

**REQUEST FOR ADMISSION NO. 14:**

Admit that after July 30, 1999, Educators relinquished to Hartford all of its responsibilities it owed to plaintiff under the insurance policy.

**RESPONSE:**

Educators objects to this request on grounds that it vague, ambiguous, and does not adequately define the information sought. Subject to the foregoing objection Educators admits that it ceded 100 percent of the liability for and the administration of the open claims subject to the insurance agreement to Hartford. To the extent that this request seeks the admission of anything further, denied.

**REQUEST FOR ADMISSION NO. 15:**

Admit that after July 30, 1999, Educators assigned all of its rights and responsibilities it had to plaintiff under the insurance policy to Hartford.

**RESPONSE:**

Educators objects to this request on grounds that it is vague, ambiguous, and does not adequately define the information sought. Subject to the foregoing objection Educators admits that it ceded 100 percent of the liability for and the administration of the open claims subject to the Reinsurance Agreement to Hartford. To the extent that this request seeks the admission of anything further, denied.

**REQUEST FOR ADMISSION NO. 16:**

Admit that the plaintiff did not provide consent to the assignment of the policy to Hartford.

**RESPONSE:**

Educators objects to this request on grounds that it is vague, ambiguous, and does not adequately define the information sought. Subject to the foregoing objection, denied.

**REQUEST FOR ADMISSION NO. 17:**

Admit that neither of the defendants advised the plaintiff of the assignment of the policy from Educators to Hartford.

**RESPONSE:**

Educators objects to this request on grounds that it is vague, ambiguous, and does not adequately define the information sought. Subject to the foregoing objection, denied.

**REQUEST FOR ADMISSION NO. 18:**

Admit that neither of the defendants advised the plaintiff of the assignment of the "master contract" from Educators to Hartford.

**RESPONSE:**

Educators objects to this request on grounds that it is vague, ambiguous, and does not adequately define the information sought. Subject to the foregoing objection, denied.

## REQUEST FOR ADMISSION NO. 19:

Admit that neither of the defendants advised the plaintiff of the assignment of the rights and liabilities set forth in the Educators' policy to Hartford.

## RESPONSE:

Educators objects to this request on grounds that it is vague, ambiguous, and does not adequately define the information sought. Subject to the foregoing objection, denied.

## REQUEST FOR ADMISSION NO. 20:

Admit that neither defendant advised any of the insureds named in the July 1999 Reinsurance Agreement between Hartford and Educators that Educators had ceded all of its rights and obligations under the policy to Hartford.

## RESPONSE:

Educators objects to this request on grounds that is vague, ambiguous, and does not adequately define the information sought. Educators further objects that this request is overly broad and is not reasonably calculated to lead to the discovery of information relevant to the claims or defenses asserted in this mater. Subject to the foregoing objection, denied.

## REQUEST FOR ADMISSION NO. 21:

Admit that after July 1999, Hartford was not administering claims on behalf of Educators, but had accepted all responsibility and liability under the policies set forth in the Reinsurance Agreement.

## RESPONSE:

Educators objects to this request on grounds that it is vague, ambiguous and does not adequately define the information sought in this request. Subject to the foregoing objections, denied.

## REQUEST FOR ADMISSION NO. 22:

Admit that after July 1999, Hartford has assumed administration of claims on its own behalf.

**RESPONSE:**

Educators objects to this request on the grounds that it is vague, ambiguous, and does not adequately define the information sought. Subject to the foregoing objection, after making reasonable inquiry, the information known or readily obtainable by Educators is insufficient to enable Educators to admit or deny this request.

Respectfully Submitted,

HARTFORD LIFE & ACCIDENT
INSURANCE COMPANY AND
EDUCATORS MUTUAL LIFE
INSURANCE COMPANY

By _____
    Barry A. Chasnoff (ct11162)
    Roberta J. Sharp (ct24407)
    Jessica S. Taylor (ct24408)
    Akin, Gump, Strauss, Hauer & Feld, LLP
    300 Convent, Suite 1500
    San Antonio, Texas 78205
    (210) 281-7000
    (210) 224-2035 (Fax)

- and -

    Donald E. Frechette (ct08930)
    William E. Murray (ct19717)
    Edwards & Angell, LLP
    90 State House Square, 9th Floor
    Hartford, CT 06103
    (860) 525-5065
    (860) 527-4198 (Fax)

## CERTIFICATION OF SERVICE

I certify that a copy of the foregoing document was sent via facsimile October 13, 2003

and certified mail, return receipt requested October 14, 2003 to the following attorney:


Eliot B. Gersten
Gersten & Clifford
214 Main Street
Hartford, CT  06106


JESSICA SPANGLER TAYLOR