## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CANDI McCULLOCH | : | CIVIL ACTION NO. |
| | | 301CV1115(AHN) |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| HARTFORD LIFE AND ACCIDENT | : | |
| INSURANCE COMPANY, and EDUCATORS | : | |
| MUTUAL LIFE INSURANCE COMPANY | : | |
| | : | |
| Defendants. | : | DECEMBER 22, 2003 |

### MANUAL FILING OF DOCUMENTS IN SUPPORT
### OF OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Please take notice that the Plaintiff has manually filed the following documents:

**Exhibits A through ZZ in support of Plaintiff's Opposition to the Hartford's Motion for Summary Judgment**

These documents have not been filed electronically because

[  ]    the document or thing cannot be converted to an electronic format
[X]    the electronic file size of the document exceeds 1.5 megabytes
[  ]    the document or thing is filed under seal pursuant to Local Rule of Civil
        Procedure 5(d) or Local Rule of Criminal Procedure 57(b)
[  ]    Plaintiff is excused from filing this document or thing by Court order

These documents have been manually served on all parties.

PLAINTIFF,
CANDI MCCULLOCH

By_____
Eliot B. Gersten,
Fed. Bar No. ct05213
GERSTEN & CLIFFORD
214 Main Street
Hartford, CT 06106
EliotG@gersten-clifford.com
(860)527-7044
Her Attorney

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CANDI McCULLOCH<br>    Plaintiff, | : | CIVIL ACTION NO. 301CV1115(AHN) |
| | : | |
| | : | |
| vs. | : | |
| | : | |
| HARTFORD LIFE AND ACCIDENT | : | |
| INSURANCE COMPANY AND EDUCATORS | : | |
| MUTUAL LIFE INSURANCE COMPANY | : | |
|    Defendants. | : | December 22, 2003 |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO HARTFORD'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................... 1

II.   FACTUAL BACKGROUND ............................................. 2

III.  STANDARD OF REVIEW .............................................. 4

IV.   THERE IS, AT MINIMUM, A GENUINE ISSUE OF FACT
      AS TO WHETHER HARTFORD ACTED IN BAD FAITH ...................... 5

      A.    HARTFORD CONDUCTED A BIASED INVESTIGATION ............... 6

            1.    Hartford Deliberately Set Out to Terminate Plaintiff's Benefits ........ 6

            2.    Hartford Had No Reasonable Basis to Conduct Surveillance
                  And Did So For the Sole Purpose of Generating a Basis to
                  Terminate Plaintiff's Benefits ................................... 8

            3.    Hartford Induced Plaintiff to Participate In An "Interview"
                  To Entrap Plaintiff By Misrepresenting The Purpose and
                  Nature of the "Interview" ...................................... 11

            4.    Hartford Had No Reasonable Basis to Require An IME or
                  FCE, Misrepresented the Reason for the IME/FCE, and Intentionally
                  Tainted the Result of the IME/FCE ........................... 13

                  a.    Hartford Had No Reasonable Basis to Require an IME ....... 13

                  b.    Hartford Misrepresented the Purpose of the IME/FCE ........ 15

                  c.    Hartford Intentionally Tainted the IME/FCE ............... 16

            5.    Hartford Improperly Used the IME and FCE When It Knew
                  That Dr. Garg Had Not Performed an FCE Although She
                  Misrepresented That She Had Done So ......................... 18

            6.    Hartford Sought Physician Responses to Dr. Garg's IME/FCE
                  and the Surveillance In A Manner Calculated to Limit the
                  Likelihood of Responses in Plaintiff's Favor .................... 21

            7.    Hartford Chose Not to Obtain and Independent Medical Review to
                  Avoid A Finding In Support of Plaintiff's Disability .............. 23

            8.    The "Red Flags" Are Nothing More Than Red Herrings ............. 23

B.      HARTFORD HAD NO REASONABLE BASIS TO TERMINATE
        PLAINTIFF'S BENEFITS ........................................... 28

V.      HARTFORD IS NOT ENTITLED TO JUDGMENT ON PLAINTIFF'S
        CLAIM FOR PUNITIVE DAMAGES ................................ 33

VI.     HARTFORD IS NOT ENTITLED TO JUDGMENT ON PLAINTIFF'S
        TORTIOUS INTERFERENCE CLAIM .............................. 35

        A.      HARTFORD WAS NOT A PARTY TO PLAINTIFF'S INSURANCE
                CONTRACT ................................................. 35

        B.      PLAINTIFF'S CLAIM IS NOT TIME BARRED ..................... 36

VII.    HARTFORD IS NOT ENTITLED TO SUMMARY JUDGMENT ON
        PLAINTIFF'S CUTPA CLAIM ..................................... 37

        A.      PLAINTIFF'S CLAIM IS NOT TIME BARRED ..................... 37

        B.      PLAINTIFF HAS SUFFERED ASCERTAINABLE LOSS ............... 37

VIII.   HARTFORD IS NOT ENTITLED TO JUDGMENT ON PLAINTIFF'S
        CUIPA ALLEGATIONS ........................................... 39

IX.     CONCLUSION ................................................. 40

## I.  __INTRODUCTION__

Before discovery is completed, Hartford Life and Accident Insurance Company

("Hartford") claims there is no evidence to submit plaintiff's bad faith, punitive damages,

tortious interference and CUTPA claims to a jury.  Hartford does not want a jury to hear that

plaintiff's insurer transferred over $1 million dollars to Hartford to administer and pay plaintiff's

disability benefits.  Hartford does not want a jury to hear that, in order to justify terminating

plaintiff's benefits, Hartford, purporting to act as an administrator on behalf of plaintiff's insurer:

- utterly disregarded four years of objective evidence that plaintiff was totally and
  permanently disabled, which included the conclusions of an Independent Medical
  Examination ("IME"), three Independent Medical Reviewers ("IME"), no less than four
  other physicians, and plaintiff's own insurer;

- subjected plaintiff to four days of covert surveillance, after which its non-medical
  personnel, who admittedly had no knowledge of how the surveillance related to plaintiff's
  ability to perform the material and substantial duties of her profession, decided that they
  would terminate plaintiff's benefits, and thereafter;

- subjected plaintiff to a 3 ½ hour interrogation under false pretenses, in the hopes of
  "catching" plaintiff in a lie;

- misrepresented the duties of plaintiff's occupation to an IME physician, claiming that
  plaintiff's occupation as a physician did not include performing any of the regular
  procedures that a physician normally performs; and

- distributed the misleading IME conclusions, along with a "summary of the results" of
  another examination that was never performed, and that Hartford knew had not been
  performed, to plaintiff's physicians and to its own contracted physician to serve as a basis
  for their conclusions regarding plaintiff's disability.

