review prior to terminating plaintiff's benefits. One might expect that Hartford would have considered this updated information if its own interests had been on the line. Stenger, supra.

7. **Hartford Chose Not to Obtain an Independent Medical Review To Avoid A Critical Review of Its Improper Procedures and A Finding In Support of Plaintiff's Disability**

After sending the IME report and surveillance to plaintiff's physicians, Hartford's claim department sent plaintiff's medical records for an independent medical "paper" review. (Pl. Ex. XX.) However, the Director of SIU, Mr. McGoldrick objected to the independent review because "what if the paper review contradicts the IME?" (Pl. Ex. SS.) So, Hartford did not proceed with the independent review. (Pl. Ex. HH at 68, 72-73.)[27] An insurer's unwillingness to undertake additional investigation that might prove its IME wrong is not the type of "neutral detached" investigation required of an insurer and is further evidence of bad faith. Stenger, supra; See also Hangarter, at *33.

8. **The "Red Flags" Are Nothing More Than Red Herrings**

The Court should reject Hartford's argument that it is entitled to summary judgment because its blatant attempts to generate a basis to terminate plaintiff's benefits were reasonably based on "red flags" noted by Ms. Wilk. (Def. Br., pp.7-8, 15-19.) First, Hartford's internal notes, final report, and representations in its referrals to the Massachusetts Fraud Bureau and police department contradict Hartford's representation. (Pl. Ex. U, p.1; Pl. Ex. X, p.2; Pl. Ex. NN.) Second, the evidence shows that Ms. Wilk's "red flags" were clearly a pretense that only

---

[27] Hartford claims it did not proceed with the paper review because Dr. Magana said "maybe" plaintiff could work. (Pl. Ex. C at 202-203.) In fact, Dr. Magana opined that plaintiff could not perform the material and substantial duties of her occupation, but could only perform her occupation with material restrictions on her duties, and that she could do so for only two days per week. (Def. Ex. A(28).)

further establish that Hartford directed its investigation to finding a way to terminate plaintiff's benefits:[28]

- <u>Alleged Surveillance by Educators</u> (Def. Ex. A(10); <u>See also</u> Pl. Exs. CC & E at 98.): In fact, the Educators file that Ms. Wilk had reviewed revealed that Educators made a conscious decision <u>not</u> to conduct surveillance as a direct result of its independent physician's report being "VERY consistent in feeling ee [employee] is unable to work at present." (Pl. Ex. S at 2011; Pl. Ex. E at 41, 74, 77-78.)[29] Far from justifying a fraud investigation, or any other continuing review of the merits of plaintiff's claim, Educators' decision strongly supported plaintiff's disability claim. Not surprisingly, Hartford completely abandons this "red flag" in its Rule 56 Statement. <u>See</u> Def. Rule 56 Statment, ¶ 38.

- <u>Alleged Failure to Provide a Driver's License for Age Verification or Return Calls</u> (Def. Ex. A(10): In fact, Ms. Wilk has admitted that she planned to refer plaintiff's claim to SIU <u>before</u> she even requested plaintiff's driver's license, and that plaintiff did return her telephone calls within one week. (Pl. Ex. E at 103, 101; <u>See also</u> Def. Ex. A(5) at H2462 & 2464.) Moreover, it is not surprising that Ms. Wilk is unable to explain why plaintiff's alleged failure to provide her with age verification would be a "red flag" in this case. (Pl. Ex. E at 98-99.) Age verification is only "necessary to ensure that the correct Maximum Benefit Duration is applied." . (Def. Ex. A(1), p.19.) Plaintiff, however, was entitled to lifetime benefits - there was no

---

[28] Accusing the insured of fraud is a tactic regularly used in bad faith claim adjudications. Hangarter, at *33.

[29] Educators was going to "possibly consider an activities check depending on medical," and decided not to conduct surveillance because the independent medical reports established plaintiff's disability. (Pl. Ex. S at 2011.) In anticipation of the possibility of surveillance, Educators obtained a "pre-surveillance report" that merely confirmed plaintiff's residence and indicated that the area would be "conducive to surveillance." (<u>Id.</u>; <u>See also</u> Pl. Ex. BB at 2039; Pl. Ex. CC.)

"maximum benefit duration." (Pl. Ex. AA; Def. Ex. A(3), p.3, ¶ 1.)[30]

- Alleged Suspicion Regarding APS: Ms. Wilk's final basis for referring plaintiff's claim to SIU was that (a) plaintiff informed her that she was seeing Dr. Porfiri every six months, but the secretary at Dr. Porfiri's office allegedly stated that Dr. Porfiri had only seen plaintiff once, and that was in 1997; and (b) Dr. Porfiri lived in Florida and had worked with plaintiff in 1995. (Def. Ex. A(10).)

