UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CANDI McCULLOCH<br>Plaintiff, | : CIVIL ACTION NO. 301CV1115(AHN)<br>:<br>: |
| vs. | :<br>: |
| HARTFORD LIFE AND ACCIDENT<br>INSURANCE COMPANY AND EDUCATORS<br>MUTUAL LIFE INSURANCE COMPANY<br>Defendants. | :<br>:<br>:<br>: December 22, 2003 |

## PLAINTIFF'S LOCAL RULE 56(a)(2) STATEMENT

In accordance with Local Rule 56(a)(2), Plaintiff Candi McCulloch ("plaintiff") respectfully submits this Statement of Facts in Opposition to Hartford Life and Accident Insurance Company's ("Hartford") Motion for Summary Judgment:

Response to Hartford's Statement of Facts:

1. Admitted.

2. Admitted.

3. Admitted.

4. Admitted.

5. Admitted that the Policy requires the insured to provide timely written notice and proof of loss to the insurer. Plaintiff denies that "proof of loss" includes anything other than preprinted forms provided by the insurer or, if not provided by the insurer, other "written proof covering the occurrence, type and extent of such loss." (Def. Ex. A(3), p.11, "Form of Proof.") The language quoted is incomplete, inaccurate, and misleading. The Policy provides that: "In the case of claim for loss of time, written proof of such loss must be given to us within 30 day after the start

1

of the period for which we are liable. Later proofs of the continuance of this disability must be furnished to us at such intervals as we may reasonably require." (Def. Ex. A(3), p.10.) The insurer's "request for the forms must be valid and reasonable within the context of [the] claim investigation." (Def. Ex. A(1), p.3; Def. Ex. A(3), p.10.)

6. Admitted subject to the following: the term "examine" refers to a physical examination by trained medical personnel and only when "reasonably require[d]." (Def. Ex. A(3), p.11.)

7. Admitted, subject to the following: a claim is only "pending" prior to acceptance of liability. (Pl. Ex. V at 228-230)

8. Admitted.

9. Admitted subject to the following: the Policy requires the written agreement of the policyholder to any change (Def. Ex. A(3), p.13) and further provides that "if the group policy terminates and the American College of Physicians no long sponsors LTD benefits of any kind for its members, we will offer coverage to all members insured under this policy on the date of termination." (Id., p.8.) Additionally, Educators informed plaintiff and other claimants whose claims were the subject of the Reinsurance Agreement that the contract with Hartford "in no way affects your rights under your Certificate of Insurance. None of the provisions of your policy which affect the determination of your disability benefit amount or duration of payments have changed as a result of this transfer." (Def. Ex. A(38).)

10. Admitted.

11. Admitted.

12. Admitted.

2

13. Admitted subject to the following: (a) Plaintiff was a physician; (b) Plaintiff's employment with H.C.M.S. required plaintiff to work as an internal medicine physician in a private practice, which included providing on-call physician coverage during all hours; providing continuity of patient care in the event of hospitalization, including providing urgent/emergent care; performing complete physical examinations; performing various invasive medical procedures; attending professional conventions and seminars; performing any other duties commensurate with professional services normally and customarily rendered by an internal medicine physician; and being available to perform her professional services, whether at the office or at hospitals (when making rounds), for a minimum of 16 hours per week. (Def. Ex. B(3) at Exhibit A, thereto, ¶¶ 1, 2, 5, 9, 13, 15, 20, 21; See also, Pl. Ex. A at H2003); (c) Plaintiff's employment with the Phyllis Rothman Woman's Center required plaintiff to work approximately 30 hours per week to assist in the creation of a women's health clinic, to manage the clinic, and to recruit, supervise and train personnel in the clinic, as well as to participate in on-site visits to successful women's health centers, to market and fund-raise, and to train other physicians and nurses. (Def. Ex. B(4), p.1 & Exhibit A, thereto, ¶¶ 4, 13, 14, 16.)

