per week prior to the date of disability, while the Educators' policy only required that the claimant work 20 hour per week prior to the disability. (Id.) UNUM had determined that plaintiff was not working the required 24 hours per week, but, SIU staff noted that there may be a "question as to whether plaintiff was working 16 hours or more" as required by her Educators' policy. (Id.)

18.    Hartford knew that Educators had "obtained a copy of the UNUM file" and was fully aware of the UNUM denial before it had even accepted plaintiff's claim. (Pl. Ex. S at 2021-2022, Pl. Exs. Y, D at 140-141.)

19.    At the meeting with UNUM, Hartford learned at the meeting that UNUM had made a lump sum settlement of plaintiff's disability claim. (Pl. Ex. D at 142.) None of the participants recorded the meeting in the SIU log, as practice and procedure dictates. (Pl. Exs. U & V at 90, 92-94; Pl. Ex. D at 142-143.)

20.    After UNUM failed to provide Hartford with evidence to justify terminating plaintiff's benefits, Hartford ordered covert surveillance of plaintiff.

21.    Educators had made a conscious decision not to conduct surveillance as a direct result of its independent physician's report being "VERY consistent in feeling ee [employee] is unable to work at present." (Pl. Ex. S at 2011; Pl. Ex. E at 41, 74, 77-78.)

22.    The order for surveillance was directly contrary to Hartford's protocols, which provide that surveillance should be used "if the claimant's activities appear to be inconsistent with his/her limitations and restrictions and medical condition, or of there is a suspicion that the claimant is working . . . surveillance should be conducted only if there are no other means to confirm the claimant's activities, and only after conducting an appropriate pre-surveillance investigation." (Def. Ex. C(1), p.6.)

20

23.    There was no evidence, or claim, that plaintiff's activities were inconsistent with her limitations and restrictions and medical conditions and there was no suspicion that plaintiff was working.  (Def. Ex. A(5), A(10), Pl. Ex. U.)

24.    At the time Hartford ordered surveillance, Hartford had barely even begun a pre-surveillance investigation.  Hartford had received plaintiff's APS and a single report from one of plaintiff's physicians, both of which were consistent with plaintiff's previous medical records and confirmed plaintiff's disability.  (Def. Exs. A(7); A(13).)

25.    As of June 19, 2000, which was over two months after the SIU ordered surveillance, Hartford still did not even fully understand plaintiff's medical reports, restrictions and limitations and was still collecting the information that was necessary to process the claim.  (Pl. Ex. E at 132-138.)

26.    The purpose of claim adjudication must be to determine whether plaintiff is able to perform the material and substantial duties of her occupation. (Pl. Ex. C at 125; Pl. Ex. GG at 41-42.)  At the time the SIU conducted and reviewed the surveillance, it had no knowledge of the functionality required for plaintiff to perform her occupation. (Pl. Ex. V at 104.)

27.    The SIU's only focus in conducting and reviewing the surveillance was to capture plaintiff performing activities that appeared inconsistent with the limitations she reported in her Personal Profile Evaluation.  (Pl. Ex. D at 156; Pl. Ex. C at 207-211; Pl. Ex. HH at 120, 123; Pl. Ex. V at 104-106.)

28.    The SIU initially ordered two days of surveillance.  (Pl. Ex. U at H3619-3620.)  The investigator monitored plaintiff's activities for 9 hours on each day, and basically observed plaintiff driving her children to and from school. (Pl. Ex.JJ; Def. Ex. A(14).)  The SIU then ordered yet more

21

surveillance. (Pl. Ex. U at H3619-3620.) Over the next two days of surveillance, the investigator monitored plaintiff for 19 hours, during which he observed plaintiff driving her car and attending a graduation party at her children's school for 1 ½ hours in which she alternately walked, sat, talked and danced with her daughter for approximately 10 minutes, stopping midway to rub her back and neck and to stretch her back. (Pl. Exs. KK; Def. Ex. A(14).)

29.    The investigator provided Hartford with approximately 1 ½ hours of <u>incomplete</u> video tape taken over the course of 37 hours of surveillance on four separate days. (Pl. Exs. JJ, KK & V at 77; D at 252; Def. Ex. A(14).) The only extended period of continuous videotape, at the party on June 20, 2000, omits the periods in which plaintiff was inactive, so that it appears that plaintiff's level of activity was more continuous than it actually was. (Def. Ex. A(14).)

