## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CANDI McCULLOCH | : | CIVIL ACTION NO. 301CV1115(AHN) |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| HARTFORD LIFE AND ACCIDENT | : | |
| INSURANCE COMPANY AND EDUCATORS | : | |
| MUTUAL LIFE INSURANCE COMPANY | : | |
| Defendants. | : | January 23, 2004 |

**PLAINTIFF'S OBJECTION TO
DEFENDANT'S MOTION TO STRIKE
PLAINTIFF'S EVIDENCE IN SUPPORT OF HER OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The Court should reject the latest salvo in the defendant Hartford Life and Accident

Insurance Company's ("Hartford") continuing war of attrition on plaintiff's resources and

distraction from the merits of plaintiff' claims that her disability benefits were improperly

terminated for the following reasons:

**A.**     **Plaintiff Provided Evidentiary Support for Her Statements**

Contrary to defendant's argument, plaintiff provided factual and evidentiary support for

her introductory statements in paragraphs 30, 38 and 50 of her Local Rule 56(a)(2) Statement:

•  In paragraph 30, plaintiff denied defendant's statement that Ms. Wilk requested

plaintiff's driver's license "for purposes of age verification," and supported that denial with

specific facts and supporting evidence:  "Age verification is only 'necessary to ensure that the

correct Maximum Benefit Duration is applied.'  (Def. Ex. A(1), p.19.)  Plaintiff, however, was

entitled to lifetime benefits. (Pl. Ex. AA; Def. Ex. A(3), p.3, ¶ 1; Pl. Ex. AA.)"

1

• In paragraph 38, plaintiff supported her denial of defendant's claim that plaintiff's alleged failure to provide a driver's license for age verification immediately upon Ms. Wilk's request was a signal of potential fraud with specific facts and supporting evidence:

Plaintiff incorporated by reference the facts and evidence cited in paragraphs 29 to 32, which, *inter alia* stated that:

(a) "Age verification is only 'necessary to ensure that the correct Maximum Benefit Duration is applied.' (Def. Ex. A(1), p.19.)  Plaintiff, however, was entitled to lifetime benefits. (Pl. Ex. AA; Def. Ex. A(3), p.3, ¶ 1; Pl. Ex. AA.)" (See Paragraph 30);

(b) plaintiff responded to Ms. Wilk's request within one week, (See Paragraph 31, citing, (Pl. Ex. E at103, 101; Def. Ex. A(5) at H2462 & 2464.)); and,

(c) plaintiff promptly sent Ms. Wilk the requested information but Ms. Wilk failed to inform plaintiff that she had not received the information (See Paragraph 32, citing (Def. Ex. A(5), at H2461-2462; Def. Ex. A(11).)).

Plaintiff also identified additional facts and evidence to support her statement, *viz.* that even under defendant's version of the events, plaintiff's response to Ms. Wilk's request was timely pursuant to Hartford's own protocol. (See Paragraph 38, citing, Def. Ex. A(1), pp.20, 28.)

• In paragraph 38, plaintiff denied defendant's claim that plaintiff's submission of an APS from an out-of-state physician was an indiction of potential fraud, with specific facts and supporting evidence:

"[i]n her claimant questionnaire, plaintiff identified four other physicians in the Massachusetts area, including Dr. Beverly Walters who had participated in an in-depth interview with Educators' independent physician in which she was 'consistent in feeling ee [employee] is unable to work at present,' which Educators personally confirmed in a subsequent telephone call to Dr. Walters. (Pl. Ex. S at 2010-2011; Pl. Ex. K; Def. Ex. A(8) at H3163.) Further, numerous other physicians, with whom plaintiff had no professional connection, including independent physicians hired by Educators, had also concluded that plaintiff was disabled. (Def. Exs. A(31), A(32); Pl. Exs. J-T.)  As Ms. Wilk knew, plaintiff lived in Florida and had treated with Dr. Porfiri since the onset of her disability in 1995.  (Pl. Ex. A, pp.1, 2.)"

2

• In paragraph 38, plaintiff denied defendant's claim that Ms. Wilk received inconsistent information from Dr. Porfiri's office staff. Plaintiff supported this denial with specific facts and evidence, namely:

• by incorporating paragraph 35 by reference, which set forth in detail, with supporting evidence, why the information that Ms. Wilk allegedly received was patently incorrect and how Ms. Wilk knew, at the time of the alleged telephone call, that it was incorrect; and

• that "two months before Ms. Wilk referred plaintiff's claim to SIU, Ms. Wilk received Dr. Porfiri's APS, which confirmed that plaintiff treated with Dr. Porfiri every six months. (Def. Ex. A(5) (telephone call allegedly made in January); A(8) (APS received in February).)"

• Finally, in paragraph 50, plaintiff supported her denial that Hartford sent Dr. Garg all of plaintiff's medical records by incorporating paragraph 65 by reference, which stated that: "Hartford did not provide Dr. Garg with past medical records that strongly supported plaintiff's disability, including Dr. Porfiri's medical records and APS, the medical reviews by Dr. Stern, and the IME by Dr. Alshon (Pl. Exs. PP & UU at 90-91, 93, 99, 165-166.)"

