UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CANDI McCULLOCH : | CIVIL ACTION NO. 301CV1115(AHN) |
|     Plaintiff, : | |
| : | |
| vs. : | |
| : | |
| HARTFORD LIFE AND ACCIDENT : | |
| INSURANCE COMPANY AND EDUCATORS : | |
| MUTUAL LIFE INSURANCE COMPANY : | |
|     Defendants. : | May 28, 2004 |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

**I.   INTRODUCTION**

This action arises out of defendant Hartford Life and Accident Insurance Company's ("Hartford") termination of plaintiff's long term disability benefits as administrator for plaintiff's insurer, defendant Educators Mutual Life Insurance Company ("Educators"). On January 6, 2003, Hartford filed a counterclaim and affirmative defense, which allege that plaintiff misrepresented her disability. The counterclaim seeks reimbursement of the benefits that Hartford paid to plaintiff.

As a matter of undisputed fact, plaintiff made the alleged misrepresentations to Hartford in its capacity as Educators' agent, Hartford paid plaintiff's benefits on Educators' behalf, and Hartford received a net gain of over $1.2 million dollars as a result of its administration of plaintiff's claim. Thus, Hartford cannot recover on its counterclaim because, even accepting Hartford's claim that plaintiff lied about her disability, Hartford has not suffered any compensable damages. Further, as a matter of law, Hartford is precluded from disclaiming plaintiff's entitlement to the benefits that it paid to her.

1

II.     **STATEMENT OF FACTS**

In October 1995, plaintiff applied for total disability insurance benefits from her insurer, Educators. Plaintiff's Local Rule 56 Statement ("Pl. Stmt."), ¶ 1. In March 1996, Educators informed plaintiff of its determination that she was entitled to total disability benefits retroactive to October 1995. Id., ¶ 2. Between March 1996 and May 1999, Educators reviewed plaintiff's continuing entitlement to disability benefits on a number of occasions, and informed plaintiff that it would not continue to pay plaintiff disability benefits in the absence of satisfactory, ongoing, "objective, clinical evidence of a disabling condition." Id., ¶ 3. In the course of evaluating plaintiff's continuing disability, Educators obtained a combined Independent Medical Examination ("IME") and paper review of plaintiff's medical records by Dr. Alshon, whom Educators hired, as well as three independent medical reviews of plaintiff's updated medical records by Dr. Stern of US Medical Review, which Educators also hired. Id.

Between March 1996 and May 1999, Educators continued to pay plaintiff benefits, and informed plaintiff that it was doing so on the basis of the updated medical information it received. Pl. Stmt., ¶ 4. Educators informed plaintiff that "[i]n review of your file, it is clearly documented that you have sustained functional limitations which prevent you from performing the substantial requirements of your occupation." Id.

In August 1999, Educators entered a contract with Hartford ("the Agreement") related to a group of its insureds, including plaintiff, to whom Educators was paying disability benefits. Pl. Stmt., ¶ 5. Educators described the Agreement to its insureds as follows: "Effective July 1, 1999, Educators . . . contracted with Group Reinsurance Plus (GRP), a service provider segment of Hartford Life and Accident Insurance Company, to administer your disability claim." Id. The Agreement provided that, as Educators' claim administrator, Hartford could issue

2

correspondence and benefit payments directly to Educators' insureds, provided that Hartford "discloses that it is acting as agent for the Company [Educators] in the performance of such functions." Id., ¶ 6. The Agreement specifically stated that it would not "create any right or legal relation between" Hartford and Educators' insureds and that Educators "shall be and remain solely liable to the" insureds on their claims. Id., ¶ 7.

Pursuant to the Agreement, Educators transferred over $25 million dollars in reserves to Hartford, of which $1,294,206.00 was allocated specifically to plaintiff's claim. Pl. Stmt., ¶ 8.[1] If Educators had determined that plaintiff was not disabled and terminated her claim before the effective date of the Agreement, Hartford would not have received the reserves associated with plaintiff's claim. Id., ¶ 9. If, however, Hartford terminated plaintiff, or any other insured's claim, which was included in the Agreement on its effective date, then Hartford would be entitled to release the reserves associated with that claim, to its own use. Id. Neither Hartford nor Educators disclosed to plaintiff, or the other insureds, that Hartford had a financial interest in the disposition of the claims it was administering. Id., ¶ 10.[2]

Hartford had the right to review the underlying files of the claims that were subject to the Agreement. Pl. Stmt., ¶ 11. Hartford chose to review the files of 11 of the claims, which did not

---

[1] The Agreement required Hartford to thereafter: (a) calculate and report to Educators, at the close of each calendar quarter and year, the amount of these reserves that Hartford was holding for each claim that remained "outstanding", so that Educators could reflect this information in its statutory and GAAP financial statements, and (b) provide Educators with a written statement from an actuary attesting that these reserves were sufficient to meet Pennsylvania's requirement for the amount of reserves that Educators was required to hold for each claim. Pl. Stmt., ¶ 8.

