**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CANDI McCULLOCH | : | CIVIL ACTION NO. 301CV1115(AHN) |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| HARTFORD LIFE AND ACCIDENT | : | |
| INSURANCE COMPANY AND EDUCATORS | : | |
| MUTUAL LIFE INSURANCE COMPANY | : | |
| Defendants. | : | May 28, 2004 |

## PLAINTIFF'S RULE 56(a)(1) STATEMENT

In accordance with Local Rule 56(a)(1), plaintiff Candi McCulloch ("plaintiff")

respectfully submits this Statement of Undisputed Facts in support of her motion for summary

judgment as to the January 6, 2003 First Amended  Counterclaim ("the Counterclaim") of

defendant Hartford Life & Accident Insurance Company ("Hartford."):

1.      In October 1995, plaintiff applied for total disability insurance benefits from her

insurer, Educators Mutual Life Insurance Company ("Educators").  Def. Ex. A(4).[1]

2.      In March 1996, Educators informed plaintiff of its determination that she was

entitled to total disability benefits retroactive to October 1995.   Pl. Ex. B.

3.       Between March 1996 and May 1999, Educators reviewed plaintiff's continuing

entitlement to disability benefits on a number of occasions, and informed plaintiff that it would

not continue to pay plaintiff disability benefits in the absence of satisfactory, ongoing,

"objective, clinical evidence of a disabling condition."  Pl. Exs. G & S.  In the course of

evaluating plaintiff's continuing disability, Educators obtained a combined Independent Medical

Examination ("IME") and paper review of plaintiff's medical records by Dr. Alshon, whom

Educators hired (Pl. Ex. G at H2165-2167; Pl. Ex. I), as well as three independent medical

---

[1]    Unless otherwise indicated, all citations to "Def. Ex." refer to the exhibits submitted by Hartford in support of its Motion for Summary Judgment; all citations to "Pl. Ex." refer to the exhibits submitted by plaintiff in opposition to Hartford's Motion for Summary Judgment; and all citations to "Def. .Supp. Ex." Refer to the exhibits attached to the exhibits attached to Hartford's reply in further support of its motion for summary judgment, which are incorporated by reference herein.

reviews of plaintiff's updated medical records by Dr. Stern of US Medical Review, which

Educators also hired.  Pl. Exs. G, J, K, L.

4.      Between March 1996 and May 1999, Educators continued to pay plaintiff

benefits, and informed plaintiff that it was doing so on the basis of the updated medical

information it received.  Pl. Exs. G, S, T; Exhibit 1 hereto.  Educators informed plaintiff that

"[i]n review of your file, it is clearly documented that you have sustained functional limitations

which prevent you from performing the substantial requirements of your occupation."  Pl. Ex. T.


5.      In August 1999, Educators entered a contract with Hartford ("the Agreement")

related to a group of its insureds, including plaintiff, to whom Educators was paying disability

benefits.  Def. Ex. B(1), Schedule 1.20. Educators described the contract to its insureds as

follows: "Effective July 1, 1999, Educators Mutual Insurance Company has contracted with

Group Reinsurance Plus (GRP), a service provider segment of Hartford Life and Accident

Insurance Company, to administer your disability claim."  Def. Ex. A(38); See also Def. Ex.

B(1), § 2.1.2.

6.      The Agreement provided that, as Educators' claim administrator, Hartford could

issue correspondence and benefit payments directly to Educators' insureds, provided that

Hartford "discloses that it is acting as agent for the Company [Educators] in the performance of

such functions."  Def. Ex. A(38), § 2.1.2.

7.      The Agreement specifically stated that it would not "create any right or legal

relation between" Hartford and Educators' insureds and that Educators "shall be and remain

solely liable to the" insureds on their claims.  Def. Ex. B(1), § 2.2.

8.      Pursuant to the Agreement, Educators transferred over $25 million dollars in

reserves to Hartford, of which $1,294,206.00 was allocated to plaintiff's claim. Def. Ex. B(1), §

4.2 & Schedule 1.20 at EDUC 0149; Exhibit 2 hereto, pp.47-48.    The Agreement required

Hartford to thereafter: (a) calculate and report to Educators, at the close of each calendar quarter

and year, the amount of these reserves that Hartford was holding for each claim that remained

"outstanding," so that Educators could reflect this information in its statutory and GAAP

financial statements, and (b) provide Educators with a written statement from an actuary

attesting that these reserves were sufficient to meet Pennsylvania's requirement for the amount

of reserves that Educators was required to hold for the claims.  Def. Ex. B(1), §§1.26, 1.27, 2.7,

2.8.

