



202 North Prince Street  
P.O. Box 83149  
Lancaster, PA 17608-3149

717 397-2751  
800 233-0307  
FAX: 717 397-1821

*file*

| | |
|---|---|
| Enrollee | Candi McCulloch MD |
| Claimant | Candi McCulloch MD |
| Soc Sec Number | 266869400 |
| Claim Number | 608050345100 |
| Begin Date | 10/03/95 |
| Policyholder | PGGIA085 |
| | American College of Physicia |
| Certificate | 7723 |
| Check Number | 25294 |
| Processor | John J. Craft, Jr. |
| Check Date | 01/13/98 |

TO:   Candi McCulloch MD  
130 Everglade Ave  
Palm Beach, FL 33480

### DISABILITY INCOME PAYMENT
### 09/01/97 - 12/31/97

| | Payment for This Claim | Year to Date This Claim | Total to Date This Claim |
|---|---|---|---|
| Gross Benefit | 28,000.00 | 28,000.00 | 168,000.00 |
| COLA-w/o FIT Taxable | 1,291.73 | 1,291.73 | 3,587.73 |
| Net Benefits | 29,291.73 | | |
| Payment Totals | 29,291.73 | 29,291.73 | 171,587.73 |

Remarks:
-- ***** We have completed an additional evaluation of your claim, based upon receipt of updated medical information. As a result, benefits are payable beyond the previous paid-through date of 8/31/97. This benefit pays at the rate of $7,210.00 monthly for 9/1 - 10/2/97, and at the rate of $7,364.00 monthly for 10/3/97 onward, due to your cost of living increase which is effective on 10/3 of each year.

| From | To | Paid Days | Net Benefit | Plan Benefits | | Summary of Payment Period Day | |
|---|---|---|---|---|---|---|---|
| 09/01/97 | 09/30/97 | 30 | 7,210.00 | Frequency | Monthly | Total | 122.0 |
| 10/01/97 | 10/02/97 | 2 | 480.66 | Amount | 7,000.00 | Eligible | 122.0 |
| 10/03/97 | 10/31/97 | 29 | 6,873.07 | | | Payable | 122.0 |
| 11/01/97 | 11/30/97 | 30 | 7,364.00 | | | | |
| 12/01/97 | 12/31/97 | 31 | 7,364.00 | | | | |

| Payment Amount | |
|---|---|
| | 29,291.7 |



2.

Page 9

1  number -- H 11857 would be the separation. However,
2  there are many copies of this, so I'm really not sure.
3      Q   Go slow for a second. H 11857?
4      A   Right.
5      Q   And does it end at some page?
6      A   11916.
7      Q   Okay. 11916.
8      A   That's the due diligence file.
9      Q   That's the due diligence file. Okay. And the
10 other portion of the file --
11     A   Would be my file.
12     Q   That would be H 11720 --
13     A   To 856, I'm assuming.
14     Q   You know, I've learned in this case I don't
15 assume. 11856?
16     A   Yes.
17     Q   Great. And that's what you're calling your
18 file?
19     A   Yes.
20     Q   And can you tell me where these records were
21 maintained as of -- I just got them Wednesday. So I'm
22 trying to understand where they were before then?
23     A   This was in the -- the auditor that did the due
24 diligence, it was on his desk.
25     Q   That would be the part of the Exhibit 108 that

Page 47

1  that -- again, there's that assume word. I do think
2  that information is kept, but I'm not privy to that.
3     Q   Okay. Who keeps that kind of information?
4     A   The actuarial accounting area. I don't know
5  exactly what reports they do keep, what data they do
6  keep, and how long they keep it. But that would be
7  who I would go, to find out if it was available.
8     Q   Okay. And by the way, you've indicated to it
9  as being a buy out of claims.
10    A   Uh-huh.
11    Q   Are you referring to the so-called reinsurance
12 agreement between Employer's and The Hartford; am I
13 correct?
14          MS. SHARP: You said Employer's. You mean
15 Educator's?
16          MR. GERSTEN: Educator's. Sorry. I did it
17 again. I apologize. Thanks for the clarification.
18          THE WITNESS: In this particular instance,
19 yes.
20    Q   (By Mr. Gersten) And when you say a buy out of
21 claims, are you aware that The Hartford was actually
22 paid money to take over the claims?
23    A   Yes.
24    Q   And how much money was The Hartford paid?
25    A   I don't know for sure. I think it was in the

