# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CANDI McCULLOCH | : | CIVIL ACTION NO. 301CV1115(AHN) |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| HARTFORD LIFE AND ACCIDENT | : | |
| INSURANCE COMPANY, and | : | |
| EDUCATORS MUTUAL LIFE | : | |
| INSURANCE COMPANY, | : | |
| Defendants. | : | June 9, 2004 |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

As a matter of undisputed fact, defendant Educators Mutual Life Insurance Company

("Educators"):

(1) granted a third party unfettered discretion to terminate plaintiff's disability
benefits, and a financial incentive of over one million dollars to do so, but represented to plaintiff
that the third party was merely acting as a "service provider" to Educators, and that this in no
way affected her rights under her certificate of insurance;

(2) after plaintiff filed this action for wrongful termination of her benefits,
immediately agreed to a joint defense with the third party although it had no information from
which to assess whether plaintiff's claim had merit; and, thereafter,

(3) claimed that it had "sold" plaintiff's claim to the third party in 1999 and thus had,
and performed, no responsibilities as plaintiff's insurer since that time; but

(4) failed to disclose this information to plaintiff at the time of the purported "sale" or at
any time before this lawsuit, because it was not "pertinent" to her; and

(5) refused to disclose the contract evidencing the purported "sale" of
plaintiff's claim in this action until compelled to do so by court order.

As a matter of law, this was a breach of contract and a breach of the covenant of good faith and

fair dealing. Accordingly, plaintiff respectfully requests that the Court grant judgment in her

favor on the second and third counts of her Second Amended Complaint.

## STATEMENT OF FACTS

Beginning on or about September 24, 1994, plaintiff purchased disability insurance from Educators through a group disability policy maintained by her employer. Plaintiff's Local Rule 56(a)(1) Statement, ¶ 1 (hereinafter "Pl. Stmt.") Educators provided plaintiff with a copy of her policy and a certificate of insurance. Id., ¶ 2. In October 1995, plaintiff applied to Educators for total disability insurance benefits. Id., ¶ 3. In March 1996, Educators informed plaintiff of its determination that she was entitled to total disability benefits retroactive to October 1995. Id.

Between March 1996 and May 1999, Educators obtained a combined Independent Medical Examination ("IME") and paper review of plaintiff's medical records by Dr. Alshon, who concluded that plaintiff was totally and permanently disabled from her occupation, as well as three independent medical reviews of plaintiff's updated medical records by Dr. Stern of US Medical Review, all of which also concluded that plaintiff was disabled from her occupation. Pl. Stmt., ¶ 4. Educators continued to pay plaintiff benefits during this time and had informed plaintiff that "[i]n review of your file, it is clearly documented that you have sustained functional limitations which prevent you from performing the substantial requirements of your occupation." Id.

During this time period, Educators ceased writing professional association policies and accepting premiums – policies such as plaintiff's had become an expense to Educators for which it was no longer earning new income. Pl. Stmt., ¶ 5. As a result, Educators wanted to sell its open disability claims, including plaintiff's claim. Id. However, because the disability insureds were located throughout the country, Educators would have been required to submit any agreement in which it sought to substitute another insurer for itself, to the Insurance Commissioners of a multitude of states, as well as to obtain the consent of the policy holders.

Id., ¶ 6.

In August 1999, Educators entered a contract ("the Agreement") with defendant Hartford Life & Accident Insurance Company ("Hartford") related to a group of its insureds, including plaintiff, to whom Educators was paying disability benefits. Pl. Stmt., ¶ 7. The Agreement required Hartford to administer and pay the disability claims of Educators' insureds. Id. The Agreement provided that, as Educators' claim administrator, Hartford could issue correspondence and benefit payments directly to Educators' insureds, provided that Hartford "discloses that it is acting as agent for the Company [Educators] in the performance of such functions." Id., ¶ 8. The Agreement specifically stated that it would not "create any right or legal relation between" Hartford and Educators' insureds and that Educators "shall be and remain solely liable to the" insureds on their claims. Id., ¶ 8.

Pursuant to the Agreement, Educators transferred over $25 million dollars in reserves to Hartford, of which $1,294,206.00 was allocated specifically to plaintiff's claim. Pl. Stmt., ¶ 9. Pursuant to the Agreement, if Hartford terminated plaintiff, or any other insured's claim, after the effective date of the Agreement, then Hartford would be entitled to release the reserves associated with that claim, to its own use. Id.

On August 26, 1999, Educators described the Agreement to its insureds as follows: "Effective July 1, 1999, Educators Mutual Life Insurance Company has contracted with Group Reinsurance Plus (GRP), a service provider segment of Hartford Life and Accident Insurance Company, to administer your disability claim. This in no way affects your rights under your Certificate of Insurance." Pl. Stmt., ¶ 10. As required by the Agreement, Hartford's subsequent correspondence to plaintiff included a stamp that stated "Administered by Hartford on Behalf of Educators Mutual Life Co." Id., ¶ 11.

Neither Hartford nor Educators disclosed to plaintiff, or the other insureds, that Hartford had any financial interest in the disposition of the claims it was administering.  Pl. Stmt., ¶ 12. Neither Hartford nor Educators submitted the Agreement to any Insurance Commissioner for review and approval, nor did they obtain the consent of the policy holders, nor did Hartford issue a new certificate of insurance to the insureds informing them that Hartford had assumed primary responsibility to them as their insurer.  Id., ¶ 13.

