### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CANDI McCULLOCH | : | CIVIL ACTION NO. |
| | : | 3:01cv1115(AHN) |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| HARTFORD LIFE AND ACCIDENT | : | |
| INSURANCE COMPANY, and | : | |
| EDUCATORS MUTUAL LIFE | : | |
| INSURANCE COMPANY, | : | |
| Defendants. | : | June 9, 2004 |

### PLAINTIFF'S RULE 56(a)(1) STATEMENT

In accordance with Local Rule 56(a)(1), plaintiff Candi McCulloch ("plaintiff")

respectfully submits this Statement of Undisputed Facts in support of her motion for

partial summary judgment as to Educators' liability for breach of contract and breach of

the covenant of good faith and fair dealing alleged in counts two and three of her Second

Amended Complaint:

1.      Beginning on or about September 24, 1994, plaintiff purchased disability

insurance from Educators through a group disability policy maintained by her employer.

Educators' Local Rule 56 Statement in Support of Motion for Summary Judgment, ¶ 3

(hereinafter "Educ. Stmt."); Educ. Ex. C(1).[1]

2.      Educators provided plaintiff with a copy of her policy and a certificate of

insurance.  Educ. Ex. C(2).

3.      In October 1995, plaintiff applied to Educators for total disability

---

1    All citations herein to "Educ. Ex." refer to the exhibits appended to Educators' Motion for Summary
Judgment dated November 6, 2003; all citations to "Htfd. Ex." refer to the exhibits appended to Hartford's
Motion for Summary Judgment dated November 6, 2003, docket no.: 136; all citations to "Pl. Htfd. Opp.
Ex." refer to the exhibits appended to plaintiff's opposition to Hartford's motion for summary judgment,
dated December 22, 2003, docket no.: 156; all citations to "Pl. Educ. Opp. Ex." Refer to the exhibits
appended to plaintiff's opposition to Educators' motion for summary judgment, dated December 1, 2003,
docket no.: 148, all of which are incorporated by reference herein.

insurance benefits.  Educ. Stmt., ¶ 7; Educ. Ex. C(3).  In March 1996, Educators

informed plaintiff of its determination that she was entitled to total disability benefits

retroactive to October 1995.  Educ. Stmt., ¶ 8; Pl. Htfd. Opp., Ex. B.

4.       Between March 1996 and May 1999, Educators had obtained a combined

Independent Medical Examination ("IME") and paper review of plaintiff's medical

records by Dr. Alshon, who concluded that plaintiff was totally and permanently disabled

(Pl. Htfd. Opp. Ex. I), as well as three independent medical reviews of plaintiff's updated

medical records by Dr. Stern of US Medical Review, all of which also concluded that

plaintiff was disabled from her occupation.  Pl. Htfd. Opp. Exs. J-L.  Educators continued

to pay plaintiff benefits during this time and had informed plaintiff that "[i]n review of

your file, it is clearly documented that you have sustained functional limitations which

prevent you from performing the substantial requirements of your occupation."  Pl. Htfd.

Oppos. Ex. T.

5.       During this time period, Educators ceased writing professional association

policies and accepting premiums – policies such as plaintiff's had become an expense to

Educators for which it was no longer earning new income.  Educ. Stmt., ¶ 9.  As a result,

Educators wanted to sell its open disability claims, including plaintiff's claim.  Id.

6.       Because the disability insureds were located throughout the country,

Educators would have been required to submit any agreement in which it sought to

substitute another insurer for itself, to the Insurance Commissioners of a multitude of

states, as well as to obtain the consent of the policy holders.  Htfd. Ex. B(1), Schedule

1.20; Exhibit 1 hereto (Mormino, pp.84-85)

7.       In August 1999, Educators entered a contract with Hartford ("the

Agreement") related to a group of its insureds, including plaintiff, to whom Educators was paying disability benefits. Pl. Educ. Opp., Ex. 1. The Agreement required Hartford to administer and pay the disability claims of Educators' insureds. Pl. Educ. Opp., Ex. 1, § 2.1.2.

8.    The Agreement provided that, as Educators' claim administrator, Hartford could issue correspondence and benefit payments directly to Educators' insureds, provided that Hartford "discloses that it is acting as agent for the Company [Educators] in the performance of such functions." Pl. Educ. Opp., Ex. 1, § 2.1.2. The Agreement specifically stated that it would not "create any right or legal relation between" Hartford and Educators' insureds and that Educators "shall be and remain solely liable to the" insureds on their claims. Id., § 2.2.

9.    Pursuant to the Agreement, Educators transferred over $25 million dollars in reserves to Hartford, of which $1,294,206.00 was allocated specifically to plaintiff's claim. Pl. Educ. Opp., Ex. 1, Schedule 1.20. Pursuant to the Agreement, if Hartford terminated plaintiff, or any other insured's claim, after the effective date of the Agreement, then Hartford would be entitled to release the reserves associated with that claim, to its own use. Id., § 2.3.

10.    On August 26, 1999, Educators described the Agreement to its insureds as follows: "Effective July 1, 1999, Educators Mutual Life Insurance Company has contracted with Group Reinsurance Plus (GRP), a service provider segment of Hartford Life and Accident Insurance Company, to administer your disability claim. This in no way affects your rights under your Certificate of Insurance." Educ. Stmt., ¶ 13; Educ. Ex. C(4); Pl. Educ. Opp. Ex. 3.

11.     As required by the Agreement, Hartford's subsequent correspondence to plaintiff included a stamp that stated "Administered by Hartford on Behalf of Educators Mutual Life Co." Pl. Educ. Opp. Ex. 1, § 2.1.2; Pl. Educ. Opp. Ex. 4.

