UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **CANDI McCULLOCH** § | CIVIL ACTION NO.: | |
|     Plaintiff, § | 301CV1115(AHN) | |
| § | | |
| vs. § | | |
| § | | |
| **HARTFORD LIFE AND ACCIDENT** § | | |
| **INSURANCE COMPANY AND** § | | |
| **EDUCATORS MUTUAL LIFE** § | | |
| **INSURANCE COMPANY** § | | |
|     Defendants. § | June 22, 2004 | |

**DEFENDANT HARTFORD LIFE & ACCIDENT INSURANCE COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Hartford seeks to recover only the disability benefits paid to Plaintiff between August 14, 2000 and October 31, 2000. Plaintiff's argument that she was somehow denied the opportunity to present evidence to support her claim of disability prior to that date is moot, as Hartford is not seeking to recover disability payments it made prior to August 14, 2000.

Hartford's assertion that Plaintiff fraudulently obtained disability benefits between August 14, 2000 and October 31, 2000 is entirely consistent with the basis upon which Hartford terminated her disability payments: namely, that Plaintiff did not meet the definition of Total Disability under the policy. The "mend the hold" doctrine does not preclude Hartford from discovering and offering additional evidence in support of the reasons it terminated Plaintiff's benefits, nor is this doctrine applicable where an insurer has expressly reserved its right to assert other defenses to coverage.

Finally, Plaintiff is not entitled to "offset" benefits obtained fraudulently from Hartford by the amount of reserves released as a result of the termination of her benefits. This is not a

proper measure of recovery for fraud, and Plaintiff has offered no competent summary judgment evidence for her speculation that the release of reserves associated with a single claimant out of a group of claimants is "profit" to the company.

## MATERIAL UNDISPUTED FACTS

In October 1995, plaintiff applied for total disability insurance benefits from Educators Mutual Life Insurance Company ("Educators"). Hartford's Local Rule 56(a)(2) Statement, ¶ 1. Based on representations Plaintiff made regarding her disability and condition, Educators determined she was entitled to receive disability benefits. *Id.* ¶ 2. Between March 1996 and May 1999, Educators reviewed plaintiff's continuing entitlement to disability benefits on several occasions. *Id.* ¶ 3. On at least two occasions, Educators informed Plaintiff that it "had no objective, clinical evidence of a disabling condition on her claim." *Id.* ¶ 4.

On July 1, 1999, Educators and Hartford executed a Reinsurance Agreement by which Educators ceded 100 percent of its liability for and the administration of its open professional association claims, including Plaintiff's, to Hartford. *Id.* ¶ 35. Under the Agreement, Hartford was given the sole authority to administer, pay and adjudicate claims and was given the responsibility for processing, payment and settlement of disputed claims. *Id.* ¶ 7. The Agreement provided that Hartford had to indemnify, defend, and hold Educators harmless in connection with any loss incurred by Educators as a result of Hartford's handling of the reinsured claims. *Id.* In short, Hartford stepped into the shoes of Educators.[1]

Educators paid Hartford a lump sum or "reinsurance premium" in consideration for taking over the administration and payment of the claims. *Id.* ¶ 8. The reserves allocated to each

---

[1] If not on Educators paper, not be in lawsuit. If the policy had not been written on Educators' paper, there would be no reason for Educators to be a party of this lawsuit. Rule 56 (a)(2) Statement, ¶ 15.

of the claims were only one factor used in the calculation of the reinsurance premium. *Id.* The reinsurance premium was less than the aggregate of all of the reserves. *Id.* Hartford conducted due diligence of 11 of the claims subject to the reinsurance agreement in order to determine whether information supplied by Educators for each claim, including data such as diagnosis code, age and COLA benefits are correct. *Id.* ¶ 36. Hartford also reviewed the files to determine how well Educators managed its claim files and conducted ongoing investigations of claims. *Id.* ¶ 37.

Educators informed Plaintiff that Hartford would be responsible for the administration of her claim after August 1999. *Id.* ¶ 38. In an August 26, 1999 letter to Plaintiff, Educators explained it had contracted with Hartford to administer her benefits and that after October 31, 1999 she would receive her benefit payments from Hartford. Educators advised Plaintiff to contact Hartford directly if she had any questions regarding her claim. *Id.* After the Reinsurance Agreement was executed, Plaintiff no longer had any contact with Educators.

