UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CANDI McCULLOCH  Plaintiff,

CIVIL ACTION NO.: 301CV1115(AHN)

vs.

HARTFORD LIFE AND ACCIDENT INSURANCE
COMPANY AND
EDUCATORS MUTUAL
LIFE INSURANCE COMPANY  Defendants.

June 21, 2004

**DEFENDANT HARTFORD LIFE & ACCIDENT INSURANCE COMPANY'S
LOCAL RULE 56(a)(2) Statement**

---

Defendant Hartford Life & Accident Insurance Company ("Hartford") submits this Statement of Facts in Opposition to Plaintiff's Motion for Summary Judgment:

**I.    RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS**

1.    Admitted.

2.    Admitted that Educators informed Plaintiff of its determination that she was entitled to disability benefits in March 1996.  Hartford also admits that Educators determined that Plaintiff became disabled in October 1995.  Hartford denies that Plaintiff was paid benefits retroactive to October 1995; Educators paid Plaintiff disability benefits from October 1995 to March 1996, less the 90 day waiting period.

3.    Admitted that between March 1996 and May 1999, Educators reviewed Plaintiff's continuing eligibility for disability benefits on a  number of occasions.  Hartford also admits Educators informed Plaintiff she would have to show ongoing, "objective, clinical evidence of a disabling condition."  Hartford further admits that Educators obtained an Independent Medical Examination and paper review of Plaintiff's medical records from

Dr. Alshon. Hartford denies that Educators obtained three independent medical of Plaintiff's updated medical records by Dr. Stern of U.S. Medical Review; the cited evidence only indicates Dr. Stern conducted two reviews of Plaintiff's medical records.

4. Denied that Educators paid Plaintiff disability benefits on a continual basis from March 1996 to March 1999. On April 20, 1997, Educators' claims manager recommended putting a hold on Plaintiff's benefit payments. Educators advised Plaintiff on September 3, 1997 that it would not pay benefits beyond August 31, 1997 because it "had no objective, clinical evidence of a disabling condition on [her] claim. Educators further advised Plaintiff on November 7, 1997 that it still did not have evidence of a disabling condition beyond August 31, 1997. Hartford admits that Educators sent Plaintiff a letter stating that "[i]n review of your file, it is clearly documented that you have sustained functional limitations which prevent you from performing the substantial requirements of your occupation;" however, the letter was sent to Plaintiff by Educators' "vocational rehabilitation" consultant for the purpose of talking to Plaintiff about "exploring other vocational options."

5. Admitted.

6. Admitted that the Agreement provided Hartford could issue correspondence and benefit payments to individuals whose claims were subject to the Agreement, provided that Hartford discloses that it is acting as agent for Educators in the performance of those functions. However, the language quoted is incomplete. The Agreement also provided that Hartford would be responsible for "the administration and management of the Reinsurance Claims including, without limitation, claims management, processing and payment, settlement of disputed Reinsured Claims; lump sum settlements and

commutations of Reinsurance claims … litigation involving Reinsured Claims; and rehabilitation and loss management services provided in respect of the Reinsured Claims."

7.      Admitted that the Agreement stated that it would not "create any right or legal relation between" Hartford and individuals whose claims were subject to the Agreement and that Educators "shall be and remain solely liable" on their claims.  The Agreement also provided that Hartford would have "sole authority to administer and adjudicate the Reinsured Claims, provided that [Hartford] shall indemnify, defend and hold [Educators] harmless in connection with any Loss (including punitive, exemplary and other forms of extra-contractual damages, fines, penalties and defense costs) incurred by [Educators] as a result of the Reinsurer's claims adjustment actions and determinations."

