Connecticut Trial Ct. Unpublished Decisions

WEST HARTFORD v. CULLINA, No. X06 CV02-0172051 S (Nov. 4, 2002)

TOWN OF WEST HARTFORD v. MURTHA CULLINA, LLP, ET AL.

*2002 Ct. Sup. 14051*

No. X06 CV02-0172051 S

Superior Court

Judicial District of Waterbury

Complex Litigation Docket.

November 4, 2002

**MEMORANDUM OF DECISION RE:**
**DEFENDANTS' MOTIONS TO DISMISS**

McWEENY, JUDGE.

  The plaintiff is the Town of West Hartford,[fn1] Connecticut, (West Hartford) which in this litigation seeks damages for itself and other town participants in the Connecticut Resources Recovery Authority ("CRRA") mid-Connecticut system. The CRRA mid-Connecticut system accepts residential and commercial waste generated by approximately sixty-seven (67) participating towns. The towns in the mid-Connecticut system contract with the CRRA to dispose of the towns' waste for a fee set by the CRRA. The defendants Murtha Cullina, LLP (Murtha Cullina) and Hawkins Delafield & Wood (Hawkins) are law firms that represented CRRA in connection with an energy buy-down transaction among CRRA, the Connecticut Light & Power Company (CL&P), Enron Power Marketing, Inc. (EPMI) and the Enron Corporation (Enron), in connection with the energy produced at the CRRA South Meadows facility of its mid-Connecticut system.

  West Hartford alleges in counts one and four of its complaint that the defendant law firms owed it a duty of care that was breached when the defendants negligently counseled CRRA in connection with the energy transaction. It alleges in counts three and five that it was a third-party beneficiary of the legal services contracts between CRRA and the defendant law firms and, therefore, may assert its own breach of contract claims. In count two, it alleges an Unfair Trade Practices claim (CUTPA) against the defendant Murtha Cullina. Murtha Cullina has filed a motion to dismiss and to strike counts one, two and three of the complaint. The defendant Hawkins has filed a motion to dismiss counts four and five of the complaint. West Hartford filed an Opposition to both motions, which motions and objections were heard by this court on October 21, 2002.

  The defendant law firms both argue that West Hartford lacks standing and is not the proper party to seek adjudication of the issues involved
CT Page 14052
in this litigation. "Standing implicates the court's subject matter jurisdiction." Ganim v. Smith & Wesson, Corp., 258 Conn. 313 (2001); Steeneck v. University of Bridgeport, 235 Conn. 572, 580, 668 A.2d 688

(1995). "[O]nce the question of lack of jurisdiction . . . is raised, [it] must be disposed of no matter in what form it is presented . . . and the court must fully resolve it before proceeding further with the case. . . ." (Citations omitted; internal quotation marks omitted.) Community Collaborative of Bridgeport, Inc. v. Ganim, 241 Conn. 546, 552, 698 A.2d 245 (1997).

The Connecticut Supreme Court has held that a motion to dismiss "properly attacks the jurisdiction of the court, essentially asserting that the plaintiff cannot as a matter of law and fact state a cause of action that should be heard by the court. . . ." (Citations omitted.) Gurliacci v. Mayer, 218 Conn. 531, 544, 590 A.2d 914 (1991)

> It is a basic principle of law that a plaintiff must have standing for the court to have jurisdiction. Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he has . . . some real interest in the cause of action, or legal or equitable right, title or interest in the subject matter of the controversy. . . .

(Citations omitted; internal quotation marks omitted.) Community Collaborative of Bridgeport, Inc. v. Ganim, supra, 241 Conn. 552-53.

"Standing focuses on the party seeking to be heard and not on the issues that party wants to have heard. . . . The question of standing does not involve an inquiry into the merits of the case. . . ." (Citations omitted; internal quotation marks omitted.) Lowe v. Lowe, 47 Conn. App. 354, 364, 704 A.2d 236 (1997). "In the absence of a justiciable controversy, the courts have no jurisdiction." Kleinman v. Marshall, 192 Conn. 479, 484, 472 A.2d 772 (1984). "A case that is nonjusticiable must be dismissed for lack of subject matter jurisdiction." Mayer v. Biafore, Florek & O'Neill, 245 Conn. 88, 91, 713 A.2d 1267 (1998). Also see Gladysz v. Planning & Zoning Commission, 256 Conn. 249, 773 A.2d 300 (2001), for an articulation of the distinction between standing and aggrievement.

