## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **CANDI McCULLOCH** | § | **CIVIL ACTION NO.:** |
| **Plaintiff,** | § | **301CV1115(AHN)** |
| | § | |
| **vs.** | § | |
| | § | |
| **HARTFORD LIFE AND ACCIDENT** | § | |
| **INSURANCE COMPANY AND** | § | |
| **EDUCATORS MUTUAL LIFE** | § | |
| **INSURANCE COMPANY** | § | |
| **Defendants.** | § | **July 14, 2004** |

## DEFENDANT EDUCATORS' MUTUAL LIFE INSURANCE COMPANY'S LOCAL RULE 56(a)(2) STATEMENT

Defendant Educators' Mutual Life Insurance Company ("Educators") submits this

Statement of Facts in Opposition to Plaintiff's Motion for Summary Judgment:

## I.    RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS

1.    Admitted.

2.    Admitted.

3.    Admitted that Plaintiff applied to Educators for total disability benefits in October 1995.

Hartford also admits that Educators determined that Plaintiff became disabled in October 1995.

Hartford denies that Plaintiff was paid benefits retroactive to October 1995; Educators paid

Plaintiff disability benefits from October 1995 to March 1996, less the 90 day waiting period.[1]

---

[1] Pl. Hart. Opp. Ex. B.(1). All citations to "Pl. Hart. Opp. Ex." refer to the exhibits submitted by Plaintiff in opposition to Hartford's Motion for Summary Judgment and all citations to "Hart. Def. Ex." refer to the exhibits submitted by Hartford in support of its Motion for Summary Judgment. "Pl. Ex." refers to the exhibits submitted by Plaintiff in support of her Motion for Summary Judgment against Educators, "Pl. Educ. Opp Ex" refers to the exhibits submitted by Plaintiff in opposition to Educator's Motion for Summary Judgment and all citations to "Educ. Def. Ex." refer to the exhibits submitted by Educators in support of its Motion for Summary Judgment. All citations to Pl. Hart. Ex refers to the exhibits submitted by Plaintiff in support of her Motion for Summary Judgment on Hartford's Counterclaim, while Hart. Opp. Ex refers to the exhibits cited by Hartford in opposition to that motion.

4.      Hartford admits that Educators obtained an Independent Medical Examination and paper review of Plaintiff's medical records from Dr. Alshon. Hartford denies that Educators obtained three independent medical of Plaintiff's updated medical records by Dr. Stern of U.S. Medical Review; the cited evidence only indicates Dr. Stern conducted two reviews of Plaintiff's medical records.[2] Hartford admits that Educators sent Plaintiff a letter stating that "[i]n review of your file, it is clearly documented that you have sustained functional limitations which prevent you from performing the substantial requirements of your occupation;" however, the letter was sent to Plaintiff by Educators' "vocational rehabilitation" consultant for the purpose of talking to Plaintiff about "exploring other vocational options."[3] Denied that Educators paid Plaintiff disability benefits on a continual basis from March 1996 to March 1999. On April 20, 1997, Educators' claims manager recommended putting a hold on Plaintiff's benefit payments.[4] Educators advised Plaintiff on September 3, 1997 that it would not pay benefits beyond August 31, 1997 because it "had no objective, clinical evidence of a disabling condition on [her] claim.[5] Educators further advised Plaintiff on November 7, 1997 that it still did not have evidence of a disabling condition beyond August 31, 1997.[6]

5.      Admitted that Educators ceased writing professional association policies and accepting premiums and as a result Educators wanted to sell its open disability claims. Educators also admits that the open professional association claims had become an expense to Educators, but

---

[2] Pl. Hart. Opp. Exs. G, J, K and L.

[3] Pl. Hart. Opp. Ex. T.

[4] Pl. Hart. Opp. Ex. S, at H2019

[5] Pl. Hart. Opp. Ex. G (H2075).

[6] Pl. Hart. Opp. Ex. G (H2073-74).

