UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
(BRIDGEPORT)

2004 SEP 22  P 2: 39

|  |  |  |
|---|---|---|
| CANDI McCULLOCH, | : | CIVIL ACTION NO. 3:01CV1115(AHN) |
| Plaintiff, | : |  |
|  | : |  |
| vs. | : |  |
|  | : |  |
| HARTFORD LIFE AND ACCIDENT | : |  |
| INSURANCE COMPANY and EDUCATORS | : |  |
| MUTUAL LIFE INSURANCE COMPANY, | : |  |
| Defendants. | : | OCTOBER22, 2003 |

## SECOND AMENDED COMPLAINT

### PARTIES

1.    Plaintiff Candi McCulloch ("McCulloch") was a physician and was, at the commencement of the suit, a resident of Leeds, Massachusetts.

2.    Defendant Educators Mutual Life Insurance Company ("Educators") is a Pennsylvania insurance company with a principal place of business in Lancaster, Pennsylvania.

3.    Defendant Hartford Life and Accident Insurance Company ("Hartford") is a Connecticut insurance company with a principal place of business in Hartford, Connecticut.

### JURISDICTION AND VENUE

4.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) (diversity) and the amount in controversy exceeds $ 75,000.00.  Venue is proper in the District of Hartford pursuant to 28 U.S.C § 1391 because defendant Hartford resides in Hartford, Connecticut and defendant Hartford breached the contract in Hartford, Connecticut.

## FACTUAL ALLEGATIONS

5.    As of September, 1995, plaintiff McCulloch was employed as the Director of the Phyllis Rothman Women's Health Center and as an internal medicine physician in the state of Florida. At that time, while employed and residing in Florida, McCulloch was insured under a group disability policy ("the Policy") issued by defendant Educators. See, Exhibit A, attached hereto.

6.    The Policy was a profession-specific disability policy that defined "Disability" or "Total Disability" as the inability to "perform the material and substantial duties of the member's occupation as it existed at the time disability began." Exhibit A, page 5.

7.    McCulloch stopped working on or about October 3, 1995, as a result of chronic shoulder and neck pain caused by a ski accident.

8.    Between October 1995 and May 1999, defendant Educators continually reviewed plaintiff's claim for benefits and medical records, and repeatedly determined that McCulloch met the Policy's definition of "Totally Disabled" and was entitled to long-term disability benefits because she was unable to perform the material and substantial duties of her occupation.

9.    Between October, 1995, and the present, McCulloch undertook an intensive course of treatment in an attempt to minimize her pain and rehabilitate herself, which included over 200 visits to orthopedic surgeons, neurosurgeons, neurologists, rheumatologists, pain management physicians, oral surgeons and primary care physicians, a doctor of osteopathy, physiatrists, five physical therapy establishments and other therapeutic care givers, including chiropractic, massage therapy, acupressure, acupuncture, Reiki and others. Additionally, McCulloch has had several invasive procedures including epidural steroid injections, discograms and intradiscal-electrotherapy, at great discomfort, in an attempt to diminish her pain.

-2-

10.    McCulloch's physicians have continually prescribed pain medications including Vicodin, Ultram, Oxycontin, Percocette, Neurontin, anti-depressants and others so that McCulloch could manage the extreme pain from which she suffers.

11.    In July, 1999, Hartford signed a purported "Reinsurance Agreement" with Educators whereby Educators provided Hartford with reserves allocated to certain benefits that Educators was obligated to pay, including McCulloch's benefits, which exceeded $7,500 per month for the rest of her life, in return for Hartford's agreement to service those benefit payments. Under the agreement, Hartford would be entitled to retain the reserves allocated for any beneficiary that Hartford eliminated from the payment schedule. As of the date of the Reinsurance Agreement, McCulloch represented the third highest monthly benefit obligation, and the second highest reserve allocation in the Reinsurance Agreement. If Hartford terminated McCulloch's benefits, it would be entitled to transfer the substantial reserves allocated to her benefits, to its own accounts.

