2001 WL 1566701 (Bankr.S.D.N.Y.)
Only the Westlaw citation is currently available.

United States Bankruptcy Court, S.D. New York.
In re Petition of Alison J. **TRECO** and David Patrick Hamilton, as Liquidators of
Meridian International Bank Limited (In Liquidation), Debtor in Foreign
Proceedings.
THE BANK OF NEW YORK and JCPL Leasing Corp., Plaintiffs,
v.
MERIDIAN BIAO BANK TANZANIA LIMITED, Meridian International Bank Limited,
Zambia Airways Corporation Limited, et al., Defendants,
In re Petition of J.S. WARD and N. Allen, as Joint Liquidators of Zambia
Airways Corp. Limited (In Liquidation), Debtor in Foreign Proceedings.
Nos. 95-44326(SMB), 00-8137, 96-44240(SMB).
Dec. 10, 2001.

Otterbourg, Steindler, Houston & Rosen, P.C., New York, NY, for Bank of New York and JCPL Leasing Corporation.
Daniel Wallen, Esq., Richard G. Haddad, Esq., Frederick M. Klein, Esq. Of Counsel.
Shearman & Sterling, New York, NY, for Zambia Airways Corporation, Limited (In Liquidation), and J.S. Ward and N. Allen, as Joint Liquidators of Zambia Airways Corporation Limited (In Liquidation).
Alan S. Goudiss, Esq., Lynette C. Kelly, Esq., Daniel Schimmel, Esq. Of Counsel.

MEMORANDUM DECISION DENYING MOTION TO VACATE DEFAULT AND DIRECTING THE ENTRY OF A DEFAULT JUDGMENT

STUART M. BERNSTEIN, Chief Bankruptcy Judge.
*1 Plaintiffs The Bank of New York and JCPL Leasing Corp. (collectively "BNY") have moved pursuant to Fed.R.Civ.P. 12(b), 41(b) and 41(c) for an order dismissing various claims and counterclaims interposed in the answer filed by J.S. Ward and N. Allen, as Liquidators of Zambia Airways Corporation Limited ("ZAC"), [FN1] and for an order striking ZAC's amended answer pursuant to Fed.R.Civ.P. 12(b), 12(f) and 15(a). ZAC cross-moves for leave to pursue its answer to BNY's Second Amended Complaint.

> FN1. In this decision "Liquidators" and "ZAC" refer to the same parties unless the context suggests otherwise.

Treating the motions as having been made under Fed.R.Civ.P. 55, I conclude that ZAC willfully failed to answer BNY's Second Amended Complaint, and has not demonstrated that the claims asserted in its late pleading have merit. Accordingly, BNY's motion is granted, and it is entitled to enter a default judgment against ZAC. It follows that ZAC's cross-motion for relief from the default is denied.

BACKGROUND

The dispute concerns a complicated, multi-party transaction involving the purchase and lease of two airplanes and related spare parts. Given the procedural nature of the issues before the Court, it is not necessary to delve too deeply into the transaction documents. The following summary is sufficient for the purposes of this decision and is not intended to be exhaustive.

A. Summary of the Transaction

Meridien Aviation S.A.Z.F. ("Meridien Aviation") bought two planes (the "Aircraft") and related spare parts (the "Spare Parts") (from Avion de Transport Regional), and simultaneously leased the Aircraft and Spare Parts for seven years to ZAC. BNY's predecessor, the Irving Trust Company, [FN2] loaned Meridien Aviation $17 million of the approximate $20 million purchase price. Meridien International Bank Limited ("MIBL"), an affiliate of Meridien Aviation, guaranteed the loan as well as ZAC's rental obligation, and pledged certain cash collateral accounts kept at BNY (the "Cash Collateral Accounts") to secure its guaranty.

> FN2. For ease of reference, this decision refers to BNY regardless of whether the

transaction involved BNY or Irving Trust, or for that matter, JCPL.

B. The Financing Agreements

The agreements involved in the transaction (collectively, the "Financing Agreements") [FN3] included a Credit Agreement dated as of June 1, 1988 between BNY and Meridien Aviation (the "Credit Agreement"), two separate Aircraft Lease Agreements dated June 1, 1988 between Zambia Airways Corp. Limited and Meridien Aviation (the "Aircraft Leases") and a Lease Agreement covering the Spare Parts dated June 1, 1988 between ZAC and Meridien Aviation (the "Parts Lease" and together with the Aircraft Leases, the "Lease Agreements"). Meridien Aviation assigned its rights under the Lease Agreements to BNY pursuant to an Assignment of Lease and Repurchase Guaranty dated June 3, 1988, and ZAC signed a Consent to Assignment, also dated June 3, 1998. The Lease Agreements are governed by English law, and all of the other Financing Agreements are governed by New York law.

> FN3. Copies of the Financing Agreements are annexed as exhibits to the Supplemental Affidavit of Dennis P. Neumann (A) In Further Support of
>
> Motion to Dismiss Claims and Counterclaims and to Strike "Amended Answer" and (B) In Opposition to Motion for Leave to File "Amended Answer" ("*Neumann Supp. Affidavit*"), sworn to July 30, 2001, as follows: Credit Agreement (Ex. A), Aircraft Lease Agreement (Ex. B), Assignment of Lease and Repurchase Guaranty (Ex. C) and Consent to Assignment (Ex. D).

Germane to the current dispute, the Financing Agreements gave BNY the rights of a secured creditor and a lessor. In the event of a default under either the Credit Agreement or the Lease Agreements, BNY could repossess and sell the Aircraft and the Spare Parts. [FN4] Under § 5.02(e) of the Credit Agreement, "all proceeds realized by [BNY] in respect of the Collateral" would be applied first to amounts owing to BNY and then distributed to "such other person(s) as may be lawfully entitled to the remainder."

> FN4. The Financing Agreements gave Meridien Aviation the right to cure the default after repossession but before a sale. If "all of the obligations of [Meridien Aviation] shall be paid by or for the account of the Borrower, collected out of any Collateral [as defined in the Credit Agreement] or provision satisfactory to [BNY] shall be made for such payment", BNY was required to "surrender to [Meridien Aviation] the possession of the [Aircraft]." (Credit Agreement § 5.02(d).)

