# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CANDI McCULLOCH,                      :
    Plaintiff,                    :
                             :
      v.                            :            3:01CV1115(AHN)
                             :
HARTFORD LIFE AND ACCIDENT            :
INSURANCE COMPANY AND                 :
EDUCATORS MUTUAL LIFE                 :
INSURANCE COMPANY,                    :
    Defendants.                   :

## OMNIBUS RULING ON PENDING SUMMARY JUDGMENT MOTIONS

Plaintiff Candi McCulloch ("McCulloch") commenced this action against Hartford Life Insurance Company ("Hartford") and Educators Mutual Life Insurance Company ("Educators"), alleging breach of contract, bad faith, tortious interference with contractual relations, and statutory violations under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b, and the Connecticut Unfair Insurance Practices Act ("CUIPA"), Conn. Gen. Stat. § 38a-816.

Pending before the court are:  1) Hartford's motion for partial summary judgment; 2) Educator's motion for summary judgment; 3) McCulloch's motion for summary judgment motion as to Hartford's counterclaim; 4) McCulloch's motion for summary judgment motion on her claim against Educators.  For the following reasons, Hartford's motion as to McCulloch [doc. # 136] is granted; Educators's motion as to McCulloch [doc. #133] is

granted in part and denied in part; McCulloch's motion as to Hartford's counterclaim is denied [doc. # 183]; McCulloch's motion as to Educators is denied [doc. #186].

<u>FACTS</u>

Based on its review of the summary judgment record, the court finds the following material facts are not in dispute:

McCulloch is a physician with a specialty in internal medicine.  Prior to becoming disabled, she worked 16 hours per week practicing medicine as an internist and 30 hours per week as the administrative director at a women's clinic in Florida.

In September 1994, McCulloch purchased disability insurance from Educators under a group plan through the American College of Physicians ("ACP").  Under the policy, McCulloch was entitled to long-term disability benefits of $7,000 per month if she, among other things, became unable to perform the substantial duties of her occupation as they existed at the time a disability began. McCulloch also purchased a disability insurance policy from Unum Life Insurance Company ("Unum").

In October 1995, McCulloch stopped working due to chronic shoulder and neck pain caused by a February 1995 skiing accident. She applied for long-term disability benefits under both the Educators and Unum policies.  Unum denied McCulloch's claim but

2

Educators accepted it.

Three provisions of the Educators policy are pertinent here. First, McCulloch was entitled to receive long term disability benefits so long as she remained totally disabled[1] and was under 65 years of age.  Second, the policy's "PROOF OF LOSS" provision requires McCulloch to provide "[l]ater proofs of the continuance of [her] disability . . . at such intervals as [Educators] . . . reasonably require[d]."  Third, the policy's "EXAMINATION" provision gives Educators "the right to examine, at [its] own expense, any person whose injury . . . is the basis of a claim . . . when and as often as it may [be] reasonably require[d] while a claim is pending."  Pursuant to those provisions, McCulloch continually submitted evidence to Educators showing that she remained disabled, including attending physician statements, independent medical evaluations, and independent medical reviews.

On April 15, 1997, the ACP terminated its relationship with Educators.  As a result, Educators stopped underwriting and

---

[1] The Educators policy defines "disability" or "total disability," in pertinent part, as an "injury or sickness [that renders] the member . . . unable to perform the material and substantial duties of the member's occupation as it existed at the time the disability began," and "the member is under the regular and direct care of a licensed physician."  See Dkt. #138, Ex. 3 at 5.

accepting premiums for professional disability policies.

Nonetheless, it continued to administer the open ACP disability

claims which, including McCulloch's, numbered approximately 35.

In July or August of 1999, Educators assigned the open ACP

claims to Hartford in a document titled "Reinsurance Agreement."

In addition, Educators transferred approximately $30 million of

reserve funds to Hartford in exchange for an undisclosed amount

of money.  Under the terms of the reinsurance agreement, Hartford

would administer and make benefit payments on the open claims

from the statutory reserves that had been set aside for them.

However, if the total amount of benefits to which all the

claimants were entitled exceeded the total amount of reserves,

Hartford would be liable for the excess amount.  Conversely, if

the total amount of benefit payments was less than the total

amount of reserves for all the open claims, Hartford would retain

the balance.[2]  Approximately $1.3 million dollars in statutory

---

[2] Specifically, the agreement defines "Reinsured Claims" as
the "disability insurance claims listed . . . at Schedule 1.20."
Also, the "Recitals" section of the reinsurance agreement
provides that Educators "desires to cede, assign, and transfer to
[Hartford] all of [Educators'] liabilities on the Reinsured
Claims . . . [and that Hartford will] reinsure and assume
[Educators'] liabilities on the Reinsured Claims."  Moreover,
§ 2.1.2 of the agreement provides that [Hartford] shall be
responsible for the administration and management of the
Reinsured Claims including, without limitation, claims
management, processing and payment; settlement of disputed

reserves were transferred to Hartford for McCulloch's claim.

Following the execution of the reinsurance agreement, both
Educators and Hartford informed McCulloch and the approximately
35 other claimants whose claims were subject to the agreement
that Hartford would be administering their disability claims.  In
its letter to McCulloch, Educators explained that it would
continue to pay her benefits until October 31, 1999, and that
after that date, benefit payments and correspondence would be
"[a]dministered by Hartford on Behalf of Educators Mutual Life
Co."

Sometime in November or December 1999, a claims examiner at
Hartford, Susan Wilk ("Wilk"), reviewed McCulloch's disability
claim.  On December 15, 1999, Wilk requested McCulloch to provide
an up-to-date attending physician statement ("APS"), complete
both a claimant questionaire and a personal profile evaluation,
and authorize Hartford to obtain medical information from her
doctors.  On January 19, 2000, Wilk received the authorization

---

Reinsured Claims; lump-sum settlements . . . [and that] [i]n
providing the Services and paying the Reinsured Claims,
[Hartford] shall be authorized to correspond with Claimants and
issue payments directly to the Claimants in [Educators'] name,
provided [Hartford] discloses that it is acting as agent for
[Educators] in the performance of such functions." Also, § 2.3
provides that Educators "shall have no right to recapture the
Reinsured Claims."

and claimant questionaire from McCulloch, but not the physician statement or personal profile.

In the claimant questionaire, McCulloch described her condition as "chronic pain from neck pathology [with] . . . herniation at C5-C6."  She stated that the "pain affects every aspect of my life [and] . . . makes me unable to perform the duties of my specialty of internal medicine [and] . . . restricts me in all activities."  McCulloch also provided a list of the medical-care providers that she had consulted in the previous 18 months, including her primary care physician, Dr. Carine Porfiri ("Dr. Porfiri"); a neurosurgeon, Dr. Beverly Walters ("Dr. Walters"); and a chiropractor, Bruce Coulombe ("Coulombe").

