**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CANDI McCULLOCH | : CIVIL ACTION NO. : |
|  | 301CV1115(AHN) |
| Plaintiff, | : |
|  | : |
| vs. | : |
|  | : |
| HARTFORD LIFE AND ACCIDENT | : |
| INSURANCE COMPANY AND EDUCATORS | : |
| MUTUAL LIFE INSURANCE COMPANY | : |
| Defendants. | : April 8, 2005 |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR RECONSIDERATION OF OMNIBUS RULING ON**
**THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

The Second Circuit has "made clear that summary judgment may not be granted

simply because the court believes that the plaintiff will be unable to meet his or her

burden of persuasion at trial. There must either be a lack of evidence in support of the

plaintiff's position, or the evidence must be so overwhelmingly tilted in one direction that

any contrary finding would constitute clear error. And it remains the case that at

summary judgment, all factual inferences must be resolved in favor of the non-movant."

Danzer v. Norden Systems, Inc., 151 F.3d 50, 54 (2nd Cir. 1998).[1]  Plaintiff respectfully

requests that the court reconsider its ruling on the parties' motions for summary

judgment, because the court overlooked evidence in support of plaintiff's position, and

plaintiff has obtained new evidence that further supports her claims.

---

[1]    A court should reconsider its ruling where it overlooked evidence or where new evidence has
become available.  Casey v. U.S., 161 F.Supp.2d 86, 91-93 (D.Conn. 2001) (Fitzimmons, J.); See
also Channer v. Brooks, 2001 U.S.Dist.LEXIS 15307 at * 1-2 (D.Conn. September 10, 2001)
(Droney, J.); See also, In re Air Crash at Dubrovnick, Croatia, 2001 U.S.Dist.LEXIS 14334
(D.Conn. June 4, 2001) (Covello, J.); LoSacco v. City of Middletown, 822 F. Supp. 870, 876-77
(D. Conn. 1993); Bristol Tech., Inc. v. Microsoft Corp., 127 F.Supp.2d 61, 62-63 (D.Conn. 2000)
(granting motion to reconsider and altering decision to more accurately reflect the facts.)

## II. THE COURT OVERLOOKED EVIDENCE FROM WHICH A JURY COULD CONCLUDE THAT HARTFORD'S INVESTIGATION AND TERMINATION OF PLAINTIFF'S BENEFITS WAS IN BAD FAITH AND <u>REQUIRES RESOLUTION OF DISPUTED ISSUES OF FACT AT TRIAL</u>

The court held that defendants could not be liable for bad faith because "Hartford conducted an extensive investigation of McCulloch's claim" and "the information Hartford obtained gave it a legitimate reason to terminate McCulloch's disability benefits." Ruling, pp.18-20, 32. The court overlooked substantial evidence from which a jury could conclude that this "extensive investigation" was so riddled with conscious wrongdoing, and acts that were designed to mislead and deceive, that the "information" that Hartford obtained thereby did **not** give it a legitimate reason to terminate plaintiff's benefits and, therefore, whether defendants are liable for bad faith is, at the least, a disputed issue of fact.

First and foremost, the court overlooked the undisputed evidence that, <u>after it</u> discovered that Dr. Garg had completely fabricated the results of a "Functional Capacities Evaluation ("FCE") that she had not performed,[2] Hartford <u>knowingly</u> sent these fabricated and false FCE results to plaintiff's physicians and to its own contracted physician reviewer to serve as a basis for their opinions on plaintiff's functionality,[3] and

---

[2] Specifically, Hartford's internal log entry discloses that on <u>September 28, 2000,</u> Hartford's Nurse Esson received the IME and "FCE Summary" (which Dr. Garg had faxed on September 21, 2000) and, immediately after reviewing it, contacted Dr. Garg's office to inquire about the underlying tests, at which time Dr. Garg's receptionist informed her that "EE [employee] did not have any testing done." Htfd. Exs. A(22), (23); Htfd. Ex. A(5) at 2449-2450 (attached hereto as **Exhibit 1**), <u>cited</u> in Pl. Stmt., ¶ 63 & Pl. Htfd. Stmt.- Add'l Facts, ¶ 73. Accordingly, Educators <u>admitted</u> in its Rule 56(a)(2) Statement that "Hartford . . . learn[ed] Dr. Garg had not performed an FCE . . . <u>September 28, 2000.</u>" Educ. Rule 56(a)(2) Stmt. in Opp. to Pl. MSJ, ¶ 24, to which plaintiff directed the court in her Reply to Educ. Rule 56(a)(2) Stmt., ¶ 24.

[3] Specifically, Hartford forwarded the false FCE results to plaintiff's physicians on October 13, 2000, which is two weeks after Hartford discovered that the results were fabricated, and to its contracted physician reviewer in the beginning of November 2000, which is more than one month after it discovered that the results were fabricated. Htfd. Exs. A(26), (29), <u>cited</u> in Pl. Stmt. – Add'l Facts, ¶ 78.

thereafter continued to purportedly rely on these fabricated, false and misleading FCE

"results," as a basis to terminate plaintiff's benefits,[4] and thereafter knowingly misled the

court to believe that it did not discover that the test results were fabricated "until later."[5]

See Appendix, Section A and **Exhibit 1**, thereto.[6]  The court could not have concluded

that "there is no evidence that Hartford knew that Dr. Garg had not conducted the [FCE]

examination," if it had not overlooked the foregoing evidence (Ruling, p.18).

Having overlooked this evidence, however, the court also overlooked the

admissions of Hartford's own employees that Hartford should have immediately

scheduled an FCE and questioned Dr. Garg's integrity as an IME physician; that the FCE

report that Hartford provided to plaintiff's physicians and to its physician reviewer would

mislead any medical professional to believe that it reflected the results of an FCE that had

been performed; and that this FCE report was essential because the IME report showed

that plaintiff had limitations and it is was the FCE that would establish the extent of those

limitations.  See Appendix, §§ C, D(2) and **Exhibits 2 & 3**, thereto.

