<u>APPENDIX</u>

**COURT'S FINDING**

"[T]here is no evidence that Hartford knew that Dr. Garg had not conducted the [FCE] examination." Ruling, p.18.

"[T]he information Hartford obtained gave it a legitimate reason to terminate McCulloch's disability benefits." Ruling, p.18.

"[T]here is no evidence to indicate that it [Hartford] was motivated to [terminate plaintiff's benefits] by fraud or ill-will."  Ruling, p.23

> **A.    THE COURT OVERLOOKED EVIDENCE FROM WHICH A JURY COULD CONCLUDE THAT HARTFORD KNOWINGLY RELIED ON, AND DISTRIBUTED, <u>FALSE TEST RESULTS</u>**

| OVERLOOKED SUPPORTING EVIDENCE | CITE IN RECORD |
|---|---|
| On September 8, 2000, Dr. Garg provided Hartford with an IME report. | Htfd. Ex. A(22), and Htfd. Stmt., ¶ 57.[1] |
| On September 14, 2000, Hartford contacted Dr. Garg to request the results of the FCE for which Hartford had paid her. | Htfd. Ex. A(5) at 2451 (log entry dated 9/11/00 – paid final charges for IME/FCE Dr Asha Garg, $675 & log entry dated 9/14/00 – requesting FCE.) and Htfd. Stmt., ¶ 61. |
| One week later, on September 21, 2000, Dr. Garg sent Hartford a document that purported to a "summary of a Functional Capacities Evaluation done on August 14, 2000." | Htfd. Ex. A(23), attached hereto as **Exhibit 4,** and Htfd. Stmt., ¶ 62**.** |
| On <u>September 28, 2000</u>, Hartford employee, Nurse Esson, received and reviewed the "FCE Summary" and immediately contacted Dr. Garg's office to inquire about the underlying testing, at which time Dr. Garg's receptionist informed her that **"EE [employee] did not have any testing done."** | Htfd. Ex. A(5) at 2449-2450, <u>cited</u> in Pl. Stmt., ¶¶ 63, 66 & Pl. Stmt.-Add'l Facts, ¶¶ 73, 98 and attached hereto as **Exhibit 1**. |
| **Educators has admitted that** "**Hartford** . . . **learn[ed] Dr. Garg had not performed an FCE** . . . <u>**September 28, 2000**</u>." | Educ. Rule 56(a)(2) Stmt. in Opp. to Pl. MSJ, ¶ 24, to which plaintiff directed the court in her Reply to Educ. Rule 56(a)(2) Stmt., ¶ 24. |
| On <u>October 13, 2000</u>, which is two weeks after Hartford learned that Dr. | Htfd. Ex. A(26), <u>cited</u> in Pl. Stmt., ¶ 66; Pl. Stmt. – Add'l Facts, ¶ 78. |

---

[1]  Citations to "Htfd. Ex." refer to the exhibits that Hartford submitted in support of its Motion for Summary Sudgment ("Motion"). Citations to "Pl. Ex." refer to the exhibits that plaintiff submitted in opposition to Hartford's Motion.  Citations to "Htfd. Stmt." refer to Hartford's Rule 56(a)(1) Statement in Support of its Motion.  Citations to "Pl. Stmt." refer to plaintiff's Rule 56(a)(2) Statement in Opposition to Hartford's Motion.  Citations to "Pl. Stmt. – Add'l Facts" refer to the Additional Undisputed Facts portion of her Rule 56(a)(2) Statement in Opposition to Hartford's Motion.

