```
 1              IN THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF CONNECTICUT

 2                    BRIDGEPORT DIVISION

 3   CANDI McCULLOCH,              )
                                   )
 4          Plaintiff,             )  CIVIL ACTION FILE
                                   )
 5          -vs-                   )  NO. 301CV1115 (AHN)
                                   )
 6   HARTFORD LIFE AND ACCIDENT)
     INSURANCE COMPANY and         )
 7   EDUCATORS MUTUAL LIFE         )
     INSURANCE COMPANY,            )
 8                                 )
               Defendants.         )
 9
10                       - - -
11           Deposition of JOSEPH L. STERLE,
12   taken on behalf of the Plaintiff, in
13   accordance with the Federal Rules of Civil
14   Procedure, before Susan M. Shaw, Certified
15   Court Reporter, at 4550 North Point
16   Parkway, Alpharetta, Georgia, on the 15th
17   day of August 2003, commencing at the hour
18   of 12:05 p.m.
19   ---------------------------------------------
20                REGENCY-BRENTANO, INC.
21              Certified Court Reporters
22                      Suite 140
23                  13 Corporate Square
24                Atlanta, Georgia  30329
25                   (404) 321-3333
```

0076

1        THE WITNESS:  Based upon the clinical
2    record and the video, there was a discrepancy.
3    She showed an ability, which some people will
4    on certain days of the month -- those with
5    chronic pain will have good days and bad days.
6    My involvement to do this was to find out if
7    that was a good day and if she was actually not
8    capable or capable of performing in her
9    occupation.  That's my -- that's the case
10   manager's role.  The case manager's role is not
11   to prove that they're lying or not lying.  What
12   I want to do is get enough information to show
13   a lay person in benefits that this is what
14   she's capable of doing, and then they make a
15   decision based upon that.
16       Q    (By Mr. Gersten)  It's interesting that
17   you should make notation about people with chronic
18   pain having good days and bad days.  What do you
19   mean by that?
20       A    People with chronic pain -- just exactly
21   what I said there.  Some days are going to be better
22   than others.  Other days, who knows, maybe they left
23   a window open and the cold affects them.  There is a
24   middle line that upon examination that you find what
25   their actual functionality is.  Aside from whether

1   it's a good day or whether it's a bad day, there's a
2   certain line upon examination that is what their
3   actual functionality is.
4       Q   And did you explain this to anyone like
5   Kim Gabrielson?
6       A   What my job is?
7       Q   No, sir. About the good days and bad days
8   with the chronic pain.
9       A   Whether I had that discussion with them
10  about Ms. McCulloch on that day, I don't remember,
11  but it is something that I have said often, and it
12  is something that I have taught to examiners about
13  the clinical aspects of claims.
14      Q   Did you have any specific discussions with
15  anyone at The Hartford about Candi McCulloch and
16  your comments that you just made about a chronic
17  pain patient having good days and bad days?
18      A   I'm sorry. Could you repeat the question?
19      Q   Sure. Did you have any discussions with
20  anyone at The Hartford regarding Candi McCulloch's
21  claim whether you were observing her on a good day
22  or a bad day as a chronic pain patient might
23  encounter?
24      A   No, not that I can recollect.
25      Q   Is there a particular reason why you

```
 1   adversary, and it just was -- the conversations did
 2   not -- were not friendly.  They were tense.  They
 3   were -- she thought I was trying to make her a liar,
 4   and I was just trying to tell her that I was doing
 5   my job.
 6       Q    Well, did you tell her you had seen the
 7   video and you thought maybe there was some
 8   discrepancies between what you had seen and what she
 9   had been describing in the paperwork?
10       A    I do not believe I did.
11       Q    Now, this was a nonadversarial thing from
12   your perspective; right?
13       A    From my perspective, all I wanted to do
14   was have a physician examine her.  Like I said, some
15   people have good days and bad days.  A doctor has
16   got to examine her and tell me what is her
17   functionality, what is the midline.
18       Q    And my question is:  Is there a reason in
19   your discussions when she said you're trying to
20   prove that I'm a liar that you didn't mention that
21   you had some tapes that may have shown her on a good
22   day as opposed to a bad day, that they were not
23   consistent with the files that you had on record,
24   the clinical files that you had on record?
25       A    That was not my responsibility to tell
```

```
 1        then the conversation went on that an IME and
 2        FCE should be done.
 3             Q    (By Mr. Gersten)  And did you discuss this
 4        idea that chronic pain patients could -- she could
 5        have just been having a good day on the day of the
 6        videotape?
 7             MS. TAYLOR:  Objection: form.
 8             THE WITNESS:  I don't believe that was
 9        discussed.  I said before, it's a known.  It's
10        a given.  That's the reason for the IME is to
11        find out.
12             Q    (By Mr. Gersten)  And when you say that's
13        the reason for the IME, to find out if it's a good
14        day or a bad day, is there some source that you have
15        to say that it's a reason?  Is there a manual?  Is
16        there some policy in place that directs you to do
17        that, to find out if it's a good day or bad day?
18             A    To do an IME?
19             Q    Yes, sir.  For the purpose you described.
20        You said you wanted to find out if it was a good day
21        or a bad day; am I correct?
22             A    Right.
23             Q    And you said that's the purpose of the
24        IME.  Am I understanding your testimony correctly?
25             A    No, that might be -- that's one of the
```