```
 1      Q      And based upon the way I hear you
 2   testifying today, that FCE was even more important
 3   than the IME?
 4      A      The FCE would have been essential to the
 5   IME.  Not necessarily more important but essential.
 6      Q      Why is that?
 7      A      Because the reason for the IME was to --
 8   was to find out what Ms. McCulloch's functional
 9   capabilities were.
10      Q      Did you tell anyone at Dr. Garg's
11   office --
12      A      Tell them --
13      Q      -- that that's what you wanted to know?
14      A      Yes.
15      Q      When did you do that?
16      A      When I set up the appointment.
17      Q      And with whom did you speak when you set
18   up the appointment?
19      A      That I don't recall.
20      Q      So this is a separate, distinct phone call
21   from the other one that you can't recall?
22      A      In setting up the appointment -- and
23   there's no documentation here of the conversation
24   with the office, but I set it up.  I said I want an
25   FCE to be either done by the physiatrist or attended
```

```
 1      Q      So it's not like Dr. Garg pulled a fast
 2   one on anyone.  The Hartford knew that it didn't get
 3   that which it paid for, correct?
 4             MS. TAYLOR:  Objection: form.
 5             THE WITNESS:  That's how it appears, yes.
 6      Q      (By Mr. Gersten)  So as of 9/21 Marcia --
 7   by the way, is she capable?  Do you know anything
 8   about her qualifications, Mr. Sterle?
 9      A      I believe that she is a knowledgeable
10   nurse.  At the time that I left, she -- I had talked
11   with her and got her to start preparing for the CCM
12   exam, and she's very smart.  She's a very good
13   nurse.
14      Q      So when she sees there's no FCE report,
15   she's performing her job adequately, isn't she?
16      A      Not if it stopped there.
17      Q      Okay.  What should she have done?
18      A      And -- can I -- I'm not -- every case
19   manager is different, and I can tell you what I
20   would have done.  But I'm not sure what was going on
21   in the office at this time to where it stopped, but
22   my point would have been then to immediately set up
23   a real FCE and then question what was going on with
24   Dr. Garg.
25      Q      And why is that?
```

1    A    Because I paid -- I have asked for an FCE.

2    Q    And you didn't get that which you paid
3 for?

4    A    If I didn't get it, I'm going to get it
5 one way or the other, but I'm going to find out why
6 I didn't get it when that's what I paid for.

7    Q    And that's something you can tell readily
8 from this K6 report, can't you?

9    A    What is?

10    Q    That you didn't get what you paid for.

11        MS. TAYLOR:  Objection: form.

12        THE WITNESS:  Again, from here where it
13    says the testing was done -- or that she did
14    not have any testing done, it's clear.

15    Q    (By Mr. Gersten)  Now, if you didn't have
16 the testing done and you know you didn't have the
17 testing done, what good is the functional equivalent
18 summary, functional capacity summary?

19    A    What that would end up being is the
20 physician's informal observations as of the time of
21 his exam.

22    Q    And that would include, wouldn't it, a
23 view of the videotape in this particular situation,
24 wouldn't it?

25    A    The videotape wouldn't have gotten there

```
 1   you received the summary as a health professional
 2   such as you are, correct -- you are a health
 3   professional; correct?
 4        A    Yes, sir.
 5        Q    And if you received this functional
 6   capacity summary, would you review this functional
 7   capacity summary and believe that a full testing was
 8   done?
 9        A    I would review the summary and I would
10   expect that a full review had been done, and I would
11   be looking for the full review for the full test.
12        Q    And my question to you is if you were a
13   healthcare professional, a treating physician, if
14   you will, and you received the summary, is it fair
15   to say, sir, that the summary would lead you to
16   believe as a healthcare professional that a full
17   test was done?
18             MS. TAYLOR:  Objection: form.
19             THE WITNESS:  Yes.
20        Q    (By Mr. Gersten)  You said yes, sir?
21        A    Yes, sir.
22        Q    So if The Hartford was sending out this
23   summary to healthcare professionals and asking them
24   to comment on it, The Hartford -- strike that.
25   That's all.  Okay.  Now, then --
```

```
1   at it, I see someone that was not altogether
2   comfortable but not altogether unable to move
3   around, and she's got everything that I would be
4   looking for.  DTR.  Is this lumbar problem going
5   on -- is this affecting her peripherally.  Straight
6   leg raises.  That's basically what I needed to know
7   objectively that supports the diagnoses that were
8   given so that I can go on from there.
9          Looking at the exam, the lady has limitations,
10  and that's basically where I'm at.  The FCE was
11  supposed to tell me what those limitations were.
12         It also gave a recommendation for continued
13  treatment.  Sometimes I can go to the adjuster or
14  the examiner, whichever you call it, and if some of
15  them are within reason, we can get that for them.  I
16  mean if the doctor says get this EMG and NCV, it
17  wouldn't be out of our realm to be able to pay for
18  that for her if we think that we might be able to
19  offer something else further down the road to give
20  her more functionality.
21      Q    And based on -- I'm sorry.
22      A    That's the case management part of it.
23  That's what -- I'm not out there to try and get them
24  off the claim.  I'm there to see if there's anything
25  I can do.  And that's why I liked the way it was
```