STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| CANDI MCCULLOCH,  :<br>    Plaintiff  :<br>  :<br>vs.  :<br>  :<br>HARTFORD LIFE AND ACCIDENT  :<br>INSURANCE COMPANY and EDUCATORS  :<br>MUTUAL LIFE INSURANCE COMPANY,  :<br>    Defendants  : | CIVIL ACTION NO.:<br>301CV1115 (AHN) |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR RECONSIDERATION**

The arguments and evidence upon which Plaintiff's Motion for Reconsideration are based are not new, and would not render the Court's ruling incorrect—much less "manifestly unjust"— if they were. In an effort to redirect the Court's attention from the voluminous evidence supporting Hartford's decision to a lone, inconclusive fact—the omission of a Functional Capacities Evaluation—Plaintiff's counsel simply substitutes his own opinion as to what sort of testing should have been done for that of every retained and unretained expert in the case. Even assuming for the sake of argument that the omission of an FCE, which the Court already noted in its opinion, was (at *most*) an oversight, it falls far short of the sort of malice necessary to show bad faith. Plaintiff's motion fails to explain how an FCE would have effected the outcome of Hartford's decision, or how the omission of an FCE should alter the conclusion reached by the Court.

Plaintiff's next argument hinges upon so-called "newly discovered" evidence that was in her possession for more than a *year* prior to the Court's ruling. If Plaintiff thought this evidence supported her position, she had ample opportunity and should have brought it to the Court's

attention in a timely fashion. The Court should reject Plaintiff's motion for this reason alone. In any event, the "newly discovered" evidence shows this, and nothing more: (1) Hartford takes to heart its obligations to policyholders as well as the state insurance departments to which it reports to identify and report insurance fraud; and (2) Hartford makes a fiscally responsible effort to use the limited resources available to fight insurance fraud in a cost-effective manner.

Finally, Plaintiff's contention that the Court improperly denied her motion for summary judgment as to Hartford's counterclaim is as specious as was her motion. First, the effect of the denial of Plaintiff's motion for summary judgment on Hartford's counterclaim is simply to allow the parties to try this claim; as a matter of law, the Court's *denial* of a motion for summary judgment cannot result in "manifest injustice." Second, Plaintiff's argument that the Court "erred" in finding that Hartford paid consideration is semantic hair-splitting: the transaction by which Hartford assumed responsibility for handling and paying the American College of Physicians book of open claims was a bargained-for exchange supported, as the Court correctly noted, by consideration on both sides. Third, Plaintiff's argument utterly ignores the common-sense and undisputed fact that Hartford has no obligation to pay fraudulent claims and to the extent it has done so, it has suffered compensable injury and has a right to recover such payments.

## ARGUMENT AND AUTHORITIES

Motions for "reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters … that might reasonably be expected to alter the conclusion reached by the court." *Bristol Technology v. Microsoft Corp.,* 127 F. Supp. 2d 61, 62 (D. Conn. 2000) (*quoting Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir. 1995)). In order to succeed on her motion, Plaintiff must show this Court overlooked evidence resulting in clear error or manifest injustice. *Id.* at 62-63; *see also Horsehead Resource*

*Development Co. v. B.U.S. Environmental Srvcs., Inc.,* 928 F. Supp. 287, 289 (S.D.N.Y. 1996) (court should grant a motion for reconsideration only if the moving party presents factual matters the court overlooked that might materially influence its decision).

Plaintiff fails to meet this strict burden. Her motion is for the most part an attempt to reargue arguments and evidence already considered by this Court and amount to nothing more than a "disagreement between an understandably disappointed litigant and the court." *Davidson v. Scully,* 172 F. Supp. 2d 458, 464 (S.D.N.Y. 2001).[1] Plaintiff's remaining arguments that the Court made the wrong decision are reminiscent of her claims against Hartford: she scours an exhaustive and thorough review of voluminous evidence in search of nits that can arguably be characterized as error. Her disagreement with the result does not render the Court's decision incorrect any more than it renders Hartford's decision "malicious."

