## CERTIFICATE OF SERVICE

    I hereby certify that the foregoing was mailed, via regular U.S. Mail, postage prepaid, on May 17, 2005 to all counsel and pro se parties of record, as follows:

Roberta J. Sharp, Esq.
Jessica Spangler Taylor, Esq.
Barry A. Chasnoff, Esq.
Akin Gump Strauss Hauer & Feld, LLP
300 Convent Street, Suite 1500
San Antonio, TX 78205
*Tel: 210-281-7146*
*Fax: 210-224-2035*

Donald E. Frechette, Esq
Joshua L. Milrad, Esq.
Charles F. Gfeller, Esq.
Edwards & Angell, LLP
90 State House Square
Hartford, CT 06103
*Tel: (860) 525-5065*
*Fax: (860) 527-4198*

                                                _____
                                                Eliot B. Gersten, Esq.

```
0001
 1          UNITED STATES DISTRICT COURT
              DISTRICT OF CONNECTICUT
 2                 (BRIDGEPORT)
 3
 4
                            )
 5  CANDI McCULLOCH,         )
         Plaintiff    )
 6                          ) Civil Action No:
    Vs.                     ) 301CV1115 (AHN)
 7                          )
    HARTFORD LIFE AND ACCIDENT )
 8  INSURANCE COMPANY and    )
    EDUCATORS MUTUAL LIFE    )
 9  INSURANCE COMPANY,       )
         Defendant     )
10                          )
11
12          Deposition of DR. JOSEPH AMATO, taken
    before Judith L. Kline, Certified Shorthand
13  Reporter/Notary Public in and for the State of
    Connecticut, pursuant to notice, at the law offices of
14  Gersten & Clifford, 214 Main Street, Hartford,
    Connecticut, on September 4, 2003 at approximately
15  9:00 a.m.
16
    APPEARANCES:
17
    FOR THE PLAINTIFF:
18     ELIOT B. GERSTEN, ESQUIRE
       GERSTEN & CLIFFORD
19     214 Main Street
       Hartford, CT 06106
20
    FOR THE DEFENDANTS:
21     ROBERTA JILL SHARP, ESQUIRE
       AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
22     300 Convent Street
       Suite 1500
23     San Antonio, TX 78205
24  ALSO PRESENT:
       Jeffery Apuzzo
25     Candi McCulloch
```

TRANSCRIPT 1

0061

1  report if there is no data with it.

2    Q  (By Mr. Gersten) I didn't mean to imply

3  otherwise.

4    A  Okay.

5    Q  And would you call an FCE report that does not

6  contain the underlying data to be more complete, or

7  less complete, than a report that contained the

8  underlying data?

9    A  I would consider it neither way. I can

10  conceive of an individual performing an FCE and, for

11  whatever reason, merely sending the conclusion and not

12  sending the raw data.

13    Q  Okay. And in looking at the FCE in this

14  particular case, your assumption is that the FCE took

15  several hours; correct?

16    A  Uh-huh. Yes.

17    Q  And are you familiar with a term informal FCE?

18    A  I am not.

19    Q  Did you ever hear of it?

20    A  No.

21    Q  How many years have you been doing this stuff?

22        MS. SHARP:  Object to form.

23        THE WITNESS:  If I include my work in

24  occupational health clinics, which I had done in the

25  past, I would say about eight years, nine years.

0062

1  Q  (By Mr. Gersten)  So are you familiar with the
2  term formal FCE?
3  A  Generally, that indicates a full FCE.
4  Q  Okay.  Is there anything such as a not
5  complete, or unfull FCE, that you're familiar with
6  A  I'm not familiar with that term.
7  Q  So as we sit here today, there's either a
8  complete FCE or there's no FCE; is that the right way
9  to understand your experience?
10        MS. SHARP:  Object to form.
11        THE WITNESS:  There is a third possibility.
12  On some occasions, when an individual begins to do an
13  FCE, for one reason or another, they fail.  They are
14  unable to complete it.
15        So there may be an incomplete FCE.
16  Individual -- testing was stopped due to patient's
17  complaints of pain, testing was stopped due to
18  dizziness, testing was stopped due to chest pain.
19        So there's a category where an individual
20  starts an FCE, and then it is stopped.
21  Q  (By Mr. Gersten)  And is that something -- this
22  third category -- that would be noted on the FCE
23  report you get?
24  A  Yes, it would.
25  Q  Do you know if it was noted on this

1

```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF CONNECTICUT
                            (BRIDGEPORT)


CANDI MCCULLOCH,                    :
                                    :
                 Plaintiff,         :  CIVIL ACTION NO.
                                    :  3:01CV1115 (AHN)
v.                                  :
                                    :  October 22, 2003
HARTFORD LIFE AND ACCIDENT          :
INSURANCE COMPANY and               :
EDUCATORS MUTUAL LIFE               :
INSURANCE COMPANY,                  :
                                    :
                 Defendants.        :



                    DEPOSITION of KIM M. HUBER




          Taken at the request of the Plaintiff
     before Tiffany V. Pratt, a Court Reporter and Notary
     Public within and for the State of Connecticut,
     pursuant to Notice and the Federal Rules of Civil
     Procedure at the offices of Gersten & Clifford,
     214 Main Street, Hartford, Connecticut, on October 22,
     2003, commencing at 10:00 a.m.




                    Tiffany V. Pratt, LSR #00128
                 BRANDON-SMITH REPORTING SERVICE, LLC
                         44 Capitol Avenue
                   Hartford, Connecticut  06106
                         (860) 549-1850
```

