UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CANDI McCULLOCH | : CIVIL ACTION NO. |
| | : 301CV1115(AHN) |
| Plaintiff, | : |
| | : |
| vs. | : |
| | : |
| HARTFORD LIFE AND ACCIDENT | : |
| INSURANCE COMPANY AND EDUCATORS | : |
| MUTUAL LIFE INSURANCE COMPANY | : |
| Defendants. | : |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR DISQUALIFICATION AND TO VACATE RULINGS**

I.  **INTRODUCTION**

Plaintiff respectfully requests, pursuant to 28 U.S.C. § 455(a) ("Section 455(a)"), that your Honor Judge Nevas ("the Court") disqualify yourself from all further proceedings in this case, and vacate your rulings on the Motion for Reconsideration of Ruling on Motions for Summary Judgment, Motion for Permission to File Jury Demand, and Motion for Entry of Judgment, all of which rulings entered under circumstances in which the Court's impartiality might reasonably be questioned.

II. **FACTUAL BACKGROUND**

On March 30, 2005, this Court ruled on Motions for Summary Judgment filed by plaintiff Candi McCulloch, Hartford Life and Accident Insurance Company ("Hartford"), and Educators Mutual Life Insurance Company ("Educators"). Dkt. # 218. Plaintiff promptly filed a timely motion for reconsideration of the Court's rulings (hereinafter "plaintiff's Motion"). Dkt. # 221. Shortly thereafter, plaintiff filed a request, in the alternative, for entry of judgment, and a request for permission to file a jury demand (collectively "plaintiff's Requests."). Dkt. # 223, 225. On or about September 1, 2005, plaintiff's counsel called the court to inquire whether as to when the

court expected to issue a ruling on plaintiff's pending Motion and Requests. Affidavit of Eliot B. Gersten, ¶ 2 ("Gersten Aff.") When counsel asked to speak with the Court's law clerk, Arthur Palmieri, in order to make the inquiry, Kevin Logan informed counsel that Mr. Palmieri was no longer at the court, and that he was Judge Nevas' new law clerk. He also stated that Mr. Palmieri had taken the McCulloch file with him when he left the court. Id., ¶ 2.

On September 29, 2005 and September 30, 2005, the Court issued its decision on the Motion and Requests. Dkt., # 234, 236, 237. Approximately two weeks later, plaintiff's counsel discovered that, after Mr. Palmieri left the court with plaintiff's file, he had commenced employment with the law firm Sedgwick, Detert, Moran & Arnold LLP ("SDMA"). Gersten Affid., ¶ 3. This law firm regularly represents defendant Hartford, including against disability claims that are similar to the claims in this action. Exhibit A to Gersten Affid.; Davison v. The Hartford Life and Accident Ins. Co., 2005 WL 807045 (N.D.Cal. April 7, 2005) (attached); Brown v. Hartford Life & Accident Ins. Co., 2004 WL 2254550 (N.D.Cal. October 5, 2004) (attached); Mizzell v. Paul Revere Ins. Co. (and Hartford Life and Accident Ins. Co.), 20056 WL 2043896 (9th Cir., August 25, 2005) (attached); Cherene v. First Am. Financial Corp. Long-Term Disability Plan (and Hartford Life and Accident Ins. Co.), 303 F.Supp.2d 1030 (N.D.Cal. 2004). SDMA also regularly defends other insurers against claims by disabled insureds that are similar to the claims involved in this action. Exhibit A to Gersten Affid.; See also e.g. Salute v. Aetna Life Ins. Co., 2005 WL 1962254 (E.D.N.Y. August 9, 2005) (SDMA defending Aetna against claim for disability benefits) (attached).

Indeed, SDMA markets itself as a law firm that specializes in advising and defending insurance companies such as Hartford, and as being "dedicated to the institutional concerns and success of insurance carriers," which would obviously include its client, defendant, Hartford.

Exhibit A to Gersten Affid.

