

340 F.Supp.2d 215                                                                                    Page 1
340 F.Supp.2d 215
**(Cite as: 340 F.Supp.2d 215)**

C

**Motions, Pleadings and Filings**

United States District Court,
D. Connecticut.
Sharon QUIGLEY, Plaintiff,
v.
The UNUM LIFE INSURANCE COMPANY OF
AMERICA, Defendant.
**No. 3:02CV1083(DJS).**

Oct. 12, 2004.

**Background:** Following denial of her claim for long term disability (LTD) benefits under group policy procured by her employer, claimant allegedly suffering from fibromyalgia brought Employee Retirement Income Security Act (ERISA) suit against policy administrator. Parties cross-moved for summary judgment.

  **Holdings:** The District Court, Squatrito, J., held that:

  (1) claimant had met requirements for proving her claim for disability benefits and was entitled to judgment as matter of law, and

  (2) award of attorney fees was not warranted.

  Plaintiff's motion granted; defendant's motion denied.

West Headnotes

**[1] Labor and Employment** ⟜572
231Hk572 Most Cited Cases
Claimant who suffered from fibromyalgia was entitled to benefits under long term disability (LTD) policy; record revealed that claimant had been suffering from condition for more than four years and experienced chronic and often debilitating pain throughout her body as direct result thereof, with memory loss and diminished cognitive capacity due to lack of sleep and general fatigue associated with chronic pain as secondary consequences, and her complaints of
chronic pain, her physicians' observations of that pain through tender points test, and her physicians' prescriptions of high doses of painkillers were sufficient basis for work limitations mandated by her primary care physician. Employee Retirement

Income Security Act of 1974, § 502(a)(1)(B), 29 U.S.C.A. § 1132(a)(1)(B).

**[2] Labor and Employment** ⟜711
231Hk711 Most Cited Cases
Ordinarily, decision to award attorney fees under ERISA is based on five factors: (1) degree of offending party's culpability or bad faith, (2) ability of offending party to satisfy award of attorney's fees, (3) whether award of fees would deter other persons from acting similarly under like circumstances, (4) relative merits of parties' positions, and (5) whether action conferred common benefit on group of pension plan participants. Employee Retirement Income Security Act of 1974, § 502(g)(1), 29 U.S.C.A. § 1132(g)(1).

**[3] Labor and Employment** ⟜717
231Hk717 Most Cited Cases
Under *Chambless* factors, award of attorney fees was not warranted to claimant with fibromyalgia who prevailed in her ERISA action for denial of benefits under long term disability (LTD) policy; record did not indicate that policy administrator's skepticism about claim was founded in bad faith, and cases revealed substantial disagreement regarding evidence necessary to award disability benefits claimant suffering from that condition. Employee Retirement Income Security Act of 1974, § 502(a)(1)(B), 29 U.S.C.A. § 1132(a)(1)(B).

  **\*216** David S. Rintoul, Brown, Paindiris & Scott, Glastonbury, CT, for Plaintiff.

  Theodore J. Tucci, Helen M. Kemp, Robinson & Cole, HARTFORD, CT, Alexander H. Schwartz, Southport, CT, for Defendant.

*MEMORANDUM OF DECISION*

  SQUATRITO, District Judge.

  Plaintiff Sharon Quigley brings this action pursuant to Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, to recover disability benefits allegedly payable to her as a beneficiary of a group long-term disability policy ("the plan") administered by defendant UNUM Life Insurance Company of America ("UNUM"). The parties have filed cross-motions for summary judgment. For the reasons set forth herein, plaintiff's motion for summary judgment (dkt.# 31) is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

340 F.Supp.2d 215                                                                                                    Page 2
340 F.Supp.2d 215
**(Cite as: 340 F.Supp.2d 215)**

**GRANTED**, and defendant's**\*217** motion for summary judgment (dkt.# 27) is **DENIED**.

### I. FACTS

Quigley claims to suffer from fibromyalgia. The Mayo Clinic offers the following description of this condition:

> You hurt all over and you frequently feel exhausted. Even after numerous tests, your doctor can't seem to find anything specifically wrong with you. If this sounds familiar, you may have fibromyalgia, a condition that affects an estimated 3 million to 8 million people in the United States. Approximately 80 percent to 90 percent of affected people are women.

