1

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
 2                     (BRIDGEPORT)

 3

 4
                                  )
 5   CANDI McCULLOCH,             )
               Plaintiff          )
 6                                )   Civil Action No:
     Vs.                          )   301CV1115 (AHN)
 7                                )
     HARTFORD LIFE AND ACCIDENT   )
 8   INSURANCE COMPANY and        )
     EDUCATORS MUTUAL LIFE        )
 9   INSURANCE COMPANY,           )
                  Defendant       )
10                                )

11

12            Deposition of ASHA GARG, M.D., taken before
     Judith L. Kline, Certified Shorthand Reporter/Notary
13   Public in and for the State of Connecticut, pursuant
     to notice, at the law offices of Tilton & Whipple, PC,
14   370 Main Street, Worcester, Massachusetts, on June 18,
     2003 at approximately 9:00 a.m.
15

16   APPEARANCES:

17   FOR THE PLAINTIFF:
             ELIOT B. GERSTEN, ESQUIRE
18           GERSTEN & CLIFFORD
             214 Main Street
19           Hartford, CT 06106

20   FOR THE DEFENDANTS:
             ROBERTA JILL SHARP, ESQUIRE
21           AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
             300 Convent Street
22           Suite 1500
             San Antonio, TX 78205
23

24

25
```

1      A    Uh-huh.

2      Q    Great.  Dr. Garg, are you here today

3    represented by counsel?

4      A    Represented by?

5      Q    Do you have a lawyer here today with you?

6      A    Roberta Sharp is here, but I understand she --

7    I was under the impression that she is representing me

8    through The Hartford Company.

9      Q    Okay.  What is the basis of your understanding,

10    that Roberta Sharp is here representing you?

11      A    Well, I have been in contact with Attorney

12    William Murray, M-U-R-R-A-Y, and that's what he told

13    me; that somebody from the firm will be representing.

14    So that's all I know.

15      Q    Okay.  And when did Mr. Murray indicate that to

16    you?

17      A    I think last I talked to him, when I received a

18    notice for deposition.

19      Q    So --

20      A    And after that, a week ago or ten days ago, I

21    met Attorney Jessica Taylor from -- I understand from

22    the firm.  They are the ones who send her there to my

23    office to meet me.

24      Q    Okay.  And you heard Attorney Sharp tell us

25    today that she's not here representing you today; is

1    that correct?

2        A    Yes.  I'm surprised.

3        Q    Okay.  So as you sit here today, is it your

4    understanding that you have a lawyer representing you

5    today here, or you don't have a lawyer representing

6    you here today?

7        A    I guess not.

8        Q    Okay. Fair enough.  When you met with -- did

9    you ever meet with Mr. Murray?

10       A    No.

11       Q    Okay.  And how many times did you and Mr.

12   Murray talk?

13       A    Maybe at least 10, 12 times.

14       Q    Ten or 12 times?

15       A    Yeah.  First he called me when the case was

16   filed, or whatever it is, and told me that this is the

17   situation.  And I'm representing Hartford Insurance

18   Company, and there's going to be case trial, or

19   whatever it is.  So then we communicated with each

20   other a few times, he asked me for the records of --

21            MS. SHARP:  Well --

22            MR. GERSTEN:  I know.  I understand.  I'm

23   going to sort of like keep it generic as she's going.

24   And I'm not going to go into specifics.

25            MS. SHARP:  But maybe you could just give

Brandon Reporting Service (860) 549-1850

9

1    her -- I mean, I don't want to instruct her, but maybe

2    you can give her a little caveat about privilege.

3        Q    (Mr. Gersten)   I'm interested not in -- okay,

4    why don't you keep going.   And all I'm going to tell

5    you is I'm not interested in the specifics of your

6    conversations with Mr. Murray, other than the way

7    you're generally describing it.   And that's fine;

8    okay?

9        A    I just talked a few times.   Every time I got a

10   notice from the other company -- whoever it was that

11   was filing notice, I called him and told him what's

12   going on.   And we communicated.   And he asked me for

13   certain records and things like that.   That's what we

14   do.

15       Q    Okay.   Did you ever formally enter into some

16   sort of letter of engagement with Mr. Murray or his

17   law firm, asking him to represent you?

18       A    Letter?   I don't think there was a formal

19   letter.   It was just communication.   I sent him --

20   faxed him the whatever I received for the notice, and

21   then he suggested me what to do, or what letters to

22   look for and things like that.

23            (Phone rings.)

24       Q    (By Mr. Gersten)   I'm going to interrupt you.

25            MR. GERSTEN:   You have to keep that on

10

1   vibrate.

2       Q   (By Mr. Gersten)  Dr. McCulloch has got kids,

3   so as we all can appreciate, with a need for a cell

4   phone.  My apologies for that.

5           Okay.  So was it the kind of thing where this

6   case started, Dr. Garg, and you learned about the

7   lawsuit starting.  And Mr. Murray contacted you and

8   said The Hartford had been sued; we're going to take

9   care of supplying you with a lawyer?

10      A   I'm not sure whether I first got the notice, or

11  he called me first.

12      Q   And am I correct then that he basically said to

13  you that the Hartford is just going to take care of

14  supplying you with a lawyer, and things like that?

15      A   Yes.

16      Q    And other than -- and you had 10 or 12

