Porfiri, Carine M., M.D.

page 1

1

2           UNITED STATES DISTRICT COURT        DISTRICT OF CONNECTICUT

3                      (BRIDGEPORT)

4           CIVIL ACTION NO. 3:01CV1115 (AHN)

5

6   CANDI MCCULLOCH,                      :

7                                         :     Plaintiff,                    :

8                                         :     vs.                           :

9                                         :HARTFORD LIFE AND ACCIDENT          :

10  INSURANCE COMPANY, and EDUCATORS      :MUTUAL LIFE INSURANCE COMPANY,      :

11                                        :     Defendants.                   :

12  -------------------------------------

13                      VIDEOTAPED

14        DEPOSITION OF DR. CARINE M. PORFIRI

15            Taken before Angela Saxon, Certified

16  Professional Reporter and Notary Public in and forthe State of Florida at
Large, pursuant to notice of

17  taking deposition filed by the Defendant in theabove cause.

18

19  Monday, September 8, 20031900 Northwest Corporate Boulevard, Suite 215 West

20  Boca Raton, Florida 334319:15 a.m. - 12:30 p.m.

21  1:10 p.m. - 2:40 p.m.

22

23

24

25

Porfiri, Carine M., M.D.

page 27

1      Q.   And how about CV?

2      A.   Cardiovascular.

3      Q.   And GI?

4      A.   Gastrointestinal.

5      Q.   How about GU?

6      A.   Genitourinary.

7      Q.   And then MKS, is that musculoskeletal?

8      A.   Yes.

9      Q.   You had notated left-sided neck pain?

10     A.   Yes.

11     Q.   And what is HEM slash IMM slash INF?

12     A.   Hematological, immunological infectious.

13     Q.   After that you have underlined denies easy

14   bruising, swollen LN, chills, sweats and fevers, do

15   you recall why you would have underlined that?

16     A.   No.

17     Q.   Would that necessarily mean that she --

18   scratch that.

19          What is LN under where it says swollen LN?

20     A.   Lymph nodes.

21     Q.   And then under neuro you have notated --

22   if you can read that for me?

23     A.   Some mornings awakens with bilateral

24   shoulder numbness and paresthesia of hands

25   bilaterally.

Porfiri, Carine M., M.D.

page 35

1       Q.   And this dosage of Ultram is it the same

2   as you notated in August, in the August 24th note?

3       A.   Yes.

4       Q.   And how about the Vicodin, was that the

5   first time you had prescribed Dr. McCulloch Vicodin;

6   do you know?

7       A.   I don't know.

8       Q.   If it was the first time it was notated

9   anywhere in your office notes would it have been the

10  first time?

11      A.   Yes.

12      Q.   And can you explain the dosage of the

13  Vicodin?

14      A.   Vicodin ES means extra strength one tablet

15  by mouth every six hours as needed for pain,

16  quantity 30.

17          MR. GERSTEN:   Can I just interrupt

18      for a second.  We just received part of

19      the fax what page are you reading from

20      now?

21          MS. TAYLOR:   H5035.

22          MR. GERSTEN:   Thank you very much.

23      Q.   Do you know at this time if Dr. McCulloch

24  was actually taking the Ultram or Vicodin that you

25  prescribed for her?

Porfiri, Carine M., M.D.

page 48

1        A.   I don't know how to answer that question.

2        Q.   When you say you don't know how to answer

3   that question, what did you mean?

4        A.   Ask me the question again.

5        Q.   How can you tell whether a patient is

6   actually limited in their range of motion by pain or

7   anatomically as opposed to just voluntarily limiting

8   their movement themselves?

9             MR. GERSTEN:   Objection.

10       A.   I will move the patient's neck for them.

11       Q.   So you can tell just by trying to move it

12  yourself that they were limited?

13       A.   Yes.

14       Q.   Then the next note about the hand and

15  shoulders, that's the tingling or the numbness that

16  we were talking about earlier?

17       A.   Yes.

18       Q.   Then the A, that's assessment again?

19       A.   Yes.

20       Q.   And when it says cervical disc pathology

21  three disc involvement, is that your own assessment

22  or is that something that Dr. Musso had told you?

23       A.   Three disc involvement by MRI, so that

24  would be per the MRI report.

25       Q.   Had you actually reviewed the MRI yourself

Porfiri, Carine M., M.D.

page 51

1   her discussion with you that they had increase the

2   weights on the machine?

3        A.   No.

4        Q.   Then on June 6th, '96, is this just

5   calling in a prescription again?

6        A.   Yes.

7        Q.   Is that the same level of Ultram as you

8   had prescribed for her before?

9        A.   Yes.

10       Q.   Can you read the notation on the bottom

11  pharmacy -- oh, that's just a number to the

12  pharmacy?

13       A.   Correct.

14       Q.   Can you read the notation on August 24,

15  '96?

16       A.   Phone conversation, patient has been

17  seeing Dr. Katzell who has sent patient to

18  Wellington PT for use of specific -- I can't make

19  out that.  PT, she states she has periods of

20  increased strength attempting -- oh, excuse me,

21  periods of increased alternating with regression.

22  This copy is really bad.

23       Q.   Could that be believes regression due to

24  increased weights on machine?

25       A.   Yes.

Porfiri, Carine M., M.D.

page 57

1    anything in the previous notes about Percocet, would

2    that mean that another doctor had prescribed for

3    her?

4         A.   It's possible.

5         Q.   And then it says upon physical examination

6    in -- does that say mid?

7         A.   Mild.

8         Q.   Mild distress?

9         A.   Secondary to pain.

10        Q.   What is mild distress secondary to pain?

11        A.   That she appeared uncomfortable.

12        Q.   When you say appeared uncomfortable, what

13   sort of objective findings would there be appearing

14   uncomfortable?

