IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

CANDI MCCULLOCH              )
                            )
      Plaintiff,            )
                            )        CIVIL ACTION NO.
   -vs-                      )        3:01CV1115(AHN)
                            )
HARTFORD LIFE AND ACCIDENT  )
INSURANCE COMPANY and        )
EDUCATORS MUTUAL LIFE        )
INSURANCE COMPANY,          )
                            )
      Defendants.           )
- - - - - - - - - - - - -

The Video Deposition of PAUL JOSEPH MEYER

      DATE:      Tuesday, November 25, 2003

      TIME:      9:16 o'clock a.m.

      PLACE:     Offices of Midwest Reporting
                 300 North Michigan Street
                 South Bend, Indiana

Called as a witness by the Defendants

in accordance with the Connecticut Rules of

Federal and Civil Procedure and Rules of the

United States District Court for the District

of Connecticut, Bridgeport Division, pursuant

to Notice.

MIDWEST REPORTING, INC.
300 North Michigan Street
South Bend, Indiana
(574)255-3121

2

1    APPEARANCES:

2
              MR. ELIOT B. GERSTEN (telephonically)
3                 Gersten & Clifford
                  214 Main Street
4                 Hartford, Connecticut  06106

5                 For the Plaintiff;

6        MS. JESSICA S. TAYLOR
                  Akin, Gump, Strauss, Hauer & Feld, LLP
7                 300 Convent, Suite 1500
                  San Antonio, Texas  46601
8
                  For the Defendants.
9
         ALSO PRESENT:  Ms. Laura A. Switalski, Videographer
10
                         *   *   *
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

16

1    BY MS. TAYLOR:

2    Q    Okay.  Well, from reviewing those records --

3    A    From reviewing the records, it would appear that she was

4         scheduled to work 16 hours a week, roughly two days a

5         week in the office.

6    Q    Do you know what she was doing the rest of the time?

7    A    Not exactly, no.

8    Q    Okay.

9    A    Is -- may I interject?  Is there gonna be a point where

10        we could take a break here quickly?

11   Q    Do you need to take one right now?

12   A    Yeah, I do.

13                    MS. TAYLOR:  Okay.  Let's go ahead and

14             take a break.

15                    (Off the record at 9:34 a.m. and back on

16             the record at 9:38 a.m.)

17   BY MS. TAYLOR:

18   Q    In her duties as an internal medicine physician at PCMA,

19        was Dr. McCulloch required to be on call?

20                    MR. GERSTEN:  Objection.

21   A    Yes.

22   BY MS. TAYLOR:

23   Q    Okay.  And Dr. McCulloch testified in the her

24        deposition, and I'll actually refer to page 53 of her

25        deposition, that she was on call every single night for

17

```
 1          the first year she was at JFK?

 2   A     I -- I do not recall that.

 3   Q     Okay.  Does that sound like something she would be

 4          required to do?

 5                    MR. GERSTEN:  Objection.

 6   A     She's required to provide or make arrangements for

 7          24-hour coverage for her patients.  Whether she does

 8          that herself or by being part of a shared call group are

 9          two alternatives that physicians generally pursue.

10   BY MS. TAYLOR:

11   Q     Well, was it possible that she was on call every single

12          night for a year?

13                    MR. GERSTEN:  Objection, in a noun.

14   A     It's possible.  I do not recall.

15   BY MS. TAYLOR:

16   Q     Okay.  If she was a -- okay.  If she was -- and I think

17          you testified earlier that she was assigned to practice

18          with Dr. Spurlock for a while; is that correct?

19   A     That's my recollection.

20   Q     Okay.  And typically, based on your experience as the

21          executive director and -- and president of PCMA, would

22          physicians share call with the doctors they practiced

23          with?

24                    MR. GERSTEN:  Objection.

25   A     Typically that would be what would happen.
```

19

```
 1                    MR. GERSTEN:  Just to give me the
 2              opportunity to make an objection.
 3                    MS. TAYLOR:  That's fine.
 4    BY MS. TAYLOR:
 5    Q    So, Mr. Meyer, after I ask a question, if we could just
 6         wait a second to give --
 7    A    Oh, okay.
 8    Q    -- him a chance to object and then --
 9    A    Thanks.
10    Q    Okay.  What do you recall about the issues with sharing
11         call with Dr. Spurlock that you just testified to?
12                    MR. GERSTEN:  Objection.
13    A    I vaguely recall that there were some questions as to an
14         internist and a family physician sharing call together
15         and the compatibility thereof.  I briefly recall that
16         there were some questions as to Dr. McCulloch's
17         availability and responsiveness in returning calls.
18    BY MS. TAYLOR:
19    Q    Okay.  And you -- when you say her responsiveness in
20         returning calls, I mean, what -- can you describe that
21         for me?
22    A    Timeliness of returning a page.
23    Q    Okay.  Were there any problems with her responding to
24         calls at all?
25    A    Not that --
```

26

```
 1              you the truth.  My suggestion, why don't we
 2              start here with Meyer 1?
 3                   MS. TAYLOR:  Okay.  Sounds good to me.
 4                   MR. GERSTEN:  I -- I don't have a good
 5              answer.
 6                   MS. TAYLOR:  That's fine.
 7                   MR. GERSTEN:  Okay.
 8                   MS. TAYLOR:  If you just wanna give me
 9              the tags, I can fill them out.
10                   (Meyer Exhibit 1 was marked for
11                    identification at this time.)
12  BY MS. TAYLOR:
13  Q    Okay.  Mr. Meyer, I'm gonna hand you what I've marked as
14       Meyer Exhibit 1?
15  A    Okay.
16  Q    Which is a December 7th, 1994 letter from Helga Kahr to
17       Denise Barton.  Did you take over Denise Barton's
18       position at PCMA?
19  A    Yes.
20  Q    When you -- when you started working as the president
21       and executive director, did Ms. Barton make you aware
22       of any problems with Dr. McCulloch's appoint --
23       employment?
24                   MR. GERSTEN:  Objection.
25  A    Not that I specifically recall.
```

27

1   BY MS. TAYLOR:

2   Q    Well, when you took over that position as president and

3        executive director, did you immediately have to deal

4        with any problems with Dr. McCulloch's employment?

5                    MR. GERSTEN:  Objection.

6   A    Not that I specifically recall.

7   BY MS. TAYLOR:

8   Q    Okay.  Do you recall Dr. McCulloch having an attorney

9        involved?

10                   MR. GERSTEN:  Objection.

11                   MS. TAYLOR:  I'm sorry.  I didn't finish

12            my question.

13  BY MS. TAYLOR:

14  Q    Do you recall Dr. McCulloch having an attorney involved

15       in dealing with some issues she had at PCMA?

16                   MR. GERSTEN:  Objection.

17  A    Yes.

18  BY MS. TAYLOR:

19  Q    Okay.  What do you recall about that, if anything?

20  A    Candidly, not a whole lot.  Having reviewed the material

21       that you sent me, I see what's in there.  But without

22       that material, I don't recall a whole lot.

23  Q    Okay.  Well, in the materials that I sent to you, were

24       there any letters to you or from you that refresh your

25       memory as to --

33

1          responsibilities within PCMA, do you re -- do you --
2          what were you referring to?
3     A    I think the issues, as I recall, primarily came down to
4          her work-time obligations in the office.
5     Q    And when you say "work-time obligations," what are you
6          referring to?
7     A    The hours and general duration of time that she put into
8          PCMA and her availability for patient care.
9     Q    Did PCMA have a complaint with the number of hours and
10         the duration of the hours that she put into PCMA?
11                    MR. GERSTEN:  Objection, leading again.
12    A    As I re -- excuse me -- as I recall there were questions
13         as it relates to Dr. McCulloch's hours of availability
14         in the office, and at times those hours conflicting with
15         or -- or overlapping with time that she was devoting to
16         other things.
17    BY MS. TAYLOR:
18    Q    When you say "other things," what do you mean?
19    A    Primarily women's center responsibilities with the
20         hospital.
21    Q    So is it your recollection that she was not spending
22         enough hours in the office?  Was that the issue in terms
23         of hours of duration put into PCMA as you referred to
24         it?
25    A    That's my recollection.

