Porfiri, Carine M., M.D.

page 1

1

2          UNITED STATES DISTRICT COURT          DISTRICT OF CONNECTICUT

3                    (BRIDGEPORT)

4        CIVIL ACTION NO. 3:01CV1115 (AHN)

5

6    CANDI MCCULLOCH,                    :

7                                        :      Plaintiff,                    :

8                                        :      vs.                           :

9                                        :HARTFORD LIFE AND ACCIDENT           :

10   INSURANCE COMPANY, and EDUCATORS    :MUTUAL LIFE INSURANCE COMPANY,      :

11                                        :      Defendants.                   :

12   -------------------------------------

13                    VIDEOTAPED

14        DEPOSITION OF DR. CARINE M. PORFIRI

15           Taken before Angela Saxon, Certified

16   Professional Reporter and Notary Public in and forthe State of Florida at
Large, pursuant to notice of

17   taking deposition filed by the Defendant in theabove cause.

18

19   Monday, September 8, 20031900 Northwest Corporate Boulevard, Suite 215 West

20   Boca Raton, Florida 334319:15 a.m. - 12:30 p.m.

21   1:10 p.m. - 2:40 p.m.

22

23

24

25

page 1

Porfiri, Carine M., M.D.

page 2


 1   APPEARANCES:

 2   On behalf of the Witness:

 3        GREGG W. McCLOSKY, ESQUIRE

 4        2300 Glades Road, Suite 400     Boca Raton, Florida 33431

 5

 6   On behalf of the Plaintiff:

 7        GERSTEN & CLIFFORD

 8        214 Main Street      Hartford, Connecticut 06106

 9        BY:  ELIOT B. GERSTEN, ESQUIRE        860-527-7044

10

11   On behalf of the Defendant:

12

13        AKIN, GUMP, STRAUSS, HAUER & FELD, LLP     300 Convent, Suite 1500

14        San Antonio, Texas 78205    BY:  JESSICA S. TAYLOR, ESQUIRE

15        (210) 281-7000

16

17

18

19

20

21

22

23

24

25

Porfiri, Carine M., M.D.

page 3

```
 1                    I N D E X

 2

 3    WITNESS                          DIRECTDR. CARINE M. PORFIRI

 4    By Ms. Taylor                        4

 5                 E X H I B I T S

 6    NUMBER                           PAGE

 7    Defendant's No. 1                 14

 8    Defendant's No. 2                 30

 9    Defendant's No. 3                123

10    Defendant's No. 4                123

11    Defendant's No. 5                124

12    Defendant's No. 6                126

13    Defendant's No. 7                126

14    Defendant's No. 8                128

15    Defendant's No. 9                132

16    Defendant's No. 10               134

17    Defendant's No. 11               136

18

19

20

21

22

23

24

25
```

Porfiri, Carine M., M.D.

page 4

1    THEREUPON,

2                    DR. CARINE M. PORFIRI

3

4    being by me first duly sworn to tell the whole

5    truth, as hereinafter certified, testified as

6    follows:

7                    DIRECT EXAMINATION

8    BY MS. TAYLOR:

9         Q.   Please state your name for the record.

10        A.   Carine Porfiri.

11        Q.   And what is your present address?

12        A.   1040 Northwest 4th Street.

13        Q.   And Dr. Porfiri --

14             MR. GERSTEN:  I cannot hear the witness at

15   all.

16        Q.   Can you just repeat your answer to see if

17   he can hear?

18        A.   1040 Northwest 4th Street.

19             MR. GERSTEN:  Thank you, Doctor.  I

20        didn't hear you.  I apologize.

21        Q.   Dr. Porfiri, as I said my name is Jessica

22   Taylor and I'm here on behalf of Hartford Life and

23   Accident Insurance Company and Educators Mutual Life

24   for a lawsuit brought by Dr. Candi McCulloch.

25             Do you know Dr. McCulloch?

Porfiri, Carine M., M.D.

page 5

1      A.   Yes.

2           MR. GERSTEN:  Jessica, can I just ask

3      one question, just note my objection to

4      the timing of the notice.

5           MS. TAYLOR:  Sure, go ahead.

6           MR. GERSTEN:  That's all, I'm just

7      making sure it's on the record before the

8      deposition started.

9           MR. McCLOSKY:  I would like to have

10     clarification on the record that Dr.

11     Porfiri is going to be reimbursed for her

12     time and preparation in attending this

13     deposition today.

14          MS. TAYLOR:  Hartford will consider

15     your request for payment, the only thing

16     -- and generally it would be something

17     there would be no question, but the fact

18     that we subpoenaed Dr. Porfiri before and

19     no one called to cancel the deposition and

20     Hartford spent a couple thousand dollars

21     for me to come down here and there was no

22     mention.  Certainly that is something that

23     would need to be offset off of any cost

24     paid to Dr. Porfiri.

25          MR. McCLOSKY:  I don't agree with

Porfiri, Carine M., M.D.

page 6

1     that offset.  You can take whatever

2     actions you deem appropriate to get a

3     court to award you whatever sanctions you

4     deem appropriate,  but I would note that

5     we rescheduled the deposition at a time

6     that was convenient for you, did not

7     require the witness to be resubpoenaed and

8     we voluntary produced her today because of

9     a breakdown in communication with respect

10    to the last deposition.

11        MS. TAYLOR:  I would argue that any

12    breakdown of communications was on your

13    side.

14        MR. McCLOSKY:  You can argue with

15    whom you want.  I'm not here to argue.

16    I'm just letting you know what my position

17    is.

18        MS. TAYLOR:  Well, certainly it's

19    something we'll consider.

20        MR. GERSTEN:  Certainly last week the

21    Hartford made it very clear that it was

22    something more than they considered.  They

23    indicated to me it was a part of the

24    federal practice just for your

25    information, Jessica, you weren't at the

Porfiri, Carine M., M.D.

page 7

1       deposition and neither was Mr. McClosky

2       but it was represented by Attorney Sharpe

3       that physicians always get paid.  So I'm

4       kind of surprised to hear an issue being

5       raised at this point.

6            MS. TAYLOR:  I'm not -- I am not

7       objecting to the fact that she get paid.

8       I'm saying you know typically I would say

9       yes you would be entitled to get paid.  We

10      just have the issue of what happened with

11      the first deposition.  But it's certainly

12      something we can discuss and work out

13      something.

