Porfiri, Carine M., M.D.

page 51


1    her discussion with you that they had increase the

2    weights on the machine?

3        A.    No.

4        Q.    Then on June 6th, '96, is this just

5    calling in a prescription again?

6        A.    Yes.

7        Q.    Is that the same level of Ultram as you

8    had prescribed for her before?

9        A.    Yes.

10       Q.    Can you read the notation on the bottom

11   pharmacy -- oh, that's just a number to the

12   pharmacy?

13       A.    Correct.

14       Q.    Can you read the notation on August 24,

15   '96?

16       A.    Phone conversation, patient has been

17   seeing Dr. Katzell who has sent patient to

18   Wellington PT for use of specific -- I can't make

19   out that.  PT, she states she has periods of

20   increased strength attempting -- oh, excuse me,

21   periods of increased alternating with regression.

22   This copy is really bad.

23       Q.    Could that be believes regression due to

24   increased weights on machine?

25       A.    Yes.

Porfiri, Carine M., M.D.

page 52


1       Q.   Do you understand that she was telling you

2    that she does better for a while and then they

3    increase the weights on the machine and she feels

4    bad again?

5            MR. GERSTEN:   Objection.

6       A.   Yes.

7       Q.   Let's turn to the next page which I think

8    is H5032 but the Bates number is kind of cutoff.

9    It's an October 15, '96 office visit.

10       Do you have that, Elliot?

11           MR. GERSTEN:   As a matter of fact,

12       no.  The next page that came up here was

13       5025.  The page you just had was page 6 of

14       the fax, page seven of the fax has not got

15       a Bate stamp number on it.

16           MS. TAYLER:   That's right.  It's got

17       it on the side and my version kind of

18       halfway cutoff?

19           MR. GERSTEN:   Fair enough, is that

20       the one starting with today's date

21       10-15-96.

22           MS. TAYLOR:   That's correct.

23           MR. GERSTEN:   Great, thank you.

24       What's the proper Bate stamp number of

25       this one, Jessica?

Porfiri, Carine M., M.D.

page 53


1          MS. TAYLOR:  I can only guess because

2     half of it is cutoff, but it looks like

3     5032.

4          MR. GERSTEN:  Thank you.

5     Q.  Dr. Porfiri, on this document can you tell

6  whether you actually saw Dr. McCulloch on this date?

7     A.  Yes.

8     Q.  And is it fair to say that it had been

9  approximately a year since you had seen Dr.

10  McCulloch for an office visit?

11     A.  Yes.

12          MR. McCLOSKY:  I'm assuming you're

13     willing to represent that these notes

14     that you've handed the doctor represent

15     all the notes in the file that were

16     produced to you in response to the earlier

17     subpoena.  In other words, we don't have

18     the original chart here to compare.

19          MS. TAYLOR:  That's correct.

20          MR. McCLOSKY:  To confirm that these

21     documents represent the whole chart that

22     was produced, but it's my understanding

23     that quite some time ago the doctor's

24     complete chart for this patient was turned

25     over and you're prepared to represent

Porfiri, Carine M., M.D.

page 54

```
1        today that these notes represents all the

2        notes that were contained in that chart

3        that were produced to you.

4            MS. TAYLOR:  As long as Dr. Porfiri

5        produced all that she had in response to

6        subpoena, yes.

7            MR. GERSTEN:  As far as I'm concerned

8        I know that there's different Bate stamp

9        numbers and all I'm not sure that when

10       Edward and Angel got this stuff we got

11       complete sets.

12           MR. McCLOSKY:  That's a separate

13       issue.  My concern is for instance with

14       respect to the last question, it's clear

15       to me, and you can't see, that the

16       doctor's response was dependent upon her

17       review of the notes that are in front of

18       her, which is fine, but I just wanted a

19       representation from counsel that these

20       notes represent all of the notes that were

21       produced by the doctor in response to an

22       earlier subpoena.

23           MS. TAYLOR:  And yes it's my

24       understanding they do.  I pulled them

25       straight from her subpoena file.
```

Porfiri, Carine M., M.D.

page 55

1   BY MS. TAYLOR:

2      Q.  On the first part of this follow-up visit

3  on 10-15-96, after it says follow-up visit, what

4  does the first line say there?

5      A.  Cervical radiculopathy.

6      Q.  What is cervical radiculopathy?

7      A.  Symptoms related to nerve root

8  involvement.

9      Q.  When you say nerve root involvement, can

10  you explain to the jury what you mean?

11      A.  Jury.  Here I'm specifying cervical nerve

12  root from the cervical spine.

13      Q.  And when the cervical nerve root is

14  involved, what kind of symptoms would you expect to

15  see?

16      A.  Symptoms similar to Dr. McCulloch's

17  symptoms.

18      Q.  And by that you mean the numbness in the

19  shoulders and the hands?

20      A.  Pain.

21      Q.  And then it says extensive history of

22  cervical spine problems; is that correct?

23      A.  Yes.

24      Q.  And then most recently -- and I can't read

25  that, what does that say?

page 55

Porfiri, Carine M., M.D.

page 56

1      A.   With new C5, C6 herniation.

2      Q.   And it says has been seeing Dr. Katzell

3   several months, pain is exacerbated by increased

4   resistance on machines; is that correct?

5      A.   Yes.

6      Q.   And you discussed with her the different

7   treatments she had tried?

8      A.   Excuse me, yes.

9      Q.   Which included massage, acupuncture,

10  what's hands-on healing?

11     A.   Excuse me.

12          MR. McCLOSKY:  She was up all night

13     with  a sick child.

14          MS. TAYLOR:  I understand.

15     A.   I don't know.

16     Q.   You don't know what that refers to.

17          And it says here she is minimizing use of

18  Ultram and Percocet; is that correct?

19     A.   Yes.

20     Q.   So it was your understanding that she was

21  trying to take as little as possible?

22     A.   Yes.

23     Q.   Did you prescribe her the Percocet?

24     A.   I don't know.

25     Q.   If it didn't note -- if we didn't see

Porfiri, Carine M., M.D.

page 57


1    anything in the previous notes about Percocet, would

2    that mean that another doctor had prescribed for

3    her?

