Porfiri, Carine M., M.D.

page 101

1          MS. TAYLOR:  Not necessarily you.

2    BY MS. TAYLOR:

3        Q.   When you said you had an understanding of

4    what the basic or the essential duties of an

5    internist were, what are those essential duties to

6    you?

7        A.   Seeing patients in the office and then the

8    hospital.

9        Q.   Anything else?

10       A.   All that goes with that, charting,

11   reviewing, labs, making phone calls.

12       Q.   Anything else?

13       A.   Keeping up with continuing medical

14   education.

15       Q.   And do you believe based on your treatment

16   of Dr. McCulloch during the time period of February

17   '95 to March '99 was she able to perform, were there

18   any of those duties you felt that she could not

19   perform as a result of her condition?

20          MR. GERSTEN:  Objection.

21          MR. McCLOSKY:  Object to the form.

22          MS. TAYLOR:  You can answer it if you

23   understand.

24          THE WITNESS:  Ask me again.

25   BY MS. TAYLOR:

Porfiri, Carine M., M.D.

page 102


1        Q.   Those duties that you just listed out for

2    me, that you thought an internist would do, during

3    the time period that you were seeing Dr. McCulloch

4    do you believe that she was unable to perform any of

5    those duties?

6             MR. McCLOSKY:  Same objection.

7             MR. GERSTEN:  Objection, different

8    question.

9    BY MS. TAYLOR:

10       Q.   Did you understand the question?

11       A.   Yes.

12       I believe performing those duties caused her

13    increased pain.

14       Q.   Which one of those duties do you believe

15    would have caused her increased pain?

16       A.   Repeat the duties to me.

17       Q.   For example, would seeing patients in the

18    office or in the hospital, would that cause her

19    increased pain?

20       A.   Yes.

21       Q.   What about that would cause her increased

22    pain?

23       A.   Any kind of prolonged time spent writing,

24    reading.

25       Q.   And when you say prolonged time writing or

Porfiri, Carine M., M.D.

page 103

1    reading would that be because her neck would have to

2    be down?

3        A.   Yes.

4        Q.   Anything else you can think of about

5    seeing patients in the office or the hospital that

6    would cause her increased pain?

7        A.   Even wearing a lab coat if it's heavy can

8    really increase neck pain, shoulder pain.

9        Q.   Do you have to wear a lab coat when

10   seeing patients?

11       A.   You have to carry equipment with you.  You

12   have to have a stethoscope and pens and prescription

13   pads.  It can get quite heavy and quite

14   uncomfortable.

15       Q.   Anything else about seeing patients in the

16   office or in a hospital that would increase her

17   pain?

18       A.   Those would be the main things.

19       Q.   And then with charting or reviewing would

20   that be what you were talking about with writing and

21   reading?

22       A.   Yes.

23       Q.   What about phone calls would that increase

24   her pain?

25       A.   Yes.

Porfiri, Carine M., M.D.

page 104

1     Q.   Would that be because of using her neck?

2     A.   Yes.

3     Q.   Anything else you can think of that as an

4  internist duties of an internist that could cause

5  Dr. McCulloch increased pain?

6     A.   At times doing a physical exam could.

7     Q.   And what about doing a physical exam would

8  cause her increased pain?

9     A.   You have to flex your neck forward.

10    Q.   So you have told me that these different

11  activities could cause her increased pain.  Would

12  you then say that she during that time period that

13  you were seeing her, that she was disabled from

14  being an internist?

15     MR. McCLOSKY:  Object to the form, no

16  predicate.

17     MR. GERSTEN:  Objection.

18    A.   You have to define disabled.

19    Q.   Let me ask you, what is your definition of

20  disabled?  What is your understanding of that term?

21     MR. GERSTEN:  Objection.

22     Jessica, I suggest that if you're

23     going to ask that line of questions you

24     should be putting the insurance policy in

25     because the doctor's understanding is

Porfiri, Carine M., M.D.

page 105

1     irrelevant without it.

2        MR. McCLOSKY:  Number two,

3     respectfully, I'm not sure this witness is

4     competent to give a definition of pain or

5     disability.  But as I understand it you're

6     just asking her for her understanding of

7     the term regardless of whether it's

8     consistent with the policy or the legal

9     standards or not, correct?

10   BY MS. TAYLOR:

11     Q.   Let me ask you this then, do you believe

12  that during the time period you saw Dr. McCulloch

13  that she was unable to perform the material and

14  substantial duties of her occupation?

15       MR. McCLOSKY:  Object to the form.

16     A.   I can say what I said before, that

17  performing those duties would increase her pain.

18     Q.   So would then because they would increase

19  her pain would you then --

20       MR. GERSTEN:  Could you let the

21     witness finish her question.

22      MS. TAYLOR:  I thought she had.

23      MR. GERSTEN:  I heard her say would

24     increase her then I didn't hear an answer.

25      THE WITNESS:  Pain.

Porfiri, Carine M., M.D.

page 106

1           MR. GERSTEN:  Thank you, Doctor.

2    BY MS. TAYLOR:

3       Q.   Would you say then because performing the

4    material and substantial duties of her occupation

5    would cause her increased pain that she should then

6    not perform those duties?

7       A.   Yes, I would say that.

8       Q.   So would you say then that what is

9    preventing her from performing the material and

10   substantial duties of her occupation is pain?

11      A.   Yes.

12      Q.   What would you say Dr. McCulloch's

13   limitations are?  I know we've discussed some of

14   them, you know, having to move her neck.  Is there

15   anything else you can think of, limitations that she

16   would have?

17          MR. GERSTEN:  I'm objecting.

18      Q.   During the time period that you saw her?

19          MR. GERSTEN:  Could you be a little more

20       specific.

21      Q.   Other than having to move her neck which

22   would cause her increased pain are there any other

23   limitations Dr. McCulloch would have based on your

24   understanding of her condition during the time you

25   saw her between February of '99 and March of '99?

Porfiri, Carine M., M.D.

page 107

```
 1              MR. McCLOSKY:  In addition to what
 2        she's testified to earlier this morning.
 3              MS. TAYLOR:  In addition to.
 4        A.   That includes pain?
 5        Q.   Yes.
 6        A.   Any heavy lifting.
 7        Q.   And this morning you had testified to a
 8   list of exacerbating activities, would you say that
 9   those would be her limitations what you testified to
10   this morning?
11        A.   Could you tell me, repeat them to me.
12        Q.   Looking down while she's at her desk?
13        A.   Yes.
14        Q.   Would that be a limitation?
15        A.   Yes.
16        Q.   How about carrying charts, would that be a
17   limitation?
18        A.   Yes.
19        Q.   How heavy are charts?
20        A.   It can be quite heavy.
21        Q.   And when you say quite heavy, do you know
22   like approximately how many pounds it could be?
23        A.   It could be three pounds.
24        Q.   And so assisting patients in the exam
25   room, she wouldn't be able to do that, that would be
```

Porfiri, Carine M., M.D.

page 108

1    a limitation?

2         A.   That would be a limitation.

3         Q.   Do you believe the fact that -- and I'm

4    talking about the time period that you saw her --

5    the fact that Dr. McCulloch was taking Vicodin and

6    Ultram or Percocet that that would prevent her from

7    performing the material and substantial duties of

8    her occupation?

9         A.   I believe it could.

10        Q.   Do you know if it did?

11             MR. GERSTEN:   Objection.

12             The question as phrased, Jessica,

13        may not be to be a trick question but if

14        it covers a time period in which Dr.

15        McCulloch was in fact working during a

16        time period where Dr. McCulloch was not

17        working, it's awfully broad and unfair to

18        the witness who's not a party to the case.

19        And I would ask you to rephrase it to

20        eliminate any kind of potential for a

21        trick question.

22   BY MS. TAYLOR:

23        Q.   Let me ask you this, we discuss the

24   dosages of medication that Dr. McCulloch was taking

25   when we went over your office notes.  Do you believe

Porfiri, Carine M., M.D.

page 109

1    that those dosages that she was taking of pain

2    medications that that would prevent her from

3    performing the material and substantial duties of

4    her occupation?