Hartford does not want a jury to draw the inference that Hartford took these actions so that it

could keep the disability benefits of a totally disabled woman, for itself.  The evidence of

Hartford's bad faith investigation and benefit termination, and the inferences to be drawn

therefrom are, at minimum, disputed.  Accordingly, the Court should deny Hartford's motion.

## II.    **FACTUAL BACKGROUND**

Beginning in 1994, plaintiff, a physician, purchased disability insurance from Educators through the American College of Physicians. (Def. Ex. A(3).)  The policy provided that plaintiff would be entitled to long term disability benefits if, among other things, plaintiff became unable to perform the material and substantial duties of her occupation as it existed at the time disability began.  (Id., p.5.)  Plaintiff applied for long term disability benefits on October 11, 1995, as the result of injuries to her neck and back following a ski accident.  (Def. Ex. A(4); & Pl. Ex. A at H2001)  At the time of her application, plaintiff resided in Florida and, in performing her occupation as a physicians accepted two part-time jobs with affiliates of the hospital.  (Def. Exs. B(3), B(4).)[1]

Educators accepted plaintiff's disability claim in May 1996. (Pl. Ex. B.) Pursuant to the policy, plaintiff was entitled to $7,000 per month, with an annual Cost of Living Adjustment.  Id. After Educators accepted plaintiff's claim, Educators required plaintiff to continually furnish "objective, clinical evidence of an ongoing disabling condition" as a precondition to continuing her benefits.  (Pl. Ex. G.)  By 1999, the file was voluminous and included MRI (Pl. Ex. H),

---

[1]  Plaintiff's first job required her to work as an internal medicine physician in a private practice, which included providing on-call physician coverage during all hours; providing continuity of patient care in the event of hospitalization, including providing urgent/emergent care; performing complete physical examinations; performing various invasive medical procedures; attending professional conventions and seminars; performing any other duties commensurate with professional services normally and customarily rendered by an internal medicine physician; and being available to perform her professional services, whether at the office or at hospitals (when making rounds), for a minimum of 16 hours per week.  (Def. Ex. B(3) at Exhibit A, thereto, ¶¶ 1, 2, 5, 9, 13, 15, 20, 21; See also, Pl. Ex. A at H2003.) Plaintiff's second job required plaintiff to work approximately 30 hours per week to assist in the creation of a women's health clinic, to manage the clinic, and to recruit, supervise and train personnel in the clinic, as well as to participate in on-site visits to successful women's health centers, to market and fund-raise, and to train other physicians and nurses.  (Def. Ex. B(4), p.1 & Exhibit A, thereto, ¶¶ 4, 13, 14, 16.)

2

Attending Physician Statements ("APS"),[2] Independent Medical Evaluations ("IME"),[3]

Independent Medical Reviews ("IMR"),[4] numerous reports from physicians with whom plaintiff

had consulted,[5] as well as copious internal notes showing that Educators carefully scrutinized all

of the information it had received.  (Pl. Ex. S.)  In sum, as Educators stated to plaintiff: "[i]n

review of your file, it is clearly documented that you have sustained functional limitations which

prevent you from performing the substantial requirements of your occupation." (Pl. Ex. T.)

In August, 1999, Educators and Hartford executed an agreement (the "Reinsurance

Agreement") whereby Educators agreed to transfer approximately $30 million dollars in reserves

to pay its open disability claims to Hartford in exchange for Hartford's agreement to administer

and pay these claims. (Def. Ex. B(1); Pl. Ex. C at 47-48, 211-212; Pl. Ex. D at 41-42.)  Over one

million dollars of this money was to pay plaintiff's disability benefits.   (Def. Ex. B(1), at EDUC

0149; Pl. Ex. E at 64; Pl. Ex. C at 218-219.)  However, if Hartford terminated plaintiff's

disability benefits, Hartford would be entitled to keep this money for its own use.  (Def. Ex. B(1),

--------

[2] See e.g. Def. Ex. A(31) (plaintiff has "severe limitation of functional capacity" and is totally disabled from her own job and from any other work.); Def. Ex. A(32) (concluding that plaintiff is only capable of sedentary activity.)

[3] See e.g., Pl. Ex. I (plaintiff's "objective findings do correlate with her subjective complaints. The patient is not able to return to her prior job as an internist. She does not have the cervical mobility or postural tolerance necessary to perform the primary job capacity in an uninterrupted basis . . . These restrictions are permanent")

[4] See e.g. Pl. Ex. J ("the appropriateness of an impairment determination . . . certainly appears to be documented."); ; See also Pl. Ex. K; Pl. Ex. L ("this case has been exhaustively reviewed with determinations in regards to attempts to corroborate appropriate findings from the subjective and objective concerns . . . Documentation for the clinical symptomology is correlated well by several physicians in regards to the objective findings.")

[5] See e.g. Pl. Ex. M at H2223, 2225 (the plaintiff "is not in any condition to do the type of work that she is trained to do."); Pls. Exs. N, O, P; Q, R.  As Educators' IMR indicated, and Hartford's claim analyst acknowledged, plaintiff supplied Educators with "extensive records . . . the patient has been evaluated by numerous orthopedic surgeons, neurosurgeons, and other physicians and specialists." Pl. Exs. K, E at 107.

3

§2.3; Pl. Ex. C at 218-219.)

On August 26, 2000, Hartford informed plaintiff that it would be administering her claim on behalf of Educators.  (Def. Ex. A(38).)  On November 17, 2000, Hartford terminated plaintiff's benefits, purportedly on Educators' behalf. (Def. Ex. A(30).)  Hartford claimed that, while the evidence submitted to Educators showed that plaintiff was disabled, the evidence submitted to Hartford showed that plaintiff was no longer disabled. (Id.)  As set forth herein, there is, at minimum, a disputed issue of fact as to whether Hartford's investigation and termination were in bad faith, and whether Hartford's conduct warrants punitive damages. Additionally, the evidence shows that Hartford was not a party to plaintiff's insurance contract and may be held liable for inducing Educators to breach that contract.  Finally, plaintiff's tortious interference claims and CUTPA claims are not barred by the statute of limitations, plaintiff has suffered ascertainable loss as required by CUTPA, and plaintiff's CUIPA allegations are properly part of her CUTPA claim.