First, there is no dispute that Ms. Wilk planned to refer plaintiff's claim to SIU before the alleged conversations with plaintiff and Dr. Porfiri's office. (Def. Ex. A(5) at 2464.) Moreover, at the time of the alleged call, Ms. Wilk knew that the information she supposedly received from the unnamed secretary[31] was erroneous because the Educators' file, which Ms. Wilk had

---

[30] Ms. Wilk's demand for a copy of plaintiff's driver's license through three telephone calls on three consecutive days, rather than plaintiff's failure to provide an immediate response, is suspect. (Def. Ex. A(5) at H2462-2463; Def. Ex. A(11).) Hartford protocol directs analysts to pursue receipt of outstanding information three times, with the first time being in writing, and to allow the responding party three to four weeks between each follow up to provide the information. (Def. Ex. A(1), pp.20, 28.) The true purpose of Ms. Wilk's request was to obtain a current photograph of plaintiff so that SIU could conduct its covert investigation. Hartford protocols provide that "the acceptable form of age verification is a copy of a birth certificate, or baptismal record," and that a driver's license is only acceptable if accompanied by a second form of verification. (Def. Ex. A(1)- Age Verification.) When Ms. Wilk received plaintiff's passport, Ms. Wilk noted in her log: "Have received copy picture i.d/passport from clmt!!!!!!!!!!!!" and, within minutes, forwarded it to the SIU, which required a current photograph of plaintiff to initiate surveillance. (Def. Ex. A(5), at 2459.)

[31] Whether this conversation occurred at all is highly suspect. While Ms. Wilk noted even the most mundane fact that she had called Dr. Porfiri's office and received a busy signal, (Def. Ex. A(5) at H2462) Ms. Wilk failed to record this critical conversation in her log at the time it allegedly occurred, failed to identify the person with whom she was speaking, and failed to send a "written follow up to the doctor summarizing the details of the conversation and asking him/her if it is accurate," as required by Hartford protocol. (Def. Ex. A(1), p.19.) Further, Ms. Wilk represented in the SIU referral that she spoke first with Dr. Porfiri's office because plaintiff "has been having [Dr. Porfiri] complete her APS," and then called plaintiff as a follow up. (Def. Ex. A(10)) By contrast, Ms. Wilk's log indicates that she did not even know which physician was going to complete plaintiff's APS when she spoke to plaintiff. (Def. Ex. A(5) at H2463.) This is because, contrary to Ms. Wilk's representation in the SIU referral, Dr. Porfiri had not completed any of plaintiff's previous APS. (Def. Exs. A(31), A(32).)

25

reviewed, included numerous office notes of plaintiff's visits to Dr. Porfiri beginning in February 1995 (Pl. Exs. DD, EE at H3139, 3144, 3147), as well as a letter from Dr. Porfiri in 1997 in which Dr. Porfiri stated that she regularly treated plaintiff. (Pl. Ex. FF). Further, after the telephone call, Ms. Wilk received a signed APS from Dr. Porfiri, which confirmed that plaintiff continued to obtain treatment from her every "6 months by office visits and 2-3 months by phone." (Def. Ex. A(8)).[32]

It is Ms. Wilk's primary job responsibility to gather the medical records that would confirm plaintiff's representations regarding the frequency of her treatment and the extent of her disability. (Pl. Ex. E at 59-60; Def. Ex. A(1), p.19.) Yet, Ms. Wilk waited for over two months, until after she had referred plaintiff's claim to SIU, before she even requested copies of plaintiff's medical records from Dr. Porfiri and the other physicians that plaintiff had identified in her PPE. (Def. Ex. A(5) at 2462; Def. Ex. A(9).) Moreover, when she finally corresponded with Dr. Porfiri, Ms. Wilk made no mention of the alleged telephone call and did not request confirmation of the dates of treatment. (Id.)

Finally, Hartford's attempt to impugn the integrity of plaintiff's treating physician is a typical tactic in bad faith adjudication. Hangarter, at *33; Clausen, 961 F.Supp. at 1452 (insurer claimed treating physicians were biased to plaintiff's cause.) Plaintiff's submission of an APS from Dr. Porfiri was not a "red flag." Numerous other physicians, with whom plaintiff had no professional connection, including independent physicians hired by Educators, had also

---

[32] The Court should disregard Hartford's assertion that Dr. Porfiri "admitted" in deposition that the date of plaintiff's last visit on the APS "was likely in error." Def. Br., p.6, fn.34. Dr. Porfiri merely responded to counsel's question "is it possible that this is a typo" with, "It's possible." Def. Ex. B(8), p.145:20-21. More importantly, this alleged "admission" is after-the-fact and cannot support Hartford's claim that it reasonably suspected plaintiff's claim at the time it initiated its fraud investigation.

concluded that plaintiff was disabled. (See FN 2-5.) In her claimant questionnaire, alone, plaintiff identified four other physicians in the Massachusetts area, including Dr. Beverly Walters who had participated in an in-depth interview with Educators' independent physician in which she was "consistent in feeling ee [employee] is unable to work at present," which Educators personally confirmed in a subsequent telephone call to Dr. Walters. (Pl. Ex. S at 2010-2011; Pl. Ex. K; Def. Ex. A(8) at H3163.) Dr. Porfiri was the appropriate physician to complete the APS because, as Ms. Wilk knew, plaintiff lived in Florida and had treated with Dr. Porfiri since the onset of her disability in 1995. (Pl. Ex. A, pp.1, 2.)