14. Admitted.

15. Admitted.

16. Admitted.

17. Admitted that after April 1997 Educators was no longer writing professional association policies and that this prompted Educators to begin negotiations with Hartford to sell all of its open professional association disability claims. Denied that Educators actually sold its open professional association disability claims. (Def. Ex. B(1).)

18. Denied. As to the ceding of liability, the Agreement specifically states that it

3

"shall not create any right or legal relation between the Reinsurer and the Claimant on a Reinsured Claim, and the Company shall be and remain solely liable to the Claimant on the Reinsured Claim." (Def. Ex. B(1) Recitals.) As to the ceding of administration, the Agreement authorized Hartford to administer the claims, but provided that Hartford would do so as Educators' agent and reserved the right to Educators to require that any claim be paid on a basis determined by Educators. (Id., §§ 2.1.2, 2.1.4). The Agreement only authorized Hartford to "correspond with Claimants and issue payments directly to the Claimants in the Reinsurer's name," and "provided the Reinsurer discloses that it is acting as agent for the Company in the performance of such functions." (Id., § 2.1.2.) In the Agreement, the defendants acknowledged that Educators would remain liable for Hartford's conduct in the administration of Educators' claims, requiring Hartford to "indemnify, defend and hold Company harmless in connection with any Loss (including punitive, exemplary and other form of extra-contractual damages, fines, penalties and defense costs) incurred by the Company as a result of the Reinsurer's claims adjustment actions and determinations." (Id., § 2.1.3.) The defendants executed the Agreement on August 6, 1999 and August 10, 1999, not on July 1, 1999. (Id., p.22.)

Prior to filing its recent challenges to plaintiff's tortious interference claim, Hartford consistently represented, including in discovery responses in this action, that it was merely administering plaintiff's claim on behalf of Educators. (Def. Exs. A(6), A(9), A(11), A(26), A(30), A(38)); Exhibits D & E to Plaintiff's Opposition to Motion to Dismiss, Nos. 21 & 22, incorporated by reference herein.)

  19. Admitted.

  20. Admitted.

  21. Admitted that the August 1999 letter informed plaintiff and other claimants that

4

Educators had contracted with "a service provider segment of Hartford" to "administer" their disability claims. The letter further stated that "[t]his in no way affects your rights under your Certificate of Insurance. None of the provisions of your policy which affect the determination of your disability benefit amount or duration of payments have changed as a result of this transfer." (Def. Ex. A(38).) Denied that the August 1999 letter informed plaintiff and other claimants that Hartford would be "responsible" for their claims. (Id.)

22. Admitted that the letter advised plaintiff that Educators had contracted with Hartford to administer her disability claim and that Educators was paying plaintiff in advance through October 31, 1999. Denied that Educators informed plaintiff that it was doing so to accommodate "the transfer of her claim"; the letter stated that Educators would be doing so "to allow enough lead time for the new claims administrator to transfer all claim information to their system." Def. Ex. A(38.) Denied that the letter advised plaintiff that she "would thereafter receive her benefits from Hartford." The letter stated that "[t]he benefit payment for November 1999 will come directly from GRP near the end of November. Details regarding future payments will be sent to you from GRP prior to their first payment." (Id.)

23. Admitted that Hartford assigned plaintiff's claim to examiner Susan Wilk. Denied that Ms. Wilk's review was "routine." (See Plaintiff's Statement of Additional Undisputed Facts and Additional Inferences) The testimony cited does not support this statement.

24. Admitted.

25. Denied. On December 15, 1999, Ms. Wilk requested that plaintiff complete an authorization to obtain and release information and a claimant questionnaire, and that plaintiff request that her physician complete and return an Attending Physician Statement, and requested that

5

plaintiff return these documents within thirty days.

 26. Admitted subject to the following: On January 11, 2000, plaintiff called Ms. Wilk to inform her that, due to the holidays, she had been unable to complete the forms and they would be delayed. (Def. Ex. A(5) at H2464.) On January 28, 2000, plaintiff informed Ms. Wilk that she had sent the APS to her physician and that it should arrive shortly. (Id., at H2463.) Hartford received the completed APS on February 2, 2000. (Def. Ex. A(8).)