30.    The activity depicted in the surveillance video was consistent with plaintiff's medical reports and her representations to Hartford. (Pl. Ex. I; Def. Exs. A(7), A(12).)

31.    The IME in Hartford's files, which Educators had reviewed and affirmed as "very thorough" before it transferred the file to Hartford  (Pl. Ex. S at 2106),  found that plaintiff could perform all of the activities that Hartford claims were depicted in the video, and concluded that plaintiff was disabled from performing her occupation. (Pl. Ex. I.)

32.    The IME found that plaintiff could sit, stand, and walk interruptedly for a maximum of 4 hours in an 8 hour day; lift between 10 and 20 pounds occasionally; use her hands to grasp, pull, push and manipulate objects; use both feet for repetitive movements; bend and squat frequently; crawl, climb and reach above shoulder level occasionally and was unrestricted in her ability to drive a car. (<u>Id.</u>, at 2311D.)

33.    The IME concluded that plaintiff's "objective findings do correlate with her

22

subjective complaints. The patient is not able to return to her prior job as an internist. She does not have the cervical mobility or postural tolerance necessary to perform the primary job capacity in an uninterrupted basis . . . These restrictions are permanent." (Id., at H2311A-2311B.) (emphasis added.)

34.    Plaintiff had informed Hartford that she drove her children to and from school and to other activities, and that she walked, swam, did yoga and light grocery shopping, made dinners, did laundry, and performed all of her daily activities, but that they caused her pain. (Def. Ex. A(7), ¶ 3; Def. Ex. A(12), ¶ 3.)

35.    Hartford's IME physician subsequently noted that "nothing in video tape to refute the c/o that this pt [patient] made regarding her functional limitations." (Pl. Ex. PP, at p.2.))

36.    However, Ms. Gabrielson and Mr. McGoldrick claimed that plaintiff's activities were inconsistent with her stated limitations and medical reports to justify yet further efforts to obtain information to justify terminating her benefits. (Pl.Ex. OO at 32-33, 43-44; Pl. Ex. V at 140.)

37.    Following the surveillance, Hartford scheduled an interrogation of plaintiff by two SIU operatives that was carefully scripted to induce plaintiff to sign a statement that appeared inconsistent with the activities in the video surveillance.   Senior claims and SIU staff participated in a "round table" on August 25, 2000 to plan the interview.  (Pl. Exs. HH at 62, 64 & V at 116 & U at H3622.)  At the meeting, at least from the perspective of the Director of SIU, "everyone was in total agreement that this [plaintiff's] claim was on the verge of being terminated" (Pl. Ex. SS; Pl. Ex. V at 280.) None of the participants in this meeting recorded the meeting in the activity log, as required by standard practice and procedure.  (Def. Ex. A(5); Pl. Ex. U.)  Staff met yet again on September 6, 2000 to plan the "interview." (Pl. Ex. U, at H3622.)

23

38.    At this time, all of the medical evidence supported plaintiff's disability and the only "evidence" that purportedly supported termination was the surveillance video. (Pl. Ex. GG at 62-67.)

39.    In response to plaintiff's objections to Hartford's demand that plaintiff submit to an "examination" by non-medical personnel, Hartford misrepresented to plaintiff that the meeting was a "routine" and "informal" "interview" with a "field representative" to go over some "formatted questions." (Pl. Ex. MM; Def. Ex. A(5) at H2452)   Hartford consciously decided not to disclose the true purpose of the interview to plaintiff. (Pl. Ex. E at 165-168; Pl. Ex. V at 151-153, 269-270; Pl. Ex. U at H3622 [08/30/00 entry].)

40.    While Hartford staff now claims that the purpose of the interview was to give plaintiff an opportunity to "explain" her videotaped activities, Hartford did not state this in the letter purporting to "clarify the intent of our interview." (Def. Ex. A(5) at H2452; Pl. Ex. MM.)

41.    At the meeting, the two investigators questioned plaintiff for over three hours and fifteen minutes. (Pl. Ex. U, at H3623.)

42.    The investigators demanded that plaintiff answer questions that had no other purpose than to harass plaintiff. For example the investigators asked plaintiff whether she had ever been "in business" with Dr. Walters, or whether she and Dr. Walters were friends. (Def. Ex.A(20) at H23.) Hartford was well aware that plaintiff only saw Dr. Walters beginning in 1998 (Def. Ex. A(13)), has never claimed that plaintiff worked after she became disabled in 1995, and had no basis to believe that plaintiff had any personal relationship with Dr. Walters.