<u>Defendant's challenge to plaintiff's Additional Undisputed Facts is equally without merit</u>.

• Plaintiff concedes she omitted, (by oversight of counsel) the citation in support of paragraph 20, that "[a]fter UNUM failed to provide Hartford with evidence to justify terminating plaintiff's benefits, Hartford ordered covert surveillance of plaintiff,". However plaintiff did include the supporting evidentiary citation in her brief, at page 8 ("After UNUM failed to provide Hartford with evidence to justify terminating plaintiff's benefits, Hartford immediately ordered covert surveillance in hopes of finding a basis to terminate plaintiff's benefits. (**Pl. Ex. U, p.1**)") ( emphasis added) Moreover, Hartford would be hard pressed to claim any prejudice by this oversight as its answers to written discovery disclose that Hartford never relied, or claimed to rely, on information obtained from UNUM as a basis to terminate plaintiff's benefits, and it is

3

clearly undisputed that Hartford ordered covert surveillance.

• Plaintiff supported her statement in paragraph 24 that "[a]t the time [ May 2000] Hartford ordered surveillance, Hartford had barely even begun a pre-surveillance investigation," by the fact, and evidence, that: at the time Hartford ordered surveillance, "Hartford had received plaintiff's APS and a single report from one of plaintiff's physicians, both of which were consistent with plaintiff's previous medical records and confirmed plaintiff's disability.  (Def. Exs. A(7); A(13).)" and by the statements, with citation to evidence, in paragraph 25.

• Plaintiff's statement in paragraph 37 that "[f]ollowing the surveillance, Hartford scheduled an interrogation of plaintiff by two SIU operatives that was carefully scripted to induce plaintiff to sign a statement that appeared inconsistent with the activities in the video surveillance." is supported by the fact and evidence that: "[s]enior claims and SIU staff participated in a 'round table' on August 25, 2000 to plan the interview.  (Pl. Exs. HH at 62, 64 & V at 116 & U at H3622.)  At the meeting, the Director of SIU, believed 'everyone was in total agreement that this [plaintiff's] claim was on the verge of being terminated' (Pl. Ex. SS; Pl. Ex. V at 280.) None of the participants in this meeting recorded the meeting in the activity log, as required by standard practice and procedure.  (Def. Ex. A(5); Pl. Ex. U.)  Staff met yet again on September 6, 2000 to plan the 'interview.'  (Pl. Ex. U, at H3622.)"

• Plaintiff supported the statement that "[t]he investigators demanded that plaintiff answer questions that had no other purpose than to harass plaintiff" with the facts and evidence that: "the investigators asked plaintiff whether she had ever been "in business" with Dr. Walters, or whether she and Dr. Walters were friends.  (Def. Ex.A(20) at H23.)  Hartford was well aware that plaintiff only saw Dr. Walters beginning in 1998 (Def. Ex. A(13)), has never claimed that

4

plaintiff worked after she became disabled in 1995, and had no basis to believe that plaintiff had any personal relationship with Dr. Walters."

> The Court should also reject defendant's objection to plaintiff's "Additional Disputed Inferences."

In order to prevail on its motion for summary judgment, defendant must establish not only that there are no issues of disputed facts, but that, drawing all reasonable inferences in the plaintiff's favor, the defendant is entitled to judgment as a matter of law. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam); Union Ins. Soc. v. Gluckin, 353 F.2d 946, 951-952 (2nd Cir. 1965); Empire Electronics Co. v. United States, 311 F.2d 175, 180 (2nd Cir. 1962). Thus, it is appropriate for plaintiff to set forth the inferences that are to be reasonably drawn from the facts, and which preclude summary judgment in defendant's favor. Further, the inferences that plaintiff articulated are based on the facts, supported by the evidence, set forth previously in plaintiff's statement. As Hartford recognizes in its Exhibit A, inferences themselves, by their nature, are not properly the subject of evidentiary citation. (Exhibit A, pp.4, 5.)

**B.    Plaintiff Cited to Competent Evidence**

The Court should deny Hartford's objection to plaintiff's counsel's purported "arguments regarding the contents of Plaintiff's medical records" for the simple reason that plaintiff's counsel has made no such arguments. In fact, as plaintiff properly informed the Court,

Educators,[1] Educator's Independent Medical Examiner,[2] Educator's Independent Medical Reviewer,[3] and numerous other physicians,[4] all concluded that plaintiff was disabled. Plaintiff also properly cited to Hartford's admission that the information plaintiff supplied to Educators showed that she was disabled,[5] and the testimony of Hartford's former and current employees, that plaintiff's updated medical records were consistent with plaintiff's previous medical records and supported her claim of injury,[6] and that nothing in any of the updated medical records that plaintiff provided to Hartford indicated that plaintiff was no longer disabled.[7]

Hartford has also failed to provide the Court with any basis to strike plaintiff's Exhibit VV from the record. Hartford does not dispute the authenticity of this exhibit, but claims that "plaintiff's interpretation of the manual is not competent evidence." Even assuming *arguendo* that an exhibit could properly be stricken on this ground, plaintiff has not attempted to "interpret"

---

[1]  See Pl. Br., p.3 ("Educators stated to plaintiff: '[i]n review of your file, it is clearly documented that you have sustained functional limitations which prevent you from performing the substantial requirements of your occupation.' (Pl. Ex. T.)"