[2] This non-disclosure is not surprising. At least twenty states, including Pennsylvania, where Educators resides, and Florida, where plaintiff resided, specifically provide that "[w]ith respect to any contracts where an administrator adjusts or settles claims, the compensation to the administrator with regard to the contracts shall in no way be contingent upon claim experience." See Cal. Ins. Code § 1759.8; Ariz. § 20-485.09; Fla. § 626.888; Idaho § 41-910; Iowa § 510.19; K.S. § 40-3808; KY § 304.9-376; Miss. § 83-18-17(1); Mont. § 33-17-617; Neb. § 44-5809; North Dakota § 26.1-27-11; N.J. § 17B:27B-8; NM § 59A-12A-11; Ok. § 36-1447(B); Oregon § 744.732(1); 40 Penn.Stat. § 324.10; S.C. § 38-51-110; Tenn. § 56-6-408; Utah § 31A-25-401; Wis. § 633.11.

3

include plaintiff's claim.  Id. Hartford agreed that its review would be limited to "verification of objective, verifiable, data points and calculation errors," and that it would not be entitled to question Educators' subjective determinations regarding the claims.  Id., ¶ 12.  Hartford conducted an actuarial analysis of the claims, and concluded that it would be profitable for Hartford to execute the Agreement.  Id., ¶ 13.

Following the Agreement, Educators informed plaintiff that Educators had contracted with a "service provider segment of Hartford" to administer and pay her claim.  Pl. Stmt., ¶ 14. Between October 1999 and November 2000, Hartford investigated plaintiff's claim for benefits, and paid plaintiff's benefits, "on behalf of Educators," as "administrator" of plaintiff's policy with Educators and as Educators' agent.  Id., ¶ 15.  After it assumed administration of plaintiff's claim, Hartford received and reviewed plaintiff's medical records that were in Educators' file. Id., ¶ 22.  Additionally, Hartford elicited supplemental information from plaintiff and plaintiff's physicians, "on behalf of Educators."  Id., ¶ 16.  Plaintiff responded to Hartford in its capacity as a claims administration "service provider" to her insurer, Educators.  Id.  When plaintiff represented to Hartford, in response to Hartford's requests for information "on behalf of Educators," that she was disabled, plaintiff did so for the sole purpose of supporting her claim for disability benefits under her policy with Educators.  Id.

On November 17, 2000, Hartford terminated plaintiff's disability benefits on the ground that "you no longer meet the Policy's definition of Totally [sic] Disability as of 8/14/00."  Pl. Stmt., ¶ 17.  In the letter terminating plaintiff's benefits, Hartford acknowledged that the evidence submitted to Educators showed that plaintiff had previously been entitled to total disability benefits, and that Hartford "should have paid" plaintiff disability benefits up until August 14, 2000.  Id., ¶¶ 23, 26.  When Hartford terminated plaintiff's benefits, it had released

4

$91,896 to plaintiff.  Id., ¶ 29.  Hartford then released, to its own use, over one million dollars out of the $1,294,206.00 in reserves that Educators had transferred to Hartford associated with plaintiff's claim.  Id., ¶¶ 29-30.  Hartford thus received a substantial net financial benefit from plaintiff's representation that she was disabled.  Id., ¶¶ 8-9, 29-33.

On November 26, 2001, after plaintiff initiated this lawsuit, Hartford filed a counterclaim in which it alleged, for the first time, that plaintiff was not entitled to disability benefits during the period prior to August 14, 2000 that Hartford administered plaintiff's claim, and seeking reimbursement of the funds it had released to plaintiff during that time period.  Id., ¶ 18.  The counterclaim does not specify the date on which Hartford contends plaintiff ceased being disabled.  Id.