9.    If Educators had determined that plaintiff, was not disabled and terminated her

claim before the effective date of the Agreement, her claim would have been eliminated from the

Agreement and either Hartford would not have received the reserves associated with her claim

from Educators or Hartford would have been required to return those reserves to Educators.  Def.

Ex. B(1), §§ 4.2, 4.3, 4.3.3; Exhibit 2 hereto, pp.65-66, 218-219.    However, if Hartford

terminated a claim that was included in the Agreement on its effective date, then Hartford would

be entitled to release the reserves associated with that claim, to its own use.  Def. Ex. B(1), § 2.3;

Exhibit 2 hereto, pp.218-219.

10.    Neither Hartford nor Educators disclosed to the insureds that Hartford had a

financial interest in the disposition of the claims it was administering. Def. Ex. A(38); Exhibit 2

hereto, pp.149-152.

11.    Hartford had the right to review the underlying files of the claims that were

subject to the Agreement.  Def. Ex. B(1), § 4.3; Pl. Exhibit 2 hereto, pp.9, 48-49, 79.  Hartford

chose to review the files of 11 of the claims, which did not include plaintiff's claim.   Exhibit 2

hereto, p.79.

12.     Hartford agreed that its review would be limited to "verification of objective, verifiable, data points and calculation errors," and that it would not be entitled to question Educators' subjective determinations regarding the claims.  Def. Ex. B(1), § 4.3.4.

13.     Hartford conducted an actuarial analysis of the claims, and concluded that it would be profitable for Hartford to execute the Agreement.  Exhibit 2 hereto, pp.213-214.

14.     Following the Agreement, Educators informed plaintiff that Educators had contracted with a "service provider segment of Hartford" to administer and pay her claim.  Def. Ex. A(38).

15.     Between October 1999 and November 2000, Hartford investigated plaintiff's claim for benefits, and paid plaintiff's benefits, "on behalf of Educators," as "administrator" of plaintiff's policy with Educators, and as Educators' agent. See First Amended Counterclaim dated January 6, 2003 (hereinafter "the Counterclaim"), ¶¶ 5, 45; Def. Exs. A(6), (9), (11), (26), (38); Exhibit 2 hereto, pp.149-152; Exhibit 3 hereto, ¶ 8; Def. Ex. B(1), § 2.1.2.

16.     Plaintiff represented to Hartford that she was disabled in response to Hartford's request for information "on behalf of Educators," (Def. Exs. A(6) & (12); Counterclaim, ¶¶ 33, 45) in Hartford's capacity as a "service provider" to plaintiff's insurer, Educators (Def. Ex. A(38); Def. Ex. B(1), § 2.1.2), and for the sole purpose of supporting her claim for disability benefits under her policy with Educators.  Counterclaim, ¶¶ 56, 59; Exhibit 3 hereto, ¶ 8.

17.     On 17, November 2000, Hartford stated to plaintiff that "it is our determination that you no longer meet the Policy's definition of Totally [sic] Disability as of 8/14/00, and as such your claim has been terminated."  Def. Ex. A(30), p.11; See also Def. Ex. A(30), p.1 ("the evidence submitted in support of your claim does not establish that you continue to meet the

4

policy's definition of Total Disability on or after 8/14/00.")

18.    On November 26, 2001, after plaintiff initiated this lawsuit, Hartford filed a counterclaim in which it alleged, for the first time, that plaintiff was not entitled to disability benefits during the period prior to August 14, 2000, that Hartford administered plaintiff's claim and sought reimbursement of the funds it had released to plaintiff during that time period. Compare November 26, 2001 Amended Answer with Affirmative Defenses and Counterclaims, ¶¶ 20, 24, 43, 47[2] with Def. Ex. A(30), pp.1, 11; Counterclaim dated September 24, 2001, ¶¶ 28, 31, 33.    Neither the November 2001 counterclaim, nor any subsequent version of the counterclaim, specifies the date on which Hartford contends plaintiff ceased being disabled. See November 2001 Counterclaim, Count I; December 4, 2002 Counterclaim, Count I; January 6, 2003 Counterclaim, Count I.

19.    The counterclaim alleges that Hartford's investigation, including surveillance, revealed that plaintiff was not disabled and that Hartford only relied on plaintiff's representation that she was disabled until August 14, 2000.    Counterclaim, ¶¶ 49, 40, 55-59.    Hartford conducted the surveillance referenced in the counterclaim in May and June of 2000. Def. Ex. A, ¶ 44.  Dr. Garg performed an IME, scheduled by Hartford, on August 14, 2000.  Def. Ex. A(22) at H3060.  Hartford continued to pay plaintiff benefits through October 2000.  Def. Ex. A(30), p.11.