Page 48

1  -- I believe it was around 25 million, but I don't
2  know for sure what the exact number was.
3      Q   Okay.  Do you know how that number was arrived
4  at?
5      A   By evaluating the claims that were given to us.
6  And, in part, by the due diligence that we performed
7  on the Educator's business prior to the sale.
8      Q   Okay.  All right.  Is there any information
9  that -- you used the term evaluation of claims.
10         If I wanted to find out what The Hartford
11 currently considered the evaluation of the claims are
12 for this book of business, what would I have to look
13 for?
14     A   Can you rephrase that?
15     Q   Sure.  You used the term evaluation of claims.
16     A   Uh-huh.
17     Q   So I'm trying to find out if there's
18 information you could find, about the evaluation of
19 the claims contained in Exhibit 109 currently?
20     A   I would go to our accountant if I wanted -- the
21 aggregate information?
22     Q   Uh-huh.
23     A   I would go to Jason.
24     Q   Okay.  And what is it you would ask Jason?
25     A   I believe we already discussed this.  I would

Page 49

1  ask him for the open liability on the Educator's
2  block.
3      Q   Okay.  That's what I wanted to make sure about.
4  Thank you.  So when you term -- when you use the term
5  open liability, is that the same -- and please
6  correct me if I'm wrong -- as what you called the
7  evaluation of claims, contained in Exhibit 108, on
8  this list of claims?
9      A   Right.  That would be the reserve that
10 Educator's was holding for those claims.
11     Q   Okay.  So that's what you would be calling the
12 open liability in your books; correct?
13     A   Yes.
14     Q   Was there any time in the past, since the
15 transfer of claims from Educator's, that you sought to
16 find out the open liability of claims related to the
17 Educator's book of business?
18     A   No.
19     Q   By the way, why did Gloria leave the company?
20     A   She retired.
21     Q   Now, going back to your use of the word
22 adjudication of claims, is there any obligation The
23 Hartford has in adjudicating a claim?
24             MS. SHARP:  Object to form.
25             THE WITNESS:  The obligation of any

1   lack of a better word?

2   A   No.  There's 57 on the first three pages,
3   though.

4   Q   There may be, if my counting is right.  I'm
5   just trying to understand --

6   A   No, I don't.

7   Q   Okay.  Am I correctly understanding that
8   everything that's listed in documents 11857 through
9   11859, which lists the claimants in the potential --
10  as of 12-31-98, should be included in some format in
11  The Hartford's current listing?

12          MS. SHARP:   Object to form.

13          THE WITNESS:   No.

14  Q   (By Mr. Gersten)  Why not?

15  A   There are -- as I explained before, we took out
16  the book of business in July of 1999.  This valuation
17  date was December of '98.

18  Q   Okay.

19  A   Claims could have terminated, for several
20  reasons, before we took over the actual claim process.

21  Q   Fair enough.  Is there a list of claims that
22  were actually taken over?

23  A   Not to my knowledge.

24  Q   Okay.  So am I understanding correctly that the
25  book of business was transferred, and there's no list

Page 66

```
 1   of claims that were subject to the transfer?
 2       A    The actuaries would have had such a list.
 3       Q    Okay.  Do you know if there is such a list?
 4       A    Do I know for sure?  No.
 5       Q    Okay.  Who would be the actuary who would have
 6   such a list?
 7       A    At this point I would go to Jason Lichtman, not
 8   to the actuary department; to our accountant.
 9       Q    Well, you indicated the actuaries would have
10   the list?
11       A    Right.  He's up in the same department, but
12   just works on accountant things.  But he would know if
13   such a list existed.
14            At one point such a list would have had to
15   have existed --
16       Q    I would think so.  That's why I'm asking.
17       A    -- for the actual true-up.  When we buy a book
18   of business, because of the changes -- where someone
19   will die, or somebody goes off of claim for the
20   benefit period expiring, or for whatever reason -- as
21   we input claims, they would then check against the
22   list of claims that actually were input, and see if
23   there are any discrepancies with the price that they
24   determined for the actual buy out.
25            And sometimes the price then would be
```

Page 67

1  adjusted downward.  If someone died, or you're not
2  taking over the liability of that claim, the price
3  would be adjusted downward.
4     Q   Okay.  Do you know if there is such a -- you
5  called it a chew-up; what does that mean?
6     A   It's a true-up, where it's a look at the data,
7  to make sure that everything you were given, that you
8  got the claims on, is actually correct.
9     Q   Did a chew-up take place in this particular
10 situation?
11    A   Yes.
12    Q   When did the chew-up take place?
13    A   It usually takes place within 90 to 180 days
14 after the buy out.  In this particular instance, I do
15 not know the exact date.
16    Q   Okay.  What is the document that evidences this
17 chew-up entitled?
18           MS. SHARP:   Object to form.
19           THE WITNESS:   There is no document that I
20 know of, so I wouldn't know any name.
21    Q   (By Mr. Gersten)  Okay.  Who did the chew-up
22 here in this particular transaction?
23    A   Our actuarial department.
24    Q   And do you know who in the actuarial
25 department?