After Hartford assumed administration of plaintiff's claim, Hartford's "Special Investigation Unit" ("SIU") contacted a different insurance company, UNUM, which it believed might have information to support that plaintiff had not been eligible for benefits at the time her disability began because she was not working the number of  hours required for eligibility under her Educators' policy.  Id., ¶ 14.  At the time that Hartford initiated this investigation, no medical personnel at Hartford had reviewed plaintiff's medical records, which Educators' and the independent medical physicians' hired by Educators had concluded "clearly documented that [plaintiff has] sustained functional limitations which prevent [her] from performing the substantial requirements of [her] occupation."  Id., ¶ 15.   The only updated medical record that Hartford had received was an attending physician statement that plaintiff was "unable to perform the material duties of her profession."  Id., ¶ 17.[1]

After Hartford learned that UNUM had settled plaintiff's claim for benefits, the SIU ordered covert surveillance of plaintiff.  Id., ¶ 18.  Hartford had still not obtained a review of plaintiff's records by medical personnel, or any opinion that refuted Educators' conclusion that plaintiff was disabled.  Id.  Hartford then demanded that plaintiff undergo an IME and Functional

---

[1]  Hartford mailed its first request for plaintiff's updated medical records to plaintiff's physicians on the same day that it initiated its fraud investigation. Pl. Stmt., ¶ 16.  Educators' claim staff "found" a "third volume" of Educators' claim file on plaintiff, for the first time, almost one year after it had assumed administration of plaintiff's claim, and almost two full months after it began its fraud investigation. Pl. Stmt., ¶ 15.

Capacities Evaluation ("FCE"). Id., ¶ 19. Hartford represented to the IME physician, Dr. Garg, that plaintiff's occupation consisted of 16 hours per week of "office work" with "no procedures or anything," "hardly any physical exertions," and thirty hours per week of administrative, purely sedentary work. Id., ¶ 20.[2] Dr. Garg, concluded that plaintiff could return to work based on Hartford's representations regarding plaintiff's job requirements, which were not consistent with the duties normally required of an internal medicine physician. Id. ¶ 22.

At Hartford's request, Dr. Garg's added a document to her report which purported to be a "summary of a Functional Capacities Evaluation done on August 14, 2000." Pl. Stmt., ¶ 23. A "Functional Capacities Evaluation" is a term of art that refers to a specific series of tests performed on an individual over a number of hours that is supposed to produce for the tester limitations of strength, mobility and endurance. Id. The tester has guidelines to go by and references from the Department of Labor and extrapolates from the testing an individual's restrictions and limitations and an individual's ability to perform either a sedentary, light, medium or heavy occupation. Id. The test can take up to two to three hours. Id. Dr. Garg did not perform an FCE and Hartford knew that Dr. Garg did not perform an FCE. Id., ¶ 24. Without informing plaintiff, Hartford forwarded the IME report and the "results" of the FCE that had never been performed, to plaintiff's physicians and asked them to comment on her functionality in light of these reports. Id., ¶ 25.

Hartford also induced plaintiff to meet with its SIU investigators, by stating that the meeting was a "routine" and "informal" "interview" with a "field representative" to go over some

---

[2] Plaintiff's policy was occupation specific, not job specific. Pl. Stmt., ¶ 21 Nevertheless, plaintiff's work at the time of her disability specifically required plaintiff to perform all of the duties normally and customarily rendered by an internal medicine physician for a minimum of 16 hours per week, which included conducting full medical examinations, providing urgent/emergent care, performing invasive medical procedures, making hospital rounds as well as managing a women's medical clinic for a minimum of 30 hours per week, which included participating in on-site visits to successful women's health centers, marketing, fund-raising, and training other physicians and nurses. Id.

"formatted questions." Pl. Stmt., ¶ 26. Hartford now admits that the purpose of the meeting was to confront plaintiff with video surveillance, and that it intentionally failed to disclose this fact to plaintiff. Id., ¶ 27. The questions to be asked at the meeting were hardly "formatted" - Hartford staff met on two separate occasions to script the interview. Id., ¶ 28. At the meeting, the investigators induced plaintiff to sign a statement that was purportedly inconsistent with her videotaped activities before they disclosed the surveillance. Id., ¶ 29.

On November 17, 2000, Hartford terminated plaintiff's disability benefits on the ground that while the evidence submitted to Educators showed that plaintiff was disabled, the evidence submitted to Hartford showed that plaintiff was no longer disabled as of August 14, 2000. Pl. Stmt., ¶ 30. In its letter terminating plaintiff's benefits, Hartford relied on the tainted IME report, the false FCE results, plaintiff's physician's failure to comment on these reports,[3] and plaintiff's signed statement. Id., ¶ 31. As a result of terminating plaintiff's benefits, Hartford was able to release, to its own use, over one million dollars out of the $1,294,206.00 in reserves that Educators had transferred to Hartford associated with plaintiff's claim. Id., ¶ 32.

On June 15, 2001, plaintiff filed her initial complaint in this action. Although Educators admittedly had no information regarding Hartford's conduct with respect to plaintiff's claim (Pl. Stmt., ¶ 35), rather than to request Hartford's records to determine whether Hartford properly administered plaintiff's claim and terminated her benefits, upon receiving plaintiff's complaint, Educators immediately agreed with Hartford to formulate a common legal strategy and defense. Pl. Smt., ¶ 36.[4]

---

3    Hartford requested the physicians to state whether they agreed to disagreed with the IME physician, Dr. Garg's assessment, and informed the physicians that, "[i]f no response is received, we will assume that you have no comment." Pl. Stmt., ¶ 31. In the letter terminating plaintiff's benefits, Hartford represented that it had informed the physicians that, "if responses were not received, we would assume that they were in agreement with Dr. Garg's assessment," and that four of her physicians failed to respond. Id.