12.     Neither Hartford nor Educators disclosed to plaintiff, or the other insureds, that Hartford had any financial interest in the disposition of the claims it was administering. Pl. Educ. Opp. Ex. 3; Educ. Ex. B(2), at p.71:4-24.

13.     Neither Hartford nor Educators submitted the Agreement to any Insurance Commissioner for review and approval, nor did they obtain the consent of the policy holders, nor did Hartford issue a new certificate of insurance to the insureds informing them that Hartford had assumed primary responsibility to them as their insurer. Pl. Educ. Opp. Exs. 1, §§ 8.4, 9.4; Pl. Educ. Opp. Exs. 3, 7; Educ. Ex. B(2) at p.71:4-24.

14.     After Hartford assumed administration of plaintiff's claim, Hartford's "Special Investigation Unit" ("SIU") contacted a different insurance company, UNUM, which it believed might have information to support that plaintiff had not been eligible for benefits at the time her disability began because she was not working the number of hours required for eligibility under her Educators' policy. Pl. Htfd. Oppos. Ex. U at H3619.

15.     At the time that Hartford initiated this investigation, no medical personnel at Hartford had reviewed plaintiff's medical records, which Educators' and the independent medical physicians' hired by Educators had concluded "clearly documented that [plaintiff has] sustained functional limitations which prevent [her] from performing the substantial requirements of [her] occupation." Pl. Exs. I, J-L, T, U at H3619 (fraud investigation initiated April 4, 2000); Exhibit 2 hereto (Sterle, p.26:7-11 [file was

referred to Nurse Sterle between June and July of 2000]); Htfd. Ex. A(29) (file review

conducted by Hartford's contracted physician on 11/9/00.) Educators' claim staff

"found" a "third volume" of Educators' claim file on plaintiff, for the first time, almost

two full months after it began its fraud investigation. Pl. Stmt., ¶ 15.

16.    Hartford mailed its first request for plaintiff's updated medical records to

plaintiff's physicians on the same day that it initiated its fraud investigation. Htfd. Ex.

A(9); Pl. Htfd. Opp. Ex. U.

17.    At the time Hartford initiated its fraud investigation, the only updated

medical record that Hartford had received was an attending physician statement, which

stated that plaintiff was "unable to perform the material duties of her profession." Htfd.

Ex. A(8).

18.    After Hartford learned that UNUM had settled plaintiff's claim for

benefits, the SIU ordered covert surveillance of plaintiff. Pl. Htfd. Opp. Exs. U at H3619

& Ex. D at 142.  Hartford had still not obtained a review of plaintiff's medical records by

medical personnel, or any opinion that refuted Educators' conclusion that plaintiff was

disabled. Pl. Htfd. Opp. Exs. U at H3619 (surveillance ordered May 17, 2000); Exhibit 2

hereto (Sterle, p.26:7-11 [file was referred to Nurse Sterle between June and July of

2000])

19.    Hartford then demanded that plaintiff undergo an IME and Functional

Capacities Evaluation ("FCE"). Htfd. Ex. A(15).

20.    Hartford represented to the IME physician, Dr. Garg, that plaintiff's

occupation consisted of 16 hours per week of office work with "no procedures or

anything," "hardly any physical exertions," and thirty hours per week of administrative,

purely sedentary work. (Pl. Ex. UU at pp.77, 84-85, 180-182, 188-189, 241-242, 262; Pl. Ex. E at 40).

21.    Plaintiff's policy was occupation specific, not job specific.  Htfd. Ex. A(3), p.5; Pl. Htfd. Opp. Ex. E, at 40; Exhibit 1 hereto (Mormino, pp.118-119.)  Nevertheless, plaintiff's job at the time of her disability specifically required plaintiff to perform all of the duties normally and customarily rendered by an internal medicine physician for a minimum of 16 hours per week, which included conducting full medical examinations, providing urgent/emergent care, performing invasive medical procedures, making hospital rounds as well as managing a women's medical clinic for a minimum of 30 hours per week, which included participating in on-site visits to successful women's health centers, marketing, fund-raising, and training other physicians and nurses.  Htfd Ex. B(3) at Exhibit A thereto, ¶¶ 1, 2, 5, 9, 13, 15, 20, 21; Htfd. Ex. B(4) at Exhibit A thereto, ¶¶ 4, 13, 14, 16; Pl. Htfd. Opp. Ex. A at H2003.

22.    Dr. Garg, concluded that plaintiff could return to work based on Hartford's representations regarding plaintiff's job requirements, which were not consistent with the duties normally required of an internal medicine physician.  Pl. Htfd. Oppos. Ex. UU at 181-182, 188-91, 221, 241-243, 255-56, 263; Htfd. Ex. A(22).

23.    At Hartford's request, Dr. Garg's added a document to her report which purported to be a "summary of a Functional Capacities Evaluation done on August 14, 2000."   Htfd. Ex. A(23) at H3055.  A "Functional Capacities Evaluation" is a term of art that refers to a specific series of tests performed on an individual over a number of hours that is supposed to produce for the tester limitations of strength, mobility and endurance. Pl. Htfd. Opp. Ex. WW at 55-56; Htfd. Ex. C(1), pp.6-7.  The tester has guidelines to go

by and references from the Department of Labor and extrapolates from the testing an individual's restrictions and limitations and an individual's ability to perform either a sedentary, light, medium or heavy occupation. Id. The test can take up to two to three hours. Id.

24.    Dr. Garg did not perform an FCE and Hartford knew that Dr. Garg did not perform an FCE. Htfd. Ex. A(5) at 2450; Pl. Ex. UU at 88, 90, 153.