Shortly after assuming responsibility for Plaintiff's claim, Hartford undertook a routine annual review of her claim, gathering information from Plaintiff and updated medical records from her doctors.[2] In conducting this review of Plaintiff's claim, the claim examiner assigned to Plaintiff's claim encountered several "red flags"[3] which caused her to refer Plaintiff's claim to Hartford's Special Investigation Unit ("SIU"). *Id.* ¶ 40. As part of the investigation of Plaintiff's claim, Hartford conducted video surveillance of Plaintiff, conducted an in-person interview with Plaintiff, arranged for Plaintiff to undergo an Independent Medical Examination

---

[2] Hartford incorporates the facts regarding its investigation of Plaintiff's claim as set forth in its Partial Motion for Summary Judgment (Docket #137) and its Local Rule 56(a)(1) Statement (Docket #138).

[3] These red flags were as follows: apparent reluctance by Plaintiff to provide Hartford with her drivers license or birth certificate to verify her birth date, the submission of an Attending Physician Statement ("APS") by an out-of-state physician and information provided by the attending physician's office staff that was inconsistent with the APS. Rule 56(a)(2) Statement, ¶ 40.

and Functional Capacities Evaluation, and arranged for a physician to conduct a paper review of her file. *Id.* ¶ 40.

Based on all the information gathered in connection with Plaintiff's claim, Hartford determined that Plaintiff no longer met the definition of Total Disability under the Policy. *Id.*¶ 41. On November 17, 2000, Hartford sent Plaintiff a termination letter. *Id.*¶ 42.

The termination letter advised Plaintiff that that the evidence submitted in support of her claim did not establish that she continued to meet the policy's definition of Total Disability on or after August 14, 2000. *Id.* ¶ 43. Hartford also informed Plaintiff that because Hartford made benefit payments after August 14, 2000, an overpayment of $19,655.53 occurred. *Id.* ¶ 46. Additionally, Hartford reserved all rights and defenses available to it in making its coverage determination. *Id.* ¶ 44. The letter expressly invited Plaintiff to provide any additional information she wished Hartford to consider. *Id.* ¶ 45.

Rather than appeal Hartford's decision or provide any additional information to support her claim, Plaintiff filed this lawsuit on June 15, 2001. *Id.* ¶ 47.

## ARGUMENT AND AUTHORITIES

**I.    HARTFORD IS ENTITLED TO RECOVER DISABILITY PAYMENTS MADE TO PLAINTIFF AFTER THE DATE SHE WAS DETERMINED NOT TO BE DISABLED.**

**A. Hartford seeks return of monies paid to Plaintiff from the date she was determined not to be disabled until the date payments were terminated.**

Hartford determined that there was sufficient basis to investigate Plaintiff's entitlement to disability benefits on or about April 4, 2000. Hartford referred her case to the Special Investigations Unit, but continued to issue her monthly payments while the investigation was ongoing. On November 17, 2000, Hartford determined that Plaintiff had ceased to meet the definition of disability as of August 14, 2000. At that time, Hartford terminated her disability

payments and requested return of the payments made between August 14, 2000 and October 31, 2000 in the amount of $19,655.53. Plaintiff declined to return the overpayment and brought suit against Hartford for breach of contract and bad faith instead.

After suit was filed, Defendants retained Dr. Arthur Taub, who is of the opinion that Plaintiff was not totally disabled when Hartford terminated her disability payments, and moreover she *never was* totally disabled.[4] Nonetheless, Hartford's counterclaim for fraud seeks return only of $19,655.53.[5] Dr. Taub reached this opinion based on his own review of Plaintiff's medical history, as well as his knowledge, education, and experience; Hartford anticipates that this testimony will persuade the jury that Hartford neither breached the contract *nor* acted in "bad faith." However, Dr. Taub's opinion that Plaintiff was never disabled does not operate as an amendment of Hartford's pleadings to seek return of disability benefits dating back to October 1995. Plaintiff's motion for summary judgment seems to be based in large part upon this erroneous perception of the impact of Dr. Taub's expert opinion.

### B. Plaintiff cannot plausibly claim to have detrimentally relied on Hartford in not producing additional evidence to support her claim of disability.

Upon terminating her claim, Hartford notified Plaintiff of the reasons for its decision in a detailed letter. Hartford invited Plaintiff to offer any additional evidence in support of her claim of disability. Plaintiff offered no additional information from that date forward, and did not appeal or ask for a review of the decision, filing this suit instead.

---

[4] Dr. Taub's opinion is that Plaintiff "was not, at any time, save from normally expected episodes of minor illness, from 10/3/95 disabled from her occupation as an internal medicine physician and/or from her job as an internal medicine physician and as Director (physician/Director) of a Women's Center." Rule 56(a)(2) Statement, ¶ 48.