8.      Hartford admits that Educators reported the total amount of reserves allocated to Plaintiff's claim by Educators was $1,294.206.  Hartford denies that Educators transferred over $25 million dollars in "reserves" to Hartford to take over the claims subject to the reinsurance agreement.  Educators paid Hartford a "reinsurance premium" in consideration for the Agreement, which was "an amount equal to (i) the product of (a) the Settlement Amount and (b) the Reinsurance Percentage, ***plus*** (ii) an allowance for interest accruing on item (i) at the Accrual Rate from the Effective Date through the Closing Date (collectively, the Reinsurance Premium"), ***less*** (iii) claims payments made by the Company that are allocable to the Post-Effective Date Period, ***less*** (iv) an allowance for interest accruing on the payments comprising item (iii) at the Accrual Rate from the date of each such payment through the Closing Date."  The Settlement Amount was the statutory reserves for the reinsured claims, while the reinsurance percentage was

93.3%. Thus, the reserves for the Reinsured Claims was only one factor used in determining the reinsurance agreement; Educators paid Hartford less than the total amount of reserves for the reinsured claims.

Hartford admits the Agreement stated that Hartford would report the amount of reserves for the reinsured claims that remained outstanding so that Educators would reflect this information in its financial statements. Hartford further admits the Agreement stated Hartford was to provide Educators with a written statement from an actuary attesting these reserves were sufficient to meet Pennsylvania's requirement for the reporting of statutory reserves.

9. Hartford admits that if Educators had determined that Plaintiff was not disabled and terminated her claim before the effective date of the Agreement, Plaintiff's claim would not have been included as one of the Reinsured Claims in the Agreement and the reserves for Plaintiff's claims would not have been calculated into the reinsurance premium. Hartford denies that if Educators had terminated Plaintiff's claim before the effective date of the agreement, that Hartford would have been required to return the reserves to Educators. Hartford may have had to make a payment to Educators or may have received a payment from Educators depending on the recalculation of the statutory premium 30 days after the closing date of the Agreement. Hartford further denies if Hartford terminated a claim that was subject to the Agreement on its effective date, that Hartford would be entitled to release the reserves associated with that claim to its own use. The testimony and evidence cited do not support this proposition.

10. Hartford denies that neither Hartford nor Educators disclosed to the individuals whose claims were subject to the reinsurance agreement that Hartford had a financial

interest in the disposition of the claims it was administering. The testimony and evidence cited do not support this proposition. Moreover, Hartford's "financial interest" in Plaintiff's claim was no different than Educators' "financial interest" in the claim.

11.     Admitted.

12.     Admitted.

13.     Admitted.

14.     Admitted.

15.     Hartford admits that between October 1999 and November 2000, Hartford investigated, administered and paid Plaintiff's claim. Hartford denies that it performed these functions solely as Educators' "agent." Hartford stamped all of its correspondence to Plaintiff, and the other individuals whose claims were subject to the reinsurance agreement, with "on behalf of Educators" because the policy was on Educators' paper, even though Hartford had assumed 100 percent of the financial liability for the claims.

16.     Admitted that Plaintiff represented to Hartford that she was disabled for the purpose of supporting her claim for disability benefits. Hartford denies that Plaintiff relied upon Hartford's statements that it was seeking information regarding Plaintiff's disability "on behalf of Educators" or in Hartford's capacity as a "service provider" to Educators. The cited testimony and exhibits do not support this proposition.

17.     Admitted.

18.     Hartford denies that it seeks reimbursement of disability benefits it paid to Plaintiff prior to August 14, 2000. Hartford only seeks to recover the disability benefits it overpaid Plaintiff during the period of August 14, 2000 through October 31, 2000.

19.     Hartford admits that it contends that its investigation, including surveillance,

revealed that Plaintiff was not disabled. Hartford denies that it has alleged that it only relied on Plaintiff's misrepresentations until August 14, 2000. Hartford admits that it conducted surveillance on Plaintiff in May and June of 2000, that Dr. Garg performed an IME of Plaintiff in August 2000, and that Hartford paid Plaintiff disability benefits through October 2000.

20.   Admitted.

21.   Admitted.

22.   Admitted.

23.   Harford denies that Hartford and Educators informed Plaintiff that the medical records submitted to Educators showed that Plaintiff was entitled to disability benefits. Hartford denies that the cited exhibits stand for that proposition.