In Connecticut Associated Builders & Contractors v. Hartford, 251 Conn. 169, 740 A.2d 813 (1999), the Supreme Court held that

> [t]o establish standing to raise an issue for
CT Page 14053
> adjudication, a complainant must make a colorable claim of direct injury. . . . Standing is . . . a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions, which may affect the rights of others, are forged in hot controversy, with each view fairly and vigorously represented. . . . These two objectives are ordinarily held to have been met when a complainant makes a colorable claim of direct injury [that the complainant] has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy provides the requisite assurance of concrete adverseness and diligent advocacy. . . ."

(Citations omitted; internal quotation marks omitted.) Id., 178.

> To fulfill these goals, the standing doctrine requires that the plaintiff demonstrate two facts. First, the complaining party must be a proper party to request adjudication of the issues. . . . Second, the person or persons who prosecute the claim on behalf of the complaining party must have authority to represent the party. . . .
>
> ***
>
> A complaining party ordinarily can show that it is a proper party when it makes a colorable claim of [a] direct injury [it] has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy . . . provides the requisite assurance of concrete adverseness and diligent advocacy. . . .
>
> ***
>
> To demonstrate authority to sue, however, it is not enough for a party merely to show a colorable claim to such authority. Rather, the party whose authority is challenged has the burden of convincing the court that the authority exists . . .

(Citations omitted; internal quotation marks omitted.)
CT Page 14054

Community Collaborative of Bridgeport, Inc. v. Ganim, supra, 241 Conn. 553-54; see also, Crone v. Gill, 250 Conn. 476, 479, 736 A.2d 131 (1999) (disqualified attorney lacks standing on appeal of disqualification order because he has no right cognizable by law to represent former client in such appeal).

Thus, the essential issue before the court is whether West Hartford, under the general rules of standing, can maintain that its claimed interest has been specially and injuriously affected in a way that is cognizable by law.

"It is well established that [i]n ruling upon whether a complaint survives a motion to dismiss, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader. . . ." (Citation omitted.) Ganim v. Smith & Wesson Corp., 258 Conn. 313, 780 A.2d 98 (2001). The allegations by West Hartford, including all facts necessarily implied from them, are as follows.

The CRRA was created in the 1970's for the purpose of planning, developing, constructing, financing and operating solid waste disposal facilities in Connecticut. General Statutes § 22a-262. One of the CRRA's major facilities is the mid-Connecticut project, which was developed in the early 1980's and financed through bonds issued under a bond resolution by CRRA on March 13, 1985, and executed by the Connecticut National Bank (predecessor to State Street Bank & Trust Company as bond trustee) on March 21, 1985.

West Hartford entered into a contract with the CRRA on May 14, 1984, for solid waste management services. Sixty-six other towns entered into

similar contractual arrangements with the CRRA. Essentially, the agreements provided that CRRA agreed to remove solid waste brought to transfer stations by the towns. The towns were obligated to make service payments to the CRRA sufficient to meet its costs of operation.

In 1985, after entering into the agreements with the towns comprising the mid-Connecticut project for the removal of solid waste, CRRA entered into a long-term contract with Connecticut Light & Power Company (CL&P) that required CL&P to purchase substantially all of the steam generated at the CRRA's solid waste facility in the South Meadows of Hartford for a price of eight and one-half cents per kilowatt hour. This contract is referred to as the "steam purchase agreement." The steam was converted by CL&P into electricity at its generation facilities located adjacent to the waste combustion facility.
CT Page 14055

The State of Connecticut, in concert with the federal government and the governments of other states, adopted a policy of deregulation of the electrical utility industry in the mid-1990's. The Connecticut legislature enacted "An Act Concerning Electrical Restructuring" in 1998. (Electrical Restructuring Act). At the time of the enactment of the Electrical Restructuring Act, the steam purchase agreement between CL&P and the CRRA had become an above-market "stranded cost" contract, due to the fact that the rate CL&P was then paying to the CRRA exceeded the market price for steam. The Electrical Restructuring Act required CL&P to attempt to mitigate its above market "stranded cost" contracts by negotiating in good faith with independent power producers for the "buy-out, buy-down or renegotiation" of such contracts. These negotiations were necessary in order to obtain Department of Utility Control (DPUC) recognition of a claim for stranded cost. General Statutes § 16-245e (c)(1).