Educators denies there were any "policies" in place after April 1997. There were no policies, only open disability claims.[7]

6.    Denied. There was no "insurance" that was the subject of the reinsurance agreement, only open disability claims. There was no insurance coverage for any insured with the American College of Physicians after April 1997.[8]  Plaintiff was not "insured" with Educators after April 1997; Educators was only paying and administering her open disability claim.[9]  Therefore, there was no requirement that Educators submit the reinsurance agreement to the Insurance Commissioners of a multitude of states or obtain the consent of the persons who had open disability claims with Educators.[10]  The testimony to which Plaintiff cites for support of her position that Educators was required to seek permission from the insurance commissioners of several states and the consent of the claimants is misleading. Pamela Mormino testified that if Hartford had assumed Educators' paper, Hartford and Educators would have been required to seek consent for the reinsurance agreement; however, Ms. Mormino testified that Hartford did not assume Educators' paper.[11]

7.    Admitted.

8.    Admitted that the Agreement provided Hartford could issue correspondence and benefit payments to individuals whose claims were subject to the Agreement, provided that Hartford discloses that it is acting as agent for Educators in the performance of those functions. However, the language quoted is incomplete. The Agreement also provided that Hartford would be

---

[7] True and correct copies of excerpts from Kim Rankin's February 5, 2004 deposition, at 9:14-19, are attached as Exhibit A.

[8] Exhibit A, at 9:17-10:1, 12:2-23, 13:7-19, 16:3-17:1.

[9] *Id.* at 16:3-17:1.

[10] *Id.* at 15:9-11; Pl. Ex. 1, at 84-85.

[11] Pl. Ex. 1, at 84:24-85:12.

responsible for "the administration and management of the Reinsurance Claims including, without limitation, claims management, processing and payment, settlement of disputed Reinsured Claims; lump sum settlements and commutations of Reinsurance claims ... litigation involving Reinsured Claims; and rehabilitation and loss management services provided in respect of the Reinsured Claims." [12] Admitted that the Agreement stated that it would not "create any right or legal relation between" Hartford and individuals whose claims were subject to the Agreement and that Educators "shall be and remain solely liable" on their claims. However, the Agreement also provided that Hartford would have "sole authority to administer and adjudicate the Reinsured Claims, provided that [Hartford] shall indemnify, defend and hold [Educators] harmless in connection with any Loss (including punitive, exemplary and other forms of extra-contractual damages, fines, penalties and defense costs) incurred by [Educators] as a result of the Reinsurer's claims adjustment actions and determinations."[13]

9.     Educators admits that it reported the total amount of reserves allocated to Plaintiff's claim was $1,294.206. Educators denied it transferred over $25 million dollars in "reserves" to Hartford to take over the claims subject to the reinsurance agreement. Educators paid Hartford a "reinsurance premium" in consideration for the Agreement, which was "an amount equal to (i) the product of (a) the Settlement Amount and (b) the Reinsurance Percentage, *plus* (ii) an allowance for interest accruing on item (i) at the Accrual Rate from the Effective Date through the Closing Date (collectively, the Reinsurance Premium"), *less* (iii) claims payments made by the Company that are allocable to the Post-Effective Date Period, *less* (iv) an allowance for interest accruing on the payments comprising item (iii) at the Accrual Rate from the date of each

---

[12] Pl. Educ. Opp. Ex. 1, § 2.1.2.

[13] *Id.* § 2.1.3.

such payment through the Closing Date."[14]  The Settlement Amount was the statutory reserves

for the reinsured claims, while the reinsurance percentage was 93.3%.[15]  Thus, the reserves for

the Reinsured Claims was only one factor used in determining the reinsurance agreement;

Educators paid Hartford less than the total amount of reserves for the reinsured claims.[16]

Educators further denies if Hartford terminated a claim that was subject to the Agreement on its

effective date, that Hartford would be entitled to release the reserves associated with that claim to

its own use.  The evidence cited does not support this proposition.[17]  Nowhere does the

Reinsurance Agreement state that Hartford would be entitled to release the reserves "to its own

use."

10.    Admitted. The August 26, 1999 letter also informed Plaintiff that if she had any

questions regarding her disability claim that she should contact Hartford.  Further, the letter

advised Plaintiff that she would receive disability payments from Hartford after October 31,

1999.[18]

11.    Admitted.

12.    Educators denies that neither Hartford nor Educators disclosed to the individuals whose

claims were subject to the reinsurance agreement that Hartford had a financial interest in the

disposition of the claims it was administering.  The testimony and evidence cited by Plaintiff do

not support this proposition.  Both Kenneth Wasnock and Pamela Mormino testified that the

August 26, 1999 letter sent to Plaintiff did not advise her that there was a "buy-out" of her claim

---

[14] *Id.* § 4.2.