12.    In the "Reinsurance Agreement," Educators sought to cede any and all responsibility to over 35 separate and distinct policy holders, including plaintiff, whose claims for benefits Educators had accepted. Following the "Reinsurance Agreement," Educators abdicated any responsibility to Hartford and no longer had any involvement in handling the benefits of these claimants, including plaintiff.

13.    Almost immediately after the Reinsurance Agreement became effective, Hartford began a campaign to terminate McCulloch's benefits.

14.    In December, 1999, Hartford contacted McCulloch and requested that she provide it with information regarding her disability, including a statement from her attending physician, representing that such information was needed to update the records regarding her disability.

-3-

15.    McCulloch provided Hartford with all of the information requested, including a statement from her attending physician, Carrine Porfiri, M.D. Dr. Porfiri's statement concluded that McCulloch suffered from chronic pain, a herniated cervical disc, TMJ and migraines; that an MRI scan revealed cervical fusions at C6-C7; and that McCulloch was unable to perform the material duties of her profession due to the chronic condition of her injuries, which were likely to worsen, rather than improve, over time.

16.    In February, 2000, McCulloch was further injured in a car accident when another car hit her car from behind. This accident exacerbated her existing injury and pain and caused additional injuries.

17.    A cervical MRI conducted in April, 2000, revealed cervical fusion at C6-C7 with diskectomy, moderate-sized bilateral osteophytes at C5-C6 with foraminal narrowing progressed since September, 1998, and a small osteophyte at C3-C4. A lumbar MRI conducted at the same time also revealed retrolisthesis of L3 on L4 and L4 on L5 with posterior osteophyte formation at L3, L4-L5, dessication of the intervertebral disc spaces at L3-L4 and L4-L5, and an annular bulge at L4-L5 with ligamentous hypertrophy and facet artropathy. The MRIs confirmed that these problems existed prior to the February, 2000, accident.

18    Beginning in or about April, 2000, notwithstanding the conclusions by at least three physicians that McCulloch suffered from serious injury to her neck and back, and the MRI that objectively confirmed the conclusions of McCulloch's physicians, Hartford continued to pursue a campaign to amass information to justify terminating McCulloch's disability benefits. Hartford conducted video surveillance of McCulloch; hired a private investigator to canvass pharmacies to obtain records of prescriptions filled by McCulloch; demanded that McCulloch undergo physical

-4-

examinations, physiological examinations, and a Functional Capacities Evaluation by physicians located over 100 miles away, chosen by Hartford; and contacted McCulloch's own physicians in an attempt to induce them to change their diagnosis of McCulloch's disability. More specifically:

    a.    Hartford conducted covert surveillance of McCulloch on May 22, 2000, and May 23, 2000. Hartford conducted further covert surveillance of McCulloch on June 20, 2000, and June 21, 2000. Hartford did not inform McCulloch of the surveillance or inquire about her conduct.

    b.    On July 12, 2000, Hartford informed McCulloch that it was requiring her to undergo a "Functional Capacities Evaluation" (FCE) pursuant to the provision in her policy which stated that "We shall have the right to examine, at our own expense, any person whose injury or sickness is the basis of a claim hereunder. We may examine said person as often as it may reasonably require while a claim is <u>pending</u>." (Emphasis added.) Pursuant to Hartford's internal manuals, McCulloch's claim was no longer "pending." Thus, the provision of the Policy that Hartford quoted to McCulloch upon which Hartford purported to base the FCE requirement, did not apply to McCulloch and Hartford was aware of this fact;

    c.    At the time Hartford required McCulloch to undergo the FCE, Hartford intended to provide the videotape surveillance to the physician performing the FCE and to use the FCE as a basis to terminate McCulloch's disability benefits. Hartford was "on the verge of terminating" plaintiff's benefits, but claimed that it was requesting the FCE "in order to *offer* any vocational