*2 Under some circumstances, ZAC, although a lessee, could share in the sale proceeds. Section 15.04 of the Aircraft Leases stated:

Without prejudice to Lessee's obligation to pay the sum due under clause 15.03 [the Termination Sum] [FN5] and any other sums due under this agreement *provided that* (i) the Aircraft shall have been redelivered in accordance with clause 16 and (ii) Lessor shall have ceased to be obliged to sell the Aircraft to Lessee pursuant to clause 18 [conferring upon ZAC the option to purchase the Aircraft upon payment of the Termination Sum], Lessor shall make all necessary arrangements and shall procure that the Aircraft be sold. Any such sale shall be at a cash price payable in full on completion and on an arm's-length basis, but without representation, recourse or warranty on the part of Lessor except as to Lessor's title. The net proceeds of sale shall be applied:

> FN5. The "Termination Sum" referred to the amount that ZAC had to pay upon termination of its right to possession. (Aircraft Leases § 15.03). The Termination Sum decreased with each month that ZAC retained possession under the Lease Agreements

(*See* Aircraft Leases, Schedule 2.).

(a) in settlement of amounts owing under this Agreement other than the Termination Sum;
(b) in settlement of the Termination Sum;
(c) in settlement of any Termination Sum or other amount owing under an Associated Lease; and
(d) *as to any surplus, to Lessee or to such other person as may be entitled thereto.*
Emphasis added. [FN6]

> FN6. BNY submitted one of the two Aircraft Leases, but represented that the other Aircraft Lease was identical. (*Neumann Supp. Affidavit* ¶ 5.) In addition, BNY did not provide a copy of Spare Parts Lease, but the parties have proceeded as if the delivery, resale and surplus money allocations were the same as the Aircraft Leases. Accordingly, I have operated under that assumption.

C. Defaults under the Financing Agreements

According to ZAC, prior to execution of the Lease Agreements and the Credit Agreement, ZAC made down payments and progress payments to MIBL in excess of $4.5 million, including but not limited to $1.8 million that was ultimately pledged by MIBL to BNY (after having been deposited in the Cash Collateral Accounts). On or about October 5, 1993, BNY declared ZAC in default under the Lease Agreements, and demanded immediate payment of the Termination Sums and surrender of the Aircraft and Spare Parts. (*Neumann Supp. Affidavit,* Ex. E.) BNY contemporaneously transmitted notice of default under the Credit Agreement to Meridien Aviation. (*Id.*)

Negotiations during late 1993 and early 1994 concerning reinstatement of the Lease Agreements resulted in the execution of a Heads of Agreement in November of 1993. [FN7] ZAC apparently made post-default payments under the Lease Agreements in connection with those efforts. It also contends that its corporate parent, Zambia Industrial and Mining Corporation Limited ("ZIMCO"), made an additional payment of $1 million to BNY as a cash security deposit for ZAC's future rental obligations. According to ZAC, although these funds were supposed to be held in a segregated account at BNY for the purpose of securing its prospective rental obligations under the Lease Agreements, they were actually deposited in the Cash Collateral Accounts without ZAC's knowledge or consent.

> FN7. ZAC failed to comply with certain conditions in the Heads of Agreement precedent to reinstatement of the Lease Agreements. As such, the Lease Agreements were not reinstated.

D. Litigation in the United Kingdom

In March of 1994, during the reinstatement negotiations, BNY commenced an action against ZAC in the United Kingdom seeking possession of the Aircraft and Spare Parts and payment of amounts due under the Lease Agreements. This led to the execution of a Reinstatement Agreement on April 27, 1994, under which ZAC paid BNY an additional $938,343.00 for the rental payments due in January through April, 1994.

*3 MIBL and BNY also entered into an Amended and Restated Pledge of Account dated as of April 27, 1994. MIBL increased the funds pledged to BNY in the Cash Collateral Accounts. In addition, MIBL agreed that BNY could "liquidate" the Cash Collateral Accounts to satisfy MIBL's obligations under the Financing Agreements, in the event that BNY "at any time deem[ed] itself insecure or the risk of non-payment or non-performance of any of the [obligations owed to it by MIBL under the Financing Agreements] increased."

ZAC again failed to take the necessary steps to reinstate the Lease Agreements, and BNY pursued the English lawsuit. By order dated July 22, 1994 (*Neumann Supp. Affidavit* ¶ F), the High Court of Justice directed ZAC to deliver the Aircraft and the Spare Parts to BNY at Toulouse Airport within 10 days. [FN8] The Court also entered a final judgment in favor of BNY for breach of each of the Lease

Agreements, plus costs, and directed ZAC to make an interim payment to BNY within 14 days in the amount of $3,133,573.75. The order stated that if ZAC neglected to obey the order, George A. Lewis, ZAC's Acting Managing Director, might "be held in contempt of Court and liable for imprisonment."

> FN8. As discussed in more detail below, the direction was consistent with ZAC's obligations under the Aircraft Leases.

ZAC failed to comply with the High Court's order, but BNY apparently agreed to give it another chance. On October 17, 1994 the High Court issued a second order (*Neumann Supp. Affidavit* ¶ F) providing for the entry of a final judgment against ZAC for the rental payments due under the Lease Agreements plus the Termination Sum (as defined therein) unless ZAC delivered the Aircraft and Spare Parts to Lusaka airport no later than October 25, 1994, and made the interim payments specified in the earlier order within 28 days. A judgment was entered against ZAC on October 25, 1994, (*id.*), when it failed to deliver the Aircraft and Spare Parts by that date. (*Id.*)

ZAC delivered the Aircraft one day later, but never delivered the Spare Parts. The High Court entered another order dated November 25, 1994, (*id.*), vacating the *in terrorem* portions of the judgment and discharging the obligation to make the interim payments required under its October 1994 order.

In or about December of 1994, BNY exercised its rights to satisfy Meridien Aviation's obligations under the Credit Agreement by drawing down on the funds available in the Cash Collateral Accounts (including the $1.8 million allegedly paid by ZAC to MIBL that MIBL pledged to BNY, and the additional $1 million cash security deposit posted by ZIMCO). According to ZAC, the amounts then due to BNY under the Credit Agreement were fully satisfied. If true, BNY was contractually obligated to return the Aircraft to ZAC. Instead, ZAC charges, BNY improperly retained possession of the Aircraft which it eventually sold.

E. United States Litigation

In December of 1994, ZIMCO, as ZAC's sole shareholder, commenced a voluntary winding-up proceeding against ZAC under the Companies Act of Zambia. J.S. Ward and N. Allen were appointed as ZAC's joint liquidators (the "Liquidators"). MIBL was placed into liquidation in the Bahamas in April of 1995.