On January 28, 2000, Wilk telephoned McCulloch and requested a copy of McCulloch's driver's license to clear up uncertainty as to her date of birth.  Wilk did not receive the information and renewed her request two more times, again without a response from McCulloch until April 25, 2000.

On February 2, 2000, Wilk received an APS from Dr. Porfiri stating that McCulloch suffered from chronic pain, a herniated cervical disc, TMJ, and migraine headaches.  Dr. Porfiri concluded that McCulloch could not perform the material duties of her profession, and indicated that she had last seen McCulloch on

November 19, 1999.  However, when Wilk contacted Dr. Porfiri's office by telephone, she was told that McCulloch had not visited the office since 1997.  Wilk also contacted Unum, McCulloch's other disability insurance company, to inquire why it had denied her claim.[3]

On April 4, 2000, Wilk requested reports from several of the medical-care providers that McCulloch had disclosed in her claimant questionnaire, including Dr. Porfiri.  On April 25, 2000, Wilk received a copy of McCulloch's driver's license and a completed personal profile evaluation.  In the personal evaluation, McCulloch stated that she suffered from chronic pain due to a cervical disc herniation, TMJ, and low back pain that required medication and constant care which made working as an internist impossible.  McCulloch further stated that she had constant neck, interscapular, and low back pain which limited and restricted all of her ordinary physical activities.[4]

On May 2, 2000, Wilk received medical records from Dr. Walters, the neurosurgeon that McCulloch disclosed in her

---

[3] Also in February 2000, McCulloch was involved in a car accident which exacerbated her condition.

[4] Also, in April 2000, McCulloch underwent cervical and lumbar MRIs which further indicated a disabling condition.

claimant questionaire.  Dr. Walters' records indicated that McCulloch visited her office twice, first on September 21, 1998, and again on June 10, 1999, and complained of pain in her neck, upper back, and shoulder blades.  Dr. Walters stated that she advised McCulloch to have surgery.

On May 22 and 23, 2000, Hartford arranged for covert video surveillance of McCulloch.  McCulloch was observed turning her head and shoulders to look behind when she was driving in reverse while drinking coffee; talking on a cell phone while driving; bending into the back of her vehicle; and entering her vehicle with no obvious discomfort.  Another video surveillance conducted on June 20 and 21, 2000, showed McCulloch carrying a large plant from her car to her child's school, dancing, stooping, bending, sitting, standing, and leaving a party with no apparent difficulty.

On July 11, 2000, a disability-case manager at Hartford, Joseph Sterle ("Sterle"), arranged for McCulloch to undergo an independent medical examination and functional capacities evaluation with Dr. Asha Garg ("Dr. Garg") in Worcester, Massachusetts.  Copies of McCulloch's medical records and the surveillance video were forwarded to Dr. Garg beforehand.  Dr. Garg issued a preliminary report which stated that, although

McCulloch had slight pain in her cervical spine and lumbrosacral region, she did not show any sign of being in pain during the examination.  Dr. Garg noted that McCulloch ambulated well, did not limp, and had a normal range of motion.  She later issued a final report which varied from the preliminary report only in that it eliminated the doctor's prior opinion that McCulloch should avoid heavy work.  Although Dr. Garg also submitted a functional capacity evaluation -- in which she opined that McCulloch was able to do light duty work without any problems and that she should avoid heavy lifting, frequent bending, stooping, twisting, kneeling, and staying in one position for more than one hour -- Hartford discovered that Dr. Garg did not in fact perform the evaluation.

On August 15, 2000, Hartford contacted McCulloch to arrange for a home interview with one of its field representatives. Initially reluctant to be interviewed, McCulloch eventually agreed and on September 8, 2000, Hartford field investigator, William Moryto ("Moryto"), visited McCulloch at her home. Hartford had told McCulloch that Moryto would conduct an informal interview and review some formatted questions regarding her disability claim.  But, unbeknownst to McCulloch, Moryto was a member of Hartford's Special Investigation Unit which focused on

insurance fraud.  Moryto intended to confront McCulloch about the video surveillance that Hartford had conducted in May and June. During the interview, and without being told about the video surveillance, McCulloch told Moryto that she was in constant, chronic pain, and explicitly denied that she could dance.  Also, at Moryto's behest, McCulloch provided a signed statement:  (1) advising that bending over caused her increased pain; (2) identifying additional treating physicians, including a new primary care doctor, Dr. Baker, and (3) indicating that she filled prescriptions for Ultram and Vicodin at a CVS Pharmacy in Northhampton, Massachusetts, and that she believed she had filled a prescription for Percocet at an Eckerd's Pharmacy in West Palm Beach, Florida.  After McCulloch signed the statement, Moryto informed her that Hartford had taken surveillance video of her that showed her dancing.  In response, McCulloch stated that she had been able to dance only because she had taken medication and had been drinking, but she refused to sign a statement to that effect.  McCulloch, who was then in tears, also refused to watch the surveillance video.

On September 13, 2000, Hartford contacted the medical care providers that McCulloch had mentioned in her statement to obtain her treatment records.  Hartford also requested prescription

records from the CVS and Eckerd pharmacies McCulloch had listed. On October 13, 2000, in accordance with Hartford's claim procedures, Wilk wrote to a number of the physicians that McCulloch had disclosed, including Dr. Porfiri, asking them to review and comment on (1) the independent medical examination conducted by Dr. Garg, (2) McCulloch's signed statement to Moryto, and (3) the surveillance videos.  All of the materials were enclosed with the letter.  Only one of McCulloch's doctors, Ignacio Magana ("Dr. Magana"), responded with comments.  Dr. Magana stated that he agreed with Dr. Garg's opinion that there was a discrepancy between the pain that McCulloch described and what she demonstrated in the video.  He thus concluded, based on the material sent by Hartford, that McCulloch "seemed capable of working a full eight hour day [and] . . . would be capable of practicing medicine two days a week as she was prior to her injury."

On November 9, 2000, Hartford asked Dr. Joseph Amato ("Dr. Amato"), an independent contractor it regularly retained, to also review McCulloch's medical records, independent examination, and surveillance video.  Dr. Amato agreed with Drs. Garg and Magana that, on a weekly basis, McCulloch could perform 16 hours of patient care and 30 hours of light work as a medical director.

On November 10, 2000, Hartford prepared a claim-termination letter and conducted a final review of McCulloch's claim.  On November 17, 2000, the termination letter was forwarded to McCulloch.  On November 30, 2000, counsel for McCulloch asked Hartford for a copy of her claim file.  Hartford granted McCulloch an extension of time to appeal its decision to terminate her benefits.  Howevever, McCulloch neither appealed Hartford's decision nor provided additional information to support her claim.  McCulloch subsequently filed the present action in June 2001.