---

[4]  Specifically, on November 17, 2000, which is almost two months after Hartford learned that
Dr. Garg had misrepresented that she had conducted an FCE and fabricated the "FCE Summary,"
Hartford stated that, among other things, it "based [its] decision to terminate her claim . . . upon . .
. Functional Capacities Evaluation (FCE) reports for services **performed** by Asha Garg, M.D."
and then quoted the "results" of the FCE, which it knew had not been performed, as support for
its termination.  Htfd. Ex. A(30), cited in Pl. Stmt. – Add'l Facts, ¶ 100. The Hartford employee
who wrote the termination letter admitted that she "place[d] a great deal of reliance on Dr. Garg's
opinion" in terminating plaintiff's benefits.  Pl. Ex. D, p.263:13-19, cited in Pl. Stmt. – Add'l
Facts, ¶ 100.
[5]  In its reply brief in further support of its motion for summary judgment, Hartford stated that
this information was "unbeknownst to Hartford until later . . ." (Hartford's Reply in Support of
Summary Judgment, p.9), which, apparently, did mislead this court. Ruling, p.18.
[6]  As set forth herein, having overlooked this evidence, the court also overlooked much of the
related evidence that supports plaintiff's bad faith claim.  For the court's convenience, the
plaintiff has attached a table setting forth this volume of evidence, with citation to the record as
an Appendix hereto.  Plaintiff has also attached some of the key exhibits to her opposition as
exhibits to this motion for the court's ease of reference – these are not new exhibits, but are
copies of portions of the exhibits that plaintiff attached to her opposition to Hartford's Motion for
Summary Judgment.

The court also overlooked the evidence that Hartford not only knowingly relied on the
fabricated FCE results, and improperly failed to even question the validity of Dr. Garg's
IME after learning that she had manufactured a conclusion about plaintiff's functionality
in the FCE for a few hundred dollars (Appendix, Section A), but it also overlooked the
testimony of Dr. Garg that Hartford <u>represented to her that plaintiff was not required to</u>
<u>perform "any procedures or anything" in her particular job as an internist,</u>[7] which was
patently false,[8] and that Dr. Garg's conclusion that plaintiff could work as an internist
was dependant on this misrepresentation.[9] <u>See</u> Appendix, §§ B, D(1) and **Exhibit 5**,
hereto

    The court also overlooked the record testimony of the Disability Case Manager
that the video surveillance, alone, was insufficient to establish either that plaintiff had
misrepresented her abilities, or that plaintiff was able to perform material duties of her
occupation: even though, in the video surveillance, plaintiff "showed an ability," "it's a
known. It's a given" that "those with chronic pain will have good days and bad days" – in
the absence of <u>both</u> an IME and FCE there was no way to know "if that was a good day

---

[7] <u>See</u> Pl. Ex. UU, p.180:17-23; p.254:17-19; 262:3-5, <u>cited</u> in Pl. Stmt. – Add'l Facts, ¶¶ 59 &
61 and attached hereto as **Exhibit 5.**

[8] Plaintiff's position description states that plaintiff's "essential duties" included providing
"urgent/emergent cares as required"; as well as performing "various invasive medical procedures
that include, but are not limited to, the injection of medications . . ." Htfd. Ex. A(4) at H1231-
1233, <u>cited</u> and <u>quoted</u> in Pl. Stmt. – Add'l Facts, ¶ 3.

[9] Dr. Garg testified that when she opined that plaintiff could work 16 hours per week as an
internist, "what I was talking about is that she [plaintiff] can do 16 hours of office practice, not
doing procedures . . .", as Hartford had characterized plaintiff's job.  Pl. Ex. UU, pp.181:19-
182:5, <u>cited</u> in Pl. Stmt. – Add'l Facts, ¶¶ 61-62 and attached as **Exhibit 5** hereto.  Dr. Garg
further testified that it was her opinion, both before and after viewing the video that plaintiff was
only capable of "light duty work," meaning "no procedures" such as "tests, examinations,
procedures like injection . . . or testing the different things - - lumbar puncture, proctoscopy, or
anything – rectal exam." Pl. Ex. UU, p242:2-243:6, <u>cited</u> in Pl. Stmt. – Add'l Facts, ¶¶ 61-62,
attached as **Exhibit 5**, hereto.

and if she was actually not capable or capable of performing in her occupation." <u>See</u> Appendix, §§ C, D & G and **Exhibit 2**, thereto.

Given all of this testimony and evidence, a reasonable jury could conclude that Hartford knowingly provided Drs. Magana and Amato with a misleading and unreliable IME and false FCE results in order to mislead and deceive them into providing an opinion that plaintiff could function as an internist. Plaintiff also presented evidence, which this court overlooked, that Drs. Magana and Amato were, in fact, misled by the IME and FCE report;[10] and that Hartford knew or was reckless in not knowing, that they had been misled when it relied on their opinions to terminate plaintiff's benefits.[11] <u>See</u> Appendix, §§ C & D and **Exhibit 3**, thereto.

The court also overlooked the evidence from which a jury could conclude that the opinions of Drs. Garg and Magana could not support the conclusion that plaintiff was capable of performing the material duties of her occupation, even if they had not been tainted by Hartford's misrepresentations regarding plaintiff's job duties and the fabricated FCE results. Even after viewing the surveillance video, Dr. Magana concluded that plaintiff could only "work where she does no bending below the waist"; Dr. Garg concluded that plaintiff was restricted from "[f]requent bending"; and plaintiff presented evidence that "work in internal medicine requires much bending." <u>See</u> Appendix, § D(3).

---

[10]    Dr. Amato, Hartford's own contracted physician testified that he had assumed, as would any professional, that the FCE reflected the results of an FCE that Dr. Garg performed, and that no one at Hartford informed him that Dr. Garg did not perform an FCE and had fabricated her "summary" of the results of this test. Pl. Ex. WW at 56-57, 63, <u>cited</u> in Pl. Stmt., ¶ 73, and attached as **Exhibit 3**, thereto.

[11] <u>See</u> Def. Ex. A(28) (Magana response, quoting and adopting the results of the FCE that was never performed); Def. Ex. A(29) (Amato notes: "FCE & IME Dr. Garg support ability to perform lite [sic] work."), <u>cited</u> in Pl. Stmt. – Add'l Facts, ¶ 99.

Finally, the court overlooked the evidence that, beyond falsely representing the purpose and nature of the "field interview" with Moryto (See Ruling, p.16), Hartford also intimidated plaintiff during the interview to obtain a purportedly inconsistent statement that plaintiff did not dance,[12] and misrepresented the purpose of the IME and FCE to plaintiff and, in violation of its own claim manual, failed to inform plaintiff that it was sending the results of the IME and FCE, as well as the video surveillance to plaintiff's physicians, and failed to inform plaintiff that, if her physicians did not write to Hartford to disagree with Dr. Garg, Hartford would use this to justify terminating plaintiff's benefits. Appendix, § E. While an insurer may have a right to "investigate the validity of a claim" (Ruling, p.17), it must exercise that right in good faith. Uberti v. Lincoln Nat'l Life Ins. Co., 144 F.Supp.2d 90 (D.Conn. 2001). As Hartford's own claim manual recognizes (Appendix, § E(2)), "[p]roceeding with a coverage investigation covertly to gain advantage over an insured is improper. When the interests of the insurer and insured conflict as a result of the discovery of coverage issues, the insurer may not covertly build a case against its insured, but should promptly take steps to see that the insured is fully aware of and understands the problem." Royal Maccabees Life Ins. Co. v. Choren, 393 F.3d 1175 (10th Cir. 2005) (affirming jury finding of bad faith where insurer obtained video surveillance of insured wind-surfing, and then conducted further investigation, including IME, without disclosing that the validity of the claim was under investigation, or why.)