| | |
|---|---|
| Garg had misrepresented that she had conducted an FCE and fabricated the "FCE Summary," Hartford sent Dr. Garg's questionable IME report, and the sham "FCE" results to plaintiff's doctors, including Dr. Magana, to serve as a basis for their opinion on plaintiff's functionality. | |
| On November 9, 2000, which is over one month after Hartford learned that Dr. Garg had misrepresented that she had conducted an FCE and fabricated the "FCE Summary," Hartford gave Dr. Garg's questionable IME report, and the sham "FCE" results to its contracted physician reviewer, Dr. Amato, to serve as a basis for his opinion on plaintiff's functionality. | Htfd. Ex. A(29), cited in Pl. Stmt. – Add'l Facts, ¶ 78. |
| On November 17, 2000, which is almost two months after Hartford learned that Dr. Garg had misrepresented that she had conducted an FCE and fabricated the "FCE Summary," Hartford stated that, among other things, it "based [its] decision to terminate her claim . . . upon . . . Functional Capacities Evaluation (FCE) reports for services performed by Asha Garg, M.D." and then quoted the "results" of the FCE, which it knew had not been performed, as support for its termination. | Htfd. Ex. A(30), cited in Pl. Stmt. – Add'l Facts, ¶ 100. |
| The Hartford employee who wrote the termination letter admitted that she "place[d] a great deal of reliance on Dr. Garg's opinion" in terminating plaintiff's benefits. | Pl. Ex. D, p.263:13-19, cited in Pl. Stmt. – Add'l Facts, ¶ 100. |
| On November 6, 2003, Hartford successfully misled this court to believe that Hartford did not know that Dr. Garg had fabricated the "FCE Summary" until after it terminated plaintiff's benefits. | See Hartford's Reply in Support of Summary Judgment, p.9 (claiming this information was "unbeknownst to Hartford until later . . ."); Ruling, p.18. |

**B.      THE COURT OVERLOOKED EVIDENCE FROM WHICH A JURY COULD CONCLUDE THAT HARTFORD INTENTIONALLY MISREPRESENTED THE DUTIES OF PLAINTIFF'S OCCUPATION TO THE IME PHYSICIAN FOR THE PURPOSE OF OBTAINING AN OPINION THAT PLAINTIFF COULD RETURN TO WORK**

| OVERLOOKED SUPPORTING EVIDENCE | CITE IN RECORD |
|---|---|
| The IME physician, Dr. Garg testified that Hartford asked her to base her analysis of plaintiff's ability to work as a physician on whether plaintiff "can do the office work – office practice for 16 hours a week, <u>and not including any procedures or anything;</u>" "that's what I was asked – office practice, not doing any procedures"; "I was asked if she can do 16 hours of work a week office practice, not doing any procedures.") | Pl. Ex. UU, p.180:17-23; p.254:17-19; 262:3-5, <u>cited</u> in Pl. Stmt. – Add'l Facts, ¶¶ 59 & 61 and attached hereto as **Exhibit 5.** |
| Hartford's policies provide that, for purposes of determining whether a claimant is totally disabled, the term Aoccupation@means Athe occupation as it is recognized in the general workplace. It does not mean the specific job that an individual is performing for a specific employer or at a specific location@and that Aan employee=s essential duties are usually defined in his/her position description.@ | Pl. Ex. VV(2) <u>cited</u> and <u>quoted</u> in Pl. Htfd. Stmt. – Add'l Facts, ¶ 58. |
| Plaintiff's position description states that plaintiff's "essential duties" included providing "urgent/emergent cares as required"; as well as performing "various invasive medical procedures that include, but are not limited to, the injection of medications, inoculations, vaccinations and performance of a phlebotomy." | Htfd. Ex. A(4) at H1231-1233, <u>cited</u> and <u>quoted</u> in Pl. Stmt. – Add'l Facts, ¶ 3. |
| The IME physician, Dr. Garg testified that, to her knowledge and in her experience, internists must be capable of doing procedures such as "tests, examinations, procedures like injection . . . or testing the different things - - lumbar puncture, proctoscopy, or anything – rectal exam" and "an internist has to be available for acute emergencies." | Pl. Ex. UU., pp.188:16-18, 242:14-19, <u>cited</u> in Pl. Stmt. – Add'l Facts, ¶¶ 61-62, 96 and attached hereto as **Exhibit 5**. |