I.      **THERE IS NO EVIDENCE A FORMAL "FUNCTIONAL CAPACITIES EVALUATION" WOULD HAVE CHANGED HARTFORD'S DECISION AND THE ABSENCE OF ONE SHOULD NOT CHANGE THIS COURT'S DECISION.**

The Court's 10-page recitation of the facts expressly noted that "Hartford discovered that Dr. Garg did not in fact perform the evaluation." Omnibus Ruling at 9. Plaintiff ignores this and targets a single sentence on page 18 of the Omnibus Ruling that "there is no evidence that Hartford knew that Dr. Garg had not conducted the examination." In the context of the entire claim file, this observation is also correct, at least in part: a disability nurse case manager by the name of Marsha Esson learned that Dr. Garg had not done an FCE and documented that fact in the activity log;[2] however, there is no evidence that Kim Gabrielsen or Sue Wilk actually read the

---

[1] Parts IV, V, and VII (C) of Plaintiff's motion consist almost solely of Plaintiff's reargument of the facts and case law, and therefore, Defendants refer the Court to their previous summary judgment briefing and this Court's Omnibus Ruling.

[2] Exh. A, Tab 5, at H2449-50, to Hartford's Rule 5b(a)(1) Statement ("Hartford's Statement").

notation or considered it in connection with their review. As the Court noted, the oversight was at *most* negligence, not bad faith. Omnibus Ruling, at 18.

More importantly, Plaintiff also ignores this critical aspect of the Court's reasoning: "Because the information Hartford obtained gave it a legitimate reason to terminate McCulloch's disability benefits, it cannot be said that Hartford acted in bad faith by terminating her benefits." The Court correctly found a more than justifiable reason for Hartford's decision. The legitimacy and the significance of the evidence supporting Hartford's decision is in no way diminished by the absence of an FCE—particularly given that there is *no* evidence an FCE was omitted because of ill will (all competent evidence is to the contrary), and there is *no* competent evidence—only the lay opinion of Plaintiff's counsel—that an FCE was essential to evaluate Plaintiff's claim.

> A. **Voluminous evidence supports Hartford's decision and precludes a finding of bad faith as a matter of law.**

Plaintiff cannot recover for bad faith if her claim was fairly debatable—that is, if Hartford had some *arguably justifiable reason* for terminating her claim. *United Tech. Corp. v. American Home Assur. Co.*, 118 F. Supp. 2d 181, 188 (D. Conn. 2000); Omnibus Ruling at 14. Plaintiff's argument that the lack of an FCE renders the decision one made in "bad faith" ignores the significant evidence supporting Hartford's decision, all of which gave Hartford a more than justifiable reason to terminate her claim: an "attending physician" located a plane ride away from a claimant who claimed to be incapable of sitting for any extended period;[3] video surveillance reflecting physical capabilities dramatically inconsistent with Plaintiff's claimed limitations;[4] Plaintiff's continued misrepresentation about her activities when interviewed in person by a Hartford representative;[5] the opinions of Dr. Wagner in 1997,[6] Dr. Garg in August 2000,[7] and

---

[3] Hartford's Statement, ¶ 38.
[4] *Id.* ¶ 45-46.
[5] *Id.* ¶ 54.

Plaintiff's own selected neurosurgeon Dr. Magana in October 2000 that she could work in her former position;[8] and the virtual absence of any treating physician's statement of *restrictions* or *limitations* (as opposed to *diagnoses* or *treatments*) that would prevent Plaintiff from performing the material and substantial duties of her occupation.[9]

"[I]f there is evidence in the record demonstrating that Hartford possessed a legitimate reason for terminating McCulloch's benefits, her bad faith claim cannot survive as a matter of law." Omnibus Ruling at 15. In short, even if Plaintiff could show that an FCE would have provided a pebble on the scale weighing *against* terminating her benefits (which she has not), her motion would fail because she must show the *absence* of evidence on the other side.[10]

### B.   There Is No Evidence To Suggest That The Omission Of An FCE Was An Act Of Ill Will.

Plaintiff's fixation on the FCE fails to suggest conduct designed to mislead or deceive. "Bad faith is not simply bad judgment or negligence, but rather it implies a *conscious wrongdoing because of a dishonest purpose*." Omnibus Ruling at 14 (emphasis added) (citing

---

[6] See Ex. A, Tab 1 to Hartford's Reply in Support of its Motion for Summary Judgment.

[7] Hartford's Statement, ¶ 50, 57-60.

[8] *Id.* ¶ 70.

[9] Only Dr. Alshon, in a 1996 independent medical examination, concluded that Plaintiff had any limitations which would impact her ability to perform the material and pre-dating Hartford's review by four years, substantial duties of her occupation. Dr. Alshon's conclusion that Plaintiff lacked the "cervical mobility" to do her prior job is belied by her videotaped activities. Exhibit I to Plaintiff's Rule 56(a)(2) Statement.