Brandon Smith Reporting Service, LLC

**TRANSCRIPT 2**

12

```
 1   seminars?
 2        A    No.
 3        Q    Have you been asked by The Hartford to attend any
 4   seminars out of the area?
 5        A    No.
 6        Q    Have you ever met Candi McCulloch?
 7        A    No.
 8        Q    Can you tell me, did you have some involvement in
 9   the review of Candi McCulloch's file?
10        A    Yes, I did.
11        Q    What sort of involvement did you have?
12        A    I was the LTD specialist who the termination
13   recommendations were made to and at that time reviewed the
14   termination letter as well as the documents that were listed
15   in that letter, and I signed off on the claim termination
16   agreeing to it.
17        Q    Now, when you say the termination letter, have you
18   looked at it in the past week or so?
19        A    Yes.
20        Q    Is that the one that was signed by Kim Gabrielson?
21        A    Yes.
22        Q    Have you looked at all the materials that you just
23   recited that were mentioned in the termination letter in the
24   past week or so?
25        A    No, not in the past week.  I would have done it at
```

14

1      Q     Okay. And that's entered in the system?
2      A     Yes.
3      Q     What do you recall reading that you wrote?
4      A     I agree with the recommendations.
5      Q     Did you look at any other materials?
6      A     Could you -- the other materials as far as --
7      Q     I'm sorry. Poor question. Any time you don't
8 understand, please --
9      A     I will. Thank you.
10     Q     You did a good job there. Thank you.
11           When you conducted the review that you indicated
12 that you agreed with the decision, you looked at the
13 materials that were mentioned in the Gabrielson letter,
14 correct?
15     A     Yes.
16     Q     Did you look at anything else outside of the
17 materials that were mentioned in the Gabrielson letter in
18 order to make your decision?
19     A     I don't recall that I -- I did or didn't. I
20 really don't remember.
21     Q     Okay. So nothing stands out?
22     A     No.
23     Q     Okay. So we can pretty much limit ourselves to
24 discussing the materials that are mentioned in the
25 Gabrielson termination letter?

Brandon Smith Reporting Service, LLC

15

1  A   I would have checked that information for
2  accuracy.
3  Q   Do you recall performing those functions in this
4  particular case?
5  A   Reviewing for accuracy?
6  Q   Yes.
7  A   Not specifically to this case, but it was a
8  practice that I did on all termination or denial sign-offs
9  and in reviewing the letters to be sure the information was
10 pulled as accurately as possible from the file.
11 Q   Tell me what you do to make sure that takes place,
12 then, as part of your practice.
13 A   A recommendation would come to me.  I would review
14 the comments.  I would review the letter and go through to
15 look at the documents to be sure that the dates were pulled
16 correctly, that the doctor's information was pulled
17 correctly.  I would review, in this case, video surveillance
18 to be sure that it was properly described in the letter.
19 Anything that was listed as a document would have been
20 checked for accuracy and to be sure -- as far as the
21 recommendations go, the recommendations would have been
22 checked to be sure that our procedures were followed down
23 the line.
24 Q   As it applies to the McCulloch matter, what sort
25 of procedures did you check to see that were followed down

38

1    know if Dr. Garg performed the test to fill out that
2    multipage document that you're familiar with?
3         A    No, she did not.
4         Q    At the time that you reviewed -- strike that. How
5    do you know that?
6         A    I don't recall how I know that.
7         Q    When did you learn that she did not?
8         A    I don't recall. It may have been at that time in
9    reviewing the report or I -- I can't guess. My memory was
10   refreshed as far as that goes, but -- in reading the
11   comments -- but I would have known at that time in reading
12   the report.
13        Q    You have to help me out here. I'm not sure I know
14   what you're talking about.
15        A    Do you have the comments that I might read?
16        Q    Absolutely, 58.
17             MS. SHARP: Since she's reviewing that to find it,
18   can we take a quick break?
19             MR. GERSTEN: Absolutely.
20             (Off the record: 10:58 a.m. to 11:06 a.m.)
21   BY MR. GERSTEN:
22        Q    Have you found what you were looking for?
23        A    Are we all set?
24        Q    Yes.
25        A    Okay. There is a review from September 28 of 2000

Brandon Smith Reporting Service, LLC

39

1    where she --

2    Q    Can you slow down one second?  What is the Bates
3    stamp number?
4    A    The actual review is on H 2450.
5    Q    Now, what were you going to say?
6    A    With the two -- let's see.  Dr. Garg's office
7    called to ascertain if any formal testing was done at FCE.
8    Spoke with Chris, who states that employee did not have any
9    testing done.  So it was in the comments.
10   Q    So as you sit here today, when you did the review
11   of the letter for accuracy, you were aware that no formal
12   testing had been done?
13   A    Yes.
14   Q    Now, did you review the item that's noted here as
15   number 16, the consultation report of the document discog --
16   my pronunciation is terrible, but I'm going to ask you to
17   look at 16 there.
18   A    All of the documents would have been reviewed,
19   yes.
20   Q    So did you understand what Dr. Hicks wrote about?
21   A    I don't recall what was written.  And, again, as
22   not being a medical expert, that would have been referred to
23   to the medical experts to make -- to provide an opinion.
24   Q    Okay.  And that's exactly why I'm asking the
25   question.  When it's listed here as being included, are you