III. **ARGUMENT**

    A. **STANDARD OF REVIEW**

Section 455(a) requires that a judge disqualify himself whenever his impartiality "might reasonably be questioned." 28 U.S.C. § 455(a). "The goal of section 455(a) is to avoid even the appearance of partiality." Liljeberg v. Health Service Acquisition Corp., 486 U.S. 847, 860, 865, 108 S.Ct. 2194 (1988). "The guiding consideration is that the administration of justice should reasonably appear to be disinterested as well as be so in fact." Id., at 869-70. "The test for disqualification under section 455(a) is not *actual* bias; it is the *perception* of bias" because section 455(a) "concerns not only fairness to individual litigants, but, equally important, it concerns the public's confidence in the judiciary, which may be irreparably harmed if a case is allowed to proceed before a judge who appears to be tainted." In re Kinsington International Ltd., 368 F.3d 289, 301-302 (3rd Cir. 2004) (emphasis in original). Thus, the relevant question is whether the facts might reasonably cause an objective observer to question the judge's impartiality. Liljeberg, 486 U.S. at 465.

"[T]here is an almost irrebutable presumption that a judge is 'tainted' and must be disqualified where . . . he surrounds himself with individuals who may not be truly disinterested." In re Kinsington, 368 F.3d at 308, citing, Edgar v. K.L., 93 F.3d 256 (7th Cir. 1996) and Hall, supra. "A judge should exercise his discretion in favor of disqualification if he has any question about the propriety of his sitting in a particular case." Hall v. Small Business Administration, 695 F.2d 175, 178-179 (5th Cir. 1983).[1]

---

[1] The decision in Hall is widely recognized as an authority in cases regarding disqualification. See e.g. Liljeberg, 486 U.S. at 860-861; Belfiore v. New York Times, 826 F.2d 177, 184 (2nd Cir. 1987).

3

B. **THE COURT SHOULD DISQUALIFY ITSELF**

    1. **A Reasonable Person Might Question Mr. Palmieri's Impartiality After He Left The Court and Accepted Employment With SDMA**

A judge should be disqualified when he fails to isolate a law clerk from all knowledge and participation in a case in which the law clerk's impartiality might reasonably be questioned. Hall, 659 F.2d at 178-180; Miller Industries, Inc. v. Caterpillar Tractor Co., 516 F.Supp. 84, 89 (S.D.Ala. 1980); See also, Code of Conduct for United States Judges Canon 3(B)(2) (stating that "a judge should require court officials, staff and others subject to the judge's direction and control, to observe the same standards of fidelity and diligence applicable to judges."). This is because "[l]aw clerks are not merely the judge's errand runners. They are sounding boards for tentative opinions and legal researchers who seek the authorities that affect decision. Clerks are privy to the judge's thoughts in a way that neither parties to the lawsuit nor his most intimate family members may be." Hall, 659 F.2d at 179. For this reason, "the clerk is forbidden to do all that is prohibited to the judge. It is the duty of the law clerk 'as much as that of the trial judge to avoid any contacts outside the record that might affect the outcome of the litigation.'" Id. (citations omitted).

A law clerk's impartiality might reasonably questioned during the period that he is interviewing for, and after he has accepted, employment with a law firm that represents one of the defendants – and this is true regardless of whether the hiring law firm is representing that party in the particular lawsuit that is before the court. See Hall, 695 F.2d at 179 (failure to isolate law clerk from all knowledge and participation in the case immediately after employment interviews began between law clerk and plaintiff's counsel mandated judge's disqualification), citing, A. DiLeo and A. Rubin, Law Clerk Handbook, § 225 (1977) (when clerk accepts position with firm, he must cease all involvement in cases in which future employers have an interest.);

4

Miller Industries, Inc., 516 F.Supp. at 89 (same) (and noting that "the Handbook is disseminated nationwide for law clerks and for judges and, therefore, is of considerable import."); Hamid v. Price Waterhouse, 51 F.3d 1411, 1416-1417 (9th Cir. 1995) ("a reasonable person might be concerned whether a law clerk's advice to a judge would be biased in favor of the position taken by a firm" that represented the defendant in a different matter than the one before the court, if the law clerk planned to work at that firm after his clerkship.); Perkins v. Spivey, 911 F.2d 22 (8th Cir. 1990) (district court judge properly disclosed that law clerk had accepted offer of employment with a law firm that occasionally represented one of the plaintiffs in other matters, and allowed them an opportunity to express any concerns regarding the clerk's continued participation in the case.)