> Fibromyalgia is a chronic condition characterized by fatigue and widespread pain in your muscles, ligaments and tendons. Previously, the condition was known by other names such as fibrositis, chronic muscle pain syndrome, psychogenic rheumatism and tension myalgias.

> In 1990, the American College of Rheumatology (ACR) identified specific criteria for fibromyalgia. [FN1] The ACR classifies a patient with fibromyalgia if at least 11 of 18 specific areas of your body are painful under pressure. Also, you must have had widespread pain lasting at least 3 months.

> FN1. UNUM relied upon this standard when evaluating plaintiff's claim. (*See* Dkt. # 35, ¶ 1 at 1).

> Although the intensity of your symptoms may vary, they'll probably never disappear completely. It may be reassuring to know, however, that fibromyalgia isn't progressive, crippling or life-threatening.

Mayo Clinic Staff, *Fibromyalgia,* at *http://www.mayoclinic.com/* (dated Apr. 24, 2003) (visited Sept. 23, 2004). With respect to diagnosis, the Mayo Clinic offers the following observations:

> Diagnosing fibromyalgia is difficult because there isn't a single, specific diagnostic laboratory test. In fact, before receiving a diagnosis of fibromyalgia, you may go through several medical tests, such as blood tests and X-rays, only to have the results come back normal. Although these tests may rule out other conditions, such as rheumatoid arthritis, lupus and multiple sclerosis, they can't confirm fibromyalgia.

> The American College of Rheumatology has established some general classification guidelines for fibromyalgia, to help in the assessment and study of the condition. These guidelines require

that you have widespread aching for at least 3 months and have a minimum of 11 locations on your body that are abnormally tender under relatively mild pressure. In addition to taking your medical history, a doctor checking for fibromyalgia will press firmly on specific points on your head, upper body and certain joints so that you can confirm which cause pain.

> However, not all doctors agree with the guidelines. Some believe that the criteria are too rigid and that you can have fibromyalgia even if you don't meet the required number of tender points. Others question how reliable and valid tender points are as a diagnostic tool.

*Id.* Symptoms include widespread pain, which "generally persists for months at a time and is often accompanied by stiffness;" fatigue and sleep disturbances; irritable bowel syndrome; chronic headaches and facial pain; heightened sensitivity; depression; numbness or tingling sensations in the hands and feet (paresthesia); difficulty **\*218** concentrating and mood changes; chest pain or pelvic pain; irritable bladder; dry eyes, skin and mouth; painful menstrual periods; dizziness; and sensation of swollen hands and feet. *See id.*

The medical records submitted to UNUM and incorporated into its claims file [FN2] indicate that the process of diagnosing and treating Quigley's condition began in late 1999. During a visit to her primary care physician, Satesh Singh, M.D., Dr. Singh noted that Quigley complained of "aches and pains in all joints," and that it was possible that she suffered from arthritis. (Dkt. # 30, at UACL 289). Dr. Singh apparently ordered and reviewed the results of subsequent laboratory tests designed to diagnose arthritis, which he concluded were "not consistent with a generalized arthritis...." (Dkt. # 30, at UACL 294). Dr. Singh stated that, "if the aches and pains continue[,] we will arrange a rheumatology [FN3] opinion." (*Id.*).

> FN2. Citations to the medical records will be in the following format: (Dkt. # 30, at UACL _____).

> FN3. "Rheumatology" is "the branch of medicine dealing with rheumatic disorders, their causes, pathology, diagnosis, treatment, etc." *Dorland's Illustrated Medical Dictionary* 1459 (28th ed.1994). "Rheumatism" is any of a variety of disorders marked by inflammation, degeneration, or metabolic derangement of the connective tissue structures of the body,

340 F.Supp.2d 215                                                                                        Page 3
340 F.Supp.2d 215
**(Cite as: 340 F.Supp.2d 215)**

especially joints and related structures, including muscles, bursae, tendons, and fibrous tissue. It is attended by pain, stiffness, or limitation of motion of these parts. Rheumatism confined to the joints is classified as arthritis.
*Id.*

Quigley's first rheumatology consultation was with Lewis Parker, M.D., on December 16, 1999. Dr. Parker writes that Quigley

describes the pain as being all over and starting in either the arms or the legs and spreading or becoming more diffuse; the problem is aggravated by standing or walking, typing or repetitive hand use. The pain is most prominent in the morning in association with significant stiffness that may persist until mid-day without any distinct gelling with mobility.