17  conversations with Mr. Murray along this time?

18      A   I think so.

19      Q   Did you keep any notes, or anything like that?

20      A   I didn't make any notes.

21      Q   Okay.  And you don't have a formal letter of

22  agreement with Mr. Murray having him represent you;

23  correct?

24      A   No.  No formal letter.

25      Q   Now, you met with Miss Taylor?

Brandon Reporting Service (860) 549-1850

11

1    A    Uh-huh.

2    Q    And she doesn't represent you?

3    A    I don't know.  She said she was sent by Bill

4    Murray and Hartford Company or -- you know, I really

5    didn't get into those details.  But that's what Bill

6    told me; that the attorney will be meeting you --

7    Jessica Taylor, probably -- representing the firm.

8    Q    Okay.  And --

9    A    She will be representative of the firm.

10    Q    And she will be representing what?

11    A    Representing --

12    Q    At the deposition?

13    A    Uh-huh.

14    Q    Okay.

15    A    I don't know if she was supposed to come here

16    to represent me today or not.  But for that day she

17    came to visit me.  And then I was under the impression

18    that she will be here or Roberta -- I knew her name,

19    too -- that she might.

20    Q    But as you sit here today, what you're learning

21    is they don't represent you?

22    A    They don't.  Who don't?

23    Q    Okay.  Miss Taylor works for Miss Sharp; are

24    you aware of that?

25    A    Yes, I think.

12

1     Q    And Miss Sharp has told us that she's not your

2    lawyer today; is that correct?

3     A    Yes.

4     Q    Okay.  So what I would like to know then is

5    what did you and Miss Taylor talk about?

6     A    We just discussed the case.  She went through

7    my case and examination, questions.  That's all.

8     Q    Okay.  When you said she went through my case,

9    what did she go through?

10     A    My notes for the independent medical exam.

11    What I did -- examination, history and all these

12    notes, the report I prepared, which Jessica Taylor had

13    a copy.  I sent it to attorney, also.  And I'm sure

14    Hartford also has my report, too.  And we just went

15    through the case.

16     Q    And can I see what you showed then to Attorney

17    Taylor?

18     A    Sure.  (Hands document.)

19          MR. GERSTEN:  We'll get this marked as

20    Exhibit 21, please.

21

22          (Plaintiff's Exhibit No. 21-- September 8,
     2000 Report, marked for identification.)
23

24          MS. SHARP:  I just wanted to state, for the

25    record, there does appear to be some confusion.  I,

16

1    A    Yes.

2    Q    And how long did you look at the videotape?

3    A    Until it lasted.

4    Q    And how long did that take?

5    A    Maybe about half an hour, 45 minutes.

6    Q    Half an hour, 45 minutes?

7    A    I think that's what it is.

8    Q    Okay.

9    A    I didn't really time it.

10   Q    No problem.  Do you remember what you saw on

11   the videotape?

12   A    Yes.

13   Q    Okay.  My first question is, what was the date

14   of the videotape you looked at?

15   A    One was June 20th.  And I think one date -- can

16   I look at my notes?

17   Q    Sure.

18   A    Because I made notes.

19   Q    You made notes of the videotape?

20   A    It was at the time of examination.

21   Q    I see.  Okay.

22   A    This was just to send me back, to refresh my

23   memory.

24   Q    Okay.

25   A    May 23rd and June 21, 2000.

20

1    Q    Okay.

2    A    I have done a few in the past also.  And I was

3  asked the same thing -- to look at the video.  So I

4  didn't think there was anything wrong or nothing to --

5  you know not anything special.

6    Q    Did you notice whether attorney -- when you met

7  with Attorney Taylor, did she take notes of your

8  conversation?

9    A    Yes.  I think so.  She was writing on the same

10  paper or she had a writing pad.

11    Q    And do you recall how long you and she met?

12    A    About one hour 45 minutes or two hours.

13    Q    Did you keep track of your time?

14    A    Yes.

15    Q    Did you charge anybody for that time?

16    A    Yes.

17    Q    And who did you charge for that time?

18    A    What did I charge?  I think I charged $500 for

19  the first hour and 250 for the second hour.

20    Q    Okay.  And who did you charge?

21    A    I just send the bill to Jessica.

22    Q    Okay.  Have you been paid?

23    A    Yes.  It was my time and they agreed upon it

24  for the time.

25    Q    Was that an agreement that was in writing

Brandon Reporting Service (860) 549-1850

21

1   somewhere?

2        A   No.

3        Q   How did you reach that agreement?

4        A   Well, they asked me since you will be taking

5   time out from your work, and you will be doing this,

6   so if there is any charges you let us know.  So I told

7   them.

8        Q   Okay.  And who was it you talked to about

9   charging?

10       A   I don't know.  There were a few people I've

11  been talking to.  I'm not sure exactly who I talked to

12  about charges, or payment, or anything like that.

13       Q   Is the bill you sent out for your time included

14  in this file?

15       A   Included in the file?  You mean bill is there?

16  I think so.

17       Q   Okay.  Could you try to point that out to me?

18       A   Okay.  Oh, for that time.  No.  That's for the

19  independent exam.  No. I don't think it's in this.  I

20  got confused.  It was for the examination and review.

21  And that was initially when I did the IME, but I don't

22  think I put the bill in here.  No.  I don't think so,

23  no.  It's not in there.

24       Q   So is there another file of some kind that you

25  keep?