15        A.   It could be the affect of the patient.

16        Q.   When you say affect what do you mean?

17        A.   Her countenance, how they appear.

18        Q.   Do you mean like grimacing?

19        A.   Grimacing is a good example.

20        Q.   Anything else?

21        A.   Could be tears.

22        Q.   Anything else you can think of?

23        A.   There could also be body language, holding

24   a body part.

25        Q.   And then underneath that note something

Porfiri, Carine M., M.D.

page 58


1    clear?

2          A.    Conjectiva clear, that's eyes.

3          Q.    So her eyes were clear?

4          A.    Yeah, the -- yeah, here, not blood shot,

5    not oozing puss.

6          Q.    What is TMs?

7          A.    Tympanic membranes.

8          Q.    What is that?

9          A.    The eardrums.

10         Q.    What does that say about the --

11         A.    WNL, within normal limits.

12         Q.    And then neck decreased range of motion

13   and flexion?

14         A.    With flexion.

15         Q.    With flexion, what does that mean with

16   flexion?

17         A.    Flexion is bending neck forward.

18         Q.    So she could bend her neck forward?

19         A.    Its decreased range of motion.

20         Q.    And to test that would you have taken her

21   head in your hands yourself?

22         A.    Yes.

23         Q.    It says patient indicates spasms along

24   posterior neck, did you have -- do you recall if you

25   had any objective findings of that, or is there


page 58

Porfiri, Carine M., M.D.

page 59

1    anything notated here to tell you that?

2          MR. GERSTEN:  Objection.

3      Q.   Is there anything notated here that would

4    indicate you had any objective findings of spasms

5    along her posterior neck?

6          MR. GERSTEN:  Objection.

7      A.   Yes.

8      Q.   And what was that?

9      A.   The following line, occiput to trapezius.

10     Q.   What is occiput?

11     A.   The back of the head right here.

12     Q.   What is trapezius?

13     A.   The muscles right here in the back.

14     Q.   Would that be palpatation?

15     A.   Right.

16     Q.   And then what is the notation about the

17   lungs?

18     A.   Clear to oscillation.

19     Q.   What does that mean?

20     A.   It means when I listened to her lungs it

21   sounded clear.

22     Q.   What is the notation under the lungs?

23     A.   Cor is COR is an abbreviation for heart,

24   regular rate and rhythm.  S1, S2 are normal heart

25   sounds.  Negative MGR is no murmurs, gallops or

Porfiri, Carine M., M.D.

page 97


1       A.    Substitute a word far me, give me another

2    definition of.

3       Q.    When you're saying substituting a word,

4    are you having a problem with the word advocate?

5       A.    Yes.

6       Q.    Do you feel it's your responsibility to

7    support your patients' positions, in other words, if

8    Dr. McCulloch believed she was disabled, she was

9    unable to do her occupation, do you believe it's

10   your responsibility to support that belief?

11          MR. GERSTEN:   Objection.

12      A.    It's my responsibility to state my

13   findings.

14      Q.    And when you say it's your responsibility

15   to state your findings, that no matter what those

16   findings are you're going to be honest about that?

17      A.    Correct.

18      Q.    Do you agree that sometimes you have to

19   accept what a patient tells you about their

20   condition?

21          MR. GERSTEN:   Objection.

22      A.    I agree that the subjective portion of my

23   findings is just that, subjective.

24      Q.    Would you agree that sometimes you may not

25   necessarily see any objective findings that would

Porfiri, Carine M., M.D.

page 99


1       A.   Disability, can you.

2       Q.   What do you believe -- let me ask you

3   this, do you believe that Dr. McCulloch can perform

4   the essential duties of her occupation?

5            MR. GERSTEN:  Objection.

6            MR. McCLOSKY:  You can answer if you can.

7       A.   I can't answer that.

8       Q.   Why can't you answer it?

9       A.   I have not seen her in how many years,

10  what did we say last time is I saw her as a patient.

11      Q.   So let's talk about in the past then when

12  you were seeing her as a patient.  In the period

13  between February of '95 and March of '99 when you

14  last saw her, during that period did you feel that

15  she was able to do the essential duties of her

16  occupation?

17      A.   Define the essential duties.

18      Q.   Let me ask you first, what did you

19  consider Dr. McCulloch's occupation to be?

20           MR. GERSTEN:  Objection.

21      A.   An internist.

22      Q.   And you're an internist as well, correct?

23      A.   I'm a family practitioner.

24      Q.   Do you know what the basic duties of being

25  an internist are?

Porfiri, Carine M., M.D.

page 100

1       A.    Yes.

2       Q.    Based on your understanding of what the

3   duties of an internist are, do you believe that

4   between -- do you believe that Dr. McCulloch in that

5   time period that were you actually seeing her was

6   able to perform those duties?

7           MR. McCLOSKY:  Object to the form, no

8       predicate.

9           MR. GERSTEN:  Objection.

10          MR. McCLOSKY:  Go ahead and answer if

11      you can.

12      A.    No.

13      Q.    You do not believe she was disabled from

14  doing the essential duties of her occupation as an

15  internist?

16          MR. McCLOSKY:  You just

17      mischaracterized her testimony.  I object

18      to the form.

19          MS. TAYLOR:  Let me ask it again

20      then.

21      A.    Start again.

22      Q.    Back up.

23          MR. McCLOSKY:  Sometimes when you use

24      a double negative it makes it difficult.

25          THE WITNESS:  For us dummies.

Porfiri, Carine M., M.D.

page 101

1          MS. TAYLOR:  Not necessarily you.

2     BY MS. TAYLOR:

3          Q.   When you said you had an understanding of

4     what the basic or the essential duties of an

5     internist were, what are those essential duties to

6     you?

7          A.   Seeing patients in the office and then the

8     hospital.

9          Q.   Anything else?

10          A.   All that goes with that, charting,

11     reviewing, labs, making phone calls.

12          Q.   Anything else?

13          A.   Keeping up with continuing medical

14     education.