34

```
 1    Q    Okay.  And then you mentioned an issue with her

 2         responsibilities at the women's center; is that correct?

 3    A    Yes.

 4    Q    Okay.  And what were you referring to with that?

 5    A    I think, as I recall, the issues related to were her

 6         duties at the women's center at times overlapping with

 7         time commitments to PCMA and patient care, and as a

 8         result, hindering her ability to be available for

 9         patient care.  I think there were also questions that

10         arose as to what was the strategy and plan for the

11         women's center and what her role was in that.

12    Q    Do you recall what her role was with the women's center?

13    A    I think she was medical director.

14    Q    Okay.  And what were the -- her duties at the women's

15         center that were hindering her ability to perform

16         patient care?

17                   MR. GERSTEN:  Objection, not his

18              testimony.  I objected.  It's not his testimony.

19                   MS. TAYLOR:  Let me rephrase the

20              question.

21    BY MS. TAYLOR:

22    Q    Did you testify earlier that Dr. McCulloch's duties at

23         the women's center were hindering her ability in caring

24         for patients?

25    A    I testified that my recollection is at times her duties
```

42

1           undertaken.

2      Q    And on page 2 of this memorandum it talks about

3           Dr. McCulloch's pro rata -- pro rata call obligation?

4      A    Where are you, at the top of the page?

5      Q    On the top of the page.

6      A    Okay.

7      Q    Do you know what that pro rata call obligation is

8           referring to?

9      A    Let me read it and -- in re-reading the -- the

10          paragraph, it would suggest that there were discussions

11          and clarifications regarding equitable sharing of call

12          with other physicians in the assigned practice.

13     Q    Okay.  Do you recall if there was a problem with

14          Dr. McCulloch equitible -- equiti -- I can't speak

15          today -- equitably sharing call with other physicians?

16                    MR. GERSTEN:  Objection.

17     A    No, I do not recall.

18  BY MS. TAYLOR:

19     Q    Okay.  And in the third paragraph -- and it's

20          actually Paragraph No. 3 of this letter -- it states

21          Dr. McCulloch made it clear in the meeting that she was

22          more interested in her women's center position.  Do you

23          recall any statements made by Dr. McCulloch regarding

24          that?

25     A    No.

43

1                      MR. GERSTEN:  Objection.

2    A    Sorry.  No, I do not.

3    BY MS. TAYLOR:

4    Q    Okay.  And if you look at Paragraph No. 7, it's No. 7 of

5         this letter, --

6    A    Mm-hmm.

7    Q    -- it discusses disparaging mark -- remarks made by

8         Dr. McCulloch to and of the former executive director.

9         Do you know what this is referring to?

10                     MR. GERSTEN:  Objection.

11   A    No, I do not.

12   BY MS. TAYLOR:

13   Q    Okay.

14                     MS. TAYLOR:  Okay.  Eliot, I'm now gonna

15              look at -- it's a one-page document, H10090.

16                     MR. GERSTEN:  Is that yesterday's pile or

17              today?

18                     MS. TAYLOR:  I believe I may have sent it

19              today.

20                     MR. GERSTEN:  Okay.

21                     MS. TAYLOR:  It's a one page of

22              handwriting.

23                     MR. GERSTEN:  All right.  Just give me a

24              second, please.  What was the Bate stamp number

25              on it?

46

1       admitted in the hospital?

2                       MR. GERSTEN:  Objection.

3    A    Yes.

4                       MS. TAYLOR:  Okay.  He's by a fire

5           station.

6    BY MS. TAYLOR:

7    Q    Would that have anything to do with her records of

8         seeing patients in her office?

9                       MR. GERSTEN:  Objection.

10   A    No, it would not.

11   BY MS. TAYLOR:

12   Q    Okay.

13   A    Two -- two separate records.

14                      MR. GERSTEN:  I'm sorry.  I didn't quite

15          get the answer

16                      THE WITNESS:  The answer was, No, it

17          would not.

18                      MR. GERSTEN:  Thank you, Mr. Meyer.

19                      THE WITNESS:  Hospital and office records

20          are two separate records.

21   BY MS. TAYLOR:

22   Q    Okay.  And this letter refers to Dr. McCulloch being

23        place on restriction for failure to complete records?

24   A    Yes.

25                      MR. GERSTEN:  Objection.

49

```
 1        appear from the letter that at the time this was written

 2        she was still on a -- a provisional status.

 3   BY MS. TAYLOR:

 4   Q    Okay.  And lower and towards the end of the letter,

 5        Denise refers to future litigious discussion.  Do you

 6        see that?

 7   A    I see it.

 8   Q    Did you feel at this time -- and this is March of

 9        '95 -- that Dr. McCulloch was threatening litigation

10        regarding her employment --

11                  MR. GERSTEN:  Objection.

12   BY MS. TAYLOR:

13   Q    -- at PCMA?

14   A    I don't recall.

15   Q    Okay.  Did you ever feel there was a time that

16        Dr. McCulloch was threatening litigation regarding

17        her employment --

18                  MR. GERSTEN:  Objection.

19   BY MS. TAYLOR:

20   Q    -- at PCMA?

21   A    From review of the file, it would appear that there were

22        indications that, yes, there may be pending threat of

23        litigation.

24   Q    Okay.  And -- and do you recall what those indications

25        were?
```

62

```
1     BY MS. TAYLOR:
2     Q    Okay.  Do you recall if Dr. McCulloch was receptive to
3          moving from the Manalapan site?
4                    MR. GERSTEN:  Objection.
5     A    It would appear from the notes in this memorandum to the
6          file that she was open to considering it.
7     BY MS. TAYLOR:
8     Q    Okay.  When you say that the Manalapan practice in your
9          words in this memo regarding a concern with sufficient
10         volume.  When you use the words "sufficient volume,"
11         what are you referring to?
12    A    Volume of patients being seen in the office.
13    Q    Okay.  Do you recall what the reason was why there was
14         not a sufficient volume of patients in that office?
15                   MR. GERSTEN:  Objection.
16    A    Do I recall the specific reason, no, not specifically.
17    BY MS. TAYLOR:
18    Q    Okay.  Do you recall any problems with that office that
19         would lead to an insufficient number of patients going
20         to that office?
21                   MR. GERSTEN:  Objection.
22    A    Yes, I think it terms of physician time and availability
23         in the office, there was inadequate time to support the
24         fixed costs and variable costs of the practice.
25    ///
```

66

```
 1                         MR. GERSTEN:  Objection.

 2    A    Putting that sentence in context with the rest of the

 3         paragraph, it's clear that my -- that the discussion and

 4         my comment relates to given the relationship between

 5         PCMA and Dr. McCulloch up to this point in time, I had

 6         questions as to whether or not it would ever change and

 7         result in an environment that Dr. McCulloch was

 8         satisfied with.

 9    Q    Okay.  Was there any concern about whether PCMA would

10         ever be satisfied with Dr. McCulloch's employment?

11    A    Yes.

12                         MR. GERSTEN:  Objection.  You gotta give

13              me a chance, Mr. Meyer.  Sorry about that.

14    A    Sorry.  My -- my apology.

15                         MS. TAYLOR:  He's getting better though.

16    BY MS. TAYLOR:

17    Q    And in the next paragraph you discuss the women's

18         center, and you -- and you talk about Dr. McCulloch

19         making a statement to you that over the last two months

20         she had indicated that she had been somewhat at a loss

21         of activities regarding the women's center?

22                         MR. GERSTEN:  Objection.

23    A    I -- I see that in the letter.

24    BY MS. TAYLOR:

25    Q    Okay.  Do you -- do you recall anything about
```

67

1          Dr. McCulloch's activities with the women's center

2          at the time of this July 20th, '95 meeting?