14  BY MS. TAYLOR:

15       Q.   In any event, anyway Dr. Porfiri I'm here

16  today to understand your treatment of Dr. McCulloch.

17  I kind of want to go through your office notes and

18  understand kind of your treatment of her.

19       I guess first I just wanted to talk about you

20  know your general policy regarding office visits and

21  the type of information you would typically record.

22       What type of information do you typically

23  record in a patient's file?

24            MR. GERSTEN:  Objection, I don't

25       understand the question.

page 7

Porfiri, Carine M., M.D.

page 8

1       Q.   When a patient comes to your office like

2   Dr. McCulloch, what type of information would you

3   typically record in their file?

4       A.   Medical history, a physcial exam.

5       Q.   And when you say physical exam does that

6   include for example like vital statistics?

7       A.   Yes.

8            MR. GERSTEN:  Does that include what?

9       Q.   Vital statistics.  When I say vital

10  statistics what would that include?

11      A.   Blood pressure, pulse, temperature,

12  respiratory rates, weight.

13      Q.   And is that something you would do each

14  time a patient came to see you in the office?

15      A.   Yes.

16      Q.   And every time a patient comes to see you

17  in the office was that something that would be

18  necessarily notated in their file?

19           MR. McCLOSKY:  Object to the form.

20           MR. GERSTEN:  I thought we're talking

21  about Candi McCulloch.

22      Q.   I was actually talking generally.

23           MR. GERSTEN:  You started out by

24      saying you wanted to know about Candi

25      McCulloch, so I'm confused.  I might add

Porfiri, Carine M., M.D.

page 9

1        I'm picking up one out of -- about four

2        out of every five words is coming loud and

3        clear.  I'm just wondering if somebody can

4        put that speaker phone closer to the

5        witness and you.

6            MR. McCLOSKY:  It's about as close it

7        can get.  We are trying to split the

8        difference between the attorney and the

9        witness.  I don't know if it can get any

10       better.

11           MR. GERSTEN:  You sound good there,

12       Mr. McClosky.

13           MS. TAYLOR:  He's the closest.

14   BY MS. TAYLOR:

15       Q.   Generally when a patient comes, generally

16   if a patient comes to your office to see you is that

17   something that would be recorded each time in their

18   file?

19       A.   Yes.

20       Q.   Would there be a time that you wouldn't,

21   that you wouldn't necessarily record something in

22   their file if they came to your office?

23       A.   Yes.

24       Q.   When would you not record something in

25   their file?

Porfiri, Carine M., M.D.

page 10

1              MR. GERSTEN:  You're asking her to guess?

2       A.    I don't know.

3       Q.    So you cannot think of any example of when

4   you would not write something down in a patient's

5   file when they came to see you in your office?

6       A.    Correct.

7       Q.    Would that mean then that a majority of

8   the time you would write down something in your file

9   when they came to see in the office?

10             MR. McCLOSKY:  Object to the form.

11      A.    Yes.

12      Q.    What would you say your role was in the

13  treatment of Dr. McCulloch?

14      A.    I was her primary care physician.

15      Q.    And when you say you're her primary care

16  physician, what does that mean?

17             MR. McCLOSKY:  Object to the form,

18        mischaracterizes her response.

19  BY MS. TAYLOR:

20      Q.    I'll ask you again what was your role in

21  Dr. McCulloch's treatment?

22      A.    I was her primary care physician.

23      Q.    When you say you were her primary care

24  physician, what do you mean by that?

25      A.    I would coordinate her care.

Porfiri, Carine M., M.D.

page 11

1       Q.   And when you say coordinate her care, do

2    you mean refer her out to specialists?

3       A.   If needed.

4       Q.   What else do you mean by coordinate her

5    care?

6       A.   I would receive consultations from the

7    specialist, review them.

8       Q.   Anything else?

9       A.   Make sure her preventative health needs

10   were met.

11      Q.   When you say preventative health needs,

12   what do you mean?

13      A.   That her mammograms were up-to-date, her

14   pap smear was up-to-date, she had recent lab work.

15      Q.   Would you prescribe medicine to

16   Dr. McCulloch?

17      A.   On occasion.

18          MR. GERSTEN:  Jessica, I'm wondering

19          could you ask the court reporting service

20          that you're using if they can figure out a

21          better way to put the speakers there, I'm

22          picking up bits and pieces.  I'm really

23          sorry.

24          MS. TAYLOR:  I'm sorry, what did you

25          want too me to do?

Porfiri, Carine M., M.D.

page 12

```
 1          MR. GERSTEN:  I'm wondering if you
 2     can ask the court reporter service the
 3     speaker phone that you're using is picking
 4     up or relaying only parts of each of you
 5     and the witness's question and answer, so
 6     I'm really missing -- I'm concerned I'm
 7     missing it.  Maybe I'm not missing
 8     anything, but just wondering if there is a
 9     better --
10          MS. TAYLOR:  You're asking if there
11     is maybe a better phone?
12          MR. GERSTEN:  Yes, or something.
13     It's awfully spotty in light of other ones
14     you and I have done before this one seems
15     to be very, very spotty.
16          MS. TAYLOR:  I guess we can try and
17     switch phones.  Let's go off the record
18     for a second.
19          MR. GERSTEN:  Great thank you for
20     trying.
21          (Thereupon, a discussion was held off
22     the record; after which the following
23     proceedings were had:)
24  BY MS. TAYLOR:
25     Q.   Before we went off the record we were
```

Porfiri, Carine M., M.D.

page 13


1    talking about that you would sometimes prescribe

2    medications for Dr. McCulloch.  Would you say that

3    it was typically her specialist who would prescribe

4    medications to her more often?

5        A.   I don't know.

6             MR. GERSTEN:  Objection.

7        Q.   When Dr. McCulloch would come see you

8    would you treat her for free?

9             MR. GERSTEN:  For what?

10            MR. MCCLOSKY:  Say it again, Elliot?

11            MR. GERSTEN:  I didn't hear, for what?

12       Q.   Did you see her for free or did she pay

13   you for the medical visits?

14       A.   I don't know.

15       Q.   So you don't recall whether or not you saw

16   her because you were in the same office, or whether

17   you submitted bills to her or to her insurance

18   company?