4        A.    It's possible.

5        Q.    And then it says upon physical examination

6    in -- does that say mid?

7        A.    Mild.

8        Q.    Mild distress?

9        A.    Secondary to pain.

10       Q.    What is mild distress secondary to pain?

11       A.    That she appeared uncomfortable.

12       Q.    When you say appeared uncomfortable, what

13   sort of objective findings would there be appearing

14   uncomfortable?

15       A.    It could be the affect of the patient.

16       Q.    When you say affect what do you mean?

17       A.    Her countenance, how they appear.

18       Q.    Do you mean like grimacing?

19       A.    Grimacing is a good example.

20       Q.    Anything else?

21       A.    Could be tears.

22       Q.    Anything else you can think of?

23       A.    There could also be body language, holding

24   a body part.

25       Q.    And then underneath that note something

Porfiri, Carine M., M.D.

page 58

1    clear?

2        A.   Conjectiva clear, that's eyes.

3        Q.   So her eyes were clear?

4        A.   Yeah, the -- yeah, here, not blood shot,

5    not oozing puss.

6        Q.   What is TMs?

7        A.   Tympanic membranes.

8        Q.   What is that?

9        A.   The eardrums.

10       Q.   What does that say about the --

11       A.   WNL, within normal limits.

12       Q.   And then neck decreased range of motion

13   and flexion?

14       A.   With flexion.

15       Q.   With flexion, what does that mean with

16   flexion?

17       A.   Flexion is bending neck forward.

18       Q.   So she could bend her neck forward?

19       A.   Its decreased range of motion.

20       Q.   And to test that would you have taken her

21   head in your hands yourself?

22       A.   Yes.

23       Q.   It says patient indicates spasms along

24   posterior neck, did you have -- do you recall if you

25   had any objective findings of that, or is there

Porfiri, Carine M., M.D.

page 59


1    anything notated here to tell you that?

2              MR. GERSTEN:  Objection.

3         Q.   Is there anything notated here that would

4    indicate you had any objective findings of spasms

5    along her posterior neck?

6              MR. GERSTEN:  Objection.

7         A.   Yes.

8         Q.   And what was that?

9         A.   The following line, occiput to trapezius.

10        Q.   What is occiput?

11        A.   The back of the head right here.

12        Q.   What is trapezius?

13        A.   The muscles right here in the back.

14        Q.   Would that be palpatation?

15        A.   Right.

16        Q.   And then what is the notation about the

17   lungs?

18        A.   Clear to oscillation.

19        Q.   What does that mean?

20        A.    It means when I listened to her lungs it

21   sounded clear.

22        Q.   What is the notation under the lungs?

23        A.   Cor is COR is an abbreviation for heart,

24   regular rate and rhythm.  S1, S2 are normal heart

25   sounds.  Negative MGR is no murmurs, gallops or

Porfiri, Carine M., M.D.

page 60

1   rubs.

2        Q.   What is the notation underneath?

3        A.   A abdomen within normal limits.

4        Q.   Is that extremities?

5        A.   Um-hum.

6        Q.   What --

7        A.   No cyanosis, clubbing or edema.

8        Q.   Under assessment it says chronic pain

9   syndrome, how do you define chronic pain syndrome?

10       A.   Didn't I answer this before?

11       Q.   Well, you told me what chronic pain is.

12   What is chronic pain syndrome?

13       A.   It's the same.

14       Q.   The same.

15            MR. GERSTEN:  I can't hear.

16       A.   It's the same.

17       Q.   So that would just mean that she has

18   daily pain over length of time due to multiple

19   cervical disc pathology?

20       A.   Yes.

21       Q.   And was that your assessment of her

22   condition, or is that something you had learned from

23   one of the specialists she went to?

24       A.   It's both.

25       Q.   So your plan with Dr. McCulloch was to

Porfiri, Carine M., M.D.

page 61


1    continue the alternative treatment she was having?

2         A.   Yes.

3         Q.   And further physical therapy?

4         A.   Yes.

5         Q.   When it says needs well?

6         A.   Woman.

7         Q.   So just an annual exam?

8         A.   (Shakes head.)

9         Q.   Let's turn to H5025.  Can you tell from

10   looking at this note for February 18,' 97, did you

11   actually see Dr. McCulloch in the office?

12        A.   Yes.

13        Q.   And again you noted that she had cervical

14   radiculopathy?

15        A.   Yes.

16        Q.   And you stated that she was basically

17   unimproved?

18        A.   Yes.

19        Q.   Would that be something that she told you?

20        A.   Yes, this is the subjective part of the

21   note.

22        Q.   Then it says, does it say multiple

23   modalities employed?

24        A.   Yes.

25        Q.   What does that mean?

Porfiri, Carine M., M.D.

page 62

1        A.    The acupressure, the physical therapy, the

2    acupuncture.

3        Q.    Then it says has seen Dr. Upledger for

4    alternative type physical therapy?

5        A.    Yes.

6        Q.    Do you know what kind of alternative type

7    physical therapy that was?

8        A.    No.

9        Q.    But you do know that she told you that

10   there were some periods of improvement in her

11   overall situation?

12       A.    Yes.

13       Q.    The next note is about the arthroplastic

14   work she had had for her TMJ?

15       A.    Yes.

16       Q.    And it indicates that that had given her

17   much relief?

18       A.    Yes.

19       Q.    Under meds it says Percocet or Vicodin,

20   were you prescribing her this medication, can you

21   tell?

22       A.    I cannot tell from this note.

23       Q.    Is that the same level of Vicodin that you

24   had prescribed to her in the past?

25       A.    Yes.

page 62

Porfiri, Carine M., M.D.

page 63

1      Q.   And how about the Ultram, is that the same

2   dosage of Ultram?

3      A.   Yes.

4      Q.   And then you said the NSAIDs, that's

5   anti-inflammatories?

6      A.   Yes.

7      Q.   That those were not tolerable?

8      A.   Yes.

9      Q.   Do you know why they weren't tolerable?

10      A.   I can't say specifically from this.

11      Q.   So is it fair to say unless something is

12   in your notes you probably can't remember it?