5         A.   It could.

6         Q.   Explain to me how it could.

7         A.   One of them is a narcotic.

8         Q.   Which one are you referring to?

9         A.   Percocet or Vicodin.

10        Q.   The fact that Percocet or Vicodin are

11   narcotics, what's significant about that?

12        A.   They could impair cognition, judgment.

13        Q.   How so?

14             MR. McCLOSKY:  That's what drugs do.

15        A.   That's what drugs do.

16             MS. TAYLOR:  Object to the side bar.

17   BY MS. TAYLOR:

18        Q.   How would it impair?

19        A.   I can't give you the pharmacology of it.

20        Q.   Do you not know how it would affect

21   cognition?

22        A.   I do not know the pharmacology of how

23   exactly.

24        Q.   Did Dr. McCulloch and in the times that

25   Dr. McCulloch saw you did she ever tell you that her

Porfiri, Carine M., M.D.

page 110

1   pain medications prevented her from working?

2           MR. GERSTEN:  I'm sorry, I didn't hear

3       all of the question.

4   BY MS. TAYLOR:

5       Q.   On your many different conversations or

6   office visits with Dr. McCulloch did she ever tell

7   you that her pain medications prevented her from

8   working?

9       A.   I recall discussions about her sensitivity

10  to medications.

11      Q.   And when you say her sensitivity to

12  medication, what does that mean?

13      A.   That she could become extremely drowsy.

14      Q.   But Dr. McCulloch also told you that she

15  was trying to take the least amount of medication as

16  possible; is that correct?

17      A.   Correct.

18      Q.   Did you ever -- did you note anywhere in

19  your office notes that these medications caused her

20  to become drowsy?

21      A.   No, not that I could see.

22      Q.   How long have you been a physician?

23      A.   Ten years.

24      Q.   During that time period have you ever

25  taken pain medication while you were working?

Porfiri, Carine M., M.D.

page 111

1     A.   No.

2     Q.   Are you aware of any ethical constraints

3  for a physician who is using narcotic pain

4  medications for pain?

5     A.   I think it would be evident.

6     Q.   Well are there any published standards?

7     A.   I wouldn't know.

8     Q.   So you don't know whether the American

9  Medical Association has said anything on that

10  subject?

11     A.   Do I know specifically, no.

12     Q.   Do you know generally?

13     A.   I know common sense

14     Q    But you don't know of any kind of written

15  ethical code for physicians?

16     A.   I do not.

17     Q.   Do you believe a physician who is taking

18  narcotic pain medications that they could do certain

19  aspects of their job?

20         MR. McCLOSKY:  Object to the form.

21         MS. TAYLOR:  You can answer it if you

22  understand.

23     A    Yes.

24     Q.   What aspects of their job could they do?

25     A.   They could walk.

Porfiri, Carine M., M.D.

page 112


1       Q.   What else?

2       A.   If possible.

3       Talk.

4       Q.   What else?

5       A.   Write.

6       Q.   What else?

7       A.   Possibly read.

8       Q    Could a physician see patients while

9    taking narcotic pain medication?

10          MR. McCLOSKY:  Object to the form;  it's

11       hypothetical and speculative.

12          MR. GERSTEN:  Objection.

13       Q.   Let me ask you this, with what a

14   physician could do -- that started bad.

15       Would it depend on the dosage a physician was

16   taking as to what sort of activities they could

17   perform while on narcotic pain medication?

18          MR. McCLOSKY:  I'm sorry, same objection.

19          MR. GERSTEN:  Objection.

20       A.   No.

21       Q.   It would not depend on the dosage?

22       A.   No.

23       Q.   Even if a doctor was taking a very small

24   dosage?  Let me back up a second.

25       Let me ask you the negative then, what do you

Porfiri, Carine M., M.D.

page 113

1   believe a physician could not do while taking

2   narcotic pain medications?

3        A.   What do I believe a physician could not

4   do.  Make sound clinical judgments.

5        Q.   No matter what dosage they were taking?

6        A.   In my opinion, no matter what dosage they

7   were taking.

8        Q.   So you don't think it depends on a

9   particular patient's tolerance for pain medications?

10       A.   I think the degree of their inability to

11  make good judgment would depend on their tolerance.

12       Q.   So would you say there might be some

13  physicians who might have a high tolerance and can

14  take pain medications and use sound clinical

15  judgment?

16       A.   I can't say, I don't know.

17       Q.   You shared a practice with Dr. McCulloch;

18  didn't you?

19       A.   Yes.

20       Q.   How long did you share a practice with

21  her?

22       A.   I don't recall exactly.

23       Q.   Was it about a year or?

24       A.   Roughly.

25       Q.   And when you shared a practice with her

Porfiri, Carine M., M.D.

page 114


1    were you also working for JFK?

2         A.    Yes.

3         Q.    Are you working for JFK now?

4         A.    No.

5         Q.    Did you have a positive experience working

6    at JFK?

7               MR. GERSTEN:  Objection.

8         A.    Did I?  Sometimes.

9         Q.    What type of complaints did you have about

10   working for JFK?

11              MR. GERSTEN:  Objection.

12              MR. McCLOSKY:  What does that have to do

13        with anything in this lawsuit?

14         MS. TAYLOR:  Relevance is not a proper

15        objection.  I think it has everything to do

16        with this lawsuit.

17              MR. McCLOSKY:  It's a proper objection.

18        It's not a basis perhaps to instruct the

19        witness not to answer.  But in interest of

20        trying to get everyone out of here in time for

21        the doctor to make her appointment at three

22        o'clock, I ask you to consider keeping your

23        questions to something more relevant.

24         MS. TAYLOR:  I'm going to ask these

25        questions, so.


page 114

Porfiri, Carine M., M.D.

page 115

1           MR. McCLOSKY:  You can ask whatever you

2       want, counsel.  And I would appreciate the

3       courtesy of not interrupting me when I'm

4       talking because I haven't interrupted you yet.

5       And if you want to start playing that game, I

6       can play that game, but I ask for your courtesy

7       in not doing so.

8           MS. TAYLOR:  I apologize if I interrupted

9       you, didn't intend to do so.

10          MR. McCLOSKY:  Ask your questions but

11      we're getting out of here in time for this

12      doctor to be at work at three o'clock today.

13          MS. TAYLOR:  That's fine, but she is under

14      subpoena and I mean.

15          MR. McCLOSKY:  She is or is not under

16      subpoena.  I don't care if she is or isn't.

17      I'm not sure she is.  Excuse me, we produced

18      her voluntarily today and I'm just telling you

19      we never anticipated this deposition to go on

20      as long as apparently it is, and I'm putting

21      everyone on notice that she's leaving in time

22      to be at work at three o'clock today.  So ask

23      whatever questions you want up until that time.

24          MS. TAYLOR:  That's fine.  I intent to.

25      If I have to call her back because, you know.

Porfiri, Carine M., M.D.

page 116

1          MR. McCLOSKY:  Call her back.

2          MS. TAYLOR:  She wasn't prepared to be

3      here for the whole day.  I mean you never asked

4      me how long it would take.

5          MR. McCLOSKY:  You're wasting time, just

6      ask your questions.

7          MS. TAYLOR:  And by agreement is the only

8      reason why I didn't subpoena her again.

9   BY MS. TAYLOR:

10      Q.   Do you have any complaints about working

11   at JFK?

12      A.   Do I answer the question or not?

13          MR. McCLOSKY:  Yes, you can answer.

14      A.   I had some issues working for Columbia

15   HCA.

16      Q.   What were those issues generally?

17          MR. GERSTEN:  Objection.

18      A.   I don't think they treated their

19   physicians very well.

20      Q.   How would they not treat their physicians

21   well?

22      A.   They did not value our input regarding our

23   practices.

24      Q.   Anything else?

25      A.   That's enough.

page 116

Porfiri, Carine M., M.D.

page 117


1       Q.    Well, was there anything else?

2       A.    That was the main -- that was.

3       Q.    Did Dr. McCulloch ever complain to you

4    about her being employed by JFK?