## III.   STANDARD OF REVIEW

A party is not entitled to summary judgment where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that reasonable minds could differ as to the material facts or inferences to be drawn therefrom. Miner v. City of Glens Falls, 999 F.2d 655, 661 (2d Cir. 1993.)  In determining whether a genuine issue has been raised, all ambiguities must be resolved and all reasonable inferences be drawn against the moving party. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam).

IV.    **THERE IS, AT MINIMUM, A GENUINE ISSUE OF FACT AS TO WHETHER HARTFORD ACTED IN BAD FAITH**

Insurance companies have an "obligation to protect the interest of the insured." Mariscal v. Old Republic Ins. Co., 42 Cal.4th 1617, 1620 (1996). "The insurer has a duty to protect the insured's interests as if it were its own." Egan v. Mutual of Omaha Ins. Com., 24 Cal.3d 809, 818-820 (1979). "[A]n insured receives more for its premium than just the possibility that its claim will be covered when appropriate . . . the insurance contract brings the insured a certain peace of mind that the insurer will deal with it fairly and justly when a claim is made." Coventry v. American States Ins. Co., 961 P.2d 933 (Wis. 1998), citing, William Shernoff et al., Insurance Bad Faith Litigation § 3.04[5], at 3-26 (1991.) To deal fairly and justly, the insurer must conduct a neutral, detached investigation and exercise the same standard of care as if the insurer were exercising ordinary diligence in its own affairs. Stenger v. Provident Life & Accident Ins. Co., 121 F.Supp.2d 1238 (E.D.Wis. 2000). The insurer must not ignore evidence which supports coverage. Mariscal, at 1620.

An insurance company acts in bad faith where it (A) conducts a biased investigation of a claim, directed at obtaining information to justify terminating the claim; or (B) terminates a claim without a reasonable basis. See Hangarter v. The Paul Revere life Ins. Co., 2002 U.S.Dist. LEXIS 21870 (D.Cal. November 12, 2002) (attached); Uberti v. Lincoln Nat'l Life Ins. Co., 144 F.Supp.2d 90 (D.Conn. 2001). There is, at minimum, sufficient evidence from which a reasonable jury could conclude that Hartford conducted a biased investigation and terminated plaintiff's claim without a reasonable basis.

## A.    **HARTFORD CONDUCTED A BIASED INVESTIGATION**

In Hangarter, supra, the court identified a number of factors that indicate a biased investigation of a claim: (1) misrepresenting the nature of the investigatory proceedings; (2) lying in depositions or to the insured; (3) dishonestly selecting experts; (4) relying on unreasonable expert opinions; (5) failing to conduct a thorough investigation; (5) questioning the insured's initial eligibility; (6) questioning the attending physician's integrity; (7) using surveillance inappropriately; and (8) accusing the insured of fraud.  Every single one of these factors is present in this case.  From the first to the last, Hartford disregarded all of the substantial medical evidence, which unequivocally showed that plaintiff was totally and permanently disabled from performing her occupation as a physician, and set out to find a way to terminate her benefits.

### 1.    **Hartford Deliberately Set Out to Terminate Plaintiff's Benefits**

Before Hartford had obtained any of plaintiff's updated medical records,[6] before Hartford had conducted any medical review of plaintiff's existing records, having absolutely no evidence that refuted either Educators' eligibility or disability determination, and without identifying any claimed misrepresentation on plaintiff's part,[7] Hartford's "Special Investigation Unit" ("SIU") scheduled a meeting with a different insurance company, UNUM, in the hope of obtaining information to terminate plaintiff's benefits.  (Pl. Exs. U & V at 252-253, 268.)

---

[6]  As of April 4, 2000, the only additional medical report that Hartford had received was an updated Attending Physician Statement that confirmed plaintiff's disability.  (Def. Ex. A(8).) The first time that Hartford even requested updated medical records was April 4, 2000.  (Def. Exs. A(5), A(9).)

[7]  Mr. McGoldrick, the Director of SIU, conceded that there was no claimed misrepresentation when the SIU began its investigation in this case.  (Pl. Ex. V., at 268.) He also stated that the SIU should not, and does not regularly, accept a referral unless the claims analyst has reviewed the whole file and is clear about exactly what the potential fraud is based on the medical reports and policy language.  (Id., at 86, 232.)

The SIU had discovered two things: (1) the reserves associated with plaintiff's claim exceeded one million dollars, which it felt would justify allocating substantial resources to an SIU investigation (Pl. Ex. V at 96-98, 131; Pl. Ex. D at 147; Pl. Ex. W)[8]; and (2) UNUM, had denied plaintiff's claim for benefits in 1996 on the ground that she failed to meet UNUM's eligibility requirements.   (Pl. Ex. U, p.1; See also Pl. Exs NN & X, p.2.) The UNUM policy dictated that the claimant had to be working at least 24 hours per week prior to the date of disability, while the Educators' policy only required that the claimant work 20 hour per week prior to the disability.  (Id.)  UNUM had determined that plaintiff was not working the required 24 hours per week, but, SIU staff noted that there may be a "question as to whether plaintiff was working 16 hours or more" as required by her Educators' policy.  (Id.)

Hartford knew that Educators had "obtained a copy of the UNUM file" and was fully aware of the UNUM denial before it had even accepted plaintiff's claim. (Pl. Ex. S at 2021-2022, Pl. Exs. Y, D at 140-141.)   However, faced with irrefutable evidence that plaintiff was disabled, Hartford decided to reinvestigate Educators' four year old eligibility determination.  (Pl. Ex. U.)[9] Hartford's disregard of the substantial evidence of plaintiff's disability, and Educators' conclusion that plaintiff was eligible for benefits, in favor of retrospectively arguing the possible existence of a technical defect in plaintiff's claim, "descends to bad faith." See Hines v. UNUM,

_____

[8] The average reserve release associated with a claim terminated by the SIU is only about $105,000.  (Pl. Ex. V at 300-301.)  The Director of the SIU was formerly a member of Hartford's "Financial Controls" unit and has a "dotted line reporting relationship" with that department.  (Id., at 169, 312.)