There are, at minimum, genuine issues of fact as to whether Hartford actually and reasonably suspected that plaintiff's well documented claim of disability was fraudulent, and whether Hartford conducted a reasonable investigation of this alleged suspicion, that preclude summary judgment in Hartford's favor. "While an insurer may challenge claims which are fairly debatable, its belief in fair debatability is a question of fact to be determined by the jury." Zilisch v. State Farm Mutual Automobile Ins. Co., 194 Ariz. 34, 977 P.2d 134 (Ariz. 2000.) Further, "while fair debatability is a necessary condition to avoid a claim of bad faith, it is not always a sufficient condition. The appropriate inquiry is whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable." Id. (reversing summary judgment on bad faith claim because, even if claim was fairly debatable, insurer could be liable for bad faith in its investigation/evaluation.). The evidence set forth above shows that Hartford's investigation, evaluation, and processing of plaintiff's claim was unreasonable and knowingly unreasonable.

## B.  HARTFORD HAD NO REASONABLE BASIS TO TERMINATE PLAINTIFF'S BENEFITS

A claim administrator's termination of a previously accepted disability is unreasonable in the absence of evidence that the insured's condition has improved. Purnell v. UNUM Life Ins. Corp., C.A. No. 02-160-JJF (D.Del. April 17, 2003), citing, Thorpe v. Continental Casualty Co., 2002 U.S.Dist.LEXIS 24405, * 10 (E.D.Pa. July 17, 2002.)[33] In its termination letter, Hartford acknowledged that the evidence in Educators' file showed that plaintiff was totally disabled because she was unable to perform the material and substantial duties of her occupation. (Def. Ex. A(30), p.3.) Further, Hartford has admitted that nothing in any of the updated medical records that plaintiff provided to Hartford indicated that plaintiff was no longer disabled (Pl. Ex. GG at 59, 62-67) - all of the physicians that examined plaintiff were unanimous in their diagnosis of plaintiff's injuries. (Pl. Ex. OO at 27, 36, 69-71, 185-186.)[34] Accordingly, plaintiff was

---

[33] In ERISA cases such as Purnell and Thorpe, the court applies a standard similar to the bad faith standard that applies non-ERISA cases. An ERISA administrator's decision is "arbitrary and capricious if no reasonable basis exists for the decision." Levinson v. Reliance Standard Life Ins. Co., 245 F.3d 1321, 1325 (11th Cir. 2001). Similarly, an insurer or administrator in a non-ERISA case acts in bad faith if the insurer's conduct was "unreasonable," Cary v. United of Omaha Life Ins. Co., 98 P.2d 462, 464 (Colo. 2003), or is based on "unsupported determinations." Uberti v. Lincoln Nat'l Life Ins. Co., 144 F.Supp.2d 90 (D.Conn. 2001). Unlike in ERISA cases, however, Hartford's decision is not entitled to any deference.

[34] Hartford implies that it had reason to doubt plaintiff's disability when it received Dr. Walters' records and learned that plaintiff had seen Dr. Walters "only twice" and "had no interest in pursuing" the surgery discussed with Dr. Walters. Def. Br., p.8. First, Dr. Walter's report makes no such statement. (Def. Ex. A(13.) Second, Hartford knew, even before it received Dr. Walters records, that it was Dr. Walters' opinion that (1) plaintiff should not pursue continued treatment because plaintiff had already attempted numerous treatments with no relief, and (2) the prognosis for plaintiff even with surgery was unsure; that surgery could actually exacerbate plaintiff's disability; and that surgery included many risks, which she had discussed with plaintiff. (Pl. Ex. K at 2038-2039.) The report that Dr. Walters sent to Hartford stated that "patient indicated a complete understanding of these risks and will consider surgery. (Def. Ex. A(13) at H3184.) The court should also disregard Hartford's improper, selective quotation of Dr. Johnson's records. (Def. Br., p.20.) Not only has Hartford conveniently failed include Dr. Johnson's records in its motion, but Hartford has admitted that nothing in Dr. Johnson's records show that plaintiff was no longer disabled. (Pl. Ex. GG at 63.)