 27. Admitted, subject to the following: In her claimant questionnaire, plaintiff also stated that the severity of her pain "cycles" and that "I do as much as I can"; "I try to swim once a week and be involved with my children as much as possible. I try to do yoga daily." (Def. Ex. A(7).)

 28. Admitted.

 29. Admitted that Hartford's claim manual provides that "[h]aving the correct date of birth is necessary to ensure that the correct Maximum Benefit Duration is applied to the claim" (Def. Ex. A(1), p.19.) Hartford's claim manual also states that: "The acceptable form of age verification is a copy of a birth certificate, or baptismal record" but that "[t]wo secondary sources can be substituted for a birth certificate. Secondary sources could be a copy of the driver's license, employment records, hospital records, etc." (Id.)

 30. Admitted that Ms. Wilk noticed that plaintiff's date of birth was sometimes noted as 1958 and sometimes as 1959 and that Ms. Wilk left a message on plaintiff's answering machine requesting a copy of plaintiff's driver's license. Denied that Ms. Wilk requested plaintiff's driver's license "for purposes of age verification." Age verification is only "necessary to ensure that the correct Maximum Benefit Duration is applied." (Def. Ex. A(1), p.19.) Plaintiff, however, was entitled to lifetime benefits. (Pl. Ex. AA; Def. Ex. A(3), p.3, ¶ 1; Pl. Ex. AA.)

6

31.  Denied. Plaintiff responded to Ms. Wilk's request within one week. (Pl. Ex. E at 103, 101; See also Def. Ex. A(5) at H2462 & 2464.)

32.  Denied. Plaintiff sent the requested information to Ms. Wilk, although Ms. Wilk claimed that she did not receive it. (Def. Ex. A(5), at H2461.) Ms. Wilk waited until April 11, 2000, more than two months after her last request for plaintiff's driver's license, to inform plaintiff that she had not received plaintiff's driver's license. (Def. Ex. A(5) at H2462; Def. Ex. A(11).)

33.  Admitted.

34.  Admitted.

35.  Denied. Plaintiff disputes that anyone at Dr. Porfiri's office represented to Ms. Wilk that "they haven't seen her since 1997 and haven't seen her any other time" as stated in the activity log. (Def. Ex. A(5) at H2463.) Dr. Porfiri had seen plaintiff numerous times beginning in February 1995. (Pl. Exs. DD, EE at H3139, 3144, 3147; Pl. Ex. FF.) Ms. Wilk knew this at the time of the alleged conversation because the office notes and a letter from Dr. Porfiri, which documented these visits, were in the file that she reviewed. (Id.; Pl. Ex. E at 77-78).

Ms. Wilk has inconsistently reported the reason for, and timing of, the alleged telephone call. Ms. Wilk represented in the SIU referral that she spoke first with Dr. Porfiri's office because plaintiff "has been having [Dr. Porfiri] complete her APS," and then called plaintiff as a follow up. (Def. Ex. A(10).) Dr. Porfiri had not completed any of plaintiff's previous APS. (Def. Exs. A(31), A(32).) Ms. Wilk did not even know that Dr. Porfiri was going to complete plaintiff's APS when she made the call to plaintiff that she characterized in her SIU referral as a "follow up" to her call to Dr. Porfiri's office. (Def. Ex. A(5) at H2463.)

7

Ms. Wilk's record of the alleged conversation is also not contemporaneous. While Ms. Wilk noted even the most mundane fact that she had called Dr. Porfiri's office and received a busy signal, (Def. Ex. A(5) at H2462) Ms. Wilk failed to record this critical conversation in her log at the time it allegedly occurred, failed to identify the person with whom she was speaking, and failed to send a "written follow up to the doctor summarizing the details of the conversation and asking him/her if it is accurate," as required by Hartford protocol. (Def. Ex. A(1), p.19.)