43.    The investigators reported that they brought plaintiff to tears on three separate occasions; two times before they even confronted her with the surveillance and induced her to sign the statement, and, once again, during subsequent "questioning" regarding the surveillance. (Pl. Ex.

24

U at H3623.)

44.    During the "interview" the investigators elicited a statement from plaintiff that she attended live music concerts in North Hampton and that she did not dance at those concerts. (Def. Ex. A(20) at H25) Plaintiff also stated that "I have been asked what duties and activities relative to my profession I unable [sic] to perform. It is all of them. I believe it is unethical and immoral to be on narcotics and practice medicine. My limitation is pain. I can't think and examine people while I am in pain and on narcotics." (Id.)

45.    When the investigators informed plaintiff that she had been videotaped dancing at her daughter's school, plaintiff informed them that she had combined alcohol with her prescribed narcotic medications, and that this had numbed her pain sufficiently to allow her to dance briefly with her daughter. (Def. Ex A) 21). The video documents plaintiff taking pain medication and drinking alcohol. (Def. Ex. A(14).)

46.    Plaintiff could not combine alcohol and narcotics while practicing medicine. (Pl. Ex. M at H2225; Pl. Ex. OO at 87-88; Pl. Ex. UU at 78-82, 95-96.)

47.    Hartford completely disregarded plaintiff's explanation, and focused exclusively on the purported inconsistency between the video tape and the statement it induced her to sign before informing her of the videotape. (Pl. Ex. C at 208-211; Pl. Ex. E at 215-217; Pl. Ex. HH at 123.)

48.    On July 11, 2000, after reviewing the surveillance, but before the above referenced "interview," Hartford demanded that plaintiff undergo an Independent Medical Examination ("IME") and Functional Capacities Evaluation ("FCE"). (Pl. Ex. U, at H3620; Def. Ex. A(15).)

49.    Hartford protocol provides that an IME is appropriate to resolve conflicting medical opinions, either between the attending physician and the medical records; between the claimant's

examining or treating physicians; or between the claimant's physician's and Hartford's medical staff, or where there is insufficient medical information from the attending physician. (Def. Ex. C(1), p.2).

50.    Plaintiff's doctor's were unanimous in their conclusions regarding plaintiff's injuries and Hartford had received substantial clinical records, including from plaintiff's treating physician. (Pl. Ex.OO at 71-72, 185-186.)

51.  Throughout the 3 ½ years that Educators paid plaintiff benefits, it continually demanded "objective, clinical evidence of an ongoing disabling condition" as a precondition to payment, commissioning an IME and three IMRs specifically to establish whether there was objective evidence of plaintiff's disability.  (Pl. Ex. G.)

52.  The IME and all of the IMRs concluded that there was objective, clinical evidence of an ongoing disabling condition.  (Pl. Exs. I-L.)  The last IMR that Educators commissioned concluded that "the case has been exhaustively reviewed with determinations in regards to attempts to corroborate appropriate findings from the subjective and objective concerns . . . Documentation for the clinical symptomology is correlated well by several physicians in regards to the objective findings." (Pl. Ex. L.)

53. Before the IME, Hartford, as well, had amassed substantial clinical (meaning objective) records that supported plaintiff's claims of injury. (Pl. Ex. OO at 27, 36, 69-71, 185-186; Pl. Ex. TT; Def. Ex. A(27) .) The IME was <u>not</u> necessitated by the absence of clinical records.  (<u>Id</u>.)

54.    Kim Gabrielson, of the SIU, directed Nurse Sterle to schedule an IME on the ground that plaintiff's activities were inconsistent with her medical reports (Pl. Ex. OO at 32-33, 43-44, 158:20-24).  Plaintiff's activities were not inconsistent with her medical reports.  (Pl. Ex. I.)

55.    The SIU is not typically involved in the decision to schedule an IME. (Pl. Ex. V at

263.) Ms. Grabrielson has denied that she made the decision to schedule an IME, and testified that the claims department felt the IME was necessary. (Pl. Ex. D at 109.) Ms. Wilk, the claims examiner in charge of plaintiff's claim testified that she was not the one who decided to schedule an IME, and contended that she couldn't remember who made the decision. (Pl. Ex. E at 153.)