[2]  Pl. Br., p.3 & fn.3, citing, Pl. Ex. I: "objective findings do correlate with her subjective complaints. The patient is not able to return to her prior job as an internist. She does not have the cervical mobility or postural tolerance necessary to perform the primary job capacity in an uninterrupted basis . . . These restrictions are permanent."

[3]  Pl. Br., p.3 & fn. 4, citing, Pl. Ex. J,; Pl. Ex. K; Pl. Ex. L.

[4]  Pl. Br., p.3 & fn. 5, citing Pl. Ex. M at H2223, 2225; Pls. Exs. N, O, P; Q, R; Pl. Exs. K, E at 107; See also, Pl. Br., pp.2-3 & fn. 2, citing, Def. Ex. A(31); Def. Ex. A(32).

[5]  Pl. Br., p.4, citing, Def. Ex. A(30).

[6]  Pl. Br., p.14, citing, Pl. Ex.OO at 71-72, 185-186; Pl. Br., pp.15 & 28, citing, Ex. OO at 27, 36, 69-71, 185-186.)

[7]  Pl. Br., p.28 (Pl. Ex. GG at 59, 62-67)

the manual. Rather, plaintiff simply quoted from this document, which Hartford created.[8]

Hartford has presented no argument or authority to support that it is beyond the purview of a lay

witness or juror to determine, based on the plain language of Hartford's protocols, and the facts,

that Hartford violated its own procedures. Def. Reply Brief, p6, n.17. Plaintiff may properly

oppose Hartford's motion for summary judgment on the ground that a reasonable juror could

conclude that the facts show that Hartford violated its protocols.

### C.    Plaintiff Has Not Misstated the Record

Defendant's objection to plaintiff's "misstatements" of the record, is nothing more than a

dispute regarding the interpretation of the evidence (in the absence of any supporting opposition

evidence from Hartford.) Hartford's objections establish, if nothing else, that there are disputes

of fact and the inferences to be drawn therefrom, which preclude judgment in Hartford's favor:

1.    Hartford's first challenge reveals that there is, at most, a genuine issue of fact as to

whether Hartford provided Dr. Garg with the records of Drs. Porfiri, Stern and Alshon. Dr. Garg

testified that she listed and took notes identifying all the physicians from whom she had received

medical records (Pl. Exs. PP & UU at 165-166), and she failed to include Drs. Stern or Alshon in

her list or notes. (Pl. Ex. PP.) Further, although the list included Dr. Porfiri, Dr. Garg did not

---

[8] See Pl. Br., p.14, n.14 ("Hartford provides that "a denial letter must never contain a statement that we are denying a claim for benefits because 'the objective medical evidence contained in the file does not substantiate that you are totally disabled" because "subjective complaints frequently contribute to an individual's functional status and we must also take these complaints into consideration when evaluating a claim for disability benefits." (Pl. Ex. VV(1)."); Pl. Br., p.16, n.20 ("Hartford provides that, for purposes of determining whether a claimant is totally disabled, the term "occupation" means "the occupation as it is recognized in the general workplace. It does not mean the specific job that an individual is performing for a specific employer or at a specific location" and that "an employee's essential duties are usually defined in his/her position description." (Pl. Ex. VV(2), pp.1-3; Pl. Ex. E at 48.)"); Pl. Rule 56(a)(2) Statement, ¶ 56 (same.)

have any notes from Dr. Porfiri's records, could not recall reviewing those records, and testified that, at the time she conducted her IME [and "FCE"], she did not know who plaintiff's treating physician was and did not have records from plaintiff's treating physician. (Pl. Ex. UU at 90-91, 93, 99.)[9]  Incredibly, despite well established law on the inferences to be drawn in order to determine if there are any issues of fact on a motion for summary judgment, Hartford asks the court to *infer* that Dr. Garg received the records of Drs. Porfiri, Alshon and Stern based on Dr. Garg's testimony that it was "possible" that she did not write down the names of all the physicians whose records she reviewed. Exhibit A, p.1.  Of course, Hartford does not actually claim, or present any evidence, that it in fact provided these records to Dr. Garg.

Finally, Hartford can not seriously dispute that the records of Drs. Alshon, Stern and Porfiri most strongly supported plaintiff's disability;  Educators relied on the reports of Drs. Alshon and Stern to accept and continue plaintiff's disability benefits, and Dr. Porfiri completed the Attending Physician Statement in support of plaintiff's continuation of disability benefits. (Pl. Exs. G, I-L; Def. Ex. A(8).)  Indeed, Hartford argues that the records of Drs. Alshon and Porfiri were the only reports that supported plaintiff's disability.  See Hartford's Reply, p.5.

2.    Hartford's second challenge confirms that Dr. Garg believed that having all of plaintiff's up to date medical records would have been important in her evaluation.