Thereafter, Hartford retained Dr. Arthur Taub, who charged for his services, as an expert to testify in this action.  Pl. Stmt., ¶ 20.  Dr. Taub's opinions include the view that plaintiff's medical records between 1995 and 1998 showed that plaintiff was not disabled, and that, on the basis of these records, any "declaration of [plaintiff's] total disability for function as a physician or in the dual capacity of function as a physician and administrator, were unjustified."  Pl. Stmt., ¶ 21.  Educators had obtained these medical records in the course of administering plaintiff's claim, and Hartford received and reviewed these medical records when it assumed the administration of plaintiff's claim.  Pl. Stmt., ¶¶ 21, 22.  Prior to disclosing Dr. Taub's opinion on September 1, 2003, neither defendant had informed plaintiff of a dispute on her entitlement to benefits during the period that Educators administered plaintiff's claim.  Id., ¶ 24.  To the contrary, both defendants had informed plaintiff that the records submitted to Educators showed that plaintiff was entitled to disability benefits.  Id., ¶¶ 2, 4, 23.

Dr. Taub's opinion further includes the view that plaintiff's medical records between

1999 and 2000, and the video surveillance of plaintiff in June 2000, also showed that plaintiff was not disabled at any time before August 2000.  Pl. Stmt., ¶ 25.  Hartford had obtained these medical records, and the video surveillance, before it terminated plaintiff's benefits.  Id., ¶¶ 19, 25.  Nevertheless, Hartford continued to pay plaintiff benefits through October 2000 and, when it terminated plaintiff's benefits, Hartford stated that it "should have paid" plaintiff benefits up until August 14, 2000.  Id., ¶ 26.

Up to and including the time that defendants terminated plaintiff's benefits, defendants led plaintiff to believe that she had supplied sufficient medical evidence to establish that she was entitled to disability benefits between October 1995 and August 14, 2000.  Pl. Stmt., ¶¶ 2-4, 15, 17, 23-24.  Had defendants challenged the adequacy of plaintiff's medical records when she submitted those records, plaintiff could have sought additional evidence to establish her inability to function as a physician at that time by obtaining additional evaluations, including a Functional Capacities Evaluation ("FCE"), which is specifically designed to determine the tasks that can and cannot be performed with reference to the nationally accepted requirements of her profession or initiated litigation to establish her functionality at that time.  Pl. Stmt., ¶¶ 27-28.  There is, of course, no evaluation or test that plaintiff can undergo now, to establish her level of functionality between October 1995 and August 2000.

**ARGUMENT**

A.      **STANDARD FOR GRANTING MOTION FOR SUMMARY JUDGMENT**

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Id. at 322-324.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

7

B.  **HARTFORD CANNOT ESTABLISH DAMAGES**

To prevail on its counter-claim, Hartford must establish, by "clear, precise and unequivocal evidence," that plaintiff's alleged misrepresentation that she was disabled caused it damages. Suffield Development Assoc. v. Nat'l Loan Investors, 260 Conn. 766, 778, 802 A.2d 44 (2002); Beik v. Thorsen, 169 Conn. 593, 594-595 (1975); Chanoff v. U.S. Surgical Corp., 857 F. Sup. 1011, 1017 (D.Conn. 1994); Miller v. Appleby, 183 Conn. 51, 54-55, 438 A.2d 811 (1981) (re: standard of proof); Citino v. Redevelopment Agency, 51 Conn.App. 262, 275-276, 721 A.2d 1197 (1998) (same). Hartford cannot meet its burden even if the court accepted the allegations of Hartford's counterclaim as true, and drew all reasonable inferences in Hartford's favor.

1.  **Hartford Does Not Have Standing**

It is a well-established legal principle that an agent has no standing to sue a third party who perpetrated an actionable wrong directed against its principal, even where the agent suffers an economic loss as a result of the misconduct. See Fairfield Ele. School B.C. v. Placko, 2003 Conn. Super. LEXIS 474 at *4-6 (February 21, 2003) (attached), quoting, Cragin & Co., Inc. v. International S.S. Co., 15 F.2d 263, 264 (2d Cir. 1926); Paul S. Yoney, Inc. v. Hospital of St. Raphael, 1992 Conn.Super.LEXIS 2105 (Jul. 10, 1992) (Katz, J.) (attached), citing, Second Exeter Corp. v. Harold Epstein, 5 Conn.App. 427, 499 A.2d 429 (1985).