20.    Hartford retained Dr. Arthur Taub, who charged for his services, to render an opinion in this action.  Def. Supp. Ex. B.

21.     Dr. Taub's opinions include the view that plaintiff's medical records between 1995 and 1998 showed that plaintiff was not disabled, and that, on the basis of these records, any

---

[2]    The November 26, 2001 counterclaim has been superceded by the January 2, 2003 counterclaim and, unless otherwise indicated, all citations to "the Counterclaim" refer to the Januar 2, 2003 counterclaim.

"declaration of [plaintiff's] total disability for function as a physician or in the dual capacity of function as a physician and administrator, were unjustified."  Def. Supp. Ex. B, p. 1, 4-12. Educators had obtained the medical records referenced in pages 1 through 12 of Dr. Taub's report in the course of administering plaintiff's claim between 1995 and 1998.  Pl. Exs. G-R, Y, DD, EE, FF.

22.     After it assumed administration of plaintiff's claim, Hartford received and reviewed plaintiff's medical records from Educators' file that Dr. Taub references at pages 1 through 12 of his report.  Exhibit 4 hereto, p.100; Pl. Ex. EE; Def. Supp. Ex. B, pp.1-12.

23.     Prior to disclosing Dr. Taub's opinion on September 1, 2003, both defendants had informed plaintiff that the medical records submitted to Educators showed that plaintiff was entitled to disability benefits.  Compare, Def. Supp. Ex. B, p.1 with Pl. Ex.T & Def. Ex. A(30), p.3 (stating that "you became entitled to LTD benefits as the evidence submitted [to Educators] showed that you were unable to perform the material and substantial duties of your occupation.")

24.     Prior to disclosing Dr. Taub's opinion on September 1, 2003, neither defendant had informed plaintiff that it disputed plaintiff's entitlement to benefits during the period that Educators administered plaintiff's claim.  Exhibit 3 hereto, ¶¶ 5-6; Def. ex. A(30), pp.1, 3, 11.

25.     Dr. Taub's opinion includes the view that plaintiff's medical records between 1999 and 2000, and the video surveillance of plaintiff in June 2000, also showed that plaintiff was not disabled at any time before August 2000. Def. Supp. Ex. B, pp.1, 13-27.  Hartford obtained the medical records, and the video surveillance, referenced in pages 13 through 27 of Dr. Taub's report before it terminated plaintiff's benefits. Def. Ex. A(30), pp.2-3.

26.     When Hartford terminated plaintiff's benefits, it stated that it "should have paid"

plaintiff benefits up until August 14, 2000.  Def. Ex. A(30), p.11.

27.     A Functional Capacities Evaluation ("FCE") is specifically designed to determine the tasks that can and cannot be performed with reference to the nationally accepted requirements of a given profession.  Pl. Ex. WW, pp.55-56.

28.     Had defendants, at any time between October 1995 and August 2000, taken the position that plaintiff's medical records were insufficient to establish her disability, plaintiff could have sought additional medical evaluations, including an FCE, to establish her functionality at that time, or initiated litigation to establish her functionality at that time.  Exhibit 3 hereto, ¶ 8.

29.     As of November 2000 when Hartford terminated plaintiff's benefits, Hartford had released $91,896 in benefits payments to plaintiff. Exhibit 5, hereto; Def. Ex. A(30), p.11.

30.     After terminating plaintiff's claim, Hartford released over one million dollars, to its own use, out of the $1,294,206.00 in reserves that Educators had transferred to Hartford allocated to plaintiff's claim.  Pl. Ex. NN at H3641-42; Def. Ex. B(1), at EDUC 0149; Exhibit 2 hereto, pp.218-219; Pl. Ex. E, p.64.

31.     But for plaintiff's claim to Educators that she was disabled, Educators would not have transferred the reserves associated with plaintiff's claim to Hartford.  Def. Ex. B(1), §§ 4.2.1, 4.3, 4.3.3 & Schedule 1.20 at EDUC 0149; Exhibit 2 hereto, pp.65-67, 218-219.

32.     The income that Hartford received from Educators in connection with plaintiff's claim exceeded the expenses incurred by Hartford in administering plaintiff's claim.  Def. Ex. B(1), Schedule 1.20 at EDUC 0149; Exhibit 5 hereto; Exhibit NN at H3641-42; Pl. Ex. E, p.64.

33.     Hartford received a financial benefit from plaintiff's representation to Educators that she was disabled.  Exhibit 5 hereto; Def. Ex. B(1) at EDUC 0149; Pl. Ex. NN at H3641-42;

Pl. Ex. E, p.64; Exhibit 2 hereto, pp.218-219.