Page 79

1  they were going to litigation.  They were both in
2  arbitration.
3           That's one of the policy provisions; that any
4  claim dispute would be subject to arbitration.
5      Q   And looking at page 11827.
6      A   (Witness complies.)
7      Q   Can you tell me whose handwriting this is?
8      A   Don Loveland.
9      Q   And what is the purpose of filling this
10 document out?
11     A   That's our document that's filled out for each
12 claim when we do a due diligence, so that we know
13 what's in the claim file, and what has actually been
14 done on the file.
15     Q   Okay.  And when you say the due diligence, is
16 there a similar form that was done in connection with
17 Candi McCulloch?
18     A   She was not subject to the due diligence.
19     Q   Okay.  That's what I wanted to know.  How many
20 claims were actually subject to the due diligence?
21     A   I believe we reviewed eleven.  We selected
22 twenty and reviewed eleven, because of time
23 constraints.
24     Q   What kind of time constraints were there?
25     A   Don traveled to Educator's, and had a day and a

Page 149

1       THE WITNESS: I don't have any personal
2  knowledge of that either.
3     Q   (By Mr. Gersten) Okay. Based upon your review
4  of the transcripts of Kim Gabrielsen and Sue Wilk, are
5  you able to answer my question?
6     A   Not in detail. I didn't commit them to memory,
7  so...
8     Q   Okay. What's your understanding?
9     A   It's my understanding of the process of looking
10 in the national economy.
11    Q   Do you know what was done to qualify?
12    A   The details, I don't believe were in those
13 deposition. I don't have them.
14    Q   Okay. As you sit here today, do you have any
15 information, which you're aware of, that The Hartford
16 engaged in any kind of review to learn what kind of
17 training was required, to perform the occupation that
18 you've described today of Candi McCulloch?
19    A   I don't have any knowledge of that.
20    Q   What does the term "administered by" mean, in
21 the phrase administrated by The Hartford on behalf of
22 Educator's?
23    A   It's actually a phrase that was given to us by
24 our legal department, as the requirement to put on all
25 of our correspondence and all our checks. As far as

Page 150

1   being administered by, it means that we are the claim
2   administrator on behalf of Educator's Mutual.
3           So that we -- again, it's almost like a third
4   party administrator; somebody who handles the claim
5   adjudication process on behalf of someone else.
6   Q   And taking the way you've just described it,
7   that's what the letterhead would appear to disclose
8   when you write down administered by Hartford on behalf
9   of Educator's; is that correct?
10  A   Yes.
11  Q   And am I correct there would be no way of
12  knowing, based upon that description, that one hundred
13  percent of the liability and an indemnification had
14  been entered into between Educator's and Hartford; is
15  that correct?
16          MS. SHARP:   Object to form.
17          THE WITNESS:   That's correct.
18  Q   (By Mr. Gersten)   And do you know if there is a
19  reason why you chose to disclose only the
20  administration on behalf of Educator's language, as
21  opposed to disclosing the hundred percent co-insurance
22  arrangement?
23          MS. SHARP:   Object to form.
24  Q   (By Mr. Gersten)   Let me restate my question.
25  A   Okay.   I was going to say, I forgot the

Page 151

1  beginning of the question.
2     Q   Is a one hundred percent co-insurance
3  arrangement, as you've described between Educator's
4  and Hartford, the same as an arrangement as a third
5  party administrator?
6     A   No.
7     Q   What's the difference?
8     A   The difference is that we have the risk, and we
9  have the financial liability, and third party
10 administrator does not.
11    Q   Okay.  Now, is there a reason why you chose not
12 to disclose to your insureds, that you had accepted
13 the risk and instead chose to disclose that you were
14 like a third party administrator?
15           MS. SHARP:   Object to form.
16           THE WITNESS:   I have no reason one way or
17 the other.
18    Q   (By Mr. Gersten)  In your position, as you sit
19 here today -- strike that.  Have you been involved in
20 situations where Hartford group re has taken over only
21 the third party administration of a block of business?
22    A   Yes.
23    Q   So in your mind, is there a difference between
24 the label third party administrator and a one hundred
25 percent co-insurance arrangement?