4    Educators and Hartford have asserted that every communication between them after plaintiff initiated this lawsuit is subject to the joint defense privilege. Pl. Stmt., ¶ 36. The "joint defense privilege" attached only to

Soon after filing her action, plaintiff requested that defendants produce documents relating to Hartford's assumption of the function of administrator for her claim. Id., ¶ 33. Defendants refused to produce any such documents, including the Agreement, until September 2002 on the ground that this information was confidential. Id. Hartford finally disclosed the Agreement in September 2002, almost one year after plaintiff had requested this information, and only after the court ordered it to do so. Id.

During depositions this past summer, Educators disclosed to plaintiff, for the first time, that Educators had treated the Agreement as a sale of its claims after which it had no responsibility or liability to the claimants, notwithstanding (a) Educators' representations to plaintiff that it had merely contracted with Hartford to provide administrative services, (b) Hartford's representations to plaintiff that it was investigating her claim, and terminating it, on Educators' behalf, (c) the Agreement, which stated that Educators would remain solely liable to its claimants, and that Hartford would be administering the claims as Educators' agent, and (d) Educators' statutory financial reports, which represent that the claims belong to Educators but are reinsured by Hartford. Pl. Stmt., ¶ 34.

On November 6, 2003, Educators moved for summary judgment on plaintiff's claims. According to Educators, its abdication of its role as plaintiff's insurer as of July 1999 was not only permissible because the Agreement constituted a "sale" and "assignment" of plaintiff's claim, in which Educators "ceded all responsibility and liability for Plaintiff's claim to Hartford," but it furnishes grounds for summary judgment in its favor. Educators' Motion for

---

communications made between a party to the attorney for another party after a joint defense effort or strategy has been decided upon and undertaken by the respective parties and their respective counsel. Only those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected. Schwimmer v. United States, 892 F.2d 237, 243 (2nd Cir. 1989). To claim protection under the doctrine the parties must show that they had a common legal, as opposed to commercial, interest, and that they cooperated in forming a common legal strategy. Walsh v. Northrop Grumman Corp., 165 F.R.D. 1618 (E.D.N.Y. 1996) The parties sharing the privilege must have cooperated in formulating a common legal strategy. Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 447 (S.D.N.Y. 1995).

Summary Judgment, pp.1, 5. Educators has asserted that it did not disclose this information to plaintiff while her claim was being adjudicated because it was not "pertinent" to her. Pl. Stmt., ¶ 34.

Hartford's Regional Vice President of Group Reinsurance Plus has acknowledged that Hartford did not buy the claims, that Hartford did not assume Educators' policies, that Educators remained ultimately responsible for the claims, and that the parties did not fulfill the review and consent requirements of an assumption agreement or novation of plaintiff's claim. Pl. Stmt., ¶ 37.

## ARGUMENT

### A.    STANDARD FOR GRANTING SUMMARY JUDGMENT

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Id. at 322-324.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

**B.     EDUCATORS BREACHED ITS OBLIGATIONS TO PLAINTIFF AS A MATTER OF UNDISPUTED FACT AND LAW**

Educators had a contractual obligation to administer plaintiff's claim reasonably and in good faith, and to pay plaintiff benefits to which she was properly entitled. See Uberti v. Lincoln Nat'l Life Ins. Co., 144 F.Supp.2d 90 (D.Conn. 2001); Coventry v. American States Ins. Co., 961 P.2d 933 (Wash. 1998) (insurer has a duty not only to pay benefits when due, but to administer claims properly and in good faith.) Educators was obligated to perform those obligations with honesty of purpose, free from intention to defraud, and with faith to its duty to plaintiff. Id., p.103. Educators was further obligated to refrain from doing anything to injure plaintiff's right to receive the benefits of her insurance contract. See e.g., Hudson United Bank v. Cinnamon Ridge Corporation, 81 Conn.App. 557, 576 (2004); Coventry v. American States Ins. Co., 136 Wn.2d 269, 278-279, 282-283, 961 P.2d 933 (1998).

Moreover, Educators bears the burden of proving, by clear and convincing evidence, that it exercised good faith, Miller v. Appleby, 183 Conn. 51, 55, 438 A.2d 811 (1981), because it had a fiduciary obligation to plaintiff. See United Technologies v. American Home Assur.