25.    Without informing plaintiff, Hartford forwarded the IME report and FCE "results" to plaintiff's physicians and asked them to comment on her functionality in light of these reports. Htfd. Exs. A(26), A(29); Pl. Htfd. Opp. Exs. C at 187-188 & WW at 55-57.

26.    Hartford also induced plaintiff to meet with its SIU investigators, by stating that the meeting was a "routine" and "informal" "interview" with a "field representative" to go over some "formatted questions." Pl. Htfd. Opp. Ex. MM; Htfd. Ex. A(5) at H2452.

27.    Hartford now admits that the purpose of the meeting was to confront plaintiff with video surveillance, and that it intentionally failed to disclose this fact to plaintiff. Pl. Htfd. Opp. Exs. E at 165-168; Ex. V at 151-153, 269-270; Ex. U at H3622 (08/30/00 entry); Ex. M; Htfd. Ex. A(5) at H2452.

28.    Hartford staff met on two separate occasions to script the interview. Pl. Htfd. Opp. Exs. HH at 62, 64 & V at 116 & U at H3622.

29.    At the meeting, the investigators induced plaintiff to sign a statement that was purportedly inconsistent with her videotaped activities before they disclosed the surveillance. Pl. Htfd. Opp. Ex. U at H3623. The investigators reported that they

brought plaintiff to tears on three separate occasions during the interview – two times before they even confronted her with the surveillance and induced her to sign the statement, and, once again, during subsequent questioning regarding the surveillance. Pl. Htfd. Opp. Ex. U at H3623. The statement that Hartford's investigators obtained was central to Hartford's termination of plaintiff's benefits. Htfd. Ex. A(30), pp.8-10; Pl. Htfd. Opp. Exs. C at 207-211; Ex. D at 156; Ex. E at 215-217; Ex. V at 104-106; Ex. HH at 120, 123; Hartford Reply in Support of Summary Judgment, p.6.

30.    On November 17, 2000, Hartford terminated plaintiff's disability benefits on the ground that while the evidence submitted to Educators showed that plaintiff was disabled, the evidence submitted to Hartford showed that plaintiff was no longer disabled as of August 14, 2000. Htfd. Ex. A(30), p.11. Hartford began to draft the letter terminating plaintiff's benefits before its contracted physician had even reviewed plaintiff's file. Htfd. Ex. A(29) (medical review conducted 11/9/00); Pl. Htfd. Opp. Ex. U, at H3629 (termination letter drafted 11/02/00.)

31.    In terminating plaintiff's benefits, Hartford relied on the IME report, the results of the FCE that it knew had not been performed, plaintiff's physicians' failure to comment on these reports, and plaintiff's signed statement. Htfd. Exs. A(30) & A(5) at 2442-2443; Pl. Htfd. Opp. Exs. D at 231-232, 263; Ex. E at 146, 211, Ex. GG at 35-38. Hartford had requested the physicians to state whether they agreed or disagreed with the IME physician, Dr. Garg's assessment, and informed the physicians that, "[i]f no response is received, we will assume that you have no comment." Htfd. Ex. A(26). In the letter terminating plaintiff's benefits, Hartford represented that it had informed the physicians that, "if responses were not received, we would assume that they were in

agreement with Dr. Garg's assessment," and that four of her physicians failed to respond. Htfd. Ex. A(30), pp.10-11.

32. As a result of terminating plaintiff's benefits, Hartford was able to release, to its own use, over one million dollars out of the $1,294,206.00 in reserves that Educators had transferred to Hartford associated with plaintiff's claim. Pl. Htfd. Opp. Ex. NN at H3641-42; Htfd. Ex. B(1), at EDUC 0149.

33. On June 15, 2001, plaintiff filed her initial complaint in this action. Soon thereafter, plaintiff requested that defendants produce documents relating to Hartford's assumption of the function of administrator for her claim. Pl. Educ. Opp. Exs. 6, No. 21. Defendants refused to produce any such documents, including the Agreement, until September 2002 on the ground that this information was confidential. Id.; Order dated July 2002, pp.2, 4. Hartford finally disclosed the Agreement in September 2002, almost one year after plaintiff had requested this information and only after the court ordered it to do so. Pl. Educ. Opp. Ex. 9, No. 21

34. During depositions this past summer, Educators disclosed to plaintiff, for the first time, that Educators had treated the Agreement as a sale of its claims after which it had no responsibility or liability to the claimants, notwithstanding (a) Educators' representations to plaintiff that it had merely contracted with Hartford to provide administrative services, (b) Hartford's representations to plaintiff that it was investigating her claim, and terminating it, on Educators' behalf, (c) the Agreement, which stated that Educators would remain solely liable to its claimants, and that Hartford would be administering the claims as Educators' agent, and (d) Educators' statutory financial reports, which represent that the claims belong to Educators but are reinsured by

Hartford. See Educ. Ex. B(1), at pp.11:19-22, 13:17-21, Educ. Ex. B(2), at p.71:4-24; Pl. Educ. Opp. Exs. 7, 1, §§ 2.4-2.8. Educators has asserted that it did not disclose this information to plaintiff while her claim was being adjudicated because it was not "pertinent" to her. Educ. Ex. B(2), at p.71:4-24.

35.    According to Educators, following the Agreement, Educators had ceased to act as plaintiff's insurer in any capacity and was not even aware that Hartford had terminated plaintiff's benefits until she filed the above-captioned action. Educ. Br., pp.1, 5, & fn.14; Educ. Ex. B(3); Pl. Educ. Opp. Ex. 8, Nos.1-4, 7, 9-12. Educators did not supervise Hartford's administration of plaintiff's claim or question its conduct in any way. Id.