[5] Hartford's Damage Analysis Regarding Its Counterclaims, served on Plaintiff on April 4, 2003, provided Plaintiff with notice that Hartford seeks to recover those benefits Hartford was fraudulently induced to pay Plaintiff after August 14, 2002, based on Plaintiff's misrepresentation that she was disabled.

Plaintiff may not now be heard to complain that she would have provided "additional information to establish her inability to function as a physician;" [6] she expressly declined to do so when the opportunity was presented. Plaintiff's assertion that she could have presented additional evidence to support her disability *before* August 14, 2000 is misplaced, as Hartford's determination that she no longer met the policy definition of "Total Disability" was only effective from August 14, 2000 forward.[7]

The policy itself recognizes the non-static nature of disability claims, in reserving to the insurer the right to examine a claimant as often as it may reasonably require.[8] Neither Educators' nor Hartford's past payments of benefits to Plaintiff estops Hartford from investigating her claim and determining that Plaintiff did not meet the definition of disability as of August 14, 2000.

II.  **HARTFORD'S RELIANCE UPON ADDITIONAL EVIDENCE OBTAINED IN DISCOVERY DOES NOT CONSTITUTE "MENDING THE HOLD."**

The somewhat archaic[9] "mend the hold doctrine" arises when a party who terminated its contract asserts a *new and different* ground for terminating the contract after suit is filed. *Rode & Brand v. Kamm Games, Inc.*, 181 F.2d 584, 587 (2d Cir. 1950); *see also Harbor Ins. Co. v.*

---

[6] Plaintiff's motion, at 6.

[7] Plaintiff does not identify what additional evidence might have been offered; after months of discovery and outstanding discovery requests for medical records, any such evidence should be of record in this case, but has not been cited by Plaintiff.

[8] None of the cases cited by Plaintiff involved misrepresentations made in connection with a claim for benefits. *Lindeman* involved the *rescission* of a disability policy based on the insured's misrepresentations in the application for the policy. *Mutual Benefit Life Ins. Co. v. Lindeman,* 911 F.Supp. 619, 621, 624-627 (E.D.N.Y. 1995). In that case, the court held the insurer could not rescind the policy because it was aware Plaintiff had made misrepresentations in the application for the policy when it began paying plaintiff disability benefits. *Id*. at 626. The remaining cases cited by Plaintiff have no application because they involve the duty to defend under liability policies, and not pursuant to a policy where the insured has a duty to show an ongoing eligibility for insurance benefits. *Jenkins v. Indemnity Ins. Co.,* 152 Conn. 249 (1964); *Nat'l Casualty Ins. Co. v. Stella,* 26 Conn. App. 462 (1992); *Agency Rent-A-Car v. ITT Hartford Accident,* 1997 Conn. Super. LEXIS 28567, October 23, 1997).

[9] In *Primetime Joint Venture v. DirecTV, Inc*. 2000 U.S. Dist. LEXIS 5022, at *31 (S.D.N.Y. April 6, 2000), the Southern District of New York noted the doctrine was from the nineteenth century and is used infrequently today.

*Continental Bank Corp.,* 922 F.2d 357, 362-63 (7th Cir. 1990) (discussing application of doctrine where insurer initially denied coverage on grounds that insured's conduct was too egregious to permit indemnification, then reversed its position 180 degrees during litigation and claimed there was no coverage because the insured had never been shown to engage in any wrongful conduct).

Hartford has consistently taken the position, both before and after the filing of this suit, that Plaintiff did not meet the definition of Total Disability under the policy as of August 14, 2000, and Hartford is entitled to return of the payments made after that date. In discovery, Hartford has obtained additional evidence in support of this position. Plaintiff has offered no case law to support the suggestion that Hartford may not discover and offer additional evidence tending to prove the *original basis for terminating the contract* – namely, that Plaintiff is not totally disabled.[10] Hartford has not "mended its hold;" to the contrary, Hartford has consistently maintained that Plaintiff is not entitled to disability payments under the contract because she is not disabled.