24.   Denied. Educators advised Plaintiff on September 3, 1997 that it would not pay benefits beyond August 31, 1997 because it "had no objective, clinical evidence of a disabling condition on [her] claim. Educators further advised Plaintiff on November 7, 1997 that it still did not have evidence of a disabling condition beyond August 31, 1997.

25.   Admitted.

26.   Denied that Hartford's termination letter dated November 17, 2000 states that it "'should have paid' plaintiff's benefits up until August 14, 2000. The letter states the following:

> Because benefits have been paid beyond 8/14/00, an overpayment of $19,655.53 has
>
> has occurred. This overpayment occurred as follows:
>
> Benefits paid 8/14/00 to 8/31/00      $7658.00
> Should have paid                      $3318.47
> Overpaid                              $4339.53

|  |  |
|---|---|
| Benefits paid 9/100 to October 31/00 | $15,316.00 |
| Should have paid | $0.00 |
| Overpaid | $15,316.00 |
| Total overpayment | $19,655.53 |

27. Hartford denies that the cited testimony supports this proposition or that there is a standard definition of a functional capacities evaluation ("FCE"). Dr. Sterle testified that an FCE tests an individual's restrictions and limitations according to guidelines and restrictions from the Department of Labor. Plaintiff's designated expert, Dr. Phillip Arnold testified an FCE tests whether an individual can perform tasks specifically related to her type of employment or work.

28. Hartford denies that Educators did not take the position that Plaintiff's medical records were insufficient to establish her disability between October 1995 and August 2000. Hartford refers the Court to paragraph 24 above. Hartford further denies that it is seeking to recover disability benefits paid to Plaintiff prior to August 2000.

29. Admitted.

30. Denied that Hartford released over one million dollars in reserves "for its own use" after terminating Plaintiff's claim. The cited testimony and exhibits do not support the amount of reserves released or that Hartford released the reserves to "its own use."

31. Hartford admits that had Plaintiff not made a disability claim with Educators, her claim would not have been a Reinsured Claim included in the Agreement. Hartford denies that the entire reserve associated with Plaintiff's claim was transferred to Hartford; the reserves allocated to Plaintiff's claim by Educators was simply one factor used in the calculation of the total reinsurance premium paid by Educators to Hartford for the Educators claimants.

32. Hartford admits that the amount of reserves released by Hartford exceeded the amount of disability payments Hartford made to Plaintiff.

33. Hartford denies that it received a "financial benefit" from Plaintiff's representation to Educators that she was disabled. The cited testimony and exhibits do not support this proposition.

II.   **ADDITIONAL DISPUTED FACTS**

34.   Plaintiff's disability policy provides that "([i])n the event of the members total disability, we will pay the Monthly Benefit Amount for each complete month of disability. For any partial month of disability, payment will be made on a pro rata basis. Coverage for this benefit and the amount of this benefit shall be determined from the Schedule of Benefits."

35.   On July 1, 1999, Educators and Hartford executed a reinsurance agreement by which Educators ceded 100 percent of its liability for and the administration of its open professional association claims, including Plaintiff's, to Hartford.

36.   Hartford conducted due diligence of 11 of the claims subject to the reinsurance agreement in order to determine whether information supplied by Educators for each claim, including such data as diagnosis code, age, and COLA benefits are correct. This information is used to evaluate the reserves set by Educators, which in turn, is used to calculate the amount of the payment made by Educators pursuant to the Reinsurance Agreement.

37.   Hartford also conducted due diligence to determine how Educators managed its claim files and conducted ongoing investigation of claims.

38.   Educators sent a letter to Plaintiff on August 26, 1999, in which explained it had contracted with Hartford to administer her benefits and that it was paying her benefits through October 31, 1999 to accommodate the transfer of her claim. It also explained she would thereafter receive her benefits payments from Hartford and that she should contact Hartford directly regarding her claim.