The Electrical Restructuring Act provided for the issuance of "rate reduction bonds" and expenditure of the bond proceeds to buy-down long-term fixed cost contracts. Such bonds, subject to DPUC approval necessary for the utility's recovery of such costs, were to be repaid through "transition assessments," being fees added to consumers' utility bills. General Statutes §§ 16-245e (a)(2), 16-245j (a) and (c)(4). The DPUC was authorized to approve the use of the proceeds of any rate reduction bonds. See General Statutes § 16-245j (c)(4). CL&P also was required under the Electrical Restructuring Act to sell its electric generation assets, which included the electrical generating facility adjacent to the CRRA's solid waste South Meadows facility.

Murtha Cullina for some time served as outside counsel to the CRRA. Murtha Cullina drafted agreements between the CRRA and CL&P, under which CL&P would pay $290 million to the CRRA to terminate its obligations under the steam purchase agreement, which payments were to be financed by the issuance of bonds. Hawkins was retained by the CRRA to advise it concerning certain aspects of the restructuring.

The CRRA also entered into negotiations with a third party, Enron Power Marketing, Inc. ("EPMI"), with the assistance of the defendant law firms. The services of the defendants in such negotiations, including the legal advice provided concerning the transactions, is alleged by West Hartford to have been negligent and in breach of contract.

The CRRA, CL&P and EPMI, on December 22, 2000, entered into multiple agreements that restructured the relationship among them. Elements of the restructuring included payment by CL&P to the CRRA of

CT Page 14056
$60 million with the conveyance to the CRRA of the mid-Connecticut project site, the electrical generating facility and various electric generators. The CRRA assumed environmental liability for the site and responsibility for operating the generators. CL&P made a one-time payment of $225 million to EPMI, in consideration for which EPMI assumed CL&P's obligations under the steam purchase agreement. The CRRA and EPMI amended the steam purchase agreement by reducing the amount of steam sold, but increasing the per unit price for steam. EPMI agreed to pay the CRRA $2.2 million per month for the steam. The CRRA committed to convert the steam into 250 million kilowatt hours of electricity per year. EPMI agreed to pay the CRRA three cents per kilowatt hour of electricity produced up to $250 million kilowatt hours, which price would increase to 3.3 cents in 2004. EPMI also agreed to pay the CRRA a further payment of $175,000 per month. EPMI agreed to sell the electricity produced from the steam to CL&P.

Enron Corporation, EPMI's parent, guaranteed the payment obligations of EPMI.

Neither West Hartford nor any other municipality was a party to any of the restructuring agreements. The DPUC, pursuant to its statutory obligation, reviewed the assignment of the steam purchase agreement by CL&P to EPMI and the payment of the buy-down amount by CL&P to EPMI from the proceeds of the rate reduction bonds, and following public hearings, the DPUC approved the actions. The CRRA's board of directors unanimously approved the restructuring and the related agreements. The State of Connecticut State Treasurer's Office, on March 30, 2001, authorized the issuance of the rate reduction bonds.

The Enron bankruptcy makes it likely that the CRRA will lose in excess of $200 million, which loss will be passed on in the form of higher trash disposal fees to West Hartford and the other municipalities that are part of the mid-Connecticut system. The Connecticut General Assembly in Public Act 02-46, § 2 authorized the Connecticut Attorney General to act on CRRA's behalf to seek to recover the CRRA claims related to the Enron bankruptcy. Those efforts, to date, have included the Attorney General acting on behalf of the CRRA in the Enron bankruptcy proceedings, seeking constructive trust of the monies paid to Enron and in the energy transaction between CRRA and EPMI. See CRRA v. Enron, No. 01-16034 (Bankr.S.D.N.Y.) (*Gonzalez, J.*). On August 7, 2002, the Attorney General, on behalf of the CRRA, served an action on the same defendant law firms, alleging similar claims as asserted in this case. See CRRA v. Murtha Cullina, LLP, et. al., X06 CV 02 0174569 5.