[15] *Id.* §§ 1.22, 1.24 and 1.25.

[16] True and correct copies of excerpts from the May 13, 2003 Deposition of Kimberley Rankin, at 22-24, are attached as Exhibit B; True and correct copies of excerpts from the deposition of Pamela Mormino, at 47-48, are attached as Exhibit C.

[17] Pl. Educ. Opp. Ex. 1, § 2.3.

[18] Pl. Educ. Opp. Ex. 3.

by Educators.[19]  Nowhere did they testify that the letter did not advise Plaintiff that Hartford had

a "financial interest in her claim."  Plaintiff has not submitted any evidence that she believed

Hartford was administering and paying her claim for free.  Moreover, Hartford's "financial

interest" in Plaintiff's claim was no different than Educators' "financial interest" in the claim.

13.    Admitted.  However, Educators denies there were requirements that Hartford or

Educators submit the reinsurance agreement to any insurance commissioner for review or

approval or that they obtain the consent of the policyholders.  See *supra,* ¶ 6.

14.    Educators admits that Hartford's SIU contacted UNUM because it believed UNUM

might have information that Plaintiff was not entitled to disability benefits.  However, Educators

denies that this occurred immediately upon Hartford's assumption of the administration of

Plaintiff's claim.  Hartford began administering Plaintiff's claim on or about November 19,

1999;[20] Hartford's SIU contacted UNUM on or about April 4, 2000.[21]

15.    Educators admits that when SIU initiated its investigation of Plaintiff's claim, no

Hartford medical personnel had reviewed Plaintiff's medical records.  However, Susan Wilk, the

claims examiner assigned to Plaintiff's claim, had reviewed her medical records.[22]  Denied that

Educators concluded that Plaintiff's medical records "clearly documented that [plaintiff has]

sustained functional limitations which prevent [her] from performing the substantial

requirements of [her] occupation."  See *supra,* ¶ 4.  Additionally, Educators denies that the

independent medical physicians hired by it included the quoted language in any of their reports.[23]

Educators also denies that Educators' claim staff "found a third volume" of its claim file on

---

[19] Educ. Def. Ex. B(2), at 71:4-24; Pl. Educ. Opp. Ex. 7.

[20] Hart. Def. Ex. A(5), at H 2465.

[21] Pl. Hart. Opp., Ex. U at H2600.

[22] Hart. Def. Ex. A(5), at 25.

[23] Pl. Hart. Opp. Exs. I, J-L.

plaintiff two months after it began its fraud investigation. Educators cannot discern what evidence Plaintiff is citing to for this proposition.

16.    Admitted.

17.    Admitted.

18.    Educators admits that Hartford's SIU conducted video surveillance of Plaintiff. Educators also admits that Susan Wilk, the claims examiner assigned to Plaintiff's claim, learned that UNUM had settled Plaintiff's claim for benefits after Plaintiff initiated litigation against UNUM. Educators denies that there is any correlation between the UNUM settlement and SIU's decision to conduct surveillance on Plaintiff. The cited evidence and testimony do not support this proposition.[24]

Educators admits that as of May 17, 2000, when Hartford ordered video surveillance of Plaintiff, Hartford's medical personnel had not reviewed plaintiff's medical records. However, as of this date, Susan Wilk and Diane Favreau, a Hartford claims specialist, had reviewed Plaintiff's medical records—both those contained in Educators' files and the updated records Hartford received from Plaintiff's physicians.[25] Educators denies that its conclusion was always that Plaintiff was disabled. See *supra*, ¶ 4.

19.    Admitted.

20.    Denied. Hartford represented to Dr. Garg that Plaintiff was an "Internist (clinic only, no surgical requirements) at 16 hrs a week, and [a] Director/administrator for a women's client at 30 hrs a week."[26] Further, Dr. Garg testified that <u>Plaintiff</u> told her "that prior to her injury, she was practicing medicine two days a week, for 16 hours a week. And she was hired in a women's

---

[24] Pl. Hart. Opp. Exs. U, at H3619 and Ex. D, at 142.