-5-

rehabilitation benefits for which [McCulloch] may qualify" and that it would be "remiss in [its] obligation to [McCulloch] not to explore this benefit that is available to [McCulloch]." Hartford also claimed that the FCE was necessary "due to an inability to obtain adequate medical documentation as well as care and treatment," notwithstanding the hundreds of pages of medical documentation that McCulloch and her treating physicians had provided to Hartford;

d.    On August 15, 2000, Hartford informed McCulloch that it would require her to participate in an interview with a "field representative," also purportedly pursuant to its right to "examine" McCulloch and require her to provide "later proofs of the continuance of [her] disability." The Policy defined the "proof" required as a written form that Educators would send to an insured to return to Educators. Hartford represented to McCulloch simply that "this interview involves meeting you and going through some formatted questions regarding your disability claim. The interview will be informal, and you will not need to have any documentation." Unbeknownst to McCulloch, the "field representative" was actually a member of Hartford's Special Investigation Unit that focused on insurance fraud, and Hartford planned to confront McCulloch with its covert surveillance for the first time at the interview, confront her with its claim that her videotaped conduct was inconsistent with her disability, and demand that McCulloch sign a statement regarding her conduct.

-6-

e.    On or about October 13, 2000, Hartford sent copies of its videotape surveillance to McCulloch's physicians in an attempt to induce them to alter their diagnosis of McCulloch.  McCulloch's treating physicians refused to alter their opinions.  However, one physician, with whom McCulloch consulted on a single occasion, agreed to write a letter altering his opinion only after Hartford agreed to pay him $500 per hour to do so.

19.    After examining McCulloch, Hartford's chosen physician, Dr. Asha Garg, made findings consistent with McCulloch's own physicians, that McCulloch suffered from lumbosacral strain, disc bulging and protruded disc at L4-L5 level and exacerbation of neck injury secondary to her February, 2000, car accident and diagnosed McCulloch with chronic pain for which pain medications were necessary.  Although Dr. Garg did not perform a functional exam, she provided a FCE Summary and concluded that McCulloch could work for 16 hours per week as a medical internist and for 30 hours per week as a medical administrator. Hartford was aware that Dr. Garg failed to perform the FCE.

20    Dr. Garg's Functional Capacity Evaluation "Summary" concluded that McCulloch should avoid heavy lifting of more than 10 pounds, frequent bending, stooping, twisting, and kneeling, and avoid staying in one position for more than one hour.

21    Thus, pursuant to both McCulloch's own physician's diagnosis and that of Dr. Garg, McCulloch is unable to perform the material and substantial duties of her occupation as it existed at the time of the disability.

22.    Additionally, McCulloch is unable to perform the material and substantial duties of her occupation as a physician because her chronic pain requires that she remain on a consistent

-7-

regimen of pain medication and multiple therapies, which is inconsistent with the legal, ethical and practical obligations of a practicing physician.

23.    Nevertheless, on November 17, 2000, Hartford, representing to act on behalf of Educators, terminated McCulloch's disability payments, retroactive to August 14, 2000, the date of Dr. Garg's examination of McCulloch, and demanded return of the disability payments it had made to McCulloch between August and November.

24.    In its letter terminating McCulloch's benefits, Hartford claimed that termination was justified because McCulloch was able to perform her job as it existed at the time of her initial claim for benefits. The "evidence" on which Hartford relied to terminate McCulloch's benefits consisted of medical records from McCulloch's physicians that contained the same diagnosis upon which Educators had previously relied in concluding that McCulloch was totally disabled; Hartford's own letters, in which it unsuccessfully attempted to induce McCulloch's physicians to change their diagnosis of McCulloch's disability; Hartford's video surveillance, which disclosed that McCulloch was able to drive a car for about ten minutes at a time, exit the vehicle without assistance, close her trunk door, carry a plastic plant, and alternate between standing and sitting at a party for a period of one hour and twenty minutes, during which she danced for a few minutes; McCulloch's description of the intensity of her pain and disability; and the opinion of, Dr. Garg, including her conclusions set forth in the "Functional Capacity Evaluation," which she never conducted and which Hartford knew she had never conducted.   Hartford disregarded all of the evidence that supported plaintiff's disability.