*4 On June 28, 1995, BNY filed a three count complaint (the "Complaint") in the United States District Court for the Southern District of New York against ZAC, MIBL and certain of MIBL's affiliates (the "District Court Action"). Only the second claim, in the nature of interpleader, named or concerned ZAC. BNY alleged that it held the Aircraft, set out the parties' competing claims, and sought a determination of the parties' interests in the Aircraft or the proceeds if the Aircraft were sold. [FN9]

> FN9. BNY alleged that it had offered the Aircraft for sale and had received an $8 million offer for both. (Complaint ¶ 46.)

The allegations regarding ZAC disclosed an interest limited in nature. BNY had previously seized the Cash Collateral Account pledged as security for MIBL's guarantee of Meridien Aviation's debt. According to ¶ 49 of the Complaint,

[ZAC] claims that it has an interest in the airplanes superior to [MIBL] or Meridien Aviation because, it has asserted, it was [ZAC's] money that [MIBL] used, wrongfully, initially to fund the [MIBL] cash collateral account that was pledged to secure [MIBL's] guarantee of the Meridien Aviation debt.

On October 20, 1995, ZAC filed an answer (the "Answer") to BNY's Complaint. The Answer admitted the allegations in ¶ 49 of the Complaint, (*see* Answer ¶ 49; *see also id.*, ¶ 42), and asserted nine affirmative defenses and four narrowly drawn counterclaims and/or cross-claims. The first counterclaim alleged that after defaulting under the Lease Agreements, ZAC delivered $1 million to BNY to secure its obligations under the Lease Agreements. BNY subsequently converted those funds, entitling ZAC to an award of $1 million. (*Id.*, ¶¶ 86-91.) The second counterclaim alleged that MIBL had misappropriated $1.8 million belonging to ZAC, deposited the funds in the Cash Collateral Account, and these funds were used to satisfy MIBL's obligations to BNY. (*Id.*, ¶¶ 93-95.) As a result

of these conversions, ZAC asserted rights in the Aircraft as subrogee of BNY, MIBL and Meridien BIAO Bank Tanzania Limited to the extent of BNY's conversion of the $1 million, and as subrogee of MIBL to the extent of MIBL's conversion of the $1.8 million. In addition, ZAC alleged that it held an equitable interest in the Aircraft under the termination and default provisions of the Leases. (*Id.,* ¶¶ 96-99.) The third counterclaim asserted the same subrogation and equitable claims in the Spare Parts. (*Id.,* ¶¶ 103-06.) Finally, the fourth claim, asserted solely against MIBL, sought $1.8 million in damages.

1. The Marketing Order

The early stages of the District Court Action resulted in several significant consensual orders. On September 21, 1995, the District Court entered an order (the "Marketing Order") permitting BNY to sell the Aircraft and Spare Parts and hold the sale proceeds in escrow pending further order of the court. [FN10] To the extent that the sale included any spare parts that were not the subject of BNY's interpleader claims, BNY was obligated to remit the proceeds to ZAC's Liquidators rather than place them in the escrow.

> FN10. The Liquidators' violation of the Marketing Order is the subject of another decision, also issued today, holding them in contempt.

**\*5** Although the Marketing Order permitted BNY to sell the Aircraft and Spare Parts, it preserved potential claims based upon improper liquidation. It stated that "nothing hereinabove or hereinafter set forth shall preclude any defendant on plaintiffs' Second Claim for Relief from asserting before the Court that the manner and terms of any sale or sales was commercially reasonable, unless such defendant consented to the manner and terms of any sale or sales". (Marketing Order at p. 3.)

2. The Deadline for ZAC's Answer

In addition to the Marketing Order, the District Court entered three related orders imposing or confirming existing deadlines on ZAC's time to answer or otherwise respond to BNY's pleadings. These orders are critical to the pending motions. After ZAC filed its Answer to the Complaint, BNY filed an Amended Complaint on June 13, 1996. On October 24, 1996, the District Court approved the parties' stipulation (the "October Stipulation & Order") that addressed several issues. As part of the stipulation, BNY granted ZAC an extension of time to answer or move in response to the Amended Complaint "until two (2) weeks after the completion of mediation (the "Mediation") ordered" by the Bankruptcy Court in the related § 304 ancillary proceeding commenced by the Liquidators of MIBL. Before ZAC's response was due, the Court "so-ordered" another stipulation on January 29, 1997 (the "January Stipulation & Order) permitting BNY to serve a Second Amended Complaint. The Second Amended Complaint added an additional claim against Meridien BIAO Bank Tanzania Limited. The interpleader claim involving ZAC was essentially a reiteration of the interpleader claim in the Complaint. (*Compare* Complaint ¶¶ 42-56 *with* Second Amended Complaint ¶¶ 55-69.)

The January Stipulation & Order also reconfirmed the prior deadline for answering. It provided that ZAC "shall serve its answer or otherwise move within the time set forth by this Court's Order entered October 24, 1996." Thus, ZAC agreed, for a second time, to respond to the outstanding complaint within two weeks after the completion of the still pending mediation.

During the ensuing months, ZAC attempted to retain new counsel as a substitute for its attorney of record in the District Court Action, Schulte, Roth & Zabel, LLP. Apparently concerned that the termination of the mediation could impose immediate obligations on ZAC, and hence, impede the search for a willing successor, ZAC wrote to Judge Sotomayor seeking relief from the time limits imposed in the October Stipulation & Order and the January Stipulation & Order. In a letter to Judge Sotomayor, dated July 3, 1997, Schulte Roth recounted the efforts to find new counsel and concluded with the following request:

> To avoid prejudice to ZAC during this brief interim period, ZAC respectfully requests a suspension of all deadlines otherwise applicable to ZAC, until such time as replacement counsel is approved by the Court and is conversant with the relevant issues.

**\*6** Judge Sotomayor summarily rejected the request the same day, endorsing the letter with the notation, "Denied. Notify your Adversary." As a result, the District Court reconfirmed the deadlines imposed under the existing orders.

The mediator informed the Bankruptcy Court on October 17, 1997 that the mediation was unsuccessful. This triggered ZAC's obligation to file an answer to the Second Amended Complaint by

October 31, 1997.
F. ZAC's Amended Answer.
ZAC did not file its answer by the deadline; in fact, it did not file an answer for another *two years.* (*See* Amended Answer with Counterclaims and Claims Related to Interpleaded Property or Proceeds, dated October 28, 1999 (the "Amended Answer").) The Amended Answer contained seven of the nine affirmative defenses asserted in its Answer, and dropped the cross-claims. It also replaced the three claims against BNY in the Answer with fifteen interpleader claims and/or counterclaims. The following chart summarizes the differences, and indicates where the claims in the two answers correspond; [FN11] blank spaces indicate no corresponding claim:

FN11. In the chart and elsewhere, "CC" refers to the counterclaims, and "IC" refers to the interpleader claims, as denominated by ZAC in its two answers. For example, "1st CC" refers to the First Counterclaim.