<u>STANDARD</u>

Summary judgment should be granted if the record demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  <u>See</u> <u>Chambers v. TRM Copy Ctrs. Corp.</u>, 43 F.3d 29, 36 (2d Cir. 1994); Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists only if the record, taken as a whole, could lead a reasonable trier of fact to find in favor of the nonmovant.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

The burden of demonstrating the absence of any genuine issue of material fact rests on the moving party, <u>see</u> <u>Celotex Corp. v.</u>

Catrett, 477 U.S. 317, 323 (1986), and all ambiguities and inferences that may reasonably be drawn from the facts must be viewed in the light most favorable to the nonmoving party, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

Where, as here, the nonmovant bears the burden of proof at trial, the movant can satisfy its burden of production by pointing to an absence of evidence to support an essential element of the nonmovant's case.  See Ginsberg v. Healey Car & Truck Leasing, Inc., 189 F.3d 268, 270 (2d Cir. 1999) (citing cases).

DISCUSSION

I.   Hartford's Summary Judgment Motion

McCulloch's complaint alleges that Hartford's decision to terminate her disability benefits constitutes a breach of contract, bad faith, tortious interference, and an unfair practice.  Hartford moves for summary judgment on all but the breach of contract claim.  It argues that McCulloch has not submitted any evidence from which a jury could find in her favor on any of those claims.  The court agrees.

A.   Bad Faith Claim

McCulloch alleges that Hartford acted in bad faith because it unjustly terminated her benefits.  Hartford contends that it

terminated McCulloch's benefits because, based on its investigation of her claim, it determined that she was no longer disabled within the meaning of her policy.  Hartford now moves for summary judgment on the ground that it cannot, as a matter of law, be held liable for bad faith because McCulloch's claim was "fairly debatable."

To prove bad faith, a plaintiff must show that the defendant engaged in conduct designed to mislead or deceive, or that it neglected or refused to fulfill some duty or contractual obligation not prompted by an honest mistake.  See Martin v. American Equity Ins. Co., 185 F. Supp.2d 162, 164-65 (D. Conn. 2002) (quoting Buckman v. People Express Inc., 205 Conn. 166, 170 (1987)).  Bad faith is not simply bad judgment or negligence, but rather it implies a conscious wrongdoing because of a dishonest purpose.  See id.  Allegations of a mere coverage dispute or a negligent investigation by an insurer will not state a claim for bad faith.  See id.  Thus, a plaintiff cannot recover for bad faith if the insurer denies a claim that is "fairly debatable," i.e., if the insurer had some arguably justifiable reason for refusing to pay or terminating the claim.  See United Techs. Corp. v. American Home Assur. Co., 118 F. Supp.2d 181, 188 (D. Conn. 2000) (citing Hatch v. State Farm Fire and Cas. Co., 842

14

P.2d 1089 (Wyo. 1992) (finding no liability for denial of coverage to the extent that coverage was "fairly debatable"); McCauley Enters., Inc. v. New Hampshire Ins. Co., 716 F. Supp. 718, 723 (D. Conn. 1989) (reasoning that "when a good faith legal controversy exists . . . insurer's withholding of the policy proceeds cannot be found to be in bad faith"). See also Bushey v. Allstate Ins. Co., 670 A.2d 807, 809 (Vt. 1995) (holding that insurance companies may challenge claims that are fairly debatable). Therefore, if there is evidence in the record demonstrating that Hartford possessed a legitimate reason for terminating McCulloch's benefits, her bad faith claim cannot survive as a matter of law.

Hartford maintains that there were several red flags that prompted it to initiate an investigation in good faith. In particular, Hartford points out that: (1) McCulloch failed to provide a copy of her driver's license for several months; (2) McCulloch's attending physician statement was submitted by a physician in Florida even though McCulloch lived in Massachusetts; and (3) there was a discrepancy regarding the date McCulloch last visited her attending physician. According to Hartford, these red flags prompted it to conduct a video surveillance of McCulloch and request her to undergo an

independent medical examination with Dr. Garg.  Based on the
information gathered from the examination and the video
surveillance, it asked McCulloch's treating physicians to
reevaluate McCulloch's condition.  Ultimately, based on all of
the information it independently gathered -- particularly the
video surveillance -- Hartford concluded that McCulloch was no
longer totally disabled as defined by her policy.

In opposition, McCulloch contends that the record contains
evidence that would permit a jury to conclude that Hartford acted
with a deceptive purpose and in bad faith.  Specifically, she
submits that Hartford (1) met with her other disability insurance
company, Unum, for the sole purpose of discovering information
that it could use to terminate her benefits; (2) conducted covert
video surveillance of her; (3) falsely represented the purpose
and nature of the field interview with Moryto; (4) used the
results of Dr. Garg's functional capacity evaluation ("FCE") even
though it was never performed; and (5) did not obtain an
independent medical review of her condition.  Even when this
evidence is viewed in McCulloch's favor, it is not sufficient to
establish a disputed factual issue as to whether Hartford lacked
any legitimate basis for terminating her benefits, i.e., that
McCulloch's claim was not "fairly debatable."

Evidence that Hartford met with Unum and conducted video surveillance does not demonstrate bad faith.  It is axiomatic that an insurer has the right to investigate the validity of a claim, otherwise there would be no check against fraud.  <u>See e.g.</u>, <u>Mutual Benefit Life Ins. Co. v. Lindenman</u>, 911 F. Supp. 619, 629 (E.D.N.Y. 1995) (reasoning that insurance company has an obligation to investigate the facts upon which its liability to pay depends before making payment under the policy) (quotations and citation omitted).  Similarly, the fact that Hartford questioned whether McCulloch continued to be disabled and whether she remained under the regular and direct care of Dr. Porfiri or another physician does not indicate bad faith.  Indeed, under the terms of her policy, McCulloch was required to furnish continual proof of an ongoing disability and to submit to examinations. While McCulloch disputes that the "EXAMINATION" provision under the policy applied to her, because, as she argues, her claim was not "pending" as that term is defined under the policy, she ignores the "PROOF OF LOSS" provision, which required later proofs of disability.  Additionally, even if Hartford misapplied the "EXAMINATION" provision, McCulloch does not submit any evidence to show that Hartford acted with ill-will or in bad faith when it invoked that clause.  Further, even if Hartford

misrepresented the purpose of Moryto's field interview, such a misrepresentation would not alter the fact that Hartford had, at least, an arguable basis for investigating and ultimately terminating McCulloch's disability benefits.  Moreover, the fact that Hartford relied on an FCE that had not, in fact, been performed by Dr. Garg does not indicate bad faith.  There is no evidence that Hartford knew that Dr. Garg had not conducted the examination.  Indeed, the evidence shows that Dr. Garg represented that she had conducted the FCE and actually submitted a bill for it.  At most, Hartford's reliance on Dr. Garg's representations show negligence, but not bad faith.  See Martin, 185 F. Supp.2d at 164-65.  Because the information Hartford obtained gave it a legitimate reason to terminate McCulloch's disability benefits, it cannot be said that Hartford acted in bad faith by terminating her benefits.