In sum, it cannot be said that plaintiff lacks any evidence in support of her bad faith claims arising from Hartford's investigation and termination of her benefits, or that

---

[12]  Indeed, one victim of Hartford' abusive "interviewing" techniques suffered a breakdown and lost consciousness during the interview, and was transported the hospital. See Munoz v. Island Finance Corp., 2005 WL 730221 (D.Puerto Rico March 28, 2005) (attached hereto).

a jury's finding of bad faith on these claims would constitute clear error.  See e.g. Hines v. UNUM, 110 F.Supp.2d 458, 466 (W.D.Va. 2000.) (granting plaintiff's motion for summary judgment on bad faith claim where Unum relied on questionable test results and 20+ hours of surveillance video.); Hangarter v. The Paul Revere life Ins. Co., 2002 U.S.Dist. LEXIS 21870 (D.Cal. November 12, 2002), affirmed, 373 F.3d 998 (9th Cir. 2004) (insurer's failure to provide the IME with the insured's job description, supported jury's finding of bad faith), citing, Sprague v. Equifax, Inc., 166 Cal.App.2d 1012, 213 Cal.Rptr. 69, 79 (1985) (fraudulent termination exists if insurer arranges "an inadequate medical examination, producing a false conclusion, which would form an apparently plausible basis for wrongfully terminating payments."); Moore v. American United Life Ins. Co., 150 Cal.App.3d 610, 197 Cal.Rptr. 878 (1984) (insurer acted in bad faith where it misled physician to opine that plaintiff was not disabled by providing erroneous definition of disability.) Stenger v. Provident Life & Accident Ins. Co., 121 F.Supp.2d 1238 (E.D.Wis. 2000) (evidence that insurer failed to question IME opinion when it had reason to do so, and opinion was based on a misconception that the insured physician's duties did not include surgery, precluded summary judgment on insured's bad faith claim); Clausen v. Standard Ins. Co., 961 F. Supp. 1446, 1457 (D. Colo. 1997) (surveillance could not justify terminating benefits where "[t]here is nothing in the record suggesting [Plaintiff] was capable of such an activity on a sustained basis or that the video documented anything other than a good day.") Cary v. United of Omaha Life Ins. Co., 98 P.2d 462, 464 (Colo. 2003) (biased IME where insurer failed to provide physicians with a proper job description could not support terminating benefits.)

### III.    PLAINTIFF HAS NEWLY DISCOVERED EVIDENCE THAT FURTHER SUPPORTS HER CLAIM OF BAD FAITH INVESTIGATION AND TERMINATION

In opposition to Hartford's motion, plaintiff presented evidence from which a jury could infer that Hartford's SIU had targeted plaintiff's claim for termination because of the substantial reserves associated with her claim.[13]    At that time, however, Hartford had filed a motion for protective order to avoid producing additional documents regarding this issue, which plaintiff had requested months previously, and plaintiff advised the court of this fact in her opposition to Hartford's Motion for Summary Judgment.  Pl. Opposition, p.1; Pl. Surreply, p.11.  After the conclusion of the briefing on Hartford's Motion for Summary Judgment, when the court denied Hartford's motion for protective order, Hartford finally produced the documents, which support that Hartford targeted plaintiff's claim for termination because of the substantial reserves associated with her claim.  This evidence includes:

- The Director of the SIU, Mr. McGoldrick ("McGoldrick"), testified, under oath, prior to the summary judgment briefing, that, while the release of reserves is "tracked" in a document known as a Monthly Management Letter ("MML"),[14] his performance is not reviewed based on reserve releases, and the release of reserves is "never" discussed in "any" performance review.  **Exhibit 6**, hereto (McGoldrick Test., p.322:9-21).

---

[13] See Pl. Stmt., – Add'l Facts, ¶¶ 14, 15. As set forth more fully in Section F of the Appendix, this court also overlooked evidence from which a jury could conclude that Hartford's "Red Flags" were merely a pretense to initiate a fraud investigation.  In light of this evidence, whether Hartford legitimately suspected plaintiff is a question for the jury to determine based on the credibility of the witnesses.  Union Ins. Soc. v. Gluckin, 353 F.2d 946, 951 (2nd Cir. 1965)("[T]he court, on a motion for summary judgment, cannot try issues of fact but can only determine whether there are issues of fact to be tried.").  Hartford can only prevail on its motion for summary judgment if "only one inference could be reasonably drawn from the undisputed evidentiary facts." Id., at 952; Casey, supra (where an issue turns on the credibility of witnesses, summary judgment is not appropriate.);

[14] These MML, which Hartford produced after the conclusion of the briefing on its motion, show that Hartford records the release of reserves relative to the number of claims "impacted" by each of their SIU department, by month and year, which it characterizes as "results."  See e.g. **Exhibit 7** hereto.

• In opposition to plaintiff's attempt to obtain documents that would refute this representation, Hartford represented to the court that "not one employee received a bonus, incentive, or reward of any kind in connection with the handling of plaintiff's claim file. *The amount of reserves 'released' is not even a basis upon which employees are evaluated*." Htfd. Motion for Protective Order dated August 25, 2003, p.4.

The documents that Hartford subsequently produced revealed the following:

• Hartford provides its SIU employees with cash bonuses and recognition to maximize the number of claims "impacted" and the amount of reserves released by those "impacts." See e.g. **Exhibit 8** hereto.

• In January 2000, Hartford issued a document entitled "Team Goals" for the SIU in the year 2000. These "goals" included to "increase number of claim impacts by at least 50%" and to "increase ratio of claims impacted to claims accepted for investigation to 1:3" (**Exhibit 9** hereto) – apparently regardless of the merits of the claim.