**C. THE COURT OVERLOOKED EVIDENCE FROM WHICH A JURY COULD CONCLUDE THAT HARTFORD INTENTIONALLY FAILED TO SCHEDULE AN FCE AND QUESTION THE IME AND, INSTEAD FORWARDED THESE RESULTS TO OTHER PHYSICIANS TO MISLEAD THEM AND TO GENERATE EVIDENCE TO SUPPORT TERMINATING PLAINTIFF'S BENEFITS**

| OVERLOOKED SUPPORTING EVIDENCE | CITE IN RECORD |
|---|---|
| The Disability Case Manager testified that, upon discovering that Dr. Garg had fabricated the results of an FCE, Hartford should have "immediately set up a real FCE and then question what was going on with  Dr. Garg." | Pl. Ex. OO, pp.142-143, cited in Pl. Stmt., ¶ 66 & Pl. Stmt. – Add'l Facts, ¶¶  69-70, 76-77, and attached hereto as **Exhibit 2**. |
| The Disability Case Manager testified that the "FCE would have been essential to the IME . . [b]ecause the reason for the IME was to – was to find out what Ms. McCulloch's functional capabilities were." | Pl. Ex. OO, p.123:4-9, cited in Pl. Stmt. – Add'l Facts, ¶  69-70, 76-77 and attached hereto as **Exhibit 2**. |
| The Disability Case Manager testified that the IME report showed that "the lady has limitations . . . The FCE was supposed to tell me what those limitations were." | Pl. Ex. OO, p.182:9-11, cited in Pl. Stmt.– Add'l Facts, ¶¶  69-70, 76-77 and attached hereto as **Exhibit 2**. |
| The Disability Case Manager and contracted physician reviewer, Dr. Amato, testified that any healthcare professional that received the FCE report that Dr. Garg provided to Hartford would believe that the report reflected the results of an FCE that Dr. Garg had performed. | Pl. Ex. OO, p.149:12-19, cited in Pl. Stmt. – Add'l Facts, ¶ 74 and attached hereto as **Exhibit 2.** Pl. Ex. WW at 56-57, cited in Pl. Stmt. – Add'l Facts, ¶ 74 and attached hereto as **Exhibit 3.** |
| The Disability Case Manager testified that video surveillance, alone, was not sufficient to justify a conclusion that plaintiff had misrepresented her abilities or that plaintiff could perform the material duties of her occupation because even though, in the video surveillance, plaintiff "showed an ability," **"it's a known. It's a given"** that **"those with chronic pain will have good days and bad days" – in the absence of an examination, there was no way to know "if that was a good day and if she was actually not capable or capable of performing in her occupation."**" Irrespective of the video tape, **"[a] doctor has got to examine her** and tell me what is her functionality, what is the middle line." | Pl. Ex. OO, p.76:1-77:77, 92:13-17, 94:3-11, cited in Pl. Stmt. – Add'l Facts, ¶¶  69-70 and attached hereto as **Exhibit 2**. |
| The Director of Long Term Disability testified that, as of October 11, 2000 (which was after Hartford had received the video tape, IME and FCE, but before Hartford had received the opinions of Drs. Magana and Amato),"we still ha[d] some work to do before we [could] make our decision." | Pl. Ex. HH, p.66:3-12, cited in Pl. Opposition, p.36. |

**D. THE COURT OVERLOOKED EVIDENCE FROM WHICH A JURY COULD CONCLUDE THAT, AT THE TIME HARTFORD TERMINATED PLAINTIFF'S BENEFITS, HARTFORD DID NOT HAVE ANY RELIABLE MEDICAL OPINION THAT PLAINTIFF WAS CAPABLE OF PERFORMING THE DUTIES OF AN INTERNIST AND IT KNEW THIS**