[10] Plaintiff also contends that Hartford "misrepresented" Plaintiff's job duties to Dr. Garg. Hartford's request to Dr. Garg was in writing and asked Dr. Garg "whether the claimant demonstrated functional capacity that would reasonably allow them [*sic*] to function as a physician in the capacity of an internist, clinic only, *no surgical requirements*, 16 hours a week, and a director and administrator working for women's clinic 30 hours a week." Deposition of Dr. Asha Garg, attached hereto as Exhibit A, at 267:7-21 (reading from Exhibit 22n to that deposition, Hartford's letter of August 2, 2000, which is attached as Exhibit A-1 to this Memorandum). There is no evidence in either the claim file or Dr. Garg's deposition to suggest that she received any communication from Hartford other than this letter, written or otherwise, describing Dr. McCulloch's duties. In her deposition, Dr. Garg simply seems to have adopted the term "no procedures" for "no surgical requirements." Dr. Garg's phraseology does not and cannot change what Hartford stated in its letter. Dr. Garg clearly knew Dr. McCulloch was an internist (*Id.* at 52:15-19) and understood that an internist's office practice includes "procedures." *Id.* at 50:1-9; 83:10-13. Moreover, Dr. McCulloch had every opportunity to describe her job to Dr. Garg in her own words and did so. *Id.* at 237:13-22.

*Martin v. American Equity Ins. Co.*, 185 F. Supp. 2d 162, 164-65 (D. Conn. 2002); *Buckman v. People Express Inc.*, 205 Conn. 166, 170 (1987)).

There is no evidence whatsoever to suggest that the omission of an FCE was an act of ill will or deceit. All evidence is to the contrary: Joseph Sterle, a disability case manager, requested an FCE over Plaintiff's objection.[11] As the Court noted, Mr. Sterle relied on Dr. Garg's invoice and paid Dr. Garg for an FCE separate and apart from Dr. Garg's charge for her independent medical examination. Omnibus Ruling at 18.[12] After Mr. Sterle's departure from Hartford, Marsha Esson took over in his role and followed up on the request for an FCE.[13] She discovered that Dr. Garg did not perform a separate FCE, and she *documented* this in the activity log as soon as she discovered it on September 28, 2000.[14] Sterle's request for an FCE and the care taken by Esson to document its absence are utterly inconsistent with the "malice" Plaintiff ascribes to Hartford.

To read Plaintiff's tale of "fabrication," one would think someone at Hartford created an FCE report and filled in false test results. It did not—Sue Wilk forwarded Dr. Garg's report, *exactly as it was received,* to five of Plaintiff's treating physicians.[15] The report referred to an FCE but included no formal testing report.[16] Plaintiff does not suggest to the Court exactly what she believes Hartford *should have* done—alter Dr. Garg's report before forwarding it to treating physicians?; add a notation that an FCE had not been done? Whatever the argument might be, it cannot advance beyond a claim of oversight or poor judgment.

---

[11] Dr. McCulloch sent Sterle a letter objecting to the FCE because she "did not want to risk further injury in demonstrating…[her] present medical condition." July 18, 2000 letter from Plaintiff to Joseph Sterle, attached hereto as Exhibit B.

[12] September 8, 2000 invoice from Dr. Garg, attached hereto as Exhibit C.

[13] Exh. A, Tab 5, at H2449-50 to Hartford's Statement.

[14] *Id.*

[15] Hartford's Statement, ¶ 66.

[16] Exh. A, Tab 23, at H3055, to Hartford's Statement.

### C. Plaintiff's counsel may not substitute his lay opinion that an FCE was necessary for that of the retained and unretained experts in this case.

The results of a formal FCE cannot have been critical to an evaluation of Plaintiff's claim: Dr. Garg did not feel it was necessary, not one of Plaintiff's treating physicians asked to see the results,[17] and no expert in the case on either side has suggested that an FCE would have informed a correct decision on Plaintiff's claim.