An objective observer might reasonably have serious questions regarding Mr. Palmieri's impartiality after he had left the court and had accepted a position with SDMA. Not only does SDMA represent Hartford, but it specializes in defending Hartford and other insurers against claims such as McCulloch's,[2] and is unabashedly "dedicated to the institutional concerns and success of insurance carriers." Exhibit A to Gersten Affid. SDMA is thus not only admittedly partisan in favor of insurers, including its client, defendant Hartford, but it has an interest in the outcome of this case: depending on its outcome, this case could be used as precedent in favor of, or against, not only SDMA's client, Hartford, but its many other insurance industry clients, in pending and future cases.

---

[2] See e.g. Davison v. The Hartford Life and Accident Insurance Co., 2005 WL 807045 (N.D.Cal. April 7, 2005) (Ruling on Motion to Dismiss filed by SDMA on behalf of Hartford in case involving claim for disability benefits, challenge to Hartford's claim administration, and claim that employer breached duty because it "failed to conduct any investigation into Hartford's claims administration practices."); Salute v. Aetna Life Ins. Co., 2005 WL 1962254 (E.D.N.Y. August 9, 2005) (SDMA defending Aetna against claim for disability benefits);

5

Indeed, Mr. Palmieri's employment with SDMA created an actual conflict of interest that mandates the court's disqualification. See In re Kinsington, 368 F.3d at 303-304. In Kinsington, the court hired two individuals, Mssrs. Gross and Hamlin, to serve as neutral advisors to the court regarding asbestos related issues in a proceeding entitled the "Five Asbestos Cases." These advisors simultaneously represented future asbestos claimants in an unrelated action, G-I Holdings, against different asbestos manufacturers. Even though the two cases involved entirely different parties, the appellate court held that the advisors had an actual conflict of interest that required the judge's disqualification, because "many of the same legal issues . . . either have arisen or will arise in both the Five Asbestos Cases and the *G-I Holdings* bankruptcy." Id., at 303-304. "By their very position as representatives of the future asbestos claimants in *G-I Holdings,* Gross and Hamlin signaled to all that they could not be non-partisan, benign, or neutral" - the advisors were virtually compelled to take positions in the Five Asbestos Cases that would result in holdings that would be favorable to the claimants in the G-I Holdings bankruptcy. Id.; See also Edgar, 93 F.3d at 259-262 (court appointed experts could not be deemed truly neutral where they had been influenced by submissions from advocacy groups and counsel supporting plaintiffs in other lawsuits against the defendant.)

The conflict in this case is even more compelling than in Kinsington because, in this case, there is not merely an identity of issues, but an identity of parties. Once he started being interviewed and then accepted employment with a law firm that is dedicated to successfully defending not only insurance companies in general, but Hartford specifically, against disability claims, Mr. Palmieri signaled that he could not be non-partisan, benign or neutral. The very same issues that the court was determining in the McCulloch matter while Mr. Palmieri was seeking and had accepted, employment with SDMA, have arisen, or will arise, in other cases in

6

which SDMA is representing Hartford and its other insurer clients. See e.g. Exhibit A to Gersten Affid., and Davison v. The Hartford Life and Accident Insurance Co., 2005 WL 807045 (N.D.Cal. April 7, 2005) (supra). Thus, to perform his obligation to support SDMA's stated mission and its clients, Mr. Palmieri was virtually compelled to take a position in the McCulloch matter that would result in holdings that were not only favorable to SDMA's insurance industry clients in general, but to Hartford, specifically.

### 2. The Court's *Ex Parte* Communications With Mr. Palmieri After His Clerkship Had Concluded Further Support Disqualification

Once Mr. Palmieri left the court and accepted employment with SDMA, he was also no longer, nor could he be, a member of the "court personnel whose function is to aid the judge in carrying out adjudicative responsibilities." See Code of Conduct for Judicial Employees, Canon 4D.[3] Accordingly, any communications with Mr. Palmieri regarding the merits of the case constituted unauthorized *ex parte* communications. Code of Conduct for U.S. Judges, Canon 3A(4).[4]

> *Ex parte* communiciations are "anathema in our system of justice." One leading reason is that *ex parte* meetings are often, as they were here, unrecorded. Consequently, there is no official record of what was said during those meetings. Of even greater concern is the

---

[3] Mr. Palmieri could not, consistent with the Code of Conduct for Judicial Employees, simultaneously serve as both an attorney-employee of SDMA and as law clerk for the court, nor could he accept compensation from SDMA while serving as a clerk for the court. See Canon 4D of the Code of Conduct for Judicial Employees.