(*Id.,* at UACL 206). Dr. Parker also noted that Quigley experienced dry eyes, mouth, and skin, and that she had suffered occasional paresthesias in her hands and feet. (*Id.,* at UACL 207). Dr. Parker treated Quigley with Naprosyn, Prednisone, Darvocet, Sinequan, Ultram, and an injection of Depo-Medrol with mixed results through late 1999 and early 2000. Despite these treatments, Quigley still complained of pain and Dr. Parker noted tenderness in her limbs and back. Dr. Parker listed Quigley's "problem[s]" as "Syorgen's syndrome [FN4], probable," "Soft tissue syndrome with bursitis, tendinitis and trigger points," and "Carpal tunnel syndrome." (*Id.,* at UACL 200).

> FN4. Sjorgen's syndrome is "a symptom complex of unknown etiology" marked by some combination of keratoconjunctivitis, gland enlargement, and a connective tissue disease such as rheumatoid arthritis. *Dorland's Illustrated Medical Dictionary* 1640 (28th ed.1994).

On March 13, 2000, Quigley consulted with a second rheumatologist named Ann Parke, M.D. for the first time. Both Dr. Parke and Miriam Borden, M.D., a fellow who examined Quigley with Dr. Parke, noted that Dr. Parker had referred Quigley to Dr. Parke because he suspected that Quigley may have Sjorgen's syndrome. In March of 2000, Dr. Parke noted Quigley's "complaints consisting of joint aches and pains, fatigue, one to two hours or early morning stiffness, and recently dry eyes and dry mouth." (*Id.,* at UACL 338). Dr. Parke also noted Quigley's "characteristic *219 cushingoid features," [FN5] and ordered an endocrinology consultation.

(*Id.*). Following Quigley's initial consultation, Dr. Borden noted that Quigley "most likely" did not have Sjorgen's syndrome, but, "[a]s to her multiple tender points, and the pain, [Quigley] may have fibromyalgia." (*Id.,* at UACL 332).

> FN5. The term "cushingoid" is a reference to Cushing's syndrome, which is a condition caused by excess intake of the hormone cortisol, usually through steroids taken for therapeutic purposes. *See Dorland's Illustrated Medical Dictionary* 1628 (28th ed.1994); Mayo Clinic Staff, *Cushing's syndrome,* at *http://www.mayoclinic.com/* (dated Feb. 4, 2003) (visited Sept. 29, 2004). This condition causes the face and shoulders to appear fatty or obese, as well as striations to appear. *See id.*

Quigley had subsequent consultations with Dr. Parke and Dr. Borden from March of 2000 through August of 2000. In April of 2000, Dr. Parke noted that Quigley had a positive reaction to fourteen of the eighteen tender fibromyalgia tender points, and that Quigley had ceased taking steroids. Dr. Parke prescribed Plaquenil to "help with the joint pains and fatigue." (*Id.,* at UACL 329). In June of 2000, Dr. Parke noted that the endocrinology consultation indicated that Quigley "almost certainly does not have Cushing's disease," but that Quigley had "developed some adrenal crisis" necessitating the resumption of steroid treatment. (*Id.,* at UACL 320). Dr. Parke also noted that Quigley "continues to complain of discomfort all over and states that this is probably not just in the joints, but in all other tissues as well. She is achy and chronically tired." (*Id.*). A physical examination revealed "multiple trigger points." (*Id.*). In August of 2000, Quigley complained that, due to stiffness, she wakes up after four or five hours of sleep, which causes her fatigue the next afternoon. Dr. Borden also noted "some tender points." Dr. Parke and Dr. Borden planned to give Quigley a steroid injection during her next visit in order to determine if Quigley's reaction indicated inflammation. Dr. Parke also referred Quigley to a rehabilitation facility for aquatic therapy.