15          Q.   And do you believe based on your treatment

16     of Dr. McCulloch during the time period of February

17     '95 to March '99 was she able to perform, were there

18     any of those duties you felt that she could not

19     perform as a result of her condition?

20          MR. GERSTEN:  Objection.

21          MR. McCLOSKY:  Object to the form.

22          MS. TAYLOR:  You can answer it if you

23     understand.

24          THE WITNESS:  Ask me again.

25     BY MS. TAYLOR:

Porfiri, Carine M., M.D.

page 102

1       Q.   Those duties that you just listed out for

2   me, that you thought an internist would do, during

3   the time period that you were seeing Dr. McCulloch

4   do you believe that she was unable to perform any of

5   those duties?

6            MR. McCLOSKY:  Same objection.

7            MR. GERSTEN:  Objection, different

8   question.

9   BY MS. TAYLOR:

10      Q.   Did you understand the question?

11      A.   Yes.

12      I believe performing those duties caused her

13  increased pain.

14      Q.   Which one of those duties do you believe

15  would have caused her increased pain?

16      A.   Repeat the duties to me.

17      Q.   For example, would seeing patients in the

18  office or in the hospital, would that cause her

19  increased pain?

20      A.   Yes.

21      Q.   What about that would cause her increased

22  pain?

23      A.   Any kind of prolonged time spent writing,

24  reading.

25      Q.   And when you say prolonged time writing or

Porfiri, Carine M., M.D.

page 103

1   reading would that be because her neck would have to

2   be down?

3       A.   Yes.

4       Q.   Anything else you can think of about

5   seeing patients in the office or the hospital that

6   would cause her increased pain?

7       A.   Even wearing a lab coat if it's heavy can

8   really increase neck pain, shoulder pain.

9       Q.   Do you have to wear a lab coat when

10  seeing patients?

11      A.   You have to carry equipment with you.  You

12  have to have a stethoscope and pens and prescription

13  pads.  It can get quite heavy and quite

14  uncomfortable.

15      Q.   Anything else about seeing patients in the

16  office or in a hospital that would increase her

17  pain?

18      A.   Those would be the main things.

19      Q.   And then with charting or reviewing would

20  that be what you were talking about with writing and

21  reading?

22      A.   Yes.

23      Q.   What about phone calls would that increase

24  her pain?

25      A.   Yes.

Porfiri, Carine M., M.D.

page 104

1       Q.    Would that be because of using her neck?

2       A.    Yes.

3       Q.    Anything else you can think of that as an

4    internist duties of an internist that could cause

5    Dr. McCulloch increased pain?

6       A.    At times doing a physical exam could.

7       Q.    And what about doing a physical exam would

8    cause her increased pain?

9       A.    You have to flex your neck forward.

10      Q.    So you have told me that these different

11   activities could cause her increased pain.  Would

12   you then say that she during that time period that

13   you were seeing her, that she was disabled from

14   being an internist?

15           MR. McCLOSKY:  Object to the form, no

16   predicate.

17           MR. GERSTEN:  Objection.

18      A.    You have to define disabled.

19      Q.    Let me ask you, what is your definition of

20   disabled?  What is your understanding of that term?

21           MR. GERSTEN:  Objection.

22           Jessica, I suggest that if you're

23           going to ask that line of questions you

24           should be putting the insurance policy in

25           because the doctor's understanding is

page 104

Porfiri, Carine M., M.D.

page 105

```
 1        irrelevant without it.

 2            MR. McCLOSKY:  Number two,

 3        respectfully, I'm not sure this witness is

 4        competent to give a definition of pain or

 5        disability.  But as I understand it you're

 6        just asking her for her understanding of

 7        the term regardless of whether it's

 8        consistent with the policy or the legal

 9        standards or not, correct?

10   BY MS. TAYLOR:

11        Q.   Let me ask you this then, do you believe

12   that during the time period you saw Dr. McCulloch

13   that she was unable to perform the material and

14   substantial duties of her occupation?

15            MR. McCLOSKY:  Object to the form.

16        A.   I can say what I said before, that

17   performing those duties would increase her pain.

18        Q.   So would then because they would increase

19   her pain would you then --

20            MR. GERSTEN:  Could you let the

21        witness finish her question.

22            MS. TAYLOR:  I thought she had.

23            MR. GERSTEN:  I heard her say would

24        increase her then I didn't hear an answer.

25            THE WITNESS:  Pain.
```

page 105

Porfiri, Carine M., M.D.

page 106

1          MR. GERSTEN:  Thank you, Doctor.

2    BY MS. TAYLOR:

3       Q.   Would you say then because performing the

4    material and substantial duties of her occupation

5    would cause her increased pain that she should then

6    not perform those duties?

7       A.   Yes, I would say that.

8       Q.   So would you say then that what is

9    preventing her from performing the material and

10   substantial duties of her occupation is pain?

11      A.   Yes.

12      Q.   What would you say Dr. McCulloch's

13   limitations are?  I know we've discussed some of

14   them, you know, having to move her neck.  Is there

15   anything else you can think of, limitations that she

16   would have?

17          MR. GERSTEN:  I'm objecting.

18      Q.   During the time period that you saw her?

19          MR. GERSTEN:  Could you be a little more

20      specific.

21      Q.   Other than having to move her neck which

22   would cause her increased pain are there any other

23   limitations Dr. McCulloch would have based on your

24   understanding of her condition during the time you

25   saw her between February of '99 and March of '99?

page 106

Porfiri, Carine M., M.D.

page 107

1           MR. McCLOSKY:  In addition to what

2       she's testified to earlier this morning.

3           MS. TAYLOR:  In addition to.

4       A.    That includes pain?

5       Q.    Yes.

6       A.    Any heavy lifting.

7       Q.    And this morning you had testified to a

8    list of exacerbating activities, would you say that

9    those would be her limitations what you testified to

10   this morning?