3                    MR. GERSTEN:  Excuse me.  I didn't

4               quite -- objection.

5                    MS. TAYLOR:  Do you want me to repeat the

6               question?

7                    MR. GERSTEN:  Oh, no, if the witness

8               understands it, fine.  I preserve the objection.

9     BY MS. TAYLOR:

10    Q    Okay.

11    A    No, I do not recall any of her activities at that time.

12    Q    Okay.  When she refers to that she had been at a loss of

13         activities, do you know what that's referring to?

14                   MR. GERSTEN:  Objection.

15    A    Reading the memo, my recollection would be that there

16         was a -- a lack of activity in the women's center at

17         that time, and therefore, she didn't have a lot to do.

18    BY MS. TAYLOR:

19    Q    Okay.  If we can go down to the fourth paragraph

20         regarding bonus calculations, do you see that?

21    A    Yes.

22    Q    And there is a statement about a target revenue goal of

23         $300,000.  Do you see that?

24    A    Yes.

25    Q    Can you explain what a -- what a target revenue goal is?

68

```
1                           MR. GERSTEN:  Objection.

2      A    My recollection from reading this is that Dr. McCulloch

3           had within her employment contract bonus provisions that

4           if her revenue on an annual basis exceeded a target,

5           that she would get a bonus for revenue in excess of that

6           target.

7      BY MS. TAYLOR:

8      Q    Okay.  And do you recall if Dr. McCulloch ever met that

9           target?

10     A    She never did.

11     Q    Okay.  And the target was $300,000, correct?

12                          MR. GERSTEN:  Objection.

13     A    It would appear to be based upon this note to the file.

14     BY MS. TAYLOR:

15     Q    Okay.  And this memo indicates that she had $66,000 in

16          revenues?

17     A    That's what the memo says.

18     Q    Okay.  Do you recall at PCMA how difficult it was to

19          reach the revenue goal of $300,000?

20                          MR. GERSTEN:  Objection.

21     A    No, I don't recall.

22     BY MS. TAYLOR:

23     Q    Okay.  Do you recall if any physicians ever met that

24          goal?

25                          MR. GERSTEN:  Objection.
```

69

```
1    A    I do.

2    BY MS. TAYLOR:

3    Q    Okay.  Was it -- of the doctors at PCMA -- and I think

4         you said it ranged anywhere from -- earlier -- anywhere

5         from 20 to 50 physicians while you were there.  Do you

6         recall how many met that target revenue goal?

7                        MR. GERSTEN:  Objection.

8    A    No, I do not.

9    BY MS. TAYLOR:

10   Q    Would it have been a majority of those physicians?

11                       MR. GERSTEN:  Objection.

12   A    I do -- I do not recall.

13   BY MS. TAYLOR:

14   Q    Okay.  In that same paragraph you reference a --

15        that you had taken a generous approach in assigning

16        6.3 percent of the net collections of Dr. Spurlock's

17        practice to her.  Do you see that?

18   A    I see that.

19   Q    Do you know what that's referring to?

20   A    Yes.

21   Q    Okay.  What is that referring to?

22                       MR. GERSTEN:  Objection.

23   A    As I recall, when Dr. McCulloch joined PCMA, and she was

24        with the assigned practice of Dr. Daniel Spurlock, her

25        initial participation in a number of managed care PPO
```

74

1    A    -- referenced on Exhibit 6?

2    Q    Yes, that's what I'm referring to.

3    A    It would appear from Exhibit 6 that we did not discuss

4         any kind of a disability.

5    Q    Okay.  Did you have -- do you recall if you had any

6         discussions with Dr. McCulloch before October 1995 that

7         she believed she was disabled?

8    A    No, I do not recall.

9    Q    Okay.

10                  MS. TAYLOR:  Eliot, I'm now gonna turn

11             to -- it's an application for reappointment.

12             And it's H9893 through 9895.

13                  MR. GERSTEN:  Okay.  Go ahead.

14             (Meyer Exhibit 8 was marked for

15             identification at this time.)

16   BY MS. TAYLOR:

17   Q    I'll give you second to look that over.

18   A    All right.

19   Q    Okay.  I have handed you what's been marked as Exhibit

20        No. 8, which looks like an application for reappointment

21        signed by Dr. McCulloch.  Would you have dealt with

22        Dr. McCulloch's application for reinpoint --

23        reappointment as a physician with PCMA?

24                  MR. GERSTEN:  I'm sorry.  I didn't --

25             well, I'm objecting.  I didn't understand the

75

1                    question.  I don't know if the witness did.

2    A    Well, I understood the question.  I'm trying to figure

3         out how to answer it.

4                    MR. GERSTEN:  Good comment.  I'll object

5              to that, too.

6    BY MS. TAYLOR:

7    Q    Let me ask you this:  In your position as president and

8         executive director of PCMA, would you have been

9         responsible for reviewing applications for

10        reappointments by physicians?

11                   MR. GERSTEN:  I'm objecting to the --

12             that question as well.

13   A    Physicians did not reappoint to PCMA.  And the Exhibit

14        No. 8 that you've handed me is not a reappointment

15        application to PCMA.  What this is is a reappointment

16        application to JFK Medical Center.

17   BY MS. TAYLOR:

18   Q    Okay.

19   A    Physicians within PCMA were employed through employment

20        contracts.  There was no reappointment process, other

21        than renewal of or extension of or termination of

22        employment contracts.

23   Q    Would it have been part of your role as president and

24        executive director to deal with appointment of

25        physicians to JFK Medical Center?

106

```
 1    A    Just a moment.

 2    Q    Sure.

 3    A    Do you recall the exhibit number?

 4    Q    I think I have it here.  And my apologies.  I know I'm

 5         doing this by telephone, and it'd be easier --

 6    A    What was the subject matter again, Mr. Gersten?  I'm

 7         sorry.

 8    Q    It was the one in which you requested some --

 9    A    Oh, the independent medical exam?  I have it.  I believe

10         it's Exhibit 9.

11    Q    Okay.

12    A    It's a letter dated January 25th, '96.

13    Q    Right.

14              Now, right on that letter I saw three names that

15         you suggested that -- McCulloch to go see?

16    A    Uh-huh.

17    Q    Do you see those names?

18    A    I do.

19    Q    Am I correct, sir, that all three of those doctors had

20         an affiliation with JFK?

21    A    All three of the doctors were on the medical staff of

22         JFK.

23    Q    Okay.  And all of those doctors would have been local to

24         the vicinity, weren't they?

25    A    Yes.
```

111

1     BY MR. GERSTEN:

2     Q    Who is the "our" you're referring to in your letter?

3     A    I can't be certain.  Insofar as trying put this in some

4          context, the immediately -- immediate preceding sentence

5          references employment agreements in the plural.  My

6          inference here is that "our" refers to both PCMA and JFK

7          Medical Center.

8     Q    Okay.  It refers to the fact that you believed at that

9          moment in time that she was presently suffering from an

10         illness, am I correct?

11    A    Based upon the documents she submitted, yes.

12    Q    Okay.  And you've described that illness as a multilevel

13         disk pathology in the neck region.  Is that the way --

14         did I pronounce all that correctly?

15    A    Yes, you did.

16    Q    Okay.  And that's the way you described it in this

17         letter, correct?