19       A.   No.

20            MS. TAYLOR:  Elliot, I have kind of

21            put all of the office notes together in

22            one pile and in date order to kind of let

23            you know what's coming up.

24            MR. GERSTEN:  Great. If you can

25            identify them by Bate stamp number that


page 13

Porfiri, Carine M., M.D.

page 14


1    will help.

2        MS. TAYLOR:  Sure I'm starting with

3    H4964.

4        MR. GERSTEN:  Let me just find it.

5        In the meantime why don't you mark it

6    and that way I won't delay you.

7        MS. TAYLOR:  I'm just going to go

8    ahead and mark -- do you have any exhibit

9    stickers?  I'm going to go ahead and mark

10    a packet full of office notes as

11    Exhibit 1.  Then as we go page by page

12    I'll tell you the Bates number.

13        MR. GERSTEN:  Okay.  I'll try to find

14    it.  I got it 4964.

15        MS. TAYLOR:  That's correct.

16        MR. GERSTEN:  Great.

17        (Thereupon, Defendant's Exhibit

18    Number 1 was marked for identification.)

19    Q.    I'm going to hand you what's been marked

20  as Exhibit 1 the first page there has been marked

21  H4964.  Can you identify this document for me,

22  Dr. Porfiri?

23    A.    Yes.

24    Q.    What is that document?

25    A.    It's a patient flow sheet.

Porfiri, Carine M., M.D.

page 15


1       Q.   When you say a patient flow sheet, what

2    does that mean?

3            MR. GERSTEN:  I don't have that

4        document.  H4964?

5            MS. TAYLOR:  H4964.

6            MR. GERSTEN:  My H4964 is a letter

7        from Dr. Johnson because the Bate stamp

8        from you guys and ...

9            MS. TAYLOR:  This is a sheet that has

10       past medical history, past surgery

11       history, routine labs, screening tests.

12       That type of information on there.

13           MR. GERSTEN:  I understand.  I'm just

14       telling you the document I've got is a

15       June 1, 2000 letter marked H4964.

16           MS. TAYLOR:  That's not what I have.

17       This came out of the documents that Dr.

18       Porfiri reproduced to us in response to a

19       subpoena awhile back.

20           MR. GERSTEN:  Let me take a moment

21       and try to go into our files and see if I

22       can find the Porfiri compliance to the

23       subpoena because the document number --

24       Bate stamp numbers is definitely

25       different.  If you give me about two

Porfiri, Carine M., M.D.

page 16

1        minutes I'll try to track that down.

2            MS. TAYLOR:  Sure.

3            MR. GERSTEN:  Do you remember

4        approximately when that subpoena was

5        complied with?

6            MS. TAYLOR:  2002 I believe.  More in

7        the beginning of the case.

8            MR. GERSTEN:  Okay, no problem give

9        me a minute to ask Joyce.

10           (Thereupon, a discussion was held off

11       the record; after which the following

12       proceedings were had:)

13   BY MS. TAYLOR:

14       Q.   And before we went off the record you were

15   saying that this was a flow sheet?

16       A.   Right.

17       Q.   And what do you mean by a flow sheet?

18       A.   Generally it has the past medical history,

19   current problems, family history, social history,

20   screening tests.

21       Q.   Is this something that you would fill out

22   or start to fill out the first time you saw a

23   patient?

24       A.   Yes.

25       Q.   And then would you add to it later as

Porfiri, Carine M., M.D.

page 17


1   events occurred?

2        A.   Yes.

3        Q.   I just want to go over a few items on

4   here.  On past medical history under number one it

5   says TMJ and then I can't read after that, if you

6   could read that for me.

7        A.   It says diagnosed age and I can't read it.

8        Q.   And what is TMJ generally?

9        A.   Temporomandibular joint disease.

10       Q.   And is that a -- I have no medical

11   background, is that line the stiffening of the jaw?

12       A.   It's pain in this joint here.

13       Q.   So pain in your jaw joint?

14       A.   Um-hum.

15       Q.   And then it's on number four it says

16   history of hepatitis B, what exactly is hepatitis B

17   if you can describe that for me?

18       A.   It's a viral disease of the liver.

19       Q.   And how does one contract hepatitis B?

20            MR. GERSTEN:   Objection.

21   BY MS. TAYLOR:

22       Q.   Do you know how Dr. McCulloch contracted

23   hepatitis B?

24       A.   No.

25       Q.   Do you know generally how someone could

Porfiri, Carine M., M.D.

page 18

1    contract hepatitis B?

2              MR. GERSTEN:  Objection.

3              MS. TAYLOR:  You can answer unless

4        your attorney instructs you not to answer.

5        A.  Yes.

6        Q.  How would you contract hepatitis B?

7        A.   It can be through sexual intercourse,

8    through being contract with contaminated fluids and

9    there is a certain percentage which we can not

10   account for.

11       Q.  After 1985 it says normal and can you read

12   that next portion?

13       A.  That says LFTs.

14       Q.  What is LFTs?

15       A.  Liver function tests.

16       Q.  So her tests in 1985 were normal then, is

17   that what that's indicating?

18       A.  No, it's -- no.

19       Q.  Can you tell me what that is indicating

20   then?

21       A.   The year generally is associated with the

22   time of diagnosis.

23       Q.   So then as of the time you wrote this her

24   recent test indicated normal LFTs?

25       A.   What it means is they were normal all

Porfiri, Carine M., M.D.

page 19


1    along.

2        Q.    And under allergies you have PCN written

3    what does PCN stand for?

4             MR. GERSTEN:   Speak up Jessica, please.

5        Q.    Under allergies PCN is written, what does

6    PCN stand for?

7        A.    Penicillin.

8        Q.    And under past surgical history it's

9    notated in '96, if I can read it, it says

10    arthroscopic and then I can't read the rest of that?

11        A.    Work.

12        Q.    Do you know what type of arthroscopic work

13    that Dr. McCulloch had?

14        A.    It looks -- no, no.

15        Q.    And you don't recall right now what that

16    would have been?

17        A.    No.

18        Q.    Under family history there is a notation

19    by mother of -- and I'm going to butcher this --

20    sarcoidosis, how do you pronounce that?