13          MR. McCLOSKY:  Object to the form.

14          MR. GERSTEN: Objection.

15          MS. TAYLOR:  Scratch that.

16          MR. McCLOSKY:  You sustained your own

17      objection.

18          MS. TAYLOR:  I sustained my own

19      objection.  It was stupid.

20      Q.   Under PE you said some winging of

21   scapular noted on left, what does that mean?

22      A.   That means -- how much I can demonstrate.

23   The means the scapular is not lying flat against the

24   back.  It's lifting off, winging.

25      Q.   When you say scapular, is that your

page 63

Porfiri, Carine M., M.D.

page 64


1   shoulder blade?

2       A.   That's the shoulder blade, yeah, that's

3   word.

4       Q.   So that's something you could just tell

5   from palpatation?

6       A.   From looking, from observation.

7       Q.   Just from looking.  What does that mean to

8   you when you see winging of scapular on the left

9   side?

10      A.   That she has some muscular weaknesses.

11      Q.   Then you also noted that the decreased

12  range of motion in her neck is unchanged since the

13  last time you saw her in October?

14      A.   Yes.

15      Q.   Again, you would have done the test with

16  her where you tried to move her neck yourself; is

17  that correct?

18      A.   Yes.

19      Q.   Under assessment, again, you state

20  multiple disc pathology; is that correct?

21      A.   Yes.

22      Q.   History of fusion times two.  Are you

23  referring to the surgery she had in '89 and '90?

24      A.   Yes.

25      Q.   And then you state per records patient is


page 64

Porfiri, Carine M., M.D.

page 65

1    clearly not a candidate for surgery?

2        A.   Yes.

3        Q.   Why did you believe she was not a

4    candidate for surgery?

5        A.   Per records could indicate specialist

6    visits, consultations, their opinions.

7        Q.   So that would mean that a specialist she

8    had seen had said she's not a candidate for surgery?

9        A.   That's what it could mean, yes.

10       Q.   Do you recall if there was anything you

11   saw yourself that would indicate that she was not a

12   candidate for surgery?

13       A.   I do not recall.

14       Q.   And under P which I suppose is plan it

15   says patient to investigate other modalities for

16   pain control and relief?

17       A.   Yes.

18       Q.   Do you know what those other modalities

19   were that you were referring to?

20       A.   Not from these notes, no.

21       Q.   Then it says follow-up CPX, what is CPX?

22       A.   Complete physical.

23       Q.   So you were recommending that she come

24   back in October of '97 for a complete physical?

25       A.   Yes.

Porfiri, Carine M., M.D.

page 66

```
1      Q.   Let's turn to H5022, annual history and
2   physical.
3           Do you have that, Elliot?
4           MR. GERSTEN:  I'm getting there.
5      Yes.           5022.  I have that as page 9
6   of the fax.
7           MS. TAYLOR:  I'm sorry.
8           MR. GERSTEN:  Yeah, that's page 9 of
9       the fax that came to me.   It looks like
10      it's two pages long.
11          MS. TAYLOR:  Okay.
12          MR. GERSTEN:  If the witness could
13      just confirm that.
14     A.   I'm sorry.
15  BY MS. TAYLOR:
16     Q.   That the annual history and physical is
17  two pages long?
18     A.   Yes.
19     Q.   Then under chief complaint it says it's a
20  follow-up visit for CPX, what is CPX?
21     A.   Complete physical.
22     Q.   Then there is a notation about Ultram and
23  Percocet?
24     A.   Yes.
25     Q.   Under the Ultram, is that the same dosage
```

Porfiri, Carine M., M.D.

page 67

1    that you had prescribed to her before?

2        A.    Yes.

3        Q.    Can you tell here if she's just telling

4    you that she has been prescribed these medications

5    or whether you prescribe them yourself?

6        A.    I cannot tell from that.

7        Q.    How about the Percocet does that seem to

8    be the same level as what you had notated before?

9        A.    It seems to be, yes.

10        Q.    You notate again that her main problem is

11    chronic pain syndrome?

12        A.    Yes.

13        Q.    Secondary to cervical disc disease; is

14    that correct?

15        A.    Yes.

16        Q.    She's telling you that she has severe pain

17    at times.  Is it fair to say that the last time you

18    saw her that she was telling you that she had seen

19    some improvement in her condition?

20        A.    The last time being February 18?

21        Q.    Yes.

22        A.    What was the question?

23        Q.    That back in February she was telling you

24    that she had seen some improvement in her overall

25    situation?

Porfiri, Carine M., M.D.

page 68


1      A.   It says basically unimproved but with some

2   periods of improvement.

3      Q.   But then in November is it fair to say

4   that it seemed like she was getting worse?

5      A.   It makes no mention of her getting better.

6      Q.   And it says she had exacerbation of

7   soaring pain?

8      A.   Searing pain.

9      Q.   Searing pain how would you define searing

10  pain?

11     A.   Burning pain.

12     Q.   Do you recall if Dr. McCulloch told you

13  what was causing this severe pain she was

14  complaining about in November of '97?

15     A.   No.

16     Q.   Is that something she had complained about

17  before, this severe pain or searing pain?

18     A.   Paresthesias which is a term I used

19  before that could indicate burning, searing,

20  tingling pain.

21     Q.   And when was the last time you had used

22  that term paresthesias?