5             MR. GERSTEN:  Objection.

6       A.    We would discuss what I just told you

7    about.

8       Q.    So that was the issue you discussed that

9    you didn't feel like they really listened to your

10   input?

11      A.    Right.

12            MR. GERSTEN:  Could you restate that I

13            couldn't hear you.

14            MS. TAYLOR:  I basically repeated back

15            what she just said, she discussed with Dr.

16            McCulloch that they did not value physicians'

17            input.

18            MR. GERSTEN:  I'm objecting.  I wish I

19            knew what this had to do with this case.

20            MS. TAYLOR:  Anyway, that's not a valid

21            objection.

22            MR. GERSTEN:  No, but I am going to -- I'm

23            objecting.  I'm not going to argue.

24      Q.    Other than the fact that you both believed

25   that Columbia HCA did not value your input, were you

Porfiri, Carine M., M.D.

page 118


1    aware of any other problems Dr. McCulloch had with

2    JFK?

3            MR. McCLOSKY:  Object to the form,

4        mischaracterizes her testimony.

5            MR. GERSTEN:  Now or then?

6            MS. TAYLOR:  Then.

7            MR. GERSTEN:  That's not what your

8        question asked.

9        Q.   At the time that you were sharing a

10   practice with Dr. McCulloch, other than the

11   complaint you just described were you aware of any

12   other problems Dr. McCulloch had with working for

13   JFK?

14           MR. McCLOSKY:  Same objection.

15       A.   No.

16       Q.   When you worked for JFK was your

17   employment all clinical?

18       A.   Yes.

19       Q.   Did you have to satisfy any quota in

20   connection with seeing patients?

21       A.   I can't remember.

22       Q.   And a little while back you said that you

23   sometimes talked to Dr. McCulloch socially?

24       A.   Yes.

25       Q.   Would you consider, are you friends with

Porfiri, Carine M., M.D.

page 119


1  Dr. McCulloch?

2        A.   Yes.

3        Q.   How long have you known Dr. McCulloch?

4        A.   Since we started working together.

5        Q.   When you worked together would you see

6  each other socially?

7        A.   Occasionally.

8        Q.   So like going out to dinner that sort of

9  thing?

10       A.   Yes.

11       Q.   How about since she's moved to

12  Massachusetts, you said that you've talked to her on

13  the phone within the last year, do you talk on the

14  phone?

15       A.   Do we, yes.

16       Q.   How often do you talk on the phone?

17       A.   Not that often.

18       Q.   Every several months maybe?

19       A.   Something like that, yeah.

20       Q.   Do you ever see Dr. McCulloch if she comes

21  to Florida to visit?

22       A.   I have.

23       Q.   When is the last time you saw Dr.

24  McCulloch in person?

25       A.   I can't remember.

Porfiri, Carine M., M.D.

page 120

```
 1        Q.   Was it within the last year?

 2        A.   I don't believe so.

 3        Q.   Has Dr. McCulloch ever told you anything

 4   about this lawsuit?

 5        A.   Not specifically.

 6        Q.   Just generally that she had sued Hartford

 7   and Educators?

 8        A.   Something like that.

 9        Q.   Have you ever talk to Elliot Gersten?

10        A.   No.

11        Q.   Did you review any documents for this

12   deposition?

13             MR. McCLOSKY:   That calls for a yes or no

14        response.

15        A.   Yes.

16        Q.   What documents did you review?

17             MR. McCLOSKY:   Don't answer that question.

18        That's attorney-client work product privilege,

19        any documents she saw she did at my request.

20        She's not going to disclose what those

21        documents were.

22             MS. TAYLOR:   That's fine.

23             Did you receive that fax, Elliot?

24             MR. GERSTEN:   Yeah, I got about four or

25        five of them.
```

page 120

Porfiri, Carine M., M.D.

page 121

1            MS. TAYLOR:  You got four or five fax or

2       four or five pages?

3            MR. GERSTEN:  It looks like they came in

4       at different times.  So it looks like four or

5       five different faxes.

6            (Thereupon, a discussion was held off the

7       record; after which the following proceedings

8       were had:)

9            MS. TAYLOR:  I'm going to hand Dr.

10       Porfiri H10062.

11            MR. GERSTEN:  Okay.  Why don't you go

12       ahead while I'm looking for it. H10042,

13       correct?

14            MS. TAYLOR: 10062.

15       Q.   If you can take look at that document real

16  quick, Dr. Porfiri.

17            MR. GERSTEN:  It's a five-page document?

18            MS. TAYLOR:  Yes.  Six.

19  BY MS. TAYLOR:

20       Q.   Let me ask you, Dr. Porfiri, were you

21  aware that Dr. McCulloch had hired an attorney to

22  represent her regarding a dispute she was having

23  with JFK?

24       A.   Not that I recall, no.

25       Q.   So you were not aware of that?

Porfiri, Carine M., M.D.

page 122


```
 1      A.   No.

 2           MR. GERSTEN:   Her answer was that she

 3      didn't recall.

 4      Q.   Yes.

 5      A.   Not that I remember, no.

 6      Q.   Do you recall Dr. McCulloch ever telling

 7      you anything about JFK trying to coerce her into

 8      relocating her medical practice?

 9      A.   No.

10      Q.   Were you aware of any problems that Dr.

11      McCulloch had sharing an office with Dr. Spurlock?

12           MR. GERSTEN:   Objection.

13      A.   Very vaguely.

14      Q.   Do you recall anything that Dr. McCulloch

15      may have told you about her relationship with Dr.

16      Spurlock?

17      A.   Specifically.  I do recall that he asked

18      him to cover -- her to cover for him on weekends and

19      it had been several weekends in a row.

20      Q.   Do you recall anything else?

21      A.   Not really, no.

22      Q.   I'm going to hand you what's been marked

23      as Exhibit No. 4 and by the way that Exhibit No. 3

24      was a letter from for purposes of the record a

25      December 7, 1994 letter from Helga Carr to Rich
```

Porfiri, Carine M., M.D.

page 123

1    Casio and Denise Barton at JFK Medical Center.

2        I'm going to hand you what's been marked as

3    Exhibit 4 which is a January 16, '95 letter from

4    Dennis Barton to Candi McCulloch.

5            MR. GERSTEN:  What document is this?

6            MS. TAYLOR:  It's H9883 to 84.

7            MR. GERSTEN:  What does this document

8        purport to be?

9            MS. TAYLOR:  January 16, '95 letter from

10       Dennis Barton to Dr. McCulloch.

11           MR. GERSTEN:  How many pages is this one?

12           MS. TAYLOR:  Two.

13           (Thereupon, Defendant's Exhibits Numbers 3

14       and 4 were marked for identification.)

15           MR. GERSTEN:  You marking this document

16       as an exhibit.

17           MS. TAYLOR:  Yes, but that doesn't

18       necessarily mean she can prove it up though, I

19       will fully admit that.

20       Q.    Let me ask you were you aware that Dr.

21   McCulloch was placed on restriction by JFK for

22   incomplete records?

23       A.    No.

24       Q.    Do you recall Dr. McCulloch ever telling

25   you anything about JFK complaining about her filling

Porfiri, Carine M., M.D.

page 124


1    out records?

2         A.   No.

3         Q.   I'm going to hand you what's been marked

4    as Exhibit No. 5 which is a memo from Ann Leopold to

5    Paul Meyer dated May 12th, '95.  It's H9868 through

6    9872.

7              MR. GERSTEN:  Is this the Epstein

8         document?

9              MS. TAYLOR:  The what?

10             MR. GERSTEN:  Epstein.

11             MS. TAYLOR:  Yes.

12             MR. McCLOSKY:  My only comment is it

13        doesn't appear to be complete.  There is no

14        signature page.  Is your last page page number

15        five?

16             MS. TAYLOR:  Yes.  The last sentence is I

17        would be happy to discuss these issues with you

18        further, please feel free to call me.