[9] This investigation apparently lead to a dead end when Hartford learned at the meeting that UNUM had made a lump sum settlement of plaintiff's disability claim. (Pl. Ex. D at 142.)

110 F.Supp.2d 458, 466 (W.D.Va. 2000.)[10]

### 2. Hartford Had No Reasonable Basis to Conduct Surveillance and Did So For the Sole Purpose of Generating a Basis to Terminate Plaintiff's Benefits

After UNUM failed to provide Hartford with evidence to justify terminating plaintiff's benefits, Hartford immediately ordered covert surveillance in hopes of finding a basis to terminate plaintiff's benefits. (Pl. Ex. U, p.1); See Marziale v. Hartford Life & Accident Ins. Co., 2002 U.S.Dist.LEXIS 11321 (E.D.La. June 20, 2002) (attached.); Hines, 110 F.Supp.2d at 469 (insurer jumped to secretly videotape insured where medical evidence supported disability - this established bad faith.) The order for surveillance was directly contrary to Hartford's protocols, which provide that surveillance should be used "if the claimant's activities appear to be inconsistent with his/her limitations and restrictions and medical condition, or of there is a suspicion that the claimant is working . . . surveillance should be conducted only if there are no other means to confirm the claimant's activities, and **only after conducting an appropriate pre-surveillance investigation.**" (Def. Ex. C(1), p.6.) (emphasis added.); See also, Id., at 8 (SIU referral is premature where additional medical information needs to be developed.)

At the time Hartford ordered surveillance, Hartford had barely even begun a pre-surveillance investigation. Hartford had received plaintiff's APS and a single report from one of plaintiff's physicians, both of which were consistent with plaintiff's previous medical records and confirmed plaintiff's disability. (Def. Exs. A(7); A(13).) According to Ms. Wilk, *as of June 19, 2000,* which was over two months <u>after</u> the SIU ordered surveillance, Hartford still did not

---

[10] Hartford has attempted to conceal this meeting. None of the participants recorded the meeting in the SIU log, as practice and procedure dictates. (Pl. Ex. U; Pl. Ex. V at 90, 92-94; Pl. Ex. D at 142-143.) Hartford conveniently fails to mention the meeting in its motion for summary judgment.

even fully understand plaintiff's medical reports, restrictions and limitations and was still collecting the information that was necessary to process the claim. (Pl. Ex. E at 132-138.)

Further, while Hartford's employees uniformly acknowledge that the purpose of claim adjudication must be to determine whether plaintiff is able to perform the material and substantial duties of her occupation (Pl. Ex. C at 125; Pl. Ex. GG at 41-42) at the time the SIU conducted and reviewed the surveillance, it had no knowledge of the functionality required for plaintiff to perform her occupation (Pl. Ex. V at 104.) The SIU's only focus in conducting and reviewing the surveillance was to capture plaintiff performing activities that appeared inconsistent with the limitations she reported in her Personal Profile Evaluation. (Pl. Ex. D at 156; Pl. Ex. C at 207-211; Pl. Ex. HH at 120, 123; Pl. Ex. V at 104-106.)

The SIU initially ordered two days of surveillance. (Pl. Ex. U at H3619-3620.) The investigator monitored plaintiff's activities for 9 hours on each day, and basically observed plaintiff driving her children to and from school. (Pl. Ex.JJ; Def. Ex. A(14).) The SIU then ordered yet more surveillance. (Pl. Ex. U at H3619-3620.) Over the next two days of surveillance, the investigator monitored plaintiff for 19 hours, during which he observed plaintiff driving her car and attending a graduation party at her children's school for 1 ½ hours in which she alternately walked, sat, talked and danced with her daughter for approximately 10 minutes, stopping midway to rub her back and neck and to stretch her back. (Pl. Exs. KK; Def. Ex. A(14).) The investigator provided Hartford with approximately 1 ½ hours of incomplete video tape taken over the course of 37 hours of surveillance on four separate days. (Pl. Exs. JJ, KK &

V at 77; D at 252; Def. Ex. A(14).)[11]

The activity depicted in the surveillance video was consistent with plaintiff's medical reports and her representations to Hartford. The IME in Hartford's files stated that plaintiff could perform all of the activities that Hartford claims were depicted in the video, and concluded that plaintiff was disabled from performing her occupation. (Pl. Ex. I.) The IME stated that plaintiff could sit, stand, and walk interruptedly for a maximum of 4 hours in an 8 hour day; lift between 10 and 20 pounds occasionally; use her hands to grasp, pull, push and manipulate objects; use both feet for repetitive movements; bend and squat frequently; crawl, climb and reach above shoulder level occasionally and was unrestricted in her ability to drive a car. (Id., at 2311D.) The IME concluded that plaintiff's "objective findings do correlate with her subjective complaints. The patient is not able to return to her prior job as an internist. She does not have the cervical mobility or postural tolerance necessary to perform the primary job capacity **in an uninterrupted basis . . . These restrictions are permanent.**" (Id., at H2311A-2311B.) (emphasis added.)[12]

Similarly, plaintiff had informed Hartford that she drove her children to and from school and to other activities, and that she walked, swam, did yoga and light grocery shopping, made dinners, did laundry, and performed all of her daily activities, but that they caused her pain. (Def. Ex. A(7), ¶ 3; Def. Ex. A(12), ¶ 3.) (Even Hartford's IME physician subsequently noted that "nothing in video tape to refute the e/o that this pt [patient] made regarding her functional

---

[11] As revealed by the time recorder, the video of the party on June 20, 2000 omits the periods in which plaintiff was inactive, so that it appears that plaintiff's level of activity was more continuous than it actually was. (Def. Ex. A(14).)

[12] Educators had reviewed and affirmed this IME as "very thorough" before it transferred the file to Hartford. (Pl. Ex. S at 2106.)

limitations." (Pl. Ex. PP, at p.2.))