28

entitled to continue to receive her benefits. (Def. Exs. A(3), p.5 & A(30).)

Nevertheless, on November 2, 2000, Ms. Gabrielson of the SIU made the decision to terminate plaintiff's benefits. (Pl. Ex. U at H3629; Pl. Ex. E at 211; Pl. Ex. HH at 128-129; Def. Ex. A(5) at 2441-2443; Def. Ex. A(30); Def. Local Rule 56(a)(1) Stmt., ¶ 74.)[35] It is not the SIU's province to determine whether a claimant is entitled to benefits. (Pl. Ex. V at 257; Pl. Ex. C at 199-200.) Ms. Gabrielson, who was not a trained claims analyst, did not even have a clear understanding of the proper standard to apply to plaintiff's "own occupation" policy. (Pl. Ex.C at 156, 163-165; Pl. Ex. D at 195-197); Stenger (lack of knowledge of claims standards can be bad faith.) However, from the moment she took over the file, Ms. Gabrielson knew that terminating plaintiff's benefits would result in a profit to Hartford of over $1 million dollars. (Pl. Ex. D at 147-148; Pl. Ex. V at 96-97; Pl. Ex. W.)

Hartford's <u>self-generated</u> evidence, which it claimed supported terminating plaintiff's benefits, did not, and could not, establish that plaintiff was able to perform the material and substantial duties of her occupation:

• <u>Surveillance Video</u>: In <u>Marziale, supra</u>, the court held that Hartford's reliance on several days of surveillance and a post surveillance "interview" "in the face of starkly contradictory medical evidence, constitute[d] an abuse discretion" where the surveillance documented less than 2 hours of activity over a 48 hour period, there was nothing that suggested plaintiff was capable

---

[35] Ms. Gabrielson unequivocally denied that she made the decision to terminate plaintiff's benefits, just as she had denied making the decision to schedule the IME. (Pl. Ex. D at 188.). Ms. Wilk and her supervisor, however, testified that Ms. Gabrielson made the decision. (Pl. Ex. E at 211; Pl. Ex. HH at 128-129.) Ms. Mormino backed up Ms. Gabrielson, claiming that Ms. Wilk had made the decision, even if she didn't know it. (Pl. Ex. C at 157, 161.) In stark contrast to its previous representations to this court, Hartford now admits that Ms. Gabrielson did make the decision to terminate plaintiff's benefits. (Compare: Def. Local Rule 56(a)(1) Statement, ¶ 74 to Order dated June 27, 2003.)

of such activity on a sustained basis, or that the video documented anything other than a good day, and none of the sporadic activities conflicted with the diagnosis of plaintiff's physician that plaintiff could stand, walk and drive for one hour each day.[36]

In this case, Nurse Sterle, who reviewed plaintiff's medical records and file, as well as Ms. Laughran, the Director of Long Term Disability Claims, have acknowledged that the surveillance video was not sufficient to justify terminating plaintiff's benefits for the same reason explained in Marziale. (Pl. Ex. OO at 76-77, 92-95, 122-123, 133; Pl. Ex. HH at 65-66.) Indeed, both Dr. Garg and Dr. Magana maintained their opinion, after reviewing the surveillance, that plaintiff could not perform the regular duties of an internist. (Pl. Ex. UU at 241-243, 254-256; Def. Ex. A(28).) As in Marziale, none of the activities in the video conflicted with the IME that Educators' commissioned. (Pl. Ex. I at 2106.)

Further, as Marziale and Clausen both noted, Hartford's assertion that plaintiff made a statement to the investigators that was inconsistent with the video surveillance bears little if any relevance to whether the plaintiff is able to perform the material and substantial duties of her occupation. Indeed, to this day, no one at Hartford appears to have any idea how plaintiff's activities depicted in the surveillance have any relationship to her ability to perform her occupation. (Pl. Ex. V at 139; Pl. Ex. HH at 120; Pl. Ex. C at 209-211; Pl. Ex. E at 215.)

---

[36] See also Clausen, supra (holding that the surveillance video could not support the defendant's termination of benefits because it "documents one eight-hour period in Clausen's life . . . There is nothing in the record suggesting Clausen was capable of such activity on a sustained basis or that the video documented anything other than a good day or a special day . . ."); Grosz-Salomon v. Paul Revere Life Ins. Co., 1999 WL 33244979, at * 6 (C.D.Cal. Feb. 4, 1999) ("[R]elying on videotapes showing the plaintiff engaging in activities that are significantly less taxing than working . . . when all of the other objective evidence of treating physicians and therapists confirms that the plaintiff is totally disabled . . . is an abuse of discretion.")