It is Ms. Wilk's primary job responsibility to gather the medical records that would confirm plaintiff's representations regarding the frequency of her treatment and the extent of her disability. (Pl. Ex. E at 59-60; Def. Ex. A(1), p.19.) Yet, Ms. Wilk waited for over two months before she even requested copies of plaintiff's medical records from Dr. Porfiri and the other physicians that plaintiff had identified in her PPE. (Def. Ex. A(5) at 2462; Def. Ex. A(9).) When Ms. Wilk finally corresponded with Dr. Porfiri, Ms. Wilk made no mention of the alleged telephone call and did not request confirmation of the dates of treatment. (Id.)

Admitted that the APS stated that the date of plaintiff's last examination was November 18, 1999. Ms. Wilk received the APS that confirmed that plaintiff treated with Dr. Porfiri every six months after the alleged call to Dr. Porfiri's office. (Def. Ex. A(5) (telephone call allegedly made in January); A(8) (APS received in February).

36.  Admitted.

37.  Admitted, subject to the following: the claim manual does not provide that the investigative analyst should accept the referral in all cases. The manual provides that "[t]he local Investigative Analyst should review the file to ensure that the referral is appropriate." The manual further provides that a referral is premature if "additional medical information needs to be developed,

8

an IME needs to be considered, or additional non-medical information needs to be obtained and/or confirmed," in which case the file should be returned to the Examiner with recommendations for further claim handling." (Def.Ex. C(1), p.8.)

38. Denied. A "red flag" is a "signal that indicate[s] the potential existence of fraud." (Def. Ex. C(1), pp.7-8.) First, Plaintiff's alleged failure to provide a driver's license for age verification immediately upon Ms. Wilk's request was not a signal of potential fraud in plaintiff's case because plaintiff was entitled to life time benefits. See Paragraphs 29-32, supra, incorporated by reference herein. Hartford protocol directs analysts to pursue receipt of outstanding information three times, with the first time being in writing, and to allow the responding party three to four weeks between each follow up to provide the information. (Def. Ex. A(1), pp.20, 28.) Ms. Wilk demanded that plaintiff provide her driver's license via three telephone calls on three consecutive days and did not make any further requests for two months. (Def. Ex. A(5) at H2463-2464.) Ms. Wilk has been unable to explain why plaintiff's alleged failure to provide her with age verification within days of her request would be a "red flag," particularly in this case. (Pl. Ex. E at 98-99.)

Second, plaintiff's submission of an APS from an out-of-state physician was not an indiction of potential fraud. In her claimant questionnaire, plaintiff identified four other physicians in the Massachusetts area, including Dr. Beverly Walters who had participated in an in-depth interview with Educators' independent physician in which she was "consistent in feeling ee [employee] is unable to work at present," which Educators personally confirmed in a subsequent telephone call to Dr. Walters. (Pl. Ex. S at 2010-2011; Pl. Ex. K; Def. Ex. A(8) at H3163.) Further, numerous other physicians, with whom plaintiff had no professional connection, including independent physicians hired by Educators, had also concluded that plaintiff was disabled. (Def. Exs. A(31), A(32); Pl. Exs.

9

J-T.) As Ms. Wilk knew, plaintiff lived in Florida and had treated with Dr. Porfiri since the onset of her disability in 1995. (Pl. Ex. A, pp.1, 2.)

Third, plaintiff disputes that Ms. Wilk ever received the alleged inconsistent information from Dr. Porfiri's office staff. See, Paragraph 35, supra. Additionally, two months before Ms. Wilk referred plaintiff's claim to SIU, Ms. Wilk received Dr. Porfiri's APS, which confirmed that plaintiff treated with Dr. Porfiri every six months. (Def. Ex. A(5) (telephone call allegedly made in January); A(8) (APS received in February).)

Finally, Hartford protocol required that "if any red flags are noted, the file is to be immediately referred to an investigative analyst" and that a referral is premature where additional medical information needs to be developed or additional non-medical information needs to be obtained or clarified. (Def. Ex. C(1), p.8.) Ms. Wilk not only waited for two months after she had the information upon which the "red flags" were purportedly based to refer plaintiff's claim to the SIU, but, during that time, Ms. Wilk did not make attempt to obtain any updated medical documentation, to obtain plaintiff's driver's license, or to clarify the dates of Dr. Porfiri's treatment, as required by Hartford protocol. (Def. Ex. A(5) at H2462; Def. Ex. A(1), pp.19, 20, 28.)