56.    In correspondence with plaintiff in July 2000, Hartford represented that it sought an IME/FCE "in order to *offer* any vocational rehabilitation benefits," to determine a "long-term case management plan," and "if there are any other benefit provision for which you may qualify." (Pl. Ex. RR.). These statements were false. Hartford sought the IME and FCE because, as a result of the surveillance video, it purportedly believed plaintiff had misrepresented her limitations. (Pl. Exs. V at 140 & OO at 43-44, 157-159.)   Before Hartford had even received the IME/FCE report, the Director of SIU believed "everyone was in total agreement that this [plaintiff's] claim was on the verge of being terminated" (Pl. Ex. V at 173-175, 277, 280; Pl. Ex. SS.)

57.    Hartford personnel specifically orchestrated the order of events to ensure that the IME would "hold off on their report" until after Hartford conducted the "interview" and provided the IME with the video surveillance and plaintiff's signed statement. (Pl. Ex. U at H3620.)

58.    Hartford provides that, for purposes of determining whether a claimant is totally disabled, the term "occupation" means "the occupation as it is recognized in the general workplace. It does not mean the specific job that an individual is performing for a specific employer or at a specific location" and that "an employee's essential duties are usually defined in his/her position description." (Pl. Ex. VV(2), pp.1-3; Pl. Ex. E at 48.) Hartford purportedly tries to give the claimant the "very best benefit of the doubt" in defining her occupation. (Pl. Ex. C at 124.) In this case, however, Hartford seized on the administrative duties associated with plaintiff's second job to claim

27

that plaintiff had two occupations, one of which was "administrator." (Pl. Ex. E at 44, 48; Pl. Ex. GG at 41-45.)

59.    Hartford did not supply the IME physician, Dr. Garg, with plaintiff's job descriptions and falsely represented to the IME physician, Dr. Garg, that plaintiff's occupation consisted of 16 hours per week of office work with "no procedures or anything," "hardly any physical exertions," and thirty hours per week of administrative, purely sedentary work. (Pl. Ex. UU at pp.77, 84-85, 180-182, 188-189, 241-242, 262; Pl. Ex. E at 40).

60.    In the IME, Dr. Garg concluded that plaintiff "should be able to work as internist 16 hours a week and administrator work in the Women's clinic 30 hours a week." (Def. Ex. A(22.)

61.    Dr. Garg based concluded that plaintiff could practice as an internist because Hartford had informed her that plaintiff would not be required to work outside the office (i.e. being on call for acute emergencies), and would not be required to perform any of the invasive medical procedures that an internist regularly performs. (Pl. Ex. UU at 181-182, 188-189, 221, 241-242, 255-256.) Further, in the absence of a position description, Dr. Garg simply, and erroneously, assumed that the "administrator" position was sedentary. (Id., at 84-85, 87.)

62.    Both before and after reviewing the video surveillance, it was Dr. Garg's opinion that plaintiff could not perform the procedures normally required by an internal medicine physician. (Pl. Ex. UU at 190-191, 241-243, 263.)

63.    The IME did not indicate on its face that Dr. Garg's opinion that plaintiff could work as an internist was qualified by Hartford's misstatements that plaintiff would not be required to perform any procedures or attend patients in the hospital. (Def. Ex. A(23) at H3054.)

64.    Hartford protocol requires that staff obtain all medical records before scheduling an

28

IME and that they provide the IME physician these records to allow the physician to "render a more accurate opinion of the individual's limitations." (Def. Ex. C(1), pp.2-3.)

65.    Hartford did not provide Dr. Garg with past medical records that strongly supported plaintiff's disability, including Dr. Porfiri's medical records and APS, the medical reviews by Dr. Stern, and the IME by Dr. Alshon (Pl. Exs. PP & UU at 90-91, 93, 99, 165-166.)

66.    The records that Hartford omitted would be very important to Dr. Porfiri's evaluation. (Pl. Ex. UU at 93; Pl. Ex. D at 272, 274.).

67.    Hartford had contracted with Dr. Garg to perform both an IME and FCE, and paid her for both examinations.  (Pl. Ex. OO at 49, 51-52, 111-112, 113, 123-124, 126-127, 133, 137.)