3.    In its third challenge, Hartford does not deny that its protocol requires it to forward a copy of the IME to the attending physician and to inform the claimant that it is doing

---

[9] Although cited, plaintiff's counsel  inadvertently omitted page 99 of Dr. Garg's deposition from her opposing papers, and attaches page 99 as Exhibit 1, hereto with apologies to the court. Having participated in the deposition, Hartford can not seriously claim prejudice from this clerical omission of plaintiff's counsel.

so, or that the protocols require Hartford to pursue a response at least three times, allowing three to four weeks between follow ups, ensuring that the claimant is kept apprised and to provide a "30 day notice" of possible termination in the final follow up. Instead, Hartford erroneously claims (in spite of its protocols and without any documented support) that it ignores these time frames established for "initial claim investigation" because they do not apply to the "handling of ongoing claims." Def. Ex. A, p.2. As page 25 of the manual, which plaintiff cited, states: "[t]he time frame for following up for information requested as part of the ongoing claim management process should follow the same guidelines for follow ups in the initial claim investigation." Further, plaintiff has not, and need not, 'interpret' the "meaning and applicability of" these straightforward guidelines - plaintiff merely quoted them - and a reasonable juror could conclude that Hartford violated them.

4.    Hartford's fourth objection, reveals, at most, a disputed issue of fact as to whether the restrictions and limitations stated in Dr. Magana's letter, and his conclusion that plaintiff could practice medicine 2 days per week constituted a conclusion that plaintiff could perform her "own occupation" as defined in the policy.

5.    Hartford does not dispute that, despite Hartford's representations to the contrary to various physicians, criminal authorities, third parties and to the plaintiff, Dr. Garg did not perform an FCE which is so critical to understanding the physical limitations of plaintiff. Notwithstanding this undisputed fact, Hartford's fifth dispute challenges whether the tainted and misleading IME and the summary of a FCE that was never performed, formed a "large part" of the opinions of Drs. Magana and Amato.

The evidence supports plaintiff's statement because Dr. Magana purportedly only viewed

the videotape and Garg's reports, and, in his conclusion, he stated that he concurred with the results of Dr. Garg's IME and the FCE, *which Dr. Garg never performed.* Def. Ex. A(28). Dr. Amato relied upon the IME and the purported FCE as the only medical findings that supported plaintiff's ability to work. Def. Ex. A(29.). Moreover, Hartford's dispute as to whether these documents formed a "large part" of the physician's decision is irrelevant. Hartford's decision to provide these false and misleading documents to Drs. Magana and Amato supports plaintiff's claim of bad faith even if these doctors did not rely on the IME and FCE documents <u>at all</u>.

6.      Hartford next claims that it considered the medical records showing that plaintiff had an annular tear, when it drafted its termination letter on November 2, 2002. Hartford's reliance on Dr. Amato's testimony, and plaintiff's Exhibit YY, which was Kim Gabrielson's handwritten transcription of Dr. Amato's notes[10] to support its argument, is creative, but misplaced. *Both of these documents were created one week <u>after</u> Hartford first drafted the termination letter.* <u>See</u> Pl. Ex. U at H3629; Def. Ex. A(29); Pl. Br., p.22. At most, there is a disputed question of fact as to whether Hartford considered this medical information when it decided to terminate plaintiff's benefits.

7.      Hartford's seventh objection is based on a bald misstatement of Ms. Huber's deposition. Ms. Huber had over 700 pages of the claim file in front of her during the deposition, which included the underlying medical records (Ex.A(3) p.32 to Defendant's Objection; Pl. Supp. Ex. 2, pp.30-31, attached hereto) and testified that the nothing in the <u>underlying medical records</u> indicated that plaintiff was no longer disabled. <u>See</u> Ex. A(3) to Defendant's Objection, p.67. Hartford's representation that Ms. Huber did not have the

---

[10] Compare Pl. Ex. YY and Def. Ex. A(29).

underlying medical records for review during the deposition, and that Ms. Huber only testified

regarding the portion of the medical records "paraphrased" in the termination letter, is flat out

wrong.[11] Hartford provides additional irony, as it currently objects to plaintiff's counsel's alleged

interpretation of the medical records on the ground that he is not qualified (Def. Obj., p.3), while

previously indicating in Ms. Huber's testimony that plaintiff's medical "records speak for

themselves." Exhibit A to Objection, p.3.[12]

      8.    Next, Hartford disputes whether, as of September 6, 2000, Hartford had any

evidence, other than the video tape, to support terminating plaintiff's benefits. Ms. Huber's

testimony, cited above, shows that none of the medical records showed that plaintiff was no

longer disabled. Hartford has not identified any medical evidence that it had as of September 6,

2000 that could support terminating plaintiff's benefits.

      9.    In its ninth objection, Hartford claims that the evidence does not support the

statement that Hartford contacted UNUM in the hope of finding information to justify

terminating plaintiff's benefits. This argument is specious. Hartford's SIU investigator notes

make clear that Hartford contacted UNUM to find out if UNUM had information that plaintiff

did not meet the eligibility requirement of her policy at the time of her disability. Pl. Ex. U, p.1.