Hartford has no standing to sue plaintiff because, as a matter of undisputed fact: (1) Hartford was acting as Educators' agent when it administered plaintiff's claim and paid plaintiff's benefits (Pl. Stmt., ¶¶ 5-7, 14-15); (2) plaintiff made her alleged misrepresentations to Hartford solely in its capacity as a purported administrative services provider to Educators (Pl. Stmt., ¶ 16); and (3) plaintiff represented that she was disabled for the sole purpose of receiving

8

disability benefits under her policy with Educators. Id. Moreover, Hartford has not alleged, nor can it adduce any evidence to support, that plaintiff intended to harm Hartford's interests, because, as a matter of undisputed fact, at all relevant times, defendants represented that Hartford was merely administering plaintiff's claim as agent for Educators and failed to disclose to plaintiff that Hartford had any financial interest in the disposition of her claim. Pl. Stmt., ¶¶ 5-6, 10, 14-16.

Finally, even if Hartford could present evidence that plaintiff intended to harm Hartford's interests, Hartford could not establish the type of direct injury that is necessary for an agent to establish standing. The only "injury" that Hartford alleges is that it paid plaintiff benefits in reliance on her representations. Counterclaim, ¶ 60. However, Hartford made these payments as Educators' agent, and Educators supplied Hartford with almost $1.3 million dollars to make those payments. Pl. Stmt., ¶¶ 6, 8, 15. The only "injury" that Hartford could conceivably claim, that the disability payments Hartford made to plaintiff on Educators' behalf reduced the amount of Hartford's net profit pursuant to the undisclosed terms of its Agreement with Educators, is precisely the type of indirect harm that is insufficient to establish standing. See Moorer v. Hartz Seed Co., 120 F.Supp.2d 1283, 1289 (M.D. Ala. 2000), citing, Restatement (Second) Agency, § 374(2), cmt. b[3]; accord Second Exeter Corp., supra; Fairfield Ele. School B.C., supra.[4]

### 2. Hartford Profited from Plaintiff's Alleged Wrongdoing

---

[3]  Section 374(2) states: "A servant or other agent has no action of tort because another has tortiously harmed the principal or destroyed its business, unless the other acted for the purpose of harming the agent's interests," and Comment B states that "[i]n conformity with the normal tort rule, a servant who loses his job or otherwise suffers economic loss as a result of the principal's misfortune, tortiously caused by another, has not thereby an action against the other."

[4]  See also Paul S. Yoney, Inc., citing, Quantel Corp. v. Niemuller, 771 F. Sup. 1361 (S.D.N.Y. 1991); Capital National Bank of New York v. McDonald's Corporation, 825 F. Sup. 874 (S.D.N.Y. 1986); Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705 (11th Cir. 1984).

9

Even if Hartford had standing, Hartford cannot establish that plaintiff's alleged misrepresentation caused it damages. As a direct and proximate result of plaintiff's representation that she was disabled, Educators transferred almost $1.3 million dollars to Hartford, of which Hartford paid plaintiff only $91,896, resulting in a net gain of at least $1,202,310 to Hartford. Pl. Stmt., ¶¶ 8-9, 29-33. Under these circumstances, Hartford cannot establish that plaintiff's alleged misrepresentation caused it damages. Byrnes v. Faulkner, Dawkins & Sullivan, 550 F.2d 1303, 1313-14 (2nd Cir. 1977) (where "far from suffering a proximate loss from the acts of appellants, Faulkner was benefited overall by them," the appellant could not establish actual damages to support either his securities or common law fraud claims - "the transaction cannot be fractionated, since otherwise 'actual damages on account of the act complained of' would be exceeded.")

Further, as a matter of law, Hartford cannot establish compensable damages where, as here, the damages consist of profits that Hartford could not have made in the absence of plaintiff's alleged wrongdoing. See e.g. Levine v. Seilon, Inc., 439 F.2d 328, 333-334 (2nd Cir. 1971); Sit-Set, A.G. v. Universal Jet Exchange, Inc., 747 F.2d 921 (4th Cir. 1984). In Levine, the plaintiff complained that that the defendant made misrepresentations which inflated the price of his stock and also induced him not to sell his stock at the time the price was inflated. The plaintiff sought damages on the ground that, had he known the truth, he would have sold his stock sooner and capitalized on the inflated price. The Second Circuit rejected the plaintiff's claim that the defendant's misrepresentation caused him damages because "if the representation had not been made, the price of his stock would not have been inflated, and there would have been no gain to be realized . . ." Id., at 333-334 (emphasis added).