Page 152

```
 1    A    There's a financial difference.
 2    Q    And what's that difference?
 3    A    One has liability and one does not.
 4    Q    Which one has the liability?
 5    A    The co-insurance arrangement.
 6    Q    I have some notes here; if you give me a
 7  second.
 8    A    Can I go get some more water, please?
 9    Q    Sure.  Take a break any time.
10         (Off the record.)
11         (Short recess.)
12    Q    (By Mr. Gersten)  Back on.  I'm going to show
13  you a document that is labeled 64-1-p, that was
14  introduced at a different deposition.
15         And I'm just curious to know why this
16  document wouldn't include the administered language,
17  as it concerns this particular claim?
18    A    It should have.  It was just a mistake.  It has
19  to be manually put on.  The heading of our letters and
20  everything, we have a claim -- a letter system that
21  imports data into the field.  That isn't one of the
22  fields that it imports any data into.  So it was just
23  a mistake on Sue's part.
24    Q    Okay.  I'm showing you a copy of 64-1-9, and
25  see if you can show me where the language,
```

Page 213

1    Q    (By Mr. Gersten)  If I say in that range,
2  that's good enough for you?
3    A    That's good enough for me.
4    Q    Okay.  Do you know how it was that The Hartford
5  made a decision to buy the book of business, in
6  exchange for a payment of 30 million dollars?
7            MS. SHARP:  Object to form.
8            THE WITNESS:  Why they wanted to buy the
9  book of business?
10   Q    (By Mr. Gersten)  (Nods head.)
11   A    Part of what we do in our particular area, is
12 to buy closed books of business.  By closed, I mean
13 cancelled policies.  And so if an offer comes to --
14 somebody comes to us, or if our sales force is talking
15 to other companies, an opportunity might arise, and
16 you buy the book of business.
17           We look at it thinking there are oftentimes
18 that we use different reserving bases.  I can't get
19 too technical on that, but I know there are different
20 ways companies reserve.
21           And if people are using the old reserving
22 tables, they may be way over reserved or under
23 depending -- or they may be way under reserved.  It
24 depends on your interest rates.
25           There's all types of things that come into

Page 214

1  it.  And they would look to see whether this would be
2  a profitable venture for The Hartford.  And it also
3  has to be a profitable venture for the selling
4  company, or they won't take it --
5      Q   Okay.  And are there any --
6      A   The offer.
7      Q   And are there any documents, that you're aware
8  of that The Hartford has, that went into determining
9  the questions you just mentioned with respect to the
10 reserve, and over reserving, or under reserving?
11     A   I'm not aware of them.
12     Q   Okay.  Do you know if there's any other
13 documents that exist, in connection with this
14 acquisition of this book of business?
15     A   I'm not aware of it.
16     Q   Now, in terms of what you said The Hartford did
17 to assess the functional capacity to perform Dr.
18 McCulloch's occupation, do you know if --
19     A   I think I told you, in general, what is done.
20     Q   Okay. Well, do you know, as it applied to this
21 particular situation, whether anyone considered her
22 taking narcotic and sedative medications?
23     A   I don't know how the decision was made.  I
24 don't know exactly what went into it.
25     Q   If consideration was taken that she was

Page 218

```
 1              MS. SHARP:    Object to form.
 2              THE WITNESS:   It takes her headaches away,
 3    and that's all.  I have never heard her complain about
 4    anything else.
 5       Q   (By Mr. Gersten)  Okay.  Going to Exhibit 109.
 6       A   (Witness complies).
 7       Q   Do you know, in Exhibit 109, ma'am, if there
 8    are any claims that had a reserve -- did the claims
 9    that are listed in 109 have a reserve -- a DLR?
10       A   Did they ever?
11       Q   Yes.
12       A   Yes.
13       Q   And do you know whether any of these claims
14    listed in 109 currently have a DLR?
15       A   Yes.
16       Q   And how would I be able to ascertain which
17    claims have a DLR today, from Exhibit 109?
18       A   You only have a disabled life reserve if
19    you have an approved claim.
20       Q   Okay.  So as we look at the approved claims --
21    as we look at this exhibit, only those claims that say
22    approved have a DLR?
23       A   Yes.
24       Q   And am I correct that any time there was a
25    termination, as set forth in Exhibit 109, there would
```

Page 219

1   be a release of a DLR?
2           MS. SHARP:   Object to form.
3           THE WITNESS:   Yes.
4   Q   (By Mr. Gersten)   Was there, in fact, a release
5   of DLR each time we see termination, as set forth in
6   the claims, spelled out on Exhibit 109?
7           MS. SHARP:   Object to form.
8           THE WITNESS:   Except for that one that was
9   entered in error, and they terminated it.  They may
10  not have had it.  They may not have had a DLR.
11  Q   (By Mr. Gersten)   What kind of time frame goes
12  on for the release of DLR?
13  A   A DLR is not set until it's in our claim system
14  for one month cycle, so they can set the DLR.
15  Q   Well, then I guess my question is, so I
16  understand it, when does the DLR get set, as it
17  relates to these claims as set forth in Exhibit 109?
18  A   They would be set within the month.
19  Q   Okay.  Within the month of the date of
20  disability or --
21  A   No.  The month it was input into our claim
22  system.
23  Q   Okay.  And when would we be able to see when it
24  was inputted into your claim system, from Exhibit 109?
25  A   You wouldn't.