Co., 118 F.Supp.2d 174 (D.Conn. 2000); Uberti v. Lincoln Nat'l Life Ins. Co., 144 F.Supp.2d 90,

fn.6 (D.Conn. 2001), citing, Farricielli v. Nationwide Mutual Fure Ins. Co., 17 Conn.L.Rptr. 368

(Conn.Super. 1996) ("At the time the insured makes his claim and while it is being processed the

insurer stands in a fiduciary relationship to the insured."); See also Gregory v. Progressive

Northern Ins. Co., 2004 Conn.Super.LEXIS 1238 at *5 (May 13, 2004) (Wagner, J.) (an insured

may assert (attached); Smith v. Allstate Indemnity Co., 1999 Conn.Super.LEXIS 3259

(November 30, 1999) (Melville, J.) ("A breach of the duties imposed by the fiduciary

relationship between the insurer and insured is not tolerable.") (attached).[5]

Educators cannot establish that it acted in good faith because, as a matter of undisputed

fact, Educators acted dishonestly, without faith to its obligation to plaintiff, and in a manner that

it knew might injure plaintiff's right to receive the benefits of her insurance contract in the

following ways:

### 1. Educators Delegated Authority to Administer Plaintiff's Claim To A Self-Interested Entity

[A]n insured receives more for its premium than just the possibility its claim will be
covered when appropriate. In the relationship between the insured and insurer, the insurer
receives both the premium and control over the arrangement.  In first party situations, the
insurer establishes the conditions for making and paying claims. The insurer evaluates the
claim, determines coverage, and assesses the monetary value of the coverage.  Thus, the
insurance contract brings the insured a certain peace of mind that the insurer will deal
with it fairly when a claim is made.  Conduct by the insurer which erodes the security

---

5    Judge Melville previously held that an insurer does not owe its insured a fiduciary duty in the context of a
typical first-party claim, Grazynski v. Hartford Ins. Co., 1997 Conn.Super.LEXIS 1876 at * 8-9 (July 11, 1997)
(Melville, J.) (attached), but apparently changed his opinion in Smith, supra, which involved a claim by an insured
against her own insurance company. Even in Grazysnki, though, Judge Melville recognized that an insurer owes its
insured a fiduciary duty when it takes actions in connection with a third party, which affect the rights of the insured.
Grazynski, at * 8-9.  For purposes of the fiduciary duty analysis, Plaintiff's claims relating to Educators' "sale" of
plaintiff's claim are more akin to a third-party, than first-party, claim, because Educators was exercising exclusive
control over plaintiff's property (her insurance policy and benefits) in a transaction that did not involve a dispute
between Educators and plaintiff. Further, plaintiff was utterly unable to protect her interests in the transaction
because she did not even have notice of the Agreement before it was executed, and Educators thereafter represented
that the Agreement was merely one for administrative services. Pl. Stmt., ¶¶ 10-13, 34. These facts justify a finding
that Educators owed plaintiff fiduciary duty in connection with the Agreement with Hartford. See e.g. Hi-Ho
Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 41, 761 A.2d 1268 (2000).

purchased by the insured breaches the insurer's duty to act in good faith.

Coventry v. American States Ins. Co., supra at 282-283, 961 P.2d 933 (1998) citing, William M. Shernoff et al., Insurance Bad Faith Litigation § 3.04[5], at 3-26 (1991); Smith, supra, at *18.

Educators eroded the security purchased by plaintiff, and failed to give her interests equal consideration with its own, when it (1) delegated authority to Hartford to administer plaintiff's claim and terminate her benefits, and, at the same time, (2) gave Hartford a substantial financial incentive to terminate plaintiff's benefits by transferring almost $1.3 million dollars in reserves associated with plaintiff's claim to Hartford and allowing Hartford to keep those reserves if it terminated plaintiff's claim. This conduct so clearly threatens the rights of an insureds to receive fair claim administration that at least thirty states, including Pennsylvania, where Educators resides, and Florida, where plaintiff resided, specifically provide that "[w]ith respect to any contracts where an administrator adjusts or settles claims, the compensation to the administrator with regard to the contracts shall in no way be contingent upon claim experience" or "savings effected." [6]

## 2. Educators Abdicated Its Role As Plaintiff's Insurer Both Prior to and After Plaintiff Initiated This Action

Educators freely admits that it abdicated its responsibilities to plaintiff since 1999. An insurer cannot simply step aside, abdicate its role, and "impose upon its assured a company

---

[6] See Alab. Rev. Stat. § 20-485.09 (2004); Alaska Stat. § 21.27.650(J) (2004); Ariz. Rev. Stat. Ann. § 20-485.09 (2004); Cal. Ins. Code § 1759.8 (2004); Fla. Stat. Ann. § 626.888 (2004); Idaho Code § 41-910 (2004); Ind. Code Ann. §27-25-8(a) (Burns 2004); Iowa Code § 510.19 (2004); Kan. Stat. Ann. § 40-3808 (2003), Kan. Rev. Stat. Ann. § 304.9-376 (2004); KY. Rev. Stat. Ann. § 304.9-376 (2004); La. Rev. Stat.    §22:3038(A) (2004); N.H. Rev. Stat. Ann. § 402-H:8 (2003); Miss. Code Ann. § 83-18-17(1) (2004); Mo. Rev. Stat. § 376.1087(1); Mont. Code Ann. § 33-17-617 (2003); Neb. Rev. Stat. § 44-5809 (2004); Nev. Rev. Stat. Ann. § 683A.0883 (2004); N.J. Stat. Ann. § 17B:27B-8; N.M. Stat. Ann. § 59A-12A-11 (2004); N.D. Cent. Code § 26.1-27-11 (2003); Okla. Stat. Ann. § 36-1447(B) & § 1447(B); Or. Rev. Stat. § 744.732(1) (2004); Pa. Stat. Ann., tit.40, § 324.10 (2004); R.I. Gen. Laws § 27-20.7-9 (2004); S.C. Code Ann. § 38-51-110 (2003); S.D. Codified Laws § 58-29D-18 (2003); Tenn. Code Ann. § 56-6-408 (2003); Utah Code Ann. § 31A-25-401 (2004); W.Va. Code § 33-46-9 (2003);Wis. Stat. Ann. § 633.11 (2004). Connecticut prohibits a "managing general agent" that administers and pays claims on behalf of an insurer from retaining more than three months of estimated claim payments at one time, and provides that where the "managing general agent" is granted any interest in the profits by controlling claim payments, it may not receive that profit for one year after it is earned. C.G.S. § 38a-90c(c), (i).