36.    Educators and Hartford have asserted that every communication between them after plaintiff initiated this lawsuit is subject to the joint defense privilege, which means that, from Educators' first communications with Hartford after being served with plaintiff's complaint, Educators agreed with Hartford to formulate a common legal strategy and defense against plaintiff's claim. Hartford's Objection to Plaintiff's Notice of Deposition Duces Tecum, ¶ 9, attached hereto as Exhibit 3, hereto; Defendants' Privilege Log re: Joint Defense Privilege, attached hereto as Exhibit 4.

37.    Hartford's Regional Vice President of Group Reinsurance Plus has acknowledged that Hartford did not buy the claims, that Hartford did not assume Educators' policies, that Educators remained ultimately responsible for the claims, and that the parties did not fulfill the review and consent requirements of an assumption agreement or novation of plaintiff's claim. (Pl. Educ. Opp. Ex. 7, Pl. Educ. Opp. Ex. 1, §§ 8.4, 9.4.

38.     Plaintiff has expended time, money and effort, including hiring an insurance industry expert to review Hartford's claim administration, and hiring a medical expert to review plaintiff's medical records, to render opinions on whether Hartford engaged in good faith in administering her claim, and whether she was entitled to disability benefits when Hartford terminated her claim.  Affidavit of Candi McCulloch, ¶ 5, attached hereto as Exhibit 5.

39.     Plaintiff spent substantial time, money and effort for the first two years of this action, including motions to compel and depositions, to simply obtain discovery of the Agreement, which disclosed that Hartford had a financial interest in the disposition of her claim, and to discover that Educators had treated the Agreement as a sale of plaintiff's claim after which it had, and exercise, absolutely no legal or contractual responsibility to plaintiff.  Exhibit 5 hereto, ¶ 5.

40.     Plaintiff would have objected to the purported "sale" of her claim by Educators to Hartford if she had been informed of the "sale" at the time it occurred.  Exhibit 5 hereto, ¶ 7.  Plaintiff purchased and paid for disability benefits from Educators, not Hartford, and expected Educators perform the function of her insurer when she did become disabled.  Id.

41.     Plaintiff would have objected to Hartford's administration of her claim had she known that Educators had transferred over one million dollars in reserves associated with her claim to Hartford, with an agreement that Hartford could keep that money if it terminated her claim, and further, that Educators had "ceded" all responsibility for her claim to Hartford, and had no intent to oversee Hartford's activities.  Exhibit 5 hereto, ¶ 7.

42.     Plaintiff would have taken action to protect herself during Hartford's administration of her claim had she known that Hartford was actually a rival for her future benefits.  Exhibit 5 hereto, ¶ 8; Htfd. Ex. B(1).  Plaintiff would have refused to meet with Hartford's investigators outside the presence of her attorney, ensured that the IME physician had all of her medical records and an appropriate description of her occupation before rendering an opinion, and required Hartford to copy plaintiff on all correspondence issued in her case.  Exhibit 5 hereto, ¶ 8.

43.     Had plaintiff known, prior to this litigation, that Educators had no knowledge of Hartford's conduct in administering her claim and terminating her benefits, plaintiff would have demanded that Educators review Hartford's conduct, and potentially avoided the necessity of this litigation.  Exhibit 5 hereto, ¶ 9.

PLAINTIFF,
CANDI McCULLOCH

By _____

Eliot B. Gersten, Esq.
Fed. Bar No. ct05213
GERSTEN & CLIFFORD
214 Main Street
Hartford, CT 06106
(860) 527 - 7044
Her Attorney

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was mailed, via first class mail, postage prepaid, on JUNE 9, 2004 to all counsel and pro se parties of record, as follows:

Roberta J. Sharp, Esq.
Barry A. Chasnoff, Esq.
Jessica Spangler Taylor, Esq.
Akin Gump Strauss Hauer & Feld, LLP
300 Convent Street, Suite 1500
San Antonio, TX 78205
*Tel: 210-281-7146*
*Fax: 210-224-2035*


Donald E. Frechette, Esq. (ct08930)
Joshua L. Milrad, Esq. (ct19321)
Charles F. Gfeller, Esq. (ct18119)
Edwards & Angell, LLP
90 State House Square
Hartford, CT 06103
Phone (860) 525-5065
Facsimile (860) 527-4198

_____
Eliot B. Gersten

McCulloch vs Hartford Life

7/28/2003                                                    Pamela M. Mormino

Page 84

1    transparent to the customer.

2        Q    Okay.   What's the purpose in that?

3        A    From a standpoint of the other insurance

4    company, it shows that they have the capability to do

5    claims, where they -- perhaps they want to use those

6    resources for something else, and they have us as

7    their extension.

8            From our standpoint -- probably is the only

9    thing that I can talk to -- is there are no advantages

10   to us, as far as that goes.   If you talk about

11   advantage, you would have to go to each one of our

12   client companies, and find out why they want a private

13   label arrangement.

14           But from our standpoint, it's a service we

15   provide.   And confidentiality is one of the most

16   important things that they are looking for, to keep

17   the confidentiality.   And The Hartford is a company of

18   integrity.   And they know they can come to us, and

19   that we will respect that.

20       Q    And that's different than when you take over a

21   book of business that's not private label?

22       A    Right.   When we do a buy out.

23       Q    When you do a buy out?

24       A    When we do a buy out, it can be done two

25   different ways.   You can buy out the financial

ca337c4d-8692-4f4f-ba9f-42c749d62989

McCulloch vs Hartford Life

7/28/2003                                              Pamela M. Mormino

Page 85

1    liability, as we did with Educator's, but it remains

2    on their paper -- it still is an Educator's policy.