Just as importantly, the "mend the hold" doctrine has no application when a party expressly reserves its right to assert new defenses to a contract. *City of Burlington v. Hartford Steam Boiler Inspection & Ins. Co.,* 190 F.Supp.2d 663, 681 (D. Vt. 2002) (if insurer refuses coverage on a particular ground, reserving its right to defend on other grounds, the "mend the hold" doctrine does not apply, and all policy defenses are available); *Daiwa Special Asset Corp. v. Desnick,* 2002 U.S. Dist. LEXIS 16164, at * 13 (S.D.N.Y. Aug. 28, 2002) (mend the hold

---

[10] "Bad faith," of course, is determined on the basis of the information that was before the insurer at the time of the decision. *Uberti v. Lincoln Nat'l Life Ins. Co.,* 114 F.Supp. 2d 90, 103-04 (D.Conn. 2001). However, breach of contract is a predicate to a "bad faith" claim and Hartford is entitled to offer relevant evidence, obtained after suit is filed, to assist the jury in determining whether Plaintiff is currently disabled (or was when her benefits were terminated). Moreover, in bringing a bad faith claim, Plaintiff asserts that no reasonable insurer could have interpreted her medical history otherwise; Hartford is entitled to rebut this claim with medical expert testimony to assist the jury in understanding the medical information that was before Hartford when it made its decision.

doctrine had no application where defendant explicitly reserved its right to assert additional grounds for termination of contract). Hartford expressly "reserve[d] all rights and defenses available" to it in its November 17, 2000 letter advising Plaintiff of the termination of her disability benefits. Therefore, Hartford is entitled to assert additional defenses to coverage. *Lugo v. AIG Life Ins. Co.,* 852 F. Supp. 187, 192 (S.D.N.Y. 1994) (insurer could not have waived right to raise a defense when its rejection of claim letter stated it reserved defenses to coverage not specifically raised); *First Mercury Syndicate, Inc. v. Telephone Alarm Systems, Inc.,* 849 F. Supp. 559, 568 (W.D. Mich. 1994) (same).

III. **PLAINTIFF IS NOT ENTITLED TO AN OFFSET OF PAYMENTS FRAUDULENTLY OBTAINED.**

The proper measure of Hartford's damages on its counterclaim is the $19,655.53 overpayment of disability benefits it made to Plaintiff as a result of her misrepresentations regarding her disability. *See, e.g., Paul Revere Life Ins. Co. v. Bass,* 523 F. Supp. 134, 137 (N.D. Cal. 1981) (insurer's damages for insured's fraudulent misrepresentations in connection with disability claim measured as the total amount of disability benefits paid as a result of insurer's reliance upon misrepresentations). Plaintiff's theory that Hartford is precluded from recovering these damages because it purportedly "profited" from the release of the reserves allocated to her claim is unsupported speculation without legal authority or competent summary judgment evidence.[11]

The setting aside of reserves is a complex function of statutory reserve requirements, actuarial calculations, expenses, and underwriting experience not just based upon individual claimants, but the entire population of long-term disability claimants in the Educators' pool. Hartford will not know whether it "profited" from the Reinsurance Agreement until the last

---

[11] Plaintiff has no competent summary judgment evidence of the amount of reserves released in connection with the termination of her claim.

benefit payment to a claimant in the pool. Plaintiff's argument that Hartford came out ahead by terminating disability payments to one of a group of claimants who ceased to meet the Policy's definition of Totally Disabled represents a gross oversimplification (and contortion) of the factors that go into reserve calculations and is unsupported by competent summary judgment evidence.

Negotiation of the total consideration for the Reinsurance Agreement was a function of an actuarial analysis of the total population that was the subject of the transaction. Hartford's "due diligence" consisted of a review of a sampling of claims from within the group to evaluate the adequacy of the reserves Educators set aside, including, for example, Educators' claims handling, problems with diagnosis codes, residual disability, and tracking of files. The total paid by Hartford was not simply the sum of future monthly benefits for the entire potential term of all the claimants in the pool.

Plaintiff's "profit" theory overlooks that the actuarial calculation that goes into setting aside reserves *already takes into account* the statistical likelihood that some claims will be properly terminated before age 65 – whether due to death, improvement of medical condition, return to alternate sources of work and income, or even for fraud. Had Plaintiff died during the ongoing administration of her benefits – an event the statistical likelihood of which Hartford's reserves for the Educators' pool took into account – but her family continued to receive disability checks from Hartford for some time before Hartford became aware of her death, Hartford would be entitled to recover these payments notwithstanding the release of reserves associated with Plaintiff's claim. Had Plaintiff found a way to use her skills and education in another career – an event the statistical likelihood of which Hartford's reserves for the Educators' pool also took into account – but failed to notify Hartford for some period of time

during which disability payments continued to be made, Hartford would be entitled to recover these payments as well. If Plaintiff's condition improved to the point where she could return to work – another event statistically accounted for by Hartford in setting aside reserves for her and others' claims – Hartford is likewise entitled to recover overpayments notwithstanding the release of reserves.