39.   Hartford undertook a routine annual review of Plaintiff's claim which included

obtaining information from Plaintiff regarding her disability and updated medical records from her doctors.

40.     In April 2000, the administration of Plaintiff's claim had raised three "red flags" which caused the referral of Plaintiff's claim to Hartford's Special Investigation Unit ("SIU"). The "red flags" included: apparent reluctance by Plaintiff to provide Hartford with her drivers license or birth certificate to verify her birth date, the submission of an APS by an out-of-state physician and information provided by the attending physician's office staff that was inconsistent with the APS. As part of the investigation of Plaintiff's claim, Hartford conducted video surveillance of Plaintiff, conducted an in-person interview with Plaintiff, arranged for Plaintiff to undergo an Independent Medical Examination and Functional Capacities Evaluation, and arranged for a physician to conduct a paper review of her file.

41.     On November 17, 2000, based on all the information gathered in connection with Plaintiff's claim, Hartford determined that Plaintiff no longer met the definition of Total Disability under her Policy and that her disability benefits should be terminated.

42.     Hartford notified Plaintiff that her benefits had been terminated by letter dated November 17, 2000.

43.     The termination letter advised Plaintiff that the evidence submitted in support of her claim did not establish that she continued to meet the policy's definition of Total Disability on or after August 14, 2000. The letter advised Plaintiff explained the reasons for the termination of her claim in detail.

44.     Hartford reserved all rights and defenses available to it in making its coverage determination.

45.     Hartford also invited Plaintiff to provide any addition information she wished Hartford to consider.

46.     Hartford also claimed an overpayment of $19,655.53.

47.     Plaintiff did not appeal Hartford's decision to terminate her benefits and did not provide additional information to support her claim after November 17, 2000.

48.     As part of this lawsuit, Hartford retained Dr. Arthur Taub to provide expert testimony to rebut both Plaintiff's breach of contract and bad faith claims.  Dr. Taub reviewed all the medical evidence available as of the date of his report and concluded Plaintiff was and is not totally disabled.  Dr. Taub's opinion is that Plaintiff "was not, at any time, save from normally expected episodes of minor illness, from 10/3/95 disabled from her occupation as an internal medical physician and/or her job as an internal medicine physician and as Director (physician/Director) of a Women's Center."

By:_____
        Barry A. Chasnoff (ct11162)
        Roberta J. Sharp (ct24407)
        Jessica S. Taylor (ct24408)
Akin Gump Strauss Hauer & Feld L.L.P.
300 Convent Street, Suite 1500
San Antonio, Texas 78205
Telephone: (210) 281-7000
Telecopier: (210) 224-2035

and

Donald E. Frechette (ct 08930)
Edwards & Angell, LLP
90 State House Square
Hartford, CT 06103
Phone: (860) 525-5065
Facsimile: (860) 527-4198

Attorneys For Defendant
HARTFORD LIFE & ACCIDENT
INSURANCE COMPANY

## **CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing document was sent via certified mail, return receipt requested to the following attorney on the _____ day of June 2004:

Eliot B. Gersten Gersten & Clifford 214 Main Street Hartford, CT 06106 Phone (860) 527-7044 Facsimile (860) 527-4968

\_\_

_____

ROBERTA J. SHARP
JESSICA S. TAYLOR

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


CANDI McCULLOCH  Plaintiff,

                              CIVIL ACTION NO.: 301CV1115(AHN)

vs.

HARTFORD LIFE AND
ACCIDENT INSURANCE COMPANY
AND EDUCATORS MUTUAL LIFE
INSURANCE COMPANY  Defendants

                                                                     **June 21, 2004**


## ORDER GRANTING DEFENDANT'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

On this date, the Court considered Defendant's Motion for Partial Summary Judgment. After considering Defendant's Motion for Partial Summary Judgment, the response, and all other evidence on file, the court finds there are no genuine issues of material fact. Therefore, the Court GRANTS the motion.

    SIGNED on _____, 2003.


_____             UNITED STATES DISTRICT
JUDGE