The undisputed facts establish that the defendant law firms were
CT Page 14057
retained by the CRRA to represent the CRRA. The attorney-client relationship between CRRA and Hawkins was governed by a legal services agreement entered into in 1998. There is no evidence whatsoever that the law firms represented West Hartford or any other municipalities in connection with the mid-Connecticut system restructuring agreements.[fn2] The opinion letters relating to the restructuring agreements are not addressed to West Hartford or any other municipality, nor do the opinion letters mention West Hartford or any municipality. None of the municipalities are parties to the restructuring agreements, nor are they mentioned in such agreements. The restructuring agreements expressly disclaim any potential third-party contract rights. West Hartford does not allege that the opinion letters were delivered to it, nor is there any allegation that it reviewed either letter. There is no evidence of

reliance by West Hartford or by any other municipality on these opinion letters.

West Hartford argues that the law firms owed it a duty to obtain the town's prior approval for the restructuring agreement, or to notify it of the restructuring. The basis for this alleged requirement is § 7.15 of the 1985 bond resolution, which in pertinent part provides that: "Unless required by law, [CRRA] will not consent to or permit any rescission, termination, amendment or other change to the [steam purchase agreement], the effect of which would increase the net operating expenses of the authority, except with the express approval of the municipalities." The same 1985 bond resolution provides in § 1.3(C): "All the covenants, stipulations, promises and agreements herein contained by and on behalf of the authorities shall be, except as may otherwise be provided in the resolution, for the sole and exclusive benefit of the authority [CRRA], trustee, the paying agents and the holders of the bonds." West Hartford and the other municipalities are not the trustee, the paying agent or the holders of the bonds. The undisputed facts show that CRRA's board unanimously concluded at a public meeting that there would be no anticipated increase as a result of the restructuring, thus no municipal approval was necessary. The plain meaning of § 7.15 of the bond resolution also addresses the duty of the authority toward the municipalities.

Standing is the prerequisite for West Hartford maintaining its negligence, contract and CUTPA claims. In Ganim v. Smith & Wesson Corp., supra, 258 Conn. 313, our Supreme Court reiterated the principles of standing, noting: "If the injuries claimed by the plaintiff are remote, indirect or derivative with respect to the defendant's conduct, the plaintiff is not the proper party to assert them and lacks standing to do so." 258 Conn. 347. The defendant law firms assert that as a matter of law, West Hartford's alleged injuries in the form of increased
CT Page 14058
"tipping fees" are too remote, indirect and/or derivative of the injuries CRRA may have suffered so as to bestow upon West Hartford the standing to pursue such claims.

In Ganim, the Supreme Court acknowledged and followed a line of federal authority recognizing a common law principle that a plaintiff who complains of harms resulting from misfortune visited upon a third person is generally held to stand at too a remote a distance to recover. Holmes v. Securities Investors Protection Corp., 503 U.S. 258, 268-69, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); Laborer's Local 17 Health & Benefit Fund v. Phillip Morris, Inc., 191 F.3d 229, 236-37 (2nd Cir. 1999), cert. denied, 528 U.S. 1080, 120 S.Ct. 799, 145 L.Ed.2d 673 (2000).

An early Connecticut case was instrumental in introducing this principle to this state's jurisprudence. In Connecticut Mutual Life Insurance Co. v. New York & New Haven R. Co., 25 Conn. 265, 276 (1856), the Supreme Court held that an insurance company could not recover from a third party for the death of its insured. More than a century later, the court held in Maloney v. Pac, 183 Conn. 313, 321, 439 A.2d 349 (1981), that standing requires a colorable claim of direct injury to the complaining party. Connecticut courts also follow the usual rule against vicarious third-party liability. See Stamford Hospital v. Vega, 236 Conn. 621, 659, 674 A.2d 821 (1996); Third Taxing District v. Lyons, 35 Conn. App. 795, 798, 647 A.2d 32, cert. denied, 231 Conn. 936, 650 A.2d 173 (1994).