[25] Hart. Def. Ex. A(5), at H2462, H2458.

[26] A true and correct copy of Joseph Sterle's August 2, 2000 letter to Dr. Garg is attached as Exhibit D.

hospital for director—as a director, but she was never decided about the work and I don't think she went there for work."[27]

21.    Educators admits that the definition of "total disability" in Plaintiff's policy is based on an insured's ability to perform the material and substantial duties of an insured's occupation.[28] Educators admits that the duties listed by Plaintiff for her positions as an internal medicine physician for 16 hours a week and the director of a women's clinic for 30 hours a week were included in the list of essential job duties that were attached to her contracts of employment.

22.    Educators admits that Dr. Garg concluded that plaintiff could return to work. Educators denies that Dr. Garg based this conclusion solely on Hartford's representations regarding her job requirements. See *supra,* ¶ 20.

23.    Educators admits that Hartford requested that Dr. Garg include a report of her functional capacities evaluation in her report regarding Plaintiff. Hartford requested this information because it had hired Dr. Garg to conduct an FCE and there was no mention of the FCE in her draft report.[29] Educators denies that there is a standard definition of a "FCE." Joseph Sterle testified that an FCE tests an individual's restrictions and limitations according to guidelines and restrictions from the Department of Labor. Plaintiff's designated expert, Dr. Phillip Arnold testified an FCE tests whether an individual can perform tasks specifically related to her type of employment or work.[30]

---

[27] Pl. Hart. Opp. Ex. UU, at 84-85.

[28] Hart. Def. Ex. A(3), at 5.

[29] True and correct copies of exceprts from Joseph Sterle's deposition, at 131:5-132:1, are attached as Exhibit E.

[30] Pl. Hart. Opp. Ex. WW, at 55-56; Hart. Opp. Ex. 5, at 119.

24.    Educators admits that Dr. Garg did not perform a FCE. Educators also admits that Hartford knew Dr. Garg did not perform an FCE. However, Hartford did not learn Dr. Garg had not performed an FCE until September 28, 2000.[31]

25.    Educators admits that Hartford forwarded Dr. Garg's IME report to plaintiff's physicians and asked them to comment on her functionality. Hartford also forwarded a copy of the video surveillance to these physicians.[32]

26.    Denied. Neither the activity log or the letter sent to Plaintiff regarding the interview refers to Hartford "inducing" Plaintiff to meet with SIU investigators.[33]

27.    Denied. The activity log entries and the testimony cited by Plaintiff mentions that one of the purposes of the interview was to identify Plaintiff as the person depicted in the video surveillance during the interview.[34] None of the evidence cited by Plaintiff supports Plaintiff's position that the purpose of the meeting was to confront plaintiff with video surveillance or that it intentionally failed to disclose this fact to Plaintiff.

28.    Educators admits that Hartford staff met on two occasions to discuss the interview. Educators denies that the cited evidence refers to "scripting" the interview. Mr. McGoldrick testified that Hartford staff met to make sure that William Moryto, the person who conducted the interview of Plaintiff, had enough information to conduct the interview.[35] The activity log notes that Hartford staff met to "discuss the interview and any questions claims staff wished to include in the interview."[36]

---

[31] Hart. Ex. A(5), at H2449.

[32] Hart. Ex. A(26).

[33] Pl. Hart. Opp. Ex. MM; Hart. Ex. A(5), at H2452.

[34] Pl. Hart. Opp. Ex. U, at H3622; Ex. E at 165-68, Ex. V. at 151-53; Hart. Ex. A(5) at H2452.

[35] Pl. Hart. Opp. Ex. V, at 116.

[36] Pl. Hart. Opp. Ex. U, at H3622.