25.    Hartford's activities, described above, were inconsistent with its own written claims procedures and internal policies, including, but not limited to, that McCulloch did not exhibit any

of the "Red Flags" that would justify further investigation; Hartford's written claims procedures provided that a case would be "closed" upon a decision to pay the claim. Educators had decided to pay plaintiff's claim following its investigation; Hartford's policies require Hartford to initially request clarification from the attending physician, rather than an IME or FCE, if it believes the medical documentation is not adequate; in deciding whether to terminate benefits, equal consideration must be given to the pertinent facts that support the claim for benefits as well as those that do not. The weight of the evidence on which Hartford bases its decision must conclusively be in support of termination; where Hartford's interpretation of the facts as they apply in establishing the claimant's limitations differ from the claimant's attending physicians, the Examiner must go back to the attending physician, explain the facts that Hartford has considered and its interpretation of the facts and request the attending physician to review the analysis and respond to it. Additionally, in determining whether an individual is able to perform the duties of her occupation, that term means occupation as it is recognized in the general workplace; it does not mean the specific job that the individual was performing for a specific employer or at a specific location.

26    Educators lacked any knowledge of the actions undertaken by Hartford until the filing of this lawsuit.

## COUNT ONE - BREACH OF CONTRACT

27    Plaintiff hereby incorporates by reference paragraphs 1 through 26 of this Complaint as though more fully set forth herein.

28.    The defendants' denial of plaintiff's disability benefits constitutes a breach of the Policy.

29.    As a direct and proximate result of defendants' breach, plaintiff has suffered damages including, but not limited to, loss of disability benefits.

## COUNT TWO - BREACH OF CONTRACT (As to Educators)

30.    Plaintiff hereby incorporates by reference paragraphs 1 through 29 of Count One as though more fully set forth herein.

31.    Educators breached its contract with plaintiff by entering into the Reinsurance Agreement, seeking to cede all of its responsibilities to plaintiff, failing to service plaintiff's benefits after November 1999, and failing to oversee Hartford's adjudication of plaintiff's claim, thereby abandoning all of its obligations to Plaintiff.

32    As a direct and proximate result of defendant's breach, plaintiff has suffered damages including, but not limited to, loss of disability benefits.

## COUNT THREE - BAD FAITH

33    Plaintiff hereby incorporates by reference paragraphs 1 through 32 of this Complaint as though more fully set forth herein.

34    Defendants had no reasonable basis to deny plaintiff benefits under her policy including, and not necessarily limited to, the following:

      a.    Defendants had no reasonable basis to review and alter their conclusion that McCulloch was totally disabled;

      b.    Defendants had no reasonable basis to reject the diagnosis of McCulloch's physicians and demand that McCulloch undergo interviews with non-medical professionals, as well as examinations by Hartford's own physicians;

-10-

c.    Defendants had no reasonable basis to engage private investigators and conduct surveillance;

d.    Defendants had no reasonable basis to conclude that McCulloch was able to perform the duties of her occupation as a physician and improperly terminated her benefits on the ground that she was able to perform the duties of her job, based on her job title, alone, as it existed at the time of her disability.

35.    Defendants knew, or recklessly disregarded, their lack of reasonable basis in terminating plaintiff's benefits.

36    Defendant Educators also violated the covenant of good faith and fair dealing inherent in the Policy in entering the Reinsurance Agreement, thereby ceding to Hartford all of its responsibilities to plaintiff, failing to service plaintiff's benefits after November 1999, failing to oversee Hartford's adjudication of plaintiff's claim, and thereby abdicating its responsibilities to plaintiff.

37.    Defendants acted outrageously and maliciously toward the plaintiff with wilful disregard for plaintiff's rights under the terms of the Policy, and with the intention of causing plaintiff to lose her sole source of income and with the intention of appropriating the reserves set aside to pay plaintiff's disability benefits to their own use and benefit.

38.    As a direct and proximate result of defendants' bad faith, plaintiff has suffered damages including, but not limited to, loss of past due disability benefits and costs of this suit.

## COUNT FOUR - TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS AND EXPECTATIONS

-11-

39.    Plaintiff hereby incorporates by reference paragraphs 1 through 38 of this Complaint as though more fully set forth herein.