FN12. ZAC's Answer alleged that it had paid the $1 million. (Answer ¶ 88.) The Amended Answer and the papers submitted in connection with the pending motions allege that ZIMCO made the payment. (*See* Amended Answer ¶

108; *Affidavit of Alan S. Goudiss, In Support of the Opposition of Zambia Airways Corporation Limited [etc .],* sworn to Apr. 25, 2000, at ¶ 12) ("*Goudiss Affidavit.*"))

| 10/20/95 Answer | 10/28/99 Amended Answer |
|---|---|
| 1st CC: BNY converted ZAC's $1 million deposit. [FN12] | 11th CC: BNY converted ZIMCO's $1 million deposit. |
| FN12. ZAC's Answer alleged that it had paid the $1 million. (Answer ¶ 88.) The Amended Answer and the papers submitted in connection with the pending motions allege that ZIMCO made the payment. (See Amended Answer ¶ 108; Affidavit of Alan S. Goudiss, In Support of the Opposition of Zambia Airways Corporation Limited [etc .], sworn to Apr. 25, 2000, at ¶ 12) ("Goudiss Affidavit.")) | |
| 2nd CC: ZAC is entitled to a declaration of its superior rights in Aircraft or their proceeds based on (1) subrogation resulting from the BNY's conversion of ZAC's $1million deposited in the Cash Collateral Account (2) subrogation resulting from MIBL's conversion of ZAC's $1.8 million also deposited in the Cash Collateral Account, and (3) the equitable interests under the termination and default provisions in the Lease Agreements. | |
| 3rd CC: ZAC is entitled to a declaration of | |

| | |
|---|---|
| its superior rights in the Spare Parts or their proceeds based on the same theories as the second counterclaim. | |
| As a separate cross claim, MIBL converted ZAC's $1.8 million deposit. | 1st IC: BNY was completely paid off by 12/94, wrongfully retained the Aircraft, and ZAC is entitled to the proceeds. |

1st CC: BNY sold the Aircraft in a commercially unreasonable manner.

2nd CC: BNY breached the covenant of good faith and fair dealing by selling the Aircraft in a commercially unreasonable manner.

3rd CC: After paying itself off, BNY held the Aircraft in constructive trust, and breached its fiduciary duty by failing to properly maintain the Aircraft, to provide the requisite care to the maintenance records regarding the treatment of the Aircraft, and return the Aircraft or sell them in a commercially reasonable manner.

4th CC: After paying itself off, BNY owed a duty of due care, and was negligent regarding the maintenance of the Aircraft and the maintenance records.

5th CC: After paying itself off in 12/94, BNY converted the Aircraft.

6th CC: BNY is liable under the doctrine of promissory estoppel based on its failure to sell the Aircraft in a commercially reasonable manner.

7th CC & 2nd IC: BNY was completely paid off by 12/94 and was not entitled to retain the Spare Parts or their proceeds.

8th CC: BNY breached the Heads of Agreement by failing to segregate ZIMCO's $1 million deposit.

9th CC: BNY breached the covenant of good faith and fair dealing implied in Heads of Agreement by failing to segregate ZIMCO's $1 million deposit.

10th CC: BNY fraudulently breached the Heads of Agreement by failing to segregate ZIMCO's $1 million deposit.

12th CC: BNY converted ZAC's $1.8 million deposit..

13th CC: BNY breached the Heads of Agreement by retaining the $400,000.00 paid by ZAC to cover BNY expenses.

14th CC: BNY breached the implied covenant of good faith and fair dealing in connection with the Heads of Agreement by retaining the $400,000.00 paid by ZAC to cover BNY expenses.

15th CC: BNY converted the portion of the $400,000.00 that exceeds the amount of the expenses compensable under the Heads of Agreement.

### G. The Transfer to this Court

*7 By Stipulated Order Referring Matter to Bankruptcy Court, dated February 1, 2000, the District Court Action was referred to this Court to "hear and determine" all matters, including counterclaims and cross claims, in accordance with 28 U.S.C. § 157(c)(2). The parties thereby consented to the core jurisdiction of this Court. In addition, the stipulated order of reference provided that this Court shall conduct any jury trial to the extent that such a right otherwise exists.

### DISCUSSION

It is beyond cavil that ZAC disobeyed two express District Court orders directing it to respond to the

Second Amended Complaint by October 31, 1997. As a result, BNY moved to dismiss the counterclaims in the Amended Answer pursuant to Fed.R.Civ.P. 41(b) and 41(c) based upon ZAC's failure "to comply with these rules or any order of court." [FN13] In addition, BNY moved to strike the counterclaims for legal insufficiency under Fed.R.Civ.P. 12(f). [FN14] Finally, BNY argued that the Amended Answer must be stricken because ZAC did not seek leave of the Court or BNY's consent to file it as required by Fed.R.Civ.P. 15. [FN15]

> FN13. The factors relevant to a Rule 41 dismissal motion include (1) the extent and duration of the party's failure to comply with a court order; (2) whether that party was aware that further delay would result in dismissal; (3) whether the opposing party will suffer prejudice due to additional delay; (4) a balance between the court's interest in protecting its docket from congestion and the non-compliant party's interest in having a fair opportunity to be heard; and (5) the availability and effectiveness of a lesser sanction. See Jackson v. City of New York, 22 F.3d 71, 74 (2d Cir.1994); Alvarez v. Simmons Mkt. Research Bur., Inc., 839 F.2d 930, 932 (2d Cir.1988).

> FN14. Rule 12(f) states:
>
> Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party or
>
> upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any other redundant, immaterial, impertinent or scandalous matter.

> FN15. Fed.R.Civ.P. 15(a) provides in substance that a pleading may be amended outside of the time during which a party may do so as a matter of course "only by leave of court or by written consent of the adverse party."



For its part, ZAC minimized its disregard of the District Court orders, and seized on the fact that BNY

amendment or supplementation of pleadings, but this ignored its complete disregard of the time limits "so ordered" with its consent. BNY's Rule 41 analysis did provide a more appropriate road map, but left a gap since it did not discuss ZAC's status in the event I granted its motion.