McCulloch's bad faith claim also fails to the extent that she alleges procedural bad faith, i.e., bad faith in the way that Hartford handled her claim.  See United Techs. Corp., 118 F. Supp.2d at 187-189 (finding that, in addition to a substantive bad faith cause of action, "the Connecticut Supreme Court would recognize a cause of action for procedural bad faith").  In United Techs. Corp., the Court recognized that "procedural bad

faith" can provide the basis for a cause of action where the
plaintiff alleges that the defendant insurer purposefully
mishandled plaintiff's request for a determination of coverage
and/or benefits, namely, by delay and lack of response. See 118
F. Supp.2d at 186-87. In that case, the Court found that a jury
could find procedural bad faith because there was sufficient
evidence to infer that the insurer had taken an unequivocal
position to deny coverage while misleading the insured into
believing that it was acting to resolve the claim. In
particular, the plaintiff "offered evidence that defendant did
nothing itself and required nothing of its attorneys . . .
imposed no schedule or deadlines . . . required no coverage
opinion letter . . . instituted no adjustment process, set
minimal reserves, and by way of post-trial documents, showed that
[defendant] manifested an early intention to deny [other like
claims.]" Id. at 184. In contrast to the lack of "any real
factual investigation" by the insurer in United Techs., in this
case, the record is replete with evidence that Hartford conducted
an extensive investigation of McCulloch's claim. Moreover,
although the record indicates that, less than six months after
the reinsurance agreement was executed, Hartford raised doubts or
"red flags" about the continued validity of McCulloch's claim,

19

McCulloch has not pointed to any evidence from which a jury could conclude that Hartford "had taken an unequivocal 'no coverage' position at [that] relatively early juncture." Id. at 184. Thus, McCulloch has failed to adduce sufficient evidence to survive Hartford's present motion for summary judgment, see id. at 187 (discussing McCauley Enters., Inc. v. New Hampshire Ins. Co., 716 F.Supp. 718 (D. Conn. 1989)), and accordingly, Hartford's motion as to her bad faith claim is granted.

   B.   Tortious Interference Claim

   McCulloch also claims that Hartford tortiously interfered with her contractual relationship with Educators because it entered into the reinsurance agreement and terminated her disability benefits.  Specifically, she submits that Hartford "engaged in a pattern of activity designed to interfere with [her] contract and expectation" by (1) making written representations that it was acting as an administrator for Educators, (2) undertaking an investigation of her claim, and (3) requiring her to undergo an independent medical examination. Hartford moves for summary judgment on this claim on the ground that it could not have, as a matter of law, interfered with McCulloch's insurance policy because it was a party to the policy by virtue of the reinsurance agreement.

Under Connecticut law, a claim for tortious interference with business expectancies requires a showing that a third party adversely affected the contractual relations of two other parties and that such interference was motivated by some improper means or motive, such as maliciousness, fraud or ill-will.  See, e.g., Hi-Ho Tower Inc. v. Com-Tronics, Inc., 255 Conn. 20, 27 (2000).  However, a direct party to a contract, or an even indirect party, such as an agent, cannot be held liable for contractual interference.  See Multi-Service Contractors, Inc. v. Town of Vernon, 193 Conn. 446, 451 (1984) (citing cases).

Hartford was a direct party to McCulloch's insurance contract because, pursuant to the reinsurance agreement, it was the assignee of her policy.  An assignment is a transfer of property or some other right from the assignor to the assignee.  See Schoonmaker v. Lawrence Brunoli, Inc., 265 Conn. 210, 227 (2003).  "No words of art are required to constitute an assignment; any words that fairly indicate an intention to make the assignee owner of a claim are sufficient . . ."  29 Williston on Contracts, § 74:3 (2004) (citing Titus v. Wallick, 306 U.S. 282 (1939) (holding that the words "sell, assign, transfer and set over all his right, title and interest" in the claim clearly indicated an intention to make a present assignment)).  See also

Restatement (Second) of Contracts § 328(1) (2005) ("an assignment of 'the contract' or of 'all my rights under the contract' or an assignment in similar general terms is an assignment of the assignor's rights and a delegation of his unperformed duties under the contract").  By virtue of the language in the reinsurance agreement, see n.2, supra, Educators both delegated its duty to administer McCulloch's benefits and transferred its right to terminate her benefits to Hartford.  The reinsurance agreement was also supported by consideration.  As the assignee of the open claims, Hartford was a direct party to the contract and therefore could not have tortiously interfered with McCulloch's policy by terminating her benefits.  See Schoonmaker, 265 Conn. at 227 (stating that assignee stands in the shoes of the assignor).

Even if the court were to find that the reinsurance agreement did not affect an assignment, there is no evidence in the record to support a finding that Hartford's alleged interference with McCulloch's contractual relations with Educators was tortious.  See Blake v. Levy, 191 Conn. 257, 261 (1983) (reasoning that a claim for tortious interference is made out only when the interference results in injury to another and is wrongful by some measure beyond the fact of the interference

itself); <u>Biro v. Hirsch</u>, 62 Conn. App. 11, 21 (2001) ("to substantiate a claim of tortious interference with a business expectancy, there must be evidence that the interference resulted from the defendant's commission of a tort").  As previously discussed in Section I.A., <u>supra</u>, the evidence relating to Hartford's investigation of McCulloch's ongoing disability claim, including its written correspondence with McCulloch, its use of investigators, its request for an independent medical examination, and its ultimate termination of benefit payments, do not, even when viewed in the light most favorable to McCulloch, demonstrate tortious conduct.  Under the terms of the insurance policy, McCulloch was entitled to receive disability benefits, not in perpetuity, but only so long as she remained disabled.  Similar to any other insurer, Hartford, as the assignee of her claim, had the right to investigate the continued validity of McCulloch's claim.  While Hartford terminated McCulloch's payments and thus, in a literal sense, interfered with her continued receipt of benefits, there is no evidence to indicate that it was motivated to do so by fraud or ill-will.  <u>See</u> <u>Hi-Ho Tower Inc.</u>, 255 Conn. at 27.  Rather, the only reasonable conclusion a jury could make is that Hartford was simply enforcing its legal rights under the contractual terms of the

insurance policy, just as Educators could have done.  <u>See</u>
<u>McCauley Enters. Inc.</u>, 716 F. Supp. at 722 (reasoning that
"[e]xercise of a lawful right cannot be either wrongful or in bad
faith").  Accordingly, in the absence of any evidence from which
a jury could find that Hartford's actions were tortious, Hartford
is entitled to summary judgment on McCulloch's tortious
interference claim.