• In April 2000, the same month that the SIU began to investigate plaintiff's claim, McGoldrick received an annual review for his performance in 1999, in which his superior: (1) under the very first heading, entitled "Results Expected/Achieved," commended him on the fact that the SIU had "exceeded their goal of increasing claims impacted 33% over 1998, and increasing the 'reserve impact' by 90% and noted that, because of these 'results' the SIU earned the President's Award and was runner up for the Chairman's Award; (2) exhorted him to "develop a capability on your team to do more 'data mining' type of activities to identify more effectively those claims with high impact potential," to "aggressively pursue the utilization of as yet unidentified data bases to identify high potential leads" and (3) directed him to "[a]ggressively performance manage the lowest performing 10-20% of your team. Up or out." McGoldrick's superior concluded by stating that in order to "achieve aggressive goals for 2000 and beyond, Jack will need to . . . look for new ways to achieve results." **Exhibit 8** hereto.

• In May 2000, shortly after Kim Gabrielson, the SIU employee in charge of plaintiff's file, became involved in plaintiff's case, McGoldrick evaluated Gabrielson's year 1999 performance, where he commended Gabrielson on being "very results oriented" and stated that he "hoped that additional results will be realized . . . particularly of the takeover claims." **Exhibit 10** hereto at H12268.

• In McGoldrick's performance appraisal of Gabrielson's for the year 2000 (in which she was responsible for terminating plaintiff's benefits), Gabrielson noted that she had "fulfilled" her "primary responsibilities," by being personally responsible for "impacting" 25 claims, which all together resulted in the release of $2,921,572 in reserves. **Exhibit 11** hereto at H13005. Gabrielson's termination of plaintiff's claim, alone, accounted for over $1 million dollars of this "success." Pl. Ex. W.

• Gabrielson received a special cash bonus of $1,000 as a result of her team's year 2000 "results." **Exhibit 12** hereto. Susan Wilk, the claim examiner in charge of

plaintiff's file received over $5,000 in cash bonuses for her year 2000 "results." <u>Id</u>.

    • When Gabrielson did not continue to achieve such "results," McGoldrick repeatedly berated her:  In Gabrielson's review for the year 2001, McGoldrick stated that Kim had an "off year . . . results were not as expected or experienced in the past." McGoldrick made sure that Gabrielson understood the "importance of results" (*recall the "up or out" directive – Ex. 8 hereto*) and that he expected her to "have a huge impact in 2002." **Exhibit 13** hereto. McGoldrick contacted Gabrielson on two other occasions to discuss "any impediments to getting results" and the "lack of claim impacts by Kim this year and that cases must be worked on to get the results that we're committed to;" the "poor year that Kim had in 2001" and to emphasize that Kim needed to investigate more cases because "we need[] great results." **Exhibit 14** hereto.

    • Gabrielson blamed her "poor" performance, in part, to the challenge she encountered in training the staff in Aurora, Illinois (to which she had been transferred) to "change culture" and adopt "Hartford's way of approaching and investigating" (**Exhibit 13**), which at least one employee in Aurora characterized as the SIU investigators "**collecting data . . . to resolve the claim for business outcomes**" so they can "**get[] credit for reserve takedown**" including by "getting involved on claims that would not necessarily warrant SIU involvement." **Exhibit 15** hereto (H12805) (emphasis added.)

    A reasonable jury could  infer, from this new evidence, in conjunction with Hartford's misrepresentations, and the evidence described in Section III, <u>supra</u>, that Hartford pressured its SIU investigators to identify high reserve claims such as plaintiff's and to generate evidence to terminate those claims and, for this reason, SIU targeted plaintiff's claim for termination from the start, and intentionally misrepresented the duties of plaintiff's job to the Dr. Garg, failed to obtain an FCE when it learned that Dr. Garg's FCE results were fabricated, and also failed to question the validity of Dr. Garg's IME as it should have, and knowingly sent the false FCE and misleading and questionable IME report to other physicians to serve as a basis for their opinion, in furtherance of this improper purpose.  See <u>e.g.</u> <u>Hangarter</u>, at *28-31 (evidence that insurer sought to develop systems to target expensive claims like plaintiff's, and had a goal to achieve a "net termination ratio," which provided an incentive to terminate claims with high reserves supports jury finding that insurer initiated and conducted investigation in bad

faith.), aff'd, 373 F.3d at 1013.[15]

## IV.    THE COURT OVERLOOKED FACTS AND CONTROLLING LAW WITH RESPECT TO PLAINTIFF'S BREACH OF CONTRACT AND BAD FAITH CLAIMS AGAINST EDUCATORS RELATED TO THE ASSIGNMENT OF HER POLICY

The court held that plaintiff could not prevail on her breach of contract and bad

faith claims against Educators related to the assignment to Hartford because "McCulloch

has neither pointed to any case law nor to any contractual provision in her policy which

would prohibit such an assignment" and "McCulloch fails to present any other evidence

of Educators' bad faith." Ruling, pp.31, 32, 45-46, fn.6.   The court's ruling overlooks

the law, as well as Educators' undisputed conduct in executing the assignment and

thereafter, that establishes that Educators breached its obligations to plaintiff and acted in

bad faith or, at the minimum, presents an issue of fact for the jury.

### A. THE COURT OVERLOOKED EDUCATORS' VIOLATION OF C.G.S. 38a-66

The court's conclusion (Ruling, p.31)  that plaintiff failed to show that Educators

violated any legal or contractual requirement, overlooked C.G.S. § 38a-66, which

prohibited Educators from assigning plaintiff's policy to Hartford without first submitting

the agreement to the Insurance Commissioner for approval, and without requiring, as part

of the contract, that Hartford assume direct liability to plaintiff and provide plaintiff with

a certificate evidencing Hartford's assumption of liability. C.G.S. § 38a-66;[16] See also 31

---

[15]  In Hangarter, the court found that similar evidence showed that the insurer "focused on claims with a high reserve -- one to two million dollars, where the insured was a disabled professional who had been receiving benefits for months or years. Plaintiff fit this profile" – as did the plaintiff in this case. Hangarter, at *31.

[16]  By its terms, C.G.S. 38a-66 applies to any assumption reinsurance agreement "to be performed in this state." C.G.S. § 38a-66(a)

Pa. Code § 90i.1 *et seq.*[17]  Instead, as a matter of undisputed fact, Educators failed to

obtain the prior approval of the Insurance Commissioner, failed to require Hartford to

assume direct liability to plaintiff, and failed to require Hartford to provide plaintiff with

a certificate evidencing Hartford's assumption of liability.[18]

Moreover, this court overlooked that Educators not only failed to comply with the

requirements of C.G.S. § 38a-66,[19] but directly contravened those requirements, by (1)

specifically purporting to relieve Hartford of any direct liability to the claimants in the

contract[20]; (2) requiring Hartford to represent to the claimants that it was merely

administering their claim as an agent for Educators[21]; and (3) representing to the plaintiff

and the other claimants that it had merely contracted with Hartford to "administer your

disability claim.  This in no way affects your rights under your Certificate of

Insurance."[22]

---

[17]  Plaintiff pointed this out to the court in her memorandum in opposition to Educators' Motion
for Summary Judgment as well as in her memorandum in support of her Motion for Summary
Judgment as to Educators.  Pl. Memo. In Opposition to Educators' Motion for Summary
Judgment, Section B; Pl. Memo. in Support of Summary Judgment as to Educators, Section B(2)
& (3).