**1. The Court Overlooked Evidence From Which A Jury Could Conclude That, In Addition to Being Unreliable, the Opinion of Dr. Garg Was Based On Hartford's Misrepresentation of Plaintiff's Job Duties, and the Opinions of Drs. Amato and Magana Revealed, On Their Face, That They Had Relied On The Fabricated FCE Results and Dr. Garg's Tainted and Unreliable IME Opinion**

| OVERLOOKED SUPPORTING EVIDENCE | CITE IN RECORD |
|---|---|
| Dr. Garg testified that, when she opined that plaintiff could work 16 hours per week as an internist, "what I was talking about is that she [plaintiff] can do 16 hours of office practice, not doing procedures . . .", as Hartford had characterized plaintiff's job. | Pl. Ex. UU, pp.181:19-182:5, <u>cited</u> in Pl. Stmt. – Add'l Facts, ¶¶ 61-62 and attached hereto as **Exhibit 5.** |
| Dr. Garg testified that it was her opinion, both before and after viewing the video that plaintiff was only capable of "light duty work," meaning "no procedures" such as "tests, examinations, procedures like injection . . . or testing the different things - - lumbar puncture, proctoscopy, or anything – rectal exam." | Pl. Ex. UU, p242:2-243:6, <u>cited</u> in Pl. Stmt. – Add'l Facts, ¶¶ 61-62 and attached hereto as **Exhibit 5.** |
| The Disability Case Manager testified that the IME report showed that "the lady has limitations . . . The FCE was supposed to tell me what those limitations were." | Pl. Ex. OO, p.182:9-11, <u>cited</u> in Pl. Stmt.– Add'l Facts, ¶¶ 69-70, 76-77 and attached hereto as **Exhibit 2**. |
| Hartford's contracted physician reviewer, Dr. Amato, testified that he did, in fact, assume that the FCE "summary" reflected the results of an FCE that had been performed - no one at Hartford had told him that Dr. Garg had provided the "results" of an FCE that she had never performed. | Pl. Ex. WW at 56-57, 63, <u>cited</u> in Pl. Stmt., ¶ 73 and attached hereto as **Exhibit 3**. |
| Drs. Magana and Amato specifically referred to, and relied on, the FCE report. | Htfd. Ex. A(28) (Magana response, quoting and adopting the results of the FCE that was never performed); Htfd. Ex. A(29) (Amato notes: "FCE & IME Dr. Garg support ability to perform lite [sic] work."), both <u>cited</u> in Pl. Stmt. – Add'l Facts, ¶ 99. |

**2. The Court Overlooked Evidence That, In The Absence of the FCE, Dr. Garg's IME Report Was Insufficient To Establish Plaintiff's Ability To Perform The Material Duties of Her Occupation**