These facts are undisputed: Dr. Asha Garg, a board certified physiatrist, reviewed Dr. McCulloch's medical records, interviewed her, and examined her. Dr. Garg also conducted a number of objective tests including range of motion, examination for spasm or tenderness, straight leg raising test and strength tests.[18] Based on the history, her interview, and her examination of Dr. McCulloch, Dr. Garg concluded she had sufficient basis to evaluate Dr. McCulloch's functional capacity:

> Q: Who performed the functional capacity evaluation on August 14?
>
> A: Well, there was no formal evaluation with equipment and tools. But with the examination, reviewing her medical records and objective findings, that's what—I did it.[19]
>
> * * *
>
> Q: Let me state my question a different way, Doctor. There's nothing in your notes that reflects that you performed a functional capacity evaluation on August 14, 2000, is there?
>
> A: Well, actually, I didn't do like how long patient sitting, or standing, or walking or things like that. But *based on examination, and reviewing the videotape and everything*, I gave my opinion that patient can do certain things. And the kind of injury she has, that kind of limitation she has.[20]

---

[17] Two of the five physicians failed to respond and two others refused to comment. Hartford's Statement, ¶ 67-69. The fifth, neurosurgeon Dr. Magana, responded and apparently did not feel that the results of the "formal" FCE were necessary to his revised opinion. *Id.* ¶ 70.

[18] Garg depo. (Exhibit A) at 157:5-24.

[19] *Id*. at 149:19-24.

[20] *Id.* at 151:23-152:7 (emphasis added). Dr. Garg is a native of India and received her medical degree there. *Id.* at 203:9-204:1. It is apparent throughout her deposition that, while she is fluent, English is her second language. *Id.* at 84:6-14.

* * *

> A: As I said, I did not do any *formal* functional capacity evaluation. And I did not mention it. But I based my decision saying that what are the activities she can do according to her injuries, objective findings and things like that, and what are the limitations. That's what I said in my opinion.[21]

Throughout her deposition, Dr. Garg continued to distinguish between what she called a "formal" FCE—one performed with equipment and tools, generally by a physical therapist, and an "informal" FCE.[22] Dr. Garg, a board-certified physiatrist, did not see the need to send Dr. McCulloch for a "formal" FCE.[23] She nonetheless was prepared to provide her expert assessment of Dr. McCulloch's functional capacity:

> Q: What did you do, specifically, with respect to your independent medical examination of Dr. McCulloch? What were the different things that you did, that formed the basis of your report?
>
> A: As I said, I reviewed the medical information. There were MRI reports, which I noted. I talked to the patient, got the information from her, as well. Then I examined the patient. I also reviewed the video later on and made my opinion.
>
> Q: Okay. did you feel that you had adequate information, to form the opinions that you did?
>
> A: Yes.[24]

Dr. Garg further testified that a videotape "shows [a] patient's activities and what they are doing in their real life."[25] In this case, the videotape of Dr. McCulloch showed she could "Function. . .without significant problems or limitations."[26]

Plaintiff's own retained expert, Dr. Arnold, testified that an FCE would not have been relevant in assessing Plaintiff's condition because an FCE "does not help with a chronic

---

[21] *Id.* at 152:20-25 (emphasis added).
[22] *Id.* at 150:15-151:3; 153:9-13.
[23] *Id.* at 154:6-13; 169:1-12; 217:17-218:8; 219:7-12.
[24] *Id.* at 235.:2-14.
[25] *Id.* at. 67:17-22.
[26] *Id.* at. 70:8-14.

myofascial pain patient in terms of the problems that they have, in terms of concentration, how long they can sit and so forth."[27]

Dr. Arthur Taub, a neurologist and neuroscientist retained by Defendants to testify in this case, explains the limited value of a clinical "functional capacities evaluation" when videotape of real-world capacities is available:

> Objective observation of untimed, continuous, behavior in the real world, free of interpersonal and social constraints, as contrasted with the time, space, interpersonal and social constraints of the clinical examination room, *is the best test of neuromuscular function*."[28]

Dr. Taub goes on to describe the "series of objective observations" in the videotape of Plaintiff as "*a definitive examination of function* [demonstrating]. . .hypernormality of motion of the cervical and lumbar spines and lower extremities."[29]

> The surveillance tapes demonstrate that, at the time they were obtained, there was no question but that vigorous, sustained, motion of all joints could be maintained without significant fatigue. . .The evidence indicates that this behavior accurately reflected Dr. McCulloch's residual neuromuscular functional capacity, i.e., at least, the *true functional capacity* of the cervical, thoracic and lumbar spines, and of the upper and lower extremities.[30]

Dr. David Ketroser, another neurologist retained by Defendants to testify in this case, concurs that the videotaped surveillance of Plaintiff supplants any purpose an FCE might have served:

---

[27] See Dr. Arnold's deposition, at 119:2-25, attached as Exhibit D to Hartford's Reply in Further Support of Its Motion for Summary Judgment.

[28] Exh. B, at 22, to Hartford's Reply in Support of its Motion for Summary Judgment (emphasis added).

[29] *Id.* at 20 (emphasis added).