[4] Canon 3A(4) of the Code of Conduct for U.S. Judges provides that a judge may neither "initiate nor consider *ex parte* communications on the merits, or procedures affecting the merits, of a pending or impending proceeding." The Commentary to this Canon states that "the proscription against communications concerning a proceeding includes communications from lawyers, law teachers, and other persons who are not participants in the proceeding, except to the limited extent permitted. It does not preclude a judge from consulting with other judges, or with court personnel whose function is to aid the judge in carrying out adjudicative responsibilities." While a judge may obtain the advice of a disinterested expert on the law applicable to a proceeding before the judge, he may only do so if he gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond. Id. The Court did not give advance notice to the parties that it was consulting with Mr. Palmieri and the substance of his "advice," and provide the parties with a reasonable opportunity to respond. Moreover, as set forth above, Mr. Palmieri could have been characterized as a "disinterested expert," after the conclusion of his clerkship and his employment with SDMA.

argument urged upon us by the Petitioners who, without knowledge of what was discussed at these meetings, contended that they could not respond to these "silent" facts.

The other problem is that *ex parte* communications run contrary to our adversarial trial system. The adversary process plays an indispensable role in our system of justice because a debate between adversaries is often essential to the truth-seeking function of trials. If judges engage in *ex parte* conversations with the parties or outside experts, the adversary process is not allowed to function properly and there is an increased risk of an incorrect result.

Attuned to that concern, the Code of Conduct for United States Judges cautions that a judge should "neither initiate nor consider *ex parte* communications on the merits, or procedures affecting the merits, of a pending or impending proceeding." Code of Conduct for U.S. Judges Canon 3 § A(4) (2003). The rule is designed to prevent all of the evils of *ex parte* communications: "bias, prejudice, coercion, and exploitation." Jeffrey M. Shaman et al., *Judicial Conduct and Ethics* § 5.03 (3d ed.2000). Kinsington, at 309.

Kinsington, at 309.

In Kinsington, the court explained that the district court's *ex parte* communications regarding the merits of the case with the advisors, who were not disinterested, "contributed to the taint" of the judge, and further warranted recusal. Id., at 309, citing, See United States v. Furst, 886 F.2d 558, 583 (3d Cir.1989) (disqualifying judge under § 455(a) because of *ex parte* communications). Similarly in this case, the fact that the Court allowed Mr. Palmieri to take the McCulloch file with him after he left the Court and had accepted employment with SDMA, and the Court's *ex parte* communications regarding the motions pending before the Court in McCulloch after Mr. Palmieri left the court and had accepted employment with SDMA, contribute to the perception that the Court may no longer be impartial, and warrant disqualification.

8

### 3. **Neither the Court's Knowledge, Nor Actual Bias Are Relevant**

Where, as here, there is an appearance of partiality, it is irrelevant whether (a) either the court, or even Mr. Palmieri, himself, was aware that SDMA specialized in representing Hartford and other insurers against disability claimants, or (b) the Court had independently decided the outcome of the Motion and Requests. These are not the "type of objectively ascertainable fact[s] that can avoid the appearance of partiality." Liljeberg, 486 U.S. at 860, citing, Hall, 695 F.2d at 179.

In Hall, supra, the judge refused to disqualify himself on the ground that he had made up his mind without input from the law clerk, who had accepted employment with a law firm that represented the defendant. The Court of Appeals reversed the trial court's decision, explaining that:

> Whether or not the law clerk actually affected the magistrate's decision, her continuing participation with the magistrate in a case in which her future employers were counsel gave rise to an appearance of partiality.
> ***
> **The judge's assertion that he had made up his mind immediately after hearing the case, without the law clerk's assistance, is immaterial.** Every judge has suffered a change of heart after reaching a tentative decision. Much might happen during research and opinion writing to affect the decision. Until the decision was signed and rendered, it was *in pectore judicis,* subject to possible influence.

Hall, 695 F.2d at 179, 180 (emphasis added).