In late 2000, Dr. Singh first suggested work restrictions due to Quigley's chronic condition. On September 19, 2000, Dr. Singh wrote the following:

Ms. Sharon Quigley has a number of medical problems including chronic fatigue syndrome and fibromyalgia with some underlying [illegible] vascular disease that is being investigated. At this point she is partially disabled and can only work a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

maximum of 20 hours (twenty) per week. Her condition can improve or worsen hence we will observe and keep her disability status adjustable based on her clinical condition.

(*Id.,* at UACL 299). On October 12, 2000, Dr. Singh noted that Quigley was "not getting better" and still in "daily pain." (*Id.,* at UACL 80). On December 4, 2000, Dr. Singh noted that Quigley had fibromyalgia causing aches and pains. He completed a Physician's Statement form, created by UNUM, on which he diagnosed Quigley with fibromyalgia, placed her on "full limitation from work," and stated that his prognosis for recovery was "chronic disability." (*Id.,* at UACL 344). Dr. Singh recommended that Quigley consult with the rheumatologists at the Lahey Clinic.

Quigley did not return to Dr. Parke and Dr. Borden and instead consulted with Paul Romain, M.D., of the Lahey Clinic. Dr. Romain examined Quigley on December 6, 2000. He noted that Quigley had "experienced substantial fatigue," "some problems with memory loss," and "pain that is constant and widespread with multiple areas of tenderness notable...." (*Id.,* at UACL 266). In his examination, Dr. **\*220** Romain found that Quigley had "2 to 3+ tenderness at 16 of 18 tender points characteristic of fibromyalgia in the upper and lower extremities, neck, chest, back, and hips." (*Id.,* at UACL 264). Dr. Romain found "clinical fibromyalgia syndrome" and a "[h]istory of elevated sedimentation rate of unclear etiology or association," which was based upon a past laboratory test result. (*Id.,* at UACL 264). Dr. Romain stated that Quigley "may well have started out with an inflammatory process and carpal tunnel symptoms and this may now be quiescent and it appears she developed an exacerbation of pain amplification disorder subsequent to that." (*Id.*). Dr. Romain also directed Quigley to increase her aquatic therapy. Dr. Romain also examined Quigley on January 25, 2001, and noted that she began to experience more persistent paresthesias, especially in the morning.

Following Quigley's evaluation from Dr. Romain, Dr. Singh went forward with his treatment plan for fibromyalgia. On January 15, 2001, Dr. Singh examined Quigley and noted that she continued to suffer from "generalized aches [and] pains" and that she had "multiple trigger points." (*Id.,* at UACL 80). On January 31, 2001, Dr. Singh stated that, because of the failure to discover any other underlying rheumatic condition, he was "[l]eft [with] [f]ibromyalgia as the diagnosis." (*Id.,* at UACL 82). Dr. Singh continued to treat Quigley's pain, which the

record reveals persisted into August of 2001, with Ultram.

Based upon the foregoing medical history, Quigley submitted a claim to UNUM for disability benefits under a policy procured by her employer, Reid & Reige, P.C. Quigley submitted her claim on January 5, 2001 and stated that the date she reached total disability was September 20, 2000, which, by operation of the ninety-day elimination period, rendered her eligible to receive benefits as of December 18, 2000. [FN6] UNUM denied her claim on April 27, 2001. On July 24, 2001, Quigley appealed UNUM's denial of benefits, and submitted additional materials for review. On August 24, 2001, and October 5, 2001, UNUM declined to reverse its prior denial of benefits. On November 27, 2001, Quigley appealed for a second time and submitted further additional materials.

> FN6. Quigley left work on September 22, 2000, apparently on short-term disability leave.