11      A.    Could you tell me, repeat them to me.

12      Q.    Looking down while she's at her desk?

13      A.    Yes.

14      Q.    Would that be a limitation?

15      A.    Yes.

16      Q.    How about carrying charts, would that be a

17   limitation?

18      A.    Yes.

19      Q.    How heavy are charts?

20      A.    It can be quite heavy.

21      Q.    And when you say quite heavy, do you know

22   like approximately how many pounds it could be?

23      A.    It could be three pounds.

24      Q.    And so assisting patients in the exam

25   room, she wouldn't be able to do that, that would be

page 107

Porfiri, Carine M., M.D.

page 108


1    a limitation?

2         A.   That would be a limitation.

3         Q.   Do you believe the fact that -- and I'm

4    talking about the time period that you saw her --

5    the fact that Dr. McCulloch was taking Vicodin and

6    Ultram or Percocet that that would prevent her from

7    performing the material and substantial duties of

8    her occupation?

9         A.   I believe it could.

10        Q.   Do you know if it did?

11             MR. GERSTEN:   Objection.

12             The question as phrased, Jessica,

13        may not be to be a trick question but if

14        it covers a time period in which Dr.

15        McCulloch was in fact working during a

16        time period where Dr. McCulloch was not

17        working, it's awfully broad and unfair to

18        the witness who's not a party to the case.

19        And I would ask you to rephrase it to

20        eliminate any kind of potential for a

21        trick question.

22   BY MS. TAYLOR:

23        Q.   Let me ask you this, we discuss the

24   dosages of medication that Dr. McCulloch was taking

25   when we went over your office notes.  Do you believe

Porfiri, Carine M., M.D.

page 109


1    that those dosages that she was taking of pain

2    medications that that would prevent her from

3    performing the material and substantial duties of

4    her occupation?

5          A.    It could.

6          Q.    Explain to me how it could.

7          A.    One of them is a narcotic.

8          Q.    Which one are you referring to?

9          A.    Percocet or Vicodin.

10         Q.    The fact that Percocet or Vicodin are

11   narcotics, what's significant about that?

12         A.    They could impair cognition, judgment.

13         Q.    How so?

14               MR. McCLOSKY:  That's what drugs do.

15         A.    That's what drugs do.

16               MS. TAYLOR:  Object to the side bar.

17   BY MS. TAYLOR:

18         Q.    How would it impair?

19         A.    I can't give you the pharmacology of it.

20         Q.    Do you not know how it would affect

21   cognition?

22         A.    I do not know the pharmacology of how

23   exactly.

24         Q.    Did Dr. McCulloch and in the times that

25   Dr. McCulloch saw you did she ever tell you that her

Porfiri, Carine M., M.D.

page 110


1   pain medications prevented her from working?

2        MR. GERSTEN:  I'm sorry, I didn't hear

3        all of the question.

4   BY MS. TAYLOR:

5        Q.   On your many different conversations or

6   office visits with Dr. McCulloch did she ever tell

7   you that her pain medications prevented her from

8   working?

9        A.   I recall discussions about her sensitivity

10  to medications.

11       Q.   And when you say her sensitivity to

12  medication, what does that mean?

13       A.   That she could become extremely drowsy.

14       Q.   But Dr. McCulloch also told you that she

15  was trying to take the least amount of medication as

16  possible; is that correct?

17       A.   Correct.

18       Q.   Did you ever -- did you note anywhere in

19  your office notes that these medications caused her

20  to become drowsy?

21       A.   No, not that I could see.

22       Q.   How long have you been a physician?

23       A.   Ten years.

24       Q.   During that time period have you ever

25  taken pain medication while you were working?

Porfiri, Carine M., M.D.

page 111


```
 1      A.   No.
 2      Q.   Are you aware of any ethical constraints
 3   for a physician who is using narcotic pain
 4   medications for pain?
 5      A.   I think it would be evident.
 6      Q.   Well are there any published standards?
 7      A.   I wouldn't know.
 8      Q.   So you don't know whether the American
 9   Medical Association has said anything on that
10   subject?
11      A.   Do I know specifically, no.
12      Q.   Do you know generally?
13      A.   I know common sense
14      Q    But you don't know of any kind of written
15   ethical code for physicians?
16      A.   I do not.
17      Q.   Do you believe a physician who is taking
18   narcotic pain medications that they could do certain
19   aspects of their job?
20           MR. McCLOSKY:  Object to the form.
21           MS. TAYLOR:  You can answer it if you
22   understand.
23      A    Yes.
24      Q.   What aspects of their job could they do?
25      A.   They could walk.
```

Porfiri, Carine M., M.D.

page 112

1       Q.   What else?

2       A.   If possible.

3       Talk.

4       Q.   What else?

5       A.   Write.

6       Q.   What else?

7       A.   Possibly read.

8       Q    Could a physician see patients while

9    taking narcotic pain medication?

10           MR. McCLOSKY:  Object to the form;  it's

11       hypothetical and speculative.

12           MR. GERSTEN:  Objection.

13      Q.   Let me ask you this, with what a

14   physician could do -- that started bad.

15      Would it depend on the dosage a physician was

16   taking as to what sort of activities they could

17   perform while on narcotic pain medication?

18           MR. McCLOSKY:  I'm sorry, same objection.

19           MR. GERSTEN:  Objection.

20      A.   No.

21      Q.   It would not depend on the dosage?

22      A.   No.

23      Q.   Even if a doctor was taking a very small

24   dosage?  Let me back up a second.

25      Let me ask you the negative then, what do you

Porfiri, Carine M., M.D.

page 113

1    believe a physician could not do while taking

2    narcotic pain medications?

3        A.   What do I believe a physician could not

4    do.  Make sound clinical judgments.

5        Q.   No matter what dosage they were taking?

6        A.   In my opinion, no matter what dosage they

7    were taking.

8        Q.   So you don't think it depends on a

9    particular patient's tolerance for pain medications?

10       A.   I think the degree of their inability to

11   make good judgment would depend on their tolerance.