18    A    That's correct.

19    Q    Now, for the benefit of us lawyers who are not as smart

20         as people who are doctors, can you tell me what you

21         meant when you called it a "multilevel disk pathology in

22         the neck region"?

23    A    I'm not a physician either, so I can't begin to explain

24         what that means.

25    Q    Okay.

113

1    Q    I'll represent to you, sir, that this came in by

2         certified mail and -- and that the document that perhaps

3         is in that pile entitled 9908 addressed to you is a

4         certified mail accompanying this letter.  Am I right in

5         my representation?

6    A    It would appear to be, yes.

7    Q    Okay.  Is there any element of doubt that you received

8         this letter on or about March 15th, 1996?

9    A    Well, aside from the fact that the postmark is indicated

10        postage paid March 29th, I -- I have no other way to

11        determine the date of receipt.

12   Q    Okay.  So there's no doubt in your mind you did receive

13        it?

14   A    No, there's no doubt in my mind I received it.

15   Q    Okay.  Great.

16             Now, in any of the piles that Attorney Taylor

17        gave to you, can you find your response to this letter?

18   A    I don't know.  Let me -- let me look.

19   Q    Okay.

20   A    Question?  Have we previously indicated that this letter

21        was misdated?  It indicates March 15th '95.

22   Q    Yeah, sure.  You may recall Attorney Taylor corrected it

23        and indicated that Candi McCulloch corrected it in her

24        testimony and she said it -- that "5" should have been a

25        "6"?

114

1    A    Okay.  I just -- I'm trying to -- I tried to organize my

2         materials chronologically so --

3    Q    Don't blame you.

4    A    Okay.  Tell me your question again, Mr. Gersten?

5    Q    Yes, sir.  Assuming for the moment that this -- that

6         this March 15th, 1996 letter was in fact received by

7         you, which you've indicated you thought it was?

8    A    Uh-huh.

9    Q    Have you found your response to this letter in the

10        materials that Attorney Taylor provided to you prior to

11        your deposition?

12   A    I have found -- I have found a response or

13        correspondence from myself to Dr. McCulloch.  In reading

14        it, it does not specifically say that it is in reference

15        to her -- her letter, which we've labeled as Exhibit 10.

16   Q    Okay.

17   A    Based upon the dates of April 4th, I would assume that

18        this might be response to it, but I can't say for sure.

19   Q    Very well.

20             And when you say "April 4th," you're talking

21        about Exhibit 11, aren't you?

22   A    Oh, okay.  Is that Exhibit 11 or is it Exhibit 12?

23   Q    I cautioned you earlier that I am the worst at doing

24        this.  Now you know what I mean.

25   A    Well, you now what, I'm not sure I see an Exhibit 11.

115

```
 1                    MS. TAYLOR:  It might have been my
 2               mistake.  I may have skipped a number.
 3    A    Because I tried to put these back in order, and I jump
 4         from Exhibit 10, which was the March 15th, 1995, should
 5         be '96 letter --
 6    BY MR. GERSTEN:
 7    Q    Okay.
 8    A    -- straight to Exhibit 12 which was the April 4th, '96
 9         letter.
10                    MR. GERSTEN:  Okay.  So we're gonna --
11               for purposes of this -- and in the hopes that
12               the court reporter can help us if we are
13               wrong -- we're -- I'm gonna offer a stipulation
14               that we don't have an Exhibit 11, and we just
15               skipped to Exhibit 12.  That way we don't have
16               to go back and renumber everything.  Is that
17               okay with you, Jessica?
18                    MS. TAYLOR:  That's fine.  And I think it
19               was my error anyway so -- I apologize.
20                    MR. GERSTEN:  No apology needed.  I've
21               messed it up enough times myself to know that
22               it's probably contagious.
23    BY MR. GERSTEN:
24    Q    So looking at Exhibit 12 then, Mr. Meyer?
25    A    Yes.
```

116

1    Q    Is this your response to the Exhibit 10?

2    A    I would assume it is a response to Exhibit 10, although

3         the letter itself does not specifically reference that

4         it is in response to the letter we've labeled as

5         Exhibit 10.

6    Q    Okay.  Well, I guess my question is:  Where in

7         Exhibit 12 do you provide McCulloch with a clear

8         idea on how she might best contribute to your efforts

9         as referenced in Exhibit 10?

10                   MS. TAYLOR:  Objection, form.

11   A    I'm -- I'm not sure of the question.  Can you --

12   BY MR. GERSTEN:

13   Q    Absolutely.  And I'll apologize again.

14   A    That's all right.  No need to apologize.

15   Q    Where in Exhibit 12 do you indicate a response to

16        McCulloch's request of you to have a clear idea on how

17        she might best contribute to your effort as referenced

18        in her Exhibit 10?

19                   MS. TAYLOR:  Objection, form.  I believe

20             you're mischaracterizing the -- the letter,

21             Dr. McCulloch's letter.

22   A    Let -- let me re-read the letters here for a moment.

23   BY MR. GERSTEN:

24   Q    Take your time.

25   A    I don't --  I don't believe the letter of April 4th in

117

1       any way responds to the questions that Dr. McCulloch

2       raises in her -- in her letter.

3  Q  Okay.  And am I correct for the -- if I understand

4       things correctly, by the time you wrote Exhibit 12, you

5       had already had gotten outside counsel involved from

6       Epstein Becker advising you on the Candi McCulloch

7       situation, correct?

8  A  That is correct.

9  Q  And apparently you got a hold of Mark Edwards here being

10      consulted with on issues dealing with -- or relating to

11      the Candi McCulloch; is that correct?

12  A  Mark Edwards was copied on the letter.  I don't recall

13      what level of consultation he had provided.

14  Q  Okay.  It looks -- if I understand it correctly then,

15      somewhere between -- as of April 19, 1996, the date you

16      wrote this letter, that was the end point, if you will,

17      of considerations about what to do with Candi McCulloch

18      vis-a-vis, your retaining the Epstein Becker firm to

19      advise you; is that correct?

20            MS. TAYLOR:  Objection, form.

21            MR. GERSTEN:  You're right.  Terrible

22         question.  Sorry about that.

23  BY MR. GERSTEN:

24  Q  How many months had taken place, Mr. Meyer, in which

25      you had consulted with counsel in connection with

122

```
 1        your experience, is it -- is it a promotion?

 2    A   No, I'm not sure I would use the word promotion.

 3    Q   Okay.  So if Mr. Gershwin used the word, you wouldn't

 4        agree with it?

 5                    MS. TAYLOR:  Objection, form.

 6    A   I -- I'm -- the -- I'm not -- I'm not sure promotion --

 7        I'm not sure what was -- what was meant by the term

 8        "promotion."

 9    BY MR. GERSTEN:

10    Q   Fair enough.  I can only ask you what you know.

11            Do you know which has a higher status,

12        provisional or active?

13    A   I -- I don't really know what is meant by "higher

14        status."  All I can say is an active staff member is

15        one who has passed whatever requirements that were in

16        the medical staff bylaws imposed upon initial appointees

17        in a provisional staff status.  Typically those

18        requirements dealt with either a length of time on the

19        medical staff from the initial appointment or a certain

20        number of minimum admissions that would have occurred or

21        passing or undergoing a level of -- of credentialing

22        peer review.

23    Q   Okay.  Okay.  In your supervision of doctors then, -- by

24        the way, Mr. Meyer, is your recollection of what took

25        place between you and Candi McCulloch better today than
```

123

```
 1          it would have been in 1995 or 1996?

 2   A      No.

 3   Q      Okay.  Would you consider it to be less good?

 4   A      Yes.

 5   Q      Okay.  Now, do you recall -- you were shown some

 6          documents today that purportedly reflected a

 7          conversation you had had with UNUM Insurance Company.

 8          Do you recall that exhibit you looked at today, those

 9          handwritten notes?

10   A      I think you're referring to Exhibit 13.

11   Q      Do you recall those?

12   A      Well, I --

13                       MS. TAYLOR:  Objection, form.

14   A      -- I did not take these notes.

15   BY MR. GERSTEN:

16   Q      Okay.  Absent these notes, do you have any recollection

17          at all about the conversations that's reflected in this

18          exhibit?

19   A      No.

20   Q      Do you recall ever even having the conversation?

21   A      This specific conversation?

22   Q      Correct.

23   A      No.

24   Q      Okay.  Now, then, are you familiar with a company called

25          Educator's Mutual Insurance?
```

125

1          be called a typical, social cocktail party setting.