21        A.    Sarcoidosis.

22        Q.    What is sarcoidosis?

23        A.    That's a disease of the immune system that

24    can affect any organ in the body.

25        Q.    What does TD stand for under shots?

Porfiri, Carine M., M.D.

page 20

1        A.     Tetanus.

2        Q.     And then under HIV there is some letters

3    with negative and positive signs, can you explain to

4    me what that means?

5        A.     There is nothing, the HIV there is no

6    documentation.  This is hepatitis B surface antigen

7    negative.  Hepatitis B antibody, positive.  Surface

8    antibody positive.

9        Q.     So what does that mean when the surface

10   antigen or I'm sorry, the antigen is negative?

11       A.     That the patient is not a carrier.

12       Q.     And then when the -- I'm sorry, you said

13   the surface antibody is positive, what does that

14   mean?

15       A.     That the patient has a Immunity to

16   hepatitis B.

17       Q.     Under social history there is a word right

18   next to it on the line that I can't read, can you

19   read that?

20       A.     It says ETOH.

21       Q.     What does that stand for?

22       A.     Alcohol.

23       Q.     So it means that she drinks alcohol?

24       A.     Next to it it says social.

25       Q.     It means she's a social drinker?

Porfiri, Carine M., M.D.

page 21


1       A.   (Shakes head.)

2       Q.   And they can next to exercise, does that

3   that say somewhat resilient?

4            MR. GERSTEN:  Can you speak up, Jessica.

5       Q.   Next to exercise does that say somewhat

6   resilient?

7       A.   No.

8       Q.   What does that say?

9       A.   Somewhat regularly.

10      Q.   If we can go to the bottom of the page

11   under other and it says NS something D times three,

12   can you read that?

13      A.   It says NSVD times two.

14      Q.   What is NSVD?

15      A.   Normal spontaneous vaginal delivery.

16      Q.   Under that it's a little hard to read TD

17   plus something, can you read that?

18      A.   I cannot make out this first part.

19      Q.   Can you read any of that?

20      A.   The next part says positive IUD.

21      Q.   And then after the four, does that mean

22   she had an IUD for four years?

23      A.   Yes.

24      Q.   Underneath four years there is something,

25   I can't read it.

Porfiri, Carine M., M.D.

page 22


1       A.   With PID.

2       Q.   What's PID?

3       A.   Pelvic inflammatory disease.

4       Q.   The next page is H5034.

5       Do you have that one, Elliot?

6            MR. GERSTEN:  I'm looking if you just

7       give me a minute.

8            MS. TAYLOR:  It says annual history

9       and physical on the top.

10           MR. GERSTEN:  What's the Bate stamp

11      number?

12           MS. TAYLOR:  H5034.

13           MR. GERSTEN:  The H5034 I have is

14      certificate of healthcare provider.

15           MS. TAYLOR:  No.  This a February

16      21st, 1995 annual history and physical.

17           MR. GERSTEN:  These were documents

18      that were given to us by the Hartford,

19      Jessica.  I'm not sure why the numbers

20      were different.

21           MS. TAYLOR:  I have a feeling that

22      these were all Bate Stamped before we got

23      involved which is not a excuse.

24           MR. GERSTEN:  I understand we'll take

25      it case by case.  I have a right to see

Porfiri, Carine M., M.D.

page 23

1    the documents being shown to the witness,

2    but.

3         MS. TAYLOR:  Well, I agree.  And I

4    tried to help you out but I didn't realize

5    that they had used Bate Stamps over again.

6         MR. GERSTEN:  Me either.  Let's go

7    page by page see how far we go before we

8    can't get this fixed.

9         MS. TAYLOR:  Do you have Dr.

10   Porfiri's office notes in front of you?

11        MR. GERSTEN:  I need to track that

12   down while you're going on, so I don't

13   have an answer for you yet.

14        MS. TAYLOR:  Because most of her

15   documents were in a group, the way she

16   produced them.  And they were probably

17   guessing around 60 pages, and they were

18   all kind of numerically together and I

19   e-mailed you the numbers altogether.

20        MR. GERSTEN:  I got that on Saturday,

21   but something is not right with this Bate

22   stamp numbering obviously.

23        MS. TAYLOR:  I'm going to go on until

24   you feel that you have to have the

25   document in front of you.

Porfiri, Carine M., M.D.

page 24


    1          MR. GERSTEN:  Sure, I'm not

    2      objecting.  I want you to try to get this

    3      done.

    4          MS. TAYLOR:  Me too.

    5      Q.  So now we're going to talk about H5034

    6   which is an annual history and physical.

    7          Now when would you fill out this form for a

    8   patient, this annual history and physical form?

    9      A.  When they came for their annual history

   10   and physical.

   11      Q.  So once a year?

   12      A.  Correct.

   13      Q.  Is it fair to say since this is the first

   14   history and physical in your file for Dr. McCulloch

   15   that this was the first physical you had given her?

   16      A.  Yes.

   17      Q.  When did Dr. McCulloch start coming to you

   18   as her primary care physician, do you recall?

   19      A.  On this date.

   20      Q.  So February 21st, '95?

   21      A.  Yes.

   22      Q.  If we can go down this list here the first

   23   notation on this form is cc, what does cc stand for?

   24      A.  Chief complaint.

   25      Q.  And it says here that her chief complaint

Porfiri, Carine M., M.D.

page 25


1    was posterior neck pain and parathesthesis?

2         A.   Paresthesias.

3         Q.   What is paresthesia?

4         A.   Numbness, pain, burning, tingling.

5         Q.   Do you recall where she was having this

6    numbness, pain and tingling?

7         A.   Yes.

8         Q.   Where was that?

9         A.   The back of her neck into both shoulders,

10   and the hands.

11        Q.   That's what it states under HPI; is that

12   correct?

13        A.   Yes.

14        Q.   What does HPI stand for?

15        A.   History of present illness.

16        Q.   Here it mentions Dr. McCulloch's fall

17   while she was skiing.  What did Dr. McCulloch tell

18   you about that skiing accident if you can recall?

19        A.   I don't remember.

20        Q.   Do you recall if you saw any objective

21   signs yourself of the neck pain and tingling that

22   she was discussing?

23        A.   No.

24        Q.   Would there be any way to have objective

25   findings of neck pain like that?