23     A.   October of 1995.

24     Q.   Approximately two years prior to her

25  November 11th '97?

Porfiri, Carine M., M.D.

page 69

```
1       A.   Yes.

2       Q.   Then the circle with the B, is that both?

3       A.   Bilateral.

4       Q.   So bilateral and rhomboids?

5       A.   Yes.

6       Q.   What are rhomboids?

7       A.   Those are muscles right next to the

8  scapular.

9       Q.   Then it says right intrascapular pain?

10      A.    It says bilaterally in rhomboids, left

11  greater than right, positive intrascapular pain.

12      Q.   What is positive intrascapular pain?

13      A.   Right in between the scapular.

14      Q.   Then next it says -- is it saying

15  headaches have decreased since arthroplasty of

16  bilateral TMJ?

17      A.   Yes.

18      Q.   Then when it says oct tension, what is

19  that?

20      A.   Occasion tension type.

21      Q.   So just occasional tension type headaches?

22      A.   Yes.

23      Q.   Then under musculoskeletal, does that say

24  continues physical therapy, massage; is that

25  meditation?
```

page 69

Porfiri, Carine M., M.D.

page 70

```
1       A.   Yes.

2       Q.   Yoga?

3       A.   Yes.

4       Q.   What does it say after Yoga?

5       A.   Without improvement.

6       Q.   And then what is oc again?  Occasional?

7       A.   Yeah.

8       Q.   Paresthesias, that would be that searing

9  pain?

10      A.   Or numbness, tingling.

11      Q.   And then notes depression, secondary to

12 chronic pain?

13      A.   Yes.

14      Q.   Had Dr. McCulloch complained of depression

15 to you before November of '97?

16      A.   Not that I can tell with my notes.

17      Q.   Other than just generally that she was

18 suffering from depression do you recall anything

19 specifically that she told you about her depression?

20      A.   Decreased appetite, weight loss.

21      Q.   And had she been complaining of decreased

22 appetite or weight loss before November of '97?

23      A.   Not according to my notes.

24      Q.   And then under neck markedly decreased

25 range of motion in neck, so does that mean that her
```

page 70

Porfiri, Carine M., M.D.

page 71

1    range of motion in her neck was worse than the last

2    time you had seen her?

3        A.   Yes.

4        Q.   And again is that something that you took

5    her head in your hands to do?

6        A.   Yes.

7        Q.   And Dr. Rudolph is that her gynecologist?

8        A.   Yes.

9        Q.   On the very bottom of this page it says

10   extremities negative?

11       A.   Cyanosis, clubbing, edema.

12       Q.   Then under assessment on the next page

13   which is H5021, under assessment it says chronic

14   pain, what does it say after that?

15       A.   Basically unresponsive to multiple

16   modalities.

17       Q.   And then under treatment plan continue

18   physical therapy?

19       A.   Continue same.

20       Q.   Same physical therapy?

21       A.   No, that's patient.  Patient to.

22       Q.   So patient to continue investigation of

23   alternative therapies?

24       A.   Correct.

25       Q.   Do you do you recall what alternative

Porfiri, Carine M., M.D.

page 72


1    therapies she was investigating?

2        A.    No.

3        Q.    Does say meds renewed?

4        A.    Yes.

5        Q.    So does that mean would that indicate that

6    you were renewing her medications for her or that

7    she was telling you that?

8        A.    That I renewed them.

9        Q.    So that would be the Ultram and the

10   Percocet?

11       A.    Yes.

12       Q.    That would be at the same dosage she was

13   taking before?

14       A.    Yes.

15       Q.    Let's turn to H5024, based on what you've

16   testified in the past in this deposition is it fair

17   to say that neither of these visits on H5024 or I'm

18   sorry, either of these notes on H5024 indicate an

19   office visit by Dr. McCulloch?

20       A.    Correct.

21       Q.    So in July of '97 you talk to her on the

22   telephone; is that correct?

23       A.    Yes.

24       Q.    And she told you that she had noted some

25   improvement?

Porfiri, Carine M., M.D.

page 73

1      A.   Yes.

2      Q.   Is that correct?

3      A.   Yes.

4      Q.   And does it say she has been able to walk,

5   is that two to four miles?

6      A.   Approximately.

7      Q.   Approximately five miles?

8      A.   Every other day.

9      Q.   Is that a major improvement from her

10   condition in November of --

11           MR. GERSTEN:  I'm objecting to form

12        of the question.

13           MS. TAYLOR:  I didn't even finish my

14        question, but okay.

15   BY MS. TAYLOR:

16      Q.   Wait a second.  So this July 17, 97 this

17   was prior to her annual exam in November of '97; is

18   that correct?

19      A.   Yes.

20      Q.   So four months before her physical in

21   November she was able to walk five miles every other

22   day?

23      A.   Yes.

24      Q.   But then four months later she's

25   complaining that she's in severe pain; is that

Porfiri, Carine M., M.D.

page 74

1    correct?

2         A.    Yes.

3         Q.    And she's also -- she's saying that she

4    has in July of '97 that she had increased energy; is

5    that correct?

6         A.    From the walking.

7         Q.    If you have two arrows as opposed to one

8    arrow for increased, does that mean much increased?

9    Is there sometimes -- would there be a reason why

10   you would use two arrows instead of one in certain

11   situations?

12        A.    In certain situations, yes.

13        Q.    So do you know if this means much

14   increased energy?

15        A.    I can't say from this.

16        Q.    She also told you that she was doing

17   stretching exercises and Yoga?

18        A.    Modified Yoga movements.

19        Q.    When you say modified Yoga movements do

20   you know what she meant by that?

21        A.    Specifically, no.

22        Q.    Generally do you have an idea?

23        A.    Modified not to cause her any pain.

24        Q.    It says has started, can you read that?

25        A.    Chondroitin Sulfate with glucosamine.

Porfiri, Carine M., M.D.

page 75


1        Q.   What is that?

2        A.   That is something sold in the grocery

3    store that makes a claim to increase decrease pain

4    and help joints.

5        Q.   And she said that since she had been

6    taking that she noticed some improvement in the

7    mobility of her joints?

8        A.   Yes.

9        Q.   Is that correct?

10       A.   Yes.

11       Q.   You don't recall what it was that happened

12   in the four months between July '97 and 11-97 that

13   would have caused her to begin having severe pain

14   again?

15            MR. McCLOSKY:  Object to the form.

16       A.   I do not.

17       Q.   And to cause her to have paresthesias

18   again?

19            MR. McCLOSKY:  Object to the form.

20       A.   I do not.

21       Q.   Let's go to the February 18, '98

22   notation.  And again this was a phone conversation

23   you had with Dr. McCulloch?