19             MR. McCLOSKY:  No.

20             MR. GERSTEN:  This 9868 through 9875?

21             MS. TAYLOR:  Right.

22             Just look at that real quickly, Dr.

23        Porfiri.

24             (Thereupon, Defendant's Exhibit Number 5

25        was marked for identification.)


page 124

Porfiri, Carine M., M.D.

page 125


1        A.    Okay.

2        Q.    Let me ask you were you aware that JFK

3    was making complaints that Dr. McCulloch was not

4    working her full 16 hours of clinical hours a week?

5             MR. GERSTEN:  Objection.

6        Q.    Did Dr. McCulloch ever tell you that JFK

7    was complaining about the number of clinical hours

8    she was performing per week?

9             MR. GERSTEN:  Objection.

10       A.    I don't recall that specifically.

11       Q.    Do you recall when you were sharing an

12   office with Dr. McCulloch were there ever times that

13   she just didn't show up for work that you remember?

14            MR. GERSTEN:  Objection.

15       A.    No.

16       Q.    Do you recall patients ever complaining

17   about Dr. McCulloch keeping them waiting for long

18   periods of time?

19       A.    No.

20            MR. GERSTEN:  Objection.

21       Q.    Do you recall Dr. McCulloch ever telling

22   you anything about JFK complaining that she wouldn't

23   answer her beeper?

24            MR. GERSTEN:  Objection.

25       A.    No.

Porfiri, Carine M., M.D.

page 126


1        Q.   I'm going to hand you what's been marked

2    Exhibit 6 and 7.  And Elliot this is H195, and then

3    the second which is Exhibit 7 is H5237 and 38.

4    These are pharmacy records.

5             MR. GERSTEN:  H195 and 5237?

6             MS. TAYLOR:  Yes.

7             MR. GERSTEN:  Thank you.

8             (Thereupon, Defendant's Exhibits

9        Numbers 6 and 7 were marked for

10       identification.)

11            MR. GERSTEN:  Which one are you

12       marking as 6?

13            MS. TAYLOR:  6 is H195 it's the

14       single page, pharmacy record.

15       Q.   Let me ask you on Exhibit No. 6 it

16   appears that on April 20, 2000 that Dr. McCulloch

17   filled a prescription for Ultram that you had

18   prescribed her; is that correct?

19       A.   Um-hum, yes.

20       Q.   And from this document it looks like that

21   you gave her at least four refills of that of

22   Ultram; is that correct?

23            MR. McCLOSKY:  You're asking her is

24       that correct in what the document says?

25            MS. TAYLOR:  In what the document


page 126

Porfiri, Carine M., M.D.

page 127

```
 1        says.

 2        A.    Yes.

 3        Q.    Let me ask you this, are there any kind of

 4   guidelines for prescribing medication when you

 5   haven't seen a patient say in over a year?

 6              MR. GERSTEN:  Objection.  I don't

 7         even understand the question.

 8        Q.    Are there any kind of guidelines for

 9   prescribing medications in terms of regularity of

10   office visits?

11        A.    Each physician has his or her own

12   guidelines.

13        Q.    So.

14              MR. GERSTEN:  The answer is -- I can

15         barely hear the doctor.

16              MR. McCLOSKY:  She said each physician his

17         or her own guidelines.

18              MR. GERSTEN:  Thank you.

19        Q.    So you're not aware of any published

20   guidelines?

21        A.    I am not.

22        Q.    Let's turn to Exhibit Number Seven, and at

23   the top of the page there is a notation that you had

24   -- the document says you had prescribed hydrocodone

25   for Dr. McCulloch on February 14, 2001; is that
```

Porfiri, Carine M., M.D.

page 128


1    correct?

2              MR. McCLOSKY:  Again, you're just asking

3         her is that correct in that is what Exhibit

4         Number Seven states, correct?

5              MS. TAYLOR:  Correct.

6         A.   Yes.

7         Q.   And the document indicates that you had

8    given her two refills of hydrocodone; is that

9    correct?

10        A.   Yes.

11        Q.   When was the last time you had seen Dr.

12   McCulloch in the office?

13        A.   I don't recall.

14        Q.   Would it be the March 5th, '99 office note

15   that we discussed earlier?

16        A.   It could have been, yes.

17        Q.   So that was approximately two years prior

18   to prescribing or what this document shows that she

19   filled a prescription for hydrocodone on February

20   14, 2001; is that correct?

21        A.   Yes.

22             (Thereupon, Defendant's Exhibit

23        Number 8 was marked for identification.)

24   BY MS. TAYLOR:

25        Q.   Let me hand you what has been marked as

Porfiri, Carine M., M.D.

page 129

1   Exhibit No. 8.

2          Elliot, this is H5040 through 41.

3          MR. GERSTEN:  Can I have that number

4     one more time, please.

5          MS. TAYLOR:  5040 through 41.

6          MR. GERSTEN:  5041.

7          MS. TAYLOR:  5040 to 41, correct.

8          MR. GERSTEN:  I have 5041.

9          MS. TAYLOR:  That's the second page of the

10     document.

11          MR. GERSTEN:  I would gather that.

12     I'm looking for the first page.

13          What does the first page look like?

14          MS. TAYLOR:  It's JFK Medical Center

15     on the top.  It says Certification of

16     Healthcare Provider Family and Medical

17     Leave Act of 1993.

18          MR. GERSTEN:  I don't have it yet.

19          MR. McCLOSKY:  It's a one-page

20     document but it's been copied on two

21     pages.  I think the second page that we

22     have is actually the flip side of a

23     one-page document.

24          MR. GERSTEN:  Go ahead, ask your

25     question.

Porfiri, Carine M., M.D.

page 130


1    BY MS. TAYLOR:

2         Q.   Dr. Porfiri, let me ask you on the second

3    page which is marked H5041 is that your signature?

4         A.   Yes.

5              MR. GERSTEN:  Can you say that the

6         question one more time?

7              MR. McCLOSKY:  She's just

8         authenticating the signature, Elliot.

9              MR. GERSTEN:  Thank you.

10        Q.   If you can turn to the first page of this

11   document.  The typewritten portion, is that

12   something your office typed up, do you know?

13        A.   I have no idea.

14        Q.   But if you signed the document is it fair

15   to say that you reviewed the answers?

16        A.   Yes.

17        Q.   To the questions?

18        A.   Yes.

19        Q.   In number three which is asking a question

20   about a serious question under the Family Medical

21   Leave Act you said that her condition was a category

22   four, what is a category four?

23        A.   A chronic condition requiring treatment.

24   It's on the next page.

25        Q.   So under categories on the second page the


page 130

Porfiri, Carine M., M.D.

page 131


1    chronic condition required treatment?

2         A.    Correct.

3         Q.    And in number four that's your description

4    of Dr. McCulloch's condition?

5         A.    Correct.

6         Q.    Anywhere in number four do you mention

7    anything about Dr. McCulloch having to take FMLA

8    leave because she taking narcotic medication?

9         A.    In number four

10        Q.    Yes.

11        A     No.

12        Q.    Let me ask you this, anywhere else in this

13   document do you state that Dr. McCulloch needs to

14   take FMLA leave because she's taking narcotic pain

15   medication?

16        A.    That's kind of a tricky question.

17             MR. McCLOSKY:   Lawyers are good at that.

18        A.    Because if you look at 6C her regimen does

19   include prescription medication and prescription

20   pain killers.

21        Q.    But would you agree this your

22   certification for her leave does not mention that

23   she needs to take leave because of the narcotic pain

24   medication?

25             MR. GERSTEN:   Objection.

Porfiri, Carine M., M.D.

page 132

```
 1      A.   I still have to clarify that.

 2      Q.   Go ahead.

 3      A.   You're asking me if I'm stating that the

 4  prescription medication is the result of her not

 5  being able to -- results in her not being able to

 6  work and therefore she has to leave; is that what

 7  you're asking me?

 8      Q.   Yes?

 9      A.   It does not state that here.

10      Q.   Let me ask you this, at this time when you

11  filled out this certification for FMLA leave, did

12  you have any idea in your mind how long Dr.

13  McCulloch would need to be off work?

14      A.   No.

15      Q.   Did you ever discuss that with her that

16  you recall?

17      A.   That I recall, no.

18      Q.   I hand you what's been marked as Exhibit

19  Number 9.  And Elliot, this is H948.

20           (Thereupon, Defendant's Exhibit

21      Number 9 was marked for identification.)

22           MR. GERSTEN:  What does it look like?

23           MS. TAYLOR:  It's the UNUM

24      letterhead.  It's a letter to Dr. Porfiri.

25           MR. GERSTEN:  Found it, thank you.
```

page 132

Porfiri, Carine M., M.D.

page 133


1        Is it a one-page document?

2            MS. TAYLOR:  Yes.

3            MR. GERSTEN:  Is it a one-page

4        document?