Nevertheless, true to form, Hartford claimed that plaintiff's activities were inconsistent with her stated limitations and medical reports so that it could justify yet further efforts to obtain information to justify terminating her benefits.  See Marziale, supra; See also Clausen v. Standard Ins. Co., 961 F.Supp. 1446 (D.Colo. 1997); (Pl.Ex. OO at 32-33, 43-44; Pl. Ex. V at 140.)  This is evidence of bad faith. Hines, 110 F.Supp.2d at 469.

> **3.    Hartford Induced Plaintiff to Participate In An "Interview" Designed To Entrap Plaintiff By Misrepresenting The Purpose and Nature of the "Interview."**

Following the surveillance, Hartford scheduled an interrogation of plaintiff by two SIU operatives that was carefully scripted to induce plaintiff to sign a statement that appeared inconsistent with the activities in the video surveillance. (Pl. Exs. HH at 64 & V at 116 & U at H3622.)[13]  Plaintiff objected to Hartford's demand that plaintiff submit to an "examination" by non-medical personnel and specifically asked Ms. Wilk to clarify the purpose of the interview. (Pl. Ex. MM.)  Hartford responded by misrepresenting that the meeting was a "routine" and "informal" "interview" with a "field representative" to go over some "formatted questions." (Pl. Ex. MM; Def. Ex. A(5) at H2452); See Clausen, supra (characterization of post-surveillance meeting with investigator as "interview" is misleading.)  Hartford consciously decided not to disclose the true purpose of the interview in its response to plaintiff. (Pl. Ex. E at 165-168; Pl.

---

[13] Senior staff participated in two meetings to plan the interview: one on August 25, 2000 and one on September 6, 2000.  (Pl. Ex. HH at 62, 64 & V at 116 & U at H3622.) At the first meeting, at least from the perspective of the Director of SIU, "everyone was in total agreement that this [plaintiff's] claim was on the verge of being terminated" (Pl. Ex. SS; Pl. Ex. V at 280.) At this time, all of the medical evidence supported plaintiff's disability and the only "evidence" that purportedly supported termination was the surveillance video.

Ex. V at 151-153, 269-270.)

At the meeting, the two investigators questioned plaintiff for over three hours and fifteen minutes. (Pl. Ex. U, at H3623.) The investigators demanded that plaintiff answer questions that had no other purpose than to harass plaintiff.[14] Indeed, the investigators reported that they brought plaintiff to tears on three separate occasions; two time before they even confronted her with the surveillance and induced her to sign the statement, and, once again, during subsequent "questioning" regarding the surveillance. (Pl. Ex. U at H3623.)  During the "interview" the investigators elicited a statement from plaintiff that she attended live music concerts in North Hampton and that she did not dance at those concerts. (Def. Ex. A(20) at H25)  Plaintiff also stated that "I have been asked what duties and activities relative to my profession I unable [sic] to perform. It is all of them. I believe it is unethical and immoral to be on narcotics and practice medicine. My limitation is pain. I can't think and examine people while I am in pain and on narcotics." (Id.)

When the investigators informed plaintiff that she had been videotaped dancing at her daughter's school, plaintiff responded that she had combined alcohol with her prescribed narcotic medications, and that this had numbed her pain sufficiently to allow her to dance briefly with her daughter. (Def. Ex A) 21).  Plaintiff obviously could not combine alcohol and narcotics while practicing medicine.  (Pl. Ex. M at H2225; Pl. Ex. OO at 87-88; Pl. Ex. UU at 78-82, 95-96.) The video documents plaintiff taking pain medication and drinking alcohol. (Def. Ex. A(14).)

---

[14] For example the investigators asked plaintiff whether she had ever been "in business" with Dr. Walters, or whether she and Dr. Walters were friends. (Def. Ex.A(20) at H23.)  Hartford was well aware that plaintiff only saw Dr. Walters beginning in 1998 (Def. Ex. A(13)), has never claimed that plaintiff worked after she became disabled in 1995, and had no basis to believe that plaintiff had any personal relationship with Dr. Walters.

Hartford's efforts to induce plaintiff to unknowingly sign a statement that would appear inconsistent with the videotaped activities is yet another hallmark of a bad faith investigation. See e.g. Clausen, supra (where insurer conducted covert surveillance and then conducted an "interview" about the insured's activities without first informing the insured that it had surveilled her, and obtained a signed statement that appeared inconsistent with surveilled activity, the insurer was plainly attempting to prove the insured a "malingerer" and "catch" her in a lie.); Hangarter, at *26 (misrepresentation regarding the nature of investigatory proceeding is a factor showing bad faith.)[15]

### 4. Hartford Had No Reasonable Basis to Require an IME/FCE, Misrepresented the Reason for the IME/FCE, and Intentionally Tainted the Result of the IME/FCE

On July 11, 2000, after reviewing the surveillance, but before the above referenced "interview," Hartford demanded that plaintiff undergo an Independent Medical Examination ("IME") and Functional Capacities Evaluation ("FCE"). (Pl. Ex. U, at H3620; Def. Ex. A(15).)

#### a. Hartford Had No Reasonable Basis to Require an IME

Hartford protocol provides that an IME is appropriate to resolve conflicting medical opinions, either between the attending physician and the medical records; between the claimant's examining or treating physicians; or between the claimant's physician's and Hartford's medical staff, or where there is insufficient medical information from the attending physician. (Def. Ex.

---

[15] Hartford staff now claims that the purpose of the interview was to give plaintiff an opportunity to "explain" her videotaped activities - which it did not include in the letter purporting to "clarify the intent of our interview." (Def. Ex. A(5) at H2452; Pl. Ex. MM.) However, Hartford completely disregarded plaintiff's explanation, and focused exclusively on the purported inconsistency between the video tape and the statement it induced her to sign before informing her of the videotape. (Pl. Ex. C at 208-211; Pl. Ex. E at 215-217; Pl. Ex. HH at 123.)

C(1), p.2). Nurse Sterle acknowledged during his deposition that plaintiff's doctors were unanimous in their conclusions regarding plaintiff's injuries and that Hartford had received substantial clinical records, including from plaintiff's treating physician. (Pl. Ex.OO at 71-72, 185-186.) However, Kim Gabrielson, of the SIU, directed Nurse Sterle to schedule an IME on the ground that plaintiff's activities were inconsistent with her medical reports (Pl. Ex. OO at 32-33, 43-44, 158:20-24.)[16] This was not true. (Pl. Ex. I.)