- <u>IME/FCE</u>: Hartford could not reasonably rely on the IME to support that plaintiff was able to perform the material and substantial duties of an internist because Hartford requested that the physician determine whether plaintiff could work as an internist if she were <u>not</u> required to perform the material and substantial duties of that occupation. (Pl. Ex. UU at 180, 188-189, 254, 262); <u>Cary</u>, 98 P.2d 462, <u>supra</u> (biased IME where insurer failed to provide physicians with a proper job description could not support terminating benefits.); <u>See also Clausen, supra</u>. Hartford's reliance on the FCE "summary" was plainly unreasonable because it knew that Dr. Garg never performed an FCE. (<u>Id</u>. at 153; Def. Ex. A(5) at H2450.)[37]

- <u>Medical Review</u>: Hartford made the decision to terminate plaintiff's benefits before its physician review even looked at plaintiff's file. (Def. Ex. A(29).) Moreover, Hartford could not reasonably rely on the opinions of its contracted physician reviewer, Dr. Amato, and that of Dr. Magana, because they were based in large part on the tainted and misleading IME and on their erroneous assumption that the FCE summary actually reflected the results of a Functional Capacities Evaluation. (Pl. Ex. WW at 55-57; Def. Ex. A(29).)[38] Hartford also could not reasonably rely on these opinions given the great weight of medical evidence supporting plaintiff's disability, including plaintiff's APS. <u>Clausen</u> (opinion of IME insufficient to justify termination given the great weight of evidence that plaintiff was disabled as defined in the Plan.)

---

[37] Ms. Gabrielson relied heavily on Dr. Garg's IME and FCE in terminating plaintiff's benefits. (Pl. Ex. D at 231-232, 263; Pl. Ex. E at 146, 211; Pl. Ex. GG at 35-38; Def. Ex. A(5) at H2442-2443; Def. Ex. A(30) at pp.3, 10.)

[38] Hartford states that Dr. Magana "a neurosurgeon selected by Plaintiff opined that the evidence indicated Plaintiff should be able to work." (Def. Br., p.20.) Dr. Magana opined that plaintiff could work two days a week which, even if accepted, would entitle plaintiff to residual disability benefits. (Def. Ex A(28) & A(3).) Further, plaintiff did not "select" Dr. Magana, or any other physician to respond to the IME and surveillance - Hartford did not even inform plaintiff that it was sending this information to physicians for comment. (Pl. Ex. C at 187-188.)

- Prescriptions: Prior to terminating plaintiff's benefits, Hartford confirmed plaintiff's representation that she was taking narcotic pain medications. In the previous six months, plaintiff had purchased 600 tablets of ultram and 200 tablets of hydrocodeine, as she had represented. (P. Ex. ZZ; Def. Ex. A(5) at H2449 and 2442 ("The claimant is taking narcotic pain medication."))[39]

- Physician Failure to Comment: Finally, Hartford has conceded that other physician's failure to comment on the IME/FCE and surveillance is not unusual, does not indicate agreement with the IME/FCE, and thus could not support a conclusion that plaintiff was no longer disabled. (Pl. Ex. GG at 59, 67); Marziale (Hartford could not rely on physician's failure to comment on surveillance video); Hines, at 469 (treating physician refused to review video tape.) This is particularly true where, as here, plaintiff's treating physician has consistently reiterated her medical opinion that plaintiff is disabled. See Marziale, supra; (Def. Ex. A(8); Pl. Exs. FF & OO at 72.)

A jury could easily conclude that Hartford's decision was unreasonable and knowingly unreasonable. The evidence shows that Hartford improperly generated all of the evidence to support its termination. Hartford utterly disregarded four years of medical reports that unanimously documented plaintiff's inability to work as a physician in favor of 1 ½ hours of edited video surveillance, the opinions of Dr. Garg and Dr. Magana that plaintiff could work as a physician if she were not required to perform the procedures normally required of a physician,

---

[39] Hartford could have formally request that plaintiff identify every pharmacy where she filled a prescription for the last three years. (Def. Ex. A(1), p.11.) Instead, Hartford initially chose to canvass only a limited number of pharmacies, which was likely to, and did, provide incomplete information (Pl. Ex. ZZ at HL151-154) Hartford never informed plaintiff that it was seeking to confirm her pharmacy records and that this confirmation was necessary to its claim adjudication, as required by Hartford protocol. (Def. Ex. A(1), p.20.)