39. Admitted, subject to the following: Ms. Wilk planned to refer plaintiff's claim to SIU before she even requested plaintiff's driver's license, before plaintiff informed her that she would be submitting an APS from Dr. Porfiri, and before her alleged questions regarding plaintiff's dates of treatment with Dr. Porfiri. (Def. Ex. A(5) at H2462-2464; Pl. Ex. E at at103, 101.) The SIU did not accept the referral on the basis of any of Ms. Wilk's "red flags." (Pl. Exs. U, X.)

40.  Admitted.

41.  Admitted.

42. Admitted, subject to the following: Plaintiff did not state that she "had to be careful in every activity she performed" but that she has to be "careful in activities." Plaintiff also stated that she undergoes physical therapy, does light grocery shopping and other errands, drives her children to and from school, attends yoga, performs light housekeeping duties, attends movies, goes on walks, and swims. (Def. Ex. A(12).)

43. Admitted that Ms. Wilk received medical records from Dr. Walters showing that plaintiff had consulted with Dr. Walters on September 21, 1998 and June 10, 1998 as a result of pain in her neck, upper back and shoulder blades. Denied that the medical records stated that Dr. Walters advised plaintiff to have surgery but plaintiff "had no interest in pursuing it." (Def. Ex. A(13).) Dr. Walters stated that "MRI of the cervical spine shows C5/C6 spondylosis, with a reduction in canal size and a paucity of cerebrospinal fluid . . . A full discussion of possible treatments for this lesion was carried out . . . Surgical treatment in the form of anterior cervical decompression and fusion was suggested . . . She was advised to consider surgery carefully. The risks of infection, bleeding, cardiac and pulmonary complications discussed . . . specific risks of injury to neural structures such as spinal cord (quadriparesis, quadriplegia), nerve roots (chronic pain, numbners, weakness) . . . The patient understands that surgery might not help or actually worsen the condition. The patient indicated a complete understanding of the risks and will consider surgery." (Def. Ex. A(13) at H3184.)

Hartford knew, even before it received Dr. Walters records, that it was Dr. Walters' opinion that (1) plaintiff should not pursue continued treatment because plaintiff had already attempted numerous treatments with no relief, and (2) the prognosis for plaintiff even with surgery was unsure; that surgery could actually exacerbate plaintiff's disability; and that surgery included many risks, which she had discussed with plaintiff. (Pl. Ex. K at 2038-2039.) The report that Dr. Walters sent

11

to Hartford reiterated these facts. (Def. Ex. A(13) at H3184.)

44. Admitted that the surveillance was scheduled and that, during the surveillance on May 22, 2000 and May 23, 2000, the investigator observed plaintiff performing normal driving maneuvers, drinking coffee, talking on a cell phone, reaching into the back of her vehicle, and entering her vehicle. Denied that plaintiff was in "no obvious discomfort." Plaintiff moved stiffly (Def. Ex. A(14).)

45. Admitted that Ms. Gabrielson scheduled more surveillance, which was conducted on June 20, 2000. Denied that this was "based on activities observed on May 22-23." Plaintiff's activities on May 22, 2000 and May 23, 2000 were consistent with her medical reports and her statements to Hartford. (Def. Exs. A(7), (12); Pl. Ex. I.)

46. Admitted.

47. Admitted.

48. Admitted.

49. Admitted subject to the following: Plaintiff also questioned Hartford's right to require an FCE. (Def. Ex. A(16); Pl. Ex. QQ.)

50. Admitted subject to the following: Nurse Sterle arranged for Dr. Garg to perform an IME and an FCE. (Pl. Ex. OO at 49, 51-52, 111-112, 113, 123-124, 126-127, 133, 137.) Hartford did not send Dr. Garg all of plaintiff's medical records. Hartford excluded the medical records that were most favorable to plaintiff including the previous IME commissioned by Educators, the three Independent Medical Reviews commissioned by Educators, and Dr. Porfiri's records and APS. See Plaintiff's Statement of Additional Undisputed Facts, ¶ 65.