68.    A "Functional Capacities Evaluation" is a term of art that refers to a specific series of tests performed on an individual over a number of hours that is supposed to produce for the tester limitations of strength, mobility and endurance.  (Pl. Ex. WW at 55-56; Def. Ex. C(1), pp.6-7.)  The tester has guidelines to go by and references from the Department of Labor and extrapolates from the testing an individuals restrictions and limitations and an individual's ability to perform either a sedentary, light, medium or heavy occupation.  (Id.)  The test can take up to two to three hours. (Id.)

69.    The FCE was essential in this case because the issue Hartford was trying to resolve was plaintiff's level of functionality.  (Pl. Ex. OO at 120-124.)

70.    Patients with chronic pain have good days and bad days and that there was no way to know whether the surveillance had simply captured plaintiff on a good day - the FCE would be the only way to establish plaintiff's "middle line" functionality.  (Pl. Ex. OO at 76-77, 122, 133, 181-182.)

71.    Hartford protocol also provides that an FCE is preferable where the

claimant's disability is musculoskeletal or where the patient's disability is subjective in nature. (Def. Ex. C(1), p.6.)

72. Dr. Garg's report included a document entitled "Functional Capacity Evaluation Summary," which purported to be a "summary of a Functional Capacities Evaluation done on August 14, 2000." (Def. Ex. A(23) at H3055.)

73. Dr. Garg did not perform an FCE, and Hartford knew that Dr. Garg did not perform an FCE. (Def. Ex. A(5) at 2450; Pl. Ex. UU at 88, 90, 153.)

74. The FCE "Summary" that Dr. Garg provided to Hartford would clearly imply to any medical professional that the results contained therein were the result of a Functional Capacities Evaluation. (Pl. Ex. OO at 145, 148-149; Pl. Ex. WW at 56-57; Pl. Ex. UU at 149-150, 153.)

75. Nurse Sterle had specifically sought out a physician who could personally perform an FCE. (Pl. Ex. UU at 49) He had rejected two other potential physicians because they stated they could not personally perform the FCE, and Dr. Garg had represented she could personally perform an FCE. (Id., at 51-52, 55-56, 64-66, 179-180.) Dr. Garg admitted in deposition that she does not have the equipment to conduct an FCE and does not conduct FCEs. (Pl. Ex. UU at 154, 169.)

76. Although Nurse Sterle left Hartford's employ before receiving a response to his request for the underlying FCE report, the notes he left would have made clear to his replacement that Dr. Garg had agreed to perform an FCE and that an FCE was necessary. (Pl. Ex. OO at 132, 139-142.) The replacement nurse would not have been performing her job if she simply noted that no FCE was done and did not immediately set up an FCE and question Dr. Garg. (Id.)

77. Upon discovering that no FCE had been completed, Hartford should have, and

regularly would have, immediately scheduled an FCE and questioned "what was going on with Dr. Garg." (Pl. Ex. OO at 140-142, 146-147.)

78.    In this case, Hartford forwarded the now suspect and misleading IME, and the knowingly misleading "Summary of FCE" to plaintiff's physicians and to its contracted physician to serve as a basis for their opinion on plaintiff's functionality. (Def. Exs. A(26), A(29); Pl. Ex. WW at 55-57.)

79.    Hartford's internal physician reviewer was not aware that Dr. Garg had not performed the FCE she purported to have completed, and assumed that she had completed it. (Pl. Ex. WW at 63.) There is no evidence that Hartford informed its physician reviewer that the IME's conclusion that plaintiff could work as an internist was based on Hartford's improper qualifications of the requirements for plaintiff's occupation.

80.    Hartford protocol requires that, where an IME conflicts with an APS, the analyst must (a) forward a copy of the IME to the attending physician for review and comment, and inform the claimant that it is doing so (Def. Ex. C(1), p.5.); (b) pursue a response at least three times, allowing three to four weeks between follow ups, ensuring that the claimant is kept apprised of the status of the request (Def. Ex. A(1), pp.20, 25); and (c) when the information outstanding is necessary for a claim determination, the third attempt should include a "30 day" notice of possible denial or termination.  (Id.).

81.    Physician responses were necessary to Hartford's claim determination. (Pl. Ex. HH at 66-67; See also Pl. Ex. C at 203-204.)