---

[11] (Q: And, again, what I'm asking is: As a part of your review of the file as a whole, having reviewed all of these attending physician records, which one of these attending physician records, if any, supported the position that Dr. McCulloch was not totally disabled? . . . A: Of the records that we just reviewed, the doctors did not indicate that she was no longer totally disabled.") (emphasis added))

[12] Notably, while Hartford characterized Ms. Huber as "a claim specialist, [who] reviewed the draft termination letter and the claim file on about November 17, 2000. Huber agreed with the recommendation to terminate benefits" in paragraph 75 of its Rule 56 Statement, Hartford now attempts to minimize Ms. Huber's role, claiming that "Huber's involvement in the handling of Plaintiff's claim was limited to reviewing the termination letter and the materials cited within to confirm the termination letter was accurate." Exhibit A to Objection, p.3.

Hartford clearly did not contact UNUM, which had previously denied plaintiff's claim for benefits, to obtain information to *support* continuing plaintiff's benefits. Significantly, Hartford does not deny plaintiff's assertion or present any evidence to support such a denial.

10.     Similarly, Hartford does not deny that the SIU believed that the $1 million dollars in reserves associated with plaintiff's claim justified expending substantial resources on an investigation. Hartford's challenge to the supporting evidence is without merit. Mr. McGoldrick testified that (a) the SIU immediately determined the reserves associated with plaintiff's claim because the size of the reserves determines the investigative strategy; for example, the SIU would not order surveillance in a case with small reserves (Pl. Ex. V, pp.97-98) and (b) the reserves associated with plaintiff's claim exceeded $1 million dollars, while the average reserves associated with a disability claim investigated by SIU is only $105,000. (Id., pp.97-98, 301.) Whether the SIU believed that plaintiff's $1 million dollars in reserves justified allocating substantial resources to an SIU investigation is, at most, a disputed inference, that is well supported by the foregoing testimony and must be drawn in plaintiff's favor. McCarthy v. American Intern. Group, Inc., 283 F.3d 121, 124 (2nd Cir. 2002); Empire Electronics, at 180 ("This admonition should especially be kept in mind when the inferences which the parties seek to have drawn deal with questions of motive, intent, and subjective feelings and reactions.")

11.     Defendant's eleventh objection is another red herring. While Hartford correctly identifies the chronology of events, Hartford fails to raise any relevant issue of fact. It is undisputed that, two years before it transferred the file to Hartford, Educators was fully aware of the UNUM denial and had continued to affirm plaintiff's right to disability benefits; Hartford was aware of this fact and, nevertheless, SIU investigators contacted UNUM because UNUM

might supply it with information to justify terminating plaintiff's benefits. Pl. Ex. S at 2021-2023; Pl. Ex. U.

12.     The cited testimony supports the statement that is the subject of defendant's twelfth objection and the defendant has not articulated any objection.

13.     Contrary to Hartford's thirteenth objection, the testimony of Kim Huber, Pamela Mormino, Deborah Laughran and John McGoldrick reveal that Hartford's only focus in conducting and reviewing the surveillance was to capture plaintiff performing activities that were inconsistent with limitations she reported in her Personal Profile Evaluation, irrespective of whether those activities bore any relationship to plaintiff's ability to perform the material and substantial duties of her occupation. None of these witnesses had any idea how the activities depicted in the surveillance related to plaintiff's ability to perform her occupation, and the only conclusion drawn by all of the witnesses was that the activities were inconsistent with plaintiff's reported limitations. Again, Hartford has not actually denied plaintiff's statement or presented any evidence to refute the statement.

14.     Hartford's fourteenth objection evidences, at most, a disputed issue as to whether Hartford scheduled the "interview" with the intent and design of inducing plaintiff to sign a statement that would appear inconsistent with her surveilled activities. While Hartford represented to plaintiff that the meeting would simply involve going over some "formatted questions," the evidence reveals that senior staff participated in two separate meetings to script the interview (Pl. Ex. HH at 62, 64 & V at 116 & U at H3622), and that they intentionally misled plaintiff about the purpose of the interview so that she would caught unaware. Pl. Ex. E at 165-168; Pl. Ex. V at 151-153, 269-270. Further, Hartford spent almost the entire three and a half

13

hour meeting questioning plaintiff and inducing her to sign a statement <u>before</u> it finally disclosed the video tape and gave plaintiff an opportunity to "explain" her activities. Pl. Ex. U, at H3623.

15.    Hartford's fifteenth objection reveals only a dispute as to the content of the video tape. (Ex. A, p.6.)

16. **It is undisputed fact the videotape relied upon by the defendant Hartford is edited and/or incomplete; it is not "raw speculation."** (Ex. A, p.6.) According to the time counter on the videotape, the investigator began taping the party at 7:17 pm, and ceased taping at approximately 8:54 pm, which covers a period of 1 hour and 37 minutes. Def. Ex. A(14); <u>See also</u> Pl. Ex. KK at HL139 (identifying time period of surveillance.) Yet, the videotape of this 1 hour and 37 minute time period, runs for only 52 minutes. **Thus, at least 45 minutes (which is almost <u>half</u> of this 1 ½ hour time period) is missing from the surveillance videotape.** The videotape is clearly misleading. Giving defendant's counsel the best benefit of the doubt, even defense counsel was/is mislead by the video, representing that the videotape excludes only "brief intervals" of the party. Exhibit A to Defendant's Objections, p.6.