Similarly to Levine, in this case, plaintiff's alleged misrepresentation that she was

10

disabled "inflated" the reserves that Educators transferred to Hartford (Pl. Stmt., ¶¶ 8-9, 31-33), and Hartford complains that, if it had known the "truth," it would have terminated plaintiff's benefits sooner, and received the full benefit of the money that Educators transferred to Hartford as a result of plaintiff's allegedly fraudulent claim. However, as in Levine, Hartford cannot establish that plaintiff's misrepresentation caused it damages because, if the misrepresentation had not been made, Educators would not have transferred these funds to Hartford in the first place, and there would have been no profit for Hartford to realize. Pl. Stmt., ¶¶ 5, 8-9, 31.

The Second Circuit's reasoning in Levine is not limited to securities cases – it is merely common sense. For example, in Sit-Set supra, the plaintiff sought damages in the form of lost profits it allegedly would have made on a contract but for the defendant's misrepresentation. The court of appeals held that this claim could not stand because, "[u]nder Sit-Set's theory, and in logic, had the 'true' facts of Universal's authority or the 'true' terms of Hodges's offer been represented to Sit-Set, the inevitable result would not have been an enforceable contract of sale, but an aborting of the pre-contract negotiations." Similarly in this case, had the alleged "truth" (that plaintiff was not disabled) been known at the time of the Agreement, Hartford would not have received the $1.29 million dollars in reserves associated with plaintiff's claim to simply keep for its own use – instead, plaintiff's claim would have been eliminated from the Agreement and Hartford would have received nothing associated with plaintiff's claim. Pl. Stmt., ¶¶ 9, 31.

Finally, Hartford may not recover damages on the premise that the "truth" should only have been revealed the moment **after** Educators and Hartford executed the Agreement, and thereby further capitalize on plaintiff's alleged wrongdoing. The courts have uniformly rejected similar attempts by stockholders asserting common law fraud claims, and their reasoning is instructive in this case. See e.g., Levine, supra; Chanoff, supra, 857 F. Supp. 1011 (Nevas, J.);

11

Arent v. Distribution Sciences, Inc., 975 F.2d 1370 (8th Cir. 1992); Crocker v. Federal Deposit Ins. Corp., 826 F.2d 347 (5th Cir. 1987); Arnlund v. Deloitte & Touche, 199 F. Supp.2d 461 (E.D.Va. 2002). In Levine, the Second Circuit explained that the plaintiff also could not establish damages because "he could hardly be heard to claim compensation for the premium he might have extracted from some innocent victim if he had known of the fraud and the buyer did not." Id., at 333-334. Similarly, in Chanoff, this court held that the plaintiff could not establish the cognizable loss necessary to support his fraud claim because he "cannot claim the right to profit from what they allege was an unlawfully inflated stock value." Id., at 1018.[5]

Again, in Crocker, supra, a similar case cited by this court in Chanoff, the Fifth Circuit explained:

> The flaw in the Crockers' argument is that it assumes a market for the stock existed at an artificially high price. This inflated price, and hence the particular market for the stock, was maintained only because of the wrongdoing of the Bank's controlling shareholders, who concealed material financial information from the shareholders and the public that would have demonstrated the failing condition of the Bank. It follows that, had this information been released, the stock price would have immediately and precipitously fallen . . . Thus, there would have been no market for the stock at the artificially high price. Without such a market, the Crockers' envisioned "profit opportunity" evaporates into hardly more than an illusion. **We cannot help but observe the troublesome paradox presented by the Crockers' theory: on the one hand, they claim the defendants' scheme caused their injury; yet, on the other hand, without the scheme, the minority shareholders could never have realized the artificially high profit that they claim to have unjustly lost. In sum, the Crockers complain that the scheme that harmed the minority shareholders also presented a unique profit opportunity, which the plaintiff class unfortunately missed.** In any event, on this theory, the Crockers cannot plead injury sufficient to confer standing under RICO.