unknown and unrelated to the assured. The financial responsibility, the business and moral integrity and reputation of the insurer, the practices followed by it . . . all these and many others are factors relevant to the conscious choice made by the assured as it selects the company with which it will deal. Such matters are of great importance and can affect both the reputation of a business and its pocket-book." American F. & C. v. Penn. T. & F.M. Cas. Ins., 280 F.2d 453 (5th Cir. 1960); Coventry, supra.

It is undisputed that, having placed plaintiff's sole source of income in the hands of a self-interested administrator, Educators simply stepped aside, abdicated all responsibility to plaintiff, and imposed upon plaintiff a company that was not only unknown and unrelated to plaintiff, but that had an interest adverse to plaintiff. Pl. Stmt., ¶¶ 8, 13, 34-35, 37; Section 3, infra. Having delegated the administration of plaintiff's claim to Hartford, Educators had an obligation to supervise Hartford's activities to (1) ensure that Hartford administered plaintiff's claim in a manner that was consistent with Educators;[7] and (2) ensure that Hartford properly performed Educators' obligation to administer and pay plaintiff's claim: "[d]elegation . . . does not free the obligor-delegant from his duty to see to it that performance is rendered . . ." Holland v. Fahnestock & Co., Inc., 210 F.R.D. 487 (S.D.N.Y. 2002), quoting, J. Calamari & J. Perillo, The Law of Contracts § 18-25. "When duties are delegated . . . the delegates obligation does not end" - - "most obligations can be delegated – as long as performance by the delegate will not vary materially from performance by the delegant. The act of delegation, however, does not relieve the delegant of the ultimate responsibility to see that the obligation is performed." Contemporary Mission v. Famous Music Corp., 557 F.2d 918, 924 (2nd Cir. 1977); Gateway Co.

---

7   And, in fact, Hartford's administration did vary materially from Educators' administration. For one thing, while Educators diligently sought independent medical assessments of plaintiff's condition, had concluded that plaintiff's disability was well-established, and simply required plaintiff to furnish evidence that her condition had not improved, Hartford looked for evidence to terminate plaintiff's benefits before its medical staff had even reviewed plaintiff's medical records from Educators, or obtained plaintiff's updated medical records. Pl. Stmt., ¶¶ 4, 14-18.

v. DiNoia, 232 Conn. 223, 233, 654 A.2d 342 (1995) (same).[8]

Having utterly failed to supervise Hartford's administration (Pl. Stmt., ¶ 35), upon receiving notice of plaintiff's claim that Hartford had failed to properly perform Educators' claim administration responsibility, Educators owed plaintiff, at minimum, a duty to inform itself of the manner in which Hartford had administered plaintiff's claim, before it agreed to ally itself with Hartford and against plaintiff. – which it failed to do.  Pl. Stmt., ¶ 36; [9]

### 3. Educators' Attempted to Repudiate Its Legal Obligation to <u>Plaintiff In This Action</u>

Educators' argument, in this action, that it had ceased being plaintiff's insurer since 1999 and thus could not be liable for Hartford's conduct, is a further breach of its contract and obligation of good faith.  The plain terms of the Agreement dictate otherwise.  Pl. Stmt., ¶ 8. Moreover, it is a matter of well-established law that Educators would have a legal obligation to plaintiff even if the Agreement purported to relieve Educators of this obligation, because Educators failed to obtain plaintiff's consent to substitute Hartford in Educators' stead (Pl. Stmt., ¶ 10-13:

> One who owes money or is bound to any performance whatever, cannot by any act of his own, or by any act in agreement with another person, except his creditor, divest himself of the duty and substitute the duty of another. 'No one can assign his liabilities under a contract without the consent of the party to whom he is liable. This is sufficiently obvious

---

8  Connecticut statutes expressly require insurers and reinsurers to oversee the claim processing activities of certain third party administrators.  See e.g., C.G.S. §§ 38a-90d(c) (requiring insurer to conduct semi-annual on-site review of claims processing operations of "managing general agent."); 38a-90c(b) (requiring "managing general agent" that administers claims for insurer to provide monthly reporting); 38a-760ff(e) (requiring reinsurer to conduct at least semi-annual on site inspections of claim processing operations of "reinsurance intermediary manager.")  Regardless of whether Educators and Hartford were technically subject to these statutes, the requirements therein evidence the conduct that an insurer which delegates performance of its claims administration duties should undertake in the exercise of good faith.  See e.g. Renz v. Allstate Ins. Co., 61 Conn.App. 336, 346-47, 736 A.2d 1072 (2001) (noting that even if conduct by insurer was not mandated, insurer should have so acted as a matter of good faith and fair dealing.); Romano v. Nationwide Mutual Fire Ins.. Co., 435 Pa.Super. 545, 646 A.2d 1228 (1994) (court may look to other statutes upon the same or similar subjects to define what constitutes bad faith on the part of an insurer), citing, Rottmund v. Continental Assurance Co., 813 F.Supp. 1104 (E.D.Pa. 1992).