3    It doesn't transfer onto Hartford paper.  That's what

4    we call it.

5              Or it can actually be an assumption

6    agreement, where it has to actually go through all the

7    states.  And that's -- in the assumption buy out, you

8    assume their paper onto your paper, as well take over

9    the liability.  So there are two different kinds.

10   Q    And do you know why this was done as a buy out

11   that was not an assumption of their paper?

12   A    No.

13   Q    Okay.  When you assumed their paper, you said

14   you have to go to all of the states; is that for

15   permission to transfer the paper?

16   A    You have to go to the states for permission,

17   and then you have to go to each claimant for

18   permission, in most of the states.

19   Q    All right.  And that wasn't done here?

20   A    No.

21   Q    Okay.  So what was done here is the first

22   example you gave me of a buy out?

23   A    A buy out of the claim liability; not of the

24   paper.

25   Q    Okay.  Is there a legal term you're familiar

ca337c4d-8692-4f4f-ba9f-42c749d62989

McCulloch vs Hartford Life

Pamela M. Mormino

Page 118

1    A    If you were an attorney here, and Roberta is an

2    attorney in her law firm, but here they make you

3    answer the phones four hours a day -- because you

4    don't have enough help, or something -- whereas,

5    Roberta doesn't have to do that, your job description

6    at your employer would include that four hours of

7    telephone work, where it would not be on hers.

8    Q    Okay.  So could you tell me what job exists in

9    the national economy, for someone whose occupation

10   you're describing today as a physician/administrator?

11   A    You would take both job descriptions.  If there

12   was not a job description, or an occupation in the

13   national economy, that was completely reflective of

14   the one, you would take two and combine the two as to

15   what are the material and substantial duties of each,

16   and apply that.

17   Q    Was that done in this case?

18   A    I believe so.

19   Q    Okay.

20   A    But I have not reviewed the file.

21   Q    Okay.  What's the source of your belief?

22   A    About what?

23   Q    That it was done so in this file?

24   A    It would be our standard procedure to do that.

25   Q    Okay.  What would be done, as a part of your

ca337c4d-8692-4f4f-ba9f-42c749d62989

McCulloch vs Hartford Life

Pamela M. Mormino

1    standard procedure, to accomplish that?

2      A    We have software, that we can use in the

3    office, that will give us what the occupation in the

4    national economy -- what the actual duties and

5    requirements are of that.

6           We also have a job description from Dr.

7    McCulloch's employer, if we were looking at job versus

8    occupation.  But this one we weren't looking at job

9    versus occupation; we were looking at occupation.

10          So that particular step isn't always

11   necessary.  It depends on the definition of disability

12   in your policy.

13     Q    All right.

14     A    And so in this one, as on any claim, we would

15   look at what the occupation was on the national

16   economy.

17     Q    What was done in this one to look at the

18   occupation as you've described it, of

19   physician/administrator in the national economy?

20     A    I don't know.  I have not read the file.

21     Q    What would we look at, to learn what was done

22   if standard procedures were followed?

23     A    We would look at both occupations and put them

24   together.  You know, at some point if you had an

25   occupation that did not exist in the -- it's called

ca337c4d-8692-4f4f-ba9f-42c749d62989



1  brought the materials over to you, what did she
2  bring over to you?
3      A    They have paper folders with clinical
4  information, the letters they send out, the release
5  of information that was signed by the employee, the
6  statement of who the treating physicians are.
7      Q    So am I correct in understanding somewhere
8  between the 19th of June and the 11th of July you
9  had some sort of conversation with Ms. Wilk?  Am I
10  correct?
11      A    The file was referred to me, correct.
12      Q    Okay.  As you sit here today, do you
13  remember the date that the file was referred to you?
14      A    No, sir, I don't.
15      Q    And other than looking at the K6, is there
16  any reference for when the file was referred to you?
17      A    Not that I see.
18      Q    And you have no independent recollection
19  on your own as to when this file was referred to
20  you?
21      A    No, sir.
22      Q    Now, can you tell me what you recall from
23  the contents of the file that Ms. Wilk referred to
24  you?
25      A    There was not a lot of actual clinical

1  information, and what I mean by that:  There were no
2  exam notes.  There were a lot of forms that were
3  filled out that just said disabled and signed, but
4  from my standpoint I need to know how they're
5  disabled and why and what's the physician -- what I
6  do then is call out to the physicians and try to get
7  an idea or at least their notes of their exam and
8  get a further working knowledge of the functionality
9  that the person has.
10      Q    My question is do you have any
11  recollection of what the file consisted of when
12  Ms. Wilk referred the file to you?
13      A    Clinical information, letters from the --
14  from the examiner to the employee, letters from the
15  employee to the examiner, letters from the doctors
16  to the examiners.  Paper.  The yearly disability
17  paperwork that gets sent to the employee.
18      Q    Okay.  You seem to be talking in
19  generalities, Mr. Sterle.  Do you have any
20  recollection of any specific documents that were in
21  the file that Ms. Wilk brought to you for review?
22      A    As far as specific and dated and who it
23  was written by, no.
24      Q    Okay.  Good.  Now, do you recall the name
25  Porfiri?