These possible future events – death, return to work, medical improvement – are precisely the events that go into calculating the total reserve to be set aside for payment of individual claims within a group policy. Plaintiff's implicit assumption that Hartford improperly "profited" by the release of reserves associated with a claimant *who is no longer disabled* (as her "profit" defense assumes)[12] is utterly unsupported by summary judgment evidence. Under Plaintiff's theory, no insurer could ever recover fraudulently obtained benefits so long as the reserve released exceeded the benefits wrongfully obtained.

## IV.  HARTFORD HAS STANDING TO ASSERT ITS FRAUD COUNTERCLAIM.

In an argument utterly inconsistent with her own suit against Hartford, Plaintiff asserts that Hartford is merely an "agent" of Educators and thus is not entitled to recover benefits fraudulently obtained by a claimant.[13] Plaintiff was aware Hartford was administering her benefits and was issuing her benefit payment.[14] Indeed, for more than a year prior to the termination of her claim, Plaintiff's only communications regarding her disability benefits were with Hartford. It is the intent to induce reliance that is necessary for fraud, not the intent that the other party incurs damages. *Magee v. Magee*, 1998 Conn. Super. LEXIS 1062, at *3 (Conn. Super. April 15, 1998) (the third element of fraud is the intent to induce reliance); *Advest Group*

---

[12] Plaintiff's motion, at 10-13.

[13] A plaintiff cannot sue a defendant in its own name where it is merely an agent and not an assignee of the claim. *Elementary School Bldg Comm. v. Placko,* 2003 Conn. Super. LEXIS 474, at *4-5 (Conn. Super. February 21, 2003).

[14] Rule 56 (a)(2) Statement, ¶ 38.

*v. Arthur Andersen, L.L.P.,* 1998 Conn. Super. LEXIS 2137, at * 16 (Conn. Super. July 20, 1998) (same).

If Educators had never transferred the book of business to Hartford and had terminated Plaintiff's benefits, Educators would have a cause of action for benefits fraudulently obtained. Plaintiff does not suggest how that cause of action was extinguished by a transaction in which Educators transferred, and Hartford assumed, liability and responsibility for administration of the claims.[15]

## CONCLUSION

Based on the foregoing, Hartford respectfully requests that the Court deny Plaintiff's Motion for Summary Judgment on Hartford's Counterclaim.

---

[15] Plaintiff's assertion that Hartford had a "financial interest" in her claim is equally specious; Hartford's financial interest in the proper administration of her claim was no greater or less than the financial interest that Educators had in her claim.

By:_____

        Barry A. Chasnoff (ct11162)
        Roberta J. Sharp (ct24407)
        Jessica S. Taylor (ct24408)
        AKIN GUMP STRAUSS HAUER & FELD L.L.P.
        300 Convent Street, Suite 1500
        San Antonio, Texas  78205
        Telephone:  (210) 281-7000
        Telecopier: (210) 224-2035

        AND

        Donald E. Frechette (ct 08930)
        Edwards & Angell, LLP
        90 State House Square
        Hartford, CT 06103
        Phone:  (860) 525-5065
        Facsimile: (860) 527-4198

        ATTORNEYS FOR DEFENDANT
        HARTFORD LIFE & ACCIDENT
        INSURANCE COMPANY

13

## **CERTIFICATE OF SERVICE**

      I certify that a copy of the foregoing document was sent via certified mail, return receipt requested to the following attorney on the _____ day of June, 2004:

Eliot B. Gersten  
Gersten & Clifford  
214 Main Street  
Hartford, CT 06106

                                                  _____  
                                                  ROBERTA J. SHARP  
                                                  JESSICA S. TAYLOR

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **CANDI McCULLOCH** | § | CIVIL ACTION NO.: |
| Plaintiff, | § | 301CV1115(AHN) |
| | § | |
| vs. | § | |
| | § | |
| **HARTFORD LIFE AND ACCIDENT** | § | |
| **INSURANCE COMPANY AND** | § | |
| **EDUCATORS MUTUAL LIFE** | § | |
| **INSURANCE COMPANY** | § | |
| Defendants. | § | June 22, 2004 |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON HARTFORD'S COUNTERCLAIM

On this date, the Court considered Plaintiff's Motion for Summary Judgment on Hartford's Counterclaim. After considering Plaintiff's Motion for Summary Judgment on Hartford's Counterclaim, Hartford's response, and all other evidence on file, the court finds there are genuine issues of material fact precluding summary judgment. Therefore, the Court DENIES the motion.

SIGNED on _____, 2004.

_____
UNITED STATES DISTRICT JUDGE