In <u>Ganim v. Smith & Wesson Corp.</u>, supra, 258 Conn. 353, our Supreme Court, like the U.S. Supreme Court in <u>Holmes</u>, considered three policy concerns that courts must ponder when determining whether a party may recover for injuries to a third person: 1) the difficulty of determining damages; 2) the possibility of multiple recovery; and 3) the general interest in deterring injurious conduct and availability of other parties who were more directly injured and may be better able to vindicate their interests rather than the plaintiff. Id. To this end, the <u>Holmes</u> court applied a proximate cause analysis, observing that, "proximate cause" is used "to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts. . . . Thus, a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover. . . . Although such directness of a relationship is not the sole requirement of [proximate] causation, it has been one of its central elements." <u>Holmes v. Securities Investor Protection Corp.</u>, supra, 503 U.S. 268-69. In <u>Laborer's Local 17 Health & Benefits Fund v. Philip Morris, Inc.</u>,
CT Page 14059
supra, 191 F.3d 237, the Second Circuit noted:

"This language tells us that to plead a direct injury is a key element for establishing proximate causation, independent of and in addition to other traditional elements of proximate cause. Thus, the other traditional rules requiring that defendant's acts were a substantial cause of the injury, and that plaintiff's injury was reasonably foreseeable, are *additional elements*, not substitutes for alleging (and ultimately, showing) a direct injury." (Emphasis in original.) Id.

In Laborer's Local 17, the union health and welfare fund was seeking a recoupment of increased cost because of the defendant tobacco producer's products. The court noted that the plaintiffs' "but for" argument could not overcome the necessary finding of proximate cause, relying on direct injury. At common law, loss that is purely contingent upon harm to third parties is too remote to be recoverable. In <u>Ganim</u>, the Supreme Court noted — *and this court regards as controlling authority* — that the existence of a directly injured party who can remedy the harm is dispositive.

Litigation brought by the CRRA itself precludes the pursuit of the indirect claims asserted by West Hartford and other municipalities in this case. The Supreme Court in <u>Ganim</u> reviewed the factors in <u>Holmes</u> and acknowledged a three-part test for analyzing directness in the context of determining standing to sue. The first factor relates to the directness or indirectness of the alleged injury. The more indirect an injury is, the more difficult it becomes to determine the amount of a plaintiff's damages attributable to the wrongdoing as opposed to other independent factors. <u>Ganim v. Smith & Wesson Corp.</u>, supra, 258 Conn. 356. The second part of the test directs the court to consider whether "recognizing claims by the indirectly injured would require courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, in order to avoid the risks of multiple recoveries." Id., 358. West Hartford argues and this court agrees that the damages likely to result to West Hartford and the other municipalities are clearer and easier to calculate than the amorphous claims of the <u>Ganim</u> plaintiffs.

In <u>Ganim</u>, however, the Supreme Court noted that "struggling with the first two problems is unnecessary where there are directly injured parties who can remedy the harm without these attendant problems." Id.,

359. In this litigation, the directly injured party is the CRRA, which is seeking essentially the same claims against the very same defendants in a lawsuit brought by the Attorney General in accordance with the specific authorization of the General Assembly.
CT Page 14060

Other recent appellate authority applied the same three-part policy analysis to find that end users of Microsoft software alleging antitrust and CUTPA violations and damages lacked standing to maintain such claims. Vacco v. Microsoft Corp., 260 Conn. 59, 90-92, 793 A.2d 1048 (2002). The Supreme Court specifically held that "applying the three-part policy analysis to the facts of the present case, we are convinced that the plaintiff's claimed injuries are too indirect and remote with respect to the defendant's alleged anticompetitive conduct for the plaintiff to recover under CUTPA." Id., 90.

West Hartford's injuries are derivative of the losses which appear to have be.en suffered by the CRRA. As the directly injured party, the CRRA is pursuing these claims to remedy the harm, without the problems attendant to the indirect claims of West Hartford and other municipalities. West Hartford lacks standing to assert such claims because of their indirect derivative damage nature.

Accordingly, the motions by each defendant to dismiss this action are granted in their entirety.

---

ROBERT F. McWEENY

[fn1] The Town of West Hartford is a municipal corporation organized and existing under the laws of the State of Connecticut.

[fn2] Hawkins Delafield did subsequently serve as bond counsel to West Hartford, but there is no claim that its service was in any way related to the restructuring agreements, mid-Connecticut project or the CRRA matters.
CT Page 14061

Copyright © 2004 Loislaw.com, Inc. All Rights Reserved