29.    Denied that Hartford "induced" plaintiff to sign a statement that was purportedly

inconsistent with her videotaped activities. The activity log is devoid of any reference to

Hartford "inducing" Plaintiff to do anything.[37] Educators also denies that Plaintiff's statement

was "purportedly" inconsistent with the activities she was observed performing on the video

surveillance. Plaintiff stated during her interview that she was in constant, chronic pain and

specifically denied that she could dance.[38] The surveillance videos show Plaintiff bending,

moving her neck, driving with no discomfort, carrying a large plant and dancing at a party at her

son's school.[39]

Denied that the investigators "brought Plaintiff to tears." The activity log merely states

that "she had three incidents of crying."[40] Educators further denies that Plaintiff's statement was

"central" to Hartford's termination of benefits. All of the evidence cited by Plaintiff reveals that

the statement was only one of the many factors that went into Hartford's decision to terminate

Plaintiff's benefits.[41]

30.    Educators admits that on November 17, 2000, Hartford terminated plaintiff's disability

benefits on the ground that Plaintiff was no longer disabled as of August, 14, 2000. Educators

denies that the evidence submitted to Educators showed that Plaintiff was disabled. See *supra*,

¶ 4. Educators denies that Hartford began to draft the termination letter before its contracted

physician had reviewed plaintiff's file. The SIU activity log to which Plaintiff cites states on

November 2, 2000, "[w]ith the agreement of claims staff, this writer will begin reviewing

---

[37] Pl. Hart. Upp. Ex. U, at H3623.

[38] *Id.*

[39] Hart. Def. Ex. A(14) and A(14)(A)-(H).

[40] Pl. Hart. Opp. Ex. U, at H3623.

[41] Hart. Def. Ex. A(30); Pl. Hart. Opp. Ex. C at 207-11; Ex. D, at 156, Ex. V. at 104-06, Ex. HH, at 120,
123.

information and composing the termination of claim letter."[42] The claims activity log notes that

Hartford's medical director was to review Plaintiff's file on November 3, 2000.[43]

31.    Educators denies that Hartford only relied on the IME report, the results of the FCE,

plaintiff's physicians' failure to comment on these reports, and Plaintiff's signed statements to

terminate her disability benefits. Hartford based its decision on all of the documents contained in

Plaintiff's claim file, as well as Plaintiff's Claimant Questionnaire, her medical records,

telephone calls with Plaintiff's physicians, video surveillance, Plaintiff's prescription records, her

job descriptions and Dr. Amato's review of her medical records.[44]

       Educators admits that Hartford requested that Plaintiff's physicians state whether they

agreed or disagreed with Dr. Garg and admits that Hartford stated it would assume the physicians

had no comment if they did not respond. Educators denies that Hartford represented to Plaintiff

in her termination letter that four of her physicians failed to respond. Hartford informed Plaintiff

that Drs. Porfiri and Johnson had not responded, that Dr. Baker indicated it was not her practice

to review video or IME results, and that Dr. Norris had stated "I have no response to this—my

involvement in Dr. McCulloch's care was rather limited...I prefer not to comment on this."[45]

Hartford also informed Plaintiff that Dr. Magana had agreed with Dr. Garg's conclusions and had

opined that that she was "capable of working a full eight hour day. She would, in my opinion, be

capable of practicing medicine two days per week as she was doing prior to her injury."[46]

---

[42] Pl. Hart. Opp. Ex. U, at H3629.

[43] Hart. Def. Ex. A(5), at H2443.

[44] Hart. Def. Ex. A(30).

[45] *Id.*

[46] *Id.*

32.    Denied that Hartford released over one million dollars in reserves "for its own use" after terminating Plaintiff's claim. The cited exhibits do not support the amount of reserves released or that Hartford released the reserves to "its own use."[47]

33.    Educators denies that Plaintiff requested that it produce documents relating to Hartford assumption of the function of administrator for her claim soon after filing her complaint in this action on June 15, 2001. Plaintiff did not serve Educators with requests for production or interrogatories until December 6, 2002, three months after the reinsurance agreement had been produced to Plaintiff.[48] Plaintiff served Hartford with Interrogatories, which included a request that Hartford "identify any document which describes the relationship between Defendant Educators and Defendant Hartford, including any assignments or indemnities." Although the Court ordered Hartford to respond to this Interrogatory by "identifying" the responding information, the Court found that Hartford had a "substantial justification" for its objections.[49]

34.    Denied that Educators stated that it "had treated the Agreement as a sale of its claims after which it had no responsibility or liability to the claimants" notwithstanding Educators and Hartford's representations to Plaintiff, the language of the Reinsurance Agreement and Educators' statutory financial reports. The testimony and evidence cited only supports the proposition that Educators treated the agreement as a sale of its professional association claims, and that pursuant to the reinsurance agreement, Educators ceded 100 percent of the administration of and the liability for its professional association claims to Hartford.[50] Educators denies that "it did not disclose this information to plaintiff" because it was no pertinent to her.