40.    At all time relevant hereto, plaintiff had an existing contract, the Policy, with Educators and an expectation that Educators would pay her benefits pursuant to the Policy, as Educators had accepted liability for those payments. Following the execution of the "Reinsurance Agreement," Hartford engaged in a pattern of activity designed to interfere with plaintiff's contract and expectation, which included those actions set forth above, as well as making other false or misleading representations to the plaintiff including but not limited to the following:

a)    In making written representations on several dates between July 1999 and September 2000, including but not limited to the correspondence addressed to the plaintiff in which Hartford represented that it was acting as an administrator for Educators and/ or on behalf of Educators, when it was in fact acting on its own behalf and without any involvement of Educators;

b)    In making representations to plaintiff on several dates between February 2000 and August 2000, including but not limited to correspondence and phone calls during the summer of 2000 about the involvement of employees of Hartford without disclosing their actual status as investigators with the Special Investigation Unit, and by allowing these employees to communicate with various medical providers to the plaintiff without the permission, knowledge or authority of the plaintiff.;

c)    In assembling information and requiring the plaintiff to undergo "independent medical examinations" under the pretense that she was required to participate in the investigation pursuant to the terms of her policy with Educators;

41.    These actions interfered with the receipt of benefits by plaintiff under the contract with Educators and have caused damages.

## COUNT FIVE - VIOLATION OF CONNECTICUT UNFAIR INSURANCE PRACTICES ACT AND CONNECTICUT UNFAIR TRADE PRACTICES ACT

42.    Plaintiff hereby incorporates by reference paragraphs 1 through 41 of this Complaint as though more fully set forth herein.

43.    Defendants were engaged in trade or commerce in the State of Connecticut, including the execution of a so-called Reinsurance Agreement whereby Educators ceded any and all responsibility to over thirty insured claimants to Hartford.

44.    As set forth above, defendants repeatedly, recklessly, willfully and wantonly deceived plaintiff, and other claimants insured by Educators, including but not limited to misrepresenting that Hartford was administering the claims on behalf of Educators when, in fact, it was administering claims on its own behalf and for its own benefit, and failing to inform plaintiff and other claimants of this fact as well as the fact that Educators had ceded any and all responsibility regarding the claims to Hartford.

45.    At all times referenced herein, defendants engaged in a repeated pattern and practice of deceptive, unscrupulous, unethical, immoral and illegal practices, as described above, which violated C.G.S. § 38a-66 and 31 Pa. Code § 90i.1 *et seq.*, the public policies of the State of Connecticut, C.G.S. § 38a-816(1), (2) and (6), and/ or C.G.S. § 42-110b, *et seq.*

-13-

46.     The above-identified patterns and practices of defendants were intentional and were designed to enrich defendants at the expense of the claimants and the claimants' rights and to avoid the legal requirement that defendants provide notice and obtain approval from the Commissioner of Insurance and the insureds as required by law.

47.     As a direct result of defendants' acts, deceptions, false representations, omissions, misuse of information and breaches of duty, plaintiff has sustained damages including, but not limited to lost benefits, expenses, and attorney's fees.

**WHEREFORE**, Plaintiff claims:

1.     Compensatory Damages;

2.     Punitive Damages pursuant to C.G.S. § 42-110g *et seq.*;

3.     Interest;

4.     Costs of suit pursuant to Florida Statute Section 627.428;

5.     Reasonable Attorneys' Fees as allowed by statute;

6.     Any and all other relief, legal or equitable, which the Court deems just and proper.


PLAINTIFF,
CANDI McCULLOCH

By: _____

Eliot B. Gersten, Esq.
Fed. Bar No. ct05213
GERSTEN & CLIFFORD
214 Main Street
Hartford, CT 06106
Tel: (860) 527-7044
Her Attorney

-14-

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2002, a copy of the foregoing was mailed, via regular U.S. Mail, postage prepaid, to all counsel and pro se parties of record, and as follows:

Donald E. Frechette, Esq. (ct 08930) *faxed as well*
Charles F Gfeller, Esq. (ct18119)
Joshua L. Milrad, Esq. (ct19321)
Edwards & Angell, LLP
90 State House Square
Hartford, CT 06103
Phone (860) 525-5065
Facsimile (860) 527-4198