At oral argument, BNY confirmed that it was essentially seeking a default judgment against ZAC. (Transcript of hearing held May 17, 2001, at 4-5)("5/17 Tr.") Since ZAC's default was beyond doubt, I stated my inclination to treat the competing motions as whether to enter a default judgment against ZAC, or alternatively, to relieve ZAC of its default. [FN17] (*Id.* at 89.) *See, e.g., Allen v. Coughing,* No. 92 Civ. 6137(MC), 1995 WL 117718, *2 (S.D.N.Y. Mar. 7, 1995) (appropriate to look to standard for setting aside entry of default to decide whether defendant should be permitted to file untimely answer), *aff'd,* 108 F.3d 329 (2d Cir.1997); *John v. Sotheby's, Inc.,* 141 F.R.D. 29, 34 (S.D.N.Y.1992)(filing of **late answer** analogous to motion to vacate a default); *Pension Benefit Guaranty Corp. v. Canadian Imperial Bank,* No. 87 Civ. 1046(MBM), 1989 WL 50171, *2 (S.D.N.Y. May 8, 1989) (analogizing motion to file a **late answer** to motion to vacate default).

> FN17. At the conclusion of the oral argument, I invited and subsequently received further briefing and proof that dealt with the motions under this standard.

***8** Rule 55(c) allows the court to set aside the entry of default for "good cause shown." The court must, in considering the motion, assess three factors: (1) whether the default is willful, (2) whether vacating the default will cause prejudice to the nondefaulting party and (3) whether a meritorious defense has been presented. *State Bank of India v. Chalasani (In re Chalasani),* 92 F.3d 1300, 1307 (2d Cir.1996); *Enron Oil Corp. v. Diakuhara,* 10 F.3d 90, 96 (2d Cir.1993); *Men's Sportswear, Inc. v. Sasson Jeans, Inc. (In Re Men's Sportswear, Inc.),* 834 F.2d 1134, 1138 (2d Cir.1987); *Sony Corp. v. Elm State Elecs., Inc.,* 800 F.2d 317, 320 (2d Cir.1986); *Marziliano v. Heckler,* 728 F.2d 151, 156 (2d Cir.1984). [FN18] The factors do not have to be afforded equal weight, and need not point in the same direction. Rather, the court must balance the relative weight of each of these factors in an effort to arrive at an equitable result. *See Enron Oil Corp. v. Diakuhara,* 10 F.3d at 97 (untimeliness of answer alone was not grounds to refuse to set aside default where court did not balance, or apparently even consider, factors of willfulness, prejudice, and meritorious defense); *Bank of New York v. Meridien Biao Bank Tanzania Ltd.,* 1998 WL 417510, at *2.

> FN18. A court may also consider other relevant equitable factors, such as whether the failure to follow a rule of procedure was a mistake made in good faith, and whether the entry of default would lead to a harsh result. *See Enron Oil Corp. v. Diakuhara,* 10 F.3d at 96; *Sony Corp. v. Elm State Elecs., Inc.,* 800 F.2d at 320; *Bank of New York v. Meridien Biao Bank Tanzania Ltd.,* No. 95 CV 4856(SS), 1998 WL 417510, at *2 (S.D.N.Y. July 24, 1998).

The motion is committed to the sound discretion of the trial court. *Enron Oil Corp. v. Diakuhara,* 10 F.3d at 95; *Marziliano v. Heckler,* 728 F.2d at 156. On the one hand, courts have an interest in promoting an efficient and orderly judicial system, and enforcing compliance with the rules governing procedure. *Sony Corp. v. Elm State Elecs. Inc.,* 800 F.2d at 320. On the other hand, defaults are generally disfavored, and there is a "strong preference for resolving disputes on their merits." *Sony Corp. v. Elm State Elec., Inc.,* 800 F.2d at 319. "[W]hen doubt exists as to whether a default should be granted or vacated, the doubt should be resolved in favor of the defaulting party." *Enron Oil Corp. v. Diakuhara,* 10 F.3d at 95; *accord Bank of New York v. Meridien Biao Bank Tanzania Ltd.,* 1998 WL 417510, at *2.

A. Willfulness

"Willfulness," in the context of a default, refers to conduct that is more than merely negligent or careless, *SEC v. McNulty,* 137 F.3d 732, 738 (2d Cir.), *cert. denied,* 525 U.S. 931 (1998); *American Alliance Ins. Co. v. Eagle Ins. Co.,* 92 F.3d 57, 61 (2d Cir.1996), and encompasses egregious conduct that is not satisfactorily explained. *SEC v. McNulty,* 137 F.3d at 738; *see American Alliance Ins. Co. v. Eagle Ins. Co.,* 92 F.3d at 61. While inadvertent behavior is not "willful," gross negligence or the

strategic decision not to plead are, and their presence strongly weighs against vacating a default. *Bank of New York v. Meridien Biao Bank Tanzania Ltd.,* 1998 WL 417510, at *2.

ZAC admits that it deliberately withheld its answer for over two years for strategic reasons. It maintains that its claims did not mature until BNY sold the Aircraft in 1999, and offers three reasons why answering before then would have been "premature." First, until the sale, "ZAC could not have ascertained the extent of [BNY's] commercial unreasonableness in marketing and selling the [Aircraft]." Second, it would have been unreasonable for ZAC, which was in liquidation, to engage in piecemeal litigation until the Aircraft were sold. Third, although the mediation concluded unsuccessfully in October 1997, the parties continued to discuss settlement, and the Liquidators "concentrated their efforts on these discussions and the preservation of ZAC's resources, instead of incurring additional expenses in litigation costs." (*Affidavit of Alan S. Goudiss, In Support of the Opposition of Zambia Airways Corporation Limited [etc.],* sworn to Apr. 25, 2000, at ¶ 26)("*Goudiss Affidavit.*") In other words, ZAC deliberately decided to wait, despite two stipulated orders fixing an earlier deadline and one memorandum endorsement and order denying its request to extend the deadline *sine die.*

**\*9** ZAC's second and third reasons warrant only brief comment. The desire to limit litigation expenses and conserve resources does not justify a delay in pleading. See *Bank of New York v. Meridien Biao Bank Tanzania Ltd.,* 1998 WL 417510, at *3 ("Lack of funding does not permit a party 'to decide *ex parte* that [it] is justified in not prosecuting [the] suit and is free to ignore the rules of the court.' ") (quoting *Rinieri v. News Syndicate Co.,* 385 F.2d 818, 823 (2d Cir.1967)). Similarly, the pendency of settlement negotiations does not excuse the failure to plead. *Marubeni America Corp. v. M.V. Karin Bornhoffen,* 102 F.R.D. 954, 955 (S.D.N.Y.1984).