    C.  <u>The CUTPA & CUIPA Claims</u>

    McCulloch also alleges that Hartford violated CUIPA and
CUTPA.  She asserts that the reinsurance agreement between
Hartford and Educators constituted an unfair insurance practice
because Educators "ceded any and all responsibility" to Hartford
and Hartford administered the claims with "unhindered authority"
to terminate her benefits.  Hartford responds that it is entitled
to summary judgment on McCulloch's claims because she has not
suffered an ascertainable loss that was proximately caused by the
alleged unfair trade practice, i.e., the reinsurance agreement.

    While it is unclear whether Connecticut courts recognize a
private right of action under CUIPA, the Connecticut Supreme
Court has allowed plaintiffs to use CUTPA "as a vehicle to bring
a claim for unfair settlement practices under CUIPA."  <u>Craig v.</u>
<u>Colonial Penn Ins. Co.</u>, 335 F. Supp.2d 296, 308 (D. Conn. 2004)

(citing Macomber v. Travelers Property & Cas. Corp., 261 Conn. 620, 645 & n.14 (2002)).  To prevail in a CUTPA action, a plaintiff must establish both that the defendant engaged in a prohibited act, and that the act proximately caused the harm alleged.  See Abrahams v. Young & Rubicam, Inc., 240 Conn. 300, 306 (1997) (citing Haesche v. Kissner, 229 Conn. 213, 223-24 (1994)).  Proximate cause exists if "the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's act."  Id. (internal quotations and citation omitted).  However, proximate cause does not exist simply because there is "but for" causation.  See id.  Rather, in order for conduct to be the proximate cause of a victim's harm, the conduct must have been both a substantial and a reasonably foreseeable factor in bringing about the complained-of harm.  See id.

Here, because the reinsurance agreement between Educators and Hartford was neither a substantial nor reasonably foreseeable factor leading to the termination of McCulloch's benefits, it cannot be the proximate cause of McCulloch's loss.  Based on the record evidence, a jury could not reasonably infer that Educators and Hartford either intended or could have reasonably foreseen that McCulloch's benefits would be terminated after execution of the reinsurance agreement.  See id. (defining proximate cause as

both a substantial and reasonably foreseeable factor).  While it is true that Hartford would not have had the authority to terminate McCulloch's benefits, but for the fact that it entered into the reinsurance agreement, cause-in-fact does not constitute proximate cause and therefore is insufficient to support McCulloch's CUTPA claim.  See id. at 306-08.  Instead, the proximate cause of McCulloch's termination of benefits was Hartford's independent determination -- through its own investigation -- that McCulloch was no longer totally disabled under the terms of her policy.  McCulloch was not harmed by the reinsurance agreement itself -- the practice that she claims violated CUTPA -- but by Hartford's independent decision to terminate her benefits pursuant to its role as a claims administrator under the terms of the reinsurance agreement.

Moreover, even if a jury could find that the reinsurance agreement was the proximate cause of McCulloch's loss of benefits, summary judgment in favor of Hartford would still be warranted because reinsurance agreements are not the type of practice that CUIPA was intended to prohibit.  The CUIPA statute does not enumerate reinsurance agreements as an unfair and deceptive act or practice in the business of insurance.  See Conn. Gen. Stat. § 38a-816 (defining unfair and deceptive

insurance practices principally as (1) misrepresenting the benefits, advantages, conditions or terms of an insurance policy; (2) disseminating or circulating false information with respect to the business of insurance; (3) disseminating or circulating any oral or written statement that is false or maliciously critical of the financial condition of an insurer; (4) entering into any agreement that tends to result in the unreasonable restraint of, or monopoly in, the business of insurance; (5) filing, disseminating or circulating false financial statements of an insurer with intent to deceive; (6) settling claims unfairly with such frequency as to indicate a general business practice; (7) failing to maintain claims complaint handling procedures).  In fact, reinsurance agreements are common in the insurance industry and are regularly entered into without consequence.  See Traveler's Indem. Co. v. Scor Reinsur. Co., 62 F.3d 74, 76 (2d Cir. 1995) (explaining basic concept of reinsurance).

Additionally, McCulloch's CUIPA claim fails to the extent it could be construed as a claim of unfair claim settlement practices.  While such a claim is cognizable under CUIPA, in order to be successful, there must be proof that the unfair settlement practice was committed or performed with such

frequency as to indicate a general business practice.  See
Colonial Penn Ins., 335 F. Supp.2d at 308 (requiring a showing of
more than a single act of insurance misconduct) (internal
citation omitted).  Here, McCulloch alleges that Hartford only
wrongfully terminated her disability benefits.  She does not
allege, and there is no evidence in the record to indicate, that
Hartford unfairly settled claims as a general practice.  While
the reinsurance agreement assigned approximately 35 open
disability claims to Hartford, the record shows that the transfer
occurred as a single bulk transaction and not as individual,
multiple transactions.  Also, McCulloch has not proffered any
evidence indicating that Hartford unfairly settled any other
claims, either claims that were transferred to Hartford in
connection with the reinsurance agreement or otherwise.  Because
alleged improper conduct in the handling of a single insurance
claim, without any evidence of misconduct in processing any other
claim, does not rise to the level of a general business practice,
see id., and for the additional reasons discussed above,
Hartford's motion for summary judgment on McCulloch's CUTPA/CUIPA
claim is granted.

II.  Educators' Summary Judgment Motion

McCulloch's complaint also alleges that Educators, as her original disability insurer, is liable for breach of contract, bad faith, and unfair practices in connection with Hartford's decision to terminate her benefits.  Educators moves for summary judgment on all of McCulloch's claims, arguing that it cannot be held liable for Hartford's actions because it did not take part in Hartford's decision to terminate McCulloch's benefits.  The court disagrees.

A.  Breach of Contract

McCulloch alleges that Educators is liable for breach of contract because it (1) wrongfully terminated her disability benefits and (2) abandoned its contractual obligation to service and oversee her open disability claim.  Educators submits that McCulloch's claim fails on both grounds.  It contends that it cannot be held liable for contractual breach because Hartford alone decided to terminate McCulloch's benefits and it had no role or influence in that decision.  Educators also argues that after execution of the reinsurance agreement it was no longer in contractual privity with McCulloch.  Both arguments fail.

Under the law of assignment, Educators could be held liable for breach of contract even if it did not have a role or did not

influence Hartford's decision to terminate McCulloch's benefits.
Educators remained in contractual privity with McCulloch even
after it executed the reinsurance agreement with Hartford
because, although the agreement assigned rights and delegated
duties to Hartford, and was supported by mutual consideration, it
did not effect a novation.  See Mace v. Conde Nast Publications,
Inc., 155 Conn. 680, 688-89 (1967) (stating an assignment does
not vitiate the duties of the original obligor without consent
from the obligee).  See also In re Balfour MacLaine Intern. Ltd.,
85 F.3d 68, 82-83 (2d Cir. 1996) (same) (applying New York law).
Thus, even though McCulloch would not be able to recover more
than once for the alleged breach of contract, both Educators and
Hartford would be liable to her for any such breach up to the
amount of loss proved.