[18]  See Pl. Educ. Rule 56(a)(1) Stmt., ¶ 13; Educ. Rule 56(a)(2) Stmt., ¶ 13; Plaintiff's
Opposition to Educators' Motion, Exhibit 1 - Recitals and §§ 8.4, 9.4 (also attached to Hartford's
Motion as Htfd. Ex. B(1) and incorporated by reference into plaintiff's Motion re: Educators –
hereinafter "Agreement"); Exhibit 3 & Exhibit 7; and Educ. Ex. B(2) at p.71:4-24.

[19]  It is well established that "the laws in existence . . . are necessarily referred to in all contracts,
and forming a part of them as the measure of the obligation to perform them by the one party, and
the right acquired by the other."  General Motors Corp. v. Romein, 503 U.S. 181, 188, 112 S.Ct.
1105 (1992), quoting, McCracken v. Hayward, 2 How. 608, 11 L.Ed. 397 (1844); See also Ogden
v. Saunders, 25 U.S. 213 (1827) (a contract is fulfilled and its obligations discharged by
complying with whatever existing laws require in relation to such contract.)

[20]  See Agreement, Recitals & § 2.2, cited in Pl. Educ. Rule 56(a)(1) Stmt., ¶ 8; Pl. Educ. Rule
56(a)(2) Stmt., ¶ 11.

[21]  See Agreement, § 2.1.2, cited in Pl. Educ. Rule 56(a)(1) Stmt., ¶¶ 8, 11 & Pl. Educ. Rule
56(a)(2) Stmt., ¶ 11.

[22]  See Exhibit C(4) to Educators' Motion (also attached as Exhibit 3 to plaintiff's Opposition to
Educators' Motion and incorporated by reference into Plaintiff's Motion re: Educators); Pl. Educ.
Rule 56(a)(1) Stmt., ¶ 10; Pl. Educ. Rule 56(a)(2) Stmt., ¶ 13; Educ. Rule 56(a)(1) Stmt., ¶ 13.

Finally, this court overlooked that a reasonable jury could conclude that, having assigned plaintiff's policy to Hartford (Ruling, pp.4, 21, 33-34), Educators' representation to plaintiff and the other claimants that it had merely contracted with Hartford to "administer your disability claim" was false and misleading and made in bad faith. See AICCO Inc. v. Insurance Company of North America, 90 Cal. App. 4th 579; 109 Cal. Rptr. 2d 359 (2001) (letter from insurer that failed to disclose that it had transferred its contractual obligations to another insurer and, instead, implied that this insurer was merely "handling" the claims, constituted fraud and an unfair business practice.) (attached).[23]

## B. THE COURT OVERLOOKED EDUCATORS' ATTEMPT TO REPUDIATE ITS CONTRACT IN THIS ACTION

In concluding that plaintiff failed to present evidence that Educators engaged in any misconduct beyond its assignment of plaintiff's policy (Ruling, pp.31-32), this court also overlooked the undisputed evidence that Educators repudiated its very status as plaintiff's insurer in this litigation. See Educators' Memorandum of Law in Support of Motion for Summary Judgment (claiming that Educators had no legal obligation or liability to plaintiff in this action as a result of the assignment.); Ruling, p.29 ("Educators also argues that after execution of the reinsurance agreement it was no longer in contractual privity with McCulloch.") An insurer's attempt to evade its obligation under the insurance contract during litigation is a violation of the covenant of good faith. See also O'Donnell v. Allstate Ins. Co., 734 A.2d 901, 907 (Pa.Super.Ct. 1999).

---

[23] The court made this finding notwithstanding that, in AICCO, unlike in this case, the insurers had obtained the consent of the Insurance Commissioner prior to transferring the claims.

## V.    THE COURT OVERLOOKED MATERIAL FACTS AND MADE ERRORS OF LAW WITH RESPECT TO PLAINTIFF'S CUTPA CLAIM

This court granted both defendants judgment on plaintiff's CUTPA claim on the ground that (A) plaintiff "was not harmed by the reinsurance agreement itself – the practice that she claims violated CUTPA." and (B) "reinsurance agreements are not the type of practice that CUIPA was intended to prohibit" – *an argument that defendants did not advance in their motions,* and thus to which the court should permit plaintiff to respond. Ruling, pp.26, 32.

First, the court overlooked that the deceptive act and practice that plaintiff has alleged is **not** simply Educators' assignment of plaintiff's policy to Hartford via the so-called Reinsurance Agreement, but defendants' failure to obtain approval from the Commissioner of Insurance, notify the insureds of the assumption, and "furnish each such insured with a certificate evidencing such assumption of liability" as required by C.G.S. § 38a-66[24] and 31 Pa. Code § 90i.1 *et seq.,*[25] and defendants' misrepresentation regarding the nature of their agreement in order to avoid those statutory requirements. See Second Amended Complaint, ¶¶ 44-46; See also Pl. Oppos. to Hartford's Motion for Summary Judgment, pp.46-47. This is precisely the type of practice that CUIPA prohibits. C.G.S. § 38a-816(1), (5).[26]

---

[24]    By its terms, C.G.S. 38a-66 applies to any assumption reinsurance agreement "to be performed in this state." C.G.S. § 38a-66(a)

[25]    While this court correctly noted that "reinsurance agreements are common in the insurance industry and are regularly entered into without consequence" (Ruling, p.27), it overlooked that where, as here, an insurer seeks to assign it obligations and liability, it must obtain the consent of the Insurance Commissioner and obtain the consent of the insureds, or, at least, notify the insureds of the assignment on a form approved by the Commissioner. C.G.S. § 38a-66; 31 Pa. Code § 90i.1 *et seq.*; 18 Del. Code § 4944; 14-109 Appleman § 109.3 & fns. 20; .