| OVERLOOKED SUPPORTING EVIDENCE | CITE IN RECORD |
|---|---|
| The Disability Case Manager testified that the IME report showed that "the lady has limitations . . . The FCE was supposed to tell me what those limitations were." | Pl. Ex. OO, p.182:9-11, cited in Pl. Stmt.– Add'l Facts, ¶¶ 69-70, 76-77 and attached hereto as **Exhibit 2**. |
| The Disability Case Manager testified that the "FCE would have been essential to the IME . . [b]ecause the reason for the IME was to – was to find out what Ms. McCulloch's functional capabilities were." | Pl. Ex. OO, p.123:4-9, cited in Pl. Stmt. – Add'l Facts, ¶ 69-70, 76-77 and attached hereto as **Exhibit 2**. |
| Dr. Garg reported that, although plaintiff did not "show any signs of <u>facial</u> expression about being pain," plaintiff did exhibit other signs of pain: "[d]uring interview she kept changing her position from sitting to standing. . . At the end of the examination she took Ultram," which is a pain reliever.  Dr. Garg testified that these activities indicated that plaintiff was in pain.[2] | Htfd. Ex. A(23), p.4; Pl. Ex. UU, p.185, 236, cited in Pl. Stmt., ¶ 58 and attached as hereto as **Exhibit 5**. |
| Dr. Garg reported that plaintiff's "range of motion was . . . painful in all directions."[3] | Htfd. Ex. A(23), p.4, cited in Pl. Stmt., ¶ 58. |
| Dr. Garg reported that plaintiff's cervical spine was "hypersensitive to touch" and "painful," that "SLR on the right side was painful . . . with low back pain radiating to gluteal region . . . Left side it was painful . . ." and made the **objective** finding that plaintiff had muscle spasms in her "lower cervical paraspinal muscles, trapezius muscles, as well as upper back muscles," in addition to spasms in the lumbrosacral and gluteal region.  Dr. Garg's "Diagnosis" included that plaintiff suffered from "lumbosacral strain" "disk bulging and protruded disk at L4-5 level and exaggeration of the neck injury secondary to motor vehicle accident" and that, as a result, plaintiff suffered from "chronic pain."[4] | Htfd. Ex. A(23), cited in Pl. Stmt., ¶ 58. |

---

[2]   The court overlooked this evidence and mistakenly relied on Hartford's characterization of Dr. Garg's preliminary report as stating that plaintiff "did not show any sign of being in pain during the examination."  Ruling, pp.8-9; Htfd. Rule 56(a)(1) Stmt., ¶ 58.

[3]   The court overlooked this evidence and mistakenly relied on Hartford's characterization of Dr. Garg's preliminary report as simply stating that plaintiff had a "normal range of motion." Ruling, p.9; Htfd. Rule 56(a)(1) Stmt., ¶ 58.

[4]   The court overlooked this evidence when it mistakenly adopted Hartford's characterization that Dr. Garg reported that plaintiff had "slight pain in her cervical spine and lumbrosacral region."  Ruling, pp.8-9; Htfd. Rule 56(a)(1) Stmt., ¶ 58.

3. **The Court Overlooked The Evidence That, Even If Reliable, The Opinions Of Drs. Garg and Magana Could Not Support The Conclusion That Plaintiff Was Capable Of Performing The Material Duties Of Her Occupation**

| OVERLOOKED SUPPORTING EVIDENCE | CITE IN RECORD |
| --- | --- |
| Dr. Magana concluded that plaintiff could only "work where she does no bending below the waist." | Htfd. Ex. A(28), <u>cited</u> in Pl. Stmt. ¶ 70; Pl. Stmt. – Add'l Facts, ¶ 86 |
| Dr. Garg concluded that plaintiff was restricted from "[f]requent bending." | Htfd. Ex. A(23) – attached hereto as **Exhibit 4.** |
| Working "to perform work in internal medicine requires much bending . . ." | Pl. Ex. M, pp.4-5, <u>cited</u> in Pl. Stmt. – Add'l Facts, ¶ 87. |

E. **THE COURT OVERLOOKED EVIDENCE FROM WHICH A JURY COULD FURTHER CONCLUDE THAT HARTFORD'S INVESTIGATION WAS IN BAD FAITH**

   1. **The Court Overlooked Evidence That Hartford Misrepresented The Purpose Of The IME**

| OVERLOOKED SUPPORTING EVIDENCE | CITE IN RECORD |
| --- | --- |
| In correspondence with plaintiff in July 2000, Hartford represented that it sought an IME/FCE "in order to *offer* any vocational rehabilitation benefits," to determine a "long-term case management plan," and "if there are any other benefit provision for which you may qualify." | Pl. Ex. RR, <u>cited</u> in Pl. Stmt. – Add'l Facts, ¶ 56. |
| In fact, Hartford employees have admitted that they sought the IME and FCE because, as a result of the surveillance video, they purportedly believed plaintiff had misrepresented her limitations. | Pl. Exs. V at 140 & OO at 43-44, 157-159, <u>cited</u> in Pl. Stmt. – Add'l Facts, ¶ 56. |
| The Director of the SIU stated, before Hartford had even received the IME/FCE report, that he believed "everyone was in total agreement that this [plaintiff=s] claim was on the verge of being terminated." | Pl. Ex. V at 173-175, 277, 280, <u>cited</u> in Pl. Stmt. – Add'l Facts, ¶ 56. |