[30] *Id.* at 21 (emphasis added).  Dr. Taub further opines that "had the evidence of video surveillance been made available to [Plaintiff's treating physicians], the likelihood is that discography, the IDET procedure and cervical facet joint injections would not have been undertaken, as they would have been deemed unnecessary in an individual manifesting normal function in the real world and impaired functionality in the clinic." *Id.* at 22.

> Dr. McCulloch is observed repeatedly entering and exiting an automobile that any patient with significant chronic low back pain would find intolerably painful to enter and exit. She does so without any alteration of normal motion. She is also observed bending, twisting and vigorously dancing in June 2000.[31]

Dr. Magana, Plaintiff's neurosurgeon, apparently agreed. Dr. Magana received and reviewed Dr. Garg's report as well as the videotape demonstrating Plaintiff's real-world functional capacity; based on this review, he advised Hartford that Plaintiff should be capable of working as she was prior to her injury.[32] If Dr. Magana or any of the other treating physicians who received Dr. Garg's report felt that they needed to see test results from a formal FCE, they could have asked for that information. They did not. Similarly, while Hartford's contract physician reviewer, Dr. Joseph Amato, assumed an FCE had been done, had the results been important to his evaluation he could have asked to see the report. He did not. Plaintiff asks the Court to substitute her counsel's opinion regarding what sort of testing was necessary for the opinions of Dr. Garg, Dr. Taub, Dr. Ketroser, Dr. Arnold, Dr. Magana, and Dr. Amato. Plaintiff's counsel is not qualified to make that assessment.

Perhaps most importantly, Plaintiff (herself a physician) knew better than anyone what sort of testing she had and had not undergone. Upon receipt of Hartford's letter detailing the basis for termination of her benefits, including reference to an FCE, Plaintiff said nary a word.[33] Had she or even one of her treating physicians asked to see a separate FCE "report" or indicated

---

[31] Exh. C, at 5 to Hartford's Reply in Support of its Motion for Summary Judgment. (emphasis added).

[32] Hartford's Statement, ¶ 70.

[33] In fact, Plaintiff resisted undergoing an FCE on the grounds that it might exacerbate her injuries. *See* July 18, 2000 McCulloch letter, attached to this memorandum as Exhibit B. In light of her documented activities, the record supports an inference that she might have been more concerned that an FCE would confirm her strength and flexibility—both of which were consistently noted by treating physicians in her records. "The patient had normal movements of both shoulders, both elbows and both wrists. The patient had normal movements of both hips, both knees and both ankles." Ronald S. Wagner, M.D., March 3, 1997 evaluation letter attached hereto as Exhibit D. "She is remarkably flexible despite the fact that she is in pain and has had to reduce her flexibility in both flexion, extension, lateral bend, and rotation." Rollin M. Johnson, M.D. April 15, 2000 evaluation letter attached hereto as Exhibit E. "Shows minimal discomfort on range of motion." Ronald N. Paasch, M.D. September 12, 2001

in any way that the report itself was important to evaluation of her claim, Hartford would have had an opportunity to obtain additional information. Having kept mum, Plaintiff may not now base a "bad faith" claim on this omission.

## II. PLAINTIFF'S "NEW EVIDENCE" IS NOT NEW AND DOES NOT CREATE A DISPUTED FACT ISSUE.

### A. Plaintiff's So-Called "New Evidence" is Not New.

Plaintiff's "new" evidence has been in her possession since it was produced by Hartford in February 2004, more than seven months prior to the Court's hearing on the motions for summary judgment and more than *thirteen months* before the Court ruled on those motions.[34] The evidence is not "newly discovered," it is merely newly *offered*. If Plaintiff felt this evidence was relevant to the pending motions for summary judgment, she owed it to Court to raise it in a timely fashion, not to sit on it and wait to see how the Court ruled. *Jones v. Carolina Freight Carriers Corp.,* 1998 WL 386180, at *1 (2d Cir., April 22, 1998)[35] (a motion for reconsideration is not properly used as a vehicle for the introduction of new evidence which could have been presented to the court prior to the decision of which reconsideration is sought); *U.S. v. Potamkin Cadillac Corp.,* 697 F.2d 491, 493 (2d Cir. 1983) (in order to succeed on a motion for reconsideration, the movant must present evidence that is "truly newly discovered" or "could not have been found by due diligence"); *LoSacco v. City of Middletown,* 822 F. Supp. 870, 877 (D. Conn. 1993) (denying defendants' motion for reconsideration in part because defendants were

---

Progress Note attached hereto as Exhibit F. "Examination today showed no sign of impairment. She appears to have complete and full orthopedic and neurological function. Assessment of radiology reports: Findings are not correlated with physical examination. "Patient maintain great movement." Lloyd R. Saberski July 31, 2003 medical note attached hereto as Exhibit G. "My problem is that her ROM is excellent and the joint does not have a great deal of arthritic look." Lloyd R. Saberski July 6, 2004 medical note attached hereto as Exhibit H.