In Liljeberg, the judge refused to disqualify himself on the ground that, at the time he decided the case, he was not aware that the entity on whose Board he served had an interest in the litigation Relying on Hall, the Supreme Court in Liljeberg, rejected this argument: "Under section 455(a), therefore, recusal is required even when a judge lacks actual knowledge of the facts indicating his interest or bias in the case if a reasonable person, knowing all the

9

circumstances, would expect that the judge would have actual knowledge." Liljeberg, 486 U.S. at 860-861. In this case, a reasonable person would expect that Mr. Palmieri knew that the law firm with which he was interviewing and had accepted employment specialized in defending insurers, including defendant Hartford. SDMA proudly emphasizes these facts, including a number of cases in which it successfully defended Hartford, throughout its website and literature. Additionally, a reasonable person would expect that Mr. Palmieri advised the Court of this potential conflict. See Advisory Opinion 74 ("To deal appropriately with this problem [of law clerk bias and conflict of interest], the judge should take reasonable steps to require that law clerks keep the judge informed of their future employment plans and prospects.") (attached), citing, Canon Canon 4C(4) of the Code of Conduct for Judicial Employees ; Canon 3F(3) of the Code of Conduct for Judicial Employees (requiring a judicial employee to promptly inform his or her appointing authority of potential conflicts.)

### 4. The Courts Rulings Further Support The Reasonableness Of Questions Regarding The Court's Impartiality

Although the plaintiff need not show that the Court's rulings were actually impartial or biased, (Liljeberg, 486 U.S. at 860-861), the Court's rulings may further support that an objective observer might reasonably question the Court's impartiality. Id., 856-857 (to determine whether judge's impartiality might reasonably be questioned, it is appropriate to look at what happened while the case was pending before the judge.) The rulings on the motions for summary judgment and motion for reconsideration in this case do give rise to reasonable questions regarding the Court's impartiality.

> a. **An Objective Observer Might Reasonably Question The Neutrality of the Court's Decision On Reconsideration Of The Ruling Granting Defendants Summary Judgment On Plaintiff's Bad Faith**

An objective observer reading the Court's ruling on reconsideration of its decision on the defendants' motions for summary judgment might reasonably question whether the Court was biased in favor of the defendants. In its ruling on the Motion for Summary Judgment and on Reconsideration of that decision, the court was prohibited from resolving disputed questions of fact, and was obligated to draw all inferences reasonably supported by the evidence, in the plaintiff's favor. Instead, in both rulings, this Court (i) disregarded undisputed facts that supported plaintiff's claims; (ii) resolved disputed questions of fact in defendants' favor; and (iii) drew every conceivable inference in defendants' favor.

> i. **Rulings Related To The FCE**

To support granting summary judgment on plaintiff's bad faith claim, the Court disregarded the undisputed evidence, including the defendants' own admissions, that Hartford discovered that Dr. Garg had failed to perform the FCE that it had hired and paid her to conduct, shortly after receiving the purported results of the FCE – when plaintiff had repeatedly pointed the court to this evidence in her briefs and Rule 56 Statements[5] – and claimed that "there is no evidence that Hartford knew that Dr. Garg had not conducted the [FCE] examination." Ruling, p.18.

On reconsideration, rather than to recognize the inference of bad faith that flows from this evidence, which the court admittedly overlooked, the court responded by concluding that,

---

[5] See Htfd. Exs. A(22), (23); Htfd. Ex. A(5) at 2449-2450, cited in Pl. Stmt., ¶ 63 & Pl. Htfd. Stmt.-Add'l Facts, ¶ 73; Educ. Rule 56(a)(2) Stmt. in Opp. to Pl. MSJ, ¶ 24, to which plaintiff directed the court in her Reply to Educ. Rule 56(a)(2) Stmt., ¶ 24.

11

even though Dr. Garg failed to perform an FCE, "the trier of fact . . . could not, consistent with the evidence, find that her [Dr. Garg's FCE] conclusions were fabricated" because "the record" shows that the FCE summary that Dr. Garg submitted was based on her "conclusions and opinion" on plaintiff's functionality based on her review of medical records, surveillance and the IME. Ruling on Motion for Reconsideration, p.4 (emphasis added).