Prior to denying Quigley's claims for benefits, UNUM's claims adjusters took the following measures to develop the record. First, UNUM's representatives collected Quigley's medical records. Second, at six times throughout the adjustment and appeal process, UNUM submitted Quigley's claims file to a registered nurse or a physician in order to obtain an answer to a question or group of questions posed by the claims adjuster. Third, UNUM sent a questionnaire to Dr. Singh, which included a functional capacity form. In response to this questionnaire, Dr. Singh indicated that Quigley could not "focus on any job for more than 3 hours per day" and that she was unlikely to return to employment "in the near future i.e. at least six months." Dr. Singh also stated that, based upon Quigley's statements and his own clinical experience, Quigley should be restricted to lifting not more than one to ten pounds only "occasionally," which is defined as not more than 33% of the time; that Quigley should bend, kneel, crawl, climb stairs, reach above her shoulder, and push or pull not more than five pounds only occasionally; and that she should do no more than a simple grasp with either hand. (*Id.,* at UACL 212-15).

In addition to the medical records discussed herein, Quigley submitted the following **\*221** materials in support of claim for benefits. On July 24, 2001, Quigley submitted a job description, a statement, and a statement dated July 5, 2001 from Dr. Singh. In her

340 F.Supp.2d 215                                                                                          Page 5
340 F.Supp.2d 215
**(Cite as: 340 F.Supp.2d 215)**

statement, Quigley reviewed the components of her job description and provided information regarding the difficulties she has with her appointed tasks. Dr. Singh's statement consisted of the following:

1. Due to chronic pain resulting from fibromyalgia, Ms. Quigley can work at a computer for no longer than 20 minutes at a time, and 3 hours in a day.

2. Frequently, due to pain resulting from fibromyalgia, she is unable to lift and carry any weight in excess of 1 lb.

3. Frequently, due to pain resulting from fibromyalgia, she is only able to walk slowly, and is unable to bend, kneel, crawl or climb stairs.

4. Due to cognitive deficits resulting from chronic pain, Ms. Quigley frequently is unable to perform a position that ever requires [her to] provide a high level of mental effort and strain, and [she is] unable to produce a high volume of information.

5. Due to cognitive defects resulting from chronic pain, Ms. Quigley cannot reliably proofread typed material for grammatical, typographical or spelling errors. The accuracy and speed of any computer work she does do will suffer due to such cognitive defects.

(*Id.,* at UACL 137). On November 27, 2001, Quigley submitted Dr. Singh's office notes from October of 2000 through November 27, 2001, a statement from Dr. Singh dated October 30, 2001, and a statements from Edward Feinglass, M.D., dated October 26, 2001. Dr. Singh stated that "the attached laboratory results of Sharon Quigley, confirm an inflammatory process in this patient. This is an objective test and cannot be varied by subjective complaints." (*Id.,* at UACL 75). Dr. Feinglass stated the following:

[Quigley] has a clinical history consistent with fibromyalgia, with generalized pain throughout the morning especially, despite chronic analgesic use. She also has associated with this chronic fatigue and requires napping at least two to three days out of the week. She has seen multiple specialists prior to seeing me and has had clinical trials of multiple classes of medication with no real benefit except for Ultram, which she takes chronically at 100 mg four times a day (the maximum dose). She cannot function without it but is still substantially disabled with respect to persistent pain and fatigue.... Some changes were made in her regimen, but I feel that her current pain and fatigue status constitute disabling problems with respect to any full-time or part-time employment.

(*Id.,* at UACL 78).

UNUM referred Quigley's medical records, together with her most recent submissions, to Lani Graham,

M.D., M.P.H. for a seventh, and ultimately final, review. UNUM requested that Dr. Graham answer the following questions:

• Do the records on file support a condition that would preclude sedentary work capacity as of 9/22/00? If not, please give specific reasons.

• Claimant's attorney indicates that the claimant has a new diagnosis. Please indicate if the diagnosis was likely present as of 9/22/00 and if it would produce restrictions and limitations that would preclude sedentary work capacity.

• Do the records on file support the diagnoses of fibromyalgia, or chronic fatigue syndrome?

**\*222** • Do the records on file support the restrictions and limitations outlined by the claimant's attending physician?