12       Q.   So would you say there might be some

13   physicians who might have a high tolerance and can

14   take pain medications and use sound clinical

15   judgment?

16       A.   I can't say, I don't know.

17       Q.   You shared a practice with Dr. McCulloch;

18   didn't you?

19       A.   Yes.

20       Q.   How long did you share a practice with

21   her?

22       A.   I don't recall exactly.

23       Q.   Was it about a year or?

24       A.   Roughly.

25       Q.   And when you shared a practice with her

Porfiri, Carine M., M.D.

page 116


1          MR. McCLOSKY:  Call her back.

2          MS. TAYLOR:  She wasn't prepared to be

3      here for the whole day.  I mean you never asked

4      me how long it would take.

5          MR. McCLOSKY:  You're wasting time, just

6      ask your questions.

7          MS. TAYLOR:  And by agreement is the only

8      reason why I didn't subpoena her again.

9  BY MS. TAYLOR:

10     Q.   Do you have any complaints about working

11  at JFK?

12     A.   Do I answer the question or not?

13         MR. McCLOSKY:  Yes, you can answer.

14     A.   I had some issues working for Columbia

15  HCA.

16     Q.   What were those issues generally?

17         MR. GERSTEN:  Objection.

18     A.   I don't think they treated their

19  physicians very well.

20     Q.   How would they not treat their physicians

21  well?

22     A.   They did not value our input regarding our

23  practices.

24     Q.   Anything else?

25     A.   That's enough.

Porfiri, Carine M., M.D.

page 119

1   Dr. McCulloch?

2       A.   Yes.

3       Q.   How long have you known Dr. McCulloch?

4       A.   Since we started working together.

5       Q.   When you worked together would you see

6   each other socially?

7       A.   Occasionally.

8       Q.   So like going out to dinner that sort of

9   thing?

10      A.   Yes.

11      Q.   How about since she's moved to

12  Massachusetts, you said that you've talked to her on

13  the phone within the last year, do you talk on the

14  phone?

15      A.   Do we, yes.

16      Q.   How often do you talk on the phone?

17      A.   Not that often.

18      Q.   Every several months maybe?

19      A.   Something like that, yeah.

20      Q.   Do you ever see Dr. McCulloch if she comes

21  to Florida to visit?

22      A.   I have.

23      Q.   When is the last time you saw Dr.

24  McCulloch in person?

25      A.   I can't remember.

Porfiri, Carine M., M.D.

page 120


1     Q.   Was it within the last year?

2     A.   I don't believe so.

3     Q.   Has Dr. McCulloch ever told you anything

4     about this lawsuit?

5     A.   Not specifically.

6     Q.   Just generally that she had sued Hartford

7     and Educators?

8     A.   Something like that.

9     Q.   Have you ever talk to Elliot Gersten?

10    A.   No.

11    Q.   Did you review any documents for this

12    deposition?

13         MR. McCLOSKY:  That calls for a yes or no

14         response.

15    A.   Yes.

16    Q.   What documents did you review?

17         MR. McCLOSKY:  Don't answer that question.

18         That's attorney-client work product privilege,

19         any documents she saw she did at my request.

20         She's not going to disclose what those

21         documents were.

22         MS. TAYLOR:  That's fine.

23         Did you receive that fax, Elliot?

24         MR. GERSTEN:  Yeah, I got about four or

25         five of them.


page 120

Porfiri, Carine M., M.D.

page 122

1       A.    No.

2             MR. GERSTEN:   Her answer was that she

3       didn't recall.

4       Q.    Yes.

5       A.    Not that I remember, no.

6       Q.    Do you recall Dr. McCulloch ever telling

7       you anything about JFK trying to coerce her into

8       relocating her medical practice?

9       A.    No.

10      Q.    Were you aware of any problems that Dr.

11      McCulloch had sharing an office with Dr. Spurlock?

12            MR. GERSTEN:   Objection.

13      A.    Very vaguely.

14      Q.    Do you recall anything that Dr. McCulloch

15      may have told you about her relationship with Dr.

16      Spurlock?

17      A.    Specifically.  I do recall that he asked

18      him to cover -- her to cover for him on weekends and

19      it had been several weekends in a row.

20      Q.    Do you recall anything else?

21      A.    Not really, no.

22      Q.    I'm going to hand you what's been marked

23      as Exhibit No. 4 and by the way that Exhibit No. 3

24      was a letter from for purposes of the record a

25      December 7, 1994 letter from Helga Carr to Rich

Porfiri, Carine M., M.D.

page 125


     1      A.    Okay.

     2      Q.    Let me ask you were you aware that JFK

     3   was making complaints that Dr. McCulloch was not

     4   working her full 16 hours of clinical hours a week?

     5            MR. GERSTEN:   Objection.

     6      Q.    Did Dr. McCulloch ever tell you that JFK

     7   was complaining about the number of clinical hours

     8   she was performing per week?

     9            MR. GERSTEN:   Objection.

    10      A.    I don't recall that specifically.

    11      Q.    Do you recall when you were sharing an

    12   office with Dr. McCulloch were there ever times that

    13   she just didn't show up for work that you remember?

    14            MR. GERSTEN:   Objection.

    15      A.    No.

    16      Q.    Do you recall patients ever complaining

    17   about Dr. McCulloch keeping them waiting for long

    18   periods of time?

    19      A.    No.

    20            MR. GERSTEN:   Objection.

    21      Q.    Do you recall Dr. McCulloch ever telling

    22   you anything about JFK complaining that she wouldn't

    23   answer her beeper?

    24            MR. GERSTEN:   Objection.

    25      A.    No.

Porfiri, Carine M., M.D.

page 130

1    BY MS. TAYLOR:

2        Q.    Dr. Porfiri, let me ask you on the second

3    page which is marked H5041 is that your signature?

4        A.    Yes.

5            MR. GERSTEN:  Can you say that the

6        question one more time?