2     BY MR. GERSTEN:

3     Q    Okay.  All right.  Now, if I understand it correctly,

4          Candi McCulloch was already employed by the

5          organizations by the time you arrived on the scene as

6          an employee; is that correct?

7     A    That's correct.

8     Q    When did you become aware of conversations she'd had

9          which led her to become employed with the organization

10         prior to your arrival?

11                   MS. TAYLOR:  Objection, form.

12                   MR. GERSTEN:  I'll restate my question.

13    BY MR. GERSTEN:

14    Q    What -- did -- did you become aware of conversations

15         she'd had with your predecessors in your position in

16         connection with engaging her employment at these

17         entities?

18    A    I guess I generally recall upon joining the organization

19         and kind of researching our operations and the people

20         involved that she had had discussions with colleagues

21         and predecessor colleagues within the organization.

22    Q    Great.

23              How many other doctors were on -- under your

24         supervision who were working under their contracts two

25         days a week as physicians?

126

1   A   I don't recall having any other physicians that were

2       classified as -- as part time.

3   Q   Okay.  So if I understood your numbers then today,

4       between the -- you said you had somewhere between 20 to

5       55 physicians under your supervision?

6   A   Depending on the time, yes.

7   Q   And the only one who was part time is Candi McCulloch,

8       the plaintiff in this case, correct?

9   A   Well, let me -- let me think for a moment here.

10   Q   Take your time.

11   A   I -- yeah, I don't recall any other physicians that --

12       that we classified as part time.

13   Q   Okay.  Now, looking at what we've marked today by

14       Attorney Taylor as Exhibit 14 and Exhibit 15?

15   A   All right.

16   Q   This chart reflects the work she did as a part-time

17       employee, am I correct?

18   A   Yes.

19   Q   Now, when you were asked if she was less -- I think the

20       work with less than other doctors.  Do you recall that,

21       less productive?

22   A   I do.

23   Q   Does this chart allow you to make that determination?

24   A   Well, without having a comparative chart of the other

25       physicians, not directly, no.

127

1   Q   Okay.  And if I understand it correctly, if you had a

2       chart like this where all the other physicians under

3       your employ, those would all be full-time physicians

4       that you're using this chart to compare it to, correct?

5   A   That's correct.  And what I would typically do would

6       then be to look at the, if you will, the -- the

7       workdays.

8   Q   Sure.

9   A   That -- that the physician is in the office to draw some

10      conclusion of comparative productivity.

11  Q   Correct.

12          But when you were asked the question by Attorney

13      Taylor in terms of more productivity or less

14      productivity, you didn't indicate that there were no

15      other doctors who were there on a part-time basis that

16      you were comparing her to, am I correct?

17  A   That's correct.

18  Q   And as you sit here today, seven or eight years later,

19      there are no other part-timers you're comparing her to;

20      am I correct?

21  A   That's correct.  I can't recall any other part-time

22      physicians.

23  Q   Were you -- going back to that long ago time period in

24      1995 when Dr. Spurlock and Dr. McCulloch were first

25      teamed up together.  Do you know the time period I'm

128

```
1        talking about now?

2    A   Generally speaking, yes.

3    Q   Are you aware whether Dr. McCulloch -- strike that.  Let

4        me restate my question.

5             Are you aware that Dr. Spurlock was told

6        Dr. McCulloch would cover his patients, --

7                   MS. TAYLOR:  Objec --

8    BY BY MR. GERSTEN:

9    Q   -- but that Dr. Spurlock would never have to cover her

10       patients?

11                  MS. TAYLOR:  Objection, form.

12   A   No I'm not aware of that.

13   BY MR. GERSTEN:

14   Q   Okay.  Were you aware that Dr. Spurlock was promised a

15       percentage of income from the McCulloch patients?

16                  MS. TAYLOR:  Objection, form.

17   A   No, I'm not aware of that.

18   BY MR. GERSTEN:

19   Q   Were you aware of any patient who sent a letter of

20       complaint to JFK or to PCMA regarding Dr. McCulloch?

21   A   No, I don't recall any.

22   Q   Okay.  And if there was a patient who sent a letter of

23       complaint to JFK or PCA, was it in the normal course of

24       business of either entity to forward a copy of a

25       complaint letter to a particular doctor?
```

129

1   A   Typically, yeah, that would be a -- a normal -- a normal

2       process.

3   Q   Okay.  And as you sit here today, do you have any

4       recollection of sending a patient's complaint along to

5       Dr. McCulloch in the normal course of doing your

6       business?

7   A   As of today, no, I have no recollection.

8   Q   Okay.  And am I correct, sir, there's nothing in that

9       pile that you spent an hour and a half looking at that

10      indicated a patient complaint letter came out with

11      respect to Dr. McCulloch, am I correct?

12  A   No, you are correct, there is nothing in there that

13      would suggest that.

14  Q   Okay.  And do you know if Dr. McCulloch ever received

15      letters from patients that thanked her or were somewhat

16      laudatory of her skills in supplying services in the

17      nature of a medical -- in the nature of -- of medical

18      work?

19  A   No, I'm not aware.

20  Q   Okay.  Now, going back to your chart here.  This chart

21      reflects the -- I'm gonna call it the output or the

22      productivity of Dr. McCulloch in her first year of

23      practice on a part-time basis, am I correct?

24  A   It -- let's see, October -- I don't recall when

25      Dr. McCulloch officially joined the organization

131

1    A    Yes.

2    Q    Okay.  And if that's the case, in doing my math, it

3         sounds like you've been doing this work for almost nine

4         years?

5    A    Well, I've been in health care for about 22 years.

6    Q    Okay.

7    A    Have been managing physician practices and physician

8         networks since about 1993.

9    Q    Okay.  Now, based upon that experience, would you agree

10        that new doctors always meet their target goals in the

11        first year of practice?

12                   MS. TAYLOR:  Objection, form.

13   A    Depends on what the goal is.

14   BY MR. GERSTEN:

15   Q    Okay.  Well, let's look at it from the perspective of

16        the chart that you've been talking about this morning.

17        Does this chart reflect what the goal was of a -- of

18        Candi McCulloch?

19   A    No, it doesn't.

20   Q    Okay.  And as you sit here today, do you know what the

21        goal was of Candi McCulloch during that time period?

22   A    No, I don't.  I don't recall.

23   Q    Okay.  How do you normally go about in your 1993 --

24        that's ten years of experience -- defining target goals

25        for new doctors?  What's used?

133

1          this work to sit down with doctors and tell them that

2          they're -- new doctors that they're not meeting their

3          goals?

4     A    Yes.

5     Q    Okay.  And how often have you done that?

6     A    I'm not sure I can give you an exact number.  Maybe

7          eight, ten times in the last ten years.

8     Q    Okay.  Now, going back to this time period, to the

9          extent you can remember something seven, eight years

10         ago, sir, do you -- do you remember the percentage of

11         doctors that were leaving PCMA while you were the chief

12         administrative guy?