Porfiri, Carine M., M.D.

page 26


1           MR. GERSTEN:  Objection.

2      A.   Sometimes.

3      Q.   What would you expect to see, what would

4  your objective findings be of that neck pain?

5           MR. GERSTEN:  Objection, because if

6       she can answer that.

7           MS. TAYLOR: Excuse me?

8           MR. GERSTEN:  She said sometimes.

9       Then you asked her a question that appears

10      from one perspective to connect to the

11      earlier question and from another it had

12      nothing to do with it, so I'm objecting.

13     Q.   Well, sometimes when you would have

14  objective findings, what would those finding be?

15     A.   Muscle spasm.

16     Q.   Anything else?

17     A.   No.

18     Q.   Do you recall seeing any signs of muscle

19  spasms in Dr. McCulloch's neck?

20     A.   On this day, no.

21     Q.   Is that something you would have notated

22  if you had seen that?

23     A.   Yes.

24     Q.   What does HENNT stand for?

25     A.   Head, ears, eyes, nose, throat.

Porfiri, Carine M., M.D.

page 27


1       Q.    And how about CV?

2       A.    Cardiovascular.

3       Q.    And GI?

4       A.    Gastrointestinal.

5       Q.    How about GU?

6       A.    Genitourinary.

7       Q.    And then MKS, is that musculoskeletal?

8       A.    Yes.

9       Q.    You had notated left-sided neck pain?

10      A.    Yes.

11      Q.    And what is HEM slash IMM slash INF?

12      A.    Hematological, immunological infectious.

13      Q.    After that you have underlined denies easy

14  bruising, swollen LN, chills, sweats and fevers, do

15  you recall why you would have underlined that?

16      A.    No.

17      Q.    Would that necessarily mean that she --

18  scratch that.

19           What is LN under where it says swollen LN?

20      A.    Lymph nodes.

21      Q.    And then under neuro you have notated --

22  if you can read that for me?

23      A.    Some mornings awakens with bilateral

24  shoulder numbness and paresthesia of hands

25  bilaterally.

Porfiri, Carine M., M.D.

page 28


1        Q.    That's what we were discussing earlier?

2        A.    (Shakes head.)

3        Q.    And under psych you've also written a note

4    here, can you read that first portion of it for me

5    stressful?

6        A.    Existence.

7        Q.    When you wrote down that she was

8    complaining of a stressful existence, do you

9    remember what she was complaining about?

10            MR. GERSTEN:  You're breaking up on

11        me, can you just say that again, please.

12        Q.    Under psych where you had written

13    stressful existence, do you know what that was

14    referring to?

15        A.    No.

16        Q.    So you don't recall what Dr. McCulloch was

17    complaining about when she told you she had a

18    stressful existence?

19            MR. McCLOSKY:  Object to the form.

20            You can answer.

21        A.    No.

22        Q.    But you also notated that she sleeps well

23    and her appetite was unchanged; is that correct?

24        A.    Yes.

25        Q.    It says under treatment plan that you


page 28

Porfiri, Carine M., M.D.

page 29


1    referred Dr. McCulloch to Dr. Musso; is that

2    correct?

3        A.   Yes.

4        Q.   Do you recall why you referred Dr.

5    McCulloch to Dr. Musso?

6        A.   Yes.

7        Q.   Why was that?

8        A.   Because she had neck pain and she had a

9    prior history of neck surgery.

10        Q.   Are you referring to the surgery she had

11    in 1989 or 1990?

12        A.   Yes.

13        Q.   If we turn back to H4964 would that be

14    posterior laminectomy and anterior discectomy?

15        A.   Yes.

16        Q.   Under treatment plan under number two it

17    says U slash S, what does that stand for?

18        A.   Ultrasound.

19        Q.   And so did you schedule Dr. McCulloch for

20    an ultrasound?

21        A.   I referred her.

22        Q.   And was the ultrasound related to her

23    neck?

24        A.   No.

25        Q.   Do you recall as of February 21st, 1995,

Porfiri, Carine M., M.D.

page 30


1    if Dr. McCulloch was working?

2        A.   I don't remember.

3        Q.   I'm going to hand you a document that

4    I've marked as Exhibit No. 2.   And Elliot, this is

5    H6 -- I'm sorry H5670.

6            MR. GERSTEN:   H5670.

7            MS. TAYLOR:   It's a March 15, '95

8        letter from Dr. McCulloch to Paul Meyer.

9            (Thereupon, Defendant's Exhibit

10       Number 2 was marked for identification.)

11           MR. GERSTEN:   I'm looking for it

12       now, 5670.

13           Jessica, can I make a suggestion on

14       the record or off the record, I don't

15       really care.   I'm wondering if they have a

16       fax machine there.

17           MS. TAYLOR:   I'm sure they do.

18           MR. GERSTEN:   I'm wondering if you

19       can just fax me these documents you're

20       working from because numbers just are not

21       matching up rather than to ...

22           MS. TAYLOR:   Sure.

23           MR. GERSTEN:   Your time and my time

24       and the doctor's time or lawyer's time, if

25       you can fax them up to me then we'll just


page 30

Porfiri, Carine M., M.D.

page 31

1     sort of cut through this and try to see

2     what we can do to make it happen more

3     quickly.

4          MS. TAYLOR:  I have a lot of

5     documents.  Whatever.

6          MR. McCLOSKY:  Why don't we do it in

7     stages, get an hours worth of papers up to

8     him and then when we take another break

9     you can fax him some more.

10         MS. TAYLOR:  I have two sets

11    obviously, so.  Let's go off the record

12    for a second.  Let me get your fax number,

13    Elliot.

14         MR. GERSTEN: 860-527-4968.

15         (Thereupon, a discussion was held off

16    the record; after which the following

17    proceedings were had:)

18         MS. TAYLOR:  I'm going to go ahead

19    and move on to H5035 which are

20     Dr. Porfiri's continuation of her office

21    notes.

22         MR. GERSTEN:  With the understanding

23    that those are being faxed to me, that's

24    fine.

25         MS. TAYLOR:  Yes, they are being

Porfiri, Carine M., M.D.

page 32


1        faxed to you.

2    BY MS. TAYLOR:

3        Q.    And on the top of the page it looks like

4    the first notation would be August 24, '95; is that

5    correct?