24       A.   Yes.

25       Q.   And it says here essentially pain level

Porfiri, Carine M., M.D.

page 76

1    unchanged?

2        A.   Yes.

3        Q.   And when it says pain level unchanged do

4    you take that to be since her November of '97 visit?

5        A.   Yes.

6        Q.   When you have continues and there is a

7    zero with a line through it?

8        A.   It's a C with a line above it.  It's with.

9        Q.   So she's continuing with walking,

10   stretching?

11       A.   Yes.

12       Q.   And what's the no triangle in meds?

13       A.   Change.

14       Q.   No change in medication, so she was still

15   taking the same dosage of the Ultram and Percocet as

16   far as you can tell from this?

17       A.   Yes.

18       Q.   And does that say will follow-up with in 6

19   to 12 months?

20       A.   Yes.

21           MS. TAYLOR:  Do you want to take a

22       quick five minute break?

23           THE WITNESS:  Does anybody else need

24       to?

25           MR. GERSTEN:  What time are you going

Porfiri, Carine M., M.D.

page 77

1       to reconvene?

2             THE WITNESS:  No, we'll keep going.

3       I'm fine.

4             MS. TAYLOR:  The next note is H3312,

5       do you have that Elliot?  It's November

6       18, '98.

7             MR. GERSTEN:  Yeah, that's page 12

8       that came in on the fax.  Okay.

9       Q.   And from looking at this can you tell

10   whether this was an office visit?

11      A.   Yes.

12      Q.   And what from looking at this -- how can

13   you tell it's an actual visit in your office by

14   Dr. McCulloch?

15      A.   Soap note format.

16      Q.   Again, you're noting she has cervical

17   radiculopathy?

18      A.   Yes.

19      Q.   Does that say SX?

20      A.   Yes.

21      Q.   What is SX?

22      A.   Symptoms.

23      Q.   So basically unchanged symptoms?

24      A.   Yes.

25      Q.   Still has decreased range of motion in her

Porfiri, Carine M., M.D.

page 78


1    neck?

2         A.   Yes.

3         Q.   And bilateral is that trapezius scapular

4    pain?

5         A.   Yes.

6         Q.   This is the first paragraph of your notes

7    would this be the subjective findings, this is what

8    she's telling you?

9         A.   Yes.

10        Q.   So she's telling you that she has -- still

11   has decreased range of motion in her neck?

12        A.   Yes.

13        Q.   She's also told you that she started some

14   Yoga which has increased her flexibility?

15        A.   Overall, yes.

16        Q.   The medication she's telling you about,

17   the Percocet and the Ultram is that still the same

18   dosage that she had had before?

19        A.   Yes.

20        Q.   So again on physical exam you noted the

21   decreased range of motion in her neck?

22        A.   Yes.

23        Q.   And then it says with flexion, extension,

24   lateral movements, what does that mean?

25        A.   Flexion is bending the neck forward and

Porfiri, Carine M., M.D.

page 79


1    extension is attempting to put the neck back and

2    lateral movements are side to side.

3         Q.   Then you noted bilateral tenderness?

4         A.   Yes.

5         Q.   Bilateral from?

6         A.   Occiput to trapezius.

7         Q.   And including same?

8         A.   Right.

9         Q.   What does that mean?

10        A.   Just means she had tenderness all along --

11   where the trapezius muscle inserts into the head,

12   all along there on both sides.

13        Q.   On the assessment here you have cervical

14   disc pathology but you don't note the chronic pain

15   that you've noted in past.  Was there any reason for

16   that?

17        A.   No.

18        Q.   At this time would you still have

19   considered your assessment chronic pain syndrome?

20        A.   Yes.

21        Q.   The plan says follow-up with specialist;

22   do you know which specialist that's referring to?

23        A.   No.

24        Q.   By November 18, '98 had Dr. McCulloch

25   already moved to Massachusetts?

Porfiri, Carine M., M.D.

page 80

1      A.   Yes.

2      Q.   So she would fly to Florida to come see

3   you in your office?

4      A.   Yes.

5      Q.   Did you ever recommend that she get a

6   primary care physician in Massachusetts?

7      A.   I believe she had a physician in

8   Massachusetts.

9      Q.   Do you know if it was a primary care

10   physician?

11      A.   I don't.

12      Q.   In November 18, '98, would you still

13   consider yourself her primary care physician at that

14   time?

15           MR. GERSTEN:   Objection.

16      A.   One of them.

17      Q.   The next note I have is H3314, which

18   notes a March 5th, 1999.

19           MR. GERSTEN:   That looks like it's page 13

20      of the fax.

21           MS. TAYLOR:   Okay.

22      Q.   Was this an actual visit by Dr. McCulloch

23   to your office?

24      A.   Yes.

25      Q.   Is there a reason why all the vitals are

page 80

Porfiri, Carine M., M.D.

page 81

1   not filled out on the top?

2       A.   No specific reason.

3       Q.   So you wouldn't necessarily take all the

4   vitals every time a patient comes to your office?

5       A.   Correct.

6       Q.   When it says under and I guess this is

7   the subjective portion, PT then and S with a line

8   over it, changes?

9       A.   Patient without changes.

10      Q.   So no changes in her condition?

11      A.   Correct.

12      Q.   But Yoga is helpful?

13      A.   Correct.

14      Q.   And then under preventative, what does

15  that say after that?

16      A.   Up-to-date.

17      Q.   And that she's having that done in

18  Massachusetts?

19      A.   Correct.

20      Q.   And then the meds on the right-hand side,

21  does that look to be the same dosage?

22      A.   Yes.

23      Q.   And can you tell whether you were

24  prescribing her this medication?