5            MS. TAYLOR:  Yes.

6            MR. McCLOSKY:  What's the Bates

7        number.

8            MS. TAYLOR:  H948.

9            MR. GERSTEN:  This is Exhibit 9?

10           MS. TAYLOR:  Yes, 9.

11   BY MS. TAYLOR:

12       Q.   Is this your handwriting on this document

13   Dr. Porfiri?

14       A.   Yes.

15       Q.   And in response to question one which asks

16   what are Dr. McCulloch's current restrictions and

17   limitations and how do they prevent her from working

18   on a part-time or full-time basis, what was your --

19   could you read your response to that?

20       A.   Chronic and debilitating pain from

21   cervical disc pathology and inability to lift heavy

22   items.

23       Q.   Let me ask you this, in this response

24   regarding her restrictions and limitations do you

25   mention that, that she can not work as a result of


page 133

Porfiri, Carine M., M.D.

page 134

1    taking narcotic pain medication?

2        A.   I do not mention that.

3        Q.   And in number three UNUM is asking you

4    what the prognosis is for Dr. McCulloch to return to

5    work on a part-time or full-time basis, can you read

6    that response for me?

7        A.   Unknown at this time, we are waiting to

8    see what progress she makes with her physical

9    therapy.

10       Q.   So at this time January 10, 1996, did you

11   believe that Dr. McCulloch could never return to

12   work?

13            MR. GERSTEN:  Objection.

14       Q.   Let me put it this way, did you believe at

15   this time that there was a possibility that some day

16   she could return to work?

17            MR. GERSTEN:  Objection.

18            MR. McCLOSKY:  Object to the form.

19       A.   I didn't know at that time.

20       Q.   I'm going to hand you what's been marked

21   Exhibit No. 10.  And Elliot, this is H2060 to 61.

22            (Thereupon, Defendant's Exhibit

23            Number 10 was marked for identification.)

24            MR. GERSTEN:  What does it look like?

25            MS. TAYLOR:  It's a letter from

page 134

Porfiri, Carine M., M.D.

page 135


1          Educators from John Craft to Dr.

2      McCulloch.

3          MR. GERSTEN:  Okay, thank you.

4      Q.  Dr. Porfiri, if you could look at Exhibit

5  No. 10 and tell me if you've ever seen a copy of

6  that letter before, if you can just read through it?

7      A.  It looks familiar.

8      Q.  And you saw Dr. McCulloch in your office

9  on November 11, 1997, is that correct?  Do you want

10  to take a look at your office notes?

11      A.  Yes, that's correct.

12      Q.  Is it possible that Dr. McCulloch brought

13  a copy of this letter with her to the visit?

14          MR. McCLOSKY:  Object to the form.

15      A.  It is possible.

16      Q.  Let me ask you this, do you recall ever

17  having a discussion with Dr. McCulloch where she --

18  scratch that.

19          Did you ever discuss with Dr. McCulloch her

20  disability claim with Educators Mutual Life?

21      A.  Specifically, I don't recall.

22      Q.  So you don't know if Dr. McCulloch ever

23  told you that Educators was claiming that there was

24  no objective or clinical evidence that she was

25  disabled?

Porfiri, Carine M., M.D.

page 136

| | |
|---|---|
| 1 | MR. GERSTEN:  Objection. |
| 2 | A.  I don't recall. |
| 3 | MR. McCULLOCH:  I want you to read back |
| 4 | her response, please. |
| 5 | (Whereupon, the reporter read from the |
| 6 | record as requested.) |
| 7 | MR. McCULLOCH:  She said "I don't recall |
| 8 | that." |
| 9 | Q.  Let me hand you what's been marked as |
| 10 | Exhibit No. 11, take a look at this. |
| 11 | And Elliot this is H5019 to 20. |
| 12 | MR. GERSTEN:  What is it? |
| 13 | MS. TAYLOR: H5019, H5020. |
| 14 | MR. GERSTEN:  What does this one look |
| 15 | like? |
| 16 | MS. TAYLOR:  This is a December 16th, '97 |
| 17 | letter from Dr. Porfiri to John Craft at Educators. |
| 18 | MR. GERSTEN:  You're marking this as what, |
| 19 | 11? |
| 20 | MS. TAYLOR:  Yes. |
| 21 | MR. GERSTEN:  Thank you. |
| 22 | (Thereupon, Defendant's Exhibit Number 11 |
| 23 | was marked for identification.) |
| 24 | Q.  Did you write this letter, Dr. Porfiri? |
| 25 | A.  Yes. |

page 136

Porfiri, Carine M., M.D.

page 137


1       Q.   Did Dr. McCulloch request that you write

2    this letter if you recall?

3       A.   Yes.

4       Q.   And is this letter a response to Mr.

5    Craft's November 1997 letter?

6       A.   Yes.

7       Q.   So then it is fair to say that you were

8    aware that Educators was questioning whether she was

9    continually disabled?

10              MR. GERSTEN:   Objection.

11              MR. McCLOSKY:   Answer if you can.

12       A.   Yes.

13       Q.   I just want to ask you a few questions

14    about this letter.

15       Why did you write this letter, if you recall?

16       A.    It says in the second paragraph that

17    basically I disagreed with contents of the letter.

18       Q.    What specific contents did you disagree

19    with?

20       A.    The first statement that the treatment

21    notes provided no objective clinical evidence of

22    ongoing disabling condition?

23       Q.    So you disagreed with that?

24       A.    Yes.

25       Q.    Why did you disagree with that?

Porfiri, Carine M., M.D.

page 138

1           MR. GERSTEN:   Objection.

2           MR. GERSTEN:   You asking her for the

3      reasons that she disagreed with that?

4           MS. TAYLOR:   Yes.

5      A.   Ask the question again, I'm sorry.

6      Q.   You said that you disagreed with Mr.

7      Craft's statement that there was no objective

8      clinical evidence of an ongoing disability; is that

9      correct?

10     A.   Correct.

11     Q.   What were the reasons why you disagreed

12     with that?

13     A.   They mentioned here in the note.  In

14     reference to Dr. Katzell's note that I found that

15     there was stating objective clinical evidence of her

16     ongoing disabling condition.

17     Q.   And do you recall what there was in Dr.

18     Katzell's notes that would provide objective

19     clinical evidence of an ongoing disabling condition?

20     A.   He made reference to her MRI findings.  He

21     mentioned severe spasm.

22     Q.   Can I ask you this, do you recall if Dr.

23     Katzell opined that Dr. McCulloch had chronic pain

24     syndrome?

25     A.   Do I recall, without seeing his notes in

page 138

Porfiri, Carine M., M.D.

page 139


1    front of me, no.

2        Q.   But that was your opinion that she had

3    chronic pain syndrome?

4        A.   Correct.

5        Q.   And in your last -- on page H5019 the last

6    sentence you state "Perhaps in your business one

7    ignores the subjective finding or considers them to

8    be nontruths or simply unimportant."

9            So from that statement would you then agree

10   that subjective findings are very important in terms

11   of a patient's condition or Dr. McCulloch's

12   condition?

13       A.   Yes.

14           MR. GERSTEN:  Objecting.  I didn't

15       understand the question.

16           MS. TAYLOR:  I'm sorry.

17           MR. GERSTEN:  I'm objecting.  I didn't

18       understand the question.

19   BY MS. TAYLOR:

20       Q.   So is it fair to say that Dr. McCulloch's

21   subjective complaints were significant to you in

22   terms of your opinions about her condition?