Further, the record flatly contradicts Hartford's current claim that it required the IME because plaintiff's medical records were "based primarily on Plaintiff's self-reporting," (Def. Br., p.20.) Throughout the 3 ½ years that Educators paid plaintiff benefits, it continually demanded "objective, clinical evidence of an ongoing disabling condition" as a precondition to paying plaintiff's benefits. (Pl. Ex. G.)[17] Educators commissioned an IME and three IMRs specifically to establish whether there was objective evidence of plaintiff's disability. (Id.) The IME and all of the IMRs concluded that "the case has been exhaustively reviewed with determinations in regards to attempts to corroborate appropriate findings from the subjective and objective concerns . . . Documentation for the clinical symptomology is correlated well by several physicians in regards to the objective findings." (Pl. Ex. L, Pl. Exs. I, J, K). Further, Nurse

---

[16] The Director of SIU testified that the SIU is not typically involved in the decision to schedule an IME. (Pl. Ex. V at 263.) Ms. Grabrielson has denied that she made the decision, and testified that the claims department felt the IME was necessary. (Pl. Ex. D at 109.) Ms. Wilk, the claims examiner in charge of plaintiff's claim testified that she was not the one who decided to schedule an IME, and contended that she couldn't remember who made the decision. (Pl. Ex. E at 153.)

[17] By contrast to Educators, Hartford provides that "a denial letter must never contain a statement that we are denying a claim for benefits because 'the objective medical evidence contained in the file does not substantiate that you are totally disabled'" because "subjective complaints frequently contribute to an individual's functional status and we must also take these complaints into consideration when evaluating a claim for disability benefits." (Pl. Ex. VV(1).)

Sterle testified that, before the IME, Hartford, as well, had amassed substantial clinical (meaning objective) records that supported plaintiff's claims of injury and that the IME was not necessitated by the absence of clinical records. (Pl. Ex. OO at 27, 36, 69-71, 185-186.)[18]

### b.   Hartford Misrepresented the Purpose of the IME/FCE

Hartford misrepresented to plaintiff the reason for requiring the IME and FCE in response to plaintiff's inquiry and objection. (Pl. Ex. QQ.) In correspondence with plaintiff in July 2000, Hartford represented that it sought an IME/FCE "in order to *offer* any vocational rehabilitation benefits," to determine a "long-term case management plan," and "if there are any other benefit provision for which you may qualify." (Pl. Ex. RR.). These statements were patently false as shown by Hartford's admission during discovery in this action that (i) before Hartford had even received the IME/FCE report, "everyone was in total agreement that this [plaintiff's] claim was on the verge of being terminated" (Pl. Ex. V at 173-175, 277, 280; Pl. Ex. SS); and (ii) it sought the IME and FCE because, as a result of the surveillance video, it purportedly believed plaintiff had misrepresented her limitations. (Pl. Exs. V at 140 & OO at 43-44, 157-159.)

There is little basis, if any to dispute that, contrary to its representations to plaintiff at the time, Hartford scheduled the IME/FCE for one reason only - to obtain a medical opinion to justify terminating plaintiff's benefits - which it hoped to accomplish by providing the IME with

---

[18]   See e.g. Def. Ex. A(27) ("Review of the MRI does show a large disc bulge on the right side at L4-5 which would be consistent with her redicular complaint."); Pl. Ex. TT at HL091-092 ("recent lumbar MRI . . . reveals a rather prominent disc bulge at L4-5 eccentric to the right. There is also some central stenosis at this level . . . There is some darkening of the L3-4 and L4-5 discs."); Id., at HL116 ("An MRI of the lumbar spine done on 4/28/2000 shows dehydrated disk at L4-5. . . An MRI of the cervical spine done on the same date shows the appearance of an anterior cervical diskectomy and fusion at C6-7, a combination of osteophytes and protruding disk narrowing the subarachnoid space at C5-6."); Id., at HL124-125 ("There is evidence of a posterior annular tear.") Id., at HL073-74 ("A review of her cervical MRI films indicates C 5/6 spondylosis with a reduction in the canal size and a paucity of cerebrospinal fluid.")

the video surveillance, (Pl. Ex. U at H3620; Pl. Ex. OO, p.43-44, 157-159)[19] and by misstating the duties of plaintiff's occupation, and providing the IME physician with only selective medical records, as set forth below.  Hartford's misrepresentation regarding the purpose of the IME (i.e. the nature of investigatory proceeding) is further evidence of its bad faith.  Hangarter, at *26.

### c.    Hartford Intentionally Tainted the IME/FCE

An insurer exhibits bias when it schedules an IME with the purpose of disproving the claimant's disability and does not provide the IME with the claimant's job description. Hangarter, at *26-27.  In this case, Hartford did not simply omit plaintiff's job description, it falsely represented to the IME physician, Dr. Garg, that plaintiff's occupation consisted of 16 hours per week of office work with "no procedures or anything," "hardly any physical exertions," and thirty hours per week of administrative, purely sedentary work. (Pl. Ex. UU at pp.77, 84-85, 180-182, 188-189, 241-242, 262; Pl. Ex. E at 40); See FN 1, supra.[20]


These misrepresentations did, in fact, taint Dr. Garg's opinion.  In the IME, Dr. Garg

---

[19]    Hartford personnel specifically orchestrated the order of events to ensure that the IME would "hold off on their report" until after Hartford conducted the "interview" and provided the IME with the video surveillance and plaintiff's signed statement.  (Pl. Ex. U at H3620.)  In Clausen, supra, the Court held that the fact that the insurer even asked the IME physician to review the surveillance video - which could have provided no information relevant to the insured's abilities to perform her occupations, called into question the insurer's motives in seeking the IME and was probative of the conflict of interest to be considered.