32

and the opinion of an internal medical review that was based on Dr. Garg's misleading IME and a "summary of a Functional Capacities Evaluation" that Hartford knew Dr. Garg had not performed. Under these circumstances, summary judgment in Hartford's favor is clearly not warranted. Hines, (granting plaintiff's motion for summary judgment on bad faith claim where Unum swept aside all of the medical evidence in support of the insured's disability in favor of nothing more than questionable test results and a videotape.); Zilisch, supra

## V. HARTFORD IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES

A jury could also reasonably conclude that Hartford acted with "bad motive or reckless disregard of, or indifference to, the plaintiff's rights." Uberti v. Lincoln Nat'l Life Ins. Co., 144 F.Supp.2d 90 (D.Conn. 2001.) As Hartford correctly points out, this case is not analogous to Uberti, where the insurer simply failed to make any investigation. Def. Br., pp.23-24. In this case, over the course of one year, Hartford

- subjected plaintiff to covert surveillance on four separate days when it had no reason to question plaintiff's disability and with no other purpose than to obtain evidence to terminate plaintiff's benefits;

- subjected plaintiff to a three hour interrogation under the pretense that it was an informal interview to go over "formatted questions," at a time when Hartford had already determined that it was going to terminate plaintiff's benefits.

- subjected plaintiff to a biased IME, based on the misrepresentation that Hartford was seeking to offer plaintiff *further* benefits, when Hartford had already determined that it was going to terminate plaintiff's benefits.

- misrepresented the duties of plaintiff's occupation and provided incomplete medical records to the IME in an effort to ensure that the IME would support terminating plaintiff's benefits.

- attempted to impugn plaintiff in the eyes of her physicians by sending them a tainted

IME, misleading FCE, video surveillance tapes and a purportedly inconsistent signed statement.[40]

- tried to induce plaintiff's physicians to opine that plaintiff was not disabled by sending them the misleading IME and the "summary of an FCE performed," although Hartford knew that Dr. Garg never performed the FCE upon which the summary was supposedly based; and

- terminated plaintiff's benefits in the face of volumes of medical evidence showing that plaintiff is totally disabled from performing her occupation as a physician, and cited the video tape that it admits could not justify terminating plaintiff's benefits, the tainted IME, the non-existent FCE, and the opinion of Dr. Magana that plaintiff could work two days a week with restriction, as support for the termination.

A reasonable jury could conclude, based on this evidence, in conjunction with Hartford's unique financial incentive to terminate plaintiff's benefits, contrasted with Educators' acceptance of plaintiff's claim for over three and half years, that Hartford intentionally set out to terminate plaintiff's benefits so that it could convert the $1 million dollars associated with plaintiff's claim. This conclusion would warrant punitive damages. See McKendry v. Paul Revere Life Ins. Co., CA No. 96-754 PHX PGR, p.4 (D.Ariz. March 31, 2000) (holding that the jury could reasonably conclude that "this was not merely a case in which defendants terminated the plaintiff's benefit based on apparently reputable, although conflicting, medical evidence [citation omitted], but was rather a case of reprehensible conduct over a period of years to terminate the plaintiff's benefits for any plausible reason regardless of the harm to the plaintiff in order to increase profits, and an attempt to conceal that conduct.") (attached)[41]; Hines, supra (holding that there was a "clear-cut

---

[40] The Director of SIU readily acknowledged that informing a physician that an insured is the subject of a fraud investigation "might cause an unfair taint to an opinion." (Pl. Ex. V at 291-292.)

[41] As in this case, McKendry, involved a "buy out" of open disability claims that gave the administrator a financial incentive to terminate claims. (Id., at pp.5-7.) As in McKendry Hartford's self-interest far exceeded that of a typical insurer. In a typical case, by terminating benefits, the insurer simply avoids further payment of benefits. In Hartford's case, terminating plaintiff's benefits resulted in the release of over $1 million dollars that Educators had paid Hartford to administer and pay plaintiff's claim. (Def. Ex. B(1).) In the ERISA context, the courts recognize that "[w]hen an insurance company both administers and pays out benefits 'its fiduciary role lies in perpetual conflict with its profit-making

34

case of self-dealing" where UNUM denied the claim based on nothing more than a series of tests, the probative value of which it knew might be questionable, and 20+ hours of surveillance that it also knew might have little bearing on the claimant's ability to function at her job.); Hangarter, at * 38-39 (affirming jury award of punitive damages where insurer used a biased medical examiner whom it failed to provide with plaintiff's job description and terminated benefits when the plaintiff was totally disabled.)

## VI. HARTFORD IS NOT ENTITLED TO JUDGMENT ON PLAINTIFF'S TORTIOUS INTERFERENCE CLAIM

### A. HARTFORD WAS NOT A PARTY TO PLAINTIFF'S INSURANCE CONTRACT

The question of whether Hartford became a party to plaintiff's insurance contract with Educators by virtue of the "Reinsurance Agreement" between Hartford and Educators is, at minimum, a disputed issue of fact. The Reinsurance Agreement, specifically provides that Hartford will not assume a contractual relationship with plaintiff, stating that it "shall not create any right or legal relation between the Reinsurer [Hartford] and the Claimant." (Def. Ex. B(1), § 2.2.) Prior to filing its recent challenges to plaintiff's tortious interference claim, Hartford consistently represented, including in discovery responses in this action, that it was merely administering plaintiff's claim on behalf of Educators. (Def. Exs. A(6), A(9), A(11), A(26), A(30), A(38)); Exhibits D & E to Plaintiff's Opposition to Motion to Dismiss, Nos. 21 & 22, incorporated by reference herein.) See also Authorities cited and discussed in Plaintiff's