51. Admitted.

12

52. Denied. The affidavit cited does not support the statement made.

53. Admitted that Ms. Wilk contacted plaintiff and induced plaintiff to participate in an interview with Mr. Moryto. Denied that the purpose of the interview was to positively identify plaintiff and provide her with an opportunity to explain the activities on the video. See Plaintiff's Statement of Additional Undisputed Facts, ¶¶ 37-47.

54. Admitted that plaintiff's signed statements included the quoted statements. Denied that plaintiff "specifically denied being able to dance." Plaintiff stated that she did not dance at the live music concerts that she attended in North Hampton. Def. Ex. A(20).) Plaintiff also stated that she has "good cycle[s]" and bad cycles and that, even when she was in a bad cycle, she still performs all of her daily activities, which included driving her children to school, doing errands, making dinner, doing laundry, and weeding in her garden. (Id.)

55. Denied. On September 8, 2000, plaintiff provided Mr. Moryto with the names of 3 additional physicians whom she had seen since her letter to Nurse Sterle on July 31, 2000. Plaintiff stated that she fills prescriptions for Ultram at CVS in Northampton; that, in the future, she would be filling prescriptions for Vicodin at that CVS, and that she thinks she had filled a prescription for Percocet at the Eckerts in West Palm Beach. (Def. Ex. A(20).)

56. Admitted.

57. Admitted.

58. Denied. Dr. Garg's IME stated "during interview she kept changing positions from sitting to standing, did not show any signs of facial expression about being in pain. She ambulated well, there was no limp. At the end of the examination she took Ultram." Def. Ex. 22. The notations that plaintiff changed positions during the interview and took pain medication after the interview

indicate that plaintiff was in pain. (Pl. Ex. UU, p.185, 236.)

59. Admitted.

60. Denied. See Plaintiff's Statement of Additional Undisputed Facts., ¶¶ 59-66.

61. Admitted.

62. Admitted.

63. Denied. Dr. Garg provided what purported to be a "summary of a Functional Capacities Evaluation done on August 14, 2000." Dr. Garg did not do a Functional Capacities Evaluation on plaintiff on August 14, 2000 or at any other time. (Pl. Ex. UU at 88, 90, 153.) And Hartford knew that Dr. Garg did not perform the FCE that her conclusions purported to summarize. (Def. Ex. A(5) at 2450.)

64. Admitted, subject to the following: Kim Gabrielson subsequently requested and obtained pharmacy records that confirmed that plaintiff was filling the prescriptions for her medications, as she had represented. (Pl. Ex. ZZ; Def. Ex. A(5) at H2449 and 2442 ("The claimant is taking narcotic pain medication.")) Hartford could have formally request that plaintiff identify every pharmacy where she filled a prescription for the last three years. (Def. Ex. A(1), p.11) Instead, Hartford chose to canvass only a limited number of pharmacies, which was likely to, and did, provide incomplete information. (Pl. Ex. ZZ at HL151-154.) Hartford never informed plaintiff that it was seeking to confirm her pharmacy records and that this confirmation was necessary to its claim adjudication, as required by Hartford protocol. (Def. Ex. A(1), p.20.)

65. Admitted.

66. Admitted, subject to the following: Plaintiff denies the inference that Hartford's claim procedures required Ms. Wilk to send either the IME or the FCE to plaintiff's physicians.

14

First, the IME did not contradict the opinion of plaintiff's primary care physician. See Plaintiff's Statement of Additional Undisputed Facts, ¶¶ 58-66. Second, Hartford knew that the IME was suspect because Dr. Garg had falsely represented that she would, and did, perform an FCE, and charged Hartford for performing an FCE that she never performed. (Pl. Ex. OO at 49, 51-52, 111-112, 113, 123-124, 126-127, 133, 137, 145, 148-149; Pl. Ex. WW at 56-57.) Under these circumstances, Hartford's practice and protocol mandated that Hartford immediately schedule an FCE and question Dr. Garg. (Pl. Ex. OO at 140-142, 146-147.) Instead, Hartford sent plaintiff's physicians both the suspect IME and copies of the misleading FCE Summary. (Def. Ex. A(5) at 2450; Def. Ex. A(26).)