82.    In a letter mailed on Friday October 13, 2000, Hartford demanded that the physicians review and comment on the surveillance video, signed statement, IME and FCE within fifteen days,

stating that if it did not receive a response it would assume the physician had no comment. (Def. Exs. A(5) at H2446 & A(26).)

83.    Hartford did not inform the physicians that it intended to use a failure to comment as evidence in support of terminating plaintiff's benefits.  (Def. Ex. A(26); Def. Ex. A(30) at H2468-2469, ¶¶ 3, 5, 9, 15, & H2476-2477.)

84.    Hartford did not inform plaintiff that it was requesting her physicians to respond to the IME and surveillance so that plaintiff could follow up with the physicians and personally request them to respond.  (Pl. Ex. C at 187-188).

85.    After sending the IME report and surveillance to plaintiff's physicians, Hartford's claim department sent plaintiff's medical records for an independent medical "paper" review. (Pl. Ex. XX.)  However, the Director of SIU, Mr. McGoldrick objected to the independent review because "what if the paper review contradicts the IME?" (Pl. Ex. SS.) Hartford did not proceed with the independent review.  (Pl. Ex. HH at 68, 7 2-73.)

86.    Dr. Magana was the only physician to comment on the IME and video stated that, based on his review of the video, the (misleading) IME and (non-existent) FCE, plaintiff should be capable of "carrying out light duty work where she does no bending below the waist or lifting . . . Within these restrictions, she would seem capable of practicing medicine two days a week." (Def. Ex. A(28).)

87.  Working as an internal medicine physician requires much bending.  (Pl. Ex. M at H2224-2225)

88.  Dr. Magana did <u>not</u> state that plaintiff could return to work on a full time basis.  (<u>Id</u>.)

32

Plaintiff would be entitled to residual disability benefits if she were capable of returning to work on less than a full-time basis. (Def. Ex. A(3), p.5, ¶ 2.) Hartford received Dr. Magana's letter on November 1, 2000. (Def. Ex. A(5) at H2443.)

89.    On November 2, 2000, Hartford received medical records showing that plaintiff had recently undergone a discogram, which is an extremely painful procedure, and that disclosed that plaintiff had an anular tear (objective evidence of plaintiff's reported limitations). (Id.; Pl. Ex. YY; Pl. Ex. WW at 82-85.) Hartford did not forward this information to Dr. Magana or any of plaintiff's other physicians for consideration.

90.    On November 2, 2000, Ms. Gabrielson began to draft the letter informing plaintiff that her benefits were terminated retroactive to August 2000. (Pl. Ex. U at H3629.) No one had followed up with plaintiff's attending physician, Dr. Porfiri, whom Hartford believed would be most likely to refute the IME, as required by Hartford protocol. (Id.; Def. Ex. A(5); Pl. Ex. HH at 75; Pl. Ex. XX.)

91.    At that time, Ms. Gabrielson acknowledged that the evidence in Educators' file showed that plaintiff was totally disabled because she was unable to perform the material and substantial duties of her occupation. (Def. Ex. A(30), p.3.)

92.    Nothing in any of the updated medical records that plaintiff provided to Hartford indicated that plaintiff was no longer disabled (Pl. Ex. GG at 59, 62-67) - all of the physicians that examined plaintiff were unanimous in their diagnosis of plaintiff's injuries. (Pl. Ex. OO at 27, 36, 69-71, 185-186.)

93.    On the date Ms. Gabrielson began to draft the termination letter, Hartford's contracted physician reviewer had not even reviewed plaintiff's file. (Def. Ex. A(29); Pl. Ex. U at

33

H3629.)

94.     Nurse Sterle, who reviewed plaintiff's medical records and file, as well as Ms.

Laughran, the Director of Long Term Disability Claims, have acknowledged that the surveillance

video was not sufficient to justify terminating plaintiff's benefits because it did not show whether

plaintiff could perform the duties of her occupation on a regular, uninterrupted basis. (Pl. Ex. OO

at 76-77, 92-95, 122-123, 133; Pl. Ex. HH at 65-66.)

95.     To this day, no one at Hartford appears to have any idea how plaintiff's activities

depicted in the surveillance have any relationship to her ability to perform her occupation.  (Pl. Ex.

V at 139; Pl. Ex. HH at120; Pl. Ex. C at 209-211; Pl. Ex. E at 215.)