Further, in another incredible assertion flying in face of well established law, e.g. Federal Rule of Evidence 901,  plaintiff does not bear the burden to present evidence regarding her activities during the intervals that are missing from the video tape. <u>Id</u>.[13] Hartford bears the burden to authenticate the video by showing that it is a true and accurate record of plaintiff's activities at the party - which the undisputed evidence shows is not the case.

_____

[13] <u>See</u> <u>also</u> <u>e.g.</u> Catale v. Physician Health Svc., No. 4495 CRB-4-02-2 (Conn. Compensation Review Board, March 5, 2003) (It is essential for a party seeking to introduce hearsay evidence such as a video recording to establish "the nature of any alterations or edits" prior to its admission.)

Second, for purposes of this motion for summary judgment, the fact that Hartford relied on an edited videotape, and provided the tape to plaintiff's physicians, its own contracted physician reviewer, and this court, under the pretense that it contained a substantially complete recording, is sufficient to raise an inference that Hartford acted in bad faith. See e.g. Kissoondath v. United States Fire Ins., 620 N.W.2d 909, 917-918 (Minn.App. 2001) (lower court properly excluded edited videotape surveillance of insured and there was no evidence that the insurer was justified in relying on an edited version of the surveillance tape in evaluating the claim.)

17. Defendant's final objection (Ex. A, p.6), only highlights the factual dispute as to whether the IME by Dr. Alshon (Pl. I) was consistent with the videotaped activities. As stated in plaintiff's opposition, the Alshon IME concluded that plaintiff could sit, stand, and walk interruptedly for a maximum of 4 hours in an 8 hour day; lift between 10 and 20 pounds occasionally; use her hands to grasp, pull, push and manipulate objects; use both feet for repetitive movements; bend and squat frequently; crawl, climb and reach above shoulder level occasionally and was unrestricted in her ability to drive a car but that she was disabled from her occupation because she could not perform these activities "in an uninterrupted basis" as required to perform her occupation. (Pl. Ex. I, at H2311A-2311B.) The video does not document plaintiff performing any activities that are not described in this IME, and does not document plaintiff performing any of these activities in the type of uninterrupted basis required by her occupation. (Def. Ex. A(14).) Nevertheless, Hartford asserts that "the IME is devoid of any reference to the activities documented in the video" and that plaintiff's activities in the video are inconsistent with the limitations noted in the IME. Whether the video shows plaintiff grasping, pulling, pushing, using her feet for repetitive movements, bending, squating, and reaching above

15

shoulder level and whether the video shows activities that are inconsistent with the limitations noted by the IME, is, at most, a question of fact for the jury.

## CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that the Court deny defendant's motion to strike evidence in its entirety.

PLAINTIFF,

CANDI MCCULLOCH

By_____

Eliot B. Gersten,
Fed. Bar No. ct05213
GERSTEN & CLIFFORD
214 Main Street
Hartford, CT 06106
EliotG@gersten-clifford.com
(860)527-7044
Her Attorney

16

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 23rd day of January, 2004, a copy of the foregoing was mailed, postage prepaid to the following counsel of record via U.S. mail:

Roberta J. Sharp, Esq.
Barry A. Chasnoff, Esq.
Jessica Spangler Taylor, Esq.
Akin Gump Strauss Hauer & Feld, LLP
300 Covent Street, Suite 1500
San Antonio, TX 78205
Tel: (210) 281-7146
Fax: (210) 224-2035

Donald E. Frechette, Esq. (ct 08930)
Joshua L. Milrad, Esq. (ct 19321)
Charles F. Gfeller, Esq.
Edwards & Angell, LLP
90 State House Square
Hartford, CT 06103
Phone (860) 525-5065
Facsimile (860) 527-4198

Eliot B. Gersten

99

1  insurance company to seek your conducting an IME?

2    A  So you give your independent opinion.

3    Q  Do you know why you're being requested to give

4  your independent opinion to an insurance company?

5    A  For this particular case?

6    Q  In general.

7    A  Because sometimes -- I don't know.  Sometimes

8  treating physician keep treating the people, you know.

9  Or they have a disability, they stay on disability.

10  Or -- I guess that's what it is.  They want to know

11  independent opinion, other than treating physician.

12    Q  And you do not have any information in your

13  files from Dr. McCulloch's treating physician, do you?

14    A  I don't think so.  Because all the records were

15  related to her injury and different physicians,

16  specialists she's seen in the past.

17    Q  And what's the difference, as you understand

18  it, between a treating physician and a specialty

19  physician?

20    A  Well, treating physician is treating you for --

21  treating physician could be your primary care doctor.

22    Q   Okay.

23    A   Or he's just treating you for your particular

24  injury.  But if they need special opinion regarding

25  surgery, or any other management, or -- they send them

Brandon Reporting Service (860) 549-1850

30

1    Q    How large was the file that you looked at when you

2    did your review?

3    A    I don't recall that.

4    Q    Was it a box or was it just --

5    A    It wouldn't have been presented to me in a box.

6    Q    What's the form it would have been presented to

7    you?

8    A    As a claim file.

9    Q    I'm going to show you what was produced as

10   Bates stamp number 001 through 738 and ask if you can tell

11   me if this contains the information you looked at when you

12   conducted your review.