---

[5] Chanoff is also instructive in its conclusion that the plaintiff could not establish that margin calls, claimed as an additional item of damages, were caused by the alleged misrepresentation. The court held that margin calls could not be deemed to be a direct result of the alleged fraud because margining is an aggressive and high risk investment strategy, and the losses caused by the margin calls were a direct result of the plaintiff's aggressive investment strategy rather than the misrepresentation. Id., at 1018-1019. Accordingly, the court refused to shift the risk of the margining investor to the defendant. In this case, as well, Hartford chose to assume administration of a block of Educators' claims, and to begin paying those claims, without first reviewing Educators' determination that the claimants were disabled. Pl. Stmt., ¶¶11-12. Hartford thus knowingly undertook the "risk" that Educators had erroneously determined that some of the claimants were disabled, and of paying those claims during the period that it conducted its own investigation. Id.

12

Crocker, 826 F.2d at 351-52 (emphasis added.)  In Arent, supra, the Eighth Circuit also held that the plaintiff could not establish damages where the plaintiff could only have earned the alleged profit at the expense of another party who was ignorant of the truth. Arent, at 1374.  The reasoning of these cases is equally applicable to preclude Hartford's claims.  See Chanoff, citing, Crocker; Arnlund, citing, Crocker, Arent and Sit-Set.

  c. **HARTFORD IS PRECLUDED FROM RECOVERING THE BENEFIT PAYMENTS IT MADE TO PLAINTIFF**

  Hartford also cannot recover the benefit payments made to plaintiff because, as a matter of well-established law, an insurer that investigates and pays a claim may not thereafter disclaim coverage on the basis of facts of which it knew or reasonably could have known at the time of the coverage determination.  Jenkins v. Indemnity Ins. Co., 152 Conn. 249, 257-259, 205 A.2d 780 (1964); Nat'l Casualty Ins. Co. v. Stella, 26 Conn.App. 462, 464-65, 601 A.2d 557 (1992); Agency Rent-A-Car v. ITT Hartford Accident, 1997 Conn.Super.LEXIS 2856 at * 28 (October 23, 1997) (Hartford's "actions in accepting coverage over a period of four years constituted a waiver of its right to disclaim coverage.") (attached); Accord Mutual Ben. Life Ins. Co. v. Lindenman, 911 F.Supp. 619 (E.D.N.Y. 1995).

  In Lindenman, supra, which is in accord with the Connecticut authorities cited above, the court found that the insured had made misrepresentations in his application for insurance, that these misrepresentations were material, and that the insurer would not have issued the policy, or made payments thereunder, in the absence of the misrepresentations.  Nevertheless, the court precluded the insurer's claim for reimbursement of the benefits paid under the policy because insurers have an obligation to investigate the facts upon which their liability depends before making payment and "if insurers knew at the time they paid the loss, 'or upon inquiry

13

might have informed themselves, of the grounds upon which they might have resisted the claim, they cannot afterwards recover it back; for it would open the door to infinite litigation.'" Id.

In this case, the physician hired by Hartford to testify in this action, has concluded that the information, which was in defendants' possession when they paid plaintiff's benefits, showed that plaintiff was never disabled:

- According to Dr. Taub, the medical records, which plaintiff's physicians provided to Educators between 1995 and 1998, showed that plaintiff was not disabled, and any declaration of total disability on the basis of these records was "unjustified." Pl. Stmt., ¶ 21. Hartford had, and reviewed, these medical records when it assumed administration of plaintiff's claim. Id., ¶ 22. Nevertheless, Hartford paid plaintiff's benefits after reviewing these records and, further, in its letter terminating plaintiff's benefits, informed plaintiff that these same medical records "showed that you were unable to perform the material and substantial duties of your occupation." Pl. Stmt., ¶ 23.

- According to Dr. Taub, the supplemental information, which Hartford received during its administration of plaintiff's claim, also showed that plaintiff was not disabled at any time between October 1995 and August 2000. Pl. Stmt., ¶ 25. Yet, Hartford continued to pay plaintiff's benefits and, in its letter terminating plaintiff's benefits, acknowledged that it "should have paid" plaintiff benefits up until August 14, 2000. Pl. Stmt., ¶ 26.

- Hartford itself has alleged in its counterclaim that, by August 14, 2000, it had obtained information that revealed that plaintiff was not disabled and that it only relied on plaintiff's representation that she was disabled until August 14, 2000. Pl. Stmt., ¶ 19. Yet, Hartford continued to pay plaintiff benefits through October 2000. Id.