9   Educators claims that, at the time plaintiff filed her complaint, Educators had no knowledge of Hartford's conduct with respect to plaintiff's claim, but asserts that, in its very first communications with Hartford after receiving plaintiff's complaint, it agreed to a joint defense with Hartford.  Pl. Stmt., ¶¶ 35-36.

when attention is called to it, for otherwise obligors would find an easy practical way of escaping their obligations.'

Contemporary Mission, at 924, quoting, 3 Williston on Contracts § 411 (3d ed. 1960); See also

14-109 Appleman § 109.1; Ruwet-Sibley Equip. Corp. v. Stebbins, 15 Conn.App. 21, 26, 642

A.2d 1171 (1988) (same); Gateway Co. v. DiNoia, 232 Conn. 223, 233, 654 A.2d 342 (1995)

(same); Berg v. Liberty Fed. Sav. & Loan Ass'n., 428 A.2d 347, 349-50 (Del. 1981).  Far from

being exempt from this legal principle, insurers must also obtain the consent of the insurance

commissioner before substituting a new insurer in their stead and the new insurer must issue a

certificate of insurance to the insureds.  See 14-109 Appleman § 109.3 & fn. 20; 31 Pa. Code §

90i.1(a), 90i.2, 90i.3; C.G.S. 38a-66.  It is undisputed that Educators and Hartford failed to do so

in this case.  Pl. Stmt., ¶ 13.  Educators' repudiation of its legal obligation in this action was thus

in bad faith.  See O'Donnell v. Allstate Ins. Co., 734 A.2d 901, 907 (Pa.Super.Ct. 1999) ("the

conduct of an insurer during the pendency of litigation may be considered as evidence of bad

faith.")

### 4. Educators Misled Plaintiff To Believe That Hartford Was Merely A Disinterested Claims Administrator and Attempted to Conceal the Agreement from Her.

Good faith also clearly required Educators to disclose to plaintiff that it had delegated

unfettered discretion to a third party to terminate plaintiff's claim and an incentive in excess of

one million dollars to do so, and that, from Educators perspective, it had sold plaintiff's claim to

that third party and no longer had, or intended to act as plaintiff's insurer in any capacity.  See

e.g. Renz, 61 Conn.App. at 346-47 (good faith requires insurer to disclose information that might

affect the policy for which the policyholders had contracted and paid.); Federal Home Loan Mtg.

v. Scottsdale Ins., 316 F.3d 431 (3rd Cir. 2003), quoting, Griggs v. Bertram, 443 A.2d 163 (N.J.

1982) (insurer's "[f]ailure to give prompt notice of . . . a conflict, or potential conflict, is

inconsistent with the overriding fiduciary duty of an insurer to deal with an insured fairly and candidly so that the insured can, if necessary, protect itself."); Jenkins v. Indemnity Ins. Co., 152 Conn. 249, 257-259, 205 A.2d 780 (1964) (insurer has an obligation to provide timely notice of its intent to disclaim liability); Nat'l Casualty Ins. Co. v. Stella, 26 Conn.App. 462, 464-65, 601 A.2d 557 (1992) (same); Accord Mutual Ben. Life Ins. Co. v. Lindenman, 911 F.Supp. 619 (E.D.N.Y. 1995)..[10]

Even if Educators had not initially had an affirmative duty to disclose the terms of the Agreement to plaintiff, Educators was bound to make a full and fair disclosure when it voluntarily chose to inform plaintiff that it had contracted with Hartford for claim administration services and that this contract did not affect plaintiff's rights under her certificate of insurance. Duksa v. Middletown, 173 Conn. 124, 127, 376 A.2d 1099 (1977) (""a party who voluntarily assumes to speak must make a full and fair disclosure as to the matters about which he assumes to speak.")

Educators not only omitted material information in its letter to plaintiff, but, from Educators' own perspective, Educators and Hartford affirmatively misrepresented their relationship to each other and to plaintiff, Pl. Stmt., ¶¶ 10-12, 34-35, and then refused to produce the Agreement, which it believed was dispositive of plaintiff's rights under her insurance contract, until plaintiff obtained a court order compelling it to do so. Id., ¶ 33. This conduct was in bad faith. See Federal Home Loan Mtg., at 446-448 (insurer's failure to produce insurance policy that affected plaintiff's rights until compelled by court to do so violated the obligation to deal with insured fairly and candidly.); Hayes v. Harleysville Mutual Ins. Co., 841 A.2d 121, 127

---

10    See also 40 Pa.Stat.Ann. § 324.11 (requiring disclosure of terms and relationship between insurer and claim administrator); Fla. Stat. Ann. § 626.885; C.G.S. § 38a-66(b)(1)-(3) (requiring notice to insureds of bulk reinsurance agreement that is fair, adequate and not misleading); 18 Del. Code § 4944(b)(1)-(3) (same); 31 Pa. Code § 90i.1(a), 90i.2, 90i.3 (same); See 14-109 Appleman § 109.3 & fn. 20 (citing the plethora of statutes that require the insurer to notify insureds of the substitution of their insurer.)

(Pa.Super. 2003) (insurer's delay in producing document that affected insured's rights was bad faith.)