1      A    Dr. Porfiri, yes.
2      Q    Did you have any information in the file
3  from Dr. Porfiri?
4      A    I believe I did have a disability
5  statement that was signed by Dr. Porfiri.
6      Q    And do you recall contacting Dr. Porfiri
7  to ask questions in order to get the clinical
8  information that you said you needed?
9      A    Yes, sir.
10      Q    Okay.  Did you get a response?
11      A    I'm supposing I did.  I don't recollect.
12      Q    Okay.  Now, as you sit here today, do you
13  have any independent recollection of the next thing
14  you did after review of the file?
15      A    After review of the file, I believe I
16  spoke with Ms. Wilk and gave her back the file.
17  Actually, there was a time where I looked at it and
18  I said that I needed some more information.  I
19  believe I still needed another release of
20  information from the employee.  And then I was asked
21  to view some other information on the claim.
22      Q    What kind of information were you asked to
23  review?
24      A    A video.
25      Q    Who asked you to look at the video?

1      A    I was approached by Kim Gabrielson.
2      Q    Who is Kim Gabrielson?
3      A    She is a -- I'm not exactly sure what her
4  title is, but she's with the investigative unit.
5      Q    And when did Ms. Gabrielson ask you to
6  view the video?
7      A    The date, I don't know.
8      Q    Okay.  Was it after Ms. Wilk brought you
9  the file for review?
10      A    It was right as I got finished getting
11  information from Dr. Porfiri.
12      Q    Now, I'm looking at the K6 report again.
13  Do you see the entry you made in which you indicated
14  that you spent time reviewing the video?
15      A    No, I don't.
16      Q    And do you see the entry there that
17  comments on Ms. Gabrielson approaching you to ask
18  you to review the video?
19      A    Not that was entered by me.  Is there one?
20      Q    No, sir, I don't know there is one either.
21      Q    Okay.
22          (Brief interruption.)
23          MS. TAYLOR:  Do you want to take a quick
24  five-minute break?
25          MR. GERSTEN:  Sure.



UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
(BRIDGEPORT)

| CANDI McCULLOCH Plaintiff, | § § § | CIVIL ACTION NO.: 301CV1115(AHN) |
| vs. | § | |
| HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY AND EDUCATORS MUTUAL LIFE INSURANCE COMPANY Defendants. | § § § § § § | October 1, 2003 |

## HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY'S OBJECTIONS TO NOTICE OF DEPOSITION DUCES TECUM OF THE RECORD KEEPER OF HARTFORD

Defendant Hartford Life and Accident Insurance Company ("Hartford") provide the following objections to the Notice of Deposition Duces Tecum of the Record Keeper of Hartford (the "Notice") and would state as follows:

## GENERAL OBJECTION

Hartford objects to this Notice on grounds that it is not a proper discovery request under the Federal Rules of Civil Procedure. Subject to this general objection, Hartford responds as follows:

## OBJECTIONS TO DOCUMENT REQUESTS

Hartford's objections, including, without limitation, objections as to admissibility, relevance, propriety, confidentiality, hearsay, and materiality, which, if sustained at trial, would require the exclusion of any document requested in the duces tecum, are reserved.

Without waiving these objections, Hartford provides the following specific objections:

1.  Monthly Management Letters (MML) for the period January 1999 to date, as referenced in Director John McGoldrick's deposition transcript of July 18, 2003 at page 298.

**RESPONSE:** Hartford objects to this request on grounds that it is overly broad and unduly burdensome in that it is not limited in time and subject matter. Further, this request is not reasonable calculated to lead to the discovery of information relevant to the claims or defenses asserted in this matter.

2.  Monthly and/or quarterly performance reviews (MPR) for the period July 1999 to date, as referenced in Director John McGoldrick's deposition transcript of July 18, 2003 at page 304.

**RESPONSE:** Hartford objects to this request on grounds that it is overly broad and unduly burdensome in that it is not limited in time or subject matter. Further, this request is not reasonable calculated to lead to the discovery of information relevant to the claims or defenses asserted in this matter. Moreover, this request is objectionable to the extent it seeks information invasive of the personal and/or privacy rights of individuals that are not parties to this matter.

3.  Personnel files for the following:

   a.  Susan Wilk

   b.  Diane Favreau

   c.  Deborah Laughran

   d.  Kim Gabrielson

   e.  Director John McGoldrick

**RESPONSE:** Hartford objects to this request to the extent it seeks information that is invasive of the personal and/or privacy rights of individuals that are not parties to this matter. Hartford also objects to this request on grounds that is not reasonably calculated to lead to the discovery of information relevant to the claims or defenses asserted in this matter.

4.  Roll up records for the time period of July 1999 to September 2000 (roll up being a term used by Pamela Mormino in her deposition transcript for July 28, 2003 at pages 14 through 17).

**RESPONSE:** Hartford objects to this request on grounds that it is overly broad and unduly burdensome in that it is not limited in time or subject matter. Further, this request is not reasonable calculated to lead to the discovery of information relevant to the claims or defenses asserted in this matter.

5.  Pending claim reports for the time period of July 1999 to November 2001.

**RESPONSE:** Hartford objects to this request on grounds that it is vague, ambiguous, and fails to adequately define the information sought. Hartford further objects to this request on grounds

that it is overly broad and unduly burdensome in that it is not limited in time or subject matter. Finally, this request is not reasonably calculated to lead to the discovery of information relevant to the claims or defenses asserted in this matter.

6.    Special Investigation Unit reports (as referred to by Pamela Mormino in her deposition transcript for July 28, 2003 at pages 18 through 21.

**RESPONSE:** Hartford objects to this request on grounds that it is overly broad, unduly burdensome, harassing, and is calculated to request Hartford to incur unnecessary or unreasonable expense. Further, this request is not reasonable calculated to lead to the discovery of information relevant to the claims or defenses asserted in this matter.