---

[47] Pl Hart. Opp. Ex. NN at H3641-42; Hart. Def. Ex. (B)(1) at EDUC 149.

[48] Plaintiff's Interrogatories and Request for Production are attached as Exhibit F.

[49] Ruling dated June 28, 2002, at 5, 20.

[50] Educ. Def. Ex. B(1), at 11:19-22, 13:17-21; Pl. Educ. Opp. Exs. 1, §§ 2.4-2.8. and 7.

Educators states that the cited testimony only states that the fact Educators sold the block of claims to Hartford was not pertinent to Plaintiff.[51]

35.    Admitted.

36.    Admitted.

37.    Denied. Pamela Mormino testified that the Reinsurance Agreement was a "buy out" of Educators' claim liability, but not Educators' paper—*i.e.,* the policy—and therefore, Hartford and Educators did not need to fulfill the review and consent requirements of an assumption agreement.[52] Ms. Mormino also testified that Hartford assumed all of Educators' liability and that Educators was held harmless for Hartford's claims decisions.[53]

38.    Educators admits that Plaintiff's affidavit states what Plaintiff claims it states.

39.    Educators denies that Plaintiff had to spend substantial time, money and effort to obtain discovery of the Reinsurance Agreement and to discover that Educators had treated the Agreement as a sale of Plaintiff's claims. See *supra,* ¶ 33. Plaintiff did not notice the depositions of Educators' corporate representatives until April 15, 2003.[54] The depositions were held on May 13, 2003.[55]

40.    Educators admits that Plaintiff states in her affidavit that she would have objected to the Reinsurance Agreement. However, Plaintiff does not cite to any authority to suggest that she would have had the right to object to the Agreement. Her policy does not give her the right to object.[56] Educators denies that Plaintiff "expected Educators to perform the function of her

---

[51] Educ. Def. Ex. B(2), at 71.

[52] Pl. Educ. Opp. Ex. 7, at 85:13-24.

[53] *Id.* at 98:23-101:11.

[54] Plaintiff's Notice of Deposition for Corporate Representative of Educators Mutual Life Insurance Company is attached as Exhibit G.

[55] Educ. Def. Ex. B(1) and (2).

[56] Educ. Def. Ex. C(2).

insurer." After Hartford terminated her claim, Plaintiff did not contact Educators to question Hartford's decision, which negates her claim that she expected Educators was "her insurer." Educators was not aware Hartford had terminated Plaintiff's claim until it was served with Hartford's lawsuit.[57]

41.    Educators admits that Plaintiff states in her affidavit that she would have objected to Hartford's administration of her claim. Educators denies that she would have had the right to object and that Hartford "could keep" "over one million dollars in reserves associated with her claim." See *supra*, ¶¶ 32 and 40.

42.    Educators admits that Plaintiff's affidavit states that she would have "taken action to protect herself." Educators denies that Hartford was a "rival" for her future benefits. Plaintiff does not cite to any evidence to suggest that Hartford was in any more of an adversarial relationship with Plaintiff than Educators. Further, after the termination of her claim, Plaintiff did not send in additional information to Hartford or appeal the termination of her benefits despite Hartford's invitation that she do so.[58]

43.    Educators admits that Plaintiff states in her affidavit that she would have requested that Educators review Hartford's conduct. Educators denies that this request would have "potentially avoided" litigation. The Reinsurance Agreement gave Hartford the "sole authority to administer and adjudicate" Plaintiff's claim.[59] In addition, Educators position in this lawsuit has always been that Plaintiff is not entitled to disability benefits. Further, after the termination of her claim,

---

[57] Ex. A, at 17:18-18:21.

[58] Hart. Def. Ex. A, ¶ 7.