Keith D. Post, Esq.
Gallwey Gillman Curtis & Vento, P.A..E.
200 S.E. First Street, #1100
Miami, FL 33131
Tel: (305) 358-1313
Fax: (305) 371-5826

Magistrate Judge Holly B. Fitzsimmons
United States District Court
915 Lafayette Boulevard
Bridgeport, CT 06604

_____
Eliot B. Gersten

-15-

# American College of Physicians

## Group Disability Insurance Plan

Certificate of Insurance under Group Disability Insurance Policy Number PG–85B

Issued to the American College of Physicians Insurance Trust

(The Policyholder)

by

## EDUCATORS MUTUAL LIFE INSURANCE COMPANY

### Lancaster, Pennsylvania

THIS IS TO CERTIFY that Educators Mutual Life Insurance Company has issued and delivered to the Policyholder the group policy identified above (herein called the "group policy" or "this policy") insuring certain members of the Policyholder.

**Effective Date of Group Policy:** April 15, 1993

**Policy Anniversaries are deemed to occur annually beginning:** April 15, 1994

**State or other Jurisdiction in which Group Policy Issued** — Delaware

**Amounts of Insurance** — Determined in accordance with the provisions entitled "Schedule of Benefits."

Other provisions of the group policy principally affecting your insurance are printed on the following pages which are made a part of this Certificate.

---

This individual Certificate is furnished in accordance with and subject to the terms of the group policy and is merely evidence of insurance under the group policy. Insurance is effective only if you are eligible for insurance and become and continue insured in accordance with the terms, provisions and conditions of the policy.

This Certificate replaces any and all Certificates previously issued for delivery to you under the group policy.

EDUCATORS MUTUAL LIFE INSURANCE COMPANY *eff 4/94*

*Kimberly A. Rankin*

Secretary

*- mental limit applies to new + change appr 4/94*
*eff 4/94*

Complaint
Exhibit A

(7261/4/94)

# SCHEDULE OF BENEFITS
## LONG TERM DISABILITY BENEFIT

Monthly Benefit Amount $10,000 or a lesser amount,
as agreed by the Insured Member and by us.

> On the April 15 policy anniversary after the
> Member attains Age 65, the Monthly Benefit
> Amount will be $1,000, or a lesser amount, as
> indicated herein.

Maximum Benefit Period

   1. Injury ...................... Lifetime   ✓

   2. Sickness-Disability commencing:

      Prior to Age 60............ To Age 65, or for Five Years,
                           as agreed by the Insured Member
                           and by us.

      At Ages 60-62 ............ 5 Years

      At Ages 63-64 ............ To Age 68

      At Ages 65-66 ............ 3 Years

      At Ages 67-69 ............ To Age 70

*[handwritten:] IF COVERAGE HAS 7 DAY WAIT FOR ILLNESS BEN. START DATE = 1ST DAY HOSP. CONFINE. (IF LESS THAN 7 DAYS)*

Disability Waiting Period

   Injury ................... 0, 30, 60, 90, 180 or 365 days as agreed upon

   Sickness ................. 7, 30, 60, 90, 180, or 365 days as agreed upon

For accumulating the Disability Waiting Period, the following
will apply:

1.  The Disability will be treated as continuous if Disability stops during
    the Waiting Period for a total number of accumulated days which is
    not more than the number of days shown in the following schedule:

| For Waiting Period of: | Number of days will be: |
|---|---|
| 180 or more days | 14 days or less |
| 90 but less than 180 days | 7 days or less |
| 60 but less than 90 days | 5 days or less |
| 30 but less than 60 days | 3 days or less |
| less than 30 days | 0 days |

2.  Days that the Member is not disabled will not count toward the Waiting Period.

Cost of Living Benefit: Available as an optional benefit as agreed by the Insured
Member and by us.   ✓

H 2321

3

H 2322

4

# DEFINITIONS

1. "Disability" or "Total Disability" means that:
   (a) As a direct result of injury or sickness the member is unable to perform the material and substantial duties of the member's occupation as it existed at the time disability began; and
   (b) The member is not working in any gainful occupation; and
   (c) The disability began while this insurance was in force; and
   (d) The member is under the regular and direct care of a licensed physician other than a person in the members family.