This leaves ZAC's "prematurity" argument. Initially, ZAC insinuates that its claims of commercial unreasonableness did not arise until the 1999 sale. This is not necessarily correct. See *Pearl-Wick Corp. v. Chase Manhattan Bank, N.A.,* 509 N.Y.S.2d 537, 539 (N.Y.App.Div.1986)(claim of commercial unreasonableness, relating to the secured party's decision to foreclose on its collateral rather than look to an existing insurance policy, accrued when secured party obtained possession of collateral), *aff'd* 522 N.E.2d 1054 (N.Y.1988). The precise acts constituting ZAC's commercial unreasonable claims were never explained. In particular, ZAC has not claimed that the Aircraft were worth more at the time of the sale than the $2,353,549.95 selling price. Rather, ZAC seems to suggest that BNY's *earlier* sale efforts were deficient. It alleges only that BNY turned down a $10 million offer to sell the Aircraft in 1995. (Amended Answer ¶ 120.) If this suggests that the failure to accept the $10 million was commercially unreasonable, the claim accrued prior to October 1997. More important, ZAC never argued until now that its commercial unreasonableness claims would not become ripe until BNY sold the Aircraft. The parties stipulated to a pleading deadline keyed to the mediation, not the sale. ZAC never insisted that its time to answer should depend on the sale. In addition, when ZAC's former counsel wrote to Judge Sotomayor requesting an extension, counsel offered only one reason: ZAC was searching for new lawyers. ZAC did not advise Judge Sotomayor that its answer should await the sale, that it was premature to answer until then, or that it would be forced to engage in piecemeal litigation if required to answer before the sale.

Moreover, its position contradicts the one it took before the sale. In the spring of 1997, the Liquidators were still involved in a mediation with BNY. On April 22, 1997, their attorneys wrote to BNY's counsel, with the mediator's consent, summarizing their claims against BNY "which otherwise have been made known (but in greater detail) to the mediator." (*See Reply Affidavit of Richard G. Haddad in Further Support of Motion to Dismiss Counterclaims [etc.],* sworn to May 25, 2001, Ex. 2.) The letter identified fraud-based claims arising from BNY's delay in selling the Aircraft after acquiring possession, (*id.,* Ex. 2, p. 2), and claims sounding in negligence and in the commercially unreasonable disposition of the collateral based, in each case, on the failure "to maintain and sell the Planes in a commercially reasonable manner." (*Id.*) Thus, ZAC contended in April 1997--six months before the pleading deadline--that it already had claims based on commercial unreasonableness.

**\*10** In fact, ZAC's commercial unreasonable claims surfaced even earlier. ZAC filed an ancillary proceeding in this Court pursuant to 11 U.S.C. § 304 on August 8, 1996. Among other things, it sought to stay the District Court Action, and notwithstanding the Marketing Order, to sell the Aircraft and Spare Parts. On August 9, 1996, Bankruptcy Judge Garrity entered a temporary restraining order which, *inter alia,* stayed the pending District Court Action against ZAC.

The relief was short-lived. In a decision read from the bench on October 9, 1996, (*see Affidavit of Richard G. Haddad in Support of Motion to Dismiss "Counterclaims" [etc.],* sworn to Nov. 18, 1999, Ex. D), Judge Garrity denied ZAC's motion for a preliminary injunction, and vacated the temporary

restraining order. ZAC had argued, in support of its right to market the Aircraft and Spare Parts, that BNY's "efforts to sell those assets and to seek a prompt determination with respect to the sales proceeds have stagnated." (*Id.* at 13-14.) In short, BNY was not acting in a commercially reasonable manner.

Judge Garrity viewed the motion as a collateral attack on the Marketing Order, and directed the Liquidators to seek relief before Judge Sotomayor, (*id.* at 14), but they never did. Instead, ZAC let BNY incur the expense of selling the Aircraft, and now seeks to challenge those sales efforts and obtain the proceeds. Suffice it to say that ZAC identified sale-related claims in 1996 and presented them to the mediator prior to April 1997, well before the deadline to answer and even longer before the actual sale.

Finally, the Marketing Order did not authorize ZAC to delay filing its commercial unreasonableness claim until after the sale. The Marketing Order, entered with ZAC's consent, authorized BNY to sell the Aircraft and the Spare Parts, but preserved the defendants' rights to assert "that the manner and terms of any sale or sales was commercially unreasonable, unless such defendant consented to the manner and terms of any sale or sales." Although it preserved potential claims, the Marketing Order did not speak to when those claims had to be asserted. Further, the two stipulated orders establishing the deadline for answering BNY's District Court complaints post-dated the Marketing Order, but did not carve out the sale claims from the deadline. And as noted, ZAC did not mention any separate deadline in its July 1997 letter motion to Judge Sotomayor.

It is true that when BNY initially sought the injunctive relief that culminated in the Marketing Order, it submitted a supporting affidavit stating that parties could assert their sale claims, if any, after the sales were concluded. (*See Affidavit of Edward A. Jaeckel,* sworn to Aug. 23, 1995, at ¶ 10.) [FN19] However, neither the subsequent Marketing Order nor anything else in the record indicates an intention to extend the deadline for the sale claims, or to delay their assertion until after the sale. In addition, ZAC has not proffered the affidavit of the attorneys representing them at the time to bolster their implicit contention that the parties meant to carve out the commercial reasonableness claims from the deadline.

FN19. The Jaeckel Affidavit is attached to the *Goudiss Affidavit* as Exhibit A.

**\*11** In brief, ZAC consciously and deliberately chose to delay answering, a course of action made all the more egregious by its disregard of its prior agreements, court orders and Judge Sotomayor's express refusal to change the deadline. Accordingly, its failure to plead was willful.

B. Prejudice

Delay alone does not constitute prejudice. *Enron Oil Corp. v. Diakuhara,* 10 F.3d at 98. Rather, the delay must "result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud and collusion." *Davis v. Musler,* 713 F.2d 907, 916 (2d Cir.1983)(quoting 10 C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure: Civil* § 2699, at 536-37 (1983)). Legal prejudice occurs, therefore, when the non-defaulting party's ability to proceed with its case has been impaired. *See MacEwen Petroleum, Inc. v. Tarbell,* 173 F.R.D. 36, 40 (N.D.N.Y.1997), *appeal dismissed,* 136 F.3d 263 (2d Cir.1998).