     This is not the case, however, with regard to Educators'
motion for summary judgment on McCulloch's breach of contract
claim, to the extent that claim is based on Educators' alleged
abandonment of its contractual obligation to service and oversee
McCulloch's open disability claim by assignment of that
obligation to Hartford.  While it is true that the reinsurance
agreement did not effect a novation, see id., and therefore
Educators cannot not escape its contractual obligations to

30

McCulloch, it was nonetheless permissible for Educators to delegate its duty to administer McCulloch's claim to Hartford. See e.g., 29 Williston on Contracts, § 74:10 (2004) (stating that contracts may generally be assigned absent clear language expressly prohibiting assigment). McCulloch has neither pointed to any case law nor to any contractual provision in her policy which would prohibit such an assignment. Similarly, she has failed to point to policy language that requires Educators alone to administer her claim. See, e.g., Delacroix v. Lublin Graphics, Inc., 993 F. Supp. 74, 81-83 (D. Conn. 1997) (finding that under Connecticut law, a "Consent and Waiver" agreement between a publisher and an artist was assignable because it did not involve personal services that could not be assigned and that there was nothing in the contract or otherwise that would have prohibited assignment). Simply because Hartford, and not Educators, determined that McCulloch was no longer disabled does not mean, without more, that Educators breached its contractual obligations under the policy. Accordingly, Educators' summary judgment motion on the portion of McCulloch's breach of contract claim that is based on Educators' alleged failure to uphold its contractual obligations to service and oversee her open claim is granted. In all other respects, Educators' motion for summary

judgment on McCulloch's breach of contract claim is denied.

B.   <u>Bad Faith Claim</u>

Educators also moves for summary judgment on McCulloch's claim that it is liable for breaching the implied covenant of good faith and fair dealing, for its alleged failure to administer her claim and for Hartford's alleged bad faith in terminating McCulloch's benefits.  As just discussed, McCulloch has not proffered any evidence showing that Educators could not delegate its duty to service and oversee her disability claim to Hartford.  Further, as discussed in Section I.A., <u>supra</u>, McCulloch has failed to create a triable issue of fact to support her claim that Hartford acted in bad faith when it terminated her benefits.  Accordingly, Educators' summary judgment motion on McCulloch's bad faith claim is granted.

C.   <u>CUTPA & CUIPA Claims</u>

Educators also moves for summary judgment on McCulloch's CUTPA and CUIPA claims.  As discussed in Section I.C., <u>supra</u>, McCulloch has failed to set forth any evidence to establish a CUTPA violation, principally because she does not establish that the reinsurance agreement constituted a prohibited act and that it was the proximate cause of her alleged harm.  Accordingly, Educators is entitled to summary judgment on McCulloch's

CUTPA/CUIPA claim as well.

III. <u>McCulloch's Motion for Summary Judgment as to Hartford's Counterclaim</u>

Hartford has filed a counterclaim seeking to recover benefit payments it made to McCulloch from August 14, 2000, to October 31, 2000, totaling $19,655.53. Specifically, it alleges that McCulloch fraudulently misrepresented her continued disability and, as a result, was unjustly enriched. McCulloch moves for summary judgment on Hartford's claim, arguing that Hartford (1) lacks standing; (2) profited from her alleged wrongdoing; (3) waived its rights to disclaim coverage; and, (4) impermissibly asserts a new ground for discontinuing her benefits.

A. <u>Standing</u>

McCulloch contends that Hartford's counterclaim fails because it merely acted as Educators' agent and therefore lacks standing to bring a counterclaim against her. Hartford maintains that it has standing because it was the assignee of the open disability claims.

Standing focuses on whether a party is the proper party to seek relief on a claim. <u>See</u> <u>Nye v. Marcus</u>, 198 Conn. 138, 141 (1985). The basic elements of standing are injury in fact, causation, and redressability. <u>See</u>, <u>e.g.</u>, <u>Allen v. Wright</u>, 468 U.S. 737, 751-53 & n.19 (1984); <u>Nielsen v. State</u>, 236 Conn. 1,

6-7 (1996).  Under Connecticut law, a plaintiff generally does not have standing to sue a defendant in its own name if it is merely an agent and not an assignee.  See Elementary School Bldg. Comm. of Fairfield v. Placko, No. CV020398162S, 2003 WL 971839, at *2 (Conn. Super. Ct. Feb. 21, 2003) (unpublished opinion) (quoting Cragin & Co., Inc. v. International S.S. Co., 15 F.2d 263, 264 (2d Cir. 1926)).  The rationale for this rule is that an agent can at best claim only an indirect injury due to an alleged act or omission.  See Paul S. Yoney, Inc. v. Hospital of Saint Raphael, No. CV90271006S, 1992 WL 170616, at *2 (Conn. Super. Ct. July 10, 1992) (discussing cases) (unpublished opinion).

In this case, the question of whether Hartford can demonstrate a direct injury arising from McCulloch's alleged misrepresentations presents a legal issue for the court to decide.  Based on the fact that Hartford is the assignee of the open disability claims covered under the reinsurance agreement, including McCulloch's claim, Hartford can establish direct harm and thus has standing.

An assignment is a transfer of property or some other right from the assignor to the assignee.  See Schoonmaker, 265 Conn. at 227.  Here, by virtue of the language in the reinsurance agreement, see n.2, supra, Educators both delegated its duty to

administer McCulloch's benefits and transferred its right to terminate her benefits to Hartford. If a jury were to find that McCulloch misrepresented her disability for the period in question, it could also find that Hartford, as the assignee of McCulloch's open disability claim, was directly harmed. See Schoonmaker, 265 Conn. at 227 (stating that the right to bring an action, such as to collect a debt, may be assigned and in such a case the assignee stands in the shoes of the assignor) (internal quotes and citations omitted). Accordingly, there is no merit to McCulloch's argument that Hartford suffered only an indirect injury because it used the reserve funds transferred to it by Educators to make the benefit payments to her. Because Hartford paid consideration to Educators for the transfer of those reserves, its injury was direct. Accordingly, Hartford has standing to assert this counterclaim.

    B.   Hartford's Benefit From McCulloch's Alleged Wrongdoing

McCulloch also contends that Hartford's counterclaim must fail because Hartford is not entitled to claim as damages the $19,655.53, it allegedly overpaid her. Specifically, McCulloch submits that Hartford's damages claim represents money that it would not have received from Educators without her alleged wrongdoing. This specious argument is based on her contention

that if Educators had known that she was not disabled at the time the reinsurance agreement was executed, it would not have released to Hartford the approximately $1.3 million in reserves that had been allocated to her claim, and Hartford, in turn, would not have recovered those funds for its own use.  In other words, she claims that because of her alleged misrepresentation, Hartford received approximately $1.3 million in reserve funds from Educators but because it paid only $91,896 to her as benefits, it was able to retain the balance.  Her argument fails for several reasons.