[26]    C.G.S. § 38a-816(1)(a) prohibits an insurer from misrepresenting "the benefits, advantages, conditions or terms of any insurance policy" and C.G.S. § 38a-816(5) prohibits an insurer from making any statement "with intent to deceive any agent or examiner lawfully appointed to

Moreover, as this court has held that, through the Reinsurance Agreement, Educators assigned plaintiff's policy (Ruling, pp.4, 21, 33), it is now a matter of undisputed fact and law that defendants (1) repeatedly misrepresented the nature of their agreement to the claimants in violation of C.G.S. 38a-816(1)(a);[27]  AICCO Inc., 90 Cal. App. 4th at 589; and (2) failed to disclose the assignment to the Insurance Commissioner, obtain his approval, and notify the insureds,[28] as required by C.G.S. 38a-66, in violation of C.G.S. 38a-816(5).

However, plaintiff would entitled to pursue her CUTPA claim even if this conduct was not a violation of CUIPA, because defendants plainly violated C.G.S. § § 38a-66 and 31 Pa. Code § 90i.1 et seq., which are expressly directed to protecting the rights of insureds[29] and are thus remedial, and also repeatedly misrepresented the nature of their agreement to plaintiff and to the other claimants. See Premier Roofing Co., Inc. v. Insurance Company of North America, 1995 WL 107186 (Conn.Super., March 3, 1995) (holding plaintiff need not establish violation of CUIPA to state a claim under CUTPA, if

---

examine into its condition or into any of its affairs, or any public official to whom such insurer is required by law to report, or who has authority by law to examine into its condition or into any of its affairs, or, with like intent, wilfully omitting to make a true entry of any material fact pertaining to the business of such insurer in any book, report or statement of such insurer." Plaintiff cited these sections in her Complaint and in her opposition to Hartford's motion for summary judgment.

[27]  See Exhibit C(4) to Educators' Motion (also attached as Exhibit 3 to Plaintiff's Opposition and incorporated by reference into plaintiff's Motion); Exhibit 4 to Plaintiff's Opposition to Educators' Motion (incorporated by reference into plaintiff's Motion); Pl. Educ. 56(a)(1) Stmt., ¶¶ 10, 11; Pl. Educ. 56(a)(2) Stmt., ¶ 13; Pl. Educ. 56(a)(2) Stmt. – Add'l Facts, ¶ 1; Educ. 56(a)(1) Stmt., ¶ 13;.

[28]  See Pl. Educ. 56(a)(1) Stmt., ¶¶ 13, 37; Educ. 56(a)(2) Stmt., ¶¶ 13, 37; Exhibits 3 & 7 to Plaintiff's Opposition to Educators' Motion (incorporated by reference into plaintiff's Motion); Exhibit B(2), p.71:4-24 to Educators' Motion (incorporated by reference into plaintiff's Motion).

[29]  Connecticut subjects "bulk reinsurance" agreements to review by the Insurance Commissioner specifically to ensure that they are "fair and equitable," that they would not "reduce the provision of service to policyholder", and that they require the assuming insurer to actually assume direct liability to the claimants for its actions and furnish the insureds with a certificate evidencing this assumption of liability, which Hartford did not do in this case. C.G.S. § 38a-66(b). See also, 18 Del. Code § 4944(b)(1)-(3); 31 Pa. Code § 90i.1(a), 90i.2, 90i.3.

plaintiff can show defendant violated another remedial law or other bad faith conduct.);
AICCO Inc., 90 Cal.App.4[th] at 589.

Second, having misconstrued the nature of plaintiff's claim, this court also
overlooked the evidence that plaintiff presented, from which a jury could conclude that
plaintiff was harmed by the defendants' deception. As a direct and proximate result of
defendants' deception, plaintiff suffered the ascertainable loss of her statutory right under
C.G.S. § § 38a-66 to (a) the protections afforded by the Insurance Commissioner's
oversight of the agreement by which an insurer assigns its rights and liabilities to the
insured to another insurer; (b) be informed of this assignment; and to (c) receive a
certificate evidencing Hartford's assumption of liability, and also incurred expenses to
obtain the information that defendants' were statutorily required to provide to her at the
time they entered the agreement.[30] Bridgestone/Firestone Tires Prod. Liab. Litig, 155
F.Supp.2d 1069, 1098 (S.D.Ind. 2001) (the loss in a consumer protection claim can arise
solely from receiving something different from, rather than less than, what was
represented to the plaintiff), citing, Hinchcliffe v. American Motors Corp., 184 Conn.
607, 612-619, 440 A.2d 810 (1981); Josey v. Filene's, Inc., 187 F.Supp.2d 9, 15 (D.Conn.
2002) (Hall, J.) (denying motion for summary judgment because deprivation of personal
property for 45 minutes could constitute ascertainable loss under CUTPA.)[31] Further, a
jury could reasonably conclude that this loss was not only foreseeable to defendants, but
that the express purpose for defendants' deception was to avoid complying with these

---

[30]  See Exhibit 5 to Plaintiff's Motion re: Educators; Pl. Educ. 56(a)(1) Stmt. ¶¶ 39-42; Pl. Educ.
56(a)(2) Stmt. – Add'l Facts, ¶¶ 2-8, 11,
[31]  See also Bristol Technologies v. Microsoft Corp., 114 F.Supp.2d 59, 78 (D.Conn. 2000) (Hall,
J.).

statutory mandates for the claimants' protection.[32]

Third, the court overlooked that, because the loss in a consumer protection claim can arise solely from receiving something _different from_, rather than _less than_, what was represented to the plaintiff, plaintiff need not prove that, but for defendants' misconduct, she would still be receiving her benefits. In re Bridgestone/Firestone Tires Prod. Liab. Litig, 155 F.Supp.2d 1069, 1098 (S.D.Ind. 2001) (emphasis in original.) (holding plaintiffs alleged ascertainable loss where tires were different from what was represented, and that they need not show that but for the difference, they would have received a higher price when selling or trading in their cars or that the tread separated from their tires), citing, Hinchcliffe, supra; Peck v. Public Service Mut. Ins. Co., 114 F.Supp.2d 51, 58 (D.Conn. 2000) (Goettel, J.) (plaintiff, subrogee of insured under direct action statute, alleged "ascertainable damages" where she had an unpaid judgment for which the defendant insurer may or may not be liable.)