2.    **The Court Overlooked Evidence That Hartford Improperly Failed To Inform Plaintiff That It Sent The IME, FCE and Surveillance Video To Plaintiff's Physicians And Intended To Rely on Their Response Or Failure to Respond As A Basis To Terminate Plaintiff's Benefits**

| OVERLOOKED SUPPORTING EVIDENCE | CITE IN RECORD |
|---|---|
| Hartford's claim manual requires that, where an IME conflicts with an Attending Physician Statement, the analyst must forward a copy of the IME to the attending physician for review and comment, and "[a]t the time we contact the attending physician, the claimant should also be advised that the [IME] results have been received and are being forwarded to the physician for review and comment." | Htfd. Ex. C(1), p.5, cited in Pl. Stmt. – Add'l Facts, ¶ 80. |
| Hartford did not inform plaintiff that it had sent the IME to plaintiff's attending physician so that she would have an opportunity to advocate on her behalf and personally request that she respond to the request. | Pl. Ex. C at 187-188, cited in Pl. Stmt. – Add'l Facts, ¶ 84. |
| Hartford's claim manual requires the analyst to pursue a response from the attending physician at least three times, allowing three to four weeks between follow ups, and to "ensure that the claimant is kept appraised of the status of the request by calling, sending copies of written requests, or sending a status letter . . ." | Htfd. Ex. A(1), pp.20, 25, cited in Pl. Stmt. – Add'l Facts, ¶ 80. |
| Instead, Hartford demanded that plaintiff's attending physician respond within 15 days of its initial request, did not conduct any follow up with plaintiff's attending physician, and did not apprise plaintiff of the status of the request. | Htfd. Exs. A(5) at H2446 & A(26), cited in Pl. Stmt. – Add'l Facts, ¶ 82; Pl. Ex. C at 187-188, cited in Pl. Stmt. – Add'l Facts, ¶ 84. |
| Hartford did attempt to follow-up to receive responses from every other physician, except plaintiff's attending physician, whom Hartford believed was most likely to refute the IME. | Htfd. Ex. A(5); Pl. Ex. XX, cited in Pl. Stmt. – Add'l Facts, ¶ 90. |
| Hartford's claim manual requires that, when information outstanding is necessary for a claim determination, Hartford should provide the claimant with a A30 day@notice of possible denial or termination to the claimant. | Htfd. Ex. A(1), pp.20, 25, cited in Pl. Stmt. – Add'l Facts, ¶80. |
| The responses from plaintiff's physicians were necessary to Hartford's determination of plaintiff's claim. | Pl. Ex. HH, p.66:3-12, cited in Pl. Stmt. – Add'l Facts, ¶ 81. |
| Hartford did not provide plaintiff with a 30 day notice of possible termination. | Pl. Ex. C at 187-188, cited in Pl. Stmt. – Add'l Facts, ¶ 84. |

**2. The Court Overlooked The Evidence That Hartford Harassed and Intimidated Plaintiff During the "Interview" With Its Investigators To Induce Plaintiff To Make A <u>Purportedly Inconsistent Statement</u>**

| OVERLOOKED SUPPORTING EVIDENCE | CITE IN RECORD |
|---|---|
| The investigators asked plaintiff whether she had ever been Ain business@with Dr. Walters, or whether she and Dr. Walters were friends, although Hartford was well aware that plaintiff only saw Dr. Walters beginning in 1998, has never claimed that plaintiff worked after she became disabled in 1995, and had no basis to believe that plaintiff had any personal relationship with Dr. Walters. | Def. Ex.A(20) at H23; Def. Ex. A(13), <u>cited</u> in Pl. Stmt. – Add'l Facts, ¶ 42. |
| The investigators brought plaintiff to tears on three separate occasions: two time before they even confronted her with the video surveillance and induced her to sign the statement; and once again during subsequent questioning regarding the surveillance. | Pl. Ex. U at H3623, <u>cited</u> in Pl. Stmt. – Add'l Facts, ¶ 43. |