[34] See Exhibits 7 and 8 to Plaintiff's motion.

[35] Attached hereto as Exhibit I.

unable to show that new evidence submitted with motion was unavailable at the time the court issued its original decision).

### B.     Plaintiff's So-Called "New Evidence" Does Not Begin to Suggest Bad Faith.

The insurance departments of thirty-nine states require Hartford to investigate and combat insurance fraud; Hartford's obligations to its policyholders require no less. The evidence Plaintiff offers from monthly management letters, performance appraisals, and bonuses is consistent with these obligations, and with Hartford's legitimate business interest in carrying out these tasks in a cost effective manner.

Contrary to Plaintiff's skewed interpretation of these documents, there is *no* evidence that the amount of reserves associated with a claim has any impact whatsoever on the *selection* of claims for investigation by SIU. All evidence is directly to the contrary. SIU's published "red flags" do not refer to the amount of reserves.[36] The Court correctly enumerated the specific "red flags" that caused Sue Wilk to refer Plaintiff's claim to SIU: the amount of reserves is nowhere to be found. Omnibus Ruling at 15. In fact, it is undisputed that Wilk was utterly unaware of the amount of reserves associated with Plaintiff's claim when she referred the case to SIU, and she remained unaware of the reserve amount until after the termination decision was made.[37]

It is undisputed that the SIU referral form does not mention reserves.[38] It is undisputed that Kim Gabrielsen knew nothing about the amount of reserves for Plaintiff's claims until *after* she accepted the claim for investigation.[39] There were other claims within the ACP book of

---

[36] Exh. C., Tab 1, at 8-9 to Hartford's Statement.

[37] Deposition of Susan Wilk, at 62:20-63:12, attached hereto as Exhibit J.

[38] Hartford's Statement, ¶ 38-39.

[39] Deposition of Kim Gabrielsen at 145:12-146:8, attached hereto as Exhibit K.

business with higher reserves that were *not* referred to SIU.[40] The record is devoid of evidence that the amount of reserves is among the criteria for identifying potential fraud claims.

Once claims are accepted for investigation by SIU, Hartford has every reason to evaluate the impact of those investigations on the bottom line. Fraud investigations consume resources. Hartford has a legitimate business interest in monitoring SIU's use of these resources, and in seeing that limited resources available for investigating fraud are allocated among the potential claims Hartford could investigate in a cost-effective manner. Common sense dictates that Hartford not spend more money investigating a suspicious claim than the claim itself is worth, and that the department dedicated to investigating fraud must justify its use of company resources by a positive impact on the bottom line. Hartford cannot measure this impact other than by reserves released.

Approximately 70% of the claims accepted by SIU for referral are *not* impacted by the investigation—i.e., the investigation concludes with no termination or reduction of benefits.[41] The sinister character Plaintiff would ascribe to SIU's goal of increasing the number of claims "impacted" reflects nothing more than a legitimate goal of improving SIU's *acceptance* criteria to reduce the number of claims accepted for referral and ultimately not impacted. Clearly the use of SIU time, personnel, and budgets to investigate entirely legitimate claims is not the most cost-effective use of these resources. Plaintiff's contention that SIU's goal was to increase the number of claims impacted by SIU investigation "regardless of the merits of the claim"[42] is a fabrication utterly unsupported by competent evidence.

---

[40] Ex. B, Tab 1, at Educ. 0149-150, to Hartford's Statement.
[41] Ex. C, ¶ 6, to Hartford's Statement.
[42] Plaintiff's motion, at 9.