The Court's conclusion disregards (a) the undisputed testimony of Hartford's own employees, and Hartford's own claim manual, that a "Functional Capacities Evaluation" is a term of art that refers to a specific series of tests performed on an individual on specialized machines, over a number of hours which produce for the tester limitations of strength, mobility and endurance. "The tester has guidelines to go by and references from the Department of Labor, and extrapolates **from the testing** an individual's restrictions and limitations, and an individual's ability to perform either a sedentary, a light, a medium or a heavy occupation."[6]; and (b) the admission of Dr. Garg that she was not qualified to administer an FCE and did not have the machinery necessary to administer an FCE.[7]

Given the undisputed testimony that an FCE is a term of art that refers to a specific type of examination on specific machinery over a 2-3 hour period, this Court's conclusion is equivalent to saying that no trier of fact could conclude that an individual, Mr. Y, hired and paid to administer the bar exam to a bar applicant, who did not administer the test and, indeed, did not even have a copy of the test or the correct answers to the test, but submitted a "Summary of Bar Exam Results" that stated "Applicant scored 47 on the Bar Exam, which is a failing score," could

---

[6] See Pl. Rule 56 Stmt. in Opp. to MSJ, Additional Disputed Facts, ¶ 68, citing, Pl. Ex. WW (Amato Depo. at 55-56); Def. Ex. C(1), pp.6-7 ("A Functional Capacities Evaluation is done by a vendor specializing in assessing an individual's limitations using a variety of **objective measurements** that apply to the specific nature of the individual's disability.")

[7] Pl. Rule 56 Stmt. in Opp. to MSJ, Additional Disputed Facts, ¶ 68, citing, Pl. Ex. UU (Garg Depo. at 154, 169.)

conclude that Mr. Y fabricated the Bar Exam results, because, in later deposition, Mr. Y testified that he based the conclusions in his Summary on a ½ hour interview he conducted with the bar applicant, and a review of his law school transcripts.

Clearly, regardless of whether Mr. Y believed, based on his analysis of the applicants records, that the bar applicant *would have* failed the bar exam with a score of 47, a trier of fact could not, consistent with the evidence, conclude anything *other* than that Mr. Y fabricated the test results and that someone who knew that the test results were fabricated could not reasonably rely on these fabricated test results. An objective observer might reasonably question the neutrality of a court that concluded, instead, that even though it was undisputed that Dr. Y failed to administer the bar exam, the plaintiff "submits no factual support for her assertion that [Dr. Y] 'fabricated' the [bar exam] results," and that, *as a matter of law and undisputed fact*, Mr. Y did *not* fabricate the results of the bar exam that he did not administer, and that it was reasonable to rely on these fabricated test results. See Ruling on M.R., p.4.

The same is true in this case. A reasonable trier of fact could conclude that Dr. Garg's testimony, that she based the purported FCE results on factors *other* than an FCE, such as her IME, is nothing more than an admission that she fabricated the FCE results, and that, as a result of Dr. Garg's conduct with respect to the FCE, it was unreasonable for Hartford to rely on the FCE, Dr. Garg's IME, and the opinions of physicians that were based on a review of her IME and FCE. An objective observer might reasonably question the partiality of a court that found, instead, that as *a matter of law and undisputed fact,* (a) Dr. Garg's testimony was *conclusive* evidence that she did *not* fabricate the FCE results, (b) Hartford's reliance on the test results that it knew to be fabricated, was reasonable; and (c) the IME of the physician who fabricated the test results, and the opinions of the other physicians that were based on the suspect IME and

fabricated IME gave Hartford a reasonable basis to conclude that plaintiff could perform her occupation.

### ii. Ruling Related to IME

An objective observer might also reasonably question the neutrality of a court which also simply 'overlooked' the strong evidence and testimony that (A) when Hartford relied on the IME, it knew that Dr. Garg had lied about performing an FCE and fabricated the FCE results, and that (according to Hartford's own Disability Case Manager), as a result of the fabricated FCE, Hartford should have immediately questioned Dr. Garg's integrity as an IME physician; (B) Hartford failed to give Dr. Garg a copy of plaintiff's job description and misrepresented that plaintiff's job duties did not include performing any of the procedures that are normally required of an internal medicine physician and that were required of plaintiff – which Hartford did not even present any evidence to refute; and (C) Dr. Garg's IME opinion that plaintiff could function as an internist was based on Hartford's improper qualification of plaintiff's job duties and that it was her opinion that plaintiff could not perform those duties that she is, in fact, required to perform as an internist, in order to conclude that, as a matter of undisputed fact and law, the IME provided Hartford with a reasonable basis to terminate plaintiff's benefits.[8]  See Ruling on M.R., pp.4-5.