(*Id.,* at UACL 66). Upon reviewing all the medical records, Dr. Graham reached the following conclusions: (1) that "the records do not support loss of functional capacity for her usual work as of 9/22/00," (2) that "it is not clear if [a fibromyalgia] diagnosis was appropriate as of 9/22/00," (3) that "there is no support in the record for chronic fatigue syndrome;" and (4) that "the restrictions and limitations provided on 7/5/01 by Dr. Singh are not reasonable." (*Id.,* at UACL 69). Based primarily upon Dr. Graham's conclusions, UNUM denied Quigley's claim by letter dated January 3, 2002.

## II. DISCUSSION

Quigley seeks an order compelling UNUM to pay benefits due under the plan, attorneys' fees, and costs pursuant to Section 502 of ERISA. Section 502 of ERISA provides, in pertinent part, that "[a] civil action may be brought ... by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan...." 29 U.S.C. § 1132(a)(1)(B). UNUM denies Quigley's claim that she is owed benefits under the plan. Each party seeks summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

### A. STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex*

340 F.Supp.2d 215
340 F.Supp.2d 215
(Cite as: 340 F.Supp.2d 215)

*Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.' " *American Int'l Group, Inc. v. London Am. Int'l Corp.,* 664 F.2d 348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1319-20 (2d Cir.1975)). A dispute concerning a material fact is genuine " 'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

## B. REVIEW OF PLAINTIFF'S DISABILITY CLAIM

The parties have stipulated that the proper standard of review to be applied to Quigley's claim is *de novo* review. The plan provides that, "[w]hen [UNUM] receives proof that an insured is disabled due to sickness or injury and requires the regular attendance of a physician, [UNUM] will pay the insured a monthly benefit after the end of the elimination period." (Dkt. # 30, at UACL 32). "Disability" and "disabled" are defined in the plan as follows:

because of injury or sickness:

**\*223** 1. the insured cannot perform each of the material duties of his regular occupation; and

2. after benefits have been paid for 60 months, the insured cannot perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education, or experience.

(*Id.,* at UACL 30). The court must now view the contents of UNUM's claims file and determine whether, for the purpose of deciding the parties' pending motions, the record lends itself to but one conclusion regarding Quigley's condition.

[1] In light of the evidence set forth in UNUM's claims file, Quigley is entitled to judgment as a matter of law. The record reveals that Quigley suffers from fibromyalgia, and that she has been suffering from this condition since September 20, 2000. The record also reveals that Quigley experiences chronic, and often debilitating, pain throughout her body as a direct result of this condition. As a secondary consequence of the pain she suffers, Quigley experiences memory loss and a diminished cognitive capacity due to lack of sleep and general fatigue associated with chronic pain. The treatment she receives for this condition is aimed at managing the chronic pain through medication and therapy. Quigley's complaints of chronic pain, her physicians' observations of this pain through the tender points test, and her physicians' prescription of high doses of pain killers are a sufficient basis for the work limitations mandated by Dr. Singh. Pursuant to these limitations, Quigley is unable to perform her former job and is "disabled" within the meaning of the plan.

UNUM's justification for denying Quigley's application for benefits, which is primarily based upon Dr. Graham's evaluation, cannot be sustained. In her evaluation, Dr. Graham bases her conclusions, in part, on inferences that cannot be supported by the evidence. First, Dr. Graham infers that, because no physician had diagnosed Quigley with fibromyalgia in September of 2000, that Quigley must not have been suffering from fibromyalgia. The record, however, reveals that Quigley complained constantly about her pain during and before September of 2000. The record also reveals that her treating physicians were attempting to rule out other conditions that could cause her the pain Quigley was experiencing. Dr. Graham also infers that, because Dr. Parke never stated that Quigley was disabled, Dr. Parke did not think Quigley was disabled. The record simply does not support any conclusions regarding Dr. Parke's view in this regard.

Second, Dr. Graham bases her conclusion that Dr. Singh's restrictions on Quigley's physical movements are unreasonable on the inference that, because Dr. Singh has restricted movements that are quite common to everyday life, Quigley must be able to perform the proscribed tasks. Dr. Graham's observations regarding the severity of the restrictions are, of course, correct, but Dr. Graham does not indicate why Quigley's history of chronic pain does not support them. The medical records set forth a constant record of chronic pain. The fact that Dr. Singh has proscribed many common movements does not mean that he is not justified in doing so.