7            MR. McCLOSKY:  She's just

8        authenticating the signature, Elliot.

9            MR. GERSTEN:  Thank you.

10       Q.    If you can turn to the first page of this

11   document.  The typewritten portion, is that

12   something your office typed up, do you know?

13       A.    I have no idea.

14       Q.    But if you signed the document is it fair

15   to say that you reviewed the answers?

16       A.    Yes.

17       Q.    To the questions?

18       A.    Yes.

19       Q.    In number three which is asking a question

20   about a serious question under the Family Medical

21   Leave Act you said that her condition was a category

22   four, what is a category four?

23       A.    A chronic condition requiring treatment.

24   It's on the next page.

25       Q.    So under categories on the second page the

Porfiri, Carine M., M.D.

page 131

1  chronic condition required treatment?

2      A.  Correct.

3      Q.  And in number four that's your description

4  of Dr. McCulloch's condition?

5      A.  Correct.

6      Q.  Anywhere in number four do you mention

7  anything about Dr. McCulloch having to take FMLA

8  leave because she taking narcotic medication?

9      A.  In number four

10     Q.  Yes.

11     A   No.

12     Q.  Let me ask you this, anywhere else in this

13  document do you state that Dr. McCulloch needs to

14  take FMLA leave because she's taking narcotic pain

15  medication?

16     A.  That's kind of a tricky question.

17         MR. McCLOSKY:  Lawyers are good at that.

18     A.  Because if you look at 6C her regimen does

19  include prescription medication and prescription

20  pain killers.

21     Q.  But would you agree this your

22  certification for her leave does not mention that

23  she needs to take leave because of the narcotic pain

24  medication?

25         MR. GERSTEN:  Objection.

Porfiri, Carine M., M.D.

page 133


1        Is it a one-page document?

2              MS. TAYLOR:  Yes.

3              MR. GERSTEN:  Is it a one-page

4        document?

5              MS. TAYLOR:  Yes.

6              MR. McCLOSKY:  What's the Bates

7        number.

8              MS. TAYLOR:  H948.

9              MR. GERSTEN:  This is Exhibit 9?

10             MS. TAYLOR:  Yes, 9.

11   BY MS. TAYLOR:

12        Q.   Is this your handwriting on this document

13   Dr. Porfiri?

14        A.   Yes.

15        Q.   And in response to question one which asks

16   what are Dr. McCulloch's current restrictions and

17   limitations and how do they prevent her from working

18   on a part-time or full-time basis, what was your --

19   could you read your response to that?

20        A.   Chronic and debilitating pain from

21   cervical disc pathology and inability to lift heavy

22   items.

23        Q.   Let me ask you this, in this response

24   regarding her restrictions and limitations do you

25   mention that, that she can not work as a result of


page 133

Porfiri, Carine M., M.D.

page 137


1        Q.    Did Dr. McCulloch request that you write

2    this letter if you recall?

3        A.    Yes.

4        Q.    And is this letter a response to Mr.

5    Craft's November 1997 letter?

6        A.    Yes.

7        Q.    So then it is fair to say that you were

8    aware that Educators was questioning whether she was

9    continually disabled?

10            MR. GERSTEN:   Objection.

11            MR. McCLOSKY:   Answer if you can.

12       A.    Yes.

13       Q.    I just want to ask you a few questions

14   about this letter.

15           Why did you write this letter, if you recall?

16       A.    It says in the second paragraph that

17   basically I disagreed with contents of the letter.

18       Q.    What specific contents did you disagree

19   with?

20       A.    The first statement that the treatment

21   notes provided no objective clinical evidence of

22   ongoing disabling condition?

23       Q.    So you disagreed with that?

24       A.    Yes.

25       Q.    Why did you disagree with that?

Porfiri, Carine M., M.D.

page 138


1          MR. GERSTEN:  Objection.

2          MR. GERSTEN:  You asking her for the

3     reasons that she disagreed with that?

4          MS. TAYLOR:  Yes.

5     A.   Ask the question again, I'm sorry.

6     Q.   You said that you disagreed with Mr.

7     Craft's statement that there was no objective

8     clinical evidence of an ongoing disability; is that

9     correct?

10    A.   Correct.

11    Q.   What were the reasons why you disagreed

12    with that?

13    A.   They mentioned here in the note.  In

14    reference to Dr. Katzell's note that I found that

15    there was stating objective clinical evidence of her

16    ongoing disabling condition.

17    Q.   And do you recall what there was in Dr.

18    Katzell's notes that would provide objective

19    clinical evidence of an ongoing disabling condition?

20    A.   He made reference to her MRI findings.  He

21    mentioned severe spasm.

22    Q.   Can I ask you this, do you recall if Dr.

23    Katzell opined that Dr. McCulloch had chronic pain

24    syndrome?

25    A.   Do I recall, without seeing his notes in

Porfiri, Carine M., M.D.

page 139


1    front of me, no.

2        Q.    But that was your opinion that she had

3    chronic pain syndrome?

4        A.    Correct.

5        Q.    And in your last -- on page H5019 the last

6    sentence you state "Perhaps in your business one

7    ignores the subjective finding or considers them to

8    be nontruths or simply unimportant."

9            So from that statement would you then agree

10   that subjective findings are very important in terms

11   of a patient's condition or Dr. McCulloch's

12   condition?

13       A.    Yes.

14           MR. GERSTEN:   Objecting.   I didn't

15       understand the question.

16           MS. TAYLOR:   I'm sorry.

17           MR. GERSTEN:   I'm objecting.   I didn't

18       understand the question.

19   BY MS. TAYLOR:

20       Q.    So is it fair to say that Dr. McCulloch's

21   subjective complaints were significant to you in

22   terms of your opinions about her condition?

23           MR. GERSTEN:   Objection.

24       Q    Do you understand the question?

25       A.    I understand the question.

Porfiri, Carine M., M.D.

page 141

1          here.  I didn't respond to that.  I'm not

2          here to argue with her.