13    A    Do I recall the percentage that were leaving PCMA while

14         I was the --

15    Q    I'll ask my question a different way.  You've -- you've

16         indicated today that there was a wide range of numbers,

17         20 to 50 --

18    A    Right.

19    Q    -- doctors that you supervised while you were at PCMA?

20    A    That's correct.

21    Q    Was the 20 at the beginning of your tenure or at the

22         end?

23    A    It -- it vacillated a fair amount.

24    Q    Okay.

25    A    When I started there, in my mind I recall that

134

```
 1          we had about 25 physicians.  As the organization

 2          was assimilated into Columbia/HCA, subsequent to

 3          Columbia/HCA's acquisition of JFK Medical Center and

 4          Primary Care Medical Associates, Primary Care Medical

 5          Associates, PCMA for short, took on the responsibility

 6          of managing the practices of physicians at other

 7          Columbia/HCA facilities in southeastern Florida, namely,

 8          from Miami Beach northwards through Palm Beach.  So the

 9          variation num -- in numbers was as a result of the

10          acquisition process and picking up other practices to

11          manage.

12     Q    Let me ask you a question just because you mentioned

13          Columbia again.  Isn't Columbia the one that's been

14          publicized about having some criminal investigation?

15     A    Columbia was under investigation several years back.  I

16          believe the investigation is -- was closed a couple

17          years ago.

18     Q    Right.

19               And when we say "several years back," would I be

20          correct in recalling that that's around the same time

21          period we're talking about here, somewhere around 19 --

22          they were -- Columbia being -- was being questioned

23          for -- strike that.

24               Columbia was being investigated for questionably

25          criminal activities during the time period of 1994 to
```

135

1     1998; is that correct?

2                    MS. TAYLOR:  Objection, form.

3   A   Yeah, I don't believe that's correct.

4   BY MR. GERSTEN:

5   Q   Okay.  How would you correct it?

6   A   If I recall correctly, the preliminary Columbia

7       investigation started in mid-to-late '97.  Prior to

8       that, there were no allegations.

9   Q   Do you recall the nature of those allegations?

10  A   Generally, yes.

11  Q   Okay.  What's your recollection?

12  A   My recollection is that at various Columbia/HCA

13      facilities there were allegations of improper coding

14      or cost accounting resulting in the allegation that that

15      resulted in excess Medicare reimbursement to the

16      hospitals.

17  Q   Okay.  Now, then, I take it the organization you're with

18      now has no connection to Columbia Health?

19  A   That's correct.

20  Q   And it sounds like you made your switch to this new

21      organization around a time period that you just

22      identified as when the investigation was taking place

23      at the Columbia?

24                   MS. TAYLOR:  Objection, form.

25  A   Excuse me.  As I recall, I left Columbia/HCA in -- in

136

1    mid-1998.  If I recall correctly, the investigation
2    began with Columbia in mid -- mid-'97 and continued
3    through till I wanna say approximately 2001.
4  BY MR. GERSTEN:
5    Q    Okay.  But I think we can agree then, based upon what
6         you recall and what you know, you left while the
7         investigation into the -- serious charges were being
8         made against Columbia Health, am I correct?
9    A    Yes.
10                   MS. TAYLOR:  Objection, form.
11   A    Oh, I'm sorry.  That's correct.
12  BY MR. GERSTEN:
13   Q    And this lawyer that you copied on the letter to Candi
14        McCulloch, he was employed by Columbia Health; correct?
15   A    That's correct.
16   Q    Okay.
17   A    Can I -- can I ask a question?
18   Q    Any time, sir.  If you need a break, you let me know.
19   A    I just -- as I referenced earlier, I, unfortunately,
20        have a matter that I need to deal with.
21   Q    We'll accommodate you.
22   A    And I need about 30 to maybe at most 45 minutes.  My
23        office is only about five minutes from here.
24   Q    What can we do to accommodate you?  You decide.
25   A    If you could -- if you could give me to -- a break to

139

1    Q    That's great.

2              During the break I had the opportunity to fax

3         something to Jessica Taylor, and she indicated she was

4         gonna have it marked as Exhibit 15 as a pre -- prior to

5         the time you came back.

6    A    15 or 16?

7    Q    Is that document in front of you now?

8              MS. TAYLOR:  Actually, Eliot, 15 was

9         already used so I marked -- marked it 16.

10             MR. GERSTEN:  Great.  Thank you.

11   A    I -- yes, I have Exhibit 16 in front of me.

12   BY MR. GERSTEN:

13   Q    Great.

14             And am I correct, sir, that's got your signature

15        on it?

16   A    Yes.

17   Q    Great.

18             And what date -- I can't -- could you just tell

19        us what date that document was signed by you?

20   A    Well, I don't see a -- I don't see a date line.  There

21        is a -- on the first page, an effective date, if you

22        will.  It looks like 26th of July, 1995.

23   Q    Okay.  And during the course of performing your job,

24        would it be fair to say that you -- you could -- you

25        would sign a document like this on the date of its

140

1  effective date?

2  A  It's a reasonable expectation.

3  Q  Okay.  So as you sit here today, is there any basis any

4  one of us can have to conclude that you signed it on

5  something other than 26th of July of 1995?

6  A  No indication to the contrary, no.

7  Q  Now, then, do you recall how many times you and Candi

8  McCulloch had a face-to-face discussion?

9  A  No.

10  Q  Okay.  Did you ever socialize with her?

11  A  No.

12  Q  Okay.  Do you recall if you had more than five meetings

13  with her?

14  A  No, I don't.  I would imagine I probably did, but I

15  can't specifically recall.

16  Q  Okay.  Well, as you sit here today, -- and I realize

17  it's five or six or seven or eight years later -- how

18  many hours do you think you spent talking to Candi

19  McCulloch back in the time period when you were her,

20  quote, supervisor?

21  A  I'm gonna guesstimate 20 hours.

22  Q  Okay.  And that would be 20 hours then over the course

23  of the time period, if I understand you correctly, she

24  went out on her -- pursuant to the letter you got from

25  the lawyer -- on disability in October of '95, correct?

141

```
 1    A    I believe so, yes.

 2    Q    And you came on board in January of '95?

 3    A    January or February.

 4    Q    And we're now trying to guesstimate that you spent 20

 5         hours with her?

 6    A    Guess, yes.

 7    Q    Now, can you tell me, where'd she go to college?

 8    A    I don't recall.

 9    Q    Okay.  Do you know where she went to medical school?

10    A    No.

11    Q    Okay.  Do you know if she paid her way through college

12         or medical school?

13    A    No, I don't know.

14    Q    Do you know if she had a family?

15    A    She was married.

16    Q    Okay.  So you recall she was married?

17    A    Yes.

18    Q    Okay.  Do you recall who her husband was?

19    A    No.

20    Q    Okay.  How do you know she was married as you sit here

21         today?

22    A    Just what I recall.

23    Q    Okay.  Do you recall whether -- any details of her

24         marriage?

25                   MS. TAYLOR:  Objection, form.
```

142

1   A   No.

2   BY MR. GERSTEN:

3   Q   I'm sorry.  What was the answer, sir?

4   A   No.

5   Q   Did she have children?

6   A   I don't believe so.

7   Q   Okay.

8   A   In fact I'm sure.

9   Q   Okay.

10  A   No, --

11  Q   And what makes you so certain?

12  A   -- you know what, now that I think about it, I'm not

13      sure.  I'm not sure.

14  Q   All right.  Now, do you know if she belonged to any kind

15      of professional society?

16  A   I don't know for sure.  I would assume that she was

17      probably a member of the American Society of Internal

18      Medicine.

19  Q   All right.  Do you know if she received any awards while

20      she was doing her degrees?