6        A.    Yes.

7        Q.    Is it fair to say that that was the next

8    time you saw Dr. McCulloch after her February 21st,

9    1995 annual physical?

10       A.    Yes.   These are conversations not visits.

11       Q.    So would you say every one of these on

12   these page were telephone conversations with her as

13   opposed to?

14       A.    Or my own notes, not office visits.

15       Q.    So not office visits.

16       So from August 24, 1995 until I guess the last

17   date on this bottom of this page is October 10,

18   1995, these are all conversations or your own notes

19   about Dr. McCulloch as opposed to an office visit?

20       A.    Yes.

21       Q.    Let's go through these.

22       Was Dr. McCulloch working in the same office

23   with you at this time that you recall?

24       A.    I don't remember.

25       Q.    Do you recall how long you worked with Dr.

Porfiri, Carine M., M.D.

page 33


1    McCulloch in the same office seeing patients?

2        A.   I don't remember.

3        Q.   I understand it was a long time ago.

4    Okay.  Let's go back.

5        Patient states physical therapy did not help at

6    all as prescribed.  And that's something Dr.

7    McCulloch would have told you?

8        A.   Yes.

9        Q.   Then it says here advise patient to

10   return to Dr. Musso for evaluation, so that was a

11   recommendation you had made to her?

12       A.   Yes.

13       Q.   Do you know if she had been seeing -- do

14   you know how many times she went to see Dr. Musso

15   after you first referred her there in February of

16   '95?

17       A.   No.

18       Q.   When it says advised Ultram, what does

19   that mean?

20       A.   Ultram is a medication for pain.

21       Q.   But when it says advised does that mean

22   you prescribed it for her or she told you she was

23   taking it?

24       A.   Oh, I advised her to take Ultram.

25       Q.   So you prescribed it for her?

Porfiri, Carine M., M.D.

page 34

1      A.   Yes.

2      Q.   And after Ultram is that the dosage that's

3   described afterwards?

4      A.   Correct.

5      Q.   Can you explain what that dosage was?

6      A.   It says one to two PO which means by

7   mouth, Q four to six hours, it means every four to

8   six hours.  PRN means as needed.

9      Q.   After that it says NSAIDS lost

10  effectiveness; what is NSAIDS?

11     A.   Nonsteroidal anti-inflammatory.

12     Q.   Is Dr. McCulloch telling you that they

13  lost effectiveness?

14     A.   Yes.

15     Q.   Do you recall what she told you about

16  that?

17     A.   No.

18     Q.   And then underneath does it say patient

19  has tried massages, acupuncture, acupressure, etc.

20  for resolution?

21     A.   Without resolution.

22     Q.   And then on September 7, 1995, this is

23  just someone in your office calling in a

24  prescription for you for Dr. McCulloch?

25     A.   Yes.

Porfiri, Carine M., M.D.

page 35


1        Q.   And this dosage of Ultram is it the same

2    as you notated in August, in the August 24th note?

3        A.   Yes.

4        Q.   And how about the Vicodin, was that the

5    first time you had prescribed Dr. McCulloch Vicodin;

6    do you know?

7        A.   I don't know.

8        Q.   If it was the first time it was notated

9    anywhere in your office notes would it have been the

10   first time?

11       A.   Yes.

12       Q.   And can you explain the dosage of the

13   Vicodin?

14       A.   Vicodin ES means extra strength one tablet

15   by mouth every six hours as needed for pain,

16   quantity 30.

17           MR. GERSTEN:  Can I just interrupt

18           for a second.  We just received part of

19           the fax what page are you reading from

20           now?

21           MS. TAYLOR:  H5035.

22           MR. GERSTEN:  Thank you very much.

23       Q.   Do you know at this time if Dr. McCulloch

24   was actually taking the Ultram or Vicodin that you

25   prescribed for her?

Porfiri, Carine M., M.D.

page 36

1              MR. GERSTEN:  I'm sorry, I'm

2      objecting to the form of the question.

3              MS. TAYLOR:  You can answer it.

4      A.   No.

5      Q.   Do you recall ever discussing the drug she

6  was taking with her other than the fact that you

7  would prescribe them?

8      A.   Yes.

9      Q.   Do you recall what sort of conversations

10  did you have about the drug she was taking?

11             MR. GERSTEN:  When?

12             MS. TAYLOR:  In '95.

13     A.   I don't remember.

14     Q.   You don't remember any specific

15  conversations you may have had?

16     A.   In '95, no.

17     Q.   September 21st, '95 it says it was a

18  clinical update, what do you mean by clinical

19  update?

20     A.   A follow-up note, update on her progress.

21     Q.   And it says here patient has seen Dr.

22  Musso for follow-up and films were reviewed, is this

23  something that Dr. McCulloch told you or did you

24  actually talk to Dr. Musso?

25     A.   Here I spoke with the patient.

Porfiri, Carine M., M.D.

page 37


1       Q.   And did you actually review the films

2   yourself, do you recall?

3       A.   I did not.

4       Q.   So Dr. McCulloch was telling you the films

5   were reviewed and three discs were involved?

6       A.   Yes.

7       Q.   And it says here you discussed the option

8   of daily physical therapy and time off clinical

9   duties as a measure to avoid surgery, so you were

10  talking to Dr. McCulloch about her taking time off

11  from seeing patients; is that correct?

12      A.   No.

13      Q.   Explain it to me then.

14      A.   That at her visit with Dr. Musso that this

15  was discussed.

16      Q.   So she discussed that with Dr. Musso?

17      A.   Yes.

18      Q.   Is it fair to say if she was discussing

19  taking time off her clinical duties on September

20  21st, '95, that she was working at that time?

21      A.   I don't know.

22      Q.   Did you agree with that assessment that

23  she should take time off clinical duties as a

24  measure to avoid surgery?

25           MR. GERSTEN:  Objection.

Porfiri, Carine M., M.D.

page 38

1      A.   I don't know.

2      Q.   Do you know how Dr. McCulloch could avoid

3  surgery by taking time off her clinical duties?

4      A.   Yes.

5      Q.   And how, can you explain that to me?

6      A.   To avoid any exacerbating activities and

7  to concentrate on daily physical therapy.

8      Q.   When you say exacerbating activities, what

9  part of her clinical duties would you think would be

10  exacerbating activities?

11      A.   Any length of time spent at a desk looking

12  down.