25      A.   I cannot tell.

Porfiri, Carine M., M.D.

page 82

1        Q.   And then under physical exam you still
2    noted the decreased range of motion in the neck?
3        A.   Correct.
4        Q.   And then continues with tension and
5    tenderness in the back of the neck and bilateral
6    trapezius?
7        A.   Yes.
8        Q.   So that's basically the same as you had
9    noted before?
10       A.   Yes.
11       Q.   And then on the assessment this time you
12   have chronic pain?
13       A.   Yes.
14       Q.   And then your plan was just to continue
15   with the modality she had already been involved in?
16       A.   Yes.
17            MS. TAYLOR:   Elliot, the next page
18       is H3316.
19            MR. GERSTEN:   That looks like page 14
20       of the fax.   Okay.
21   BY MS. TAYLOR:
22       Q.   And it looks the first note -- well, let
23   me ask you first, on either of these notations does
24   it look like Dr. McCulloch came to see you in the
25   office?

page 82

Porfiri, Carine M., M.D.

page 83

1     A.   It does not.

2     Q.   So February, on February 20th, 2000, this

3  was a telephone call you had with Dr. McCulloch?

4     A.   Yes.

5     Q.   And she told you that she was in a car

6  accident in Florida?

7     A.   Correct.

8     Q.   Do you recall if she told you if she saw a

9  doctor right after the accident?

10    A.   I do not recall.

11    Q.   But she didn't come and see you after the

12  accident, did she?

13    A.   No.

14    Q.   And it says was traveling at -- does it

15  look like 15 to 20 miles per hour?

16    A.   Yes.

17    Q.   And was rear ended?

18    A.   Yes.

19    Q.   And then there is a notation and then

20  seatbelt, does that note that she had her seat belt

21  on?

22    A.   Yes.

23    Q.   And what is the next notation there?

24    A.   That she was the driver.

25    Q.   Then there is a notation head injury, does

Porfiri, Carine M., M.D.

page 84


1    that mean no head injury?

2         A.   No head injury.

3         Q.   And is that loss of consciousness, no loss

4    of consciousness?

5         A.   Correct.

6         Q.   And it says she did not hit the car in

7    front of her?

8         A.   Correct.

9         Q.   And it says she's back in Massachusetts

10   and will keep me posted?

11        A.   Correct.

12        Q.   Do you recall anything else about your

13   conversation other than what's in this note?

14        A.   I do not.

15        Q.   Then the next time -- and you talk to her

16   again on the telephone on March 30th, 2000?

17        A.   Correct.

18        Q.   She's telling you that while doing

19   physical therapy for her neck she noticed she had

20   lower -- she had right lower back pain superior

21   buttock?

22        A.   Right.

23        Q.   What does that mean superior buttock?

24        A.   The top half of her buttock.

25        Q.   She was just -- if you're noticing that

Porfiri, Carine M., M.D.

page 85


1     she had -- noting that she had right lower back,

2     that means the back pain was on her right?

3          A.   Correct.

4          Q.   Just on the right, okay.

5               She said she noticed this two or three days

6     after the onset or after the motor vehicle accident?

7          A.   Correct.

8          Q.   But you had -- so the last time you had

9     talked to her was February 29th of 2000?

10         A.   Correct.

11         Q.   And the car accident was on February 25th

12    of 2000?

13         A.   Looks like 28th.

14         Q.   28th.

15         A.   The way I write, yes.

16         Q.   So when you had talked to her the day

17    after the accident she hadn't noticed any lower back

18    pain at that time?

19         A.   She did not mention it.

20         Q.   And it says that she went to see a

21    chiropractor two to three times a week?

22         A.   Approximately.

23         Q.   Approximately two to three times a week?

24         A.   Approximately three times a week.

25         Q.   And what's the notation after?

Porfiri, Carine M., M.D.

page 86

1       A.    In DC, discontinued all physical activity

2   except Yoga.

3       Q.    When she says she stopped all physical

4   activity except Yoga what did that mean to you?  You

5   don't recall?

6       A.    I do not recall.

7       Q.    To you would that mean she wasn't doing

8   housework?

9       A.    I can't say.

10      Q.    So you don't know.  Okay.  It says two to

11  three days ago started to have paresthesias, right

12  buttock and into upper thigh?

13      A.    Correct.

14      Q.    So she telling you then in her right

15  buttock and right upper thigh that she was having

16  numbness or burning?

17      A.    Right.

18      Q.    And started massage therapy with no

19  relief; is that correct?

20      A.    Approximately one time a week with no

21  relief.

22      Q.    What does it say after that?

23      A.    Of note.  Patient did have posterior

24  headaches and increased neck pain especially right

25  shoulder for two weeks after accident.

page 86

Porfiri, Carine M., M.D.

page 87


1        Q.    What does that say after?

2        A.    Headaches resolved, neck pain persists.

3        Q.    Then on the next page which is H3315 that

4    she's going to consult a neurosurgeon?

5        A.    Yes.

6        Q.    Did you refer her to a neurosurgeon or did

7    she find one herself, do you know?

8        A.    I do not recall.

9        Q.    Then there is a notation about April 20,

10   2000 and is this notating a phone call as opposed to

11   an office visit?

12       A.    Correct.

13       Q.    It's stating neurosurgeon recommended MRI

14   of cervical spine and lumbar spine?

15       A.    Yes.

16       Q.    And an oral surgeon recommended MRI of TMJ

17   because of increase jaw pain?

18       A.    Correct.

19       Q.    On April 15th patient saw ortho Dr. Roland

20   Johnson who did hip films?

21       A.    Correct.

22       Q.    Do hip films does that indicate X-rays to

23   you?

24       A.    It does.

25       Q.    And then the negative in parentheses does

Porfiri, Carine M., M.D.

page 88


1   that mean the X-rays were negative?

2       A.   Correct.

3       Q.   And he agreed that MRI should be ordered?

4       A.   Correct.

5       Q.   And so on April 20th she's telling you

6   that all low back flexibility is lost?

7       A.   Correct.

8       Q.   And she has stopped all physical therapy

9   and all physical activity except Yoga?

10      A.   Correct.

11      Q.   Let me ask you this is her ability to do

12  Yoga is that inconsistent with her losing all low

13  back flexibility?

14           MR. GERSTEN: I didn't I understand the

15  question.

16      Q.   I asked if Dr. McCulloch'S ability to do

17  Yoga was inconsistent with her claim that she had

18  lost all low back flexibility?

19           MR. GERSTEN:  Thank you, I didn't

20  understand it, appreciate it.