23           MR. GERSTEN:  Objection.

24       Q    Do you understand the question?

25       A.   I understand the question.

Porfiri, Carine M., M.D.

page 140

1        Yes.

2        MR. GERSTEN:  You understand it, Doctor,

3    this question used the word significant.

4        MS. TAYLOR:  Elliot, I'm going to

5    ask that you make proper objection and not

6    continue to coach the witness.  First of

7    all, we're trying to get Dr. Porfiri out

8    of here and these long extended

9    objections, if you object to the question,

10   that's fine but you can object properly.

11       MR. GERSTEN:  Objected to the form

12   and I continue to do what I'm suppose to

13   to do.  Thank you.

14       MR. McCLOSKY:  Speak up, Elliot.

15       MR. GERSTEN:  I'll continue to object

16   properly, thank you.

17       MS. TAYLOR:  Your objections are

18   noted but I would like to get Dr. Porfiri

19   out of here so she doesn't have to come

20   back another day.  I'm sure she doesn't

21   want to do that.

22       MR. McCLOSKY:  Elliot, are you far

23   away from your phone?  Can you move closer

24   to your phone?

25       MR. GERSTEN:  Sure, no, I'm right

Porfiri, Carine M., M.D.

page 141

1    here.  I didn't respond to that.  I'm not

2    here to argue with her.

3         MR. McCLOSKY:  That's fine, that's

4    perfect the way you're speaking right now.

5    The videographer is having a hard time

6    hearing you.

7  BY MS. TAYLOR:

8    Q.   Dr. Porfiri, turn to the second page of

9  your letter on H5020.  And then the first sentence

10 hear you say "In my business it's important to

11 believe the patient?"

12   A.   Um-hum.

13   Q.   So you would agree that it was important

14 for to you believe what Dr. McCulloch was telling

15 you about her condition?

16   A.   You have to be more specific with the

17 question.

18   Q.   Did you feel that it was important to

19 believe what Dr. McCulloch was telling you about her

20 condition?

21   A.   Yes.

22   Q.   Let me ask you this, in that same

23 paragraph you refer to straightening of the cervical

24 neck spine, what is that?  Straightening of the

25 cervical neck spine?

page 141

Porfiri, Carine M., M.D.

page 142


 1      A.   You would see that on films, if you have a

 2   straightening of the normal curvature of the

 3   cervical neck then you have muscular spasm of the

 4   neck.

 5      Q.   Is that something you would have seen in

 6   Dr. Katzell's notes?

 7      A.   It could have been, yes.

 8      Q.   And that straightening is that also

 9   referring to the cords of muscle in the upper back

10   and neck?

11      A.   They're involved in that straightening

12   process.

13      Q.   And when you say atrophy neck muscles,

14   what are you referring to?

15      A.   Weakened muscles.  They have actually

16   shrunk in size.

17      Q.   So would it be like a tightening of the

18   muscles?

19      A.   No, it's a shrinking in size of the

20   muscle.

21      Q.   Would that -- what would the result be of

22   a shrinking in the size of the muscles, what sort

23   of --

24      A.   A visual inspection you could see that.

25   You could see, if some muscles are atrophied you can

Porfiri, Carine M., M.D.

page 143


1   see it.

2        Q.   So you can see it just by looking at the

3   person?

4        A.   Yes.

5        Q.   What would you see that would show that

6   muscles are atrophied?

7        A.   If for instance you're looking at a

8   person's biceps, one would be a lot smaller than the

9   other, for instance, the one that's smaller could be

10  atrophied.

11       Q.   On the second paragraph you say Dr.

12  McCulloch continues to see Dr. Katzell and me on a

13  regular basis, how would you define regular basis?

14       A.   That could be yearly, could be every six

15  months.

16       Q.   And then later on in this paragraph you

17  say you discussed with Dr. McCulloch that you

18  believe physical therapy was futile; is that

19  correct?

20       A.   Correct.

21       Q.   Why did you believe physical therapy was

22  futile?

23       A.   It states here she's tried them over and

24  over again at great expense to herself with

25  ultimately no benefit.

Porfiri, Carine M., M.D.

page 144


```
 1      Q.   Did you ever see any objective evidence

 2   from examining Dr. McCulloch that the physical

 3   therapy had improved her condition at all?

 4      A.   Had improved her condition at all, no.

 5      Q.   Then you tell Mr. Craft, "There are times

 6   when a cure is not easy and may never be found.  I

 7   do not believe this to be the case here."

 8      So it is fair is say that on December 16, 1997

 9   you thought that there might be a resolution to Dr.

10   McCulloch's problems?

11           MR. GERSTEN:  Objection.

12      A.   That there could be.

13      Q.   So you believe that there might be some

14   sort of --

15      A.   Possibly.

16      Q.   I'm sorry, I didn't mean to interrupt

17   you.

18           MR. GERSTEN:  Jessica, did you finish

19      the question?

20           MS. TAYLOR: I did.

21           (Thereupon, Defendant's Exhibit

22      Number 12 was marked for identification.)

23   BY MS. TAYLOR:

24      Q.   I'm going to hand you what's been marked

25   deposition Exhibit No. 12.
```


page 144

Porfiri, Carine M., M.D.

page 145


1          And Elliot this is H4234 and 4235 which is the

2     attending physician's statement to Hartford.

3               MR. GERSTEN:   Thank you.   Did you say

4          number 12?

5               MS. TAYLOR:   Yes.

6          Q.   On page 2 of this document, Dr. Porfiri,

7     which is H4235, is that your signature on the bottom

8     of the page?

9          A.   Yes.

10         Q.   And is this your handwriting on this

11    document except for the very top part of H4234?

12         A.   Yes.

13         Q.   And under number one which is diagnosis

14    it states that the date of your last examination was

15    November 18, 1999?

16         A.   Yes.

17         Q.   Do you have an office note from that date?

18         A.   I don't know.

19         No.

20         Q.   Is it possible that this is a typo?

21         A.   It's possible.

22         Q.   Is it true that the last note that you

23    have of an actual office visit with Dr. McCulloch

24    was in March of '99?

25         A.   Correct.


page 145

Porfiri, Carine M., M.D.

page 146


1        Q.    Is it correct that you filled out this

2    form on January 28th of 2000?

3        A.    Yes.

4        Q.    And in the description of diagnosis you

5    gave to Hartford you stated that her diagnosis was

6    chronic pain, herniated cervical disc, TMJ and

7    migraines; is that correct?

8        A.    Yes.

9        Q.    And in the ICD9 codes do those correspond

10   with the four diagnoses?

11       A.    As far as I know.

12       Q.    And then the subjective symptoms those

13   would be what Dr. McCulloch had described to you; is

14   that correct?

15       A.    Correct.

16             MR. GERSTEN:   Could you say that a little

17       louder.

18             MS. TAYLOR: The subjective symptoms

19       that would be what Dr. McCulloch described

20       to you, is that correct, and she said

21       correct.

22       Q.    So the subjective symptoms you listed were

23   pain in neck, upper back, right shoulder, jaw pain,

24   severe head pain and migraines; is that correct?

25       A.    Yes.


page 146

Porfiri, Carine M., M.D.

page 147


1        Q.    In the objective findings would be what

2    you had found on examination?

3        A.    Yes.

4        Q.    And here you note scars anterior and

5    posterior neck, what is that referring to?

6        A.    Those refer to the scars from her prior

7    two surgeries.

8        Q.    And those are the surgeries in '89 and

9    '90?

10       A.    Yes.

11       Q.    And then you also noted that you found

12   objective evidence of decreased range of motion in

13   the neck; is that correct?

14       A.    Yes.

15       Q.    And muscle spasm in the neck and shoulder

16   muscles bilaterally?

17       A.    Yes.

18       Q.    And in the muscle atrophy which we

19   described a few minutes ago?

20       A.    Yes.

21       Q.    There is kind of a line and then you make

22   a notation about a September '98 MRI of the cervical

23   spine, is that what that says?

24       A.    Yes.

25       Q.    Was that the latest MRI that you were

Porfiri, Carine M., M.D.

page 148


1    aware of at the time you filled out this form; do

2    you know?