[20]    Hartford provides that, for purposes of determining whether a claimant is totally disabled, the term "occupation" means "the occupation as it is recognized in the general workplace. It does not mean the specific job that an individual is performing for a specific employer or at a specific location" and that "an employee's essential duties are usually defined in his/her position description."  (Pl. Ex. VV(2), pp.1-3; Pl. Ex. E at 48.)  Hartford purportedly tries to give the claimant the "very best benefit of the doubt" in defining her occupation.  (Pl. Ex. C at 124.) In this case, however, Hartford not only recharacterized plaintiff's occupation based on her jobs, but mischaracterized her second job as "administrator," and misstated her essential duties.  (Pl. Ex. E at 44, 48; Pl. Ex. GG at 41-45.)

concluded that plaintiff "should be able to work as internist 16 hours a week and administrator

work in the Women's clinic 30 hours a week." (Def. Ex. A(22.)  Dr. Garg testified that she only

concluded that plaintiff could practice as an internist because Hartford had informed her that

plaintiff would not be required to work outside the office (i.e. being on call for acute

emergencies), and would not be required to perform any of the invasive medical procedures that

an internist regularly performs. (Pl. Ex. UU at 181-182, 188-189, 221, 241-242, 255-256.)

Further, in the absence of a position description, Dr. Garg simply, and erroneously, assumed that

the "administrator" position was sedentary.  (Id., at 84-85, 87.)  Dr. Garg testified that, both

**before and after reviewing the video surveillance, it was her opinion that plaintiff could not**

**perform the procedures normally required by an internal medicine physician.** (Pl. Ex. UU

at 190-191, 241-243, 263.)[21]

Dr. Garg's deposition also disclosed that Hartford neglected to provide Dr. Garg with the

medical records that most strongly supported plaintiff's disability, namely, the medical reviews

by Dr. Stern, the IME by Dr. Alshon, and Dr. Porfiri's medical records and APS. (Pl. Ex. PP &

UU at 90-91, 93, 99.)  Hartford protocol requires that staff obtain all medical records before

scheduling an IME and that they provide the IME physician these records to allow the physician

to "render a more accurate opinion of the individual's limitations." (Def. Ex. C(1), pp.2-3.) Dr.

Garg also testified that this information would be very important in her evaluation, but that

---

[21] This is not surprising because, as Dr. Garg recognized, narcotics, alone, affect a physician's
ability to work and make judgments, and alcohol should not be mixed with narcotics, which makes the
affect on judgment even worse. (Pl. Ex. UU at 78-82, 95-96; See also Pl. Ex. M ("the patient is in so
much discomfort that to do the demands of her occupation would likely require significant and possibly
narcotic medication, which again, would be contraindicated in her line of work."); Pl. Ex. OO at 87-88.)

Hartford did not provide it. (Pl. Ex. UU at 93.)[22] Hartford has also admitted that it would be

important for Dr. Garg to have had Dr. Porfiri's records. (Pl. Ex. D at 272, 274.).

Hartford's efforts to taint Dr. Garg's conclusions is conclusive evidence that Hartford's

investigation was biased and directed to the goal of terminating plaintiff's benefits. See e.g.

Hangarter, supra; Moore v. American United Life Ins. Co., 150 Cal.App.3d 610, 630, 197

Cal.Rptr. 878, 890 (Cal.Ct.App. 1984).

     **5.**     **Hartford Improperly Used Dr. Garg's IME and FCE When It Knew that Dr. Garg Had Not Performed an FCE Although She Represented That She Had Done So.**

The evidence shows that Hartford's bad faith with respect to the IME did not end with

tainting the IME. Hartford had contracted with Dr. Garg to perform both an IME and FCE, and

paid her for both examinations. (Pl. Ex. OO at 49, 51-52, 111-112, 113, 123-124, 126-127, 133,

137.) A "Functional Capacities Evaluation" is a term of art that refers to a specific series of tests

performed on an individual over a number of hours that is supposed to produce for the tester

limitations of strength, mobility and endurance. (Pl. Ex. WW at 55-56; Def. Ex. C(1), pp.6-7.)

The tester has guidelines to go by and references from the Department of Labor and extrapolates

from the testing an individuals restrictions and limitations and an individual's ability to perform

either a sedentary, light, medium or heavy occupation. (Id.) The test can take up to two to three

hours. (Id.)

Nurse Sterle, who scheduled the IME and FCE testified that the FCE was essential

because the issue Hartford was trying to resolve was plaintiff's level of functionality. (Pl. Ex.

---

     [22]  Dr. Garg listed Dr. Porfiri's records as having been reviewed, but did not have any notes regarding those records in her review, and testified that she took notes on all the records she reviewed and that she never received those records. (Pl. Ex. UU at 90-91, 165-166.)

OO at 120-124.) Nurse Sterle explained that patients with chronic pain have good days and bad days and that there was no way to know whether the surveillance had simply captured plaintiff on a good day - the FCE would be the only way to establish plaintiff's "middle line" functionality. (Pl. Ex. OO at 76-77, 122, 133, 181-182.) Hartford protocol also provides that an FCE is preferable where, as here, the claimant's disability is musculoskeletal and where, as Hartford now asserts (Def. Br., p.20), the patient's disability is subjective in nature. (Def. Ex. C(1), p.6.)

At Hartford's request, Dr. Garg's added a document to her report entitled "Functional Capacity Evaluation Summary," which purported to be a "summary of a Functional Capacities Evaluation done on August 14, 2000." (Def. Ex. A(22), A(23) at H3055.) However, Dr. Garg did not perform an FCE and Hartford knew that Dr. Garg did not perform an FCE. (Pl. Ex. UU at 88, 90, 153; Def. Ex. A(5) at 2450.) The FCE "Summary" that Dr. Garg provided to Hartford would clearly imply to any medical professional that the results contained therein were the result of a Functional Capacities Evaluation. (Pl. Ex. OO at 145, 148-149; Pl. Ex. WW at 56-57.)[23]

Nurse Sterle testified that, upon discovering that no FCE had been completed, Hartford should have, and regularly would have, immediately scheduled an FCE and questioned "what was going on with Dr. Garg." (Pl. Ex. OO at 140-142, 146-147.)[24] Instead, Hartford forwarded

---

[23]    Indeed, in deposition, Dr. Garg, herself thought that someone had conducted an FCE based on the FCE "summary" page, until she remembered that she was the one that was supposed to have done the FCE and that she did not perform an FCE. (Pl. Ex. UU at 149-150, 153.)