---

role as a business,'" creating a presumption of conflict for which it is unnecessary to make any actual showing of self-dealing. Pinto v. Reliance Standard Life Ins., 214 F.3d 377, 384, 389 (3d Cir. 2000.) Because of this presumption of conflict, the courts apply a stricter review and less deference to the insurance company's decision. Id., at 391-392. There is no reason that a jury should not also recognize this inherent conflict, as well, in its evaluation of plaintiff's claim. See e.g. McKendry, supra.

Memorandum of Law in Opposition to Educators' Motion for Summary Judgment, at pp.3-6 & 11-14, incorporated herein by reference.[42] Plaintiff is entitled to proceed to trial on the alternative theory that, if Hartford was not a party to plaintiff's contract with Educators, Hartford tortiously interfered with that contract. See e.g. Henry v. Daytop Village, Inc., 42 F.3d 89 (2nd Cir. 1994) (Cabranes, J.) (party is entitled, under federal rules, to plead alternative, and even inconsistent, legal theories and facts.)

### B. PLAINTIFF'S CLAIM IS NOT TIME BARRED

As set forth more fully in plaintiff's Opposition to Motion to Dismiss, incorporated by reference herein, plaintiff's tortious interference claim relates back to her prior pleading and is timely. See Plaintiff's Opposition to Motion to Dismiss, pp.10-11. The act or omission of which plaintiff complained in her first amended complaint and in her proposed second amended complaint, was Hartford's improper adjudication of plaintiff's claim, which ultimately lead to the improper termination of plaintiff's benefits on November 17, 2000. First Amended Complaint, ¶¶ 11-13, 17, 22-24, 29-31 ; Proposed Second Amended Complaint, ¶¶ ¶¶ 23, 39, 40, 41. Thus, the tortious interference claim arises out of the same conduct or transaction set forth in the First Amended Complaint. Even if it does not relate back, plaintiff filed the October 2003 proposed Second Amended Complaint within three years of the date of the last act or omission of which she complains. Collum v. Chapin, 40 Conn.App. 449, 452, 671 A.2d 1329 (1996) (tortious interference claim accrues on the date the third party terminates the contractual relationship with the plaintiff.)

---

[42] Nevertheless, Hartford may be held liable for the bad faith it exercised in administering plaintiff's benefit claim. See Cary, 68 P.2d at 463-464.

36

## VII. HARTFORD IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CUTPA CLAIM

### A. PLAINTIFF'S CLAIM IS NOT TIME BARRED

Hartford claims that the statute of limitations bars plaintiff's CUTPA claim because "the last time Hartford represented to Plaintiff that it was administering claims on behalf of Hartford [sic] was September 25, 2000." Def. Br., p.27. As a matter of undisputed fact, in its November 17, 2000 termination letter, Hartford reiterated its misrepresentation that it had investigated plaintiff' claim in its capacity as administrator for Educators, and that it was terminating plaintiff's benefits in that capacity. (Def. Ex. A(30), pp.1, 3; Pl. Ex. C at 170.) Pursuant to defendant's own authority, plaintiff's October 2003 proposed Second Amended Complaint was timely. Timmons v. City of Hartford, 2003 WL 22228989 (D.Conn.) (Sept. 16, 2003) (CUTPA claim accrued when the last act occurred - that being the date when defendant told plaintiff it would not be paid.) (Attached as Def. Ex. H.)

### B. PLAINTIFF HAS SUFFERED ASCERTAINABLE LOSS

In its motion, Hartford does not dispute that Educators improperly abdicated its responsibilities to over thirty disabled insureds, including plaintiff, when it transferred both the reserves to pay their claims, and the unhindered authority to terminate their claims, to Hartford. See Proposed Second Amended Complaint, ¶¶ 44-46; Pl. Oppos. Educ. Mtn., pp.5-10, 20-26. Hartford also does not dispute that, by doing so, Educators subjected plaintiff, as well as its other claimants, to the whims of a third party - Hartford - which had a significant financial incentive to terminate their benefits. Id. Hartford does not dispute that the defendants intentionally mischaracterized the agreement as one for "indemnity reinsurance" (Def. Ex. B(1), Recitals), and

37

misrepresented to the insureds that Hartford was merely a "service provider" with whom Educators had contracted to administer their disability claims (Def. Ex. A(38)) in order to avoid the regulatory oversight required for such an agreement, and to deprive the policyholder and insureds of the right to object to this agreement. See Proposed Second Amended Complaint, ¶¶ 44-46; Pl. Oppos. Educ. Mtn., pp.5-10, 20-26.