67. Admitted. However, this fact is irrelevant. Ms. Huber, who reviewed the termination and letter and signed off on the termination testified that physicians commonly decline to comment and that this does not indicate agreement with an IME or indicate that plaintiff was no longer disabled. (Pl. Ex. GG at 59, 67.)

68. Admitted that Dr. Norris declined to comment. The cited exhibit does not state or support that Dr. Norris stated that "he had not seen Plaintiff for a long time." In any event, this fact is irrelevant. (Pl. Ex. GG at 59, 67.)

69. Admitted. However, this fact is irrelevant. (Pl. Ex. GG at 59, 67.)

70. Denied. Dr. Magana stated that plaintiff would be capable of carrying out "light duty work where she does not bending below the waist or lifting" and concluded that plaintiff would be "capable of practicing medicine two days a week." (Def. Ex. A(28).)

71. Admitted.

72. Admitted.

15

73.  Admitted, subject to the following: (a) Dr. Amato also reviewed, and relied upon, the FCE Summary, which he believed summarized the results of a Functional Capacities Evaluation. (Pl. Ex. WW at 56-57, 63.); and (b) plaintiff denies that the surveillance videos showed that plaintiff was able to stand for more than four hours, twist, dance, squat, bend and move her neck for an entire day without signs of fatigue or pain. (Def. Ex. A(14).) The investigator provided Hartford with approximately 1 ½ hours of incomplete video tape taken over the course of 37 hours of surveillance on four separate days. (Pl. Exs. JJ, KK & V at 77; D at 252; Def. Ex. A(14).) The only extended period of videotape, at the party on June 20, 2000, omits the periods in which plaintiff was inactive, so that it appears that plaintiff's level of activity was more continuous than it actually was. (Def. Ex. A(14).)

74.  Denied. See Plaintiff's Statement of Additional Undisputed Facts, ¶¶ 89-104, supra; Plaintiff's Statement of Disputed Inferences, ¶¶ 15, 19.

75.  Admitted.

76.  Admitted.

77.  Admitted.

78.  Admitted.

Additional Undisputed Facts:

Plaintiff submits the following additional undisputed facts in accordance with Local Rule 56(a)(2):

1.  Beginning in 1994, plaintiff, a physician, purchased disability insurance from Educators through the American College of Physicians. (Def. Ex. A(3).)

2.  Plaintiff applied for long term disability benefits on October 11, 1995, as the result

16

of injuries to her neck and back following a ski accident. (Def. Ex. A(4); & Pl. Ex. A at H2001) At the time of her application, plaintiff resided in Florida and held two jobs for the same employer. (Def. Exs. B(3), B(4).) Both jobs required plaintiff to act as a physician. (Id.)

3. Plaintiff's first job required her to work as an internal medicine physician in a private practice, which included providing on-call physician coverage during all hours; providing continuity of patient care in the event of hospitalization, including providing urgent/emergent care; performing complete physical examinations; performing various invasive medical procedures; attending professional conventions and seminars; performing any other duties commensurate with professional services normally and customarily rendered by an internal medicine physician; and being available to perform her professional services, whether at the office or at hospitals (when making rounds), for a minimum of 16 hours per week. (Def. Ex. B(3) at Exhibit A, thereto, ¶¶ 1, 2, 5, 9, 13, 15, 20, 21; See also, Pl. Ex. A at H2003.)

4. Plaintiff's second job required plaintiff to work approximately 30 hours per week to assist in the creation of a women's health clinic, to manage the clinic, and to recruit, supervise and train personnel in the clinic, as well as to participate in on-site visits to successful women's health centers, to market and fund-raise, and to train other physicians and nurses. (Def. Ex. B(4), p.1 & Exhibit A, thereto, ¶¶ 4, 13, 14, 16.)