96.     Both Dr. Garg and Dr. Magana maintained their opinion, after reviewing the

surveillance, that plaintiff could <u>not</u> perform the regular duties of an internist.  (Pl. Ex. UU at 241-

243, 254-256; Def. Ex. A(28).)  None of the activities in the video conflicted with the IME that

Educators' commissioned, which concluded that plaintiff was totally and permanently disabled from

practicing as a physician. (Pl. Ex. I at 2106.)

97.     Dr. Garg's IME did not support that plaintiff was able to perform the material and

substantial duties of an internist because Hartford requested that Dr. Garg determine whether

plaintiff could work as an internist if she were <u>not</u> required to perform the material and substantial

duties of that occupation.  (Pl. Ex. UU at 180, 188-189, 254, 262.)

98.     Dr. Garg did not perform an FCE and Hartford knew that Dr. Garg did not perform

an FCE. (<u>Id</u>. at 153; Def. Ex. A(5) at H2450.)

99.     The opinions of Hartford's contracted physician reviewer, Dr. Amato, and that of Dr.

Magana, were based in large part on the tainted and misleading IME and on their erroneous

assumption that the FCE summary actually reflected the results of an Functional Capacities Evaluation. (Pl. Ex. WW at 55-57; Def. Ex. A(29).)

100.    Ms. Gabrielson relied heavily on Dr. Garg's IME and FCE "summary" in terminating plaintiff's benefits. (Pl. Ex. D at 231-232, 263; Pl. Ex. E at 146, 211; Pl. Ex. GG at 35-38; Def. Ex. A(5) at H2442-2443; Def. Ex. A(30) at pp.3, 10.)

101.    Prior to terminating plaintiff's benefits, Hartford confirmed plaintiff's representation that she was taking narcotic pain medications. In the previous six months, plaintiff had purchased 600 tablets of ultram and 200 tablets of hydrocodeine, as she had represented. (P. Ex. ZZ; Def. Ex. A(5) at H2449 and 2442 ("The claimant is taking narcotic pain medication."))

102.    Plaintiff's treating physician, Dr. Porfiri, has consistently reiterated her medical opinion that plaintiff is disabled. (Def. Ex. A(8); Pl. Exs. FF & OO at 72.) Dr. Porfiri and plaintiff's other physician's failure to comment on the IME/FCE and surveillance is not unusual, does not indicate agreement with the IME/FCE, and thus could not support a conclusion that plaintiff was no longer disabled. (Pl. Ex. GG at 59, 67.)

103.    It is not the SIU's province to determine whether a claimant is entitled to benefits. (Pl. Ex. V at 257; Pl. Ex. C at 199-200.)

104.    Ms. Gabrielson was not a trained claims analyst, and did not even have a clear understanding of the proper standard to apply to plaintiff's "own occupation" policy. (Pl. Ex.C at 156, 163-165; Pl. Ex. D at 195-197)

105.    From the moment she took over the file, Ms. Gabrielson knew that terminating plaintiff's benefits would result in a profit to Hartford of over $1 million dollars. (Pl. Ex. D at 147-148; Pl. Ex. V at 96-97; Pl. Exs. W, NN at 3635.)

106.    The Reinsurance Agreement gave Hartford a unique financial incentive to terminate plaintiff's benefits because, rather than simply avoiding the obligation to pay future benefits, terminating plaintiff's benefits would result in the release of over $1 million dollars that Educators had transferred to Hartford to administer and pay plaintiff's claim.  (Def. Ex. B(1); Pl. Ex. NN.)

107.    In its November 17, 2000 termination letter, Hartford reiterated its representation that it had investigated plaintiff' claim in its capacity as administrator for Educators, and that it was terminating plaintiff's benefits in that capacity. (Def. Ex. A(30), pp.1, 3; Pl. Ex. C at 170.)

Additional Disputed Inferences:

Plaintiff submits the following additional disputed inferences in accordance with Local Rule 56(a)(2):

1.    Hartford conducted a biased investigation and terminated plaintiff's claim without a reasonable basis.

2.    Hartford scheduled a meeting with UNUM in April 2000 in the hopes of discovering information to justify terminating plaintiff's benefits.

3.    In scheduling the meeting with UNUM in April 2000, Hartford disregarded the substantial evidence of plaintiff's disability, and Educators' conclusion that plaintiff was eligible for benefits, in favor of retrospectively arguing the possible existence of a technical defect in plaintiff's claim.