13       MS. SHARP:  Object to form.

14   A    Are these all tabs of this information here?

15   BY MR. GERSTEN:

16   Q    You can ignore the tabs.

17   A    Okay.  This will take some time.

18   Q    That's all right.  Take your time.  I'm trying to

19   understand what you did.  By the way, ma'am, any time you

20   want to take a break, I forgot to tell you, any time, go

21  right ahead.

22      A   I understand.

23      Q   There's no endurance test here.

24          MS. SHARP:  I'm going to object to the form.

25  First you asked her -- you have two different questions

        Brandon Smith Reporting Service, LLC

31

1   pending here.  First you asked her if documents 1 through

2   738 was the file she received, and now you're asking her to

3   tell you what she did.

4   BY MR. GERSTEN:

5       Q   Fair enough.  Is this what you looked at when you

6   performed your review?

7           MS. SHARP:  I would have to object to form again.

8       A   I looked at the claim file that was presented to

9   me.  I'm assuming this is the same information, but without

10  going through it page-by-page through here, there's -- I can

11  go through the information here, but there's no way to

12  remember all of these documents.

13  BY MR. GERSTEN:

14      Q   Sure.  Rather than make an assumption and rather

15  than to have anyone acting on a misguided task that takes up

16  time and may not go anywhere, I'm just trying to understand

17  that the stuff that has been told to me being part of the

18  claims file -- and everybody refers to a claims file, and

19  I'm not sure exactly what it is what everybody's talking

20  about.  I'm trying to understand, when you refer to a claims

21  file now, what it is you were looking at and if that's the

22  same claims file that you're looking at here as the claims

23  file, or is there some other documentation or box or

24  whatever that consists of claims file.  Does that help at

25  all?

Brandon Smith Reporting Service, LLC

Connecticut Workers' Comp. Decisions

CATALE v. PHYSICIANS HEALTH SERVICES, NO. 4495 CRB-4-02-2 (3-5-2003)

MARIA CATALE, CLAIMANT-APPELLANT v. PHYSICIANS HEALTH SERVICES, EMPLOYER

and AIG CLAIMS SERVICES, INSURER, RESPONDENTS-APPELLEES

CASE NO. 4495 CRB-4-02-2

CLAIM NO. 400040221

COMPENSATION REVIEW BOARD

WORKERS' COMPENSATION COMMISSION

MARCH 5, 2003

The claimant appeared pro se at oral argument, accompanied by her husband, Vito Catale, who spoke on her behalf.

The respondents were represented by Lucas Strunk, Esq., Pomeranz, Drayton & Stabnick, 95 Glastonbury Road, Glastonbury, CT 06033.

This Petition for Review from the February 20, 2002 Finding and Award of the Commissioner acting for the Fourth District was heard September 20, 2002 before a Compensation Review Board panel consisting of the Commission Chairman John A. Mastropietro and Commissioners Donald H. Doyle, Jr. and Amado J. Vargas.

## OPINION

JOHN A. MASTROPIETRO, CHAIRMAN.

The claimant has petitioned for review from the February 20, 2002 Finding and Award of the Commissioner acting for the Fourth District. She argues in her appeal that the trier erred by finding that she was not totally disabled during a six-month period between May and November, 2000. We find error, and reverse the trial commissioner's decision with direction that the claimant be given a new trial.

The claimant suffered a compensable injury to her back on September 1, 1999, as a result of moving a box. Dr. Shanley, her treating physician, released her to light duty work effective January 12, 2000. Dr. Dugdale, an orthopedic surgeon, examined the claimant on May 2, 2000. At the time, he stated that it was appropriate for her to continue working four-hour days with lifting and movement restrictions, but he later opined that she had been capable of full-time work as of that date. See Respondents' Exhibit 1. A videotape purported to show the claimant working on June 28, 2000. In a February 8, 2001 report, Dr. Shanley stated that the claimant had a 10% permanent partial disability of her back. The trier concluded that she had been totally disabled from the date of her injury through January 12, 2000, and found her entitled to a 10% permanency award as of February 8, 2001, her maximum medical improvement date. He ordered that an offset be taken for total disability benefits that she had been paid between January 12, 2000, and October 27, 2000. The claimant has appealed that decision to this board.

The claimant's main objection on appeal concerns the aforementioned videotape, which was entered into evidence on December 4, 2001, as Respondents' Exhibit 2. On September 26, 2000, Dr. Dugdale viewed the tape and prepared a report stating that the claimant had been capable of full-time work "unless the patient's condition has objectively deteriorated since I examined her on May 2, 2000 . . . and [if] the video footage presented by [the respondent's attorney] is representative of this patient's usual comfort level." Respondents' Exhibit 1. According to Dr. Dugdale's report, the tape showed the claimant walking normally on June 28, 2000 and July 25, 2000, and showed her loading three bicycles into the back of a sport utility vehicle on the former date with no significant difficulty. The claimant protests that she was denied access to this tape until October 2001, despite repeated requests to obtain it earlier. She also alleges that the tape> was <edited, with no foundation having been provided to substantiate the dates, times, or location that was filmed.[fn1]

The record shows that the claimant was initially shown the video on November 2, 2000, at an informal hearing that was ordered by the commissioner. See November 28, 2000 Transcript, p. 2; December 4, 2001 Transcript, pp. 5-9, 12. The claimant requested a copy of the tape at that point. The respondents declined to provide that copy until she first submitted to a deposition, relying on unspecified Superior Court caselaw. November 28, 2000 Transcript, p. 2. The claimant never followed through on her deposition; December 4, 2001 Transcript, p. 7; and thus the respondents did not turn over the reproduction. The claimant later stated that she had wanted to study the tape prior to the deposition of Dr. Dugdale so that she could ask questions based on her analysis,

including questions that concerned the tape's authenticity. Id., 8.
Instead, the claimant did not attend Dr. Dugdale's December 5, 2000
deposition, though she received notice of its having been scheduled.
Respondents' Exhibit 1.