14

Hartford may not disclaim plaintiff's coverage between October 1995 and October 2000 because, according to Hartford's own counterclaim and witness, defendants know or "upon inquiry might have informed themselves, of the grounds upon which they might have resisted the claim," (Lindenman, supra) but, instead, not only continued to pay plaintiff benefits, but repeatedly informed plaintiff that her medical records established that she was entitled to the benefits paid.  Pl. Stmt., ¶¶ 2-4, 19, 26.

D.  **HARTFORD MAY NOT "MEND ITS HOLD"**

Hartford also may not avoid the waiver of its right to disclaim plaintiff's coverage by recasting its fraud claim as an affirmative defense to plaintiff's breach of contract claim.  See Counterclaim, First Affirmative Defense.[6]  "Where a party gives a reason for his conduct and decision touching any thing involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to mend his hold."   Railway Co. v. McCarthy, 96 U.S. 258, 267-268 (1877) Goodman v. Purnell, 187 F. 90, 93 (2d Cir. 1911) (holding that defendants could not seek to justify their repudiation of a contract by presenting evidence that plaintiff made misrepresentations because "when they deliberately placed their repudiation of the contract on the single  ground set forth in the letter, they thereby waived all objections as to misrepresentations, and should not be allowed after suit was brought to bring up other grounds, not theretofore brought to plaintiffs' attention"); Edwards Mfg. Co. v. Bradford Co., 294 F. 176, 181 (2nd Cir. 1923) (refusing to permit defendant to "mend his hold" by asserting new grounds

---

[6]  The court granted plaintiff's request for permission to file a motion for summary judgment on Hartford's counterclaim on the ground that Hartford cannot establish damages.  Hartford essentially recasts the first count of its counterclaim as an affirmative defense.  Thus, the same undisputed facts that support judgment on the counterclaim, also support judgment on Hartford's first affirmative defense.  Plaintiff respectfully requests that the court consider plaintiff's motion as to the first affirmative defense in the interest of efficiency and judicial economy.

15

for breaching a contract.)

The courts have especially applied the doctrine that precludes a party from "mending his hold" in the context of insurer's denial of coverage. See e.g. Harbor Ins. Co. v. Continental Bank Corp., 922 F.2d 357, 363-364 (7th Cir. 1990), citing, McCarthy, supra; Trans Ocean Container Corp. v. The Yorkshire Ins. Co., Ltd., 81 F.Supp.2d 1340, 1347 (S.D.Fla. 1999) 1347 ("defenses not raised by Underwriters in the initial denial of coverage, which set forth four specific grounds for denial of coverage, must be excluded from use in new defenses by Underwriters.")

In this case, Hartford not only terminated plaintiff's benefits on the single ground that "it is our determination that you **no longer** meet the Policy's definition of Totally Disability [sic] **as of 8/14/00**, and as such your claim has been terminated," but specifically acknowledged that the evidence submitted to Educators showed that plaintiff had previously been disabled, and that Hartford "should have paid" plaintiff benefits up until August 14, 2000. Pl. Stmt., ¶¶ 17, 23, 26. Hartford's first affirmative defense, counterclaim and retained witness's report all claim that the information that was in Hartford's possession before it made these statements, actually showed that plaintiff was not disabled during the period prior to August 14, 2000, and that plaintiff engaged in a fraudulent scheme to receive benefits during that time period. First Affirmative Defense, ¶ 34; Pl. Stmt., ¶¶ 19-22, 25. Hartford is not simply asserting a new justification for terminating plaintiff's benefits, it is contradicting the express representations that it made to plaintiff when it terminated her benefits, and doing so on the basis of evidence that was, admittedly, in its possession when it terminated plaintiff's benefits.

Hartford may not thus "mend its hold."[7] See Trans Ocean Container Corp., at 1346-1347 (precluding insurer from raising a new defense in the lawsuit when it was on notice of the

---

[7] In Harbor Ins. Co., Judge Posner explained that the phrase "mend the hold" "is a nineteenth-century wrestling term, meaning to get a better grip (hold) on your opponent." Id., at 362.

facts giving rise to the defense at the time it denied coverage); Goodman, at 93 (precluding defendant from defending breach of contract claim on grounds that plaintiff made misrepresentation was particularly appropriate where there was no suggestion that defendant lacked the information to support that defense at the time it repudiated the contract); Harbor Ins. Co., at 364-65 (distinguishing the situation where a defendant changes its position on the basis of information that could not have been acquired earlier).

## CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that the court render judgment in plaintiff's favor on Hartford's counterclaim and first affirmative defense.