### C.    **EDUCATORS' CONDUCT INJURED PLAINTIFF**

Educators' conduct injured plaintiff. First, plaintiff has been damaged by the loss of her benefits. As set forth herein, after Educators acknowledged plaintiff's entitlement to benefits, it improperly granted Hartford unfettered authority to terminate plaintiff's claim, improperly gave Hartford a substantial financial incentive to terminate plaintiff's benefits, improperly failed to inform plaintiff of these facts so that plaintiff could take action to protect herself, and Hartford subsequently did terminate plaintiff's benefits.[11]

In its motion for summary judgment, Educators implied that, to establish injury, plaintiff bore the burden to show the "entirely speculative" negative that, "but for" Educators' misconduct, plaintiff's claim would not have been terminated. Educ. Br., p.12, fn.21. Having prejudiced plaintiff's ability to protect her rights under her insurance policy, by (1) failing to disclose or produce the Agreement, which purportedly is dispositive of plaintiff's rights and affirmatively misleading plaintiff to believe that the Agreement had no effect on her rights (Pl. Stmt., ¶ 10); (2) failing to disclose that it had abdicated all responsibility for plaintiff's claim to Hartford; and (3) failing to disclose Hartford's conflict of interest, Educators may not disclaim plaintiff's coverage. See Federal Home Loan Mtg., at 446-448; Griggs, at 168-170; Massachusetts Bonding & Ins. v. Car & Gen., 152 F.Supp.477, 480-481 (E.D.Pa. 1957); City of Carter Lake v. Aetna Cas. and Sur., 604 F.2d 1052 (8th Cir. 1979) (injury is presumed where insurer accepts coverage, begins to perform its obligation to defend the insured, and then withdraws from the defense, even where insured had its own attorney).

---

11    Hartford was clearly motivated to terminate plaintiff's claim regardless of whether plaintiff was disabled. Pl. Stmt., ¶¶ 14-17.

In <u>Federal Home Loan Mtg.</u>, the plaintiff owned a building and, without its knowledge, was an additional insured under a policy issued by the defendant, Scottsdale Insurance, to a contractor, T&R. Scottsdale's counsel waited four months after plaintiff had issued interrogatories, to disclose that T&R even had a policy with Scottsdale, and required the plaintiff to obtain a court order before it would produce a copy of the policy. Id., at 447. Scottsdale then waited eighteen months before it disclaimed coverage in its answer to the plaintiff's complaint. <u>Id</u>. The Third Circuit affirmed the district court's conclusion that Scottsdale not only had a duty to defend the plaintiff under the terms of the policy, but that "it is irrelevant whether the insurer would have been liable under the policy . . . Because of its actions, Scottsdale is equitably estopped from denying coverage and liable to indemnify plaintiffs for the settlements that have been entered." <u>Id</u>., at 446. This was because Scottsdale's conduct prejudiced the plaintiff's ability to take action to protect itself from Scottsdale's conflict of interest and obligated the plaintiff to defend itself. <u>Id</u>., at 447-448. [12]

In this case, Educators not only failed to disclose material information regarding plaintiff's insurance to plaintiff, but affirmatively misled her. Educators represented that it had contracted with Hartford to provide administrative services on Educators' behalf, which would have no effect on her rights under her certificate of insurance (Pl. Stmt., ¶ 10); waited for almost one year in this litigation to produce the Agreement (Pl. Stmt., ¶ 33), which it later claimed was

---

[12]  While <u>Home Loan Mtg.</u> involved a third-party claim, coverage by estoppel is also applied in the first-party context. <u>See</u> <u>e.g.</u> <u>Mutual Ben. Life Ins. Co. v. Lindenman</u>, 911 F.Supp. 619 (E.D.N.Y. 1995). In <u>Coventry</u>, <u>supra</u>, the court refused to impose coverage by estoppel in a typical first party context based on Washington precedent. However, under the rationale articulated in <u>Coventry</u>, coverage by estoppel would be appropriate in the context of plaintiff's challenge to Educators' agreement with Hartford, because, similar to a third party case, Educators was not only aware of plaintiff's claim at the time it acted, but had accepted plaintiff's claim; Educators contributed to the loss alleged by failing to fulfill its obligations as plaintiff's insurer, and particularly by misleading plaintiff; and the consequential damages include the loss of plaintiff's benefits. <u>See</u> <u>Coventry</u>, at 284. If the court concludes that Educators is not estopped from denying plaintiff's coverage, the court should permit plaintiff to submit this portion of her damage claim to the jury. <u>See</u> Plaintiff's Opposition to Educators' Motion for Summary Judgment, docket no.: 148.

dispositive of plaintiff's rights (Pl. Stmt., ¶¶ 34-35); and waited almost two years into the litigation to disclose that it had abdicated all responsibility to plaintiff following the Agreement and to disclose its position that, contrary to its previous representation to plaintiff, the Agreement dramatically affected plaintiff's rights under her certificate of insurance because it constituted a sale of her claim after which Educators had no legal or contractual obligation to her. Id.

Under these circumstances, there is a presumption that Educators' bad faith harmed plaintiff. See City of Carter Lake v. Aetna Cas. and Sur., 604 F.2d 1052 (8th Cir. 1979); Safeco Inc. v. Butler, 823 P.2d 499, 506 (Wash. 1992). This is because "the course cannot be rerun so as to determine whether the insured would have fared better if the insurer had disclaimed properly." Sneed v. Concord Ins. Co., 98 N.J.Super. 306, 320, 237 A.2d 289 (App.Div. 1967).