7.    Reserve reports (as referenced by Pamela Mormino in her deposition transcript for July 28, 2003 at page 19.

**RESPONSE:** Hartford objects to this request on grounds that it is vague, ambiguous, and fails to adequately define the information sought. Hartford further objects to this request on grounds that it is overly broad and unduly burdensome in that it is not limited in time or subject matter. Finally, this request is not reasonably calculated to lead to the discovery of information relevant to the claims or defenses asserted in this matter.

8.    Disabled Life Reserve (DLR) report on open liability records as referenced for the time period of July 1999 to date, including the Educator's Block.

**RESPONSE:** Hartford objects to this request on grounds that it is vague, ambiguous, and fails to adequately define the information sought. Hartford further objects to this request on grounds that it is overly broad and unduly burdensome in that it is not limited in time or subject matter. Finally, this request is not reasonably calculated to lead to the discovery of information relevant to the claims or defenses asserted in this matter.

9.    Any documentation exchanged between the defendants after November 1999 to date.

**RESPONSE:** Hartford objects to this request on grounds that it seeks documents protected by the joint defense privilege. Hartford further objects on grounds that it is overly broad and unduly burdensome in that it is not limited in subject matter. Finally, this request is not reasonably calculated to lead to the discovery of information relevant to the claims or defenses asserted in this matter.

10.    Any documents relating to the "true up" which took place, as referenced in Pamela Mormino's deposition transcript for July 28, 2003 at pages 67 through 69.

**RESPONSE:** Hartford objects to this request on grounds that it is overly broad and unduly burdensome. Further, this request is not reasonably calculated to lead to the discovery of information relevant to the claims or defenses asserted in this mater. Subject to the foregoing objection, Hartford has already produced documents responsive to this request.

11.    Any quarterly reserve reports between July 1999 to date as referenced in Pamela Mormino's deposition transcription for July 28, 2003 at pages 104 and 105.

RESPONSE: Hartford objects to this request on grounds that it is overly broad, unduly burdensome, harassing, and is calculated to request Harford to incur unnecessary or unreasonable expense. Further, this request is not reasonable calculated to lead to the discovery of information relevant to the claims or defenses asserted in this matter.

12.    Any calculation of reserves in the Educators Block of business as reference at pages 223 through 225 of Pamela Mormino's deposition transcript.

RESPONSE: Hartford objects to this request on grounds that it is vague, ambiguous, and fails to adequately define information sought. Further, this request is overly broad and unduly burdensome. Finally, this request is not reasonably calculated to lead to the discovery of information relevant to the claims or defenses asserted in this matter.

13.    Any actuarial tables and/or calculations relating to the determination of a Disability Loss Reserve for any claims subject to the Educators Reinsurance Agreement.

RESPONSE: Hartford objects to this request on grounds that it is overly broad and unduly burdensome in that it is not limited in time or subject matter. Further, this request is not reasonably calculated to lead to the discovery of information relevant to the claims or defenses asserted in this matter.

14.    Reserve reviews and calculation of premiums (including reinsurance premium).

RESPONSE: Hartford objects to this request on grounds that it is vague, ambiguous, and fails to adequately define the information sought. Hartford further objects to this request on grounds that it is overly broad and unduly burdensome in that it is not limited in time or subject matter. Finally, this request is not reasonable calculated to lead to the discovery of information relevant to the claims or defenses asserted in this matter.

15.    GAAP Reserve reports.

RESPONSE: Hartford objects to this request on grounds that it is vague, ambiguous, and fails to adequately define the information sought. Hartford further objects to this request on grounds that it is overly broad and unduly burdensome in that it is not limited in time or subject matter. Finally, this request is not reasonable calculated to lead to the discovery of information relevant to the claims or defenses asserted in this matter.

16.    Reserve opinions and bordereaux exits.

RESPONSE: Hartford objects to this request on grounds that it is vague, ambiguous, and fails to adequately define the information sought. Hartford further objects to this request on grounds that it is overly broad and unduly burdensome in that it is not limited in time or subject matter. Finally, this request is not reasonable calculated to lead to the discovery of information relevant to the claims or defenses asserted in this matter.

17.    Monthly and/or quarterly reviews in connection with the "Reinsurance Agreement."

**RESPONSE:** Hartford objects to this request on grounds that it is vague, ambiguous, and fails to adequately define the information sought. Hartford further objects to this request on grounds that it is overly broad and unduly burdensome in that it is not limited in time or subject matter. Finally, this request is not reasonable calculated to lead to the discovery of information relevant to the claims or defenses asserted in this matter.

Respectfully Submitted,

HARTFORD LIFE & ACCIDENT
INSURANCE COMPANY AND
EDUCATORS MUTUAL LIFE
INSURANCE COMPANY

By

Barry A. Chasnoff (ct11162)
Roberta J. Sharp (ct24407)
Jessica S. Taylor (ct24408)
Akin, Gump, Strauss, Hauer & Feld, LLP
300 Convent, Suite 1500
San Antonio, Texas 78205
(210) 281-7000
(210) 224-2035 (Fax)

- and -

Donald E. Frechette (ct08930)
William E. Murray (ct19717)
Edwards & Angell, LLP
90 State House Square, 9th Floor
Hartford, CT  06103
(860) 525-5065
(860) 527-4198 (Fax)

## CERTIFICATION OF SERVICE

This is to certify that on the _____1st_____ day of October, 2003, a copy of Hartford Life Insurance Company's Objections to Notice of Deposition Duces Tecum of the Record Keeper of Hartford was served via facsimile and certified mail, return receipt requested, to:

Eliot B. Gersten
Gersten & Clifford
214 Main Street
Hartford, CT 06106

JESSICA SPANGLER TAYLOR



# AKIN GUMP
# STRAUSS HAUER & FELD L.L.P

━━━━━━━━ *Attorneys at Law*

JESSICA SPANGLER TAYLOR
210.281.7322/fax: 210.224.2035
jtaylor@akingump.com

May 7, 2004

**VIA FACSIMILE AND CERTIFIED MAIL**

Eliot B. Gersten
Gersten & Clifford
214 Main Street
Hartford, CT 06106-1881

RE:    Candi McCulloch v. Hartford Life and Accident Insurance Company and Educators Mutual Life Insurance Company; Civil Action No. 3:01 cv 1115 (AHN); In the United States District Court, District of Connecticut

Dear Eliot:

Enclosed you will find a privilege log for the documents exchanged between Hartford and Educators after the lawsuit was filed, an amended notice of deposition duces tecum for Mary Fuller, and a consent for release of information from the Social Security Administration.