[59] Educ. Def. Ex. B(1), § 2.1.3.

14

Plaintiff did not send in additional information to Hartford or appeal the termination of her

benefits despite Hartford's invitation that she do so.[60]

## II.    ADDITIONAL DISPUTED FACTS

44.    The Policy upon which Plaintiff's claims are based includes the following definition of

disability" or "total disability:"

    a.    As a direct result of injury or sickness the member is unable to perform the material and substantial duties of the member's occupation as it existed at the time disability began; and

    b.    The member is not working in any gainful occupation; and

    c.    The disability began while this insurance was in force; and

    d.    The member is under the regular and direct care of a licensed physician other than a person in the member's family.[61]

45.    The policy provides that "([i])n the event of the members total disability, we will pay the

Monthly Benefit Amount for each complete month of disability.  For any partial month of

disability, payment will be made on a pro rata basis.  Coverage for this benefit and the amount of

this benefit shall be determined from the Schedule of Benefits."[62]

46.    Payment under the Policy is subject to all of the following conditions:

    1.    Disability must begin while the member is covered under this benefit provision;

    2.    During any period of disability, the member must be under the regular and direct care of a physician;

    3.    Benefits will be paid for the period that disability continues beyond the Disability Waiting Period shown in the Schedule of Benefits;

    4.    Benefits will not be paid for any period of disability beyond the Maximum Benefit Period shown in the Schedule of Benefits;

---

[60] Hart. Def. Ex. A, ¶ 7; Hart. Def. Ex. A(30.

[61] Educ. Ex. A(2).

[62] *Id.* at 6.

5.    On the policy anniversary on or next following the member's 65 birthday, the Monthly Benefit Amount will be reduced to $1,000.00, if it is greater than $1,000.00.[63]

47.    The Policy requires the insured to provide timely written notice and proof of loss to the insurer. The policy gives the insurer the right to require "[l]ater proofs of the continuance of [the] disability...at such intervals as we may reasonably require."[64]

48.    The Policy reserves to the insurer the right to examine a person whose injury or sickness is the basis of a claim under the Policy at its own expense.[65]

49.    The Policy allows the insurer to examine the insured "when and as often as it may reasonably require while a claim is pending."[66]

50.    The Policy states that "[t]he master policy, the copy of the application of the policyholder attached to it and the applications submitted by members constitute the entire contract between the parties."[67]

51.    The Policy further states it may be changed at any time and "no consent of any person insured hereunder is needed for such a change."[68]

52.    In 1969, Educators Mutual Life Insurance Company ("Educators") contracted with Group Insurance Administrators ("GIA") to underwrite and administer a group long-term disability plan for the American College of Physicians ("ACP").[69]

53.    On April 15, 1997, GIA and ACP terminated their relationship with Educators and moved their long-term disability plan to New York Life Insurance Company. After April 1997,

---

[63] *Id.*

[64] *Id.* at 10.

[65] *Id.* at 11.

[66] *Id.*

[67] *Id.* at 10.

[68] *Id.*

[69] Educ. Def. Ex. B (1) at 5:4-7:19.

Educators was no longer writing professional association policies, accepting premiums or insuring any ACP member; its only involvement was the administration of open disability claims such as Plaintiff's.[70]  This prompted Educators to begin negotiations with Hartford to sell all of its open professional association disability claims.[71]

54.   On July 1, 1999, Educators and Hartford executed a reinsurance agreement by which Educators ceded 100 percent of its liability for and the administration of its open professional association claims, including Plaintiff's, to Hartford.[72]

55.   Hartford conducted due diligence of 11 of the claims subject to the reinsurance agreement in order to determine whether information supplied by Educators for each claim, including such data as diagnosis code, age, and COLA benefits are correct.  This information is used to evaluate the reserves set by Educators, which in turn, is used to calculate the amount of the payment made by Educators pursuant to the Reinsurance Agreement.[73]

56.   Hartford also conducted due diligence to determine how Educators managed its claim files and conducted ongoing investigation of claims.[74]

57.   Educators sent a letter to Plaintiff on August 26, 1999, in which explained it had contracted with Hartford to administer her benefits and that it was paying her benefits through October 31, 1999 to accommodate the transfer of her claim.  It also explained she would thereafter receive her benefits payments from Hartford and that she should contact Hartford directly regarding her claim.[75]

---

[70] Educ. Def. Ex. B (1) at 9:15-21; 11:10-12:13.