2. "Residual Disability" means that the member is not totally disabled, but because of injury or sickness requiring the regular care of a physician:
   (a) The member is able to do:
      (i) Some but not all of the substantial and material duties of the member's regular occupation or profession; or
      (ii) All of the substantial and material duties of the member's regular occupation or profession, but for less than full-time; and
   (b) The member is working and the member's earnings do not exceed 80% of the member's indexed pre-disability earnings.

3. "Injury" means a bodily injury resulting solely from an accident. Total disability from the injury must begin within 60 days of the accident. If it begins later, it will be considered a sickness.

4. "Sickness" means sickness, illness, disease, or pregnancy, regardless of the date of origin.

5. "Physician" means a person, other than the member, who is duly qualified and licensed to practice medicine and who is acting within the scope of such person's license.

6. "Policyholder" means the entity named as such on the face of the Group Policy. Subsidiaries or affiliates, if any, will be considered part of the policyholder for purposes of insurance hereunder only if they are shown on the face page of this policy. The policyholder may act for any such subsidiary or affiliate in all matters pertaining to this policy. Every act done by, agreement made of, or notice given to the policyholder shall be binding on such subsidiary or affiliate.

7. "Earnings" means all salaries, fees or other income for work performed by the member; less usual and customary business expenses incurred in the course of producing this income. Earnings does not include any form of unearned income such as rent, interest, dividends, loan repayments, annuities or trust proceeds.

8. "Average Prior Earnings" means the greater of:
   (a) The member's average monthly earnings during the twelve-month period just prior to the member's total or residual disability; or
   (b) The member's highest average monthly earnings for either of the two tax years completed just prior to the member's total or residual disability.

H 2323

5

## DEFINITIONS (cont'd.)

9. "Indexed Pre-Disability Earnings" means the member's average prior earnings, adjusted on the first anniversary of benefit payments and each anniversary thereafter. The earnings adjustment will be the lesser of 6% or the annual percentage increase in the Consumer Price Index for Urban Consumers.

10. "Loss of Earnings" means the member's indexed pre-disability earnings minus the member's earnings during each month of residual disability.

11. "We, Our, Us" means the Educators Mutual Life Insurance Company of Lancaster, Pennsylvania.

12. "Member" means the insured person named in the certificate.

## LONG TERM DISABILITY BENEFIT

In the event of the member's total disability, we will pay the Monthly Benefit Amount for each complete month of disability. For any partial month of disability, payment will be made on a pro rata basis. Coverage for this benefit and the amount of this benefit shall be determined from the Schedule of Benefits.

Payment is subject to all of the following conditions:

1. Disability must begin while the member is covered under this benefit provision; and
2. During any period of disability, the member must be under the regular and direct care of a physician; and
3. Benefits will be paid for the period that disability continues beyond the Disability Waiting Period shown in the Schedule of Benefits; and
4. Benefits will not be paid for any period of disability beyond the Maximum Benefit Period shown in the Schedule of Benefits; and
5. On the policy anniversary on or next following the member's 65th birthday, the Monthly Benefit Amount will be reduced to $1,000.00, if it is greater than $1,000.00.

H 2324

## SUCCESSIVE PERIODS OF DISABILITY

Successive periods of disability separated by less than six consecutive months of active work on a full-time basis shall be considered one period of disability unless:

1. The latter disability is due to an injury or sickness not related to the causes of the prior disability; and
2. The latter disability starts after the member has returned to work and finished at least one full day of active work.

6

# REHABILITATION EXPENSE BENEFIT

We will pay a Rehabilitation Expense Benefit to cover the costs of a rehabilitation program approved by us in advance. Such rehabilitation costs would be payable:
1. After the onset of disability; and
2. Only for the same monthly periods for which a disability benefit is thereafter payable; and
3. Are in addition to any monthly benefit; and
4. Are for a program which is primarily oriented towards vocational rehabilitation.

# CONCURRENT DISABILITY

The member will not be paid concurrent benefits for a disability that has more than one cause. Any period of disability resulting from one or more causes will be considered as a single period of disability. Any benefits payable shall be based on such single period.