BNY contends that Judge Sotomayor's prior decision in this case compels the conclusion that ZAC's delay caused legal prejudice. After Meridien Aviation defaulted and the clerk entered the default, Fed.R.Civ.P. 55(a), BNY moved for a default judgment, and Meridien Aviation moved to vacate its default. Addressing the existence of prejudice, Judge Sotomayor observed that BNY had suffered "inherent prejudice ... from the long and wilful delay occasioned by [Meridien] Aviation's intentional default." *Bank of New York v. Meridien Biao Bank Tanzania Ltd.,* 1998 WL 417510, at \*4. Discovery deadlines had expired, BNY had settled with the remaining defendants, and accordingly, "BNY's discovery burdens are presumptively more difficult now than if [Meridien] Aviation had originally responded in a timely manner." *Id.* BNY now argues that the same expired discovery deadlines applied to the disputes between BNY and ZAC, and consequently, the delay, deemed prejudicial in July 1998, is even more prejudicial today.

It is not so clear that BNY is entitled to the same presumption in this case, at least with respect to some of the claims. The prejudice caused by Meridien Aviation's default arose because of the advanced procedural posture of the issues that Meridien Aviation intended to litigate--its ownership of

the Aircraft and the Spare Parts. See *id.*, 1998 WL 417510, at *2. BNY had already settled with the other defendants, leaving only Meridien Aviation. [FN20] Implicitly, it may have settled in the belief that it had resolved the entire dispute, and could put it behind. Under the circumstances, the District Court presumed that BNY had suffered prejudice, and BNY did not have to identify the loss of any specific evidence.

> FN20. Apparently, the District Court did not consider ZAC's subrogation or vague equitable interest claims.

Unlike Meridien Aviation, ZAC filed an Answer in this case. While this does not prevent the entry of a default judgment, *see Parise v. Riccelli Haulers, Inc.*, 672 F.Supp. 72, 74 (N.D.N.Y.1987)(granting default judgment for failure to answer amended complaint notwithstanding that defendant had answered the original complaint), it bears on the issue of prejudice. The Answer asserted a damage claim relating to the conversion of a $1 million deposit, and interpleader claims to the Aircraft, the Spare Parts and their proceeds based on subrogation (up to $2.8 million) and an undefined and unquantified equitable interest arising under the Lease Agreements. While ZAC has dropped its subrogation theory, it still seeks damages based on the misappropriation of these deposits. BNY knew these issues had been raised, and has not indicated that it entered into any settlements in the belief that ZAC would not pursue these claims. And if discovery is closed as to these issues, as BNY contends, BNY will not suffer any further discovery obligation.

*12 In addition, MIBL recently filed a timely challenge to the commercial reasonableness of BNY's sale efforts. BNY must, therefore, litigate this claim anyway, and this undercuts its claim of prejudice. *See Smith v. City of Chester*, 152 F.R.D. 492, 493-94 (E.D.Pa.1994)(no prejudice when plaintiff must litigate same claim against remaining parties).

I cannot presume, therefore, that BNY will suffer the type of prejudice that Judge Sotomayor found in the case of Meridien Aviation. Further, I will assume for the sake of argument that BNY has failed to demonstrate legal prejudice as to any claims currently asserted in the Amended Answer. Nevertheless, the absence of prejudice is not determinative. The combination of ZAC's deliberate default and the total failure to demonstrate merit in any of its claims, a subject to which I now turn, leads me to conclude that ZAC should not be relieved from its default. *See SEC v. McNulty*, 137 F.3d at 738 (court may deny motion to vacate default in absence of prejudice if the default is willful and the party has failed to show a meritorious defense); *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 244 (2d Cir.1994) (default judgment entered despite lack of showing of prejudice; court "need not scrutinize this factor [prejudice] ... because the [defendants'] willful default and the absence of meritorious defenses were sufficient to support the district court's disposition of the case"); *Marziliano v. Heckler*, 728 F.2d at 157 (district court properly denied motion to vacate under Rule 55(c) where default was willful and defaulting party failed to show meritorious defense).

C. Meritorious Claim

To establish a meritorious defense, the movant need not establish his defense conclusively, but "must present evidence of facts that, 'if proven at trial, would constitute a complete defense.' " *SEC v. McNulty*, 137 F.3d at 740 (quoting *Enron Oil Co. v. Diakuhara*, 10 F.3d at 98); *accord* 10 JAMES WM. MOORE, ET AL., MOORE'S FEDERAL PRACTICE ¶ 55.50, 55-9 (3d ed.2001). Normally, general denials are not enough. While the burden is not especially high, *see Meehan v. Snow*, 652 F.2d at 277, the party seeking relief from the default "must support its general denials with some underlying facts." *Sony Corp. v. Elm State Elec., Inc.*, 800 F.2d at 320. The same criteria apply when the party asserting the claim seeks to vacate his own default; he must show a meritorious claim. *Christiani v. Metro-North Commuter RR. Co.*, No. 92 Civ. 4494(JFK), 1994 WL 74881, at *3 (S.D.N.Y. Mar. 7, 1994).

ZAC's counterclaims and interpleader claims flow from two different bundles of rights: (1) the contractual or other interests in the Aircraft, Spare Parts or their proceeds and (2) common law claims unrelated to any interest in the Aircraft or Spare Parts. The first category includes the interpleader claims relating to the Aircraft and the Spare Parts and the counterclaims pertaining to the wrongful retention of the Aircraft after BNY had been fully repaid (1st IC, 2nd IC, 5th CC, 7th CC) and the failure to care for, market or sell the Aircraft with due care or in a commercially reasonable manner (1st CC, 2nd CC, 3rd CC, 4th CC, 6th CC). These claims depend on a demonstration that ZAC

held a property or contractual interest in the Aircraft or Spare Parts (or their proceeds). The second category consists of damage claims arising from a breach of contract or other legal duty regarding ZIMCO's $1 million deposit (8th CC, 9th CC 10th CC), ZAC's $1.8 million deposit (11th CC, 12th CC), and the $400,000.00 paid under the Heads of Agreement (13th CC, 14th CC, 15th CC).

**\*13** The Lease Agreements, which lie at the heart of the ZAC's first category claims, are governed by English law. English law utilizes the same general principles of contract interpretation as American law. (*See Declaration of Steven Andrew Nathan,* dated June 28, 2001 ("*Nathan Declaration* "), at ¶¶ 13- 18.) [FN21] The relevant provisions of the Lease Agreements are straightforward and unambiguous, and their interpretation presents a pure issue of law.

> FN21. Mr. Nathan is ZAC's expert on English law. BNY proffered the *Declaration of Sir Royston Miles Goode,* dated July 24, 2001 ("*Goode Declaration* ") as its expert on English law.