Primarily, McCulloch's argument fails because it ignores the fact that Hartford paid marginally more consideration to Educators to obtain the right to the reserves allocated to her claim.  If McCulloch's claim had not been one of the claims that Educators transferred to Hartford under the reinsurance agreement, the amount of reserves transferred would have been less and Hartford, in turn, would have presumably paid marginally less consideration to Educators.  The fact that Hartford terminated McCulloch's benefits before the reserves allocated to her claim were exhausted simply represents the additional risk/return that Hartford assumed when it purchased McCulloch's claim as part of the open claims that were transferred to it

under the reinsurance agreement.

Similarly, McCulloch does not present evidence that her allegedly fraudulent claim was causally connected to the release of reserves for her claim. See generally Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1495 (2d Cir. 1992) (reasoning that common law fraud requires a causal connection between alleged wrongdoing and the harm) (citing cases). Hartford's theory of liability and its alleged harm is not that McCulloch was never disabled, but that McCulloch ceased to be disabled on August 14, 2000, approximately one year after the reinsurance agreement was executed. Hartford's counterclaim only seeks to recover benefit payments it made from August 14, 2000, to October 31, 2000; not from the date the reinsurance agreement was executed. Thus, Hartford need not establish that McCulloch's allegedly fraudulent claim was causally connected to the reinsurance agreement. Accordingly, a jury need not reach the issue of whether Hartford benefitted from McCulloch's alleged wrongdoing.[5]

---

[5] As Hartford points out, McCulloch's benefit theory also fails to the extent that it oversimplifies the process of setting aside reserves. McCulloch has not provided any evidence in support of her assertion that, due to the termination of her benefits, Hartford realized a profit equal to the difference between the amount of benefit payments it made to her, $91,896, and the amount of statutory reserves allocated to it for her open claim, approximately $1.3 million. To the contrary, Hartford submits that the amount of reserves to be set aside on any claim is a complex function of statutory requirements and actuarial

Also, McCulloch's reliance on case law in support of her claim that Hartford did not suffer compensable harm as a result of her alleged misrepresentations is misplaced.  The first case that McCulloch cites, Levine v. Seilon, Inc., 439 F.2d 328, 333-34 (2d Cir. 1971), actually undercuts her argument.  Levine involved an action for damages brought under § 10(b) of the Securities Exchange Act in which the owner of corporate preferred stock alleged that she was a forced seller.  Specifically, the plaintiff in Levine claimed that the corporation had falsely represented that it would give preferred stockholders the opportunity to exchange their shares for common stock.  In affirming the district court's dismissal of the plaintiff's claim, the Second Circuit, adhering to the principle that "a wrongdoer should disgorge his fraudulent enrichment," id. at 334 (internal quotes and citation omitted), reasoned that it was "hardly realistic to accuse a corporation of having secured an unjustified windfall or enrichment as a result of a redemption which was legally and financially within its power to effectuate."  Id.  Similarly in this case, and contrary to her

---

calculations.  It contends that the net profit it might realize from entering into the reinsurance agreement, if any, is not dependent on McCulloch's policy alone and cannot be accurately determined until it makes the last benefit payment to the last open claimant in the pool; an event which has yet to occur.

reading of <u>Levine</u>, McCulloch cannot sustain her argument that Hartford should be precluded from seeking a disgorgement of benefit payments wrongfully paid to her.  Like the corporation in <u>Levine</u>, Hartford simply exercised its legal right:  it terminated McCulloch's benefit payments before the statutory reserves for her claim were exhausted based on its determination that she was no longer disabled.

McCulloch further relies on this court's ruling in <u>Chanoff v. United States Surgical Corp.</u>, 857 F. Supp. 1011, 1018-19 (D. Conn. 1994).  In <u>Chanoff</u>, also a securities case, the court held, in part, that the plaintiffs' claim for losses due to hedging and margining were too speculative to be a direct result of certain corporate officers' alleged fraud because margining is an aggressive and high risk investment and the losses caused thereby were more directly a result of the plaintiffs' aggressive investment strategy than misrepresentation.  <u>See id.</u> Specifically, the court reasoned that there was insufficient evidence to justify a presumption that the "margin calls were within the contemplation of the [corporate officers] as the probable consequence of their fraudulent representations."  <u>Id.</u> at 1018 (internal quotes and citation omitted).  In this case, unlike <u>Chanoff</u>, the link between McCulloch's alleged

misrepresentation about her condition and the overpayment of benefits to her is not tenuous or unforeseeable. Thus, if proved, a jury could infer that McCulloch could reasonably have foreseen that her alleged actions would result in Hartford's overpayment of benefits to her.

McCulloch's reliance on Sit-Set, A.G. v. Universal Jet Exchange, Inc., 747 F.2d 921, 928-29 (4th Cir. 1984), is similarly flawed. In that case, the Fourth Circuit held that the plaintiff, the prospective seller of an aircraft alleging damages by a broker's misrepresentations, was not entitled to recover for anticipated profits because, had the true terms of the offer been represented to the plaintiff, "the inevitable result would not have been an enforceable contract of sale, but an aborting of the pre-contract negotiations." Id. at 929. In this case, however, Hartford does not allege that McCulloch misrepresented her disability at the time it entered into the reinsurance agreement. Instead, it alleges that she initially misrepresented her disability approximately one year after, on August 14, 2000. Unlike the facts in Sit-Set, no genuine issue exists here that McCulloch was disabled at the time the agreement was executed. Thus, there is no record evidence of any set of facts which, had they been known to Hartford, would have led it to abort the

agreement with Educators.

    C.   <u>Hartford's Alleged Waiver</u>

McCulloch further contends that Hartford waived its right to recover the benefits it paid on her claim because it knew or reasonably should have known that she was not disabled at the time it made the payments.  Hartford argues, in opposition, that it did not waive its right to recover payments it wrongfully paid because, under the terms of her policy, McCulloch had a continuing duty to provide proof of her disability, and therefore, it continually made determinations about whether she was eligible to receive benefits.  McCulloch does not, however, specify whether Hartford is precluded from recovery under a theory of intentional waiver or equitable estoppel. Nevertheless, her claim fails under either theory.

Waiver is the intentional relinquishment of a known right in which the party has both knowledge of the existence of the right and the intention to relinquish it.  <u>See</u> <u>National Cas. Ins. Co. v. Stella</u>, 26 Conn. App. 462, 464 (1992) (citations omitted).  A waiver can either be express or implied by acts or conduct.  <u>See id.</u>  Here, McCulloch has not provided any evidence of Hartford's express intention to waive its right to recover benefit payments wrongfully paid.  To the contrary, the summary judgment record

reveals Hartford gave McCulloch notice of its doubts regarding
her claim before August 14, 2000.  For example, in as early as
July 2000, Hartford requested that McCulloch undergo an
independent medical examination with Dr. Garg.  Also, on
September 8, 2000, Hartford sent a field investigator to question
McCulloch regarding damaging video surveillance it had taken of
her.