Fourth, this court overlooked evidence from which a jury could conclude that Hartford's bad faith investigation and termination were of the "same general nature as the foreseeable risk created by the defendant's" failure to comply with C.G.S. 38a-66.[33] Both Pennsylvania, where Educators resides, and Connecticut, where the assignment was to be peformed, require that where, as here, a party is given both the reserves associated with a claim and the authority to administer that claim, that party must assume direct liability to the insureds.  C.G.S. § 38a-66; 31 Pa. Code § 90i.1 _et seq._.  The legislatures of

---

[32]    See Exhibit 1 to plaintiff's Motion re: Educators, at pp.84-85, cited, in Pl. Educ. 56(a)(1) Stmt., ¶ 6.
[33] "The issue of proximate cause is ordinarily a question of fact for the trier . . . if there is room for reasonable disagreement the question is one to be determined by the trier of fact." Doe v. Manheimer, 212 Conn. 748, 756-57, 563 A.2d 699 (1989), modified, Stewart v. Federated Department Stores, Inc., 234 Conn. 597, 608, 662 A.2d 753 (1995)

at least thirty states, including Pennsylvania, where Educators resides, have concluded

that the risk of unfair claim administration that exists where a party that has not assumed

direct liability to the insureds is given the authority to administer claims, and financial

interest in the outcome of its administration, is so great that they have outlawed such

contracts. [34] A reasonable jury could thus conclude that Hartford's bad faith

administration and termination were a direct result of the financial interest it obtained in

conjunction with its failure to assume direct liability to the claimants, as required by

C.G.S. § 38a-66.

The new evidence that plaintiff has obtained further supports that she was injured

as a result of the so-called Reinsurance Agreement.  This evidence discloses that the

Director of Hartford's SIU specifically encouraged Gabrielson, the SIU investigator

assigned to plaintiff's claim, to achieve "results" – meaning reserve releases -

"particularly of the takeover claims."  **Exhibit 11** hereto (H12265-69, at 12268.)

## VII.  THE COURT OVERLOOKED MATERIAL FACTS AND MADE ERRORS OF LAW WITH RESPECT TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO HARTFORD'S COUNTERCLAIM

### A.    THE COURT'S CONCLUSION THAT HARTFORD HAS STANDING WAS BASED ON A MISCONSTRUCTION OF THE FACTS

The court concluded that, "[b]ecause Hartford paid consideration to Educators for

the transfer of those reserves [associated with plaintiff's claim], its injury was direct."

Ruling, p.35.  Hartford did not argue that it had paid Educators money in exchange for

the transfer of reserves, and did not present any evidence that it did so.  Nor could it have

done so.  The integrated contract, provides only for the payment of consideration by

Educators (§§ 4.2, 12.9), and, although defendants have characterized the agreement as a

---

[34] See e.g. Fla. Stat. Ann. § 626.888 (2004); Pa. Stat. Ann., tit.40.

"sale of claims" or "buy out", they have admitted that, in fact, Educators paid Hartford, not the other way around.[35]

Additionally, while "the right to bring an action, such as to collect a debt, may be assigned" (Ruling, p.35, citing, Schoonemaker v. Lawrence Brunoli, Inc., 265 Conn. 210, 227 (2003)), Hartford presented absolutely no evidence that Educators had, in fact, assigned this right to Hartford. The integrated contract does not contain any such assignment, and there is no evidence in the record that the parties executed such an assignment.

**B.    THE COURT'S CONCLUSION THAT HARTFORD SUFFERED DAMAGES IS BASED ON A MISCONSTRUCTION OF THE FACTS**

Plaintiff sought summary judgment on Hartford's counterclaim for the additional reason that Hartford could not establish damages. This court held that "[p]rimarily, McCulloch's argument fails because it ignores the fact that Hartford paid marginally more consideration to Educators to obtain the right to the reserves allocated to her claim . . . If McCulloch's claim had not been one of the claims that Educators transferred to Hartford . . . Hartford, in turn, would have presumably paid marginally less consideration to Educators." Ruling, p.36. As set forth in Section A, supra, Hartford did not make this argument, nor could it have, because there is nothing in the record to support that Hartford paid any consideration to Educators to obtain the right to the reserves, much less that Hartford would have paid less money to Educators had plaintiff's claim been excluded from the agreement. The evidence in the record, the integrated agreement, does not require Hartford to pay any money to Educators beyond returning to Educators any

---

[35]    Exhibits 1 and 7, pp.47-48 to Plaintiff's Opposition to Educators' Motion, cited in Pl. Rule 56(a)(2) Stmt. in Opposition to Educators' Motion for Summary Judgment, ¶ 12 and incorporated by reference into plaintiff's Motion re: Educators (Pl. Educ. 56(a)(1) Stmt., ¶ 37.).

**overpayment** that Educators made to Hartford. Htfd. Ex. B(1), § 4.3.3 (incorporated by reference into plaintiff's motion for summary judgment). Thus, it is a matter of undisputed fact that Educators supplied Hartford with all of the money from which it paid plaintiff's benefits, and Hartford financially benefit.[36]

The court's second reason for denying plaintiff's motion is that there is no genuine issue that plaintiff was disabled at the time the agreement was executed, and thus, plaintiff has not shown a causal connection between her alleged misrepresentation and Hartford's receipt of money from Educators. Ruling, pp.37, 40-41.[37] This conclusion overlooks that Hartford's "theory of liability" is that plaintiff's claim was fraudulent from its inception and it presented, and that Hartford intends to present testimony purporting to show that plaintiff was <u>never</u> disabled and, further, that the evidence in Educators files <u>at the time of the agreement</u>, showed that plaintiff was not disabled. <u>See</u> First Affirmative Defense and Counterclaim (alleging that plaintiff misrepresented that she was disabled in her January 7, 2000 claimant questionnaire); Htfd. Supp. Ex. B in Support of its Motion for Summary Judgment, pp. 1, 4-12 ("expert" report, claiming that plaintiff was never disabled and that the records in Educators file at the time of the agreement showed this). Thus, plaintiff has presented undisputed evidence of facts that Hartford itself alleges, had they been known by Educators, would have allegedly led Educators to terminate

---

[36] <u>See</u> Htfd. Ex. B(1), Schedule 1.20 at EDUC 0149; Pl. Ex. 5 in support of Motion re: Educators; Pl. Ex. NN at H3641-42 and Pl. Ex. E, p.64 submitted in opposition to Hartford's Motion and incorporated by reference into plaintiff's Motion re: Hartford – all <u>cited</u> in Pl. 56(a)(1) Stmt. re: Hartford, ¶ 32 & Hartford's Rule 56(a)(2) Stmt. in Opposition, ¶ 32.