**F. THE COURT OVERLOOKED EVIDENCE FROM WHICH A JURY COULD CONCLUDE THAT HARTFORD'S "RED FLAGS" WERE A PRETENSE TO INITIATE A FRAUD <u>INVESTIGATION</u>**

**1. The Court Overlooked Evidence That Ms. Wilk Had No Reason To Suspect That Plaintiff's Claim Was Fraudulent When Plaintiff Allegedly Failed To Provide Her <u>Driver's License</u>**

| OVERLOOKED SUPPORTING EVIDENCE | CITE IN RECORD |
|---|---|
| Hartford's claim manual provides that age verification is only Anecessary to ensure that the correct Maximum Benefit Duration is applied.@ | Htfd.. Ex. A(1), p.19, <u>cited</u> in Pl. Stmt., ¶¶ 29 & 30. |
| Plaintiff's maximum benefit duration was "lifetime." | Pl. Ex. AA; Htfd. Ex. A(3), p.3, <u>cited</u> in Pl. Stmt., ¶ 30; <u>See</u> <u>also</u> Htfd. Reply Br., p.8 (admitting this.) |
| Ms. Wilk discussed referring plaintiff's claim to the SIU before she even requested plaintiff's driver's license. | Htfd. Ex. A(5) at H2462-2464, <u>cited</u> in Pl. Stmt., ¶ 39. |

**2. The Court Overlooked Evidence From Which A Jury Could Discredit Ms. Wilk's Claim That She Suspected Plaintiff As A Result of A Conversation With Dr. Porfiri's Receptionist**

| OVERLOOKED SUPPORTING EVIDENCE | CITE IN RECORD |
|---|---|
| Ms. Wilk has inconsistently reported the reason for, and timing of, the alleged telephone call. Ms. Wilk represented in the SIU referral that she spoke first with Dr. Porfiri=s office because plaintiff Ahas been having [Dr. Porfiri] complete her APS,@and then called plaintiff as a follow up. Dr. Porfiri had not completed any of plaintiff=s previous APS. Ms. Wilk did not even know that Dr. Porfiri was going to complete plaintiff=s APS when she made the call to plaintiff that she characterized in her SIU referral as a Afollow up@to her call to Dr. Porfiri=s office. | Htfd. Exs. A(10), (31), (32), & (5) at H2463, <u>cited</u> in Pl. Stmt., ¶ 35. |
| Dr. Porfiri had seen plaintiff numerous times beginning in February 1995, and Ms. Wilk knew this at the time of the alleged conversation because the office notes and a letter from Dr. Porfiri, which documented these visits, were in the file that she reviewed. | Pl. Exs. DD, EE at H3139, 3144, 3147; Pl. Ex. E at 77-78, <u>cited</u> in Pl. Stmt., ¶ 35. |
| Ms. Wilk=s record of the alleged conversation is also not contemporaneous. While Ms. Wilk noted even the most mundane fact that she had called Dr. Porfiri=s office and received a busy signal, Ms. Wilk failed to record this critical conversation in her log at the time it allegedly occurred, failed to identify the person with whom she was speaking, and failed to send a Awritten follow up to the doctor summarizing the details of the conversation and asking him/her if it is accurate,@as required by Hartford's claim manual. | Htfd. Ex. A(5) at H2462; Htfd. Ex. A(1), p.19, <u>cited</u> in Pl. Stmt., ¶ 35. |
| Ms. Wilk waited for over two months after the alleged conversation before she even requested copies of plaintiff=s medical records from Dr. Porfiri and the other physicians that plaintiff had identified in her PPE. When Ms. Wilk finally corresponded with Dr. Porfiri, Ms. Wilk made no mention of the alleged telephone call and did not request confirmation of the dates of treatment. | Htfd. Ex. A(5) at 2462; Htfd. Ex. A(9), <u>cited</u> in Pl. Stmt., ¶ 35. |