Hartford can both earn profits and investigate claims in good faith. COUCH ON INS. § 198.25; *see also Austero v. Nat'l Cas. Co. of Detroit, Mich.,* 84 Cal.App.3d 1, 30 (1998) (insurer has a duty not to dissipate its reserves through the payment of meritless claims, which would prejudice the insurance-seeking public by way of necessitating rate increases, and would finally drive the insurer out of business), overruled on other grounds, *Egan v. Mutual of Omaha Ins. Co.,* 24 Cal.3d 809 (1979). A claim of "bad faith" must be demonstrated in a particular case, not by the insurer's general business practices. *See, e.g., Kosierowski v. Allstate Ins. Co.,* 51 F.Supp.2d 583, 594 (E.D.Pa. 1999) "(bad faith statute is not intended to be a means for individual plaintiffs to attack an entire insurance industry"). Hartford's business practices are irrelevant to Plaintiff's bad faith claims unless she has evidence that Hartford's purported objectionable business practices had some direct impact on her claim. *Id.* at 595 (plaintiff had no evidence that objectionable computer program designed to calculate the value of claims was used in evaluating her claim). Plaintiff has identified no such evidence. The fact that Hartford monitors the cost-effectiveness of entire departments or individuals, or that it praised or rewarded the overall year 2000 results of Kim Gabrielsen or Sue Wilk, simply is not evidence that Hartford terminated Plaintiff's claim with malice.

### III.   THE COURT PROPERLY DENIED PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON HARTFORD'S COUNTERCLAIM

Hartford's counterclaim seeks to recover disability payments made to Plaintiff that she was not entitled to under the policy. The Court properly rejected Plaintiff's contention that Hartford may not recover payments it did not owe her to begin with. As a matter of law, Plaintiff cannot show the "manifest injustice" necessary to a motion to reconsider because the Court's ruling simply leaves Hartford to establish its right to recover those payments at trial, and allows Plaintiff to dispute that right.

Even if the Court's ruling had final effect, Plaintiff has shown no basis for reconsideration. The Court correctly found Hartford gave consideration to Educators for the transfer of reserves set aside for payment of the ACP claims; and regardless of what Hartford gave *Educators* in a bargained-for exchange, Hartford suffered compensable injury if it gave *Plaintiff* something it was not obligated to give her.

### A.     Hartford gave consideration in exchange for Educator's transfer of reserves.

Plaintiff's semantic hair-splitting about the "consideration" given by Hartford is mysterious, given that the distinction Plaintiff draws is one without a difference. It is hornbook law that consideration need not consist of the payment of money. Consideration is:

> The inducement to a contract. The cause, motive, price, or impelling influence with induces a contracting party to enter into a contract. The reason or material cause of a contract. Some right, interest, profit or benefit accruing to one party, or some *forbearance, detriment, loss, or responsibility, given, suffered, or undertaken by the other*.

Black's Law Dictionary, Fifth Ed (emphasis added).

Educators transferred to Hartford funds that Educators had reserved for payment of the ACP open claims.[43] Along with it, Educators transferred all responsibility for administering these claims and all responsibility for payment of these claims—whether the reserves ultimately proved to be enough or not. Hartford's consideration includes the assumption of obligations and liabilities it did not previously have and did not have to assume. The Court was absolutely correct in finding that Hartford gave consideration to Educators. Omnibus Ruling at 35.[44]

---

[43] Hartford's Rule 56 (a)(2) Statement, ¶ 8-9.

[44] The Court also correctly noted that "Hartford paid marginally more consideration to Educators to obtain the right to the reserves allocated to [Plaintiff's] claim." Omnibus Ruling at 36. That marginal consideration, in exchange for the marginally greater reserve, consisted of the marginally greater obligation and risk that Hartford assumed for each claimant. The precise "margin" for Plaintiff's claim cannot be determined and does not exist, because Hartford did not perform individual due diligence on each of the approximately 80 claims in the block of open claims transferred in the Reinsurance Agreement; rather, it conducted due diligence on a sampling of 11

**B.  Hartford suffered compensable injury in making payments to Plaintiff if she was not entitled to them under the policy.**

Whether Hartford paid a peppercorn or a fortune, in dollars or in doorknobs, is of no moment to Hartford's standing to recover money it paid to Plaintiff if it did not owe her that money. Under the Reinsurance Agreement, Hartford assumed the liability to pay the open claims only for so long as each claimant *remained entitled to benefits under the policy*. If Hartford had assumed some sort of unconditional obligation to pay benefits to each claimant regardless of continued entitlement, Hartford would have had no reason to engage in any due diligence or independent underwriting to determine whether the reserves set aside by Educators were adequate—it would have simply multiplied each claimant's monthly payments by the remaining months until age 65 and totaled these sums.