### b. An Objective Observer Might Reasonably Question The Neutrality Of The Court's Decision Denying Plaintiff's Motion For Summary Judgment On Hartford's Counterclaim

The court's ruling on plaintiff's motion for summary judgment on Hartford's counterclaim could also cause an objective observer to question the court's impartiality. In its ruling, the Court not only continued to disregard evidence in plaintiff's favor to which plaintiff

---

[8] See Appendix to Plaintiff's Motion for Reconsideration, §§ B & C, which cites the volumonous supporting evidence in the record as well as the paragraphs of the Rule 56 statements in which plaintiff directed the court to these facts and the supporting evidence.

had specifically directed the court's attention, but, in stark contrast, it readily "presumed" the existence of evidence in defendants' favor, which defendants had not even claimed existed, and which the record contradicted and eagerly developed its *own new* arguments to support denying plaintiff's motion for summary judgment.

### i. Ruling on Hartford's Standing

Plaintiff sought summary judgment on Hartford's counterclaim on the ground that Hartford administered plaintiff's claim, and paid her benefits, as an agent of Educators, and thus had no standing to seek damages allegedly flowing from its payment of benefits to her on Educators' behalf. Although plaintiff was the moving party, Hartford bore the burden to establish its standing by presenting evidence beyond conclusory allegations. The court denied plaintiff's motion on the ground that Hartford was an assignee of plaintiff's claim, rather than merely Educators' agent. Ruling on MSJ, pp.33-34.  Bauer v. Veneman, 352 F.3d 625, 636 (2nd Cir. 2003). Hartford did not make this argument and did not present any evidence to support such an argument. Htfd. Opp., pp.10-11 (claiming only that Hartford had standing because "plaintiff was aware Hartford was administering her benefits and issuing her benefit payment.")

Nor could Hartford have done so. The record unequivocally shows that, contrary to this Court's finding, Educators did not assign plaintiff's policy to Hartford in the so-called "Reinsurance Agreement"; Hartford was administering plaintiff's claim as Educators' agent;[9] and both Educators and Hartford repeatedly represented to plaintiff and other claimants that Educators had not assigned their claims to Hartford and that Hartford was merely acting as

---

[9] See, Pl. Rule 56 Stmt., ¶¶ 6-7, citing, Def. Ex. B(1) (Reinsurance Agreement), § 2.1.2 (providing that, as Educators' claim administrator, Hartford could issue correspondence and benefit payments directly to Educators' insureds, provided that Hartford "discloses that it is acting as agent for the Company [Educators] in the performance of such functions.") and § 2.2 (expressly stating that the Reinsurance Agreement would not "create any right or legal relation between" Hartford and Educators' insureds and that Educators "shall be and remain solely liable to the" insureds on their claims.);

Educators' agent.[10]

An objective observer might reasonably question the neutrality of a Court that denied plaintiff's motion for summary judgment on an issue that the defendant bore the burden to establish, based on an argument that the defendant did not even make, and a finding of fact that the evidence directly contradicted, and that the defendant thus did not even allege existed.

### ii.     Ruling On Hartford's Damages

Similarly, an objective observer might reasonably question the neutrality of a Court that (at the same time it ignored substantial evidence in plaintiff's favor), not only willingly "*presumed*" that Hartford paid consideration to Educators in order to obtain the right to the reserves associated with the Educators' claimants (a fact that was not supported by anything in the record or even asserted by Hartford) but that "Hartford paid marginally more consideration to Educators to obtain the right to the reserves allocated to" *plaintiff's* claim (also not supported by anything in the record or even asserted by Hartford), and then denied plaintiff's motion for summary judgment "primarily" because "plaintiff's argument ignores" these non-existent facts that were not in the record and that Hartford had not asserted.

---

[10] See, Pl. Rule 56 Stmt., ¶¶ 5, 14, citing, Def. Ex. A(38); Pl. Rule 56 Stmt., ¶ 15, citing, First Amended Counterclaim dated January 6, 2003 (hereinafter "the Counterclaim"), ¶¶ 5, 45; Def. Exs. A(6), (9), (11), (26), (38); Exhibit 2 hereto, pp.149-152; Exhibit 3 hereto, ¶ 8; Def. Ex. B(1), § 2.1.2. While Hartford did assert that, in the Reinsurance Agreement, Educators "ceded" its liability for the claims to Hartford, it is a matter of black-letter law, which defendants have not refuted, that the ceding of liability in a Reinsurance Agreement does not constitute an assignment of the policies by the ceding insurer to the reinsurer or provide the reinsurer with standing to bring action against a claimant to recover money paid on behalf of the reinsured insurer. See Reliance Ins. Co. v. Aerodyne Engineers, Inc., 204 A.D.2d 944, 612 N.Y.S.2d 87 (3rd Dept. 1994); 1-2 Holmes' Appleman on Insurance 2d § 2.15 (""The liability of the reinsurer is solely to the reinsured, which is the ceding company. The ceding company retains all contractual relationship with the original insured."); 14-105 Appleman § 105.4; 14-106 Appleman § 106.7 ("As an initial matter, a ceding insurer remains liable to its insured for the full amount of the insured risk even though it obtains reinsurance . . . , the reinsurance contract is totally distinct from, and unconnected with, the original insurance policy.") (emphasis added.)