Thus, the court rejects UNUM's justification for rejecting Dr. Singh's restrictions not because UNUM had a duty to give Dr. Singh's opinion special weight, but rather because UNUM does not point to any credible evidence suggesting that Dr. Singh's restrictions were inappropriate. "[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's

340 F.Supp.2d 215                                                                                                    Page 7
340 F.Supp.2d 215
**(Cite as: 340 F.Supp.2d 215)**

**\*224** physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003); *see Jordan v. Northrop Grumman Corp. Welfare Benefit Plan,* 370 F.3d 869, 879 (9th Cir.2004) ("This paragraph quite plainly holds that a treating physician's opinion gets no special weight and can be rejected on the basis of reliable evidence with no discrete burden of explanation."). Here, UNUM offers no reliable evidence to rebut Dr. Singh's properly supported opinions.

Dr. Singh's opinions are supported by Quigley's complaints of pain, which are prominent in the records. UNUM argues that Quigley's support for her claim of disability amounts to nothing more than complaints of pain to her primary care physician, who then simply accepts the complaints and imposes restrictions commensurate with these complaints. UNUM contends that, if an insurer was required to accept essentially subjective complaints of pain, with no objective evidence of the etiology of the disabling symptoms, the insurer would not be fulfilling its duty to pay only substantiated claims.

The Court of Appeals for the Second Circuit has stated the following with respect to the relevance of a claimant's complaints of pain:

> It has long been the law of this Circuit that "the subjective element of pain is an important factor to be considered in determining disability." *Mimms v. Heckler,* 750 F.2d 180, 185 (2d Cir.1984). While a district court reviewing an administrator's decision de novo is not required to accept such complaints as credible, ... it cannot dismiss complaints of pain as legally insufficient evidence of disability....

*Connors v. Connecticut General Life Ins. Co.,* 272 F.3d 127, 136 (2d Cir.2001) (citations omitted). Where the record reveals well-documented complaints of chronic pain, and there is no evidence in the record to contradict the claimant's complaints, the claim administrator, and the court, cannot discredit the claimant's subjective complaints.

Therefore, the court finds that the sole conclusion permitted by the evidence in the record is that Quigley has met the requirements for proving her claim for disability benefits.

### C. ATTORNEYS' FEES

[2][3] The court finds that an award of attorneys' fees is not warranted. The parties agree that the standard for determining if either party is entitled to an award of attorneys' fees under 29 U.S.C. § 1132(g)(1) is set forth in *Chambless v. Masters, Mates & Pilots Pension Plan,* 815 F.2d 869 (2d Cir.1987):

> Ordinarily, the decision is based on five factors: (1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants.

*Id.* at 871. The record does not indicate that UNUM's skepticism was founded in bad faith. Further, the cases reviewed by the court reveal substantial disagreement regarding the evidence necessary to award disability benefits to a beneficiary suffering from fibromyalgia. Although the court, reviewing her claim *de novo,* has decided to award Quigley benefits, UNUM's position did have some merit. Given the relative merit of each party's **\*225** position, the court finds it unlikely that an award of fees would serve as a deterrent to other plan administrators. As such, in consideration of the *Chambless* factors, an award of fees is not warranted.

### III. CONCLUSION

For the reasons set forth herein, plaintiff's motion for summary judgment (dkt. # 31) is **GRANTED**, and defendant's motion for summary judgment (dkt.# 31) is **DENIED**. The Clerk shall enter judgment in favor of the plaintiff as follows:

1. Defendant UNUM Life Insurance Company of America shall pay benefits to Sharon Quigley, in an amount due under the terms of the plan, plus prejudgment interest at the statutory rate, that have accrued from December 19, 2000 through the present date; and

2. Defendant UNUM Life Insurance Company of America shall reinstate any benefit or status to Sharon Quigley attendant to her being disabled under the terms of the plan as of September 20, 2000.

340 F.Supp.2d 215

**Motions, Pleadings and Filings (Back to top)**

• 3:02cv01083 (Docket) (Jun. 21, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.