3               MR. McCLOSKY:  That's fine, that's

4          perfect the way you're speaking right now.

5          The videographer is having a hard time

6          hearing you.

7     BY MS. TAYLOR:

8          Q.   Dr. Porfiri, turn to the second page of

9     your letter on H5020.  And then the first sentence

10    hear you say "In my business it's important to

11    believe the patient?"

12         A.   Um-hum.

13         Q.   So you would agree that it was important

14    for to you believe what Dr. McCulloch was telling

15    you about her condition?

16         A.   You have to be more specific with the

17    question.

18         Q.   Did you feel that it was important to

19    believe what Dr. McCulloch was telling you about her

20    condition?

21         A.   Yes.

22         Q.   Let me ask you this, in that same

23    paragraph you refer to straightening of the cervical

24    neck spine, what is that?  Straightening of the

25    cervical neck spine?

Porfiri, Carine M., M.D.

page 142

1      A.   You would see that on films, if you have a

2  straightening of the normal curvature of the

3  cervical neck then you have muscular spasm of the

4  neck.

5      Q.   Is that something you would have seen in

6  Dr. Katzell's notes?

7      A.   It could have been, yes.

8      Q.   And that straightening is that also

9  referring to the cords of muscle in the upper back

10  and neck?

11      A.   They're involved in that straightening

12  process.

13      Q.   And when you say atrophy neck muscles,

14  what are you referring to?

15      A.   Weakened muscles.  They have actually

16  shrunk in size.

17      Q.   So would it be like a tightening of the

18  muscles?

19      A.   No, it's a shrinking in size of the

20  muscle.

21      Q.   Would that -- what would the result be of

22  a shrinking in the size of the muscles, what sort

23  of --

24      A.   A visual inspection you could see that.

25  You could see, if some muscles are atrophied you can

Porfiri, Carine M., M.D.

page 143

1    see it.

2        Q.    So you can see it just by looking at the

3    person?

4        A.    Yes.

5        Q.    What would you see that would show that

6    muscles are atrophied?

7        A.    If for instance you're looking at a

8    person's biceps, one would be a lot smaller than the

9    other, for instance, the one that's smaller could be

10   atrophied.

11       Q.    On the second paragraph you say Dr.

12   McCulloch continues to see Dr. Katzell and me on a

13   regular basis, how would you define regular basis?

14       A.    That could be yearly, could be every six

15   months.

16       Q.    And then later on in this paragraph you

17   say you discussed with Dr. McCulloch that you

18   believe physical therapy was futile; is that

19   correct?

20       A.    Correct.

21       Q.    Why did you believe physical therapy was

22   futile?

23       A.    It states here she's tried them over and

24   over again at great expense to herself with

25   ultimately no benefit.

Porfiri, Carine M., M.D.

page 144


1       Q.   Did you ever see any objective evidence

2    from examining Dr. McCulloch that the physical

3    therapy had improved her condition at all?

4       A.   Had improved her condition at all, no.

5       Q.   Then you tell Mr. Craft, "There are times

6    when a cure is not easy and may never be found.   I

7    do not believe this to be the case here."

8       So it is fair is say that on December 16, 1997

9    you thought that there might be a resolution to Dr.

10   McCulloch's problems?

11           MR. GERSTEN:   Objection.

12      A.   That there could be.

13      Q.   So you believe that there might be some

14   sort of --

15      A.   Possibly.

16      Q.   I'm sorry, I didn't mean to interrupt

17   you.

18           MR. GERSTEN:   Jessica, did you finish

19       the question?

20           MS. TAYLOR: I did.

21           (Thereupon, Defendant's Exhibit

22       Number 12 was marked for identification.)

23   BY MS. TAYLOR:

24      Q.   I'm going to hand you what's been marked

25   deposition Exhibit No. 12.


page 144

Porfiri, Carine M., M.D.

page 145


1        And Elliot this is H4234 and 4235 which is the

2    attending physician's statement to Hartford.

3           MR. GERSTEN:   Thank you.  Did you say

4       number 12?

5           MS. TAYLOR:  Yes.

6       Q.   On page 2 of this document, Dr. Porfiri,

7    which is H4235, is that your signature on the bottom

8    of the page?

9       A.   Yes.

10      Q.   And is this your handwriting on this

11   document except for the very top part of H4234?

12      A.   Yes.

13      Q.   And under number one which is diagnosis

14   it states that the date of your last examination was

15   November 18, 1999?

16      A.   Yes.

17      Q.   Do you have an office note from that date?

18      A.   I don't know.

19      No.

20      Q.   Is it possible that this is a typo?

21      A.   It's possible.

22      Q.   Is it true that the last note that you

23   have of an actual office visit with Dr. McCulloch

24   was in March of '99?

25      A.   Correct.


page 145

Porfiri, Carine M., M.D.

page 146


1        Q.    Is it correct that you filled out this

2    form on January 28th of 2000?

3        A.    Yes.

4        Q.    And in the description of diagnosis you

5    gave to Hartford you stated that her diagnosis was

6    chronic pain, herniated cervical disc, TMJ and

7    migraines; is that correct?

8        A.    Yes.

9        Q.    And in the ICD9 codes do those correspond

10   with the four diagnoses?

11       A.    As far as I know.

12       Q.    And then the subjective symptoms those

13   would be what Dr. McCulloch had described to you; is

14   that correct?

15       A.    Correct.

16            MR. GERSTEN:  Could you say that a little

17       louder.

18            MS. TAYLOR: The subjective symptoms

19       that would be what Dr. McCulloch described

20       to you, is that correct, and she said

21       correct.

22       Q.    So the subjective symptoms you listed were

23   pain in neck, upper back, right shoulder, jaw pain,

24   severe head pain and migraines; is that correct?

25       A.    Yes.

Porfiri, Carine M., M.D.

page 147


1          Q.    In the objective findings would be what

2     you had found on examination?