21  A   No.

22  Q   Okay.  Do you recall where she lived when she -- when

23      she was working for you?

24  A   If I recall correctly, I think she lived in Palm --

25      in the community of Palm Beach, but I'm -- I'm not a

143

```
 1          100 percent certain of that.
 2    Q     Okay.  And the community of Palm Beach is pretty wide
 3          area as you're describing it, isn't it?
 4    A     No, actually Palm Beach is a fairly small area.
 5    Q     Okay.  What is it you're describing as the community of
 6          Palm Beach?
 7    A     It's the island of Palm Beach.
 8    Q     Okay.  And you're recollection is she lived on the
 9          island?
10    A     It's my recollection.
11    Q     What's the source of your knowledge?
12    A     My vague memory.
13    Q     Okay.  Do you know -- do you have any recollection how
14          you got that memory, vague or not?
15                    MS. TAYLOR:  Objection, form.
16    A     From having worked with her.
17    BY MR. GERSTEN:
18    Q     Okay.  Did you ever accompany her on any of her patient
19          consultations?
20    A     You mean being in an exam room with her?
21    Q     Correct.
22    A     No.
23    Q     Okay.  Were you ever in the office with her while exams
24          were taking place?
25    A     I believe I was.
```

144

1    Q    Okay.  Tell us about the occasion?

2    A    I don't recall the specifics of it.

3    Q    Okay.  What do you recall about it?

4    A    I would periodically make rounds to all of our offices

5         including Dr. McCulloch's.  Typically I'm making rounds

6         during patient care hours.

7    Q    Okay.  And other than that statement, do you have any

8         recollection at all, specifically referring to your

9         making rounds of the office that she was in while she

10        was working?

11   A    No.

12   Q    Okay.  So am I correct, sir, your general -- your

13        general impression is based upon your general practice,

14        but you don't have any specific recollection of

15        observing McCulloch in the office while you were there;

16        is that correct?

17             MS. TAYLOR:  Objection, form.

18   A    I -- I'm thinking.

19   BY MR. GERSTEN:

20   Q    Okay.  Look, this took place a long time ago, and I'm

21        not trying to --

22   A    You know, I -- I -- I specifically recall one occurrence

23        having been in the office while she was -- during

24        patient care hours.  As far as other circumstances, I

25        can't recall any specifics, but I can recall at least

145

1      one circumstance.  Why is -- why can I recall one, I

2      can't tell you.  But I just know that I did it.

3   Q  Okay.  What do you recall from that one circumstance?

4   A  It was during patient care hours.

5   Q  Okay.  And anything else?

6   A  No.

7   Q  Okay.  Would it be too much to ask you if you recall the

8      date?

9   A  That would be too much to ask me.

10  Q  Okay.  You could probably identify the year as sometime

11     in 1995, correct?

12  A  That would be a reasonable assumption.

13  Q  Okay.  Any other details of that visit that you do

14     recall?

15  A  No.

16  Q  And how much time did you spend there?

17  A  I don't recall.

18  Q  Okay.  So while you were there, did you get an

19     opportunity to meet the staff who worked at the

20     location?

21          MS. TAYLOR:  Objection, form.

22  A  I had probably met the staff before I'd gone over there.

23  BY MR. GERSTEN:

24  Q  Okay.  While you were there, did you have the

25     opportunity to talk with the staff while you were there?

146

| | | |
|---|---|---|
| 1 | A | You know, I don't recall. |
| 2 | Q | Okay.  Do you recall who the staff was or were? |
| 3 | A | I can't cite names. |
| 4 | Q | Okay.  Do you recall how many people were members of the |
| 5 | | staff of the office? |
| 6 | A | If my recollection serves me correctly, I think we had |
| 7 | | two or three employees in the office other than the |
| 8 | | physicians. |
| 9 | Q | Okay.  And what's the source of your recollection? |
| 10 | A | My memory. |
| 11 | Q | Okay.  Is there a particular business model setup in |
| 12 | | terms of staffing people at these office as far as you |
| 13 | | knew from your hospital -- from your physicians' |
| 14 | | association? |
| 15 | A | Yeah, there were typical or there were norms that |
| 16 | | generally we followed in staffing an office. |
| 17 | Q | Okay.  And is it your testimony today that the norm was |
| 18 | | followed for this particular office? |
| 19 | A | I can't recall that level of detail. |
| 20 | Q | Okay.  Do you recall what the norm was? |
| 21 | A | Generally a physician would have a nurse or a medical |
| 22 | | assistant that they worked with.  Depending on the pace |
| 23 | | of activity of that physician, they may have two. |
| 24 | | Excuse me.  There would typically be a front office |
| 25 | | receptionist.  If the physician was a proceduralist or a |

147

```
 1           surgical subspecialist, there might often be a surgical

 2           scheduler.  And, again, depending on the pace of

 3           activity in the office, there be -- may be a medical

 4           records technologist --

 5    Q      Now, --

 6    A      -- or technician.

 7    Q      -- do you recall paying a visit to Dr. Spurlock's

 8           office?

 9    A      Say that again, I couldn't hear you.

10    Q      Do you recall paying visits, in particular, to

11           Dr. Spurlock's office?

12    A      Yes.

13    Q      Okay.  How -- during the time of period of 1995, how

14           many times did you pay a visit there?

15    A      I can't recall exactly; maybe five to seven.

16    Q      Okay.  And can you tell me how many staffs were working

17           at the Spurlock's office during that time period?

18    A      Approximately five.

19    Q      Okay.  Do you recall who they were?

20    A      Not by name, no.

21    Q      What do you recall?

22    A      Well, actually, I do recall some names.

23    Q      Okay.  What do you recall?

24    A      What -- what do I recall of names?

25    Q      Sure.
```

148

 1   A   Well, I recall Deborah Copeland, who was a physician's

 2       assistant at the practice.  And I recall Carla Spurlock,

 3       who was the practice manager.

 4   Q   Okay.  And what was Carla's relationship to the doctor?

 5   A   Wife.

 6   Q   Anyone else?

 7   A   I don't recall any other names.

 8   Q   Do you recall any discussions with Dr. Spurlock

 9       regarding the need for more staff -- to fill more

10       staffing?

11   A   At -- at his office?

12   Q   Correct.

13   A   No, I don't recall any discussions along those line.

14   Q   Okay.  Now, did you ever have an opportunity to observe

15       Dr. McCulloch performing her job as director of the

16       women's center?

17   A   I might have participated in one meeting early in my

18       tenure where she -- it was a meeting.  I vaguely recall

19       a meeting where it was regarding the women's center.

20       And so obviously in that capacity she was fulfilling her

21       role as a -- as the medical director.

22   Q   Okay.  Where did that meeting take place, Mr. Meyer?

23   A   If I recall correctly, at the hospital.

24   Q   Okay.  And what do you recall from that discussion, what

25       was discussed?

149

```
 1   A   As I recall there were discussions about the
 2       organizational model that would be used for the women's
 3       center.
 4   Q   Okay.  Anything else?
 5   A   In my -- in my mind I have some discussions regarding
 6       Phyllis Rothman and her role.  And I have in my mind
 7       some discussions regarding the, if you will, the
 8       interior design and accoutrements of the women's center.
 9   Q   Okay.  And that's what was discussed at this one
10       opportunity you had to observe Dr. McCulloch performing
11       her job as director of the women's health center?
12   A   It's the subject matter that I recall from the meeting.
13   Q   Okay.  And that's -- that opportunity to observe
14       Dr. McCulloch was at the beginning of your tenure?
15   A   Early in my tenure.
16   Q   Okay.  So is it safe to say sometime February, March
17       of '95?
18   A   It's as good a guess as any.
19   Q   Okay.  I'm just trying to understand it.
20           Okay.  And you mentioned something about Phyllis
21       Rothman.  What -- what was your understanding about
22       Phyllis Rothman?
23   A   She was the benefactor behind the center.
24   Q   Okay.  And do you recall anything else about her
25       involvement from that meeting?
```

150

1   A   No.

2   Q   Okay.  All right.  Now, -- I'm sorry.  I got a little

3       sidetracked here, and I apologize for that.