13      Q.   Anything else?

14      A.   Any carrying of lots of charts, lots of

15  papers, any assisting patients in exam rooms.

16      Q.   And what about assisting patients in exam

17  rooms would exacerbate --

18          MR. McCLOSKY:  Were you finished with

19      your answer?

20      A.   Yes.

21          MR. McCLOSKY:  I wasn't sure if she

22      was finished.

23          MS. TAYLOR:  If you weren't I

24      apologize.

25      Q.   What about assisting patients in exam

Porfiri, Carine M., M.D.

page 39

1   rooms would be exacerbating?

2           MR.  GERSTEN:  Could I have that

3       question one more time because I could

4       barely hear you, Jessica.

5       Q.   What about assisting patients in exam

6   rooms would be an exacerbating activity?

7       A.   Helping them go from lying to a sitting

8   position, from sitting to standing.

9       Q.   Anything else?

10      A.   No.

11      Q.   On September 26, '95 it says that you

12  reviewed Dr. Musso's notes and MRI, did you review

13  the MRI yourself; do you recall?

14      A.   No.

15      Q.   So you just would have read his notes

16  about the MRI?

17      A.   Yes.

18      Q.   How is intensive physical therapy and

19  possible time off clinical duties a conservative

20  approach?

21      A.   It's nonsurgical.

22      Q.   So anything nonsurgical you would consider

23  a conservative approach?

24      A.   Yes.

25      Q.   Did you have any opinion one way or the

Porfiri, Carine M., M.D.

page 40


1    other whether she should have surgery or follow this

2    conservative approach?

3              MR. GERSTEN:  Objection.

4        A.   It says here agree with conservative

5    approach.

6        Q.   Is that something that you would leave up

7    to a specialist like Dr. Musso?

8        A.   Yes.

9        Q.   Then on October 10, '95 is this notating a

10   discussion you actually had with Dr. Musso?

11             MR. GERSTEN:  What date?

12             MS. TAYLOR:  October 10th, '95.

13             MR. GERSTEN:  That's the bottom

14        there.

15             MS. TAYLOR:  Yes.

16             MR. GERSTEN:  Thank you.  It's not as

17        clear on my copy as it maybe on yours.

18             MS. TAYLOR:  Not very clear here

19        either.

20        A.   The question again.

21        Q.   Is this discussing an actual conversation

22   you had with Dr. Musso?

23        A.   Yes.

24        Q.   So it was Dr. Musso who told you about his

25   review of the MRI?

Porfiri, Carine M., M.D.

page 41

1     A.   Yes.

2     Q.   And he told you there was three disc

3   bulge slash what does that say, oh, herniation?

4     A.   Yes.

5     Q.   When it says here requiring rest and

6   intensive physical therapy to attempt to break out

7   of pain cycle; what do you mean by pain cycle?

8     A.   Chronic pain.

9     Q.   How would you define chronic pain?

10     A.   I would describe it as daily pain.

11     Q.   Anything else?

12     A.   Over a length of time.

13     Q.   And when you say a length of time, what

14   length of time are you talking about?

15     A.   It depends.

16     Q.   So it would depend according to the

17   patient?

18     A.   Yes.

19     Q.   Let me ask you this, on H5035 when we

20   first started talking about it you told me that none

21   of these were actual office visits by Dr. McCulloch,

22   how can you tell that readily by looking at this?

23     A.   Because there is no documented vital

24   signs, there are no physical exams, no objective

25   findings, no plans.

Porfiri, Carine M., M.D.

page 42

1       Q.   Let's turn to the next page which is --

2    I'm not sure Elliot that yours has a Bate stamp on

3    it, but it is H949.  It's the 10-17-95 office visit.

4            MR. GERSTEN:  10-17-95?

5            MS. TAYLOR:  Yes.

6            MR. GERSTEN:  You're right there is

7        no Bate stamp number on it.  It starts

8        with 10-17-95.

9            MS. TAYLOR:  And you do have that?

10           MR. GERSTEN:  Yes.

11           MS. TAYLOR:  I actually do have a

12       Bate stamp version.

13           MR. GERSTEN:  What's the version of

14       it you have Bate Stamped?

15           MS. TAYLOR:  H949.

16           MR. GERSTEN:  H949?

17           MS. TAYLOR:  Right.

18       Q.   Based on what you just told me, is it fair

19    to say that you actually saw Dr. McCulloch in your

20    office on 10-17-95?

21       A.   Yes.

22       Q.   How can you tell that, by the vital signs?

23       A.   Correct, and the format of the note.

24       Q.   What about the format of the note tells

25    you that you actually saw her in your office?

page 42

Porfiri, Carine M., M.D.

page 43

1      A.   It looks like what we call a SOAP note.

2      Q.   And when you say SOAP note, what?

3      A.   S is subjective, O is objective, A is

4   assessment, P is plan.

5      Q.   What was her chief complaint on October

6   17, '95?

7      A.   Neck pain and decreased mobility.

8      Q.   And when it says decreased mobility is

9   that of her neck or?

10     A.   Yes.

11     Q.   So it says here patient continues to have

12  chronic neck pain; is that correct?

13     A.   Correct.

14     Q.   And then it says there is a down arrow and

15  ROM, is that range of motion?

16     A.   Decreased range of motion.

17     Q.   And is that again in her neck?

18     A.   Yes.

19     Q.   Did she have any sort of decreased range

20  of motion anywhere else that you recall?

21     A.   I don't recall.

22     Q.   It says she has been on Ultram with

23  minimal relief?

24     A.   Ultram PO which is by mouth, PRN as needed

25  with minimal relief.

page 43

Porfiri, Carine M., M.D.

page 44


1        Q.   When a patient tells you that a pain

2    medication like Ultram has been given them minimal

3    relief typically what -- scratch that.

4        When she told you that the Ultram was giving

5    her minimal relief, what was your response?

6            MR. GERSTEN:  Objection.

7        Q.   Did you continue her on the Ultram?

8        A.   I don't know.

9        Q.   It says here the Vicodin extra strength

10   that she was using it sparingly?

11       A.   Yes.

12       Q.   So does that mean to you she was trying to

13   use it as little as she could?

14       A.   Yes.

15       Q.   When a patient tells you generally that

16   the pain medication that you've prescribed is not

17   really helping them that much, do you try to

18   prescribe them something else?