21      A.   No.

22      Q.   And why not?

23      A.   Yoga could be anything from sitting there

24  and breathing to back bends.

25      Q.   But if she was doing back bends would that

Porfiri, Carine M., M.D.

page 89

1    be inconsistent with lost all lower back

2    flexibility?

3        A.    If she were, yes, it would be

4    inconsistent.

5        Q.    And then it says here Doctor Johnson also

6    recommended sports rehab doctors?

7        A.    Correct.

8        Q.    What to you is a sports rehab doctor?

9        A.    What was the question?

10       Q.    What a sports rehab doctor?

11       A.    Physiatrist, physical medicine doctor.

12             MS. TAYLOR:  I think we're at a

13       stopping point.

14             (Thereupon, a recess was taken; after

15       which the following proceedings were had:)

16   BY MS. TAYLOR:

17       Q.    Just to go back to your office notes for a

18   second, is it fair to say that the last time you saw

19   Dr. McCulloch for an office visit was March 5th,

20   1999?

21       A.    Yes.

22       Q.    And have you seen Dr. McCulloch -- well,

23   have you talked to Dr. McCulloch about her condition

24   since April 20th of 2000?

25       A.    I don't know.

page 89

Porfiri, Carine M., M.D.

page 90

1      Q.    When is the last time you talked to Dr.

2    McCulloch?

3      A.    I don't remember.

4      Q.    So it's been awhile?

5      A.    Yes.

6      Q.    Would you say more than a year or so?

7      A.    Not more than a year.

8      Q.    So several months?

9      A.    Several months.

10     Q.    When you talk to her did you talk at all

11   about her chronic pain, or was it like a friendly

12   call?

13     A.    It was social.

14     Q.    Social.  Can you define what an attending

15   physician is?

16           MR. GERSTEN:  Can you speak up, Jessica,

17   please.

18     Q.    Can you define what an attending physician

19   is?

20     A.    Yes.

21     Q.    What is an attending physician?

22     A.    A physician in charge of a hospital

23   admission.

24     Q.    How about a treating physician, what's a

25   treating physician to you?

page 90

Porfiri, Carine M., M.D.

page 91

1           MR. GERSTEN:  Object to the form.

2      A.    A physician involved in patient's care.

3      Q.    What's the difference between an attending

4  physician and treating physician then?

5           MR. GERSTEN:  Objection.

6      A.    In my understanding an attending physician

7  is the physician on record who admits a patient to a

8  hospital.  A treating physician could be any

9  physician that renders care to a patient while in

10  the hospital.

11     Q.    So for example if a patient goes to a

12  specialist once for an evaluation, could that be a

13  treating physician?

14     A.    Yes.

15     Q.    Is a treating physician's opinion

16  regarding a patient's condition entitled to any less

17  weight than an attending physician's opinion?

18           MR. GERSTEN:  Objection.

19           MS. TAYLOR:  What's the basis of your

20           objection?

21           MR. GERSTEN:  First of all we're

22           talking about Candi McCulloch, second of

23           all, the question calls for speculation,

24           thirdly, it's calling for a conclusion

25           about something I don't -- there is no

page 91

Porfiri, Carine M., M.D.

page 92


1        foundation for, so there is three right

2        away.

3            MS. TAYLOR:  Okay, well.  I think

4        it's frivolous.

5        Do you understand the question?

6        A.    I would like you to repeat it.

7        Q.    Is a treating physician's opinion

8    regarding a patient's condition entitled to any less

9    weight than an attending physician's opinion?

10           MR. GERSTEN:  Objection again.  To

11       whom?

12           MR. McCLOSKY:  Object to the form

13       also.  I think it calls for a legal

14       conclusion.

15   BY MS. TAYLOR:

16       Q.    Who would you feel would be more

17   qualified -- scratch that.

18       Would you as a physician give a treating

19   physician's opinion regarding a patient's condition

20   any less weight than an attending physician's

21   opinion regarding their condition?

22           MR. McCLOSKY:  Object to the form, no

23       predicate.

24           MR. GERSTEN:  Objection.

25           MS. TAYLOR:  You can answer the

Porfiri, Carine M., M.D.

page 93

1       question if you understand it.

2       A.    Would I give treating physician's opinion

3    less weight than an attending's, no, I would not.

4       Q.    So if you had a patient coming to you for

5    the first time and you're reviewing their records,

6    and they had had a primary care physician before and

7    they had seen some treating physicians, would you

8    consider all their opinions about their condition

9    equally?

10          MR. McCLOSKY:  Object to the form.

11          MR. GERSTEN:  Excuse me?  What was

12       the last part of that?  If you can speak

13       up when you're asking your last part of

14       your questions it will help me.

15          MS. TAYLOR:  Been trying.

16   BY MS. TAYLOR:

17       Q.    If you have a patient come to you for the

18   first time and you have their medical records and

19   you have some records from treating physicians and

20   records from their previous attending physician,

21   would you consider all of those doctors' opinions

22   regarding that patient's condition equally?

23          MR. McCLOSKY:  Object to the form.

24          MR. GERSTEN:  Objection.

25          MR. McCLOSKY:  You can answer if you can.

Porfiri, Carine M., M.D.

page 94


1        A.    It would depend on the problem.

2        Q.    Would you consider yourself Dr.

3    McCulloch's attending or treating physician?

4              MR. GERSTEN:   Objection.

5        A.    Neither.

6        Q.    Either?

7        A.    Neither.

8        Q.    How about when were you actually seeing

9    Dr. McCulloch?

10       A.    I consider myself her primary care

11   physician.

12       Q.    So would you consider a primary care

13   physician something different than an attending or

14   treating physician?

15       A.    I would consider it a treating physician.

16   My understanding of an attending physician is

17   related to hospital admissions.

18       Q.    Is there any difference in terms of

19   treatment of a patient between a treating physician

20   and an attending physician?

21             MR. GERSTEN:   Objection.

22       A.    Repeat the question, please.

23       Q.    Is there any difference in the terms of

24   treating a patient between a treating physician and

25   an attending physician?