3        A.    I don't know.

4        Q.    This fusion C6, C7 is that referring to

5    the earlier surgery?

6        A.    What I have right here is what the

7    findings were on that MRI so.

8        Q.    The fusion, I see what you're saying.

9        So the fusion C6, C7 is referring to the MRI?

10       A.    Yes.

11       Q.    Next to that it looks like PPD?

12       A.    DDD.

13       Q.    DDD, what is that?

14       A.    Degenerative disc disease with posterior

15    osteophyte formation.  All I wrote here is the MRI

16    findings in that whole little area.

17       Q.    What is posterior osteophyte formation?

18       A.    That she had a bony formation on the

19    posterior aspect of the cervical spine.

20       Q.    Is that something, if you know, that could

21    be caused just by age, just by aging?

22            MR. GERSTEN:  By AIDS or by age?

23            MS. TAYLOR:  Aging.

24       A.    It's possible.

25       Q.    And then underneath there if you can read

Porfiri, Carine M., M.D.

page 149

1   that narrow left?

2        A.    Intervertebral foramen C5, C6.

3        Q.    What is inter --

4        A.    Intervertebral foramen is a little whole

5   basically where the nerve root exits so it's

6   narrowed.

7        Q.    Is that something that could be caused by

8   aging, if you know?

9        A.    The narrowing, degenerative disc disease

10  could lead to that.

11       Q.    Is degenerative disc disease a result of

12  aging?

13             MR. McCLOSKY:   You talking about

14             generally or with this particular

15             patient?

16       Q.    Generally?

17       A.    Generally it can be.

18       Q.    On the dates of treatment the first visit

19  it states October 17, '95?

20       A.    Yes.

21       Q.    Based on our review of the office notes;

22  is that accurate?

23       A.    Yes.  Wait a minute, the date of first

24  visit, no.

25       Q.    And then under the frequency you have a

Porfiri, Carine M., M.D.

page 150

1    little what looks like a G with a line under it?

2         A.    That's Q which means every.

3         Q.    Which means every.  So you state that you

4    saw her every six months by office visit; is that

5    accurate based on the office notes?

6         A.    Roughly, yes.

7         Q.    Isn't it true if you look at your office

8    notes that the only time it approximates six months

9    is between November 18th, '98 and March 5th, '99?

10        A.    I have them all out of order, I'm sorry.

11        Q.    That's okay.

12        A.    In '97 there was nine months between and

13   from '96 to '97 is four months, and so it was

14   yearly, so it's --

15        Q.    So it ranges from anywhere?

16        A.    It ranges.

17        Q.    And then under nature of treatment?

18        A.    Yes.

19        Q.    You note the patient has undergone

20   physical therapy with five different therapists

21   without improvement or help?

22        A.    Yes.

23        Q.    And without improvement or help is that

24   just referring to the physical therapy itself?

25        A.    Yes.

Porfiri, Carine M., M.D.

page 151

1    Q.   Would you agree that there was a time

2  period though particularly in '97 where her

3  condition was improving?

4         MR. GERSTEN:  Objection.

5    A.   '97, it says basically unimproved.

6    Q.   What about July of '97?

7    A.   That's the only time there was some

8  improvement.

9    Q.   She was able to walk five miles every

10  other day, that's what she reported to you at that

11  time?

12    A.   Yes.

13    Q.   When you state under progress that Dr.

14  McCulloch was ambulatory, what does ambulatory mean?

15    A.   It means she can walk.

16    Q.   And then under nature of treatment, you

17  kind of added on the bottom the medications Ultram

18  and then Vicodin and Percocet, are these consistent

19  with the dosages that were you prescribing for her?

20    A.   Yes.

21    Q.   Between '95 and '99?

22    A.   Yes.

23    Q.   Then on the next page if you look at

24  physical impairment on the bottom -- let me ask you

25  this, it doesn't look like you filled out any of the

page 151

Porfiri, Carine M., M.D.

page 152


1    classes.  Is there a class that would you have

2    designated for Dr. McCulloch at that time?

3         A.   No, because there are no definitions here.

4         Q.   So you didn't feel that anything here you

5    could answer?

6         A.   Yeah.

7         Q.   But you did state, Dr. McCulloch is unable

8    to perform the material duties of her profession?

9         A.   Correct.

10        Q.   Are those the limitations we referred to

11   earlier?

12        A.   Yes.

13        Q.   Then under prognosis when it asks "Do you

14   expect a fundamental or market change in the

15   future?" And you put "no".  So is it fair to say at

16   this time that you didn't expect Dr. McCulloch's

17   condition for her to improve?

18        A.   Yes.

19        Q.   Then you state under here "The chronic

20   condition of patient's cervical neck pathology is

21   likely to worsen rather than improve."  What did you

22   mean that it was likely to worsen?

23        A.   Just what I wrote.

24        Q.   Why did you believe that it would worsen?

25        A.   Because she certainly hadn't gotten any

Porfiri, Carine M., M.D.

page 153


1    better and gotten worse over the course of my seeing

2    her.

3        Q.    Under remark you say that "Dr. McCulloch

4    continues to try to do anything to increase her

5    strength and decrease her chronic pain."  What were

6    you aware of that Dr. McCulloch was trying to do?

7        A.    We talked about it earlier, all the things

8    she tried: Yoga, acupuncture, acupressure, healing

9    hands, hands healing, all of it.

10       Q.    And you don't know what that healing hands

11   was referring to?

12       A.    I don't recall.

13       Q.    Let me ask you real quick on this

14   attending physician statement of disability, where

15   on here do you tell Hartford that Dr. McCulloch

16   can't perform the material duties of her profession

17   because she's taking narcotic pain medication?

18       A.    It doesn't say that.

19           MS. TAYLOR:  I don't have that much

20       left but I've got to run to the restroom.

21       So I don't know if you want to stay on the

22       phone, Elliot?

23           MR. GERSTEN:  I sorry, I couldn't

24       hear what you said.

25           MS. TAYLOR:  I've got to run to the

Porfiri, Carine M., M.D.

page 154


1      restroom.

2          MR. McCLOSKY:  We're going to take a

3      five minute break, Elliot.

4          (Thereupon, a recess was taken; after

5      which the following proceedings were had:)

6          MS. TAYLOR:  Elliot, I'm going to go

7      ahead and play it and let her watch it.

8          MR. GERSTEN:  Note my objection for

9      the record.

10         MS. TAYLOR:  Well, you could have

11     been here.

12         (Thereupon, a videotape was played.)

13  BY MS. TAYLOR:

14     Q.   Can you identify the woman in the video?

15     A.   I guess I know who it is already since you

16  told me.

17         MR. McCLOSKY:  That's an important

18     question, Doctor, so it's one thing for

19     somebody to tell you something, another

20     thing to testify based on your own

21     observations.

22     A.   It looks like somebody I know.

23     Q.   Does it look like Doctor Candi McCulloch?

24     A.   It does.

25     Q.   Let me ask you this, based on what you


page 154

Porfiri, Carine M., M.D.

page 155

```
 1    just watched in the video -- based on what you

 2    watched in the video did it appear that Dr.

 3    McCulloch was in debilitating pain?

 4            MR. GERSTEN:  Objection.

 5            MR. McCLOSKY:  Object to the form.

 6       A.   I can't tell that from the video.

 7       Q.   Did you see any objective signs that Dr.

 8    McCulloch was in pain?

 9            MR. GERSTEN:  Objection.

10       A.   I can't answer that from that.

11       Q.   Did it appear in the video that Dr.

12    McCulloch's cognitive abilities were limited by pain

13    medications?

14            MR. GERSTEN:  Objection.

15       A.   I can't tell that.

16       Q.   Did it appear from the video that Dr.

17    McCulloch is unable to lift heavy items?

18            MR. GERSTEN:  Objection.

19       A.   No.

20            MR. GERSTEN:  What was the answer?

21            MS. TAYLOR:  No.

22       Q.   Did it appear from the video that Dr.

23    McCulloch had limited range of motion in her neck?

24            MR. GERSTEN:  Objection.

25       A.   I can't tell from that video.
```

page 155

Porfiri, Carine M., M.D.

page 156


1      Q.   Does it appear from the video if it looks

2    like Dr. McCulloch is following your recommendation

3    that she rest to see if she can prevent from having

4    surgery?