[24]    Nurse Sterle had specifically sought out a physician who could personally perform an FCE. (Pl. Ex. UU at 49) He had rejected two other potential physicians because they stated they could not personally perform the FCE, and Dr. Garg had represented she could personally perform an FCE. (Id., at 51-52, 55-56, 64-66, 179-180.) Dr. Garg admitted in deposition that she does not have the equipment to conduct an FCE and does not conduct FCEs. (Pl. Ex. UU at 154, 169.) Nurse Sterle left Hartford's employ before receiving a response to his request for the underlying FCE report. (Pl. Ex. OO at 132.) There was no doubt in Nurse Sterle's mind that the notes he left would have made clear to his replacement that Dr. Garg had agreed to perform an FCE and that an FCE was necessary, and the replacement nurse would not have been performing her job if she simply noted that no FCE was done and

19

the now suspect and misleading IME,[25] and the knowingly misleading "Summary of FCE" to plaintiff's physicians and to its contracted physician to serve as a basis for their opinion on plaintiff's functionality. (Def. Exs. A(26), A(29); Pl. Ex. WW at 55-57.) Hartford apparently never informed even its internal physician reviewer that Dr. Garg had not performed the FCE she purported to have completed. (Pl. Ex. WW at 63.) There is no evidence that Hartford informed its physician reviewer that the IME's conclusion that plaintiff could work as an internist was based on Hartford's improper qualifications of the requirements for plaintiff's occupation.

In Stenger, supra, the Court denied the insurer's motion for summary judgment on the insured's bad faith claim, holding that the insurer's reliance on two IME's that contradicted mounds of contrary medical evidence supporting disability, without subjecting the IME to reasonable analysis, was evidence of bad faith. Significantly, one of the IME physicians in Stenger based his opinion on the conclusion that the claimant, who was a physician, could perform "common tasks," while it was undisputed that a physician performs more than "common tasks." Id. Further, had the insurer conducted a good faith investigation, it would have discovered that neither of the IME physicians were aware that Dr. Stenger's duties included surgery Id.

Here, Hartford not only failed to critically review the IME, which contradicted all of the medical reports in its file, but it intentionally misled Dr. Garg about the duties of plaintiff's occupation, and then relied on Dr. Garg's IME when it knew that Dr. Garg's credibility was

---

did not immediately set up an FCE and question Dr. Garg. (Pl. Ex. OO at 139-142.)

[25] The IME did not indicate on its face that Dr. Garg's opinion that plaintiff could work as an internist was qualified by Hartford's misstatements that plaintiff would not be required to perform any procedures or attend patients in the hospital. (Def. Ex. A(23) at H3054.)

20

suspect because she had falsely represented that she performed and FCE and billed Hartford for

an FCE, and relied on the FCE "summary" even though it knew Dr. Garg had not performed an

FCE. The evidence of bad faith in this case is thus far greater than that in Stenger, supra.

> **6.    Hartford Sought Physician Responses to Dr. Garg's IME/FCE and the Surveillance In A Manner Calculated to Limit the Likelihood of Responses in Plaintiff's Favor**

Hartford protocol requires that, where an IME conflicts with an Attending Physician

Statement, the analyst must (a) forward a copy of the IME to the attending physician for review

and comment, and inform the claimant that it is doing so (Def. Ex. C(1), p.5.); (b) pursue a

response at least three times, allowing three to four weeks between follow ups, ensuring that the

claimant is kept apprised of the status of the request (Def. Ex. A(1), pp.20, 25); and (c) when the

information outstanding is necessary for a claim determination, the third attempt should include a

"30 day" notice of possible denial or termination. (Id.). The Director of Long Term Disability

has acknowledged that the physician responses were necessary to Hartford's claim determination.

(Pl. Ex. HH at 66-67; See also Pl. Ex. C at 203-204.)

Nevertheless, in a letter mailed on Friday October 13, 2000, Hartford demanded that the

physicians review and comment on the surveillance video, signed statement, IME and FCE

within fifteen days, stating that if it did not receive a response it would assume the physician had

no comment. (Def. Exs. A(5) at H2446 & A(26).) Hartford did not inform the physicians that it

intended to use a failure to comment as evidence in support of terminating plaintiff's benefits.

(Def. Ex. A(26); Def. Ex. A(30) at H2468-2469, ¶¶ 3, 5, 9, 15, & H2476-2477.) Hartford did not

inform plaintiff that it was requesting her physicians to respond to the IME and surveillance so

that plaintiff could follow up with the physicians and personally request them to respond. (Pl.

Ex. C at 187-188).

Dr. Magana, who was the only physician to respond, stated that, based on his review of the video, the (misleading) IME and (non-existent) FCE, plaintiff should be capable of "carrying out light duty work where she does no bending below the waist or lifting . . . Within these restrictions, she would seem capable of practicing medicine two days a week." (Def. Ex. A(28).) Thus, Dr. Magana stated that plaintiff could <u>not</u> perform the material and substantial duties of her "own occupation," but only that plaintiff could perform a modified occupation. (<u>See</u> <u>e.g.</u> Pl. Ex. M at H2224-2225 ("to perform work in internal medicine requires much bending, much change of position . . .") Further, Dr. Magana did <u>not</u> state that plaintiff could return to work on a full time basis. (<u>Id</u>.)[26]

On November 2, 2000, Hartford began the letter informing plaintiff that her benefits were being terminated, without any follow up with plaintiff's attending physician, Dr. Porfiri, whom Hartford believed would be most likely to refute the IME, as required by Hartford protocol. (Pl. Ex. U at H3629; Pl. Ex. HH at 75; Pl. Ex. XX.)  Hartford began drafting this letter one week <u>before</u> its contracted physician, Dr. Amato, even reviewed plaintiff's medical records.  (Pl. Ex. U at H3629; Def. Ex. A(29).) Hartford completely disregarded the medical records that it had received on November 2, 2002 showing that plaintiff had recently undergone a discogram, which is an extremely painful procedure, and that disclosed that plaintiff had an anular tear (objective evidence of plaintiff's reported limitations). (<u>Id</u>.; Pl. Ex. YY; Pl. Ex. WW at 82-85.) Hartford has failed to explain why it did not provide these records to Dr. Garg or to plaintiff's physicians for

---

[26]  Plaintiff would be entitled to residual disability benefits if she were capable of returning to work on less than a full-time basis.  (Def. Ex. A(3), p.5, ¶ 2.)