Rather, Hartford argues that this misconduct was not the "proximate cause" of any "ascertainable loss" to plaintiff. (Def. Br., pp.27-28.) This argument is without merit. Hartford caused plaintiff to suffer an ascertainable loss when it misrepresented that it was administering her claim on Educators' behalf in order to conceal that Educators had abdicated its responsibilities to her and to conceal Hartford's conflict of interest. Bridgestone/Firestone Tires Prod. Liab. Litig, 155 F.Supp.2d 1069, 1098 (S.D.Ind. 2001) (the loss in a consumer protection claim can arise solely from receiving something *different from*, rather than *less than*, what was represented to the plaintiff), citing, Hinchcliffe v. American Motors Corp., 184 Conn. 607, 612-619, 440 A.2d 810 (1981).[43] Hartford caused plaintiff to suffer an ascertainable loss when it subjected her to its self-interested adjudication and terminated her benefits so that it could convert the reserves that Educators transferred to Hartford to pay plaintiff's claim. Coventry, at 279, 282.(conduct that "damages the very protection or security which the insured sought to gain by buying insurance" causes the insured injury even where the denial of coverage is ultimately determined to be correct.)

---

[43] See also Bristol Technologies v. Microsoft Corp., 114 F.Supp.2d 59, 78 (D.Conn. 2000) (Hall, J.).

38

Moreover, this is precisely "of the same general nature as the foreseeable risk created by defendant's act." Def. Br., p.27, citing, Abrahams v. Young & Rubicam, Inc., 240 Conn. 300, 306-307 (1997). Connecticut subjects assumption agreements to review by the Insurance Commissioner specifically to ensure that they are "fair and equitable,"[44] that they would not "reduce the provision of service to policyholder", and that they require the assuming insurer to actually assume direct liability to the claimants for its actions and furnish the insureds with a certificate evidencing this assumption of liability, which Hartford did not do in this case. C.G.S. § 38a-66(b).[45] By is misrepresentations, Hartford avoided the regulatory oversight that is intended to protect insureds such as plaintiff from the precise conduct and harm that occurred in this case.

## VIII. HARTFORD IS NOT ENTITLED TO JUDGMENT ON PLAINTIFF'S CUIPA CLAIM

Plaintiff has properly asserted a claim under CUTPA, and incorporated the alleged violations of CUIPA as predicate to plaintiff's CUTPA count. Mead v. Burns, 199 Conn. 651, 663-66, 509 A.2d 11 (1986) (in the context of an insurance case, the plaintiff must assert a violation of CUIPA in order to state a violation of CUTPA.)

---

[44] While the Connecticut statute does not define "fair and equitable," other comparable state statutes specifically include "the plans of the assuming insurer in administering the claims," and whether the notice intended to be provided to the insureds is "fair, adequate and not misleading" as part of their review of the assumption agreement. See 14-109 Appleman § 109.3 & fns. 20. Connecticut has specifically identified misrepresentations about the true nature of an insurance policy, and misrepresentations to effect the assignment of an insurance policy or to avoid regulatory oversight, C.G.S. § 38a-816(1), (5), as unfair insurance practices. In this case, the agreement specifically required Hartford to make the misleading statement that it was administering the claims on behalf of Educators. (Def. Ex. B(1), § 2.1.2.)

[45] C.G.S. § 38a-66 applied to the agreement in this case because it was to be "performed in this state." C.G.S. § 38a-66(a)

## IX.     CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that the Court deny Hartford's Motion for Summary Judgment in its entirety.

                PLAINTIFF,

                CANDI MCCULLOCH

By_____
    Eliot B. Gersten,
    Fed. Bar No. ct05213
    GERSTEN & CLIFFORD
    214 Main Street
    Hartford, CT 06106
    EliotG@gersten-clifford.com
    (860)527-7044
    Her Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on the 22th day of December, 2003, a copy of the foregoing as mailed, postage prepaid to the following counsel of record via U.S. mail:

Roberta J. Sharp, Esq.
Barry A. Chasnoff, Esq.
Jessica Spangler Taylor, Esq.
Akin Gump Strauss Hauer & Feld, LLP
300 Covent Street, Suite 1500
San Antonio, TX 78205
Tel: (210) 281-7146
Fax: (210) 224-2035

Donald E. Frechette, Esq. (ct 08930)
Joshua L. Milrad, Esq. (ct 19321)
Charles F. Gfeller, Esq.
Edwards & Angell, LLP
90 State House Square
Hartford, CT 06103
Phone (860) 525-5065
Facsimile (860) 527-4198

_____
Eliot B. Gersten