5. Educators accepted plaintiff's disability claim in May 1996. (Pl. Ex. B.) Pursuant to the policy, plaintiff was entitled to $7,000 per month, with an annual Cost of Living Adjustment. Id.

6. After Educators accepted plaintiff's claim, Educators required plaintiff to continually furnish "objective, clinical evidence of an ongoing disabling condition" as a precondition to

17

continuing her benefits. (Pl. Ex. G.)

7. By 1999, plaintiff's file was voluminous and included MRI (Pl. Ex. H), Attending Physician Statements ("APS") (Def. Ex. A(31), A(32)), Independent Medical Evaluations ("IME") (Pl. Ex. I), Independent Medical Reviews ("IMR") (Pl.Exs. J-L), numerous reports from physicians with whom plaintiff had consulted (Pl. Ex. M-R), as well as copious internal notes showing that Educators carefully scrutinized all of the information it had received. (Pl. Ex. S.) Educators stated to plaintiff: "[i]n review of your file, it is clearly documented that you have sustained functional limitations which prevent you from performing the substantial requirements of your occupation." (Pl. Ex. T.)

8. In August, 1999, Educators and Hartford executed an agreement (the "Reinsurance Agreement") whereby Educators agreed to transfer approximately $30 million dollars in reserves to pay its open disability claims to Hartford in exchange for Hartford's agreement to administer and pay these claims. (Def. Ex. B(1); Pl. Ex. C at 47-48, 211-212; Pl. Ex. D at 41-42.) Over one million dollars of this money was to pay plaintiff's disability benefits. (Def. Ex. B(1), at EDUC 0149; Pl. Ex. E at 64; Pl. Ex. C at 218-219.)

9. Pursuant to the Reinsurance Agrement, if Hartford terminated plaintiff's disability benefits, Hartford would be entitled to keep this money for its own use. (Def. Ex. B(1), §2.3; Pl. Ex. C at 218-219.)

10. On August 26, 2000, Hartford informed plaintiff that it would be administering her claim on behalf of Educators. (Def. Ex. A(38.))

11. On April 4, 2000, Hartford's Special Investigation Unit ("SIU") began to investigate plaintiff's claim. (Pl. Ex. U.)

18

12.     The SIU should not, and does not regularly, accept a referral unless the claims analyst has reviewed the whole file and is clear about exactly what the potential fraud is based on the medical reports and policy language. (Id., at 86, 232.) There was no claimed misrepresentation when the SIU began its investigation in this case. (Pl. Ex. V., at 268.)

13.     As of April 4, 2000, the only additional medical report that Hartford had received was an updated Attending Physician Statement that confirmed plaintiff's disability. (Def. Ex. A(8).)

14.     From the moment it took over plaintiff's claim, the SIU was aware that reserves associated with plaintiff's claim exceeded one million dollars, which would justify allocating substantial resources to an SIU investigation. (Pl. Ex. V at 96-98, 131; Pl. Ex. D at 147; Pl. Ex. W) The average reserve release associated with a claim terminated by the SIU is only about $105,000. (Pl. Ex. V at 300-301.)

15.     The Director of the SIU was formerly a member of Hartford's "Financial Controls" unit and has a "dotted line reporting relationship" with that department. (Id., at 169, 312.)

16.     Before Hartford had obtained **any** of plaintiff's updated medical records, before Hartford had conducted **any** medical review of plaintiff's existing records, having absolutely **no** evidence that refuted either Educators' eligibility or disability determination, and without identifying any claimed misrepresentation on plaintiff's part, Hartford's "Special Investigation Unit" ("SIU") scheduled a meeting with a different insurance company, UNUM, in the hope of obtaining information to terminate plaintiff's benefits. (Pl. Exs. U & V at 252-253, 268.)

17.     The SIU had discovered that UNUM, had denied plaintiff's claim for benefits in 1996 on the ground that she failed to meet UNUM's eligibility requirements. (Pl. Ex. U, p.1; See also Pl. Ex. X, p.2.) The UNUM policy dictated that the claimant had to be working at least 24 hours