4.    Hartford has attempted to conceal the meeting with UNUM.

5.    Hartford had no reasonable basis to conduct surveillance and did so for the sole purpose of generating a basis to terminate plaintiff's benefits.

6.    Hartford claimed that plaintiff's activities were inconsistent with her stated

36

limitations and medical reports so that it could justify yet further efforts to obtain information to justify terminating her benefits.

7.      Hartford scheduled the interview with Mr. Moryto and Mr. Golden with the intent of inducing plaintiff to sign a statement that would appear inconsistent with the video surveillance.

8.      Hartford intentionally misrepresented the purpose of the "interview" to further this intent.

9.      Hartford had no reasonable basis to require plaintiff to undergo and IME and FCE.

10.     Hartford scheduled the IME/FCE for one reason only - to obtain a medical opinion to justify terminating plaintiff's benefits - which it hoped to accomplish by providing the IME with the video surveillance, by misstating the duties of plaintiff's occupation, and by providing the IME physician with only selective medical records.

11.     Hartford did not question Dr. Garg's credibility in the IME, or schedule and FCE because its goal was to terminate plaintiff's benefits and Dr. Garg's IME and FCE summary would further that goal.

12.     Hartford provided its contracted physician reviewer, Dr. Amato, and plaintiff's physicians with a knowingly misleading IME and FCE summary to induce them to conclude that plaintiff was not disabled.

13.     Hartford intentionally limited the time for plaintiff's physicians to comment on the IME, FCE, and surveillance video to limit the likelihood that it would receive responses before it terminated plaintiff's benefits.

14.     Hartford improperly interpreted Dr. Magana's response to the IME/FCE and surveillance as support for terminating plaintiff's benefits, when the response actually indicated that

37

plaintiff could not perform the material and substantial duties of her occupation and did not support that plaintiff could work full-time.

15.     Hartford did not send the medical records that it received on November 2, 2000, which showed that plaintiff had recently undergone a discogram, which is an extremely painful procedure, and that disclosed that plaintiff had an anular tear (objective evidence of plaintiff's reported limitations) to Dr. Garg or to plaintiff's physicians, including Dr. Magana because there was a risk that they would provide Hartford with an opinion that refuted termination.

16.     Hartford chose not to obtain an Independent Medical Review to avoid a finding that supported plaintiff's disability.

17.     Ms. Wilk's "red flags" were a pretense to justify beginning a fraud investigation to find a way to terminate plaintiff's benefits.

18.     The true purpose of Ms. Wilk's request for a driver's license was to obtain a current photograph of plaintiff so that SIU could conduct its covert investigation.

19.     Hartford utterly disregarded four years of medical reports that unanimously documented plaintiff's inability to work as a physician in favor of 1 ½ hours of edited video surveillance, the opinions of Dr. Garg and Dr. Magana that plaintiff could work as a physician if she were not required to perform the procedures normally required of a physician, and the opinion of an internal medical review that was based on Dr. Garg's misleading IME and a "summary of a Functional Capacities Evaluation" that Hartford knew Dr. Garg had not performed.

20.     Hartford intentionally terminated plaintiff's benefits so that it could convert over $1 million dollars from reserves associated with plaintiff's claim.

38

PLAINTIFF,

CANDI MCCULLOCH

By_____

    Eliot B. Gersten,
    Fed. Bar No. ct05213
    GERSTEN & CLIFFORD
    214 Main Street
    Hartford, CT 06106
    EliotG@gersten-clifford.com
    (860)527-7044
    Her Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on the 22 th day of December, 2003, a copy of the foregoing as mailed, postage prepaid to the following counsel of record via U.S. mail:

Roberta J. Sharp, Esq.
Barry A. Chasnoff, Esq.
Jessica Spangler Taylor, Esq.
Akin Gump Strauss Hauer & Feld, LLP
300 Covent Street, Suite 1500
San Antonio, TX 78205
Tel: (210) 281-7146
Fax: (210) 224-2035

Donald E. Frechette, Esq. (ct 08930)
Joshua L. Milrad, Esq. (ct 19321)
Charles F. Gfeller, Esq.
Edwards & Angell, LLP
90 State House Square
Hartford, CT 06103
Phone (860) 525-5065
Facsimile (860) 527-4198

Eliot B. Gersten