   Section 31-298 states that, in presiding over hearings, a workers'
compensation commissioner "shall not be bound by the ordinary common law
statutory rules of evidence or procedure, but shall make inquiry, through
oral testimony, deposition testimony or written and printed records, in a
manner that is best calculated to ascertain the substantial rights of the
parties. . . ." Kirsten v. B.F. Goodrich Sponge Products Co., 178 Conn. 401,
404-405 (1979). This law gives the trier broad discretion to determine
the admissibility of evidence, and we cannot set aside his rulings on
appeal absent an abuse of discretion. Nelson v. Deb's Inc., 15 Conn.
Workers' Comp.Rev.Op. 274, 2228 CRB-3-94-12 (June 20, 1996), aff'd,
45 Conn. App. 909 (1997) (per curiam), appeal dismissed, 244 Conn. 349
(1998) (certiorari improvidently granted). Still, the trier must remain
mindful of the requirements of procedural due process, such as a party's
right to cross-examination upon the offering of evidence. Balkus v. Terry
Steam Turbine Co., 167 Conn. 170, 177 (1974); Diogostine v. Somers Thin
Strip, 3 Conn. Workers' Comp.Rev.Op. 139, 282 CRD-5-83 (Jan. 22,
1987).

   Prior to the admission of documentary or secondary evidence, such as a
contract or a recorded sound or image, it is usually necessary to
establish the probity and relevance of such hearsay evidence by providing
authentication. Caganiello v. Hartford, 135 Conn. 473, 475 (1949)
(photograph should be substantiated by testimony or other evidence that it
correctly represents the conditions depicted); Nelson, supra (claimant
acknowledged her signature on contract, and other evidence allowed
inference that this contract was authentic). The accurate establishment
of a time frame for the taking of a photograph, video or sound
recording, as well as the nature of any alterations or edits, is
essential before one can judge the relevance of such evidence. Pisel v.
Stamford Hospital, 180 Conn. 314, 323 (1980) (rules applying to
admissibility of photographs also apply to movies); Caganiello, supra,
474-75; Gioielli v. Mallard Cove Condominium Ass'n, Inc.,
37 Conn. App. 822, 834 (1995) (defendant failed to offer proof as to date
aerial photograph was taken).

   The claimant here made a timely objection regarding the authenticity of
the videotape. December 4, 2001 Transcript, pp. 7-9. Thus, we must decide
whether the commissioner could reasonably have deemed the respondents'
offer of proof satisfactory to overcome that objection. Balkus, supra;
Cabral v. Metropolitan District Employees, 3770 CRB-1-98-2 (May 13, 1999)

(evidence may be excluded after an objection is raised). At the December 4, 2001 formal hearing, no evidence or testimony was offered by the respondents to corroborate the accuracy of the dates and subject matter that the videotape purported to cover. After it was mentioned that the claimant had been allowed to view the tape at the November 2, 2000 informal hearing, the trier simply admitted it as an exhibit without conducting inquiry into any of the claimant's stated concerns. We do not believe this foundation was adequate to support its admission into evidence. Given the heavy reliance on that videotape by Dr. Dugdale, whose opinion formed the basis of the trier's conclusion regarding total disability, it was crucial that the authenticity of the videotape be confirmed. In the absence of such verification, the video was improperly allowed into evidence. The trier's conclusions are therefore without sufficient evidentiary support, and cannot stand on appeal. Warren v. Federal Express Corp., 4163 CRB-2-99-12 (Feb. 27, 2001).

Accordingly, the trial commissioner's decision is reversed, and this matter is remanded for a new trial.

Commissioners Donald H. Doyle, Jr., and Amado J. Vargas concur.

## CERTIFICATION

THIS IS TO CERTIFY THAT a copy of the foregoing was mailed this 5th day of March 2003 to the following parties:

MARIA CATALE                    7099 3400 0008 5540 7115

PHYSICIANS HEALTH SERVICES

DOUGLAS DRAYTON, ESQ.           7099 3400 0008 5540 7108
LUCAS STRUNK, ESQ.

_____
Lorraine Lockery
  Administrative Hearings Lead Specialist
Compensation Review Board
Workers' Compensation Commission

[fn1] The claimant has appended to her brief five notes from Dr. Shanley, which show that he excused her from work from May 22, 2000 through November 20, 2000. Those notes were not marked as exhibits at trial, and cannot be accepted into the record now for the first time. See Drew v. Sears Roebuck & Co., 4400 CRB-7-01-5 (May 2, 2002) (Pro se claimant could not introduce documents via Motion to Submit Additional