Educators conduct did, in fact, prejudice plaintiff's ability to protect her rights. Had she known of the purported "sale" of her claim by Educators, plaintiff certainly would have objected – she purchased and paid for insurance from Educators, not Hartford, and reasonably expected Educators to perform the function of her insurer after she became disabled. Pl. Stmt., ¶ 41. Moreover, had plaintiff known that Hartford was administering plaintiff's claim with an impermissible financial incentive to terminate her benefits, plaintiff would have objected to Hartford's administration. Id., ¶ 41. At minimum, had plaintiff known that Hartford was actually a rival for her future benefits, plaintiff would have taken appropriate action to protect herself during Hartford's administration. Id., ¶ 42. Among other things, plaintiff would have refused to meet with Hartford's investigators outside the presence of her attorney, [13] ensured that the IME physician had all of her medical records and an appropriate description of her

---

[13] During the interview, the investigators reportedly brought plaintiff to tears on three separate occasions – two of which occurred before they even confronted plaintiff with the surveillance video and induced her to sign the statement. Pl. Stmt., ¶ 29. It is unlikely that counsel, if he had been present, would have permitted the interview to continue under these circumstances, and certainly would have advised plaintiff not to sign a statement while under such duress. This statement was central to Hartford's termination of plaintiff's benefits. Pl. Stmt., ¶ 29.

occupation before rendering an opinion, and required Hartford to copy plaintiff on all correspondence issued in her case (which would have disclosed that Hartford was forwarding the tainted IME report, false FCE results, and edited video surveillance to plaintiff's physicians to serve as the basis for their opinion on her functionality.) Id., ¶¶ 31, 42. Further, had plaintiff known, prior to this litigation, that Educators had no knowledge of Hartford's conduct, plaintiff would have demanded that Educators', as her insurer with primary responsibility for the administration of her claim, review Hartford's conduct, and potentially avoided the necessity of this litigation. Id., ¶ 43.[14]

In sum, as in Federal Home Loan Mtg., Educators so severely prejudiced plaintiff's ability to protect her rights under her insurance policy, that it is estopped from denying plaintiff's right to receive the benefits of that policy. Id.; See also Massachusetts Bonding & Ins. v. Car & Gen., 152 F.Supp.477, 481-482 (E.D.Pa. 1957) (insurer that abdicates its responsibility and fails to actively participate in a claim cannot enforce the contract provisions intended for its protection or take a position at trial that is wholly inconsistent with the position it took at the time of the claim.); Bead Chain v. Saxton Products, Inc., 183 Conn. 266, 278-279, 439 A.2d 314 (1981) (A defendant may not avoid liability on the ground that plaintiff cannot prove damages, when its own breach created the difficulty of proof.) It is Educators, not plaintiff, that should suffer the consequence of the fact that "the course cannot be rerun so as to determine whether [plaintiff] would have fared better if" Educators had acted properly. Sneed, 98 N.J.Super. at 320.

Second, plaintiff is entitled to damages for the time, money and effort she has been required to expend, including hiring an insurance industry expert, to review Hartford's claim administration, and a medical expert to review plaintiff's medical records, both of which Educators was obligated to do. See e.g. Coventry, at 283 (insured is entitled to recover expenses

---

14

incurred as a result of insurer's failure to properly perform its investigation.); Pl. Stmt., ¶ 38.

Finally, by its non-disclosure and affirmative misrepresentation regarding the relationship between Educators, Hartford and plaintiff, Educators required plaintiff to spend substantial time, money and effort for the first two years of this action, including motions to compel and depositions, to simply obtain discovery of information that Educators was obligated to disclose to plaintiff long before this litigation even began – *inter alia*, that Hartford had a financial interest in the disposition of her claim and that Educators had treated the Agreement as a sale of plaintiff's claim after which it had, and exercise, absolutely no legal or contractual responsibility to plaintiff. Pl. Stmt., ¶ 39.

## CONCLUSION

"An insurance company must be mandated to give equal, if not more, consideration to the insured's interest when making decisions concerning . . . a claim covered by an insurance policy. The principal supporting rationale is that an insurer ought not to be permitted to favor its own interests unless it is then prepared to protect its insured by absorbing the losses which result from the implementation of its business policies." Smith, at 19. For the foregoing reasons, plaintiff respectfully requests that the court grant judgment in her favor against Educators on Counts Two and Three of her Second Amended Complaint.

PLAINTIFF,
CANDI McCULLOCH

By: _____
Eliot B. Gersten, Esq.
Fed. Bar No. ct05213
GERSTEN & CLIFFORD
214 Main Street
Hartford, CT 06106
Tel: (860) 527-7044
Her Attorney

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was mailed, via first class mail, postage prepaid, on June 9, 2004 to all counsel and pro se parties of record, as follows:

Roberta J. Sharp, Esq.
Barry A. Chasnoff, Esq.
Jessica Spangler Taylor, Esq.
Akin Gump Strauss Hauer & Feld, LLP
300 Convent Street, Suite 1500
San Antonio, TX 78205
*Tel: 210-281-7146*
*Fax: 210-224-2035*


Donald E. Frechette, Esq. (ct08930)
Joshua L. Milrad, Esq. (ct19321)
Charles F. Gfeller, Esq. (ct18119)
Edwards & Angell, LLP
90 State House Square
Hartford, CT 06103
Phone (860) 525-5065
Facsimile (860) 527-4198

Eliot B. Gersten