Please note that we scheduled the deposition of Ms. Fuller for July 13, 2004. This is one of the dates we provided to you in our last letter. Because we have not received a response from you regarding the dates that you and Ms. Fuller will be available for the deposition, we are noticing it for that date. If, however, you and Ms. Fuller have an alternate date in mind, we will work with you to reschedule the deposition.

On April 9, 2004, we sent you a consent for release of information from the Social Security Administration for Dr. McCulloch to sign. We never received the consent form back from you. I am enclosing another form. Please have Dr. McCulloch sign it and return it back to us as soon as possible.

Sincerely,

Jessica Taylor

Enclosure
cc:    Roberta Sharp [FIRM]

0267/0.0250 WEST 5512581 v1

| | | |
|---|---|---|
| H 13260<br>David L. Harbaugh letter to Jessica Spangler Taylor | Information relating to lawsuit | Attorney / Client Privileged Communication, Joint Defense |
| H 13261-H 13266<br>Jeffery Apuzzo letter to Kim Rankin | Information relating to lawsuit | Joint Defense |
| H 13267-H 13273<br>Kimberly A. Rankin letter to David Harbaugh | Information relating to lawsuit | Attorney / Client Privileged Communication |
| H 13274-H 13278<br>Jeffrey Apuzzo e-mail to Kim Rankin | Information relating to lawsuit | Joint Defense |

5

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**
**(BRIDGEPORT)**

CANDI McCULLOCH                    :     CIVIL ACTION NO. 301CV1115(AHN)
    Plaintiff,                            :
                              :
vs.                                 :
                              :
HARTFORD LIFE AND ACCIDENT          :
INSURANCE COMPANY AND EDUCATORS     :
MUTUAL LIFE INSURANCE COMPANY       :
    Defendants.                           :

## AFFIDAVIT

I, CANDI McCULLOCH, do hereby depose and say the following:

1.      I am over the age of eighteen years and believe in the obligation of an oath.

2.      I am the plaintiff in this matter.

3.      I have personal knowledge of the facts set forth herein.

4.      The attached documents, Exhibits 1 and 2 are transcripts of depositions taken in this action. The attached documens, Exhibits 3 and 4, were produced by defendant Hartford Life and Accident Insurance Company ("Hartford") in response to the plaintiff's Notice of Deposition Duces Tecum of Hartford's Record Keeper in this matter.

5.      In this action, I have spent at least $30,000 to obtain discovery of Hartford's claim files, hire an insurance industry expert to review Hartford's claim administration, hire a medical expert to review my medical records that were in Hartford's claim file to render an opinion on whether I was entitled to disability benefits when Hartford terminated my claim, to compel defendants to produce the agreement between them relating to Hartford's administration of my claim, and to conduct depositions where Educators disclosed, for the first time, its position that, following the agreement with Hartford lacked any legal or contractual responsibility to me.    The legal fees for these activities far exceed $30,000 and will be offset against any recovery I might receive on

my claim for wrongful termination of my disability benefits.

6.     During the entire time that Hartford administered my claim, I understood that Hartford was acting as a third party administrator for Educators.  This understanding was based on the representation of Educators and Hartford that Educators had contracted with a service provider segment of Hartford to act as a claim administrator on Educators' behalf.  Neither Educators nor Hartford ever informed me, before disclosing the agreement between them during discovery in this action, that Hartford had a financial interest in my claim.

7.     I would have objected to any "sale" of my claim by Educators to Hartford.  I purchased and paid for disability benefits from Educators and, after I became disabled, expected Educators to administer and pay my claim.  I certainly would have objected to Hartford's administration of my claim had I known that Educators had transferred over one million dollars in reserves associated with my claim to Hartford, with an agreement that Hartford could keep that money if it terminated my claim, and further, that Educators had "ceded" all responsibility for my claim to Hartford, and had no intent to oversee Hartford's activities.

8.     At the minimum, if I had been compelled to accept the arrangement between Educators and Hartford, I would have taken other actions to protect myself.  Among other things, I would have refused to meet with Hartford's investigators outside the presence of my attorney; I would have ensured that the IME physician had all of my medical records and an appropriate description of my occupation before rendering an opinion, and demanded that Hartford copy me on all correspondence issued in my case.

9.     Had I known at the time that Hartford terminated my benefits, that Educators did

not have any knowledge of Hartford's conduct in administering my claim and terminating my benefits, I would have contacted Educators before filing this action, and demanded that Educators', as my insurer with primary responsibility for the administration of my claim, which had previously accepted my claim for disability benefits, and confirmed my entitlement to those benefits, conduct an investigation into Hartford's conduct.

AFFIANT,

*Candi McCulloch*

Candi McCulloch

Subscribed and sworn to before me, this 9th day of June, 2004.

*Cheryl A. Turner*

**CHERYL A. TURNER**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES NOV. 30, 2004

3