[71] *Id.* at 11:19-12:13.

[72] Educ. Def. Ex. (B)(1) at 13:7-14:4.

[73] Hart. Opp. Ex. 2, at 70:4-71:5.

[74] Hart. Opp. Ex. 5, at 38:12-40:21.

[75] Hart. Def. Ex. A(38).

58.    Hartford undertook a routine annual review of Plaintiff's claim which included obtaining information from Plaintiff regarding her disability and updated medical records from her doctors.[76]

59.    In April 2000, the administration of Plaintiff's claim had raised three "red flags" which caused the referral of Plaintiff's claim to Hartford's Special Investigation Unit ("SIU").[77] The "red flags" included: apparent reluctance by Plaintiff to provide Hartford with her drivers license or birth certificate to verify her birth date, the submission of an APS by an out-of-state physician and information provided by the attending physician's office staff that was inconsistent with the APS.[78] As part of the investigation of Plaintiff's claim, Hartford conducted video surveillance of Plaintiff, conducted an in-person interview with Plaintiff, arranged for Plaintiff to undergo an Independent Medical Examination and Functional Capacities Evaluation, and arranged for a physician to conduct a paper review of her file.[79]

60.    On November 17, 2000, based on all the information gathered in connection with Plaintiff's claim, Hartford determined that Plaintiff no longer met the definition of Total Disability under her Policy and that her disability benefits should be terminated.[80]

61.    Hartford notified Plaintiff that her benefits had been terminated by letter dated November 17, 2000.[81]

---

[76] Hart. Def. Ex. B(7); Hart. Def. Ex. A(6); Hart. Def. Ex. A(7); Hart. Def. Ex. A(8); Hart. Def. Ex. A(5), at 23; Hart. Def. Ex. A(9).

[77] Hart. Def. Ex. A(10); Hart. Def. Ex. A(5), at 21.

[78] Hart. Def. Ex. A(10).

[79] Hart. Def. Ex. C(14) and C(14A)-(14H); Hart. Def. Ex. A(20); Hart. Def. Ex. A(22); Hart. Def. Ex. A(23); Hart. Def. Ex. A(29).

[80] Hart. Def. Ex. A (29); Hart. Def. Ex A(5), at 1.

[81] Hart. Def. Ex. A(30).

62.    The termination letter advised Plaintiff that the evidence submitted in support of her claim did not establish that she continued to meet the policy's definition of Total Disability on or after August 14, 2000.[82]  The letter advised Plaintiff explained the reasons for the termination of her claim in detail.[83]

63.    Hartford also invited Plaintiff to appeal Hartford's decision and to provide any addition information she wished Hartford to consider.[84]

64.    Plaintiff did not appeal Hartford's decision to terminate her benefits and did not provide additional information to support her claim after November 17, 2000.[85]

---

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85]  Hart. Def. Ex. A, ¶ 7.

By: _____

Barry A. Chasnoff (ct11162)
Roberta J. Sharp (ct24407)
Jessica S. Taylor (ct24408)
AKIN GUMP STRAUSS HAUER & FELD L.L.P.
300 Convent Street, Suite 1500
San Antonio, Texas  78205
Telephone:  (210) 281-7000
Telecopier: (210) 224-2035

AND

Donald E. Frechette (ct 08930)
Edwards & Angell, LLP
90 State House Square
Hartford, CT 06103
Phone:  (860) 525-5065
Facsimile: (860) 527-4198

ATTORNEYS FOR DEFENDANT
HARTFORD LIFE & ACCIDENT
INSURANCE COMPANY

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was sent via certified mail, return receipt requested to the following attorney on the _____14th_____ day of July 2004:

| | |
|---|---|
| Eliot B. Gersten<br>Gersten & Clifford<br>214 Main Street<br>Hartford, CT 06106<br>Phone (860) 527-7044<br>Facsimile (860) 527-4968 | |

ROBERTA J. SHARP
JESSICA S. TAYLOR