# RESIDUAL DISABILITY BENEFIT

If the member has a period of continuous residual disability that:
1. Continues beyond the longer of:
    (a)  The Disability Waiting Period, or
    (b)  A period of 30 days; or
2. Immediately follows a period of total disability for which benefits have been paid under the Long Term Disability Benefit provision of the policy; or
3. Immediately follows a period of residual and total disability throughout the Disability Waiting Period;

the amount we will pay while the member's residual disability continues will be determined monthly. Our monthly payment will equal:
1. The member's loss of earnings; divided by
2. The member's indexed pre-disability earnings.
3. The result from Steps 1 and 2 is multiplied by the Monthly Benefit Amount for total disability shown in the Schedule of Benefits.

If the member's loss of earnings is more than 80% of the member's indexed pre-disability earnings, we will pay the member the full Monthly Benefit Amount for total disability.

For any period of disability of less than one month we will pay 1/30th of the amount determined in Step 3 for each day of disability.

H  2325

7

## RESIDUAL DISABILITY BENEFIT (cont'd)

Payment of benefits for a period of continuous residual disability will continue for as long as the Maximum Benefit Period shown in the Schedule of Benefits; however, for a combined period of residual and total disability we will not pay benefits for longer than the Maximum Benefit Period.

## WAIVER OF PREMIUM

We will waive each premium which becomes due with respect to the member on a date which occurs during a period the member is entitled to a Long Term Disability Income Benefit or Residual Partial Disability Benefit except:

1. No premium will be waived that falls due before a period of successive days of the member's disability equal to the greater of 90 days or the member's Disability Waiting Period; and
2. No premium will be waived that falls due after the end of the period during which a Long Term Disability Benefit or Residual Disability Benefit is payable.

## CONVERSION

If the group policy terminates and the American College of Physicians no longer sponsors LTD benefits of any kind for its members, we will offer coverage to all members insured under this policy on the date of termination. The member's conversion of coverage is subject to the following conditions:

1. Disability benefit amounts under the member's new policy may not exceed the member's amounts in effect under this policy at time of conversion; and
2. The premium for the member's new policy will be based on our premium rates in effect at the member's attained age at time of conversion.

## GUARANTEED INSURABILITY OPTION

Each option shall be for an increase of $500 in the Monthly Benefit Amount. The option must be exercised within 60 days prior to the option date and will become effective as of the option date. Coverage and additional premium for the increased protection will be on the same basis and at the same premium rate per $500 as the basic coverage.

Regular option dates are the policy anniversaries on or next following the member's attainment of ages 35, 40 and 45.

H 2326

8

## GUARANTEED INSURABILITY OPTION (cont'd.)

Exercise of each option shall be:
- (a)   Without any requirement for evidence of insurability; except that
- (b)   Total amounts of disability income insurance from all sources cannot exceed 70% of current monthly earnings at that time.

Coverage under any option will be effective for total disability which begins after the option date.

If the member is totally or partially disabled at the time of the member's option date, the increased amount of coverage under any exercised option will not become effective until after the member has returned to full, normal activities for at least six months.

This Guaranteed Insurability Option will terminate:
- (a)   Upon termination of the policy or the member's insurance; or
- (b)   Upon attainment of a total of $10,000 Monthly Benefit Amount under this policy; or
- (c)   Upon the policy anniversary on or next following the member's attainment of age 45.

## EXCLUSIONS

We will not pay benefits for any disability resulting from:
1.   An act of war or insurrection; or
2.   An attempt at suicide, while sane or insane; or
3.   An intentionally self-inflicted injury; or
4.   The member's active participation in an assault, felony or riot or the member's attempt to commit an assault or felony; or
5.   Service in the armed forces of any country.

## LIMITATIONS UPON CHEMICAL DEPENDENCE OR ABUSE

We will limit benefits to a maximum period of one year for any disability resulting from:
1.   Use of stimulants, depressants, hallucinogens, or other controlled substances which have not been prescribed by a physician other than the member; or
2.   Alcoholic intoxication.

H 2327

9