Although the parties' experts disagree on several points, they concur that ZAC's rights, if any, must arise from § 15.04 of the Aircraft Leases, quoted *supra.* [FN22] ZAC's rights under § 15.04 depended on its compliance with the redelivery obligations imposed under Article 16. Section 16.01 stated, in pertinent part, that following the occurrence of an event of default and demand, ZAC had to redeliver the Aircraft, at its own cost and within ten days to the lessor or its designee (*i.e.,* BNY) at Toulouse airport in Toulouse, France, or elsewhere as the lessor might reasonably require.

> FN22. As noted, I assume that the Spare Parts Lease contained a similar provision..

BNY sent the required Notice of Default and demand on or about October 5, 1993. (*Neumann Supp. Affidavit,* Ex. E.) ZAC failed to voluntarily redeliver the Aircraft, and instead, it took two orders from the High Court of Justice and the threat of contempt to recover possession. Mr. Nathan minimizes the breach, noting that ZAC complied with its delivery obligations, "albeit through the assistance of the Court," and in any case, BNY waived ZAC's failure to comply with Article 16. (*Nathan Declaration* ¶ 44.) Professor Goode notes, with "regret," his inability to understand this argument. (*Goode Declaration* ¶ 19.) The High Court "did not 'assist' performance; it compelled it." (*Id.*) Further, BNY did not waive the contractual ten day redelivery obligation. It extended the time that ZAC had to comply with the High Court's July 1994 order compelling specific performance, and thereby avoid contempt and the imprisonment of its Acting Managing Director. (*Id.*)

Mr. Nathan also proposes that § 15.04 is an unenforceable forfeiture. (*Nathan Declaration* ¶¶ 45-46.) He recognizes that ZAC must demonstrate a propriety or possessory right beyond a mere contractual right to obtain relief from forfeiture, (*id.,* ¶ 46), but suggests that even if ZAC breached the redelivery condition, § 15.04 would still impose an equitable or constructive trust in the proceeds for the benefit of ZAC. (*Id.,* ¶¶ 40-43, 47.) Initially, this seems inconsistent. If ZAC lost its contractual right to the proceeds because it breached the redelivery condition, it should also lose any property interest created by § 15 .04 for the same reason.

In any event, the language in § 15.04 does not create a property interest in the Aircraft or their proceeds. Under English law, the obligation to pay sales proceeds in a particular way, without more, does not create a trust or equitable assignment in the proceeds or the property sold. *Swiss Bank Corp. v. Lloyds Bank Ltd.,* [1982] A.C. 584 (borrower's agreement to pay proceeds of sale of property to lender did not give lender an equitable interest in the property or proceeds); *Palmer v. Carey* [1926] A.C. 703, 706-07 (same). Here, the pertinent language of § 15.04 said that the proceeds of the sale of the Aircraft "shall be applied" in the manner set forth. This is no different than stating that they shall be paid to particular entities in a specific order, and hence, did not create a property right.

**\*14** Similarly, English law would not impose a constructive trust. Like American law, unjust enrichment is an element of a constructive trust under English law. (*Goode Declaration* ¶ 21 .) BNY has not been unjustly enriched at ZAC's expense. Once ZAC lost its possessory interest and failed to comply with its redelivery obligations, it relinquished any right to share in the surplus proceeds. Finally, Mr. Nathan contends that the loss of rights occasioned by the breach of the redelivery

obligation is an unenforceable penalty. In general, a "penalty" is a contractual provision that requires a breaching party to pay a sum of money beyond a genuine attempt to estimate, in advance, the loss that the breach is likely to cause the innocent party. 1 CHITTY ON CONTRACTS § 27- 102, at 1326 (28th ed. 1999)("CHITTY"). The term has also been applied to situations where the breaching party forfeits a deposit previously paid, see Workers Trust & Merchant Bank Ltd. v. Dojap Inv. Ltd., [1993] A.C. 573, 578 (forfeiture of 25% down on contract to purchase real estate), 1 CHITTY § 27- 121, at 1336-37, although no English court has ever equated the two. Id. at 1337.

The present case does not involve a penalty. The Aircraft Leases did not require ZAC to pay any sums (or forfeit sums previously paid) on account of its breach. Instead, the loss of rights in the surplus sales proceeds occasioned by its breach is governed by the law relating to forfeitures. (Goode Declaration ¶ 29.) For the reasons, stated, equity would not grant ZAC relief from the forfeiture of any alleged rights in the Aircraft or their proceeds.

Hence, ZAC was a mere lessee who lost its possessory rights in the Aircraft years ago. Further, as a result of its failure to deliver the Aircraft in accordance with § 16.01 of the Aircraft Leases (ZAC also failed to deliver the Spare Parts), it sacrificed any contractual right to share in the sale proceeds. Absent such a right or some other interest in the proceeds, BNY owed it no duty with respect to the care or sale of the Aircraft. (See id., ¶ 30.) As a result, I need not consider whether ZAC also failed to submit sufficient proof on its underlying charges. ZAC's interpleader claims relating to the Aircraft and Spare Parts, and its claims alleging the improper retention of the Aircraft, or the improper maintenance, marketing or sale of the Aircraft (i.e., the first category claims), lack merit.

ZAC's common law claims are more easily disposed of. ZAC failed to provide any evidence to buttress its claims that BNY breached any pledge agreement or the Heads of Agreement, or misappropriated or misused the $1 million deposit, the $1.8 million deposit or the $400,000.00 payment. It did not even provide copies of these agreements or show how their provisions were violated. Since the conclusory allegations of wrongdoing in the Amended Answer did not meet its burden, ZAC failed to demonstrate that these claims have merit.

*15 ZAC's failure is all the more perplexing since I pointed out these deficiencies beforehand. When I stated that I was inclined to analyze the motions under Rule 55, I invited further submissions. At the time, I suggested to ZAC that it might take more than a well-pleaded complaint to show a meritorious defense. At a minimum, ZAC should submit the agreements on which its claims depended. (5/17 Tr. 90.) ZAC submitted some legal argument and Mr. Nathan's declaration, but did not submit the documents that supported these claims.

## CONCLUSION

ZAC deliberately failed to comply with the pleading deadlines it agreed to and the District Court "so ordered." Further, it has failed to demonstrate that its claims have merit. Even in the absence of prejudice, the egregious nature of the default and the lack of merit lead to the conclusion that ZAC should not be relieved of the consequences of that default. Accordingly, its Amended Answer is stricken, and BNY is entitled to the entry of a default judgment. Further, ZAC's cross-motion is denied.

Settle order on notice.
Bkrtcy.S.D.N.Y.,2001.
In re **Treco**
2001 WL 1566701 (Bankr.S.D.N.Y.)
END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.