     Based on this same evidence, which demonstrates that
McCulloch was aware that Hartford questioned her continued
disability, a jury could also find that Hartford is not estopped
from recovering benefit payments for that period.  "Under
Connecticut law, any claim of estoppel is predicated on proof of
two essential elements: the party against whom estoppel is
claimed must do or say something calculated or intended to induce
another party to believe that certain facts exist and to act on
that belief; and the other party must change its position in
reliance on those facts, thereby incurring some injury."
Middlesex Mut. Assur. Co. v. Walsh, 218 Conn. 681, 699 (1991)
(quotes and citation omitted).  Here, there is a question of fact
as to whether Hartford's actions were calculated or intended to
induce McCulloch to believe that she was entitled to disability
benefit payments between August 14, 2000, and October 31, 2000,

and whether McCulloch relied on those actions and would now suffer unfair prejudice if Hartford were to recover those funds. See Town of Andover v. Hartford Accident and Indem. Co., 153 Conn. 439, 444 (1966) (holding that, without proof of prejudice, estoppel could not be found to exist). Accordingly, McCulloch is not entitled to summary judgment on her claim that Hartford is equitably estopped from seeking reimbursement of the benefit payments.

D.    "Mend the Hold" Doctrine

Finally, McCulloch argues that Hartford's counterclaim fails because it impermissibly asserts a new and different ground for terminating her benefits than the reason it initially gave. Her argument is baseless. While, as McCulloch asserts, a party generally may not initially assert one defense for its conduct, and then, after litigation has begun, change its ground, or, "mend its hold," and offer another defense, see Brand v. Kamm Games, Inc., 181 F.2d 584, 587 (2d Cir. 1950), she does not establish that Hartford, in fact, has asserted, in this action, a new or different ground for its decision. Rather, the record indicates that Hartford has consistently maintained that McCulloch ceased to meet the policy's definition of total disability as of August 14, 2000. McCulloch's assertion that

Hartford possessed evidence showing she was not disabled prior to August 14, 2000, does not constitute a new and different ground for Hartford's termination of her benefits.  To the contrary, this is wholly consistent with the reasons it initially gave her for its decision.  See Dkt. # 138, Ex. 30 at 12.  Moreover, because Hartford expressly reserved all rights and defenses available to it, see id., it would be entitled to assert additional defenses to disclaim coverage if it chose to do so. See City of Burlington v. Hartford Steam Boiler Inspection & Ins., 190 F. Supp.2d 663, 681 (D. Vt. 2002) (discussing Vermont case law that "mend the hold" doctrine does not limit the defenses available to an insurer that reserves its rights to defend on other grounds).  Accordingly, McCulloch's motion for summary judgment is denied as to this ground as well.

IV.  McCulloch's Summary Judgment Motion as to Educators

McCulloch also moves for summary judgment against Educators on her breach of contract and bad faith claims against Educators. Specifically, she contends that Educators impermissibly delegated its administrative duties to Hartford and acted in bad faith when it entered into the reinsurance agreement.  Educators contends that, because McCulloch is not entitled to relief on these claims, summary judgment should be entered in its favor.  The

44

court agrees.

    A.   <u>Breach of Contract Claim</u>

McCulloch argues that Educators had a contractual obligation to administer her claim reasonably and in good faith, and to make benefit payments to which she was properly entitled.  She contends that Educators breached that duty by entering into the reinsurance agreement with Hartford, which had a financial incentive to discontinue her benefits.

As discussed in Section II.A., <u>supra</u>, McCulloch has failed to produce any evidence to support her claim that Edcuators breached a contractual term of the insurance policy by entering into the reinsurance agreement with Hartford.  McCulloch has neither pointed to a provision that prohibits a delegation or assignment to a third-party, nor provided evidence of a contractual requirement, much less of her own reasonable expectation, that Educators itself would administer her benefits.  Similarly, her argument regarding Hartford's unique financial incentive to discontinue her benefits is groundless because, like any other insurer, and as the assignee of the insurance policy here, Hartford would be justified in denying benefits on a claim it determines is no longer valid.  Furthermore, as discussed in Section II.A., <u>supra</u>, a genuine issue of fact exists whether

45

Hartford wrongfully terminated McCulloch's benefits and thus whether Educators, as the obligor of the insurance policy, might be liable to McCulloch for breach of contract.  Thus, summary judgment cannot enter in McCulloch's favor on the breach of contract claim.

B.   Bad Faith Claim

McCulloch also moves for summary judgment on her bad faith claim, arguing that Educators breached its fiduciary duty to her by entering into the reinsurance agreement.  Educators contends that it did not owe McCulloch a fiduciary duty, and that, nevertheless, she has not presented any evidence that it acted in bad faith.  Because, as discussed in Section II.B., supra, Educators is entitled to summary judgment on McCulloch's bad faith claim, McCulloch's cross-motion for summary judgment on the same claim is denied.[6]

---

[6] Even if the court were to consider McCulloch's summary judgment motion on its merits, it nonetheless fails.  First, Connecticut courts have held that the relationship between an insurer and insured is not a fiduciary one, but is based solely on contract.  See Sheltry v. Unum Life Ins. Co. of Am., 247 F. Supp.2d 169, 178-79 (D. Conn. 2003) (finding "Connecticut courts have held that the relationship between insurer and insured is one based solely upon contract" and is not "characterized by a unique degree of trust and confidence between the parties," as required in a fiduciary relationship) (citing Connecticut case law).  Second, McCulloch fails to present any other evidence of Educators' bad faith.  As discussed in Section I.A., supra, the record evidence demonstrates only that Educators entered into the reinsurance agreement with Hartford because it no longer

<u>CONCLUSION</u>

For the following reasons, Hartford's partial summary judgment motion as to McCulloch [doc. # 136] is granted; Educator's summary judgment motion as to McCulloch [doc. #133] is granted in part and denied in part; McCulloch's summary judgment motion as to Hartford's counterclaim is denied [doc. # 183]; and McCulloch's summary judgment motion as to Educators is denied [doc. #186].

So ordered this ___ day of March, 2005, at Bridgeport, Connecticut.

_____
Alan H. Nevas
United States District Judge

---

underwrote policies for the ACP.  McCulloch has not adduced any evidence to show that Educators acted with ill-will, such as, for example, by targeting her claim, out of the nearly 35 other claims transferred in the agreement, to be terminated. Similarly, while Educators could be liable for Hartford's bad faith actions under an agency theory of liability, McCulloch has not presented any evidence of Hartford's dishonest purpose either.  <u>See</u> Section I.A., <u>supra</u>.

47