[37] <u>See also</u> Ruling, p.40 ("Hartford does not allege that McCulloch misrepresented her disability at the time it entered into the reinsurance agreement. Instead it alleges that she initially misrepresented her disability one year after, on August 14, 2000 . . . no genuine issue exists that McCulloch was disabled at the time the agreement was executed. Thus, there is no record evidence of any set of facts which, had they been known to Hartford, would have led it to abort the agreement with Educators.")

plaintiff's benefits and withdraw plaintiff's claim, and the associated reserves, from the agreement.

**C.     THE COURT'S RULING ON THE WAIVER, ESTOPPEL AND "MEND THE HOLD" ARGUMENT OVERLOOKED A SUBSTANTIAL PORTION OF PLAINTIFF'S MOTION ON THIS ISSUE, AND OVERLOOKED RELEVANT EVIDENCE REGARDING THIS ARGUMENT**

In addition to her other arguments, plaintiff argued, that defendants and waived and were estopped from seeking, through the first affirmative defense and counterclaim, to establish that plaintiff was not disabled <u>prior</u> to August 14, 2000.  Pl. Motion for SJ, §§ C, D & fn.6.  While court held that there were disputed issues of fact as to whether Hartford took actions to induce plaintiff to believe, to her prejudice, that she was entitled to disability benefits <u>after</u> August 14, 2000, it overlooked, and did not rule on, plaintiff's argument that defendants took actions to induce plaintiff to believe, to her prejudice, that she was entitled to disability benefits <u>before</u> August 14, 2000.  Ruling, pp.42-43.

The court overlooked the undisputed evidence that defendants have alleged, and intend to present testimony in this action, purporting to show that plaintiff was not disabled between October 1995 and August 2000, and that the records she provided to defendants during this time period, which both Educators and Hartford represented to plaintiff were sufficient to establish that plaintiff was entitled to benefits, actually showed that plaintiff was not entitled to benefits during that time period.  Pl. 56(a)(1) Stmt. re: Hartford, ¶¶ 8, 21, 23, 25.[38]

Having overlooked this evidence, the court also overlooked the unrefuted evidence that plaintiff presented, showing that, prior to this action, defendants led

---

[38]  Plaintiff cited the following evidence: Htfd. Supp. Ex. B (in further support of Hartford's motion), pp.1, 4-12 incorporated by reference into plaintiff's motion; Counterclaim, First Affirmative Defense and Count 1.

plaintiff to believe that her entitlement to benefits between October 1995 and August 14, 2000 was not in dispute. Pl. 56(a)(1) Stmt re: Hartford, ¶¶ 2-4, 17, 23-24, 26.[39]  Indeed, this court, itself, believed that "no genuine issue exists here that McCulloch was disabled at the time the agreement was executed."  (Ruling, p.40) and that "the record indicates that Hartford consistently maintained that McCulloch ceased to meet the policy's definition of total disability as of August 14, 2000" and not before.  Ruling, p.43.

Plaintiff also presented undisputed evidence that defendants' representations prejudiced plaintiff's ability to establish the existence of her disability during the period of October 1995 and August 2000.  Pl. Ex. 3 in Support of her Motion re: Hartford, cited in Pl. 56(a)(1) Stmt. re: Hartford, ¶ 28.  If Educators had informed plaintiff, in 1995, or 1996, or 1997 or 1998 or 1999 that the medical records she submitted at that time were insufficient to establish her entitlement to benefits, or that her medical records actually showed that she was not disabled as it presently intends to do, plaintiff could have, and would have, sought additional medical evaluations, including an FCE, to establish her functionality at that time, as she had done on every previous occasion where Educators had questioned the sufficiency of plaintiff's medical records.  Id. & fn.39, supra. Similarly, if Hartford had informed plaintiff, in the second half of 1999 or the first half of 2000, that the medical records she submitted at that time were insufficient to establish her

---

[39]  Plaintiff cited the following evidence: Htfd. Ex. A(30); Pl. Exs. G, S, T, in Opposition to Hartford's Motion (incorporated by reference in to plaintiff's motion) and Pl. Exs. 1 & 3, ¶¶ 5-6 in Support of her Motion.  While Hartford responded that, on a number of occasions during its administration, Educators had questioned plaintiff's continuing disability and required her to furnish updated evidence to support her claim, this does not change the fact that, on each of those occasions, plaintiff provided Educators with updated evidence, which Educators represented to plaintiff was sufficient to establish her continuing entitlement to benefits, and that, just prior to transferring her file to Hartford, Educators represented to plaintiff that "[i]n review of your file, it is clearly documented that you have sustained functional limitations which prevent you from performing the substantial requirements of your occupation."  Pl. Ex. T, cited in Pl. 56(a)(1) Stmt. re: Hartford, ¶ 4.

entitlement to benefits, or that her medical records actually showed that she was not disabled, as it presently indends to do, plaintiff could have, and would have, sought additional medical evaluations, including an FCE, to establish her functionality at that time. Id.

In sum, as a direct result of defendant's representations that the records that plaintiff submitted between October 1995 and August 2000 were sufficient to establish her disability, plaintiff did not obtain additional examinations to establish her inability to perform the material duties of her occupation during that period – and she obviously cannot do so now. Id. "[A]fter the insured's proofs of loss are accepted by the insurer, there is an obligation on the insurer to point out any defects or deficiencies in the proofs of loss . . . An insurer that fails to seasonably object to a proof of loss statement submitted in good faith waives its right to complain about any defects in the statement during subsequent litigation." City of Burlington v. Hartford Steam Boiler Inspection & Ins., 190 F.Supp.2d 663, 682-683 (D.Vt. 2002), cited in Ruling, p.44.[40] Thus, allowing defendants to present testimony that the medical records she submitted prior to August 2000 were insufficient to establish her entitlement to benefits at that time would result in manifest injustice to plaintiff.

---

[40] In City of Burlington, the insurer invoked a faulty workmanship exclusion to deny a claim – it did not attempt to challenge the sufficiency of the insured's proof of loss. However, the court held that the insurer would have been estopped from challenging the sufficiency of the insured's proof of loss in litigation if it had failed to timely apprise the insured of the deficiency in its proof. Significantly, the court made this conclusion notwithstanding its previous recognition that the defendant had reserved its rights.

**CONCLUSION**

For the foregoing reasons, plaintiff respectfully requests that the court reconsider its ruling and (1) Deny Hartford's Motion for Summary Judgment; (2) Deny Educators' Motion for Summary Judgment; and (3) Grant plaintiff's Motion for Summary Judgment.

PLAINTIFF,
CANDI McCULLOCH

By: _____

Eliot B. Gersten, Esq.
Fed. Bar No. ct05213
GERSTEN & CLIFFORD
214 Main Street
Hartford, CT 06106
Tel: (860) 527-7044
Her Attorney