### 3. The Court Overlooked Evidence From Which A Jury Could Further Conclude That The "Red Flags" Were A Pretense To Initiate A Fraud Investigation

| OVERLOOKED SUPPORTING EVIDENCE | CITE IN RECORD |
|---|---|
| Ms. Wilk planned to refer plaintiff's claim to SIU before any of the "Red Flag" events allegedly occurred. Ms. Wilk's internal log entries reveal that on January 25, 2000, Ms. Wilk spoke to a "specialist" about referring plaintiff's claim to the SIU. Ms. Wilk did not even request plaintiff's driver's license until January 26, 2000; plaintiff did not inform Ms. Wilk that she would be submitting an APS from Dr. Porfiri until January 28, 2000. | Htfd. Ex. A(5) at H2462-2464, cited in Pl. Stmt., ¶ 39. |
| The SIU did not accept the referral on the basis of any of Ms. Wilk=s Ared flags.@ | Pl. Exs. U, X, cited in Pl. Stmt., ¶ 39. |

### G. THE COURT OVERLOOKED EVIDENCE FROM WHICH A JURY COULD CONCLUDE THAT PLAINTIFF DID NOT MAKE "INCONSISTENT" STATEMENTS

| OVERLOOKED SUPPORTING EVIDENCE | CITE IN RECORD |
|---|---|
| Plaintiff had informed Hartford that she drove her children to and from school and to other activities, and that she walked, swam, did yoga and light grocery shopping, made dinners, did laundry, and performed all of her daily activities, but that they caused her pain.[5] | Htfd. Ex. A(7), & 3; Htfd. Ex. A(12), & 3, cited in Pl. Stmt., ¶ 42 & Pl. Stmt. – Add'l Facts, ¶ 34. |
| Plaintiff also stated that she has Agood cycle[s]@and bad cycles and that, even when she was in a bad cycle, she still performs all of her daily activities, which included driving her children to school, doing errands, making dinner, doing laundry, and weeding in her garden. | Htfd. Ex. A(20), cited in Pl. Stmt., ¶ 54. |
| Plaintiff did not "explicitly deny that she could dance" in her interview with Hartford's investigators – plaintiff stated that she did not dance at the live music concerts that she attended in North Hampton but wished that she could. Plaintiff then explained that she had only been able to dance at her daughter's graduation party because she had mixed her pain medications with alcohol.[6] | Htfd. Ex. A(20), cited in Pl. Stmt., ¶ 54. |
| The fact that plaintiff's presentation to Drs. Magana and Garg was allegedly "inconsistent" with her video taped activities does not support that plaintiff | Pl. Ex. OO, p.76:1-77:77, 92:13-17, 94:3-11, cited in Pl. Stmt. – Add'l Facts, ¶¶ 69-70 and |

---

[5]  The court overlooked these facts when it referred only to plaintiff's statements regarding the level of her pain and that this pain restricted her activities. Ruling, pp.6-7

[6]  The court overlooked this fact when it erroneously adopted Hartford's characterization of plaintiff's statement to the investigators. Ruling, p.10; Htfd. Rule 56(a)(1) Stmt., ¶ 54.

| misrepresented her condition to them: The Disability Case Manager testified that **"it's a known. It's a given"** that **"those with chronic pain will have good days and bad days."** | attached hereto as **Exhibit 2**. |
|---|---|