As stated in Hartford's original Opposition to Plaintiff's Motion for Summary Judgment, Hartford's underwriting of this transaction—and the amount of reserve funds it was willing to accept in exchange for the obligations it assumed—took into account the statistical probability that some claims would terminate prior to age 65 due to death, improvement of medical condition, return to alternate sources of work and income, or fraud. Put another way, Hartford carefully calculated, using all the underwriting and actuarial tools available to it, the amount of reserves necessary to pay the claims of this population assuming statistically normal returns to work, deaths, etc., and accepted a reserve amount from Educators based on that analysis; if Hartford knew that it could not recover funds paid to fraudulent claimants, it undoubtedly would not have accepted the reserves that it did as adequate consideration for the obligations Hartford assumed. To deny Hartford the right to recover funds paid to one who was not entitled to them denies Hartford the benefit of this underwriting and the very bargain it made with Educators—to

---

claimants, none of whom were Plaintiff, in order to determine whether Educators' reserve was adequate. Hartford's Statement, ¶ 19.

administer and pay benefits to the ACP claimants *so long as due under the terms of the policy*—and unjustly enriches Plaintiff.

The funds reserved by Educators were transferred to Hartford and, after execution of the Reinsurance Agreement, were every bit as much a real asset of Hartford's as the obligation to pay claims in accordance with the policy terms was a real liability if those reserves ran out. *See, e.g., Calif. Union Ins. Co. v. Liberty Mutual Ins. Co.,* 920 F. Supp. 908, 919 (N.D. Ill. 1996) (rejecting argument that excess insurer did not suffer damage because "reserves" were set policy limits and the amount it was required to pay to satisfy jury verdict was less than amount of reserves); *Paul Revere Life Ins. Co. v. Bass,* 523 F. Supp. 134, 137 (N.D. Cal. 1981) (insurer's damages for insured's fraudulent misrepresentations in connection with disability claim measured as the total amount of disability benefits paid as a result of insurer's reliance upon misrepresentations). Hartford cannot know whether it profited from the Reinsurance Agreement until the last benefit payment is made to the last claimant in the pool. Omnibus Ruling at 37-38 n.5. But if Hartford paid $19,655.53 out of these assets to Plaintiff and she was not entitled to this money, Hartford suffered compensable injury just as surely as it would have had that been the *last* $19,655.53 in the fund and other legitimate claimants remained to be paid.

## CONCLUSION

The Court thoroughly examined the facts and correctly found that the undisputed evidence establishes a justifiable basis for Hartford's termination of Plaintiff's claim; this evidence precludes a finding of "bad faith" as a matter of law. Plaintiff seizes upon a single arguable misstatement in the Court's recitation of the facts in the hope of parlaying this into "manifest injustice." Her effort falls short, not only because of the voluminous evidence supporting Hartford's decision, but because there is no competent evidence that an FCE was

omitted in "malice," that its inclusion would have made a difference in the decision, or that it was necessary to evaluate Plaintiff's real-world functionality.

Plaintiff attempts to find a smoking gun in "newly discovered" evidence showing only that Hartford monitors the cost-effectiveness of its Special Investigations Unit and its employees. This evidence is not new, and does not suggest what Plaintiff claims it does.

Finally, the Court should reject Plaintiff's contention that Hartford cannot recover money paid to Plaintiff that Plaintiff was not entitled to.

Plaintiff's claims for bad faith, CUTPA, and CUIPA "violations" are without merit and would transform a straightforward contract dispute into an overly complex and unnecessarily long trial. Defendants respectfully request that the Court deny Plaintiff's Motion for Reconsideration.

         AKIN GUMP STRAUSS HAUER & FELD L.L.P.

         By:_____
           Barry A. Chasnoff (ct11162)
           Roberta J. Sharp (ct24407)
           Jessica S. Taylor (ct24408)
           300 Convent Street, Suite 1500
           San Antonio, Texas 78205
           Telephone: (210) 281-7000
           Telecopier: (210) 224-2035

            AND

          Donald E. Frechette (ct 08930)
          EDWARDS & ANGELL, LLP
          90 State House Square
          Hartford, CT 06103
          Phone: (860) 525-5065
          Facsimile: (860) 527-4198

          ATTORNEYS FOR DEFENDANT
          EDUCATORS MUTUAL LIFE
          INSURANCE COMPANY

## CERTIFICATION OF SERVICE

    This is to certify that on the ___ day of May, 2005, a copy of Defendants' Memorandum In Opposition To Plaintiff's Motion For Reconsideration was mailed, *Via Certified Mail Return Receipt Requested* to:

Eliot B. Gersten
Gersten & Clifford
214 Main Street
Hartford, CT 06106

_____
Jessica Spangler Taylor