### C. THE COURT SHOULD VACATE THE RULINGS ON THE MOTIONS FOR RECONSIDERATION, REQUEST FOR PERMISSION TO FILE JURY DEMAND AND REQUEST FOR ENTRY OF JUDGMENT

"[T]o perform its high function in the best way 'justice must satisfy the appearance of justice.'" Liljeberg, 486 U.S. at 864. For this reason, it is appropriate to vacate decisions that entered during a period in which a reasonable person might question the court's impartiality, even where those decision were not, in fact, affected by any bias. Id.; See also Hall, supra; Potashnik v. Port City Construction Co., 609 F.2d 1101 (5th Cir. 1990) (reversing judgments entered by judge during period in which he should have been disqualified, and ordering a new trial before a different judge); Barksdale v. Emerick, 853 F.2d 1359, 1362 (6th Cir. 1988) (if reasonable person would question impartiality of judge who rendered decision, decision must be vacated and the merits considered by a different judge, because a "litigant is entitled to the decision of a judge eligible to preside."); Miller Industries, Inc., 516 F.Supp. at 89 (vacating judgment entered by court even though "[i]t is undisputed that all parties to this case hold Judge Hand in the greatest professional esteem, that the trial was fairly conducted, and that the decision does not evidence bias or prejudice.").

In this case, the rulings on the motion for reconsideration, request for permission to file jury demand and request for entry of judgment were all pending and subsequently entered, after Mr. Palmieri had begun interviewing for a position with SDMA, after he had accepted employment with SDMA and after he left the court with the McCulloch file. An objective observer might reasonably question the court's impartiality during the period in which these decisions were made, and the court should vacate those decisions and allow the motions to be determined by a new judge based on the briefs and evidence already submitted to the Court by the parties.

## CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that the court vacate its rulings on the motion for reconsideration, request for permission to file jury demand, and request for entry of judgment, and disqualify itself from all further proceedings.

PLAINTIFF CANDI McCULLOCH

By_____

Eliot B. Gersten, Esq.
Fed. Bar No. ct05213
GERSTEN & CLIFFORD
214 Main Street
Hartford, CT 06106
(860) 527-7044
Her Attorney

ADVISORY OPINION 74

<u>Law Clerk's Future Employer</u>.

>Judges have inquired about appropriate procedures when it is contemplated that a law clerk may accept employment with a lawyer or law firm in a pending case. The Committee advises that that circumstance does not in itself mandate disqualification of the judge. In such circumstances, however, the law clerk should have no involvement whatsoever in pending matters handled by the prospective employer. <u>See</u> Federal Judicial Center, <u>Chambers Handbook for Judges' Law Clerks and Secretaries</u> (1994). It is the view of the Committee that the need to exclude the law clerk from involvement in pending matters handled by the prospective employer arises whenever an offer of employment has been extended to the law clerk and either has been, or may be, accepted by the law clerk; the formalities are not crucial.
>
>The occasion for these precautionary measures does not arise merely because the law clerk has submitted an application for employment, but there may be situations in which, because of the nature of the litigation, or the likelihood that a future employment relationship with the clerk will develop, the judge may feel it advisable to take these precautionary measures even at a preliminary stage of the employment discussions.
>
>To deal appropriately with this problem, the judge should take reasonable steps to require that law clerks keep the judge informed of their future employment plans and prospects. <u>See, generally</u>, Canon 4C(4) of the Code of Conduct for Judicial Employees.
>
>In appropriate circumstances, the judge may elect to inform counsel that the law clerk may have a prospective employment relation with counsel and that the foregoing policy is being followed.

October 26, 1984
Revised January 16, 1998