3          A.    Yes.

4          Q.    And here you note scars anterior and

5     posterior neck, what is that referring to?

6          A.    Those refer to the scars from her prior

7     two surgeries.

8          Q.    And those are the surgeries in '89 and

9     '90?

10         A.    Yes.

11         Q.    And then you also noted that you found

12    objective evidence of decreased range of motion in

13    the neck; is that correct?

14         A.    Yes.

15         Q.    And muscle spasm in the neck and shoulder

16    muscles bilaterally?

17         A.    Yes.

18         Q.    And in the muscle atrophy which we

19    described a few minutes ago?

20         A.    Yes.

21         Q.    There is kind of a line and then you make

22    a notation about a September '98 MRI of the cervical

23    spine, is that what that says?

24         A.    Yes.

25         Q.    Was that the latest MRI that you were

Porfiri, Carine M., M.D.

page 148


1    aware of at the time you filled out this form; do

2    you know?

3        A.    I don't know.

4        Q.    This fusion C6, C7 is that referring to

5    the earlier surgery?

6        A.    What I have right here is what the

7    findings were on that MRI so.

8        Q.    The fusion, I see what you're saying.

9        So the fusion C6, C7 is referring to the MRI?

10       A.    Yes.

11       Q.    Next to that it looks like PPD?

12       A.    DDD.

13       Q.    DDD, what is that?

14       A.    Degenerative disc disease with posterior

15   osteophyte formation.  All I wrote here is the MRI

16   findings in that whole little area.

17       Q.    What is posterior osteophyte formation?

18       A.    That she had a bony formation on the

19   posterior aspect of the cervical spine.

20       Q.    Is that something, if you know, that could

21   be caused just by age, just by aging?

22            MR. GERSTEN:  By AIDS or by age?

23            MS. TAYLOR:  Aging.

24       A.    It's possible.

25       Q.    And then underneath there if you can read


page 148

Porfiri, Carine M., M.D.

page 149


1    that narrow left?

2         A.   Intervertebral foramen C5, C6.

3         Q.   What is inter --

4         A.   Intervertebral foramen is a little whole

5    basically where the nerve root exits so it's

6    narrowed.

7         Q.   Is that something that could be caused by

8    aging, if you know?

9         A.   The narrowing, degenerative disc disease

10   could lead to that.

11        Q.   Is degenerative disc disease a result of

12   aging?

13             MR. McCLOSKY:  You talking about

14        generally or with this particular

15        patient?

16        Q.   Generally?

17        A.   Generally it can be.

18        Q.   On the dates of treatment the first visit

19   it states October 17, '95?

20        A.   Yes.

21        Q.   Based on our review of the office notes;

22   is that accurate?

23        A.   Yes.  Wait a minute, the date of first

24   visit, no.

25        Q.   And then under the frequency you have a

Porfiri, Carine M., M.D.

page 151

1      Q.    Would you agree that there was a time

2    period though particularly in '97 where her

3    condition was improving?

4            MR. GERSTEN:   Objection.

5      A.   '97, it says basically unimproved.

6      Q.    What about July of '97?

7      A.    That's the only time there was some

8    improvement.

9      Q.    She was able to walk five miles every

10   other day, that's what she reported to you at that

11   time?

12     A.    Yes.

13     Q.    When you state under progress that Dr.

14   McCulloch was ambulatory, what does ambulatory mean?

15     A.    It means she can walk.

16     Q.    And then under nature of treatment, you

17   kind of added on the bottom the medications Ultram

18   and then Vicodin and Percocet, are these consistent

19   with the dosages that were you prescribing for her?

20     A.    Yes.

21     Q.    Between '95 and '99?

22     A.    Yes.

23     Q.    Then on the next page if you look at

24   physical impairment on the bottom -- let me ask you

25   this, it doesn't look like you filled out any of the

Porfiri, Carine M., M.D.

page 152


1    classes.  Is there a class that would you have

2    designated for Dr. McCulloch at that time?

3         A.   No, because there are no definitions here.

4         Q.   So you didn't feel that anything here you

5    could answer?

6         A.   Yeah.

7         Q.   But you did state, Dr. McCulloch is unable

8    to perform the material duties of her profession?

9         A.   Correct.

10        Q.   Are those the limitations we referred to

11   earlier?

12        A.   Yes.

13        Q.   Then under prognosis when it asks "Do you

14   expect a fundamental or market change in the

15   future?" And you put "no".  So is it fair to say at

16   this time that you didn't expect Dr. McCulloch's

17   condition for her to improve?

18        A.   Yes.

19        Q.   Then you state under here "The chronic

20   condition of patient's cervical neck pathology is

21   likely to worsen rather than improve."  What did you

22   mean that it was likely to worsen?

23        A.   Just what I wrote.

24        Q.   Why did you believe that it would worsen?

25        A.   Because she certainly hadn't gotten any

Porfiri, Carine M., M.D.

page 153


1    better and gotten worse over the course of my seeing

2    her.

3         Q.    Under remark you say that "Dr. McCulloch

4    continues to try to do anything to increase her

5    strength and decrease her chronic pain."  What were

6    you aware of that Dr. McCulloch was trying to do?

7         A.    We talked about it earlier, all the things

8    she tried: Yoga, acupuncture, acupressure, healing

9    hands, hands healing, all of it.

10        Q.    And you don't know what that healing hands

11   was referring to?

12        A.    I don't recall.

13        Q.    Let me ask you real quick on this

14   attending physician statement of disability, where

15   on here do you tell Hartford that Dr. McCulloch

16   can't perform the material duties of her profession

17   because she's taking narcotic pain medication?

18        A.    It doesn't say that.

19            MS. TAYLOR:  I don't have that much

20         left but I've got to run to the restroom.

21         So I don't know if you want to stay on the

22         phone, Elliot?

23            MR. GERSTEN:  I sorry, I couldn't

24         hear what you said.

25            MS. TAYLOR:  I've got to run to the