4              Were you involved in any of the decisions

5       regarding the -- whether the women's center would open

6       or not open?

7   A   Was I involved in any of those decisions?

8   Q   Yes, sir.

9   A   Not that I recall.

10  Q   Okay.  Do you know if the women's center ever opened?

11  A   Not that I recall.  I don't -- I just don't recall.

12  Q   Okay.  Now, when's the first time you recall learning

13      that Candi McCulloch submitted a claim for disability

14      insurance?

15  A   I honestly can't cite a date.

16  Q   Okay.  As you sit here today, when's the most recent

17      time you learned about a claim being submitted?

18              MS. TAYLOR:  Objection, form.

19              MR. GERSTEN:  You're right.  Good point.

20  BY MR. GERSTEN:

21  Q   When -- do you have any recollection, Mr. Meyer, of

22      learning that Candi McCulloch had submitted a claim to

23      Educator's seeking to obtain benefits for disability?

24  A   I really -- I really cannot recall how I became aware of

25      it.

153

1                    CROSS-EXAMINATION CONTINUED

2    BY MR. GERSTEN:

3    Q    Focusing your attention on the time period of January

4         1996 when you understood that Candi McCulloch was

5         suffering from a multilevel disk injury -- pathology in

6         the neck area.  Do you recall that time period?

7    A    Generally, yes.

8    Q    Great.

9              Now, then, did you understand someone who was

10        suffering from an illness like that would be showing

11        that illness by limping?

12   A    I'm -- I'm not a physician.  I can't -- I can't render a

13        judgment like that.

14   Q    Okay.  So you're indicating today that knowing what you

15        understood at that time as a multilevel disk pathology

16        in the neck region, you don't know how that would

17        demonstrate itself with a showing of a limp?

18   A    No, I -- I couldn't begin to tell you what the

19        symptoms -- how the symptoms would manifest itself.

20        And to be clear, multilevel -- whatever it is -- disk

21        pathology, as I recall, was taken directly off of a

22        medical report that was filed by Dr. McCulloch's

23        initially -- initial treating physician, who, I believe,

24        was Dr. Porfiri.

25   Q    So as you sit here today, the document you're referring

156

```
 1   A   Pain that won't go away; stays on for a long period of
 2       time.
 3   Q   Okay.  Now, in your capacity as a supervisor of -- is it
 4       fair to say that you serve in the capacity of supervisor
 5       of the physicians?
 6   A   I acted as the chief executive officer over -- over the
 7       group.
 8   Q   And what about up there in South Bend?
 9   A   I'm in a similar capacity.
10   Q   And in that capacity do you have the opportunity to talk
11       to your doctors and learn about any kinds of medications
12       they're taking?
13   A   About medications that they are taking personally?
14   Q   Yes.
15   A   It's not a -- typically a question that I would ask.
16       You know, that -- that gets into personal medical
17       information, which I'm -- no, I don't really have a
18       cause to ask a question like that currently.
19   Q   Okay.  Have you ever been in a situation where any of
20       your physicians that you're supervising are taking
21       narcotics?
22   A   I've had circumstances, yes.
23   Q   Okay.  How many times?
24   A   I'm thinking.  I can think of three circumstances.
25   Q   Okay.  Now, I don't wanna know anything about who they
```

157

1        are or identifications of them, but I would like to have

2        a general description about the circumstances which gave

3        rise to them taking narcotics?

4   A   Could you ask that question again?  I -- I didn't quite

5        hear you.

6   Q   Sure.  Without disclosing any of the very personal

7        information about anyone that you just made reference

8        to, could you tell me if they were taking any kind of

9        narcotics for pain?

10   A   No, I couldn't tell you that.

11   Q   What were they taking narcotics for?

12   A   I'm not sure I can answer that question, aside from the

13        fact that from my knowledge and recollection, it

14        appeared to be a -- appeared to be circumstances of, if

15        you will, habitual abuse.

16   Q   And from a layman's perspective, what's "habitual

17        abuse"?

18   A   You're hooked on taking pills.

19   Q   And would that have any kind of significance that you're

20        concerned as a -- strike that.

21            As a supervisor of these doctors, is that of

22        some concern to you in terms of your doctors performing

23        their jobs?

24   A   Sure.

25   Q   And why would that be?

158

```
 1    A    From a layman's perspective, I would be concerned about

 2         the effect of the drug on impairing their judgment.

 3    Q    All right.

 4    A    Or motor skills.

 5    Q    Okay.  And from -- when you say "from a layman's

 6         perspective," would you include in that layman's

 7         perspective your perspective as a supervisor of those

 8         physicians?

 9    A    Sure.

10    Q    And did you take any kind of action upon learning that

11         your employees were hooked on narcotics?

12    A    Directly or indirectly, yes.

13    Q    Okay.  And in a general way, could you just describe

14         what kind of action you took?

15    A    Either termination of their practice privileges and/or

16         referral to certain recognized impaired physician

17         programs.

18    Q    Okay.  As you sit here today, again, from a layman's

19         perspective, do you recall what kind of narcotics were

20         involved?

21    A    No, I don't recall.

22                   MR. GERSTEN:  That's all the questions I

23              have.  Thanks a lot.  I appreciate all the time

24              you gave us here today and that you volunteered

25              to do it.
```

163

1    A    I am indicating that I do not recall those.  That's how

2         you phrased the question initially.

3    Q    Correct.

4              And do you recall her registering any objection

5         or -- or calling you up and discussing some issues she

6         had with having local doctors perform the examination?

7    A    No.

8    Q    Okay.  Again, that's your recollection, --

9    A    That's my --

10   Q    -- you don't know whether the conversation took place?

11   A    Exactly.  That's my recollection.  I do not recall a

12        conversation in that regard.

13   Q    And, again, sir, I asked you this earlier, and this may

14        be my last question, if we came to you in 1999 and asked

15        you these questions, it would be safe to say your

16        recollection would be a little bit better than it is

17        today, correct, about your experiences in Florida with

18        Candi McCulloch?

19   A    I'd say that's a reasonably safe assumption.

20   Q    Or, again, if somebody came to see you in 1996 and said,

21        Hey, Candi's putting a claim in.  We need to talk to you

22        about this claim.  It'd be pretty safe to say you could

23        remember things pretty well back then about what took

24        place the year before?

25   A    I think -- again, I think that's a reasonably safe

164

1          assumption and most people would -- would agree with

2          that.

3     Q    And am I correct, sir, that up until the time you had a

4          chance to look at some of the documents that Attorney

5          Taylor gave you, you didn't recall very much about the

6          whole Candi McCulloch employment arrangement?

7     A    It's not a matter that I've thought of for some time,

8          so, yeah, I think that's a safe -- safe comment to make.

9     Q    Again, like most people, you'd remember things a whole

10         lot better several years ago about events that took

11         place in 1995 than you do today?

12              MS. TAYLOR:  Objection, form.

13    BY MR. GERSTEN:

14    Q    Do you agree with that?

15              MS. TAYLOR:  Objection, form.

16    A    Yeah.  You've asked that question the same way several

17         times and, yes, I would agree.

18              MR. GERSTEN:  Thank you, Mr. Meyer.  I

19         have no further questions.

20              MS. TAYLOR:  I have nothing either.

21              (Video Deposition concluded and Witness

22         excused at 3:08 p.m.)

23                    *       *       *

24

25