19       A.   Generally?

20       Q.   Yes.

21       A.   Yes.

22       Q.   Is there any notation that you can see on

23   this 10-17-95 note that you try to prescribe her

24   something else?

25       A.   No.

Porfiri, Carine M., M.D.

page 45

1      Q.    What is TENS?

2      A.    That's an electrical stimulation unit that

3   is used for people with pain.

4      Q.    Did you recommend that for her or is that

5   something that she told you another doctor had

6   prescribed for her?

7      A.    I did not personally recommend that.

8      Q.    Can you explain how a TENS unit works?

9      A.    No.

10          MR. GERSTEN:  What was the answer?

11     A.    No.

12     Q.    And then the patient will get TENS, is the

13  U slash S an ultrasound?

14     A.    Yes.

15     Q.    And is that Dr. McCulloch telling you that

16  someone else had told her to get an ultrasound?

17     A.    Yes.

18     Q.    Is that related or unrelated to her neck

19  problem?

20     A.    It would be related.

21     Q.    Related.  I can't read your note after

22  the ultrasound, can you read that?

23     A.    Yes.  Ice, heat, etc.

24     Q.    Again that's Dr. McCulloch tell you what

25  another doctor has told her to do?

Porfiri, Carine M., M.D.

page 46


1        A.    Yes.

2        Q.    And after that when it says we will

3    request second evaluation by Dr. Charles Theofilos;

4    is that a referral you made to Dr. Theofilos?

5        A.    Yes.

6        Q.    Why did you make that referral?

7        A.    Because she wasn't getting better.

8        Q.    Underneath that it says P slash E, what

9    does P slash E stand for?

10       A.    Physical exam.

11       Q.    And then it says no and there is a

12   triangle?

13       A.    Change.

14       Q.    No change, okay.  It says left posterior

15   neck pain, is that something that Dr. McCulloch told

16   you about, or did you have any objective findings of

17   her pain?

18       A.    This would be objective to palpation.

19       Q.    So you said to palpation?

20       A.    Yes.

21       Q.    What do you mean by palpation?

22       A.    To touch the back of the neck.

23       Q.    You would be feeling maybe the muscle

24   spasms that you described earlier?

25       A.    Yes.


page 46

Porfiri, Carine M., M.D.

page 47

1      Q.   And then it says again decreased range of

2   motion?

3      A.   Yes.

4      Q.   Is that something that you found

5   objectively?

6      A.   Yes.

7      Q.   How would you test the range of motion?

8      A.   By having her move her neck, try to move

9   her neck.

10      Q.   How can you tell objectively when a

11   patient tries to move their neck whether they have

12   decreased range of motion?

13          MR. GERSTEN:  Objection.

14          MR. McCLOSKY:  Go ahead.

15      A.   They either are limited anatomically or by

16   pain.

17      Q.   Can you tell whether a patient is actually

18   limited anatomically or by pain as opposed to just

19   limiting their movements themselves voluntarily?

20          MR. GERSTEN:  I didn't understand

21      the question.  I'm objecting.

22      Q.   Did you understand the question,

23   Dr. Porfiri?

24      A.   Yes.

25      Q.   You can answer it if you understood it.

Porfiri, Carine M., M.D.

page 48


1        A.    I don't know how to answer that question.

2        Q.    When you say you don't know how to answer

3   that question, what did you mean?

4        A.    Ask me the question again.

5        Q.    How can you tell whether a patient is

6   actually limited in their range of motion by pain or

7   anatomically as opposed to just voluntarily limiting

8   their movement themselves?

9              MR. GERSTEN:   Objection.

10       A.    I will move the patient's neck for them.

11       Q.    So you can tell just by trying to move it

12   yourself that they were limited?

13       A.    Yes.

14       Q.    Then the next note about the hand and

15   shoulders, that's the tingling or the numbness that

16   we were talking about earlier?

17       A.    Yes.

18       Q.    Then the A, that's assessment again?

19       A.    Yes.

20       Q.    And when it says cervical disc pathology

21   three disc involvement, is that your own assessment

22   or is that something that Dr. Musso had told you?

23       A.    Three disc involvement by MRI, so that

24   would be per the MRI report.

25       Q.    Had you actually reviewed the MRI yourself

Porfiri, Carine M., M.D.

page 49


1    by this time?

2        A.   I had not reviewed the films.

3        Q.   But you had reviewed the written results

4    of the MRI?

5        A.   Yes.

6        Q.   Under P which is plan you made a note

7    continue Ultram.  Did you increase the dosage of the

8    Ultram?

9        A.   No.

10       Q.   So you left the Ultram the same dosage as

11   it was before?

12       A.   Yes.

13       Q.   Let's go to H5036.

14           MS. TAYLOR:  Do you have that, Elliot?

15           MR. GERSTEN:  Yes, ma'am, thank you.

16   BY MS. TAYLOR:

17       Q.   On 10-24-95 is that you -- is that just

18   calling in prescription for Dr. McCulloch?

19       A.   Yes.

20       Q.   Is that the same dosage as before?

21       A.   Yes.

22       Q.   Let me ask you this:  On this page, H5036,

23   are any of these office visits?

24       A.   No.

25           MR. GERSTEN:  What was the answer to the


page 49

Porfiri, Carine M., M.D.

page 50

1        question?

2        A.    No.

3              MR. GERSTEN:   I'm just looking here.

4        Q.    If you can read the note on November 16th

5    for me.

6        A.    Patient stopped by office today to pick up

7    prescriptions.  She states she is attending Central

8    Palm Beach Rehab via a referral per ortho, states a

9    slight progress was made until increased weights on

10   machine, then became very painful and pain decreased

11   range of motion returns to baseline.  Await progress

12   notes from above.

13       Q.    So Central Palm Beach Rehab that's where

14   she was having her physical therapy?

15       A.    Yes.

16       Q.    And when she says slight progress was

17   being made until increased weights on machine, is

18   she telling you that she was doing better and then

19   the weights were too heavy and it reinjured her

20   somehow?

21       A.    The weights were too heavy and she -- I

22   don't know if I would say reinjured.  She was in

23   pain again.

24       Q.    Do you recall -- and I realize it was a

25   long time ago -- do you recall when, how long before