Porfiri, Carine M., M.D.

page 95

1            MR. GERSTEN:  Objection again.

2            MR. McCLOSKY:  Object to the form.  Answer

3       it if you can.

4       A.   I really don't understand the question.

5       Q.   Let's talk about Dr. McCulloch

6  specifically.  Would you consider -- what would you

7  consider Dr. Musso to be in her treatment, would he

8  be a treating physician or an attending physician?

9       A.   He would be a consultant, consulting

10  physician.

11      Q.   So a consulting physician is something

12  different than a treating physician or an attending

13  physician?

14      A.   In my opinion a treating physician is

15  anybody who renders care to the patient.  Anybody.

16      Q.   So a consulting physician like Dr. Musso

17  would also be a treating physician?

18      A.   Yes.

19      Q.   So when you said that an attending

20  physician would be either someone who would be in

21  charge of a hospital admission, would you say then

22  that had Dr. McCulloch needed to be admitted to the

23  hospital while she was under your care that you

24  would not have been that physician?

25      A.   It would depend on why she was admitted.

page 95

Porfiri, Carine M., M.D.

page 96


1        Q.    So for example if she was seeing Dr. Musso

2    or Dr. Theofilos for something relating to her neck

3    and she had to be admitted to the hospital for

4    surgery, would it then they be one of her attending

5    physicians?

6        A.    It would depend on her insurance.

7             MR. McCLOSKY:  Managed care, a

8    wonderful beast.

9             MS. TAYLOR:  I think I understand

10    what you're saying.

11   BY MS. TAYLOR:

12       Q.    Do you consider yourself to be an advocate

13   for your patients?

14            MR. GERSTEN:  Objection.

15            MR. McCLOSKY:  Object to the form.

16       A.    Define advocate.

17       Q.    Well, if you have a patient who is --

18   let's talk about Dr. McCulloch specifically.  When

19   you're giving information to disability insurers

20   about her condition, do you feel like you're her

21   advocate, that you're advocating what her disability

22   is?

23            MR. McCLOSKY:  Same objection to the

24    form.

25            MR. GERSTEN:  Objection.


page 96

Porfiri, Carine M., M.D.

page 97


1       A.    Substitute a word far me, give me another

2    definition of.

3       Q.    When you're saying substituting a word,

4    are you having a problem with the word advocate?

5       A.    Yes.

6       Q.    Do you feel it's your responsibility to

7    support your patients' positions, in other words, if

8    Dr. McCulloch believed she was disabled, she was

9    unable to do her occupation, do you believe it's

10   your responsibility to support that belief?

11            MR. GERSTEN:   Objection.

12      A.    It's my responsibility to state my

13   findings.

14      Q.    And when you say it's your responsibility

15   to state your findings, that no matter what those

16   findings are you're going to be honest about that?

17      A.    Correct.

18      Q.    Do you agree that sometimes you have to

19   accept what a patient tells you about their

20   condition?

21            MR. GERSTEN:   Objection.

22      A.    I agree that the subjective portion of my

23   findings is just that, subjective.

24      Q.    Would you agree that sometimes you may not

25   necessarily see any objective findings that would

Porfiri, Carine M., M.D.

page 98


1    confirm a patient's subjective complaints?

2              MR. McCLOSKY:  Object to the form.

3              MR. GERSTEN:  Objection.

4       A.   In general?

5       Q.   Let's talk about Dr. McCulloch, for

6    example.  If she, you know, on one of these

7    occasions when she came into your office and she

8    said that she was having, you know, severe pain at

9    times or searing pain, is that something that you

10   could necessarily have objective findings of?

11      A.   I could.

12      Q.   But you're not -- you wouldn't have been

13   with Dr. McCulloch every day?

14      A.   Correct.

15      Q.   So you would have to believe what she says

16   that maybe the week before that she had had this

17   searing pain?

18      A.   Correct.

19      Q.   So you have to accept sometimes just what

20   she tells you?

21      A.   Correct.

22      Q.   What do you believe Dr. McCulloch's

23   disability to be?

24             MR. McCLOSKY:  Object to the form.

25             MR. GERSTEN:  Objection.

Porfiri, Carine M., M.D.

page 99


1        A.    Disability, can you.

2        Q.    What do you believe -- let me ask you

3   this, do you believe that Dr. McCulloch can perform

4   the essential duties of her occupation?

5              MR. GERSTEN:  Objection.

6              MR. McCLOSKY:  You can answer if you can.

7        A.    I can't answer that.

8        Q.    Why can't you answer it?

9        A.    I have not seen her in how many years,

10  what did we say last time is I saw her as a patient.

11       Q.    So let's talk about in the past then when

12  you were seeing her as a patient.  In the period

13  between February of '95 and March of '99 when you

14  last saw her, during that period did you feel that

15  she was able to do the essential duties of her

16  occupation?

17       A.    Define the essential duties.

18       Q.    Let me ask you first, what did you

19  consider Dr. McCulloch's occupation to be?

20             MR. GERSTEN:  Objection.

21       A.    An internist.

22       Q.    And you're an internist as well, correct?

23       A.    I'm a family practitioner.

24       Q.    Do you know what the basic duties of being

25  an internist are?

Porfiri, Carine M., M.D.

page 100

1       A.   Yes.

2       Q.   Based on your understanding of what the

3   duties of an internist are, do you believe that

4   between -- do you believe that Dr. McCulloch in that

5   time period that were you actually seeing her was

6   able to perform those duties?

7            MR. McCLOSKY:  Object to the form, no

8       predicate.

9            MR. GERSTEN:  Objection.

10           MR. McCLOSKY:  Go ahead and answer if

11      you can.

12      A.   No.

13      Q.   You do not believe she was disabled from

14  doing the essential duties of her occupation as an

15  internist?

16           MR. McCLOSKY:  You just

17      mischaracterized her testimony.  I object

18      to the form.

19           MS. TAYLOR:  Let me ask it again

20      then.

21      A.   Start again.

22      Q.   Back up.

23           MR. McCLOSKY:  Sometimes when you use

24      a double negative it makes it difficult.

25           THE WITNESS:  For us dummies.