5      A.   I can't tell that from that video.

6           MR. McCLOSKY:  Mr. Videographer, your

7           videotape has on the record that which is

8           shown to the witness, correct, on the

9           video?

10          VIDEOGRAPHER:  Correct.

11   BY MS. TAYLOR:

12     Q.   Does it appear that Dr. McCulloch is

13   resting in the video?

14     A.   At one point, yes.

15     Q.   Which point was that?

16     A.   Sitting on the ground.

17     Q.   How about when she was carrying her

18   daughter into the house?  Did it appear that Dr.

19   McCulloch was resting?

20     A.   Did not appear at that time that she was

21   resting.

22          MS. TAYLOR:  Elliot, I'm now showing

23          her the Hartford video.

24          MR. GERSTEN:  I'm objecting again.

25          MS. TAYLOR:  That's fine.

Porfiri, Carine M., M.D.

page 157

1            (Thereupon, a videotape was played.)

2       Q.    Can you identify the person in the video I

3    just showed you?

4       A.    Yes.

5       Q.    Who is that person?

6       A.    Dr. McCulloch.

7       Q.    And what did it appear that Dr. McCulloch

8    was doing in the video?

9       A.    Driving.

10      Q.    What else was she doing?

11      A.    Nothing else that I saw.

12      Q.    Was Dr. McCulloch not talking on the

13   phone?

14      A.    I did not see that.

15      Q.    Does it appear that Dr. McCulloch has a

16   phone on her shoulder?

17      A.    Honestly, I really can't see that.

18      Q.    That's fine.

19            Let me ask you, does it appear that Dr.

20   McCulloch is unable to lift heavy items from that

21   portion of the video you just watched?

22      A.    I didn't see her lift anything.

23      Q.    Does it look like she cannot carry heavy

24   items?

25      A.    I saw her carrying something, I don't know

Porfiri, Carine M., M.D.

page 158

1    how heavy.

2        Q.   Did it appear that Dr. McCulloch was

3    limping in the video?

4        A.   I couldn't tell that from the video.

5        Q.   Let me ask you this, from what you just

6    reviewed, can you identify the person in the video?

7        A.   Yes.

8        Q.   And who was that person?

9        A.   It was Dr. McCulloch.

10       Q.   And what was Dr. McCulloch doing in the

11   video?

12       A.   Dancing.

13       Q.   And does it appear that she had stopped

14   all physical activity except for Yoga?

15            MR. GERSTEN:   Can I have the question read

16   back.

17       Q.   I asked if it appeared that she had

18   stopped all physical activity except for Yoga?

19       A.   No.

20       Q.   Does it appear that she has a limited

21   range of motion in her neck?

22       A.   Yes.

23       Q.   What in the video appeared to you that she

24   had limited range of motion in her neck?

25       A.   She really did not move her neck that

page 158

Porfiri, Carine M., M.D.

page 159


1    much, she really didn't.

2        Q.   Did it appear that she had lost all

3    flexibility in her lower back?

4        A.   I would have to see it again.

5        Q.   Well, did she bend over in the video?

6        A.   She squatted, I know that.  I don't recall

7    if she was bending forward from the waist or not.

8        Q.   But if she were bending forward from the

9    waist would you say that her statement that all

10   lower back flexibility was lost would be inaccurate?

11       MR. McCLOSKY:  Object to the form.

12       Q.   Let me ask it this way, if she were

13   bending at the waist would it appear then that she

14   had lost all lower back flexibility?

15       MR. McCLOSKY:  Object to the form.

16       MR. GERSTEN:  Objection.

17       MS. TAYLOR:  You can answer it if you

18   understand it.

19       A.   It would appear that she had some range of

20   motion of her lower back.

21       Q.   Are there any objective signs on the video

22   that Dr. McCulloch is in pain?

23       A.   I can't determine that from the video.

24       Q.   Did Dr. McCulloch bend at the waist?

25       A.   Yes.

Porfiri, Carine M., M.D.

page 160

1    Q.   In that portion of the video.

2    Do you see any objective signs that Dr.

3  McCulloch's cognitive abilities are affected by

4  narcotic pain medications in that portion of the

5  video?

6        MR. GERSTEN:  File an objection.

7    A.   I cannot tell from that video.

8    Q.   Let me ask you this, if Dr. McCulloch --

9  if narcotic pain medications makes Dr. McCulloch

10  drowsy, should she be driving?

11    A.   Depends on when she took the medicine.

12    Q.   Let me ask you this, do you see any

13  objective signs that Dr. McCulloch is under the

14  influence of alcohol?

15    A.   I cannot tell that from that video.

16    Q.   Let me ask you this, do you recall if

17  Hartford ever asked to you look at their

18  surveillance video of Dr. Porfiri?

19    A.   I don't.

20    Q.   If they had asked you would you have

21  looked at it?

22        MR. GERSTEN:  Objection.

23        MR. McCLOSKY:  Object to the form.

24        MS. TAYLOR:  You can answer it if you

25  understand.

page 160

Porfiri, Carine M., M.D.

page 161


1      A.    Only if I had to.

2      Q.    When you say if you had to, what do you

3   mean?

4            MR. GERSTEN:   Under subpoena.  Objection.

5      Q.    I ask you, what do you mean if you had to?

6      A.    It was required by law that I view it.

7            MS. TAYLOR:  Well, I have no further

8      questions for you, Dr. Porfiri.

9            MR. McCLOSKY:  Elliot, this is Greg

10     speaking.  I know indicated before that you have

11     some cross examination, I would ask that you defer

12     on those questions at this time.

13           MR. GERSTEN:  I'll defer.  The doctor has

14     to leave at three o'clock and I'm prepared to defer.

15           MR. McCLOSKY:  To resume this subject

16     whatever you all work out, we can do it all by

17     telephone.  Jessica, you don't need to come back

18     either.

19           MS. TAYLOR:  We'll see.  We'll discuss it.

20           THE REPORTER:  Mr. Gersten, this is the

21     court reporter, if this is ordered would you like a

22     copy?

23           MR. GERSTEN:  Yes, the transcript only.

24           (Thereupon, the deposition was

25     adjourned at 2:28 o'clock p.m., and the

Porfiri, Carine M., M.D.

page 162


```
 1        reading and signing were waived.)

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Porfiri, Carine M., M.D.

page 163

```
 1              CERTIFICATE OF OATH

 2    STATE OF FLORIDA,        )COUNTY OF PALM BEACH,      )

 3    I, the undersigned authority, a certify that the

 4    witness personally appeared before me and was dulysworn.

 5    WITNESS my hand and official seal this __6th___

 6    day of October, 2003.

 7              _____

 8              Angela Saxon            Notary Public - State of Florida

 9              Expires:  April 5, 2005        My Commission No. DD
13252

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

page 163


Porfiri, Carine M., M.D.

page 164


1          C E R T I F I C A T E

2

3     STATE OF FLORIDA,          )COUNTY OF PALM BEACH,          )

4

5          I, ANGELA SAXON, Registered ProfessionalReporter and Notary Public, do hereby certify that I

6     was authorized to and did report the abovedeposition in stenotype; inclusive, are a true and

7     correct transcription of my stenotype notes takenduring said deposition.

8          I further certify that I am not a relative,

9     employee, attorney or counsel of any of the parties,nor am I a relative or employee of any of the parties'

10    attorney or counsel connected with the action, nor amI financially interested in the action.

11         The foregoing certification of this transcript

12    does not apply to any reproduction of the same byany means unless under the direct control and/or

13    direction of the certifying reporter.

14         Dated this__6th___ day of October, 2003.

15

16    _____          Angela Saxon

17            Notary Public - State of Florida          Expires:  April 5, 2005

18            My Commission No. DD 13252

19

20

21

22

23

24

25


page 164